**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **IN RE: TIKTOK, INC.,** | **MDL Docket No. 2948** |
| **CONSUMER PRIVACY LITIGATION,** | |
| | **Master Docket No.: 1:20-cv-04699** |
| **This Document Relates to:** | **Hon. Rebecca R. Pallmeyer** |

| | |
|---|---|
| **Bravo v. TikTok, Inc.** | **23-cv-00225** |
| **Murphy v. TikTok, Inc.** | **23-cv-00504** |
| **Buckley v. TikTok, Inc.** | **23-cv-00841** |
| **Tado v. TikTok, Inc.** | **23-cv-01430** |
| **Recht v. TikTok, Inc.** | **23-cv-02248** |
| **Fleming v. TikTok, Inc.** | **23-cv-02260** |
| **E.K. v. TikTok, Inc.** | **23-cv-02262** |
| **Androshchuk v. TikTok, Inc.** | **23-cv-02462** |
| **Albaran v. TikTok, Inc.** | **23-cv-02463** |
| **G.R. v. TikTok, Inc.** | **23-cv-02464** |
| **Moody v. TikTok, Inc.** | **23-cv-02465** |
| **Schulte v. TikTok, Inc.** | **23-cv-02466** |
| **Fugok v. TikTok, Inc.** | **23-cv-02467** |

### *IN-APP BROWSER* PLAINTIFFS' OPPOSITION TO DISMISSAL OF THE *IN-APP BROWSER* CLAIMS ON THE BASIS OF THE *BIOMETRIC DATA* SETTLEMENT

## I.  INTRODUCTION

The *In-App Browser* cases concern TikTok's practice of secretly injecting JavaScript code into third-party websites accessed from the TikTok app, which allowed TikTok to intercept, view and record users' private activities on those websites.  TikTok used this valuable information to command massive advertising revenue.  All the *In-App Browser* cases allege federal and state wiretapping claims, which broadly prohibit the interception and eavesdropping of any wire, oral, or electronic communications without the consent of at least one of the parties to the communication.

Unfortunately, TikTok has a long history of secretly collecting user data, albeit of different forms and by strikingly different means.  In the now-terminated MDL, *In Re: TikTok, Inc., Consumer Privacy Litigation*, MDL No. 2948 (the "*Biometric Data*" case)[1], plaintiffs alleged unlawful data collection through an entirely different function of the TikTok app – the video-sharing function – and asserted different legal claims arising from that unique function.  Specifically, the *Biometric Data* case involved "defendants' conduct with respect to the scanning, capture, retention and dissemination of facial geometry and other biometric information of users of the app."  *In re: TikTok, Inc., Consumer Privacy Litig.*, 481 F. Supp.3d 1331, 1331 (J.P.M.L. 2020).  Importantly, none of the allegations of the *Biometric Data* complaint refer to TikTok's surreptitious interception of users' activity on third-party websites and, not surprisingly, the *Biometric Data* plaintiffs did not allege any wiretapping claims.  Rather, their "core claim" was a violation of the Illinois Biometric Information Privacy Act, which, as alleged in the *Biometric Data* Complaint, arose when the plaintiffs there recorded videos, posted videos, searched for videos and liked videos while using the video-sharing functions of the Tik-Tok app.[2]

---

[1] For purposes of this brief, "*Biometric Data*" refers to the cases filed in this MDL, *In re: TikTok, Inc., Consumer Privacy Litig.*, Case No. 1:20-cv-04699.  "*In-App Browser*" refers to the newly-filed cases, beginning with Plaintiff Austin Recht's filing, alleging that TikTok illegally wiretapped, keystroke logged and key event logged individuals' activities on third-party websites using an in-app browser.

[2] *See* Declaration of Roland Tellis ("Tellis Decl."), Exh. 1, at pp. 5-19. Further citations to the exhibits attached to the Tellis Decl. will cite just the exhibit.

The *Biometric Data* plaintiffs reached a classwide settlement two years before the *In-App Browser* cases were filed. The *Biometric Data* class settlement did not, and could not, release Plaintiffs' claims in the *In-App Browser* cases. A careful analysis of the *Biometric Data* case, including its procedural history, the allegations of the consolidated complaint, the terms of the settlement agreement, the settlement briefs (both at the preliminary approval and final approval stage), the dissemination of class notice, and the MDL Court's Orders leave no doubt that the two sets of cases do not share a single common factual predicate, let alone an ***identical*** one, as required for dismissal of the *In-App Browser* cases. Against this backdrop, barring the *In-App Browser* claims based on the *Biometric Data* Settlement would raise grave due process concerns.

TikTok's anticipated arguments to the contrary lack merit.[3]

## II. THE *BIOMETRIC DATA* AND *IN-APP BROWSER* CASES DO NOT SHARE A COMMON FACTUAL PREDICATE

### A. From Start to Finish, the Core Factual Allegation of the *Biometric Data* Cases Concerned the Capture of Biometric Data from TikTok's Video Sharing Function

The procedural history of the *Biometric Data* cases and the *Biometric Data* Settlement is well-documented in multiple briefs and Court Orders.[4] From the very beginning, the core factual issue involved "the scanning, capture, retention, and dissemination of the facial geometry and other biometric information of users of the app," as recognized by the Judicial Panel on Multi-District Litigation. *See In re TikTok, Inc., Consumer Privacy Litig.*, 481 F. Supp. 3d 1331, 1331 (J.P.M.L. 2020). Thereafter, the allegations of Plaintiffs' Consolidated Amended Class Action Complaint again centered on TikTok's unlawful scanning, capture, retention, and dissemination of facial geometry and other biometric information, occurring *in the video sharing functions* of the TikTok app.[5] Indeed, in both the Settlement Agreement and related Addendum, the settling

---

[3] *In-App Browser* plaintiffs reserve their right to request leave to file a reply in support of this brief addressing any new arguments raised by TikTok that were not previously raised in any of the briefing before the Joint Panel on Multi-District Litigation.

[4] *See* Exh. 1 at 1-4, Exh. 4 at ¶¶ 14-41, Exh. 5 at ¶¶ 9-23; Exh. 6 at 8-10; Exh. 7 at 2-6; Exh. 8 at 1-4, 8-13; Exh. 9 at 1-2, 4-9.

[5] *See* Exh. 2 at 2-3; Exh. 7 at 1-2, 5-6; Exh. 8 at 2-3; Exh. 9 at 1, 4-6; Exh. 10 at 2 (defining both the Nationwide Class and Illinois Subclass with reference to the "TikTok video sharing application").

parties defined the TikTok "App" as the "video-sharing application."[6]  From consolidation to final approval, there was never a reference to TikTok's use of JavaScript code in an in-app browser to monitor consumers' activities on third-party websites, including TikTok's keystroke logging, which is at issue in the *In-App Browser* cases.

**B. The *Biometric Data* Plaintiffs *Never* Alleged *In-App Browser's* Wiretapping Claims**

In stark contrast to the *In-App Browser* complaints, notably absent from the *Biometric Data* Complaint were **any** wiretapping claims under federal or state laws.  The *Biometric Data* complaint focused on TikTok's collection of facial recognition information and other biometric information when users engaged with the video sharing platform, including during the video creation, sharing and browsing functions.  The *Biometric Data* Complaint also alleged violations of law caused by TikTok's collection of information from users' mobile devices (such as G.P.S. location and clipboard contents) and the transfer of that information outside of the U.S.[7]

To illustrate the obvious divergence between the two groups of cases, the word "video" appears a staggering 324 times in the 119-page *Biometric Data* Complaint, and "biometric" appears 138 times while the words "in-app browser," "keystroke logging," and "third-party website" **do not appear even once**.  And, conversely, the terms facial geometry scans, voice prints, or any other biometric markers are not mentioned **even once** in the *In-App Browser* cases.  Quite simply, the allegations in the *In-App Browser* cases do not involve making or recording videos, sharing videos, sending messages or any other activity involving the "video sharing application" that formed the basis of the class definition in the *Biometric Data* MDL.

Next, the *Biometric Data* Complaint describes the various ways TikTok collects data and the types of data extracted as follows:

> Defendants have used automated software, proprietary algorithms, AI, facial recognition, and other technologies to commercially profit from Plaintiffs' and Class Members' identities, unique identifying information, biometric data and information, images, video and digital recordings, audio recordings, clipboard data,

---

[6] *Id.*

[7] Exh. 1. at §§ V-VI; *see also* Exh. 14 at ¶¶ 13-18 (detailing investigation into BIPA and Video Privacy Protection Act Claims underlying the *Biometric Data* Complaint).

> geolocation, names, e-mail addresses, passcodes, social media accounts, messaging services, telephone numbers, and other private, non-public, or confidential data and information, or meaningful combinations thereof…[8]

Again, there is no mention of TikTok's use of an in-app browser, its monitoring of users' activity on third-party websites, or its keystroke logging.

### C. Confirmatory Discovery Taken in the *Biometric Data* Cases was Limited to TikTok's Warranty Regarding the Collection of Biometric Data

The confirmatory discovery that TikTok agreed to provide was **never** intended to allow the *Biometric Data* plaintiffs to discover additional claims, and certainly not the *In-App Browser* claims. Instead, the *Biometric Data* Settlement described the intended, limited purpose of the confirmatory discovery as follows: "TikTok will provide the following confirmatory discovery to confirm this warranty."[9] Namely, that "TikTok warrants that it has not used the App **to collect biometric identifiers or biometric information** as defined by the Illinois Biometric Information Privacy Act."[10] Accordingly, the *Biometric Data* plaintiffs never had the confirmatory discovery necessary to plumb TikTok's source code for information about the *In-App Browser* claims. **All** the discovery focused on TikTok's warranty which was limited to the *Biometric Data* claims.[11]

Tellingly, the injunctive relief sought as a result of the confirmatory discovery was aimed specifically at TikTok's collection of biometric data; wiretapping and data interception (much less on a third-party website via the in-app browser) were not part of the enjoined conduct.[12]

### D. The *Biometric Data* Settlement Briefing Never Mentions Any Facts Related to the *In-App Browser* Claims

The preliminary and final approval briefing, and related Orders, make clear that the core factual issue in the *Biometric Data* cases was the capture of biometric data. Nowhere in any of

---

[8] Exh. 1 at ¶ 9.

[9] Exh. 3 at § 7 .1.

[10] *Id*.

[11] *See id*. at 7.3: "Interrogatories. TikTok will respond under oath to a supplemental interrogatory designed to elicit an explanation of the function and purpose of up to 20 specific terms in the source code that the third-party expert believes in good faith to be potentially related to the collection of biometric data from users."; *see also, id*. at 7.6: "Depositions. TikTok will make available Fed. R. Civ. P. 30(b)(6) witness(es) for depositions by written question to verify the warranty that TikTok has not collected biometric identifiers or biometric information from users of the App."

[12] *See id*. at § 6.1 and Addendum at § 4.1.

these documents is there a single mention of TikTok's use of an in-app browser to monitor users' activity on third-party websites. The focus of the briefing and Orders was on activity during users' engagement with the video-sharing function of the app.[13] While Judge Lee highlighted a number of common issues shared by the *Biometric Data* class in his Orders,[14] counsel submitted sixteen common issues that predominated over any individual issues, including: issues related to the collection, use and sharing of biometric data, unauthorized access to plaintiffs' devices, disclosure of video viewing histories, etc.[15] *Nowhere* among this list, or the list included in Judge Lee's Order, is there any mention of TikTok's use of JavaScript code and an in-app browser to monitor users' activities on third-party websites, or TikTok's keystroke logging.

### E. *Biometric Data* Co-Lead Counsel Filed an *In-App Browser* Case

The actions of *Biometric Data's* co-lead counsel further confirm that the *In-App Browser* claims were not released by the *Biometric Data* Settlement. Judge Lee issued his Order and Final Judgment Granting Final Approval of Class Action Settlement on August 22, 2022.[16] Just days before that, software researcher Felix Krause ("Mr. Krause") released new evidence proving that TikTok's in-app browser used JavaScript insertions to log keystrokes, key events and other information while users interacted with third-party websites.[17] Although there was a brief appeal of Judge Lee's Order and Final Judgment, it was dismissed on October 12, 2022,[18] rendering the *Biometric Data* Settlement's Effective Date as October 13, 2022.[19]

The first *In-App Browser* case was filed on November 25, 2022, alleging new claims arising from TikTok's illegal practice of wiretapping and keystroke logging individuals'

---

[13] Exh. 2 at 1-4; Exh. 7 at 1-5; Exh. 8 at 2-4; Exh. 9 at 1-2.

[14] *See* Exh. 7 at 14.

[15] Exh. 2 at 39-41.

[16] Exhs. 9 and 10.

[17] Krause, Felix, "iOS Privacy: Announcing InAppBrowser.com – see what JavaScript commands get injected through an in-app browser" Felix Krause, Aug. 18, 2022 (available at https://krausefx.com/blog/announcing-inappbrowsercom-see-what-javascript-commands-get-executed-in-an-in-app-browser).

[18] Exh. 13.

[19] *See* Exh. 3 at § 2.12: "'Effective Date' means the first date after either (i) the time to appeal the Final Order and Judgment has expired with no appeal having been filed or (ii) the Final Order and Judgment is affirmed on appeal by a reviewing court and no longer reviewable by any court."

interactions with third-party websites.  Thereafter, co-lead counsel and a PSC member from the *Biometric Data* cases – Katrina Carroll and Jonathan Jagher – filed an *In-App Browser* case on December 27, 2022, alleging claims nearly identical to those of *In-App Browser* Plaintiff Recht.[20]  Absent from the complaint filed by Ms. Carroll and Mr. Jagher was any mention of the *Biometric Data* cases or settlement.  Instead, Ms. Carroll and Mr. Jagher filed a brief supporting the creation of a new MDL for the new *In-App Browser* claims asserted against TikTok – declining to support TikTok's position that the *In-App Browser* cases arose from the same core set of facts as the *Biometric Data* cases.[21]  These filings confirm that (1) the *In-App Browser* claims were not alleged in the *Biometric Data* cases, and (2) counsel in the *Biometric Data* cases did not release of the *In-App Browser* claims as part of the *Biometric Data* Settlement.  *Johnson v. Winco Foods, LLC*, No. EDCV 172288DOCSHKX, 2019 WL 6139161, at *8 (C.D. Cal. Sept. 18, 2019) (subsequent claims were not alleged in a prior action and neither counsel, nor the plaintiff, contemplated that the subsequent claims would be released).

## F.  References in the *Biometric Data* Complaint to "Browsing History" and "Internet Browsing History" Do Not Refer to the In-App Browser

The *In-App Browser* plaintiffs anticipate TikTok likely will recycle the same or similar arguments and reasoning it made in prior briefings to the JPML.[22]  There, TikTok argued that passing references to buzzword terms like "browsing history" and "internet browsing history" indicate the complete subsummation of the claims brought by the *In-App Browser* plaintiffs.  The assertion that these passing references indicated or even included allegations regarding TikTok's illegal wiretapping and keystroke logging of individuals' activities on third-party websites is incorrect for several reasons.

---

[20] *See* Exh. 11.

[21] *See* Exh. 12 at 1 ("Plaintiff's action, like all other actions in the Member Cases, stems from Defendants' . . . unlawful practiced of surreptitiously intercepting Plaintiff's and other consumer's private electronic communications in violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* and analog state causes of action").

[22] Exh. 16.

First, TikTok erroneously relies on the term "browsing history" to argue that the *In-App Browser* plaintiffs' claims have already been considered and determined by the Court under the Settlement Agreement. The term "browsing history" is just one of 18 types of data at issue in the *Biometric Data* case.[23] This reference must be interpreted within the context of the Court's and *Biometric Data* counsel's understanding, which consistently refers to the term in the context of "video viewing histories," a phrase both the Court and *Biometric Data* counsel used repeatedly.[24] As a result, the use and context of these two terms together show the Court's and *Biometric Data* counsel's mutual understanding of the terms are related to a record of the videos a user has viewed. This can be contrasted with what is at issue in this case: keystroke data illegally tracked and scraped by TikTok when one utilizes the in-app browser.

Second, TikTok's reliance on the term "internet browsing history" is similarly without merit. Defendants have omitted the full context surrounding the phrase as used by both the *Biometric Data* Court and counsel. The *Biometric Data* Complaint specifically alleges TikTok extracts a user's data from their mobile device "even when the TikTok app is not in use." Moreover, the related footnote in the *Biometric Data* Complaint cites a section of TikTok's privacy policy that lists data TikTok automatically collects, even if the person who downloaded the app does not create an account (*i.e.,* does not actually use the app). Thus, "internet browsing history," as used by the *Biometric Data* Court and counsel, references data pulled from the default internet browser on a user's device (such as Safari). This reference is distinct from the conduct alleged here involving TikTok's in-app browser and its surreptitious insertion of JavaScript code for the sole purposes of monitoring a user's activity on third party websites.[25]

Furthermore, TikTok's dependence on the phrase "internet browsing history" to lump the distinct claims alleged here with the *Biometric Data* Settlement Agreement fundamentally misrepresents the *In-App Browser* claims. The former references a static, stored record of a

---

[23] Exh. 1 at ¶ 156.
[24] *See, e.g.*, Exh. 2 at 4 ("private viewing histories") and 7 ("video viewing histories"); Exh. 9 at 6 ("video viewing histories").
[25] *See* Exh. 15 at ¶¶ 87-96 (describing use of in-app browser on the TikTok app).

user's previously visited website, allegedly acquired regardless of whether the TikTok app was even open or running.  By contrast, the latter relates to claims that TikTok actively harvested a user's activity from third-party websites through a real-time keystroke and key event wiretapping scheme implemented at a point in the application when a user would believe they have left the TikTok app entirely and were, instead, browsing third-party websites.  References in the *Biometric Data* Settlement Agreement and related proceedings to data concerning "internet browsing history," or even video browsing history generally, are profoundly different from the keystroke data contentions made against TikTok here.

**III.** **THE LAW GOVERNING THE NOTICE AND EFFECT OF PRIOR SETTLEMENT AGREEMENTS CONFIRMS THAT THE *BIOMETRIC DATA* SETTLEMENT DID NOT RELEASE CLAIMS ASSERTED IN THE *IN-APP BROWSER* CASES**

**A.** **The *Biometric Data* Settlement Failed to Provide Notice to *In-App Browser* Plaintiffs or Class Members That Their *In-App Browser* Claims Were Being Released**

The certified settlement classes in the *Biometric Data* cases only included users who used TikTok as a video-sharing application, and not users who accessed third-party websites from the app.[26]  The class notices make clear that the *Biometric Data* Settlement resolves claims related to the "video-sharing application" at issue in the *Biometric Data* MDL.  Undeniably absent from the notice is any mention of third-party websites, keystroke logging, or an in-app browser.

As noted on the settlement website, the *Biometric Data* action's core facts center on allegations that TikTok collected, and used, "without sufficient notice and consent, Plaintiffs' personal data in connection with their use of the TikTok – Make Your Day **video-sharing application** (and/or its predecessor app Musical.ly) distributed in the U.S." (emphasis added).[27]

---

[26] *See* Exh. 2 at 12 (settlement class definitions reference only the video sharing functions of the app); *see also* Exh. 12 (referencing only the video sharing functions of the app).
[27] https://www.tiktokdataprivacysettlement.com/important-documents.php

**If you and/or your minor child used the TikTok and/or Musical.ly application, You May Be Entitled to a Payment from a Class Action Settlement.**

If you live in Illinois and used the TikTok app in Illinois to create videos, you may be entitled to up to 6x the Payment.

- Plaintiffs filed a class action complaint alleging that TikTok, Inc. f/k/a Musical.ly, Inc; ByteDance, Inc.; Musical.ly n/k/a TikTok, Ltd. and Beijing ByteDance Technology Co. Ltd. (collectively, the "Defendants") violated federal and state law by collecting and using, without sufficient notice and consent, Plaintiffs' personal data in connection with their use of the TikTok - Make Your Day video-sharing application (and/or its predecessor app Musical.ly) distributed in the U.S. (the "App.").

Moreover, the Claim Form provided to class members in the *Biometric Data* MDL only asks three questions, none of which relate to the *In-App Browser* Plaintiffs' access of third-party websites, or Defendants' interception of personal information and data on third-party websites, and instead relate to use of the video viewing and creating functions of the app:[28]

**II. CLASS MEMBER DETAILS**

| | |
|---|---|
| Do you currently reside in the United States? | Yes ☐ <br> No ☐ |
| Are you both (1) a resident of Illinois (2) who used the TikTok – Make Your Day video-sharing application (and/or its Musical.ly predecessor) to **create** videos while living in Illinois? | Yes ☐ <br> No ☐ |
| Did you use the TikTok - Make Your Day video-sharing application (and/or its Musical.ly predecessor) distributed in the U.S. prior to September 30, 2021? | Yes ☐ <br> No ☐ |

The definition, notice, and claim form are consistent with the *Biometric Data* factual predicate of users' use of the video-sharing function in the TikTok app, and not accessing third-party websites.

---

[28] *Id.*

Plaintiffs expect TikTok to rely on several inapposite cases to support its arguments. Each is distinguishable because, in those cases, class members received ***actual*** notice of the claims they were releasing, which is not the case here. In *Skilstaf, Inc. v. CVS Caremark Corp.*, Skilstaf participated in the prior case's settlement proceedings, objected, corresponded with counsel in the case, and was given a specific opportunity to opt out by the court. *Skilstaf, Inc. v. CVS Caremark Corp.,* No. C 09-02514 SI, 2010 WL 199717, at *3 (N.D. Cal. Jan. 13, 2010), *aff'd,* 669 F.3d 1005 (9th Cir. 2012). The *Skilstaf* court emphasized that Skilstaf did not opt out when given the opportunity to do so and noted that if Skilstaf's notice of the terms of the settlement had come solely from the settlement and opt out notice, the Court would share Skilstaf's due process concerns. *Id.* But, due to Skilstaf's "unique position," its claim that it lacked notice of the scope of the release was significantly undermined. *Id.*

Similarly, the court in *Tropp v. W.-Southern Life Ins. Co.,* held that a release encompassed subsequent claims of the plaintiff regarding her deceased mother's insurance policy because the mother was "properly notified by Rust Consulting, the firm hired to provide notification materials to all class members. [The mother] could have opted out of the class after she received notice of the settlement, but did not do so." *Tropp v. W.-S. Life Ins. Co.,* 381 F.3d 591, 596 (7th Cir. 2004). Likewise, the plaintiff in *Schulte v. Fifth Third Bank* was prevented from maintaining an action based on an identical factual predicate: the resequencing of debit card transactions. *Schulte v. Fifth Third Bank,* No. 09 C 6655, 2012 WL 2254197, at *3 (N.D. Ill. June 15, 2012). The *Schulte* plaintiff also received notice but "did not object to the broad release . . . or opt out . . ." *Id.* at *4. Finally, the plaintiff in *In re VMS L.P. Sec. Litig.* also received notice of the claims – he filed a claim and received payment. The court further found that the facts of both cases were part of the same sequence of events. *Matter of VMS Ltd. Partnership Sec. Litig.,* No. 90 C 2412, 1995 WL 678493, at *1 (N.D. Ill. Nov. 8, 1995) ("[W]ithout the released claim there are no new claims."). That is certainly not the case here.

Critically, unlike the above cases, the *Biometric Data* class notice did not inform class members of the existence of, let alone release, the *In-App Browser* claims, nor did it inform

TikTok users they might be class members if they used TikTok's in-app browser or visited third-party websites from the app. Thus, the *In-App Browser* plaintiffs have not been "independently compensated for the broad release of any [*In-App Browser* claims]." *See Hendricks*, 2016 WL 692739, at *3.

**B. The *Biometric Data* Settlement Cannot Release Class Claims in the *In-App Browser* Cases Because They Do Not Arise From the Same Factual Predicate**

Even if the *In-App Browser* plaintiffs did receive notice of the *Biometric Data* Settlement, that agreement cannot release class claims (whether known or unknown) that are not based on the ***identical*** factual predicate as that underlying the claims in the settled *Biometric Data* case. *Williams v. Gen. Elec. Cap. Auto Lease, Inc*., 159 F.3d 266, 273–74 (7th Cir. 1998) ("The weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim based on the ***identical*** factual predicate as that underlying the claims in the settled class action") (internal citation omitted) (emphasis added); *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("a settlement agreement's bare assertion that a party will not be liable for a broad swath of potential claims does not necessarily make it so."); *Schulte v. Fifth Third Bank*, No. 90 C 6655, 2012 WL 2254197, at *2 (N.D. Ill. June 16, 2012) (quoting *Williams* for the identical factual predicate standard); *In re Auction Houses Antitrust Litig.,* 42 F. App'x 511, 519 (2d Cir. 2002) ("[W]e have never affirmed the approval of a class action settlement which included the uncompensated impairment of non-class claims unless the non-class claims were based on the identical factual predicate as the class claims."); Joseph M. McLaughlin, McLaughlin on Class Actions § 6:29 (19th ed. 2022 update). Nearly every Circuit has adopted this standard, with none rejecting it. *See* William B. Rubenstein, Newberg and Rubenstein on Class Actions § 18:19 (6th ed. 2023 update).

Here, as discussed above, the factual predicate of the *Biometric Data* cases and the *In-App Browser* cases are not similar, let alone identical. Indeed, to prevail on their wiretapping claims, the *In-App Browser* plaintiffs will not rely on any facts concerning TikTok's collection

11

of biometric data via the video sharing function.[29]  The Ninth Circuit's opinion in *Hesse* is particularly instructive on this point.  In *Hesse*, Sprint negotiated a nationwide settlement agreement between itself and a class of customers for billing them for certain regulatory fees (the *Benney* litigation).  *Hesse,* 598 F.3d at 584.  A set of Washington plaintiffs filed a separate class action alleging violations of Washington state law related to billing for taxes.  Sprint moved for summary judgment, relying on the *Benney* settlement which broadly released "any and all claims… that have been, could have been, or in the future might be asserted in [this action]."  *Id.*  The *Hesse* court found that the subsequent claims were based on new factual allegations and involved different conduct by the defendant.  Like the *In-App Browser* claims, the *Benney* case did not include the Washington plaintiffs' state-specific claims, or "even pretend to prosecute those claims on their behalf."  *Id.* at 589.  Accordingly, the Ninth Circuit held that the release could not preclude the Washington plaintiffs because the *Benney* case "did not adequately represent the Washington Plaintiffs" as the Washington plaintiffs' claims were "based on a set of facts different from those underlying the claims settled in the *Benney* Settlement."  *Id.* at 587.

Similar to *Hesse* and *Benney*'s overlap regarding improper billing practices, the *Biometric Data* and *In-App Browser* claims both arguably raise questions that fall under the broad umbrella of data privacy.  But, like the differences in the improper billing practices described above, the method by which TikTok collected that data, the type of data and the location from which the data was collected, are factually distinct, with (a) biometric data harvesting via the video creating, sharing and browsing function on the one hand, and (b) interception of data transmitted to third-party websites via the in-app browser on the other.  *See Mata v. Manpower Inc.*, No. 14-CV-03787-LHK, 2016 WL 948997, at *7 (N.D. Cal. Mar. 14, 2016) (claim based on untimely receipt of paychecks different factual predicate than failure to pay wages); *Hendricks v. Starkist Co*, No. 13-CV-00729-HSG, 2016 WL 692739, at *3 (N.D.

---

[29] *See, e.g., In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 563 (9th Cir. 2018) (holding that claims for paying inflated prices on natural gas futures contracts was not based on identical factual predicate as previous litigation; each would "depend on proof of different facts to establish a different injury.").

Cal. Feb. 19, 2016) ("That the underlying fact of underfilling could play some part in both this [fraud and consumer protection] lawsuit and a possible future antitrust action does not compel the conclusion that the two actions are based on an identical factual predicate.").

## IV.  **A COMPLETE DISMISSAL OF THE *IN-APP BROWSER* CLAIMS IS NOT WARRANTED**

Even if the Court is inclined to accept TikTok's assertion that the *Biometric Data* Settlement released the *In-App Browser* claims (which it should not), the Court should still allow two categories of *In-App Browser* claims to proceed because they fall outside the time limitations included in the definition of the *Biometric Data* Settlement's "Released Claims" and are, therefore, not part of an "identical factual predicate" between the two cases.  *In re Conseco Life Ins. Co. Cost of Ins. Litig.,* No. ML 04-1610 AHM, 2005 WL 5678842, at *7 (C.D. Cal. Apr. 26, 2005) (Plaintiffs' claims were not based on an identical factual predicate as the prior claims because they "occurred years after the [prior] settlement and therefore could not have been asserted in [that] litigation"); *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 606 (N.D. Ill. 2015) (*aff'd sub nom. Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016).

First, the Court should not dismiss claims asserted by TikTok users who downloaded and used the app for the first time after September 30, 2021.  The definition of "Released Claims" only applies the Released Parties[30] which include the Class Representatives and Class Members (*i.e.* members of the Nationwide Class and Illinois Subclass).[31]  Individuals who joined TikTok for the first time after September 30, 2021 ***do not*** fall within the "Class" definitions certified by Judge Lee and, thus, their claims were not released.[32]  For these individuals, *In-App Browser* claims exist from the date they first joined TikTok through the present.

Second, the Court should not dismiss *In-App Browser* claims by TikTok users that arise after the "Effective Date" of the *Biometric Data* Settlement because the "Released Claims" include only those "arising from the beginning of time through the effective date" of October 13,

---

[30] Exh. 3 at ¶ 2.30.
[31] *Id*. at ¶¶ 2.4 and 2.26.
[32] Exh. 10 at 2 (defining the classes and specifying that inclusion ended on September 30, 2021).

2022.[33]  Accordingly, no *In-App Browser* claims by any TikTok user (whether new or old) arising after October 12, 2022 were released.

## V.  THE COURT SHOULD ALLOW DISCOVERY INTO ARGUMENTS TIKTOK RAISES ABOUT MATTERS OUTSIDE OF THE PLEADINGS

Plaintiffs anticipate that TikTok will argue, as it has done before, that there is no evidence that TikTok's JavaScript code insertions were actually used to track keystrokes, intercept any wire communications,[34] and/or that confirmatory discovery in the *Biometric Data* case proved that counsel in those cases investigated the *In-App Browser* wiretapping allegations.[35]  If the Court intends to consider these arguments – which Plaintiffs anticipate will include TikTok's reliance on documents or other information not available on public case dockets – then the Court should allow the *In-App Browser* plaintiffs to engage in discovery to test the merits of TikTok's position.  *See* Fed. R. Civ. Proc. 12(d); *Patterson v. Respondus, Inc.*, 593 F. Supp. 873, 803-04 (N.D. Ill. 2022).

For the sake of argument, and to preserve Plaintiffs' opposition, Plaintiffs anticipate TikTok will rely on a November 4, 2022 *Forbes* article for the position that Mr. Krause allegedly reneged on his exposé of TikTok's in-app browser JavaScript code's data interception.  But the *Forbes* author simply claims that he has seen "no evidence TikTok is actually [using the JavaScript code]" and made no independent investigation to ascertain whether Mr. Krause's claim was true.[36]

TikTok has also claimed that the *Biometric Data* plaintiffs "tasked an expert with examining the TikTok app source code to look for precisely the sort of data-privacy asserted in Mr. Recht's [*In-App* Browser] complaint.  Plaintiffs' expert presumably found *nothing* regarding

---

[33] Exh. 3 at ¶ 2.30.

[34] *See* Exh. 16 at 9, n.3 (arguing about the impact of a Forbes article on the merits of Plaintiffs' complaints).

[35] *Id.* (arguing TikTok's presumption that plaintiff's expert found nothing regarding the tracking of keystroke data).

[36] *See*, Exhibit 16 at 9 and n.3 (citing Mozur, Paul, et al., *TikTok Browser Can Track User's Keystrokes, According to New Research*, Forbes, Aug. 19, 2022 (updated Aug. 21, 2022), https://www.nytimes.com/2022/08/19/technology/tiktok-browser-tracking.html).

the tracking of keystroke or key event data, otherwise that issue would have been raised by the plaintiffs in that [*Biometric Data*] action."[37]  TikTok's argument on this point goes well beyond the pleadings.  TikTok cannot rely on what the *Biometric Data* plaintiffs' expert did or did not find in his review of the TikTok app source code, or what counsel in the *Biometric Data* cases concluded, without allowing the *In-App Browser* plaintiffs an opportunity to engage in discovery on those matters.

At a minimum, if TikTok intends to rely on so-called "confirmatory discovery" conducted in the *Biometric Data* cases, Plaintiffs should be provided access to the source code that the prior expert apparently reviewed, all interrogatories propounded and responses, all document requests propounded and responses, transcripts of all deposition questions and answers, a transcript of the "candid question-and-answer session" between Co-Lead Counsel and TikTok's counsel, all expert reports or analyses, and a copy of Co-Lead Counsel's analyses of the confirmatory discovery and expert analyses.

## VI.  <u>CONCLUSION</u>

Based on the facts and law above, Plaintiffs respectfully request that the Court allow all *In-App Browser* claims to move forward.  In the alternative, the Court should allow at least the two categories of claims which fall outside the *Biometric Data* Settlement's time limitations to proceed.

Dated:   August 11, 2023

Respectfully submitted,

By:   */s/ Roland Tellis*
      Roland Tellis

**BARON & BUDD, P.C.**
Roland Tellis (SBN 186269)
Sterling Cluff (SBN 267142)
David Fernandes (SBN 280944)
Shannon Royster (SBN 314126)
Jay Lichter (SBN 266960)

---

[37] Exh. 16 at 9 and n.3.

15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: 818-839-2333

*Counsel for Plaintiff Austin Recht*

James E. Cecchi
Kevin G. Cooper
**Carella Byrne Cecchi Brody & Agnello, P.C.**
5 Becker Farm Rd.
Roseland, NJ 07068
Tel. 973-994-1700
jcecchi@carellabyrne.com
kcooper@carellabyrne.com
*Counsel for Plaintiff Carina Fleming*

Bryan P. Thompson
**Chicago Consumer Law Center, P.C.**
650 Warrenville Road, Suite 100
Lisle, IL 60532
Tel.  312-858-3239 | Fax  312-610-5646
bryan.thompson@cclc-law.com

*Counsel for Plaintiff Katie Murphy*

**HERMAN JONES LLP**
John C. Herman (Ga. Bar No. 348370)
jherman@hermanjones.com
Candace N. Smith (Ga. Bar. No. 654910)
csmith@hermanjones.com
Connely M. Doizé (Ga. Bar No. 663453)
cdoize@hermanjones.com
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501

*Counsel for Plaintiff Grace Schulte*

Israel David
Blake Hunter Yagman
**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Telephone: (212) 739-0622
Facsimile: (212) 739-0628

israel.david@davidllc.com
blake.yagman@davidllc.com

*Counsel for Plaintiff E.K.*

Joseph H. Meltzer
Melissa L. Yeates
Tyler S. Graden
Jordan E. Jacobson
**KESSLER TOPAZ MELTZER &
CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
myeates@ktmc.com
tgraden@ktmc.com
jjacobson@ktmc.com

*Counsel for Plaintiffs Bradley Fugok,
Adam K. Storey, and Yevgeniy S.
Androshchuk*

Kate M. Baxter-Kauf (*pro hac vice*)
Kyle Pozan (IL Bar No. 6306761)
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981 0981
kmbaxter-kauf@locklaw.com
kjpozan@locklaw.com

*Counsel for Plaintiff Buckley*

Michael R. Reese
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
mreese@reesellp.com

*Counsel for Plaintiff Anibeth Bravo*

17

Joseph P. Guglielmo (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT
LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
jguglielmo@scott-scott.com

*Counsel for Plaintiff G.R., a Minor, by
and through Her Guardian Mayra De La
Cruz*

MaryBeth V. Gibson (*pro hac vice*)
**THE FINLEY FIRM, P.C.**
3535 Piedmont Rd.
Building 14, Suite 230
Atlanta, GA 30305
Phone: (404) 978-6971
Fax: (404) 320-9978
mgibson@thefinleyfirm.com

*Counsel for Plaintiff Melanie Tado*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **IN RE: TIKTOK, INC.,** | **MDL Docket No. 2948** |
| **CONSUMER PRIVACY LITIGATION,** | |
| | **Master Docket No.: 1:20-cv-04699** |
| **This Document Relates to:** | |
| | **Hon. Rebecca R. Pallmeyer** |

| | |
|---|---|
| **Bravo v. TikTok, Inc.** | **23-cv-00225** |
| **Murphy v. TikTok, Inc.** | **23-cv-00504** |
| **Buckley v. TikTok, Inc.** | **23-cv-00841** |
| **Tado v. TikTok, Inc.** | **23-cv-01430** |
| **Recht v. TikTok, Inc.** | **23-cv-02248** |
| **Fleming v. TikTok, Inc.** | **23-cv-02260** |
| **E.K. v. TikTok, Inc.** | **23-cv-02262** |
| **Androshchuk v. TikTok, Inc.** | **23-cv-02462** |
| **Albaran v. TikTok, Inc.** | **23-cv-02463** |
| **G.R. v. TikTok, Inc.** | **23-cv-02464** |
| **Moody v. TikTok, Inc.** | **23-cv-02465** |
| **Schulte v. TikTok, Inc.** | **23-cv-02466** |
| **Fugok v. TikTok, Inc.** | **23-cv-02467** |

## DECLARATION OF ROLAND TELLIS IN SUPPORT OF PLAINTIFF'S BRIEF IN OPPOSITION TO DISMISSAL OF THE *IN-APP BROWSER* CLAIMS

I, Roland Tellis, declare as follows:

1.      I am an attorney licensed to practice in California and a partner at the law firm Baron & Budd, P.C.  I and am counsel for first-filed Plaintiff Austin Recht.  *Recht v. TikTok, Inc.* was transferred to this Court pursuant to an order of the Joint Panel on Multi-District Litigation and is now styled as case number 1:23-cv-002248.

2.      I have personal knowledge of the matters included herein and submit this declaration in support of Plaintiffs' Brief in Opposition to Dismissal of the In-App Browser Claims on the Basis of the Biometric Data Settlement.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the Consolidated Amended Class Action Complaint, filed as ECF No. 114.

1

4.      Attached hereto as Exhibit 2 is a true and correct copy of Plaintiffs' Motion for Preliminary Approval, filed as ECF No. 122.

5.      Attached hereto as Exhibit 3 is a true and correct copy of the Exhibit A to Plaintiffs' Motion for Preliminary Approval – the Settlement Agreement and Release, and Addendum thereto – filed as ECF No. 122-1.

6.      Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Katrina Carroll in Support of Plaintiffs' Motion for Preliminary Approval, filed as ECF No. 122-6.

7.      Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of Elizabeth A. Fegan, filed as ECF No. 122-7.

8.      Attached hereto as Exhibit 6 is a true and correct copy of Plaintiffs' Supplemental Memorandum in Further Support of their Motion for Preliminary Approval, filed as ECF No. 137.

9.      Attached hereto as Exhibit 7 is a true and correct copy of Judge Lee's Memorandum Opinion and Order, filed on September 30, 2021 as ECF No. 161.

10.     Attached hereto as Exhibit 8 is a true and correct copy of Plaintiffs' Motion for Final Approval of Class Action Settlement, filed as ECF No. 195.

11.     Attached hereto as Exhibit 9 is a true and correct copy of Judge Lee's Memorandum Opinion & Order, filed on July 28, 2022 as ECF No. 261.

12.     Attached hereto as Exhibit 10 is a true and correct copy of Judge Lee's Order and Final Judgment Granting Final Approval of Class Action Settlement, filed on August 22, 2022 as ECF No. 264.

13.     Attached hereto as Exhibit 11 is a true and correct copy of the complaint filed in *Rahn v. TikTok*, N.D. Ill., Case No. 1:22-cv0072560-RRP.

14.     Attached hereto as Exhibit 12 is a true and correct copy of Plaintiff Nate Rahn's Response To Motion to Transfer, filed in MDL No. 3067 as ECF No. 19.

15.    Attached hereto as Exhibit 13 is a true and correct copy of the Notice of Dismissal of the appeal filed by Steven F. Helfand, filed as ECF No. 277.

16.    Attached hereto as Exhibit 14 is a true and correct copy of the declaration of Ekwan E. Rhow in Support of Plaintiffs' Motion for Preliminary Approval, filed as ECF No. 122-8.

17.    Attached hereto as Exhibit 15 is a true and correct copy of the complaint filed in *Recht v. TikTok, Inc.* as ECF No. 1.

18.    Attached hereto as Exhibit 16 is a true and correct copy Defendant TikTok's Opposition to Plaintiff Austin Recht's Motion to Vacate Conditional Transfer Order (CTO-3), filed in MDL No. 2948 as ECF No. 129.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 11th day of August, 2023 at Encino, California by Roland Tellis.

*/s/ Roland Tellis*
Roland Tellis

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| | ) **MDL No. 2948** |
| | ) |
| **IN RE TIKTOK, INC.,** | ) **Master Docket No. 20-cv-4699** |
| **CONSUMER PRIVACY** | ) |
| **LITIGATION** | ) **Hon. John Z. Lee** |
| | ) |
| | ) **Magistrate Judge Sunil R. Harjani** |
| | ) |
| **This Document Relates to All Cases** | ) **JURY TRIAL DEMANDED** |
| | ) |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all other persons similarly situated, upon personal knowledge of the facts pertaining to them and on information and belief based upon the investigation of counsel as to all other matters, by and through undersigned counsel, bring this class action complaint against TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok, Inc."); ByteDance, Inc. ("ByteDance"); Musical.ly n/k/a TikTok, Ltd. ("Musical.ly") and Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance") (collectively, "Defendants").

## I. **INTRODUCTION.**

1.      In August 2018, Defendants launched a video-creation and sharing social media platform, TikTok (formerly Musical.ly) (the "TikTok app"), in the United States. In less than a year, the TikTok app skyrocketed in popularity, landing it among the "top 5" most downloaded free iPhone/Android apps. With an eye-popping 800+ million active users worldwide[1] and 2019 revenues estimated at over $17 billion dollars,[2] the TikTok app is one of the most popular entertainment apps for mobile devices in the United States and the world.

2.      The TikTok app has acquired one of the largest installed user bases in the country on the strength of its popular 60-second videos of fun activities like dancing, lip-syncing, and stunts.

3.      TikTok's owner, ByteDance, was founded in 2012 and remains based in Beijing, China. ByteDance is well known as a hit app factory that has spent the last decade using technologies such as artificial intelligence and facial recognition. This action seeks to ensure that the privacy of TikTok users is adequately protected.

---

[1] https://influencermarketinghub.com/tiktok-stats/ (last accessed June 24, 2020).

[2] https://www.bloomberg.com/news/articles/2020-05-27/bytedance-is-said-to-hit-3-billion-in-profit-as-revenue-doubles (last accessed Sept. 24, 2020).

4.      Plaintiffs and class members have particular concerns here given TikTok's reported connections to the Chinese government, which have very recently come under close public scrutiny. Several U.S. Senators have formally requested that the Intelligence Community conduct an assessment of the national security risks posed by TikTok. Recognizing the serious ongoing threat posed by TikTok, prominent U.S. Senators wrote to the FTC on May 29, 2020 that, "[f]aced with **compelling** evidence that this wildly popular social media platform is **blatantly flouting binding U.S. privacy rules**, the FTC should move swiftly to launch an investigation and forcefully hold violators accountable for their conduct."

5.      Because of data privacy concerns, some U.S. military branches have even banned the use of the app on government-issued phones. Republican Senator Josh Hawley called for a total ban on the use of the app across the United States.[3] Reddit CEO and co-founder Steve Huffman called TikTok "fundamentally parasitic" due to privacy concerns.[4]

6.      In fact, the Department of Defense recently expressed concern over TikTok's "popularity with Western Users, and its ability to convey location, image and biometric data to its Chinese parent company, which is legally unable to refuse to share data to the Chinese Government," going so far as to issue an internal memo to encourage its employees to avoid installing the app.[5]

7.      ByteDance relies on artificial intelligence ("AI") technologies for its different content platforms and states that "these new technologies can be found across every segment of

---

[3]   https://www.forbes.com/sites/tjmccue/2020/02/13/is-tiktok-raiding-your-privacy-in-2020-here-is-how-to-stop-it/#1e34f6b569c8.

[4]      https://www.theverge.com/2020/2/27/21155845/reddit-ceo-steve-huffman-tiktok-privacy-concerns-spyware-fingerprinting-tracking-users.

[5] https://www.inc.com/jason-aten/the-department-of-defense-is-warning-people-not-to-use-tiktok-over-national-security-concerns.html

our product portfolio."[6] The company uses AI technologies in its services: e.g., recommender systems, voice recognition, computer vision, natural language process, and more.[7] According to a ByteDance executive, "ByteDance has the largest number of users in the world whose videos need to be analyzed and processed and uploaded[.]"[8]

8.     "As a user interacts with the content by taps, swipes, time spent with each article, comments and more, large-scale machine learning and deep learning algorithms continue to learn about a user's preferences[.]"[9]

9.     Defendants have used automated software, proprietary algorithms, AI, facial recognition, and other technologies to commercially profit from Plaintiffs' and Class Members' identities, unique identifying information, biometric data and information, images, video and digital recordings, audio recordings, clipboard data, geolocation, names, e-mail addresses, passcodes, social media accounts, messaging services, telephone numbers, and other private, non-public, or confidential data and information, or meaningful combinations thereof, as more fully set forth herein.

10.     Further, Defendants, through the TikTok app, collected, captured, obtained, stored and, upon information and belief, disclosed and otherwise disseminated Illinois resident TikTok users' biometric information in violation of the Illinois' Biometric Information Privacy Act ("BIPA"), 740 ILCS §14/1, *et seq*. Public policy in Illinois provides that given the risks of unwanted data collection, Illinois citizens need the power to make decisions about the fate of their

---

[6] https://ailab.bytedance.com

[7] https://medium.com/syncedreview/intel-and-bytedance-partner-on-ai-lab-b678036cbda4.

[8] https://technode.com/2018/04/24/bytedance-jinri-toutiao-ai-chips.

[9]      https://www.forbes.com/sites/bernardmarr/2018/12/05/ai-in-china-how-buzzfeed-rival-bytedance-uses-machine-learning-to-revolutionize-the-news/#524f960e40db.

unique biometric identifiers and information. Defendants' actions robbed them of that power.

11.     What is more, unknown to its users, included in the TikTok app is surveillance software developed in China. The TikTok app has clandestinely vacuumed up and transferred to servers in China (and to other servers accessible from within China) vast quantities of private and personally identifiable user data and content that could be employed to identify, profile, and track the physical and digital location and activities of United States users now and in the future.

12.     The TikTok app has surreptitiously taken TikTok users' private draft videos they never intended for publication – without notice or consent.

13.     Defendants and their sophisticated engineering teams also covertly collect and use TikTok users' highly sensitive and immutable biometric identifiers and information.

14.     Defendants also covertly transmit personally identifiable information about each TikTok user's video viewing history to third parties without notice or consent, in violation of the Video Privacy Protection Act ("VPPA").

15.     In short, the TikTok app's lighthearted fun comes at a heavy cost. Meanwhile, Defendants unjustly profit from the secret harvesting of this massive array of private and personally identifiable TikTok user data and content by using it for targeted advertising, improvements to Defendants' artificial intelligence technologies, the filing of patent applications, and the development of consumer demand for, and use of, Defendants' other products.

16.     TikTok accesses its users' data for various purposes, including tracking users by age, gender, location, operating system, and interest in order to attract marketing and ad sales. By collecting and filtering this user data, TikTok offers a sophisticated targeted ad and marketing platform that allows its ad clientele to hone into their target demographics with shocking

precision.[10]

17.     Users are further at risk because Defendants' conduct exposes TikTok user data to access by the Chinese government to assist that government in meeting two of its crucial and intertwined state objectives: (a) world dominance in artificial intelligence; and (b) population surveillance and control.

18.     Defendants' conduct violates statutory, constitutional, and common law privacy, data, biometrics and consumer protections, and it should be stopped.

## II.     THE PARTIES.

### A.     The Plaintiffs.

#### *The California Plaintiffs*

19.     **Plaintiff Misty Hong** is, and at all relevant times was, an individual and resident of Palo Alto, California. In or about March or April 2019, Ms. Hong downloaded the TikTok app onto her mobile device. At the time Ms. Hong downloaded the TikTok app, she did not read any privacy policy or terms of use, nor did she see discernible hyperlinks to or warnings about these items. In fact, she never clicked the sign-up button and never knowingly created an account with Defendants. However, months later, she discovered for the first time that Defendant TikTok, Inc. had created an account for her, without her knowledge or consent, and provided her with a user name (the word "user" followed by a combination of numbers followed by "@" followed by the word "user" followed by a combination of letters and numbers) and assigned her phone number as the account password.

20.     Shortly after completing the download of the TikTok app onto her mobile device, Ms. Hong made approximately five or six videos using the TikTok app on her mobile device.

---

[10] https://www.wired.co.uk/article/tiktok-filter-bubbles.

Images of her face were captured in some or all of these videos. Ms. Hong experienced difficulty in timing the background music to lip-syncing and dancing. Consequently, after shooting each video, Ms. Hong (i) sometimes pressed the "next" button and (ii) sometimes pressed the "x" button and then the "reshoot" button. Ms. Hong neither saved nor posted any of these videos. But, as a result of sometimes pressing the "next" button, Defendants took some of these private videos without Ms. Hong's knowledge or consent. Images of Ms. Hong's face also have been captured in Musical.ly and/or TikTok videos recorded and posted by others.

21.     **Plaintiff A.S., a minor,** is, and at all relevant times was, an individual and resident of Stevenson Ranch, California. A.S. brings this suit by and through her mother and legal guardian, Laurel Slothower, who is, and at all relevant times was, an individual and resident of Stevenson Ranch, California.

22.     Plaintiff A.S., a minor who is currently 15 years old, first downloaded the Musical.ly app to her mobile device and created a user account in 2016 when she was under age 13. She subsequently downloaded the Musical.ly app in 2017 to a new mobile device that was hers. In 2019, A.S. downloaded the TikTok app to another new mobile device that was hers. A.S. and her legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

23.     Beginning in 2016, A.S. created numerous videos using the Musical.ly app and the TikTok app. Many are private videos containing images of her face, while many others are videos containing her voice and images of her face that she intentionally uploaded and posted. A.S. used the augmented reality features and facial filters on her face in both private videos and in videos that she intentionally uploaded and posted.

24.     **Plaintiff A.R., a minor,** is, and at all relevant times was, an individual and resident of Pasadena, California. A.R. brings this suit by and through her mother and legal guardian, Gilda

Avila, who is, and at all relevant times was, an individual and resident of Pasadena, California.

25.     A.R. downloaded the Musical.ly app to her mobile device and created a user account in or about 2017 when she was approximately 12 years old. Subsequently, in 2019, while still a minor, A.R. downloaded the TikTok app to a new mobile device that was hers. A.R. and her legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

26.     A.R. created numerous videos using the Musical.ly app and the TikTok app. Many are private videos containing images of her face, while many others are videos containing images of her face that she intentionally uploaded and posted. A.R. used the augmented reality features and facial filters on her face in her private videos. A.R.'s voice and images of A.R.'s face have been captured in private videos recorded by others, as well as in videos that were recorded, uploaded and posted by others.

27.     **Plaintiff G.R., a minor**, is, and at all relevant times was, an individual and resident of Los Angeles, California. G.R. brings this suit by and through her mother and legal guardian, Mayra De La Cruz, who is, and at all relevant times was, an individual and resident of Los Angeles, California.

28.     Plaintiff G.R. downloaded the TikTok app to her own mobile devices and created her user account on or about October 5, 2017, when she was six years old. G.R. and her legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

29.     Plaintiff G.R. created approximately 3,000 videos using the TikTok app. Many are private videos containing images of her face, while many others are videos which she intentionally uploaded and posted and which also contain images of her face. G.R. used the augmented reality features and facial filters on her face in videos she intentionally uploaded and posted.

30.     **Plaintiff Aparna Iyer** is a citizen and resident of the State of California. Plaintiff

created her TikTok account approximately fall 2019.

31.     Plaintiff Iyer has uploaded and posted at least one video using TikTok, which includes images of her face and a friend's face, since creating her account. Plaintiff Iyer has also appeared in friends' videos, which have included the use of a combination of TikTok features such as stickers, filters, and the tracker lens available in the App when creating, saving, and posting videos on the App. Plaintiff Iyer has also viewed and "liked" other videos, commented on videos, and sent messages to other viewers concerning their videos.

32.     Plaintiff Iyer does not recall seeing the Terms of Service or Privacy Policy upon registering for an account with the App.

### The Illinois Plaintiffs

33.     **Plaintiff Meghan Smith** is, and at all relevant times was, an individual and resident of Champagne, Illinois.

34.     Plaintiff Meghan Smith downloaded the TikTok app to her mobile device and created a user account in 2018. Ms. Smith has never read and does not recall seeing any of Defendants' privacy policies or terms of use.

35.      Ms. Smith created numerous videos using the TikTok app. Many are private videos containing her voice and images of her face, while many others are videos containing her voice and images of her face that she intentionally uploaded and posted. Ms. Smith used the augmented reality features and facial filters on her face in both private videos and in videos that she intentionally uploaded and posted.

36.     **Plaintiffs C.W., a minor, and I.W., a minor,** are, and at all relevant times were, individuals and residents of Chicago, Illinois. C.W. and I.W. bring this suit by and through their mother and legal guardian, Mikhaila Woodall, who is, and at all relevant times was, an individual and resident of Chicago, Illinois.

37.     Plaintiff C.W., a minor who is currently 11 years old, and Plaintiff I.W., a minor who is currently 8 years old, are siblings who each downloaded the TikTok app to their own mobile devices and created their respective user accounts in or about March 2019. C.W., I.W. and their legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

38.     C.W. and I.W. each created numerous videos using the TikTok app. Each has videos containing images of their respective faces that they intentionally uploaded and posted. C.W. and I.W. used the augmented reality features and facial filters on their respective faces in videos they intentionally uploaded and posted.

39.     **Plaintiff P.S., a minor,** is, and at all relevant times was, an individual and resident of Illinois. P.S. brings this suit by and through her legal guardian, Cherise Slate, who is, and at all relevant times was, an individual and resident of Carpentersville, Illinois.

40.     P.S. downloaded the TikTok app to her mobile device and created a user account in or about 2019 when she was approximately 12 years old. P.S. and her legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

41.     P.S. created numerous videos using the TikTok app. Many are private videos containing images of her face, while many others are videos containing images of her face that she intentionally uploaded and posted. P.S. used the augmented reality features and facial filters on her face. P.S.'s voice and images of P.S.'s face have been captured in private videos recorded by others, as well as in videos that were recorded, uploaded and posted by others.

42.     **Plaintiff M. T. W., a minor**, is, and at all relevant times was, an individual and resident of Illinois. M.T.W. brings this suit by and through her legal guardian, Brenda Washington, who is, and at all relevant times was, an individual and resident of Country Club Hills, Illinois.

43.     M.T.W. first downloaded the Musical.ly app followed by the TikTok app to her

mobile device and created a user account in or about 2018 when she was approximately 15 years old. M.T.W. and her legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

44.     M.T.W. created numerous videos using the Musical.ly app and the TikTok app. Many are private videos containing images of her face, while many others are videos containing images of her face that she intentionally uploaded and posted. M.T.W. used the augmented reality features and facial filters on her face. M.T.W.'s voice and images of M.T.W.'s face have been captured in private videos recorded by others, as well as in videos that were recorded, uploaded and posted by others.

45.     **Plaintiffs N.T., a minor, and L.T., a minor,** are, and at all relevant times were, individuals and residents of Yorkville, IL. N.T. and L.T. bring this suit by and through their mother and legal guardian, Darcy Tellone, who is, and at all relevant times was, an individual and resident of Yorkville, IL.

46.     Plaintiffs N.T. and L.T. are siblings who each downloaded the TikTok app to their own mobile devices and created their respective user accounts in or about 2014. Neither N.T., L.T., or their legal guardian have ever seen or read any of Defendants' privacy policies or terms of use.

47.     N.T. and L.T. each created numerous videos using the TikTok app. Each has videos containing images of their respective faces that they intentionally uploaded and posted. N.T. and L.T. used the augmented reality features and facial filters on their respective faces in videos they intentionally uploaded and posted. Images of N.T.'s and L.T.'s faces have been captured in videos that were recorded, uploaded, and posted by others.

48.     **Plaintiffs S.P., J.P., K.P., and G.P., minors,** are, and at all relevant times were, individuals and residents of Yorkville, Illinois. S.P., J.P., K.P., and G.P. bring this suit by and

through their mother and legal guardian, Katie Pattermann, who is, and at all relevant times was, an individual and resident of Yorkville, IL.

49.     Plaintiffs S.P., J.P., K.P., and G.P. are siblings who each downloaded the TikTok app to their mobile devices and created their respective user accounts in or about 2014 (for J.P.) and in or about 2020 (for S.P., K.P., and G.P.). S.P., J.P., K.P., and G.P. and their legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

50.     S.P., J.P., K.P., and G.P. each created numerous videos using the TikTok app. Each has videos containing images of their respective faces that they intentionally uploaded and posted. S.P., J.P., K.P., and G.P. used the augmented reality features and facial filters on their respective faces in videos they intentionally uploaded and posted. Images of S.P., J.P., K.P., and G.P.'s faces have been captured in videos that were recorded, uploaded, and posted by others.

51.     **Plaintiff L.M., a minor,** is, and at all relevant times was, an individual and resident of Swansea, Illinois. L.M. brings this suit by and through L.M.'s mother and legal guardian, Stephanie Mohler, who is, and at all relevant times was, an individual and resident of Swansea, Illinois.

52.     Plaintiff L.M., who is currently 12 years old, first downloaded the Musical.ly app to Plaintiff L.M.'s own mobile device and created a user account in or about 2017. Subsequently, Plaintiff L.M. downloaded the TikTok app and created a user account in or about 2018. L.M.'s legal guardian has never seen or read any of Defendants' privacy policies or terms of use.

53.     L.M. created numerous videos using the TikTok app. Many are private videos containing images of L.M.'s face, while many others are videos containing images of L.M.'s face that L.M. intentionally uploaded and posted. L.M. used the facial filters on L.M.'s face in both private videos and in videos that L.M. intentionally uploaded and posted. L.M.'s voice and/or

images of L.M.'s face have been captured in videos recorded by L.M.'s sibling, as well as in videos that were recorded, uploaded, and posted by L.M.'s sibling.

54. **Plaintiff A.J. a minor,** is and at all relevant times was, an individual and resident of Palatine, Illinois. A.J. brings this suit by and through her father and legal guardian, Aaron Johnson, who is, and at all relevant times was, an individual and resident of Palatine, Illinois.

55. Plaintiff A.J., a minor who is currently 14 years old, downloaded the Musical.ly app to her iPad and created her Musical.ly user account, with the help of her mother, in or about January 2016. A.J. and legal guardian have never seen or read any of Defendants' privacy policies or terms of use. Plaintiff A.J. also downloaded the Musical.ly app or the TikTok app, by herself and without any adult supervision, to (a) her iPhone 5S in or about December 2017; (b) her iPhone 6S Plus in or about August 2018; and (c) her iPhone 8 in or about December 2019. A.J. has never seen or read any of Defendants' privacy policies or terms of use.

56. A.J. created dozens of videos using the TikTok app. A.J. has videos containing images of her face that she intentionally uploaded and posted. A.J. used the augmented reality features and facial filters on their respective faces in videos she intentionally uploaded and posted. Images of A.J.'s face have been captured in videos that were recorded, uploaded, and posted by others.

57. **Plaintiff E.R., a minor,** is, and at all relevant times was, an individual and resident of Streamwood, Illinois. E.R. brings this suit by and through her mother and legal guardian, L.H., who is, and at all relevant times was, an individual and resident of Streamwood, Illinois.

58. E.R., a minor who is currently 16 years old, downloaded the Musical.ly app to her mobile device and created a user account in or about 2014 when she was approximately 10 years old. E.R. and her legal guardian have never seen or read any of Defendants' privacy policies or

terms of use.

59.　　E.R. created numerous videos using the Musical.ly/TikTok app. Many are private videos containing images of her face, while many others are videos containing images of her face that she intentionally uploaded and posted. E.R. used the augmented reality features and facial filters on her face in both private videos and in videos that she intentionally uploaded and posted.

60.　　**Plaintiffs R.S., a minor, and J.S., a minor,** are, and at all relevant times were, individuals and residents Highland Park, Illinois. R.S. and J.S. bring this suit by and through their mother and legal guardian, who is, and at all relevant times was, an individual and resident of Highland Park, Illinois.

61.　　Plaintiffs R.S. and J.S. are siblings who each downloaded the TikTok app to their own mobile devices (an iPhone 7 for R.S. and iPad for J.S.), and created their respective user accounts in or about March 2020. R.S., J.S., and their legal guardian had not seen nor read any of Defendants' privacy policies or terms of use prior to establishing their accounts.

62.　　R.S. and J.S. each created numerous videos using the TikTok app. Each has videos containing images of their respective faces that they intentionally uploaded and posted. R.S. and J.S. used the augmented reality features and facial filters on their respective faces in videos they intentionally uploaded and posted. Images of R.S. and J.S.'s face have been captured in videos that were recorded, uploaded, and posted by others.

63.　　**Plaintiff Katherine Czajka** is a citizen and resident of the State of Illinois. Plaintiff downloaded the App on an iPhone 8 (November 2018), iPhone 11 (September 2019), and iPad Pro (June 2020), and created her TikTok account in or around November of 2018.

64.　　Plaintiff Czajka has uploaded and posted numerous videos using TikTok, which includes images of her face, since creating her account from December 2018 through July 2020.

Plaintiff Czajka has also viewed and "liked" other videos, commented on videos, and sent messages to other viewers concerning their videos.

65. Plaintiff Czajka does not recall seeing the Terms of Service or Privacy Policy upon registering for an account with the App.

66. **Plaintiff Brandy Johnson** is a citizen and resident of the State of Illinois. Plaintiff created her TikTok account approximately April 2020 on her mobile device (iPhone 11) and maintains her account to the present day.

67. Plaintiff Johnson has uploaded and posted numerous videos using TikTok, which includes images of her face, since creating her account. Plaintiff Johnson has also used a combination of TikTok features such as stickers, filters, and the tracker lens available in the App when creating, saving, and posting videos on the App. Plaintiff Johnson has also viewed and "liked" other videos, commented on videos, and sent messages to other viewers concerning their videos.

68. Plaintiff Johnson does not recall seeing the Terms of Service or Privacy Policy upon registering for an account with the App.

69. **Plaintiff Karina Quinteiro** is a citizen and resident of the State of Illinois. Plaintiff downloaded the App and created her TikTok account in or around July 2019.

70. Plaintiff Quinteiro has uploaded numerous videos using TikTok, which includes images of her face, since creating her account. Plaintiff Quinteiro has also used a combination of TikTok features such as stickers, filters, and the tracker lens available in the App when creating, saving, and posting videos on the App. Plaintiff Quinteiro has also viewed and "liked" other videos, commented on videos, and sent messages to other viewers concerning their videos.

71. Plaintiff Quinteiro does not recall seeing the Terms of Service or Privacy Policy

upon registering for an account with the App.

72. **Plaintiff S.A., a minor,** is, and at all relevant times was, an individual and resident of Illinois (Waukegan, Illinois until May 2020 and, since then, Park City, Illinois). S.A. brings this suit by and through his mother and legal guardian, Maritza Albarran, who is, and at all relevant times was, an individual and resident of Illinois (Waukegan, Illinois until May 2020 and, since then, Park City, Illinois).

73. S.A. first downloaded the Musical.ly app, followed by the TikTok app to his mobile device and created a user account in or about 2016, when he was approximately 10 years old. S.A. and his legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

74. S.A. created approximately five or six videos using the TikTok app. These are private videos containing images of his face. S.A. used the augmented reality features and facial filters on his face in these videos. Numerous additional images of S.A.'s face have been captured in videos that were recorded, uploaded, and posted in Illinois by others.

75. **Plaintiff L.B., a minor,** is, and at all relevant times was, an individual and resident of Mokena, Illinois. L.B. brings this suit by and through his mother and legal guardian, Molly Janik, who is, and at all relevant times was, an individual and resident of Mokena, Illinois.

76. L.B., a minor who is currently 17 years old, downloaded the TikTok app to his own mobile devices and created his respective user account in or about May 12, 2016. L.B. and his legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

77. L.B. created at least five videos using the TikTok app. The public videos contain images of his face that he intentionally uploaded and posted. L.B. used the augmented reality features and facial filters on his face in videos.

78. **Plaintiffs L.P., a minor, and M.P., a minor,** are, and at all relevant times were,

15

individuals and residents of Chicago, Illinois. L.P. and M.P. bring this suit by and through their mother and legal guardian, Requeenis Gilder, who is, and at all relevant times was, an individual and resident of Chicago, Illinois.

79.     Plaintiffs L.P. and M.P. are siblings who each downloaded the TikTok app to their own mobile devices and created their respective user accounts in or about 2018. L.P., M.P., and their legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

80.      L.P. and M.P. each created numerous videos using the TikTok app. Each has videos containing images of their respective faces that they intentionally uploaded and posted. L.P. and M.P. used the augmented reality features and facial filters on their respective faces in videos they intentionally uploaded and posted.

81.     **Plaintiff A.O., a minor,** was at all relevant times an individual and resident of Evergreen Park, Illinois. A.O. brings this suit by and through his mother and legal guardian, Jasmin Beverly, who was at all relevant times an individual and resident of Evergreen Park, Illinois.

82.     Ms. Beverly downloaded the TikTok app to her mobile device and created a user account in 2015 for her son, A.O.

83.     A.O. created at least seven videos using the TikTok app. The videos contain images of his face that he and his mother intentionally uploaded and posted. A.O. used the augmented reality features and facial filters on his face in videos that he and his mother intentionally uploaded and posted.

84.     **Plaintiff H.S., a minor,** is, and at all relevant times was, an individual and resident of River Forest, Illinois. H.S. bring this suit by and through her father and legal guardian, Joshua Schubkegel, who is, and at all relevant times was, an individual and resident of River Forest, Illinois.

85.     H.S., a minor who is currently 15 years old, downloaded the TikTok app to her mobile device and created a user account in May 11, 2019. H.S. and her legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

86.     H.S. created numerous videos using the TikTok app. Many are private videos containing images of her face, while many others are videos containing images of her face that she intentionally uploaded and posted. H.S. used the augmented reality features and facial filters on her face in both private videos and in videos that she intentionally uploaded and posted.

87.     **Plaintiffs K.M., a minor,** is, and at all relevant times was, an individual and resident of Frankfort, Illinois. K.M. brings this suit by and through her mother and legal guardian, Charlene Marks, who is, and at all relevant times was, an individual and resident of Frankfort, Illinois.

88.     Plaintiff first downloaded the Musical.ly app followed by the TikTok app to her own mobile device and created her user account in or about summer of 2018 when she was approximately 15 years old. K.M. and her legal guardian saw Defendants' Cookies Policy but did not read or review Defendant's Privacy Policy for Young Users, Privacy Policy, or Terms of Use.

89.     K.M. created approximately 12 videos using the TikTok app. Many are private videos containing images of her face, while many others are videos containing images of her face that she intentionally uploaded and posted. K.M. used the augmented reality features and facial filters on her face in both private videos and in videos that she intentionally uploaded and posted.

90.     **Plaintiff, Morgan Kukovec,** is an 18-year-old female and, at all relevant times herein, is and was a resident of Hampshire, Illinois.

91.     Plaintiff Kukovec downloaded the TikTok app to her mobile device and created her user account in or about December 2019, when she had not yet met the age of majority. Plaintiff

Kukovec had never seen or read any of Defendants' privacy policies or terms of use.

92.    Plaintiff Kukovec created numerous videos using the TikTok app. Plaintiff Kukovec has videos containing images of her face that she intentionally uploaded and posted. Plaintiff Kukovec used the augmented reality features and facial filters on her face in videos she intentionally uploaded and posted. Furthermore, images of Plaintiff Kukovec's face have been captured in videos that were recorded, uploaded, and posted by others.

93.    **Plaintiff C.H., a minor** who is currently 16 years old, is, and at all relevant times was, an individual and resident of Chicago, Illinois. C.H. brings this suit by and through his father and legal guardian, Marc Halpin, who is, and at all relevant times was, an individual and resident of Chicago, Illinois.

94.    Plaintiff C.H. downloaded the TikTok app to his iPhone and iPad devices and created his user account in or about October 5, 2016 when he was 12 years old. C.H. and his legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

95.    C.H. created numerous videos using the TikTok app. Many are private videos containing images of his face, while many others are videos that he intentionally uploaded and posted and which also contain images of his face. C.H. used the augmented reality features and facial filters on his face in both private videos and in videos he intentionally uploaded and posted. C.H.'s voice and images of C.H.'s face have been captured in videos that were recorded, uploaded, and posted by others.

96.    **Plaintiff D.M., a minor,** is, and at all relevant times was, an individual and resident of Chicago, Illinois. D.M. brings this suit by and through her mother and legal guardian, D.H., who is, and at all relevant times was, an individual and resident of Chicago, Illinois.

97.    D.M., a minor who is currently 17 years old, downloaded the Musical.ly app to her

mobile device and created a user account in or about 2017 when she was approximately 14 years old. D.M. and her legal guardian have never seen or read any of Defendants' privacy policies or terms of use.

98.     D.M. created numerous videos using the Musical.ly/TikTok app. Many are private videos containing images of her face, while many others are videos containing images of her face that she intentionally uploaded and posted. D.M. used the augmented reality features and facial filters on her face in both private videos and in videos that she intentionally uploaded and posted.

**B.     The Defendants.**

99.     **Defendant ByteDance, Inc**. is, and at all relevant times was, a Delaware corporation with its principal place of business in Palo Alto, California. Defendant ByteDance, Inc. is a wholly owned subsidiary of ByteDance, Ltd., a Cayman Islands corporation.

100.     **Defendant TikTok, Inc. f/k/a Musical.ly, Inc.** ("TikTok, Inc.") is, and at all relevant times was, a California corporation with its principal place of business in Culver City, California.[11] Defendant TikTok, Inc. also maintains offices in Palo Alto, California and Mountain View, California.[12] The name change from Musical.ly, Inc. to TikTok, Inc. occurred in May 2019. Defendant TikTok, Inc. is a wholly owned subsidiary of TikTok, LLC, which in turn is a wholly owned subsidiary of TikTok, Ltd. And TikTok, Ltd. – like Defendant ByteDance, Inc. – is a wholly owned subsidiary of ByteDance, Ltd.

101.     **Defendant Musical.ly n/k/a TikTok, Ltd.** is, and at all relevant times was, a

---

[11] https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[12] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/;
https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

Cayman Island corporation with its principal place of business in Shanghai, China. Defendant Musical.ly was the parent company of Musical.ly, Inc. Defendant Musical.ly changed its name to TikTok, Ltd. and, as noted above, is a wholly owned subsidiary of ByteDance, Ltd.

102. **Defendant Beijing ByteDance Technology Co. Ltd.** ("Beijing ByteDance") is, and at all relevant times was, a privately held company headquartered in Beijing, China. Defendant Beijing ByteDance is a wholly owned subsidiary of ByteDance Co., Ltd., which is also headquartered in Beijing, China. ByteDance Co., Ltd. is owned by founder Zhang Yiming (98.8%) and Zhang Lidong (1.2%). Defendant Beijing ByteDance and ByteDance Co., Ltd. operate as one company.

103. ByteDance, Ltd. owns 100% of ByteDance (HK) Co., Ltd., which is headquartered in Hong Kong. ByteDance (HK) Co., Ltd. in turn owns 100% of Beijing ByteDance Network Technology Co., Ltd., which is headquartered in Beijing, China.

### C.      Alter Ego And Single Enterprise Allegations.

104.  At all relevant times, Defendants TikTok, Inc. and ByteDance, Inc. have shared offices in Silicon Valley[13] and also have shared employees. U.S. and China-based employees of the ByteDance family of companies perform work on and concerning the TikTok app that is at the center of this lawsuit, including the functionality and operation of the TikTok app and the Chinese version of the app ("Douyin") that Defendant Beijing ByteDance operates in China.

105. Plaintiffs' investigation has revealed that one Director of Engineering in the Mountain View office leads an "augmented reality" team that is tasked with transforming state-of-the-art artificial intelligence and augmented reality technologies into "fun features" and

---

[13] In addition to ByteDance-TikTok cross-listed personnel in Palo Alto, TikTok logos and paraphernalia are found in the ByteDance, Inc. Palo Alto office. *See* https://www.youtube.com/watch?v=RymGJG0miv0.

"creative tools" for both the TikTok and Douyin apps.

106. At all relevant times, Defendant Beijing ByteDance has directed the operations of Defendants TikTok, Inc. and ByteDance, Inc. with respect to the TikTok app, and Defendants TikTok, Inc. and ByteDance, Inc. have reported to Defendant Beijing ByteDance.

107. At all relevant times, Defendant Beijing ByteDance has collected and analyzed data from the United States regarding the performance of various features of the TikTok app, and has worked with Defendants TikTok, Inc. and Defendant ByteDance, Inc. to address performance issues. Additionally, at all relevant times, Defendant Beijing ByteDance and its engineers have done significant coding for the TikTok app and its many versions and updates.

108. Plaintiffs' investigation has revealed that, at certain relevant times, with respect to Defendants' monitoring and censorship of content on the TikTok app, management in China has determined content review policies enforced in Defendant TikTok, Inc.'s Culver City office; a content review manager in the same Culver City office was reporting to someone in China; and another content reviewer was required to seek authorization from someone in China in order to access non-published information about user accounts when content concerns arose. Also, at certain relevant times Defendant Beijing ByteDance employed a vast number of content reviewers in China to review TikTok videos uploaded by United States users, and these reviewers in China had authority to take down any such videos if the content was deemed inappropriate or illegal.

109. These facts are consistent with public reporting. For example, "[m]ultiple TikTok sources, who spoke with *The Intercept* on the condition of anonymity …, emphasized the primacy of ByteDance's Beijing HQ over the global TikTok operation, explaining that their ever-shifting decisions about what's censored and what's boosted are dictated by Chinese staff, whose policy declarations are then filtered around TikTok's 12 global offices, translated into

rough English, finally settling into a muddle of Beijing authoritarianism crossed with the usual Silicon Valley prudishness."[14]

110.     Plaintiffs' investigation has revealed that Defendant Beijing ByteDance employees have collected TikTok users' feedback regarding upgraded and/or newly introduced features, and the departments responsible for managing and monitoring TikTok user experience have been based in China. Employees in these departments reported to their supervisors in China, who in turn shared their findings with Defendant TikTok, Inc. in the United States. Defendant Beijing ByteDance employees also distributed questionnaires to TikTok users, and collected and recorded reports from such users about problems they were experiencing. Employees in the United States contacted TikTok users and took notes regarding such users' experiences. These notes were translated into Chinese and sent to Defendant Beijing ByteDance executives to review and analyze.

111.     Defendant Beijing ByteDance made key strategy decisions for Defendants TikTok, Inc. and ByteDance, Inc., as well as for offices elsewhere in the world, and Defendants TikTok, Inc., ByteDance, Inc. and the other offices were tasked with executing such decisions.

112.     A publicly available interview of Isaac Bess and Gregory Justice, employees of Defendants, on YouTube is consistent with these facts. In that interview, Isaac Bess identifies himself as responsible for leading "ByteDance" business development from Los Angeles, and Gregory Justice identifies himself as part of Defendant TikTok, Inc.'s content team in Los Angeles. Both discuss having regular all-hands bi-monthly meetings with the CEO in China to discuss global strategy with the "local teams."[15]

113.     At all relevant times, and in connection with the matters alleged herein, each

---

[14] https://theintercept.com/2020/03/16/tiktok-app-moderators-users-discrimination/.

[15] https://www.youtube.com/watch?v=lKV6wsdI4-A (at 0:20 – 0:54; 15:59 – 17:08).

Defendant acted as an agent, servant, partner, joint venturer and/or alter ego of each of the other Defendants, and acted in the course and scope of such agency, partnership, and relationship and/or in furtherance of such joint venture. Each Defendant acted with the knowledge and consent of each of the other Defendants and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted, and/or participated in the acts or transactions of the other Defendants.

114.    At all relevant times, and in connection with the matters alleged herein, Defendants were controlled and largely owned by the same person, founder Zhang Yiming, and constitute a single enterprise with a unity of interest. Recognition of the privilege of separate existence under such circumstances would promote injustice.

## III.    <u>JURISDICTION AND VENUE.</u>

115.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants, and also because two Defendants are citizens or subjects of a foreign state.

116.     This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District, and purposely availed themselves of the laws of the United States.

117.    This Court further has personal jurisdiction with respect the claims of the Illinois Subclass (defined below) because Defendants used and disseminated data derived directly from Illinois-based TikTok users and exposed residents of Illinois to ongoing privacy risks within

Illinois based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information. Furthermore, many of the images Defendants used for their unlawful collection, capture and obtainment of biometric identifiers and information were created in Illinois, uploaded from Illinois, and/or managed via Illinois-based user accounts, computers, and mobile devices. Because of the scope and magnitude of Defendants' conduct, Defendants knew that their collection, capture, obtainment, disclosure, redisclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens. Defendants knew or had reason to know that collecting, capturing, obtaining, disclosing, redisclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite releases would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via their Illinois-managed devices and exposed minors in Illinois to potential surveillance and other privacy harms as they went about their lives within the state.

118.    Furthermore, through the TikTok app, Defendants actively collect information harvested from the Illinois-based devices of Illinois residents, including "location information" based on users' "SIM card and/or IP address."

119.    Defendants use this harvested information to "provide [users] with location-based services, such as advertising and other personalized content" directed toward Illinois.

120.    Defendants' deliberate gathering of Illinois users' personally identifiable information is intentionally targeted toward Illinois residents, including Plaintiffs and the Class, and constitutes purposeful activity directed at devices and individuals in Illinois.

121.    Indeed, Defendants attract advertisers by touting the TikTok's app's ability to target

users by, among other things, location, stating that "[i]t has never been easier to reach potential customers by precisely targeting your audience. Using TikTok Ads, you can target your audience by gender, location, age, interests, and other unique variables."  TikTok expressly targets its advertisements by State, including, upon information and belief, within Illinois.  Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in Illinois.  Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

122.    Venue is also proper because the Judicial Panel on Multi-District Litigation ordered that the various cases filed against Defendants be centralized in the Northern District of Illinois.

## IV.    THE GROWTH OF DEFENDANTS AND THEIR DANGEROUS APPS.

### A.    Defendant Beijing ByteDance Becomes A China-Based Tech Giant Focused On Overseas Markets, Particularly In The United States.

123.    Founded in 2012, Defendant Beijing ByteDance—the parent company of TikTok— is one of China's largest technology companies with an estimated valuation of $100 billion.[16] ByteDance's CEO, Zhang Yiming, was honored by an organization affiliated with the Chinese Communist Party as one of its "100 outstanding private entrepreneurs."[17] The list is "something of a guide to who is in the good books of the Chinese authorities."[18]

124.    Defendant Beijing ByteDance makes a variety of video and news-aggregation apps.[19] It "regards its platforms as part of an artificial intelligence company powered by algorithms

---

[16]    https://techcrunch.com/2020/08/10/bytedance-valuation-under-huge-pressure-as-tiktok-sale-nears.

[17] https://www.weekinchina.com/2018/11/loyalty-points.

[18] https://www.weekinchina.com/2018/11/loyalty-points.

[19] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

that 'learn' each user's interests and preferences through repeat interaction."[20] Because Defendant Beijing ByteDance emerged only after other China-based tech giants already had taken over the market in China, Defendant Beijing ByteDance has looked to overseas markets, including those in the United States, for growth.[21]

125.    Defendant Beijing ByteDance had $7.2 billion in annual revenue for the year 2018. It far surpassed this number in 2019, booking $7 billion to $8.4 billion in revenue in a better-than-expected result for the first half of 2019.[22] Investors in Defendant Beijing ByteDance include Sequoia Capital China, Russian billionaire Yuri Milner, Japanese technology giant SoftBank, and big private-equity firms such as KKR, General Atlantic, and Hillhouse Capital Group.[23]

126.    Most of Defendant Beijing ByteDance's revenue is generated from advertising.[24] "ByteDance has [] been doubling down on its advertising business as the company's management sets increasingly ambitious revenue goals."[25] "As with pretty much all major social media and content startups, ByteDance monetises through advertising. Specifically, it runs targeted advertising within user feeds – providing them promotional content in between using the app."[26]

---

[20] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats; https://www.cotton.senate.gov/?p=press_release&id=1239.

[21] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[22] https://www.cnbc.com/2019/09/30/tiktok-owner-bytedances-first-half-revenue-better-than-expected-at-over-7-billion-sources.html.

[23] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123; https://www.reuters.com/article/us-tiktok-cfius-exclusive/exclusive-us-opens-national-security-investigation-into-tiktok-sources-idUSKBN1XB4IL.

[24] https://www.bloomberg.com/news/articles/2019-01-15/bytedance-is-said-to-hit-lower-end-of-sales-goal-amid-slowdown.

[25] https://technode.com/2019/09/20/bytedance-launches-video-ad-tools-for-tiktok-douyin/.

[26] https://www.businessofapps.com/insights/bytedance-social-media-advertising-company/.

## B.     The Musical.ly App Evolves Into The TikTok App.

127.     Defendant Musical.ly (named, and now known as, TikTok, Ltd.) and Defendant Musical.ly, Inc. (named, and now known as, TikTok, Inc.) launched the highly popular social media and social networking app "Muscial.ly" in 2014. This app allows its users to (i) create video selfies of themselves dancing and/or lip-syncing with a musical soundtrack in the background, and (ii) share such videos with friends.[27]

128.     There are simple tools provided by the Musical.ly app that users can use to create and edit these videos, and the app provides a large online music library from which users may select their background music. The Musical.ly app was designed "to capture the YouTube phenomenon of teenagers sharing videos of themselves singing or dancing to popular music."[28] Beyond the creation and sharing of videos, the Musical.ly app provides a platform through which users can interact, including by commenting on other users' videos and "following" other users' accounts. Users also can send direct messages in order to communicate with other users on the app. By November 2017, the Musical.ly app had 60 million monthly active users.[29]

129.     Meanwhile, in 2016, Defendant Beijing ByteDance launched its own app called "Douyin" in China, which mimicked the Musical.ly app.[30] By 2017, shortly before its purchase of Defendants Musical.ly and Musical.ly, Inc., Defendant Beijing ByteDance introduced an English-

---

[27] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123.

[28] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123.

[29] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123; https://www.nytimes.com/2019/11/01/technology/tiktok-national-security-review.html.

[30] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

language version of the Douyin app outside China under the name "TikTok." In August 2018, after having acquired Defendants Musical.ly and Musical.ly, Inc., Defendant Beijing ByteDance combined the Musical.ly app with its TikTok app, merging all existing accounts and data into a single app under the retained "TikTok" name.[31]

130. The Musical.ly and TikTok apps are hereafter collectively referred to as the "TikTok app," and the Musical.ly and TikTok users are hereafter collectively referred to as the "TikTok users."

## C. The TikTok App Becomes A Global Phenomenon With A Strong Presence In The United States.

131. The TikTok app has become "one of the world's fastest-growing social media platforms" and a "global phenomenon" with a massive American audience.[32] In November 2019, the *Washington Post* reported that the TikTok app had been downloaded more than 1.3 billion times worldwide, and more than 120 million times in the United States.[33] However, by April 2020, *TechCrunch* reported that the TikTok app's worldwide downloads already had surpassed 2 billion, and that in "the quarter that ended on March 31, TikTok was downloaded 315 million times — the highest number of downloads for any app in a quarter."[34] It is the most downloaded non-game app in the world.[35] The TikTok app routinely outranks its top competitors – such as Facebook,

---

[31] http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

[32] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[33] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[34] https://techcrunch.com/2020/04/29/tiktok-tops-2-billion-downloads/.

[35] https://www.cnbc.com/2019/07/25/china-camera-apps-may-open-up-user-data-to-beijing-government-requests.html.

Snapchat, and Instagram – on the Apple and Google app stores.[36] In fact, it has been the most downloaded app on the Apple and Google app stores for months.[37] As of August 2019, the TikTok and Douyin apps had 625 million monthly active users.[38] The average user opened the TikTok app more than 8 times per day and spent approximately 45 minutes on the app daily as of March 2019.[39]

132.    In January 2020, *Barron's* reported on the TikTok app's revenue: "The wildly popular short-video service generated $176.9 million in revenue in 2019—71% of the total $247.6 million in revenue the app has ever generated, according to new data from the app-tracking firm SensorTower. In the fourth quarter alone, TikTok had revenue of $88.5 million, up two times from the third quarter and up six times year over year, most of that from advertising and in-app purchases, SensorTower reports. China accounted for about 69% of the company's 2019 revenue, according to the firm, with U.S. revenues accounting for 20%."[40] Evidencing the TikTok app's rapid growth, three months later, *TechCrunch* reported that: "Users have spent about $456.7 million on TikTok to date, up from $175 million five months ago. Much of this spending — about 72.3% — has happened in China. Users in the United States have spent about $86.5 million on the app, making the nation the second most important market for TikTok from the revenue standpoint."[41]

133.    As of August 2020, TikTok admitted to having more than 100 million monthly

---

[36] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[37] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

[38] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

[39] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[40] https://www.barrons.com/articles/beware-facebook-tiktok-revenues-are-exploding-51579201752.

[41] https://techcrunch.com/2020/04/29/tiktok-tops-2-billion-downloads/.

active users in the United States.[42] Some estimates indicate that there are 123.8 million active users of TikTok in the United States.[43] In other words, over one-third of the United States' population of 328.2 million has used TikTok, and approximately 50 million Americans use TikTok each day.[44]

134.    This level of success globally and in the United States is rare for a China-based tech giant. Facebook CEO Mark Zuckerberg acknowledged as much, stating that the TikTok app "is really the first consumer internet product built by one of the Chinese tech giants that is doing quite well around the world. It's starting to do well in the U.S., especially with young folks."[45] Indeed, Defendant TikTok, Inc. recently took over office space in Silicon Valley once occupied by Facebook's WhatsApp messaging app, and is poaching employees from rival Facebook by offering salaries as much as 20% higher.[46] Other competitors from whom Defendant TikTok, Inc. is hiring away employees include Snap, Hulu, Apple, YouTube, and Amazon.[47]

135.    One key to Defendants' financial success is the targeted advertising that they run through the TikTok app. Such targeted advertising relies heavily upon knowledge of each user's preferences.[48]

---

[42]   Complaint for Injunctive and Declaratory Relief, ¶ 19, *TikTok Inc. v. Donald J. Trump et al.*, No. 2:20-cv-7672, (C.D. Cal. Aug. 24, 2020), ECF No. 1, available at: https://cdn.vox-cdn.com/uploads/chorus_asset/file/21812645/document__1_.pdf (hereafter "*TikTok v. Trump*").

[43]   *See* https://commercialfreechildhood.org/wp-content/uploads/2020/05/tik_tok_complaint.pdf.

[44]   *TikTok v. Trump*, ¶ 21.

[45]   https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[46]   https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[47]   https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[48]   https://www.digitaltrends.com/social-media/tiktok-advertiser-audience-network-targeted-ads/.

136.     Through a secretive and highly invasive information gathering campaign, Defendants have unlawfully accumulated private and personally identifiable data and content from TikTok users that Defendants are monetizing. Thus, Defendants are unjustly profiting from their unlawful activities.

## V.     DEFENDANTS' THEFT OF PRIVATE AND PERSONALLY IDENTIFIABLE TIKTOK USER DATA AND CONTENT.

### A.     Defendants' Secret Taking and Disclosure of Private TikTok User Data Without Notice Or Consent.

#### 1.     The TikTok app requires that users provide private and personally identifiable data upon sign-up.

137.     In order to create and send videos, an individual can first create a TikTok profile by registering with TikTok using his or her phone number or email address, or Facebook, Google, or Twitter credentials.

138.     Videos are shared either publicly (and then available to be viewed by all other TikTok users) or sent privately to selected users.

139.     By default, TikTok profiles are set to "public," which allows anyone to see a user's profile, username, and videos.

140.     But users can set their TikTok profile to "private," purportedly to ensure their profiles and videos do not appear in searches of TikTok content. A user with a private profile may access all of TikTok's functions and features, and can share videos directly with friends through the app.

141.     As elaborated upon below, public videos are central to the TikTok experience. Through its "For You" page, TikTok curates content for each user, offering an endless feed of recommended videos that Defendants select based on algorithmic evaluation of each user's interests.

142.     These curated video feeds are integral to TikTok's revenue model, which is heavily reliant on "microtargeted" advertisements.

143.     By prompting users to view videos with which they are more likely to engage (as determined by TikTok based on the vast amounts of data available it collects), TikTok has proven able to scale up its revenues at an extraordinary pace.

144.     And, of course, the more data TikTok has at its disposal, the more efficiently and effectively it can deploy advertising and grow its profits.

**2.     The TikTok app secretly takes users' private videos before users are given the choice whether to save or post them.**

145.     Unless publicly shared through the affirmative consent of the TikTok user, videos created using the TikTok app, which often include close-ups of faces and private acts unintended for public consumption, are inherently private, personal, and sensitive.

146.     After using the TikTok app to record a video, a screen presents TikTok users with certain options, including the following: (i) an "x" button; (ii) a "next" button; and (iii) a button for effects. The "x" button takes TikTok users to a screen with options, including "reshoot" and "exit." The "next" button takes TikTok users to a screen with options, including "save" and "post." The "effects" button takes TikTok users to a screen offering the ability to modify the video.

147.     Once TikTok users click the "next" button, but before they click either the "save" or "post" buttons, their ***private videos that are neither saved nor posted*** (the "Private Videos") are transferred from their mobile devices to the following domain owned and controlled by Defendants: muscdn.com.

148.     The "mus" portion of the domain name stands for Musical.ly, and the "cdn" portion of the domain name stands for content distribution network. During the secret transfer of TikTok users' Private Videos to the domain and servers mentioned above, there is no progress bar or any

other indication that their Private Videos are being transferred.

149.    Nor is Defendants' surreptitious taking of the Private Videos disclosed in any of Defendants' privacy policies or other disclosure documentation. TikTok users are thus prevented from knowing that Defendants have taken their Private Videos. No user consent exists.

150.    Additionally, the December 2019 version of the TikTok app transfers five thumbnail images uniformly distributed across each of the Private Videos (the "Private Video Images") to byteoversea.net. The domain byteoversea.net is controlled by Defendants and has numerous sub-domains. Accordingly, when data and content arrives at byteoversea.net, it is routed to one or more of these sub-domains. The various sub-domains are spread across the globe, including within China.

151.    Defendants' taking of the Private Video Images is not disclosed in any of Defendants' privacy policies or other disclosure documentation. TikTok users are thus prevented from knowing that Defendants have taken their Private Video Images as well. No user consent exists.

152.    This highly invasive breach of TikTok users' privacy is not the only harm that befalls such users as a result of Defendants' theft of their Private Video Images. Defendants also can take highly sensitive and immutable biometric identifiers and information from these Private Video Images and unjustly profit from such activities.

### 3.    The TikTok app covertly takes user and device information.

153.    Also unknown to TikTok users is that the seemingly innocuous TikTok app infiltrates their mobile devices and extracts a remarkably broad array of private and personally identifiable data and content that Defendants use to track and profile TikTok users for the purpose of, among other things, targeting them with advertisements from which Defendants unjustly profit.

154.    Plaintiffs, the Class, and the Subclass have a reasonable expectation of privacy in

the private and personally identifiable data and content on their mobile device.

155. The United States Supreme Court has recognized that, in contemporary society, cell phones are so ubiquitous and inextricably intertwined with the user's personal privacy that such devices have become "*almost a 'feature of human anatomy*.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)). The United States Constitution thus provides a privacy right that protects individuals against unreasonable governmental searches of their physical movements through historical cell phone records in the possession of their service providers. *Carpenter*, 138 S. Ct. at 2218.

156. From each mobile device on which the TikTok app is installed, Defendants take a combination of, among other items, the following user identifiers and mobile device identifiers ("User/Device Identifiers"):

   a. username, password, age/birthday, email address, and profile image;

   b. user-generated content, including messages sent through the apps;

   c. phone and social network contacts;

   d. the mobile device's WiFi MAC address (*i.e.*, media access control address), which is the unique hardware number on the WiFi card adapter that tells the internet who is connected to it;

   e. the mobile device's International Mobile Equipment Identity ("IMEI") number, which is a unique number given to every mobile device that is used to route calls to one's phone, and that reflects information about the origin, model, and serial number of the mobile device;

   f. the user's International Mobile Subscriber Identity ("IMSI") number, which is a unique number given to every subscriber to a mobile network;

g.  the IP address (*i.e.*, Internet Protocol address), which is a numerical label assigned to each user mobile device connected to a computer network that uses the Internet Protocol for communication. IP addresses allow the location of literally billions of digital devices that are connected to the Internet to be pinpointed and differentiated from all other such devices;

h.  the device ID, which is a unique, identifying number or group of numbers assigned to the user's individual mobile device that is separate from the hardware serial number;

i.  the OS version, which is the operating system on the user's mobile device;

j.  the mobile device brand and model/version;

k.  the hardware serial number, which is the unique, identifying number or group of numbers assigned to the user's individual mobile device;

l.  the Advertising ID, which is a unique ID for advertising that provides developers with a simple, standard system to monetize their apps;

m.  mobile carrier information (*e.g.*, the name of the phone company);

n.  network information, including the technology that the carrier uses;

o.  browsing history;

p.  cookies;

q.  metadata; and

r.  precise physical location, including based on SIM card, cell towers and/or GPS.

157.  Such collection of physical and digital location tracking data is highly invasive of TikTok app users' privacy rights. Two United States Senators observed that "[l]ocation data is among the most sensitive personal information that a user can share with a company … Today,

modern smartphones can reveal location data beyond a mere street address. The technology is sophisticated enough to identify on which floor of a building the device is located."[49] Location data reveals *private living patterns* of TikTok users, including where they work, where they reside, where they go to school, and when they are at each of these locations. Location data, either standing alone or combined with other information, exposes deeply private and personal information about TikTok users' *health, religion, politics and intimate relationships*.

158.    The TikTok app also invites users to sign in through Facebook, Google, and Twitter. What users do not know and what Defendants fail to adequately disclose is that this "single sign-on" option gives Defendants access to TikTok users' private and personally identifiable data and content stored on these *other social media accounts*, including User/Device Identifiers such as the user's photos and friends/contacts information. What users also do not know and what Defendants fail to disclose is that Defendants transmit private and personally identifiable user information to third parties like Facebook and Google, as discussed below.

### 4.    The TikTok App clandestinely transmits user video viewing histories to third parties.

159.    Defendants use the TikTok app to distribute private and personally identifiable information concerning TikTok users' video viewing history to third parties Facebook and Google without user knowledge or consent.

160.    For example, the TikTok app transmits the following information from TikTok users' devices to Facebook's domain graph.facebook.com: (1) when an individual TikTok user views a particular video, including the video's ID; (2) when an individual TikTok user "likes" a particular video, including the video's ID; (3) when an individual TikTok user "favorites" a

---

[49] https://www.law360.com/consumerprotection/articles/1221312/sens-prod-zuckerberg-why-keep-tracking-user-locations-.

particular video, including the video's ID; (4) the other TikTok users that the individual TikTok user "follows," including the other TikTok users' IDs; and (5) the individual TikTok user's Facebook-assigned advertising ID linked to the individual TikTok user's Facebook account.

161.    This advertising ID is linked to the user's particular device and it identifies that user to an ordinary person without need for further cross-referencing or investigation because Facebook maintains a 1:1 correspondence of advertising IDs to individuals, a fact known to Defendants.

162.    Defendants do not disclose to TikTok users that Defendants transmit this private and personally identifiable information to Facebook, nor do Defendants obtain user consent for such transmissions.

163.    Also by way of example, the TikTok app transmits the following information from TikTok users' devices to Google's domain app-measurement.com: (1) the particular videos that an individual TikTok user "likes," including the video ID and the individual TikTok user's Google-assigned device ID and advertising ID, linked to the TikTok user's Google account, which identifies the user to an ordinary person without need for further cross-referencing or investigation because Google maintains a 1:1 correspondence of device IDs and advertising IDs to individuals, a fact known to Defendants; and (2) the other TikTok users that the individual TikTok user "follows," including the other users' IDs and the individual TikTok user's Google-assigned device ID and advertising ID, which are linked to the TikTok user's Google account. Defendants do not disclose to TikTok users that Defendants transmit this private and personally identifiable information to Google, nor do Defendants obtain user consent for such transmissions.

### 5.    The TikTok App secretly collects data far beyond what Defendants disclose to users.

164.    The TikTok app's source code reveals that Defendants track each user's specific

location, notwithstanding TikTok's claim that it does so only if users consent.[50]

165.    Specifically, TikTok "determine[s] as precise a location [for the user] as possible from the available location providers, including the Global Positioning System (GPS) as well as WiFi and mobile cell data." Penetrum, a cybersecurity company that analyzed the TikTok app's source code, concluded that because TikTok collects highly sensitive location data, the app provides a "dangerous[ly]" low level of protection for users.[51]

166.    And although both Apple and Google prohibit apps from accessing the MAC address of mobile devices, TikTok accesses the MAC address on mobile devices running on an Android operating system. It does so by concealing the data the app gathers and transmits to Defendants by using custom encryptions allowing the data to "bypass detection by Apple or Google because if Apple or Google saw them passing those identifiers back they would almost certainly reject the app."[52] It thus can pinpoint users' precise current locations, and well as those they often visit, using the devices' MAC addresses.

167.    In addition to device and network data, TikTok also collects data regarding users' general habits and their devices—even when the TikTok app is not in use—and transmits the data to Defendants. The data that TikTok accesses includes user content and communications, cookies, metadata, and internet browsing history, all of which may contain highly sensitive, user-specific

---

[50]: https://penetrum.com/tiktok/Penetrum_TikTok_Security_Analysis_whitepaper.pdf

[51]

https://developer.android.com/reference/android/Manifest.permission#ACCESS_FINE_LOCATI ON (noting that the code used by TikTok "allows an app to access precise location" and that the protection level of the particular code is "dangerous").

[52]         https://www.wsj.com/articles/tiktok-tracked-user-data-using-tactic-banned-by-google-11597176738.

information.[53]

168.    The app also attempts to ascertain the user's gender, race, and age. To do this, as elaborated below, TikTok uses biometric identifiers and facial recognition algorithms to map the user's face in both the user's profile picture and videos featuring the user.[54] TikTok frequently recommends that a user follow other users with similar profile pictures.[55]

169.    Defendants accelerate their data harvesting efforts once users actually begin to engage with the TikTok app. TikTok uses AI and various algorithms to determine a user's "interests" based on the user's behavior when using the app.

170.    Defendants also intentionally share data with third parties, such as advertisers and other complementary social media services.

171.    For example, data protection researcher and journalist Matthias Eberl discovered that TikTok transmits certain data directly to third parties, such as Facebook and Appsflyer, including the user's device information, which videos the users watched videos and actual usage time.[56]

172.    The third parties may be sharing the data with additional entities.[57]

173.    TikTok tracks which specific users watch particular videos and performs "highly controversial methods" of fingerprinting each device on which the app is installed by "combining

---

[53]  https://www.tiktok.com/legal/privacy-policy?lang=en#privacy-us (last updated Jan. 1, 2020) (listing data that Defendants automatically collect even if the person who downloaded the app does not create an account).

[54]  https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html.

[55]  https://www.vox.com/recode/2020/2/25/21152585/tiktok-recommendations-profile-look-alike.

[56]  https://rufposten.de/blog/2019/12/05/privacy-analysis-of-tiktoks-app-and-website.

[57]  *See* https://rufposten.de/blog/2019/12/05/privacy-analysis-of-tiktoks-app-and-website.

unique hardware and browser characteristics."[58]

174.    The app also creates an audio fingerprint of the device by generating and recording internal sounds that are unique thereto.[59]

175.    Fingerprinting the mobile devices could allow users and their devices to be tracked by Defendants and third parties (such as advertisers).

176.    Not even users' private messages to others are safe from Defendants. TikTok reads the private messages that users exchange with one another—it even scans draft messages that are not yet, and may never be, sent—and views (and, on information and belief, analyzes) videos users send to friends privately through the app, but which are not posted publicly.[60]

**6.      Defendants' theft of private and personally identifiable user data and content begins even before users can choose whether to sign up with TikTok and create an account.**

177.    The TikTok app begins taking private and personally identifiable user data and content immediately upon the completion of the download process and before TikTok users even have the opportunity to sign up and create an account. TikTok users therefore do not have an opportunity to learn about the existence of, much less consent to, any of Defendants' privacy policies or other disclosure documentation before the TikTok app begins mining their mobile devices for their data and content.

**7.      Defendants' theft of private and personally identifiable data and content continues even after users close the TikTok app.**

178.    Even when TikTok users stop using the app and close it, Defendants continue to

---

[58] https://rufposten.de/blog/2019/12/05/privacy-analysis-of-tiktoks-app-and-website.

[59] https://rufposten.de/blog/2019/12/05/privacy-analysis-of-tiktoks-app-and-website.

[60]      https://www.bloomberg.com/news/articles/2020-07-14/tiktok-s-massive-data-harvesting-prompts-u-s-security-concerns;      http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information.

harvest private and personally identifiable data and content from such users' mobile devices. There are no disclosures in any of Defendants' privacy policies or other disclosure documentation that such surreptitious taking of private and personally identifiable user data and content occurs when the TikTok app is closed. TikTok users are thus prevented from knowing that Defendants have taken their private and personally identifiable data and content while the TikTok app is closed. No user consent exists.

**8.  Defendants' theft of private and personally identifiable data and content extends to sources wholly unrelated to the TikTok app.**

179.   Defendants' invasive, surreptitious, and unlawful data collection is not limited to the scope of the TikTok app.

180.   Rather, Defendants have gone as far as to track and collect private user data, created outside of and unrelated to the TikTok app, when the app is not in use.

181.   For example, TikTok has accessed the clipboard on users' devices, allowing it to capture text and images that the user copied, even if in a different app, which could include passwords, financial information, or other sensitive, personally identifiable information.[61]

182.   TikTok accessed a device's clipboard every few keystrokes, presumably to ensure it captures every bit of information available.[62]

183.   Apple's iOS 14 beta operating system exposed that Defendants were engaging in unauthorized data-mining and surveillance of user devices through automated technologies which allow them to gain covert access to the Universal Clipboard.

184.   A user's system clipboard is unlimited in the array of sensitive data and information

---

[61]  https://www.forbes.com/sites/zakdoffman/2020/06/26/warning-apple-suddenly-catches-tiktok-secretly-spying-on-millions-of-iphone-users/#4a4ff00334ef.

[62]  *See* https://twitter.com/jeremyburge/status/1275896482433040386.

it may contain, such as: photos, text messages, audio recordings, e-mails, cryptographic keys, medical records, and other personal information.

185.    Moreover, the clipboard on a user's phone or tablet may contain content from other of the user's devices, e.g., his or her laptop. For example, Apple's continuity features—the "Handoff" function—facilitate seamless continuity and sharing between iOS and MacOS devices signed into the same iCloud account. Handoff is the default setting, and, unless disabled, a user's shared devices will automatically discover nearby devices, send communications by and between devices, interface with Apple iCloud and transmit data and information between them.

186.    Handoff works with Calendar, Contacts, Pages, Safari, Messaging, News and E-books, music, system clipboard and various third-party apps. The Universal Clipboard transmits clipboard data to all nearby shared devices. The information, however, is typically only accessible for a 120-second timeout period.

187.    Defendants gained unauthorized, covert access to User's Universal Clipboard by reading the system clipboard with every few keystrokes (if not even more often), thus circumventing the automatic 120-second timeout feature.

188.    Defendants continuously accessed, intercepted, and otherwise used the data and information on the Universal Clipboard, including information from users' other shared devices.

189.    Defendants did not obtain permission from users to access their devices, social media accounts, system clipboards, messaging apps, safari apps or other such sensitive data and information.

190.    Defendants did not obtain permission from users to intercept, read, and use their electronic communications or inter-device communications.

191.    Upon information and belief, Defendants used various software, technologies, and

programs to covertly intercept, access, and otherwise use Plaintiffs and Class Members' data and information stored on electronic devices.

192. Defendant used various programs and technologies to conduct geo-tracking and other surveillance of Plaintiffs and Class Members, without authorization or permission.

### 9. Defendants conceal their misconduct.

193. At the same time that Defendants utilize the TikTok app to covertly tap into a massive array of private and personally identifiable user data and content, they go to great lengths to hide their tracks. Plaintiffs' investigation has revealed that Defendants do so by obfuscating the source code that would reveal their misconduct.

### B. Defendants Settle An FTC Lawsuit Alleging They Unlawfully Collected And Used Children's Data.

194. On February 27, 2019, the United States, on behalf of the Federal Trade Commission ("FTC"), filed a lawsuit against Defendants Musical.ly and Musical.ly, Inc. alleging they had violated the Children's Online Privacy Protection Act ("COPPA") by collecting and using personal data from children under age 13 without the required notice and consent from parents or guardians.[63] According to the FTC, Defendants' violations were knowing and willful, as Defendants received scores of complaints from concerned parents. In fact, in a two-week period in September 2016, Defendants received more than 300 complaints from angry parents demanding that Defendants close their children's accounts. [64] While Defendants closed the accounts, they did not delete the minors' videos or profile information from their servers.[65]

195. Shortly thereafter, Defendants Musical.ly and Musical.ly, Inc. stipulated to an order

---

[63] *United States of America v. Musical.ly and Musical.ly, Inc.*, United States District Court, Central District of California, Case No. 2:19-cv-1439 [ECF No. 1]

[64] *Id*. at ¶ 21.

[65] *Id*.

mandating, among other things, a civil penalty in the amount of $5.7 million and injunctive relief concerning the collection and destruction of children's personal data.[66] The $5.7 million fine is the largest civil penalty ever imposed for such a violation.[67] The FTC also published a statement indicating that, "[i]n our view, these practices reflected the company's willingness to pursue growth even at the expense of endangering children."[68]

196.    Defendants' compliance with the FTC settlement terms is unclear and as recently as May 29, 2020, a bipartisan group of United States Senators and Representatives called for investigations into whether Defendants continue to violate COPPA. Their concerns are not unfounded: a coalition of 20 children's privacy protection groups complained to the FTC that Defendants flout the settlement terms.[69]

197.    On December 14, 2020, the FTC renewed its interest in TikTok, issuing an order requiring TikTok to provide data on how it collects, uses, and presents users' personal information, as well information on its advertising and user engagement practices, and how its practices affect children and teenagers.[70]

198.    The FTC's order included a joint statement explaining that social media companies like TikTok "have been able to exploit their user-surveillance capabilities to achieve such

---

[66] *United States of America v. Musical.ly and Musical.ly, Inc.*, United States District Court, Central District of California, Case No. 2:19-cv-1439 [ECF No. 10].

[67] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861; https://www.techinasia.com/tiktok-owner-bytedance-gathers-1-billion-monthly-active-users-apps.

[68] https://www.nbcnews.com/tech/tech-news/tiktok-pay-5-7-million-over-alleged-violation-child-privacy-n977186.

[69] *See* https://commercialfreechildhood.org/wp-content/uploads/2020/05/tik_tok_complaint.pdf.

[70] *See* https://www.ftc.gov/news-events/press-releases/2020/12/ftc-issues-orders-nine-social-media-video-streaming-services.

significant financial gains that they are now among the most profitable companies in the world." Moreover, social media companies' "constant access" to users' mobile devices allows them "to monitor where users go, the people with whom they interact, and what they are doing."[71]

199.   TikTok has forty-five days from receipt of the order to respond.

### C.   Defendants Come Under United States Government Scrutiny.

#### 1.   The United States Government investigates Defendants' stockpiling of TikTok users' private and personally identifiable data and content for the Chinese Government.

200.   United States Senators Charles Schumer and Tom Cotton sent an October 2019 letter to the Acting Director of National Intelligence describing "national security" risks associated with the TikTok app. The Senators noted that there is evidence that Defendants may share private and personally identifiable user data and content with the Chinese government:

> TikTok's terms of service and privacy policies describe how it collects data from its users and their devices, including user content and communications, IP address, location-related data, device identifiers, cookies, metadata, and other sensitive personal information. While the company has stated that TikTok does not operate in China and stores U.S. user data in the U.S., ByteDance is still required to adhere to the laws of China.

> Security experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party. … With over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore. Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok … and brief Congress on these findings.[72]

---

[71] https://www.ftc.gov/system/files/documents/reports/6b-orders-file-special-reports-social-media-video-streaming-service-providers/joint_statement_of_ftc_commissioners_chopra_slaughter_and_wilson_regarding_social_media_and_video.pdf

[72] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-

201.    The Committee on Foreign Investment in the United States ("CFIUS") is an inter-agency committee of the United States government that reviews the national security implications of foreign investments in United States companies or operations. Chaired by the United States Secretary of the Treasury, CFIUS includes representatives from 16 United States departments and agencies, including the Defense, State, Commerce and Homeland Security departments. CFIUS is reviewing Defendant Beijing ByteDance's acquisition of Defendants Musical.ly and Musical.ly, Inc.[73]

202.    Additionally, the Senate Judiciary Subcommittee on Crime and Terrorism held a hearing in November 2019 that Defendant TikTok, Inc. declined to attend although it had been invited. The Chairman, Senator Josh Hawley, stated in opening remarks that: "TikTok should answer … to the millions of Americans who use their product with no idea of its risks."[74] Chairman Hawley also told reporters that: "The idea that TikTok is not sharing data, is not taking direction from Beijing, that just does not appear to be true."[75]

203.    Indeed, the risk that Defendants sends TikTok user data to the Chinese government is so great that the U.S. Army has banned the app on government-owned devices. That decision was based on concerns specific to Defendants and their close relationship to the Chinese government. The Army banned the TikTok app despite the fact that it had been using it for recruiting purposes until it realized the risk.[76] The U.S. Navy, Marines, Air Force and Coast Guard,

---

threats; https://www.cotton.senate.gov/?p=press_release&id=1239.

[73] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[74] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

[75] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

[76] https://www.businessinsider.com/us-government-agencies-have-banned-tiktok-app-2020-2

as well as the Department of Defense and the Transportation Security Administration have likewise banned the TikTok app due to the risk that user data is being sent to China.[77]

204.    Recognizing the serious ongoing threat posed by TikTok, prominent U.S. Senators wrote to the FTC on May 29, 2020 that, "[f]aced with **compelling** evidence that this wildly popular social media platform is **blatantly flouting binding U.S. privacy rules**, the FTC should move swiftly to launch an investigation and forcefully hold violators accountable for their conduct."

205.    The U.S. Department of Defense recently expressed concern over TikTok's "popularity with Western users, and its ability to convey location, image and **biometric data** to its Chinese parent company, which is legally unable to refuse to share data with the Chinese Government," going so far as to issue an internal memo to encourage its employees to avoid installing the app.[78]

### 2.    Defendants unpersuasively deny they transfer TikTok users' private and personally identifiable data and content to the Chinese Government.

206.    In July 2019, amid growing scrutiny, Defendant TikTok, Inc. retained consultants who opined that there is "no indication" that the Chinese government accessed TikTok users' data.[79] But the lead consultant admitted that the review and analysis was limited to a narrow and recent four-month period: "He added that in the analysis from July [2019] to October [2019], which included interviews with TikTok employees and a review of the app's underlying computer code,

---

[77] https://www.businessinsider.com/us-government-agencies-have-banned-tiktok-app-2020-2#1-the-navy-banned-tiktok-from-government-devices-1; https://www.engadget.com/2020-01-04-nearly-whole-us-military-bans-tiktok.html

[78]     https://www.inc.com/jason-aten/the-department-of-defense-is-warning-people-not-to-use-tiktok-over-national-security-concerns.html.

[79] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

his team found no way TikTok could send data to China during those months."[80] And, the consultants did not address whether TikTok user data could be "*accessed from*," as opposed to "*sent to*," China.

207.    Defendant TikTok, Inc. also issued a public statement in which it represented: "First, let's talk about data privacy and security. We store all TikTok U.S. user data in the United States, with backup redundancy in Singapore. Our data centers are located entirely outside of China, and none of our data is subject to Chinese law."[81]

208.    This public statement is carefully couched in the present tense and studiously avoids mention of past practices. In fact, the statement does not actually say that no private and personally identifiable user data and content is transferred to China. Rather, it says that private and personally identifiable user data and content is stored in the United States (but not necessarily exclusively in the United States) and that Defendants' *current* data centers are located outside China (but not whether these data centers transfer private and personally identifiable user data to China or make it accessible there).

209.    Even Defendant TikTok, Inc.'s February 2019 Privacy Policy, which is not viewed by users in the ordinary course, states that "[w]e may share your information with a parent, subsidiary, or other affiliate of our corporate group." Although this language is ambiguous, it apparently "means it would include China-based ByteDance."[82] Accordingly, Defendant TikTok, Inc.'s public statement (above) and its February 2019 Privacy Policy are, at best, highly

---

[80] https://www.nytimes.com/2019/11/01/technology/tiktok-national-security-review.html.

[81] https://newsroom.tiktok.com/en-us/statement-on-tiktoks-content-moderation-and-data-security-practices.

[82] https://www.cnbc.com/2019/07/25/china-camera-apps-may-open-up-user-data-to-beijing-government-requests.html.

misleading.

**D.** **Transfers Of Private And Personally Identifiable User Data And Content From TikTok Users To China Without Notice Or Consent.**

      **1.** **The TikTok app secretly transfers private and personally identifiable user data and content to servers in China.**

210.    On November 15, 2020, CBS News 60 Minutes published an investigative report entitled "Is TikTok a Harmless App or a Threat to U.S. Security: It's billed itself as 'the last sunny corner on the internet,' but is TikTok really a tool for China to obtain troves of data on Americans?"

211.    The report included discussions between CBC correspondent Bill Whittaker and Klon Kitchen, who spent 15 years working for the U.S. intelligence community, including the CIA, and is now director of technology policy at the Heritage Foundation; Kara Frederick, who helped set up Facebook's counterterrorism program after spending six years at the Pentagon, the National Security Agency, and in the armed forces; U.S. Senator and former Missouri Attorney General Josh Hawley; and TikTok interim CEO Vanessa Pappas.

212.    In the report, Mr. Kitchen states, *inter alia*:

> What makes TikTok particularly concerning is its relationship with the Chinese Communist Party in Beijing, the government of China. The Chinese have fused their government and their industry together so that they cooperate to achieve the ends of the state.
>
> \*    \*    \*
>
> Imagine you woke up tomorrow morning and you saw a news report that China had distributed 100 million sensors around the United States, and that any time an American walked past one of these sensor, this sensor automatically collected off of your phone your name, your home address, your personal network, who you're friends with, your online viewing habits and a whole host of other pieces of information. Well, that's precisely what TikTok is. It has 100 million U.S. users, it collects all of that information.
>
> And more, like many U.S. social media companies, TikTok asks

49

> users for access to their cameras, microphones, photos, videos, and contacts. More obscure data, like "keystroke patterns," are collected from everyone using the app.

213. Regarding keystrokes, Ms. Frederick stated: "The patterns and the rhythms of the way that you strike the keyboard, it can basically say, 'This device belongs to this user.' And you can do a lot with that if you are a foreign government. It's very, very invasive."

214. Senator Hawley noted particular concerns stemming from TikTok's ownership by Beijing ByteDance, "a Chinese parent company that has direct ties to the Chinese Communist Party. And we also know that under Chinese law, TikTok, ByteDance, the parent, is required to share data with the Chinese Communist Party."

215. *Affinity* published an article entitled "TikTok is Scamming People & Stealing Information." Quoting from a pre-2019 TikTok privacy policy, the article reports that "they store and process user data in United States of America, Singapore, Japan or to China."[83] The article also reports that Defendant TikTok, Inc. is "offering personal information to third parties and the Chinese government."[84]

216. *CNBC* published an article entitled "China's globally popular camera apps may open up user data to Beijing requests" in which it confirms that a TikTok privacy policy from 2018 acknowledged transmission of private and personally identifiable user data and content to China: "TikTok's 2018 privacy policy said the company can transfer international users' data to China, according to archived versions of that web page."[85] Even Defendant TikTok, Inc.'s August 2018 Privacy Policy, which is not seen by users and which by its own terms does not even apply to

---

[83] http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

[84] http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

[85] https://www.cnbc.com/2019/07/25/china-camera-apps-may-open-up-user-data-to-beijing-government-requests.html.

United States users, states: "We will also share your information with any member or affiliate of our group, in China, for the purposes set out above, to assist in the improvement or optimisation of the Platform, … increase user numbers, development, engineering and analysis of information or for our internal business purposes …."

217.   *Quartz* published an article by David Carroll entitled "Is TikTok a Chinese Cambridge Analytica data bomb waiting to explode?" Mr. Carroll is an associate professor at the Parsons School of Design in New York, and in 2017 he sued Cambridge Analytica in the United Kingdom. In his *Quartz* article, Mr. Carroll quoted from Defendant TikTok, Inc.'s August 2018 Privacy Policy that reveals that private and personally identifiable user data and content is transferred to China.[86] Mr. Carroll further reported that, in emails between him and Defendant TikTok, Inc. in March and April 2019, Defendant TikTok, Inc. (i) confirmed that, at least prior to February 2019, U.S. TikTok user data may have been processed in China; and (ii) provided confusing answers about what happened after that, including that U.S. TikTok user data may have continued to be processed by systems operated by "one of our China registered entities," and may exist there in some form, even where such user data is stored elsewhere.[87]

218.   The *New York Times* has reported that a source "said the American government had evidence of the [TikTok] app sending data to China."[88]

219.   That explains why the Defense Department, Navy, Army, Marines, Air Force, Coast Guard and Transportation Security Administration have taken the extraordinary step of prohibiting their members from using the TikTok app on any government-issued devices, and have

---

[86] https://qz.com/1613020/tiktok-might-be-a-chinese-cambridge-analytica-scale-privacy-threat/.

[87] https://qz.com/1613020/tiktok-might-be-a-chinese-cambridge-analytica-scale-privacy-threat/.

[88] https://www.nytimes.com/2019/11/01/technology/tiktok-national-security-review.html.

advised that their children also remove the TikTok app from their devices.[89] United States Senators also have proposed a bill banning federal employees from using the TikTok app on government-issued phones because it "presents a major security risk."[90]

### a. Evidence of post-February 2019 transfers.

220. Even after Defendant TikTok, Inc. adopted its February 2019 Privacy Policy, the TikTok app secretly transferred private and personally identifiable user data and content to China where, under Chinese law, it is subject to collection and use by the Chinese government. Specifically, as Plaintiffs' investigation reveals, Defendants used the TikTok app to transfer private and personally identifiable user data and content to the following two servers in China as recently as April 2019: (i) bugly.qq.com and (ii) umeng.com.

221. Private and personally identifiable TikTok user data and content transferred to bugly.qq.com as recently as April 2019 includes at least the following items: (i) the OS version; (ii) the mobile device model; (iii) the WiFi MAC address; (iv) the hardware serial number; (v) the device ID and (vi) the IP address. Private and personally identifiable TikTok user data and content transferred to umeng.com as recently as April 2019 includes these same six items, plus at least the following item: (vii) the number of bytes users' mobile devices have uploaded and downloaded.

### b. Evidence of pre-February 2019 transfers.

222. Plaintiffs' investigation further reveals that the TikTok app transferred private and personally identifiable TikTok user data and content to various servers in China prior to the February 2019 Privacy Policy, including to at least the following servers: (i) musemuse.cn; (ii) zhiliaoapp.com; (iii) mob.com; and (iv) umeng.com.

---

[89] https://www.wsj.com/articles/u-s-military-bans-tiktok-over-ties-to-china-11578090613.

[90] https://www.reuters.com/article/us-usa-china-tiktok/us-senators-seek-to-ban-federal-employees-from-using-tiktok-on-their-phones-idUSKBN20Z1E4.

223.    The private and personally identifiable TikTok user data and content transferred to one or more of these four China-based servers includes User/Device Identifiers. Additional private and personally identifiable TikTok user data and content transferred to one or more of these four China-based servers includes: (i) a list of the other apps installed on users' mobile devices; and (ii) more specific location data.

224.    Such information reveals TikTok users' precise physical location, including possibly indoor locations within buildings, and TikTok users' apps that possibly reveal mental or physical health, religious views, political views, and sexual orientation.

**2.**    **Defendants' privacy policies do not constitute notice of or consent to the transfer of private and personally identifiable TikTok user data and content to servers in China.**

225.    TikTok users do not knowingly consent to Defendants' privacy policies because notice and warnings of the privacy policies are not adequately displayed, as discussed above. Additionally, many provisions of the privacy policies are ambiguous, providing inadequate notice of what private and personally identifiable user data and content is taken and where it is being sent. Even scholars with expertise in such matters, such as Mr. Carroll (*supra* ¶ 217), cannot discern what is being taken and where it is going. Certainly, ordinary TikTok users cannot be expected to understand such baffling "disclosures." This ambiguity further renders the notice inadequate to infer knowing user consent.

226.    In addition to the above-stated deficiencies, privacy policy provisions stating that certain TikTok user data and content may be sent to servers in China is contradicted by Defendants' public and misleading assurances that no such transfers occur. Moreover, TikTok users whose data and content is sent before they even have an opportunity to sign-up and create an account do not actually or constructively receive notice, and therefore cannot be deemed to have assented to, such transfers to China.

### 3. The China-based tech giants also possess TikTok users' private and personally identifiable data and content while they work cooperatively with the Chinese Government.

227. The bugly.qq.com server is owned and operated by China-based tech giant Tencent Holdings Limited ("Tencent"), and the umeng.com server is owned and operated by another China-based tech giant Alibaba Holding Group Limited ("Alibaba"). Tencent and Alibaba thus possess TikTok users' private and personally identifiable data and content. Such data transfers to Tencent and Alibaba servers were accomplished through Tencent and Alibaba source code that Defendants embedded within the TikTok app.

228. Also embedded within the TikTok app is source code from China-based tech giant Baidu, Inc. ("Baidu") as well as source code from a China-based software development kit ("SDK") known as Igexin. The Igexin SDK is notorious for causing the removal of some 500 apps from the Google play store in 2017 after it was discovered that Igexin constituted a "secret backdoor" that allowed its operators "to install a range of spyware."[91] Specifically, Igexin "could update the app to include spyware at any time, with no warning. The most serious spyware installed on phones were packages that stole call histories, including the time a call was made, the number that placed the call, and whether the call went through. Other stolen data included GPS locations, lists of nearby Wi-Fi networks, and lists of installed apps."[92]

229. Baidu, Alibaba, and Tencent – popularly known by the acronym "BAT" – are "China's original tech titans"[93] and dominate the fields of artificial intelligence, social media, and

---

[91] https://arstechnica.com/information-technology/2017/08/500-google-play-apps-with-100-million-downloads-had-spyware-backdoor/.

[92] https://arstechnica.com/information-technology/2017/08/500-google-play-apps-with-100-million-downloads-had-spyware-backdoor/.

[93] https://www.forbes.com/sites/rebeccafannin/2019/08/23/baidu-alibaba-tencent-clash-to-lead-chinas-tech-future-while-a-new-b-arises/#18cc42e414d0.

the internet in China. The private and personally identifiable TikTok user data and content they possess may well be used by the Chinese government in the future, if it has not already.

230.     BAT routinely assist the Chinese government in the surveillance and control of its people through biometrics. "Biometric surveillance powered by artificial intelligence is categorically different than any surveillance we have seen before. It enables real-time location tracking and behavior policing of an entire population at a previously impossible scale."[94] The Chinese government is taking full advantage of China-based technology corporations like BAT to assist: "Beijing is embracing technologies like facial recognition and artificial intelligence to identify and track 1.4 billion people. It wants to assemble a vast and unprecedented national surveillance system, with crucial help from its thriving technology industry. … China has become the world's biggest market for security and surveillance technology, with analysts estimating the country will have almost 300 million cameras installed by 2020. Chinese buyers will snap up more than three-quarters of all servers designed to scan video footage for faces …."[95]

231.     The Chinese government relies on China-based technology companies like BAT to assist in government investigations of criminal activity and political dissent, as well as surveillance activities: "The Chinese police 'request data from Alibaba for their own investigations, … tapping into the trove of information the tech giant collects through its e-commerce and financial payment networks. … Companies including Alibaba [], Tencent [], and Baidu [] are required to help China's government hunt down criminal suspects and silence political dissent. Their technology is also being used to create cities wired for surveillance. … Apple disclosed that more than 35,000 user accounts were affected by 24 Chinese law-enforcement requests in the first half of this year [2017],

---

[94] https://www.buzzfeednews.com/article/evangreer/dont-regulate-facial-recognition-ban-it.

[95] https://www.nytimes.com/2018/07/08/business/china-surveillance-technology.html.

many in connection with fraud investigations. It said it provided information on about 90% of them. Chinese companies don't release any information on the number of requests from the government, the nature of the requests or the compliance rate.'"[96]

232.     The Chinese government's use of BAT to sort and analyze information, including information gathered from smartphones, is also well documented: "Along with access to online data, China's government wants something else from tech companies – the cloud computing prowess to sort and analyze information. China wants to crunch data from surveillance cameras, smartphones, government databases and other sources to create so-called smart cities and safe cities. … Police now work with Alibaba to use surveillance footage and data processing to identify 'persons of interest' and keep them out, local police official Dai Jinming said at a recent conference sponsored by Alibaba. Tencent is working with police in the southern city of Guangzhou to build a cloud-based 'early-warning system' that can track and forecast the size and movement of crowds, according to a statement from the Guangzhou police bureau."[97]

233.     The *Wall Street Journal* has reported on the significant patronage that BAT receive from the Chinese government, the growing number of tech entrepreneurs who have become members of the legislature under President Xi Jinping (including, for example, Tencent's Tony Ma), and BAT's pledges of loyalty to the Chinese government.[98] "'The government is always the boss and the tech firms are there to serve the goals of the Chinese government.'"[99]

---

[96] https://www.wsj.com/articles/chinas-tech-giants-have-a-second-job-helping-the-government-see-everything-1512056284.

[97] https://www.wsj.com/articles/chinas-tech-giants-have-a-second-job-helping-the-government-see-everything-1512056284.

[98] https://www.wsj.com/articles/the-godfathers-of-chinese-tech-get-an-offer-they-cant-refuse-1520510404.

[99] https://www.wsj.com/articles/the-godfathers-of-chinese-tech-get-an-offer-they-cant-refuse-1520510404.

234.   Defendant Beijing ByteDance is emerging as a threat to BAT's exclusive status: "there's a new B in the BAT trio on the horizon: the world's highest-valued unicorn, ByteDance ...."[100] Like BAT, Defendant Beijing ByteDance is subject to the same cybersecurity laws mandating cooperation with the Chinese government that are described in Senator Schumer and Senator Cotton's letter.

235.   Senator Hawley, according to the *Wall Street Journal*, described the resulting threat to TikTok users by stating: "all it takes is one knock on the door of their parent company [Defendant Beijing ByteDance], based in China, from a Communist Party official for that data [from Defendant TikTok, Inc.] to be transferred to the Chinese government's hands, whenever they need it."[101] In the same *Wall Street Journal* article, a former TikTok employee from the Los Angeles office stated that: "We're a Chinese company ... We answer to China."[102]

236.   A *Washington Post* opinion piece entitled "Could TikTok allow China to export repression?" describes the danger to TikTok users in the United States if Defendants provide such users' private and personally identifiable data and content to the Chinese government: "TikTok's leaders protest that they store local information locally, so whatever data the company has on the behavioral patterns or personal attributes of some of the most vulnerable American citizens are not 'subject to Chinese law.' But it's reasonable to wonder whether TikTok might not comply with targeted intelligence requests from the repressive regime ruling over its parent company ByteDance. TikTok's younger users will be voting in the coming years; down the line, they may

---

[100] https://www.forbes.com/sites/rebeccafannin/2019/08/23/baidu-alibaba-tencent-clash-to-lead-chinas-tech-future-while-a-new-b-arises/#18cc42e414d0.

[101] https://www.wsj.com/articles/tiktok-looking-at-ways-to-shake-off-its-ties-to-china-11574073001.

[102] https://www.wsj.com/articles/tiktok-looking-at-ways-to-shake-off-its-ties-to-china-11574073001.

hold positions of power. A trove of their information is a valuable asset."[103]

237.    The *Wall Street Journal*, in an article entitled "U.S. Orders Chinese Firm to Sell Dating App Grindr Over Blackmail Risk," also has reported on the dangers Americans face from the Chinese government's accumulation of their private and personally identifiable data and content, including blackmail and other sinister scenarios: "U.S. national-security experts said Chinese government knowledge of an individual's usage of Grindr could be used in certain cases to blackmail U.S. officials and others with security clearances, such as defense contractors, and force them to provide information or other support to China. They have also envisioned more elaborate scenarios. For example, one could use Grindr's location data to discern that a certain user works at a telecommunications firm and pays regular visits to the same building in Northern Virginia that intelligence officials frequent. Chinese-intelligence officials could then determine that that individual is the telecommunications firm's intelligence liaison, and they would know both whom to target and how to threaten that person with potentially compromising information. … The risk has grown as the Chinese government acquires more large data sets through hacking and other means, allowing it to build databases with detailed profiles of targets."[104]

## VI.    DEFENDANTS' THEFT OF TIKTOK USER BIOMETRICS.

### A.    The Illinois Biometric Information Privacy Act Regulates Face Geometry Scans, Voiceprints And Information Derived Therefrom.

238.    In 2008, Illinois enacted the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.* This was due to the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Reg. Sess.

---

[103] https://www.washingtonpost.com/opinions/global-opinions/could-tiktok-allow-china-to-export-repression/2019/11/02/1729f038-fa79-11e9-8906-ab6b60de9124_story.html.

[104] https://www.wsj.com/articles/u-s-orders-chinese-company-to-sell-grindr-app-11553717942.

No. 276. The Illinois Legislature recognized the importance of protecting the privacy of individuals' biometric data, finding that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse [and] is at heightened risk for identity theft …." *Id.*

239.     BIPA thus focuses on "biometric identifiers" and "biometric information." Biometric identifiers consist of "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. A "scan" under BIPA means to examine by observation or checking, or systematically in order to obtain data especially for display or storage. *In re Facebook Biometric Information Privacy Litigation*, 2018 WL 2197546, *3 (N.D. Cal. May 14, 2018). "Geometry" under BIPA is the relative arrangement of parts or elements. *Id.* Neither the term "scan" nor the term "geometry" require "actual or express measurements of spatial quantities like distance, depth, or angles." *Id.* Biometric information constitutes "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10.

**B.     Defendants Unlawfully Collect, Use And Profit From TikTok User Biometrics, Face Geometry Scans, Voiceprints And Information Derived Therefrom.**

240.     Defendants' unlawful collection, possession, storage, dissemination, use and profiting from biometric identifiers, e.g., face geometry scans of TikTok users, and the biometric information derived therefrom, takes three forms.

241.     *First*, Defendants' BIPA and other biometrics-related violations are established by the functionality and code of the TikTok app itself.

242.     This functionality and code includes: (a) content recommendations based on

TikTok users' race/ethnicity and age; (b) scans of face geometry to determine TikTok users' age; (c) censoring video content to remove people Defendants consider "ugly"; (d) the augmented reality feature that scans face geometry while processing users' videos; (e) code for deepfake videos; and (f) code for age, race/ethnicity and emotion recognition.

243.    **Second**, Defendants' BIPA and other biometrics-related violations are further established by their ongoing work in China, which includes: (a) the application of facial recognition technology[105] to TikTok users' videos by highly-trained engineers skilled in computer vision, convolutional neural network and machine learning; (b) patent applications for face, voice, age, race/ethnicity and emotion recognition technologies; and (c) the publicly known functionality of Douyin that allows its users to perform facial recognition on faces selected by such users from other users' videos.

244.    **Third**, Defendants' BIPA and other biometrics-related violations are also established by Defendants' legal and political obligations to accumulate and share vast troves of data, including biometrics, in order to assist the Chinese government in meeting two crucial and intertwined state objectives: (a) world dominance in artificial intelligence; and (b) population surveillance and control.

       **1.**      **Defendants' BIPA and other biometrics-related violations are evidenced by the TikTok app's functionality and code.**

245.    There are at least six specific categories of functions and code within the TikTok app that reveal BIPA violations: (1) the race/ethnicity and age-based content recommendations;

---

[105] Facial recognition "is a technology capable of identifying or verifying a person from a digital image or a video frame from a video source. There are multiple methods in which facial recognition systems work, but in general, they work by comparing selected facial features from a given image with faces within a database." *See* https://en.wikipedia.org/wiki/Facial_recognition_system.

(2) the scans to determine age; (3) the removal of so-called "ugly" videos; (4) the augmented reality feature; (5) the deepfake video code; and (6) the age, race/ethnicity and emotion recognition code.[106] These also evidence violations of the other statutory, constitutional and common law claims set forth herein.

246.    That the TikTok app violates BIPA and other laws is highlighted by comments from a "Bytedance representative" who confessed to *The Verge* that "TikTok makes use of the company's AI technologies in various ways, from ***facial recognition for the filters*** through to the recommendation engine in the For You feed. … We build intelligent machines that are capable of understanding and analyzing text, images and ***videos*** using natural language processing and computer vision technology. This enables us to serve users with the content that they find most interesting …."[107]

247.    Similarly, *Marketing Technology Insights* reported on Defendants' use of facial recognition technology in the TikTok app in violation of BIPA and other laws, stating that Defendant TikTok, Inc. and the TikTok app "deploy[] AI and ***Face Recognition technology*** to analyze user's interests and preferences through their interactions with the content, and display a personalized content feed to each user."[108]

### a.    Race/ethnicity and age-based content recommendations.

248.    Marc Faddoul, a researcher at the University of California at Berkeley who studies artificial intelligence, conducted an experiment in or about February 2020 that revealed the TikTok

---

[106] These allegations also support the other statutory, constitutional, and common law causes of action herein.

[107] https://www.theverge.com/2018/11/30/18107732/bytedance-valuation-tiktok-china-startup (emphasis added).

[108] https://martechseries.com/mts-insights/staff-writers/pay-attention-to-tiktok-content/ (emphasis added).

app recommends content based in part on race/ethnicity and age information that it gleans from TikTok users' digital face images. *Buzzfeed* described his findings: "In the app, when a person follows a new account, they can click an arrow that then recommends other accounts to follow. Faddoul noticed that when he did this, the recommended accounts tended to look just like whoever he'd just followed — right down to ethnicity and hair color."[109]

249.  *Recode* also reported on Faddoul's research in its article entitled "There's Something Strange About TikTok Recommendations":

> When artificial intelligence researcher Marc Faddoul joined TikTok a few days ago, he saw something concerning: When he followed a new account, the profiles recommended by TikTok seemed eerily, physically similar to the profile picture of the first account. Following a young-looking blond woman, for instance, yielded recommendations to follow more young-looking blond women. …
>
> Following black men led to recommendations to follow more black men. Following white men with beards produced recommendations for more white men with beards. Following elderly people spawned recommendations for other elderly people. And on and on. …
>
> Faddoul also told *Recode* that he believes it's more likely that TikTok is using something he calls automatic featurization. This type of recommendation algorithm could take "signals" from profile images to find profile pictures with similar attributes. These kinds of signals would be correlations between the pictures, which could correspond to anything from skin color to having a beard. The algorithm is simply looking for similarities in the photos or profiles. …
>
> "What I suspect is happening is that TikTok is featurizing the profile picture," he says, "and using these features in the recommendation engine."[110]

---

[109] https://www.buzzfeednews.com/article/laurenstrapagiel/tiktok-algorithim-racial-bias.

[110] https://www.vox.com/recode/2020/2/25/21152585/tiktok-recommendations-profile-look-alike.

### b. Face scans to determine age.

250. Defendants also scan face images taken from TikTok user videos in order to determine TikTok users' age. The *Wall Street Journal* has reported that "TikTok has built an artificial intelligence tool that scans faces in videos to estimate users' ages."[111] Both Faddoul's research and this *Wall Street Journal* article are consistent with evidence of Defendants' work in China on TikTok user videos as well as their patent applications in China for face, voice, age, race/ethnicity and emotion recognition technologies (below).

### c. Removal of videos of so-called "ugly" people.

251. Public reporting indicates that "the makers of TikTok … instructed moderators to suppress posts created by users deemed too ugly …. Today, *The Intercept* and *The Intercept Brasil* are publishing two internal TikTok moderation documents …. One … describes algorithmic punishments for unattractive and impoverished users. The documents appear to have been originally drafted in Chinese and later — at times awkwardly — translated into English for use in TikTok's global offices."[112] It appears therefore, that Defendant TikTok, Inc. uses artificial intelligence technology in its Culver City office to review and flag user content. Given the presence of this AI technology and the sheer volume of TikTok user videos that are reviewed for "ugliness," Defendant TikTok, Inc. may be using facial recognition technology to identify and remove such users' videos.

### d. Augmented reality features.

252. The TikTok app uses an advanced video editor and camera face filters. Employing this technology, TikTok users edit their videos to, among other things, morph their face into

---

[111] https://www.wsj.com/articles/tiktok-wants-to-grow-up-but-finds-it-tough-to-keep-kids-out-11581858006.

[112] https://theintercept.com/2020/03/16/tiktok-app-moderators-users-discrimination/.

another face; change the size, shape, height and width of their face; change particular features of their face (*e.g.*, eyes, ears, nose, lips, mouth, cheeks), including the size and shape of such facial features; and so on. Users thereby create videos in which their faces and specific facial features take on cartoonish dimensions and appearances, and in which they can appear older, etc.

253.    This functionality is a form of augmented reality ("AR").[113] To perform AR, the TikTok app examines, detects and localizes the face and the arrangement of its various parts (*e.g.*, the eyes, ears, nose, lips, mouth, cheeks) relative to the other parts, and then also tracks the face and its various parts (and their relative arrangement) while in motion.

254.    The following relevant code is located within the TikTok app: "FaceDetectManager"; "faceDetectMaxTime"; "faceDetectMinTime"; "Requirement_Face_3D_Detect"; "Requirement_Face_Detect"; "Requirement_Face_Track"; "face_track.model"; "maxScanTime"; "minScanTime"; and "faceID". Additional code for pitch, yaw and roll – "the three dimensions of movement when an object moves through a medium"[114] – is within the TikTok app as well.

255.    This functionality and code reveal Defendants' use of face geometry scans on TikTok users. While it is currently unclear whether Defendants upload such face geometry scans from TikTok users' mobile devices, in addition to performing separate face geometry scans at the server level, this functionality and code demonstrate Defendants' technological ability and

---

[113] AR "is an interactive experience of a real-world environment where the objects that reside in the real world are enhanced by computer-generated perceptual information …. AR can be defined as a system that fulfills three basic features: a combination of real and virtual worlds, real-time interaction, and accurate 3D registration of virtual and real objects. … This experience is seamlessly interwoven with the physical world such that it is perceived as an immersive aspect of the real environment. In this way, augmented reality alters one's ongoing perception of a real-world environment …. With the help of advanced AR technologies (e.g. adding computer vision, incorporating AR cameras into smartphone applications and object recognition) the information about the surrounding real world of the user becomes interactive and digitally manipulated." *See* https://en.wikipedia.org/wiki/Augmented_reality.

[114] https://simple.wikipedia.org/wiki/Pitch,_yaw,_and_roll.

willingness to perform such scans on TikTok users.

### e.  Code for deepfake videos.

256.    There is code within the TikTok app, as well as within Douyin, for performing facial recognition. *TechCrunch* reported that there is "Face Swap" code within the TikTok app for "life-like deepfakes technology." It "asks users to take a multi-angle biometric scan of their face, then choose from a selection of videos they want to add their face to and share."[115] Defendants admitted that such code is present in the TikTok app, but denied its use. A TikTok spokesperson "insisted that 'after checking with the teams I can confirm this is definitely not a function in TikTok ….' They later told *TechCrunch* that 'the inactive code fragments are being removed to eliminate any confusion,' which implicitly confirms that Face Swap code was found in TikTok."[116]

257.    That the "Face Swap" code is present in the TikTok app demonstrates Defendants' technological capacity to perform facial recognition on TikTok users.

### f.  Code for age, race/ethnicity, and emotion recognition.

258.    There is additional code within the TikTok app designed to recognize users' age, race/ethnicity, and emotions. The code separates race/ethnicity into at least four categories: "Blac" [*sic.*]; "Indian"; "White"; and "Yellow." The code also distinguishes between at least seven different ranges of emotion: "Angry"; "Disgust"; "Fear"; "Happy"; "Neutral"; "Sad"; and "Surprise."

259.    The age, race/ethnicity, and emotion recognition code within the TikTok app is consistent with Faddoul's research (above) and also directly correlates to Defendants' China-based work on TikTok user videos and patent applications (below).

---

[115] https://techcrunch.com/2020/01/03/tiktok-deepfakes-face-swap/.

[116] https://techcrunch.com/2020/01/03/tiktok-deepfakes-face-swap/.

## 2. Defendants' BIPA and other biometrics-related violations are further evidenced by Defendants' China-based operations.

260. Defendants' BIPA violations are further established by the China-based Defendants' ongoing work in China, which includes: (a) the application of facial recognition technology to TikTok users' videos by highly-trained engineers skilled in computer vision, convolutional neural network, and machine learning; (b) patent applications for face, voice, age, race/ethnicity, and emotion recognition technologies; and (c) the Douyin app's functionality that allows its users to perform facial recognition on faces selected by such users from other users' videos. These factors also evidence violations of the other statutory, constitutional, and common law claims set forth herein.

### a. Defendants' China-based team includes highly skilled computer vision, convolutional neural network, and machine learning engineers.

261. Defendants' artificial intelligence work within China, which is closely tied to its United States operations, is among the most sophisticated in the world. "ByteDance has received accolades for being a top AI innovator from CBInsight who recognized the company on its 2018 AI 100 List as well as from Fast Company, who placed it on its most innovative companies list. In 2016, it founded its AI Lab, a research division led by Wei-Ying Ma, formerly of Microsoft Research Asia. The Lab's primary focus has been on developing innovative technologies to enhance ByteDance's content platforms."[117]

262. Defendants have a team of engineers in cutting-edge fields such as computer

---

[117] https://www.forbes.com/sites/bernardmarr/2018/12/05/ai-in-china-how-buzzfeed-rival-bytedance-uses-machine-learning-to-revolutionize-the-news/#6579bada40db.

vision,[118] convolutional neural network ("CNN"),[119] and machine learning,[120] all of which are foundational to the face geometry scans that Defendants conduct on and/or derive from the Private Videos and the posted videos of TikTok users.

263. Defendants' China-based engineering team includes, among others: (i) a research scientist focused on facial recognition, object detection, computer vision and machine learning who has worked for Defendants since 2018; (ii) a computer vision and image processing algorithm engineer who has worked for Defendants since 2017; (iii) a computer vision algorithm engineer who has worked for Defendants since 2019; (iv) a machine learning and neural network engineer

---

[118] Computer vision "is an interdisciplinary scientific field that deals with how computers can gain high-level understanding from digital images or videos. … Computer vision tasks include methods for acquiring, processing, analyzing and understanding digital images …. The classical problem in computer vision, image processing, and machine vision is that of determining whether or not the image data contains some specific object, feature, or activity. … • Object recognition (also called object classification) – one or several pre-specified or learned objects or object classes can be recognized, usually together with their 2D positions in the image or 3D poses in the scene. … • Identification – an individual instance of an object is recognized. Examples include identification of a specific person's face or fingerprint …. • Detection – the image data are scanned for a specific condition. … Currently, the best algorithms for such tasks are based on convolutional neural networks. … Several specialized tasks based on recognition exist, such as: • Content-based image retrieval – finding all images in a larger set of images which have a specific content. … • Facial recognition." *See* https://en.wikipedia.org/wiki/Computer_vision#Recognition.

[119] CNN "is a class of deep neural networks, most commonly applied to analyzing visual imagery. … They have applications in image and video recognition, recommender systems, [and] image classification …. CNNs use relatively little pre-processing compared to other image classification algorithms. This means that the network learns the filters that in traditional algorithms were hand-engineered. This independence from prior knowledge and human effort in feature design is a major advantage." *See* https://en.wikipedia.org/wiki/Convolutional_neural_network#Image_recognition.

[120] Machine learning "is the study of computer algorithms that improve automatically through experience. It is seen as a subset of artificial intelligence. Machine learning algorithms build a mathematical model based on sample data, known as "training data", in order to make predictions or decisions without being explicitly programmed to do so. Machine learning algorithms are used in a wide variety of applications, such as … computer vision, where it is difficult or infeasible to develop conventional algorithms to perform the needed tasks." *See* https://en.wikipedia.org/wiki/Machine_learning.

who has worked for Defendants since 2017; (v) an algorithm engineer who focuses on video retrieval and who has worked for Defendants since 2018; and (vi) an algorithm engineer who has worked for Defendants since 2017.

**b.** **Facial recognition technology applied to TikTok videos.**

264. Wei-Ying Ma is a ByteDance Vice President in Beijing and has led the AI Lab since 2017. He is known for having developed a highly respected image retrieval system called NeTra, which is a tool for navigating very large image databases. Ma recently delivered a keynote speech at a Taipei Web Conference in which he acknowledged that Defendants use facial recognition technology and face geometry scans on their enormous and ever-growing database of face images from user videos. During his speech, Ma used visual representations that show facial recognition and face geometry scans being performed on specific regions of face images. Chinese language text accompanying the face images indicate the type of facial expression and the age of the individuals represented by the face images. English language notes to the side of the face images refer to "emotion analysis," "object detection and tracking," and "content-based recommendation." Ma made the following representations during his speech while these face images, accompanied by the aforementioned Chinese language and English language statements, were visually presented on the screen:

> We are actually receiving a huge number of video created by users every day, so it's at the hundreds of millions of video per day. Imagine the amount of computation and also video understanding we need to do here. And here just to give you a glimpse of all kinds of video understanding tasks we need to run, and let me show you for example, you just saw that video, and for video like that we actually do all kind of analysis. We need to automatically classify and also do a lot tagging and understand the structure inside the video and also run copyright infringement detecting and duplicate detection and also object detection and tracking. So based on this video, we convert this video into a structural representation, and

here just to give you one of the examples.[121]

265.    Defendants' team of engineers in China also includes a computer vision and machine learning engineer who has worked for Defendants since 2018. His job responsibilities have included face/body detection and face attribute recognition, ***including specifically on TikTok users' videos***.

266.    Within China, Defendant Beijing ByteDance makes no secret of its processing and analysis of users' videos from around the world. *TechNode* reported that one of its vice presidents publicly told a gathering that "ByteDance" required more chips to continue uploading, processing and analyzing its vast database of videos accumulated from around the world. This vice president stated that "'Bytedance has the largest number of users in ***the world*** whose ***videos*** need to be analyzed and processed and uploaded, and we are purchasing a large number of chips.'"[122]

267.    Defendants' wealth of video recordings from TikTok users is critical to Defendants' success in making the TikTok app one of the most popular in the world: "The [TikTok] app heavily utilizes AI that is trained on the vast quantity of ***video footage*** to understand the preferences of users, while also using machine learning to make creating, editing, and promoting the ***videos*** as easy as possible."[123]

268.    Indeed, "***all of ByteDance's products*** use artificial intelligence and machine learning to deliver content that users want. The company's intelligent machines use computer vision and natural language processing technology to understand and analyze written content, images and ***videos***. Then, based upon what the machines know about each user, they deliver the

---

[121] https://www.youtube.com/watch?v=2D29f4-J2mw (at 18:18 – 19:17).

[122] https://technode.com/2018/04/24/bytedance-jinri-toutiao-ai-chips/ (emphasis added).

[123] https://dzone.com/articles/the-data-thats-driving-chinas-hidden-champions (emphasis added).

content it believes each user would want. As a user interacts with the content by taps, swipes, time spent with each article, comments and more, large-scale machine learning and deep learning algorithms continue to learn about a user's preferences to refine its content delivery for the future. The end result is a high-quality content feed based upon each user's preferences and interests. As more content is accumulated by the system, the better the algorithms get to enhance the content experience."[124] As the United States National Security Adviser noted, Defendants are "getting facial recognition" on millions of Americans as well as mapping their relationships, and then sending all of this "intimate data" back to China for processing.[125]

### c. Face, age, race/ethnicity, and emotion recognition patent applications.

269.    One of Defendants' engineers in China stands out for his inventions that form the basis of numerous patent applications filed by Defendants' sister company Beijing ByteDance Network Technology Co., Ltd. The underlying technology in these patent applications involves age, race, and emotion detection through face images, including those derived from videos. The specific patent applications include, among others, the following:

a.  Facial image identifying method.[126]

b.  Use of face images and a facial recognition model to determine ethnic information, to then determine race, to ultimately determine age.[127]

c.  Use of face and body images, and a facial recognition model, to determine

---

[124] https://www.forbes.com/sites/bernardmarr/2018/12/05/ai-in-china-how-buzzfeed-rival-bytedance-uses-machine-learning-to-revolutionize-the-news/#6579bada40db (emphasis added).

[125] https://www.forbes.com/sites/zakdoffman/2020/07/15/tiktok-trump-warning-facial-recognition-data-sends-china-ban/#493e38852dea

[126] Publication No. WO2020037963A1.

[127] Publication No. CN110046571A.

age.[128]

    d.  Use of image data sets and audio data sets to determine age.[129]

    e.  Use of face images extracted from videos to determine age.[130]

    f.  Use of face images extracted from videos to determine age.[131]

    g.  Human facial expression recognition method.[132]

    h.  Use of face images extracted from videos to determine emotions based on expression recognition.[133]

    i.  Use of face images extracted from video segments to identify a face characteristic by parsing the face image.[134]

270.    This same engineer was one of the inventors involved in two earlier patent applications filed by a Chinese university that concern face attribute recognition[135] and a face verification method that determines whether faces in two images are the same or distinct.[136]

271.    "TikTok's owner, Beijing-based ByteDance, is a hit app factory that has spent the last decade learning how to use artificial intelligence, machine learning, and ***facial recognition*** to figure out what people like and serve them endless streams of entertainment tailored to their interests and ***emotions***. Its apps are used by billions of people, including 1.45 billion global

---

[128] Publication No. CN109993150A.

[129] Publication No. CN110321863A.

[130] Publication No. CN110163170A.

[131] Publication No. CN110188660A.

[132] Publication No. CN110097004A.

[133] Publication No. CN110175565A.

[134] Publication No. CN110163171A.

[135] Publication No. CN106203395B.

[136] Publication No. CN106203533B.

downloads for TikTok alone. The company has years of data informing it on ***how people think,
feel and act***, making it an expert on ***what makes people tick and how to persuade them*** to watch,
share or like certain content."[137]

### d. Voiceprint patent applications.

272.     Beijing ByteDance Network Technology Co., Ltd. filed additional patent
applications for a method for voice extraction involving voiceprints,[138] a voice recognition
method,[139] and an age recognition method based on audio.[140] This is consistent with reporting that
Defendant Beijing ByteDance "uses various AI technologies in its services [including] ***voice
recognition*** …."[141] In fact, during Wei-Ying Ma's recent keynote speech at a Taipei Web
Conference (above), he discussed the use of audio to identify speakers and he published a slide
during his speech entitled "Speaker Identification" that stated: "Detect identity, age, gender of
speakers."[142]

### e. The Douyin app's facial recognition function.

273.     The Douyin app provides its users with an "in-video" search tool that uses facial
recognition technology. Users of Douyin can press the "Search" button while a video is playing,
drag a rectangle around the target face in the video, and cause the Douyin app to perform a search
(based on the face in question) for other videos in which the targeted person appears.[143] This

---

[137] https://www.bloomberg.com/news/newsletters/2019-10-29/worries-that-tiktok-is-a-threat-to-national-security-have-merit (emphasis added).

[138] Publication No. CN110503961A.

[139] Publication No. WO2019214628A1.

[140] Publication No. CN110335626A.

[141] https://medium.com/syncedreview/intel-and-bytedance-partner-on-ai-lab-b678036cbda4 (emphasis added).

[142] https://www.youtube.com/watch?v=2D29f4-J2mw (at 30:04).

[143] https://radiichina.com/tiktok-new-video-search-function-is-from-the-future/.

subjects anyone using the Douyin app to "behind-the-scenes *facial recognition* analysis."[144] While U.S. TikTok users cannot access this feature, there is evidence that they are subject to the same behind-the-scenes facial recognition analysis, as discussed herein.

### 3. Defendants' BIPA and other biometrics-related violations are also evidenced by their obligation to accumulate and share data, including biometrics, with the Chinese Government.

274.     Defendants' BIPA violations are further established by the China-based Defendants' legal and political obligations to accumulate and share data, including biometrics, in order to assist the Chinese government in meeting two crucial and intertwined state objectives: (a) world dominance in artificial intelligence; and (b) population surveillance and control.[145]

### a. The Chinese Government's plan to become the world leader in artificial intelligence.

275.     In 2017, the Chinese government released its Next Generation Artificial Intelligence Development Plan, in which it set 2030 as the temporal goal for becoming the world leader in artificial intelligence. To ensure achievement of its artificial intelligence goal, the Chinese government selected the five leading technology companies as "national champions" and assigned them particular areas of research and development within the artificial intelligence field. In exchange, these companies receive government support, including access to finance, preferential contract bidding and sometimes market share protection. The list of "national champions" has grown to at least 15 in recent years.[146]

276.     The United States government has taken notice. Last November, Congress's National Security Commission on Artificial Intelligence, chaired by former Google CEO Eric

---

[144] https://futurism.com/the-byte/tiktok-facial-recognition (emphasis added).

[145] This evidence also constitutes a basis for the other statutory, constitutional, and common law causes of action herein.

[146] https://fortune.com/longform/tiktok-app-artificial-intelligence-addictive-bytedance-china/.

Schmidt, published an interim report warning that China was outpacing the United States in artificial intelligence spending.[147]

### b. The Chinese Government's program of population surveillance and control.

277.     The Chinese government's monitoring of and control over its own population are well known. Most notable is its pervasive use of artificial intelligence-enabled cameras to conduct video surveillance of its population.[148] As the *South China Morning Post* reported: "China's goal of becoming a global leader in artificial intelligence (AI) is nowhere more manifested than in how facial recognition technology has become a part of daily life in the world's second-largest economy. Facial recognition systems, which are biometric computer applications that automatically identify an individual from a database of digital images, are now being used extensively in areas such as public security, financial services, transport and retail across the country."[149] In fact, the Chinese government employs a variety of biometrics for population surveillance and control: "In addition to voice recognition, there are facial and pupil recognition, gathering of DNA samples—building the world's largest DNA database—and fingerprint scans."[150]

### c. Data accumulation, including biometrics, through China-based technology companies is a critical part of achieving the Chinese Government's twin goals.

278.     Artificial intelligence algorithms feed on data to learn and improve – thus, the more

---

[147] https://fortune.com/longform/tiktok-app-artificial-intelligence-addictive-bytedance-china/.

[148] https://fortune.com/longform/tiktok-app-artificial-intelligence-addictive-bytedance-china/.

[149] https://www.scmp.com/tech/start-ups/article/2133234/meet-five-chinese-start-ups-pushing-facial-recognition-technology.

[150] https://vlifestyle.org/codec-news/?l=business/content-2254742-china-gathers-people-s-voices-new-identification-technology-drawing-concerns.

data the better the development of the algorithms driving the advance of the artificial intelligence.[151] With better artificial intelligence comes more effective population surveillance and control.

279.    To advance these interrelated goals, the Chinese government has worked hand in glove with China-based technology companies to accumulate and share data. For example, the China-based company Megvii, a leader in computer vision, has the world's largest open source database (Face++) for training other facial recognition algorithms. It has reportedly used government data banks to help compile this training program.[152] As another example, the Chinese government partnered with the China-based technology firm d-Ear Technologies to build a database of voiceprints for voice recognition purposes.[153]

280.    "Private [China-based] corporations and the [Chinese] Communist Party's security apparatus have grown together, discovering how the same data sets can both cater to consumers and help commissars calibrate repression. … Many [China-based] tech firms make a point of hiring the relatives of high party officials, and a vast state database of headshots might be shared with a private firm to train new facial recognition software, while the firm's trove of real-time user data might be offered to police, for a panoramic view of potential 'troublemakers.'"[154]

281.    Such data accumulation is not confined to China's borders. For example, the Chinese government is compiling a tremendous storehouse of private and personally identifiable data on ordinary Americans. Recently, Chinese government-sponsored hackers stole data

---

[151] https://fortune.com/longform/tiktok-app-artificial-intelligence-addictive-bytedance-china/.

[152] https://fortune.com/longform/tiktok-app-artificial-intelligence-addictive-bytedance-china/.

[153] https://vlifestyle.org/codec-news/?l=business/content-2254742-china-gathers-people-s-voices-new-identification-technology-drawing-concerns.

[154] https://www.nytimes.com/interactive/2019/05/02/opinion/will-china-export-its-illiberal-innovation.html.

belonging to approximately 500 million Marriott International guests. "[M]achine learning is yielding uses for large data sets that humans alone could not imagine – or even understand – given that machine learning can generate correlations among data that the machine itself can't explain. … Beijing's plan may be simply to vacuum up as much data like this as possible and *then* see what today's machine learning—or, better yet, tomorrow's machine learning—can do with it."[155]

282.    The lengths to which the Chinese government will go to obtain such data about ordinary Americans is further evidenced by other large-scale hacking schemes, including one involving 145 million Americans whose data was held by Equifax,[156] and another involving 78 million Americans whose data was held by Anthem.[157] "The United States assessed that China was building a vast database of who worked with whom in national security jobs, where they traveled and what their health histories were, according to American officials. Over time, China can use the data sets to improve its artificial intelligence capabilities to the point where it can predict which Americans will be primed for future grooming and recruitment …."[158] "The hacks, security researchers said, were an extension of China's evolving algorithmic surveillance system, which has greatly expanded over the past few years."[159]

283.    The Chinese government's goal of obtaining private and personally identifiable data (including biometrics) of ordinary citizens throughout the world is also evidenced by the deal struck by China-based CloudWalk Technology in Africa. CloudWalk, with the Chinese government's blessing, entered into a strategic partnership agreement with Zimbabwe to begin a

---

[155] https://www.justsecurity.org/62187/weapons-mass-consumerism-china-personal-information/.

[156] https://www.nytimes.com/2020/02/10/us/politics/equifax-hack-china.html.

[157] https://www.nytimes.com/2019/05/09/technology/anthem-hack-indicted-breach.html.

[158] https://www.nytimes.com/2020/02/10/us/politics/equifax-hack-china.html.

[159] https://www.nytimes.com/2019/05/09/technology/anthem-hack-indicted-breach.html.

large-scale facial recognition program. With access to a database containing millions of Zimbabwean faces, CloudWalk and the Chinese government intend to train their algorithms in order to further improve their facial recognition capabilities. "With the largest surveillance system already in place, ***China is also building one of the world's most comprehensive facial recognition databases***. Rolling out the technology in a majority black population will allow CloudWalk to more clearly identify other ethnicities, getting ahead of US and European developers."[160]

### 4. Defendants are obligated by Chinese law and politics to accumulate and secretly share their data, including biometrics, with the Chinese Government.

284. Given the Chinese government's illegal extraction of massive quantities of private and personally identifiable data (including biometrics) from hundreds of millions of ordinary Americans and others, there is no reason to believe that the Chinese government has refrained from extracting the same type of U.S. TikTok user data from Defendants.

285. In fact, to access that data, there is no need to hack major U.S. corporations or the China-based technology companies, like Defendants, that have surreptitiously amassed such information on their own.

286. That is because such China-based companies are ***required by law*** to ***secretly*** provide that data to the government upon demand:

> The message contained in each of China's state security laws passed since the beginning of 2014 is clear: everyone is responsible for the party-state's security. According to the CCP's definition of state security, the Party's political leadership is central. … And the party expects Chinese people and citizens to assist in collecting intelligence. The Intelligence Law states 'any organization and citizen shall, in accordance with the law, support, provide assistance, and cooperate in national intelligence work, and guard the secrecy of any national intelligence work that they are aware

---

[160] https://qz.com/africa/1287675/china-is-exporting-facial-recognition-to-africa-ensuring-ai-dominance-through-diversity/ (emphasis added).

of…' Not only is everyone required to participate in intelligence work when asked, but that participation must be kept secret.[161]

287.   In an article entitled "Take China's TikTok App Security Threat Seriously," *Bloomberg* reported that many "Hong Kong protesters say that regardless of whether TikTok is censoring content or not, they fear posting on a social media site owned by ByteDance, a Beijing company that must hand over user information to Chinese authorities if asked, just like all its compatriots."[162]

288.   In fact, Defendants in this action – including even the two based in the United States (Defendants TikTok, Inc. and ByteDance, Inc.) – have objected to Plaintiff Misty Hong's requests for the production of relevant documents in this lawsuit "to the extent they seek state secrets or any other information that cannot be disclosed without violating Chinese law, including the People's Republic of China on Guarding State Secrets and/or Civil Procedure Law of the People's Republic of China ("State Secrets")." Defendants apparently interposed this "State Secrets" objection in order to comply with China's Intelligence Law requirement that "[n]ot only is everyone required to participate in intelligence work when asked, but that participation must be kept secret."[163] This "State Secrets" objection flatly contradicts Defendant TikTok, Inc.'s misleading public statement that "none of our data is subject to Chinese law."[164]

289.   Defendant Beijing ByteDance has a particularly strong incentive to cooperate with the Chinese government. In 2018, China's State Administration of Radio and Television, an arm

---

[161] https://capx.co/britain-must-avoid-being-sucked-into-huaweis-moral-vacuum/. *See also* https://www.lawfareblog.com/beijings-new-national-intelligence-law-defense-offense.

[162] https://www.bloomberg.com/news/newsletters/2019-10-29/worries-that-tiktok-is-a-threat-to-national-security-have-merit.

[163] https://capx.co/britain-must-avoid-being-sucked-into-huaweis-moral-vacuum/.

[164] https://newsroom.tiktok.com/en-us/statement-on-tiktoks-content-moderation-and-data-security-practices.

of the Chinese Communist Party, ordered Defendant Beijing ByteDance to shut down one of its apps due to "vulgar" content. That prompted the CEO of Defendant Beijing ByteDance to publicly apologize. His re-dedication to the Chinese Communist Party resulted in his being named one of the "100 outstanding private entrepreneurs" who were "chosen for being 'emblematic of the country's private economic development', while also being people who 'resolutely uphold the Party's leadership ....'"[165]

290.    In a further show of allegiance to the Chinese government, Defendant Beijing ByteDance actively supports and participates in the spreading of Communist Party propaganda. It signed a strategic cooperation agreement with the Ministry of Public Security's Press and Publicity Bureau to promote the credibility of the police department, including within an area of China known for severe repression, demolition of mosques, and wide-spread detention centers for ethnic minorities. Under that agreement, "all levels and divisions of police units from the Ministry of Public Security to county-level traffic police would have their own Douyin account to disseminate propaganda. The agreement also reportedly says ByteDance would increase its offline cooperation with the police department ...."[166]

291.    Combined with evidence of the TikTok's app's functionality and code, the application of facial recognition technology to TikTok user videos, the patent applications for facial, voice, age, race/ethnicity and emotion recognition technologies, and the Douyin app's facial recognition feature, Defendants' legal obligations and political ties to the Chinese government make clear their large-scale BIPA and other biometrics violations.

---

[165] https://chinatechmap.aspi.org.au/#/company/bytedance.

[166] https://chinatechmap.aspi.org.au/#/company/bytedance. *See also* https://www.washingtonpost.com/world/tiktoks-owner-is-helping-chinas-campaign-of-repression-in-xinjiang-report-finds/2019/11/28/98e8d9e4-119f-11ea-bf62-eadd5d11f559_story.html.

## VII.  DEFENDANTS UNJUSTLY PROFIT WHILE PLAINTIFFS, THE CLASS, AND THE SUBCLASS SUFFER HARM

292.    Defendants possess User/Device Identifiers, the biometric identifiers and information, the Private Videos and Private Video Images, and the video viewing histories sufficient to create a dossier of private and personally identifiable data and content for each TikTok user. Such living files can be supplemented over time with additional private and personally identifiable user data and content, and all of this private and personally identifiable data and information has been, is, and will be used in the past, the present, and the future for economic and financial gain.

293.    Defendants' unlawful possession and control over this data and information make tracking and profiling TikTok users, and targeting them with advertising, much more efficient, effective, and lucrative. Such private and personally identifiable data and content are used to analyze TikTok users' income, consumption habits, and preferences. Such information provides guidance as to what methods of advertising will be most effective on particular TikTok users, what products – including Defendants' own products – will be most attractive to particular TikTok users, and how much to spend on particular ads. Defendants unjustly have earned and continue to earn substantial profits and revenues from such targeted advertising and from generating increased demand for and use of Defendants' other products.

294.    Defendants also unlawfully leverage the private and personally identifiable TikTok user data and content to improve their artificial intelligence technologies and file patent applications, thereby unjustly increasing their past, present and future profits and revenues – and their market value.

295.    Meanwhile, Plaintiffs, the Class and the Subclass have incurred, and continue to incur, harm as a result of the invasion of privacy stemming from Defendants' covert theft of their

private and personally identifiable data and content – including their User/Device Identifiers, biometric identifiers and information, Private Videos and Private Video Images, and video viewing histories.

296. Plaintiffs, the Class and the Subclass also have suffered and continue to suffer harm in the form of diminution of the value of their private and personally identifiable data and content as a result of Defendants' surreptitious and unlawful activities.

297. Moreover, Plaintiffs, the Class and the Subclass have suffered and continue to suffer injuries to their mobile devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed, due to Defendants' clandestine and unlawful activities.

298. Finally, Plaintiffs, the Class, and the Subclass have incurred additional data usage and electricity costs that they would not have incurred but for Defendants' covert and unlawful actions.

## VIII. <u>FRAUDULENT CONCEALMENT AND TOLLING.</u>

299. The applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct alleged above – through, among other things, their obfuscation of the source code, misleading public statements, and hidden and ambiguous privacy policies and terms of use. Plaintiffs, the Class, and the Subclass were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

300. Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs, the Class and the Subclass. Defendants are therefore estopped from relying on any statute of limitations.

301.     Defendants' fraudulent concealment is common to the Class and the Subclass.

## IX.   **ADDITIONAL NAMED PLAINTIFF ALLEGATIONS.**

302.     During the time that the TikTok app was installed on plaintiffs' mobile devices, Defendants surreptitiously performed the following actions without notice to or the knowledge and consent of plaintiffs or, in the case of the minor plaintiffs, their legal guardians: (i) Defendants took plaintiffs' User/Device Identifiers and Private Videos from their mobile devices; (ii) Defendants took plaintiffs' biometric identifiers and information (including face geometry scans) from plaintiffs' and their friends' mobile device and/or videos; (iii) Defendants shared plaintiffs' video viewing history with third parties; (iv) Defendants took plaintiffs' private and personally identifiable data and content from plaintiffs' mobile devices before they had the opportunity to sign up and create an account; (v) Defendants took plaintiffs' private and personally identifiable data and content from their mobile devices after they closed the TikTok app; and (vi) Defendants transferred some or all such stolen data and content to servers located in China – including to servers under the control of third parties who cooperate with the Chinese government.

303.     Defendants performed these acts for the purpose of secretly collecting plaintiffs' private and personally identifiable data and content – including their User/Device Identifiers, biometric identifiers and information, and Private Videos – and using such data and content to track, profile and target plaintiffs with advertisements. Further, Defendants have used plaintiffs' private and personally identifiable data and content for the purpose of developing their artificial intelligence capabilities and patenting commercially valuable technologies. Defendants and others now have access to private and personally identifiable data and content regarding plaintiffs that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from these activities.

304.     Meanwhile, plaintiffs have incurred harm as a result of Defendants' invasion of their privacy rights through their covert taking of plaintiffs' private and personally identifiable data and content – including their User/Device Identifiers, biometric identifiers and information, Private Videos and Private Video Images, and video viewing history. Plaintiffs also have suffered harm because Defendants' actions have diminished the value of their private and personally identifiable data and content. Moreover, plaintiffs have suffered injury to their mobile devices. The battery, memory, CPU, and bandwidth of such devices have been compromised, and as a result, the functioning of those devices has been impaired and slowed, due to Defendants' clandestine and unlawful activities. Finally, Plaintiffs have incurred additional data usage and electricity costs that they and/or their guardians would not have incurred but for Defendants' covert and unlawful actions.

305.     Neither Plaintiffs nor, in the case of the minor plaintiffs, their guardians, ever received notice that Defendants would collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers, face geometry scans, voiceprints or any of their other biometric information. Defendants never informed plaintiffs or their guardians of the specific purpose and length of time for which their biometric identifiers, face geometry scans, or any of their other biometric information would be collected, captured, received, otherwise obtained, stored, and/or used. Neither Plaintiffs nor, in the case of minors, their guardians, ever signed a written release authorizing Defendants to collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers, face geometry scans, voiceprints, or any of their other biometric information.

306.     Based on counsel's investigation and analysis, set forth in detail below, TikTok deliberately designed its Terms of Service and Privacy Policy to decrease the likelihood that a user will notice and comprehend its terms and conditions or could provide meaningful, express consent

to its conditions, in order to encourage users to sign up and not be deterred by accurate and truthful disclosures.

307. Plaintiffs did not know nor expect that Defendants would collect, store, and use their biometric identifiers and biometric information when they used the App

308. Plaintiffs did not receive notice from Defendants (written or otherwise) that Defendants would collect, store, and/or use their biometric identifiers or biometric information. Plaintiffs did not receive notice from Defendants of the specific purpose and length of time that Defendants would collect, store, and/or use her biometric identifiers or biometric information. Plaintiffs did not give authorization (written or otherwise) for Defendants to collect, store, and/or use her biometric identifiers or biometric information.

309. Plaintiffs were not aware of, nor do they recall seeing, a retention schedule setting out the guidelines for Defendants to permanently destroy biometric identifiers or biometric information.

## X. DEFENDANTS' PRIVACY POLICIES AND TERMS OF USE DO NOT CONSTITUTE NOTICE OF, NOR CONSENT TO, TIKTOK USER DATA THEFT, THE ARBITRATION PROVISION OR THE CLASS ACTION WAIVER.

310. Defendants have adopted various privacy policies and terms of use for the TikTok app over the years. Certain privacy policies, revealed by investigation of counsel but not seen in the ordinary course by users, purport to disclose that the TikTok app takes some (but not all) of the private and personally identifiable user data and content above. Certain terms of use, revealed by investigation of counsel but not seen in the ordinary course by users, purport to require arbitration and class action waivers.

311. Because the TikTok app begins taking private and personally identifiable user data and content – including User/Device Identifiers – immediately upon the completion of the download process, and before TikTok users are even presented with the option of signing-up for

and creating an account, TikTok users have no notice of, and cannot consent to, the privacy policies and terms of use prior to such theft. Moreover, because the TikTok app takes Private Videos and Private Video Images even if TikTok users have not signed up for an account, TikTok users who have not signed up for an account have no notice of, and cannot consent to, the privacy policies and terms of use prior to such theft.

312.    Moreover, even at the point at which TikTok users have the option to sign-up and create an account, Defendants do not provide such users actual notice of privacy policies or terms of use. Nor do Defendants present TikTok users with conspicuously located and designed hyperlinks to their privacy policies and terms of use, much less conspicuous warnings accompanying such hyperlinks. The TikTok app thus allows users to utilize it without ever placing them on actual or constructive notice of the privacy policies and terms of use. This lack of actual or constructive notice deprives TikTok users of the opportunity to accept or reject TikTok's privacy policies and terms of use, rendering such documents unenforceable.

313.    Additionally, certain privacy policies and terms of use are ambiguous as to what conduct they purport to cover. Such privacy policies and terms of use are also substantively and procedurally unconscionable. The ambiguities render meaningless the purported disclosures and requirements in the remainder of these documents, and the substantive and procedural unconscionability render such documents unenforceable.

314.    Moreover, even if TikTok users had knowingly accepted the terms of use (which they did not), the purported waiver of the right to seek public injunctive relief in a court of law is unenforceable under California law. *See, e.g., McGill v. Citibank*, 2 Cal. 5th 945 (2017); *Blair v. Rent-A-Center*, 928 F.3d 819 (9th Cir. 2019).

315.    Any attempt to surreptitiously secure minor users' "consent" to TikTok's Terms of

Use is unlawful and invalid.

316.     Defendants do not make any attempt to secure the consent of parents or lawful guardians.

317.     Defendants have not obtained consent from the parents or lawful guardians of minor Class Members for their accounts.

318.     Defendants fail to make reasonable efforts to ensure that a parent or lawful guardian of minor Class Members receives direct notice of their practices regarding the collection, use, or disclosure of personal and biometric information.

319.     Defendants do not at any point contact the parents or lawful guardians of minor Class Members to give them notice and do not even ask for contact information for the parents or lawful guardians of Class Members.

320.     Thus, Defendants have no means of obtaining verifiable parental consent for minor class members, or the consent of any lawful guardian, before any collection, use, or disclosure of the personal information of minor Class Members, nor do Defendants obtain verifiable parental consent to any alleged arbitration or class action waiver provisions.

321.     To the extent that Defendants attempt to claim that they obtained the minor Plaintiffs' consent, the minor Plaintiffs expressly disaffirm such consent.

## XI.    CLASS ALLEGATIONS.

322.     Plaintiffs seek certification of the classes set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of a class and subclass defined as follows:

**Nationwide Class:** All persons who reside in the United States who used the TikTok app and/or the Musical.ly app.

Or, in the alternative,

**Multi-State Consumer Protection Class:** All persons who reside in California, Illinois, or any state with materially similar consumer protection laws[167] who used the TikTok app and/or the Musical.ly app.

**Illinois Subclass**: All persons who reside in Illinois and used the TikTok app and/or the Musical.ly app to create one or more videos.

323.    Plaintiffs are the proposed class representatives for the Nationwide Class and the Multi-State Consumer Protection Class. Illinois Plaintiffs are the proposed class representatives for the Illinois Subclass.

324.    Plaintiffs reserve the right to modify or refine the definitions of the Class and the Subclass.

325.    Excluded from the Class and the Subclass are: **(i)** any judge or magistrate judge

---

[167] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include but are not limited to: Arkansas (Ark. Code § 4-88-101, et seq.); California (Cal. Bus. & Prof. C. §§ 17200 and 17500 et seq.); Colorado (Colo. Rev. Stat. § 6-1-101, et seq.); Connecticut (Conn. Gen. Stat. § 42-110, et seq.); Delaware (Del. Code tit. 6, § 2511, et seq.); District of Columbia (D.C. Code § 28-3901, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Hawaii (Haw. Rev. Stat. § 480-1, et seq.); Idaho (Idaho Code § 48-601, et seq.); Illinois (815 ICLS § 505/1, et seq.); Maine (Me. Rev. Stat. tit. 5 § 205-A, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010, et seq.); Montana (Mo. Code. § 30-14-101, et seq.); Nebraska (Neb. Rev. Stat. § 59 1601, et seq.); Nevada (Nev. Rev. Stat. § 598.0915, et seq,); New Hampshire (N.H. Rev. Stat. § 358-A:1, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New Mexico (N.M. Stat. § 57-12-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); North Dakota (N.D. Cent. Code § 51-15-01, et seq.); Oklahoma (Okla. Stat. tit. 15, § 751, et seq.); Oregon (Or. Rev. Stat. § 646.605, et seq.); Rhode Island (R.I. Gen. Laws § 6-13.1-1, et seq.); South Dakota (S.D. Code Laws § 37-24-1, et seq.); Texas (Tex. Bus. & Com. Code § 17.41, et seq.); Virginia (VA Code § 59.1-196, et seq.); Vermont (Vt. Stat. tit. 9, § 2451, et seq.); Washington (Wash. Rev. Code § 19.86.010, et seq.); West Virginia (W. Va. Code § 46A-6- 101, et seq.); and Wisconsin (Wis. Stat. § 100.18, et seq.). *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), aff'd, 795 F.3d 654 (7th Cir. 2015).

presiding over this action and members of their staff, as well as members of their families; **(ii)** Defendants, Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; **(iii)** persons who properly execute and file a timely request for exclusion from the class; **(iv)** persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; **(v)** counsel for Defendants; and **(vi)** the legal representatives, successors, and assigns of any such excluded persons.

326. **Ascertainability**. The proposed Class and Subclass are readily ascertainable because they are defined using objective criteria so as to allow Class and Subclass members to determine if they are part of the Class and/or one of the Subclass. Further, the Class and Subclass can be readily identified through records maintained by Defendants.

327. **Numerosity (Rule 23(a)(1))**. The Class and Subclass are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass members, as herein identified and described, is not known, but download figures indicate that the TikTok app has been downloaded more than 120 million times in the United States.

328. **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

        a)     Whether Defendants engaged in the activities and practices referenced above;

        b)     Whether Defendants' activities and practices referenced above constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

        c)     Whether Defendants' activities and practices referenced above constitute a

violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. C. § 502;

d) Whether Defendants' activities and practices referenced above constitute a violation of the Right to Privacy under the California Constitution;

e) Whether Defendants' activities and practices referenced above constitute an intrusion upon seclusion;

f) Whether Defendants' activities and practices referenced above constitute a violation of the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq.*

g) Whether Defendants' activities and practices referenced above constitute a violation of the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.*

h) Whether Defendants' activities and practices referenced above constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

i) Whether Defendants' activities and practices referenced above constitute a violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.*;

j) Whether Defendants' activities and practices referenced above constitute a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.*;

k) Whether Plaintiffs and members of the Class and Subclass sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

l) Whether Defendants profited from their activities and practices referenced above, and, if so, in what amount;

m) What is the appropriate injunctive relief to ensure that Defendants no longer unlawfully: **(i)** take private and personally identifiable TikTok user data and content – including User/Device Identifiers, biometric identifiers and information, Private Videos

and Private Video Images, and video viewing histories; **(ii)** utilize private and personally identifiable TikTok user data and content to develop and patent commercially valuable artificial intelligence technologies; **(iii)** utilize private and personally identifiable TikTok user data and content to create consumer demand for and use of Defendants' other products; **(iv)** transfer such private and personally identifiable TikTok user data and content to servers in China and to third parties either in China or whose data is accessible from within China; **(v)** cause the diminution in value of TikTok users' private and personally identifiable data and content; **(vi)** cause injury and harm to TikTok users' mobile devices; **(vii)** cause TikTok users to incur higher data usage and electricity charges; **(viii)** retain the unlawfully acquired private and personally identifiable data and content on TikTok users; and **(ix)** profile and target, based on the above activities, TikTok users with advertisements.

n)     What is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and relevant third parties destroy unlawfully-acquired private and personally identifiable TikTok user data and content in their possession, custody or control.

329.     **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of members of the Class and Subclass because, among other things, Plaintiffs and members of the Class and Subclass sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants.

330.     **Adequacy (Rule 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the Class and Subclass. Plaintiffs' interests do not conflict with the interests of the Class and Subclass members, and Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class and Subclass.

331. **Predominance & Superiority (Rule 23(b)(3))**. In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class and Subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

332. **Final Declaratory or Injunctive Relief (Rule 23(b)(2))**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class and Subclass, making final declaratory and/or injunctive relief appropriate with respect to the Class and Subclass as a whole.

333. **Particular Issues (Rule 23(c)(4))**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation.

## XII.   CALIFORNIA LAW APPLIES TO THE CLAIMS OF THE  CLASS

334. With the exception of BIPA, which applies exclusively to the claims of the Illinois Subclass, California's substantive laws apply to the statutory, constitutional and common law claims of every member of the Class, regardless of where in the United States the Class Member

resides. California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class Members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

335.    Defendants' U.S. headquarters and principal places of business are located in California. Defendants also own property and conduct substantial business in California, and therefore California has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

336.    California is also the state from which Defendants' alleged misconduct emanated. This conduct similarly injured and affected Plaintiff and all other Class Members.

337.    The application of California laws to the claims of the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## XIII.   CAUSES OF ACTION.

**FIRST CAUSE OF ACTION**
**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**
**(On Behalf of the Plaintiffs and the Class)**

338.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

339.    The Plaintiffs' and the Class's mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers"

under 18 U.S.C. § 1030(e)(2)(B).

340.     Defendants have exceeded, and continue to exceed, authorized access to the Plaintiffs' and the Class's protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

341.     Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of the Plaintiffs' and the Class's private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption.

342.     Defendants' conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of the Plaintiffs and the Class being made available to foreign actors, including foreign intelligence services, in locations without adequate legal privacy protections. That this threat is real and imminent is evidenced by the ban on the TikTok app instituted by the Defense Department, Navy, Army, Marines, Air Force, Coast Guard and Transportation Security Administration, as well as the proposed legislation by United States Senators that would ban federal employees from using the TikTok app. As Senators Schumer and Cotton wrote in an October 23, 2019 letter to the Acting Director of National Intelligence concerning TikTok, "[s]ecurity experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party. Without an independent judiciary to review requests made by the Chinese government for data or other actions, there is no legal mechanism for Chinese companies to appeal if they disagree

with a request."[168]

343.    Accordingly, the Plaintiffs and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

**SECOND CAUSE OF ACTION**
**Violation of the California Comprehensive Data Access and Fraud Act**
**Cal. Pen. C. § 502**
**(On Behalf of the Plaintiffs and the Class)**

344.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

345.    Defendants' acts violate Cal. Pen. C. § 502(c)(1) because they have knowingly accessed, and continue to knowingly access, data and computers to wrongfully control or obtain data. The Plaintiffs' and the Class's private and personally identifiable data and content accessed by Defendants – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption – far exceeds any reasonable use of the Plaintiffs' and the Class's data and content to operate the TikTok app. There is no justification for Defendants' surreptitious collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content from their mobile devices and their other social media accounts; for Defendants' clandestine collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content before they even sign-up and create an account; for Defendants' covert collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content when the TikTok app is closed; or for Defendants having embedded source code within the TikTok app that transfers the Plaintiffs' and

---

[168] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats; https://www.cotton.senate.gov/?p=press_release&id=1239.

the Class's private and personally identifiable data and content to servers and third-party companies based in China where such servers and third-party companies are subject to Chinese law requiring the sharing of such data and content with the Chinese government.

346.    Defendants' acts violate Cal. Pen. C. § 502(c)(2) because they have knowingly accessed and without permission taken, copied, and made use of data from a computer – and they continue to do so. Defendants did not obtain permission to take, copy, and make use of the Plaintiffs' and the Class's private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption – from their mobile devices and their other social media accounts. Nor did Defendants obtain permission to take, copy, and make use of the Plaintiffs' and the Class's private and personally identifiable data and content from their mobile devices before they even sign-up and create an account. And Defendants did not obtain permission to take, copy, and make use of the Plaintiffs' and the Class's private and personally identifiable data and content from their mobile devices when the TikTok app is closed. Finally, Defendants did not obtain permission to embed source code within the TikTok app that transfers the Plaintiffs' and the Class's private and personally identifiable data and content to servers and third-party companies based in China where such servers and third-party companies are subject to Chinese law requiring the sharing of such data and content with the Chinese government.

347.    Accordingly, the Plaintiffs and the Class are entitled to compensatory damages, including "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access," injunctive relief, and attorneys' fees. Cal. Pen. C. § 502(e)(1), (2).

## THIRD CAUSE OF ACTION
### Violation of the Right to Privacy – California Constitution
### (On Behalf of the Plaintiffs and the Class)

348.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

349.    Plaintiffs and the Class hold, and at all relevant times held, a legally protected privacy interest in their private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption – on their mobile devices and in their other social media accounts that Defendants have taken.

350.    There is a reasonable expectation of privacy concerning Plaintiffs' and the Class's data and content under the circumstances present.

351.    The reasonableness of Plaintiffs' and the Class's expectation of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption – from Plaintiffs' and the Class's mobile devices and other social media accounts.

352.    Defendants' conduct constitutes and, at all relevant times, constituted a serious invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of – and allow third-party companies based in China to take and make use of – Plaintiffs' and the Class's private and personally identifiable data and content. Defendants intentionally invaded Plaintiffs' and the Class's privacy interests by intentionally designing the TikTok app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain their private and personally identifiable data and content.

96

353.     These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiffs' and the Class's private and personally identifiable data and content available to third parties, including foreign governmental entities whose interests are opposed to those of United States citizens. The offensiveness of Defendants' intrusion is further heightened by Defendants' secret collection and transfer of Plaintiffs' and the Class's private and personally identifiable data and content before they even sign-up and create an account; by Defendants' covert collection and transfer of Plaintiffs' and the Class's private and personally identifiable data and content when the TikTok app is closed; and by Defendants' clandestine collection and transfer of Plaintiffs' and the Class's private and personally identifiable data and content from their other social media accounts. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted Plaintiffs' and the Class's mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain Plaintiffs' and the Class's private and personally identifiable data and content.

354.     Plaintiffs and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this First Amended Complaint.

355.     Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs and the Class.

356.     Plaintiffs and the Class seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiffs and the Class, and were made in

conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

357.    Plaintiffs and the Class seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants to stop taking more private and personally identifiable data and content of Plaintiffs and the Class from their mobile devices and their other social media accounts than is reasonably necessary to operate the TikTok app; to make clear disclosures of Plaintiffs' and the Class's private and personally identifiable data and content that is reasonably necessary to operate the TikTok app; to obtain Plaintiffs' and the Class's consent to the taking of their private and personally identifiable data and content; to stop transferring Plaintiffs' and the Class's private and personally identifiable data and content to China, to servers located in China, or to servers or companies whose data is accessible from within China; and to recall and destroy Plaintiffs' and the Class's private and personally identifiable data and content already taken in contravention of Plaintiffs' and the Class's right to privacy under the California Constitution.

358.    The Plaintiffs and the Class seek restitution and disgorgement for Defendants' violation of their privacy rights. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

**FOURTH CAUSE OF ACTION**
**Intrusion upon Seclusion**
**(On Behalf of the Plaintiffs and the Class)**

359.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully

set forth herein.

360.    "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

361.    The Plaintiffs and the Class have, and at all relevant times had, a reasonable expectation of privacy in their mobile devices and their other social media accounts, and their private affairs include their past, present and future activity on their mobile devices and their other social media accounts.

362.    The reasonableness of the Plaintiffs' and the Class's expectations of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content from the Plaintiffs' and the Class's mobile devices and other social media accounts.

363.    Defendants intentionally intruded upon the Plaintiffs' and the Class's solitude, seclusion, and private affairs – and continue to do so – by intentionally designing the TikTok app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain the Plaintiffs' and the Class's private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption.

364.    These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Defendants' making the Plaintiffs' and the Class's private and

personally identifiable data and content available to third parties, including foreign governmental entities whose interests are opposed to those of United States citizens. The offensiveness of Defendants' intrusion is further heightened by Defendants' secret collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content before they even sign-up and create an account; by Defendants' covert collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content when the TikTok app is closed; and by Defendants' clandestine collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content from their other social media accounts. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted the Plaintiffs' and the Class's mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain the Plaintiffs' and the Class's private and personally identifiable data and content.

365. The Plaintiffs and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this First Amended Complaint.

366. Defendants' conduct was a substantial factor in causing the harm suffered by the Plaintiffs and the Class.

367. The Plaintiffs and the Class seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiffs and the Class, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

368. The Plaintiffs and the Class seek injunctive relief to rectify Defendants' actions,

including but not limited to requiring Defendants to stop taking more private and personally identifiable data and content from the Plaintiffs' and the Class's mobile devices and other social media accounts than is reasonably necessary to operate the TikTok app; to make clear disclosures of the Plaintiffs' and the Class's private and personally identifiable data and content that is reasonably necessary to operate the TikTok app; to obtain the Plaintiffs' and the Class's consent to the taking of such private and personally identifiable data and content; to stop transferring the Plaintiffs' and the Class's private and personally identifiable data and content to China, to servers located in China, or to servers or companies whose data is accessible from within China; and to recall and destroy the Plaintiffs' and the Class's private and personally identifiable data and content already taken in contravention of the Plaintiffs' and the Class's privacy rights.

369. Plaintiffs and the Class seek restitution and disgorgement for Defendants' intrusion upon seclusion. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

**FIFTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law,**
**Bus. & Prof. C. §§ 17200 et seq.**
**(On Behalf of the Plaintiffs and the Class)**

370. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

371. The Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.* (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice,

which can include false or misleading advertising.

372.     Defendants violated, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

373.     Defendants violated, and continue to violate, the "unfair" prong of the UCL because they took private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption – from the Plaintiffs' and the Class's mobile devices and other social media accounts under circumstances in which the Plaintiffs and the Class would have no reason to know that such data and content was being taken.

374.     Plaintiffs and the Class had no reason to know because (i) there was no disclosure of Defendants' collection and transfer of the Plaintiffs' and the Class's biometric identifiers and information, and Private Videos and Private Video Images not intended for public consumption; (ii) there was no disclosure of Defendants' collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content before they even sign-up and create an account; (iii) there was no disclosure of Defendants' collection and transfer of the Plaintiffs' and the Class's private and personally identifiable data and content when the TikTok app is closed; (iv) there was no disclosure that Defendants had embedded source code within the TikTok app that transfers the Plaintiffs' and the Class's private and personally identifiable data and content to servers and third-party companies based in China where such servers and third-party companies are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (v) there was no effective disclosure of the wide range of the private and personally identifiable data and content, including User/Device Identifiers, that Defendants took from the Plaintiffs' and the Class's mobile devices and other social media accounts.

375.    Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because (i) Defendants made it appear that the Plaintiffs' and the Class's User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images would not be collected and transferred unless the Plaintiffs and the Class chose to do so, but in fact Defendants collected and transferred such data and content without notice or consent; (ii) Defendants made it appear that the Plaintiffs' and the Class's private and personally identifiable data and content would not be collected and transferred before they had signed-up and created an account, but in fact Defendants collected and transferred such data and content before sign-up and account creation without notice or consent; (iii) Defendants made it appear that the Plaintiffs' and the Class's private and personally identifiable data and content would not be collected or transferred while the TikTok app is closed, but in fact Defendants clandestinely collected and transferred such data and content when the app was closed without notice or consent; (iv) Defendants made it appear that the Plaintiffs' and the Class's private and personally identifiable data and content would not be transferred to servers and third-party companies based in China where such servers and third-party companies are subject to Chinese law requiring the sharing of such data and content with the Chinese government, but in fact Defendants covertly transferred such data and content to servers and third-party companies based in China without notice or consent; and (v) Defendants have intentionally refrained from disclosing the use to which the Plaintiffs' and the Class's private and personally identifiable data and content has been put, while simultaneously providing misleading reassurances about Defendants' data collection and use practices. The Plaintiffs and the Class were misled by Defendants' concealment, and had no reason to believe that Defendants had taken the private and personally identifiable data and content that they had taken.

376.    Plaintiffs and the Class have been harmed and have suffered economic injury as a

result of Defendants' UCL violations. First, Plaintiffs and the Class have suffered harm in the form of diminution of the value of their private and personally identifiable data and content. Second, they have suffered harm to their mobile devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images.

377.    Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their targeted-advertising, improvements to their artificial intelligence technologies, their patent applications, and the increased consumer demand for and use of Defendants' other products. Plaintiffs and the Class seek restitution and disgorgement of these unjust profits and revenues.

378.    Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices, and will not recall and destroy Plaintiffs' and the Class's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

**SIXTH CAUSE OF ACTION**
**Violation of the California False Advertising Law,**
**Bus. & Prof. C. §§ 17500 *et seq.***
**(On Behalf of the Plaintiffs and the Class)**

379.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

380.    California's False Advertising Law (the "FAL") – Cal. Bus. & Prof. Code §§

104

17500, *et seq.* – prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

381.    Defendants' advertising is, and at all relevant times was, highly misleading. Defendants do not disclose at all, or do not meaningfully disclose, the private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption – that they have collected and transferred from the Plaintiffs' and the Class's mobile devices and other social media accounts. Defendants also do not advertise that Defendants secretly take private and personally identifiable data and content from the Plaintiffs' and the Class's mobile devices before they even sign up and create an account, or that Defendants covertly take private and personally identifiable data and content from the Plaintiffs' and the Class's mobile devices even when the TikTok app is closed. Nor do Defendants disclose that the Plaintiffs' and the Class's private and personally identifiable data and content has been made available to foreign entities, including foreign government entities. As United States Senator Josh Hawley said on November 18, 2019: "If your child uses TikTok, there's a chance the Chinese Communist Party knows where they are, what they look like, what their voices sound like, and what they're watching" . . . "That's a feature TikTok doesn't advertise."[169]

382.    Reasonable consumers, like the Plaintiffs and the Class, are – and at all relevant times were – likely to be misled by Defendants' misrepresentations. Reasonable consumers lack the means to verify Defendants' representations concerning their data and content collection and use practices, or to understand the fact or significance of Defendants' data and content collection

---

[169] https://www.law360.com/articles/1220783/no-more-data-storage-in-china-gop-senator-s-bill-says.

and use practices.

383.    Plaintiffs and the Class have been harmed and have suffered economic injury as a result of Defendants' misrepresentations. First, they have suffered harm in the form of diminution of the value of their private and personally identifiable data and content. Second, they have suffered harm to their mobile devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption.

384.    Defendants, as a result of their misrepresentations, have been able to reap unjust profits and revenues. This includes Defendants' profits and revenues from their targeted-advertising, improvements to their artificial intelligence technologies, their patent applications, and the increased consumer demand for and use of Defendants' other products. Plaintiffs and the Class seek restitution and disgorgement of these unjust profits and revenues.

385.    Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices, and will not recall and destroy Plaintiffs' and the Class's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

### SEVENTH CAUSE OF ACTION
### Restitution / Unjust Enrichment
### (On Behalf of the Plaintiffs and the Class)

386.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

387. Plaintiffs and the Class have conferred substantial benefits on Defendants by downloading and using the TikTok app. These include the Defendants' collection and use of the Plaintiffs' and the Class's private and personally identifiable data and content – including User/Device Identifiers, biometric identifiers and information, and Private Videos and Private Video Images never intended for public consumption. Such benefits also include the revenues and profits resulting from Defendants' collection and use of such data and content for Defendants' targeted-advertising, improvements to their artificial intelligence technologies, their patent applications, and the increased consumer demand for and use of Defendants' other products.

388. Defendants have knowingly and willingly accepted and enjoyed these benefits.

389. Defendants either knew or should have known that the benefits rendered by the Plaintiffs and the Class were given with the expectation that Defendants would not take and use the Plaintiffs' and the Class's private and personally identifiable data and content that Defendants have taken and used without permission. For Defendants to retain the aforementioned benefits under these circumstances is inequitable.

390. Through deliberate violation of the Plaintiffs' and the Class's privacy interests, and statutory and constitutional rights, Defendants each reaped benefits that resulted in each Defendant wrongfully receiving profits.

391. Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiffs and the Class.

392. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiffs and the Class are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by

Defendants through this inequitable conduct.

## EIGHTH CAUSE OF ACTION
### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*
### (On Behalf of Plaintiffs and the Class)

393.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

394.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1). Defendants violated the VPPA by knowingly disclosing such "personally identifiable information" to Facebook and Google.

395.    Defendants are "video tape service providers" under 18 U.S.C. § 2710(a)(4) because they "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." Defendants are engaged in the business of delivering video content and services to Plaintiffs and the Class. Defendants' platform allows TikTok users to create, post, share, view, and otherwise engage with videos. Defendants' platform is built to deliver video content to consumers, and Defendants regularly delivered videos to Plaintiffs and the Class by making those materials electronically available to Plaintiffs and the Class on Defendants' platform. Defendants also allowed TikTok users to create and share videos with a non-public audience.

396.    Plaintiffs and the Class are "consumers" under 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services" from Defendants. Plaintiffs and the Class are registered TikTok users who use the TikTok app through interaction with it. Plaintiffs and the Class were required to provide "personally identifiable information" to TikTok, including date of birth, in order to sign up, become registered users, establish user profiles, to subscribe to "follow" other

accounts, and to contribute to TikTok's video streaming content. By signing up for accounts with TikTok, becoming registered users, establishing user profiles, providing TikTok with personal information, and spending time and attention using and contributing to TikTok's video streaming platform, Plaintiffs and the Class entered into transactions with Defendants to obtain access to TikTok's content and services and for the purpose of subscribing to TikTok's video streaming content and services.

397.    The VPPA defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1)(3). Defendants "knowingly disclose[d]" to Facebook and Google each TikTok user's "personally identifiable information," including: (1) what specific videos each TikTok user has watched; (2) whether each TikTok user has engaged with a specific video by "liking" and/or "favoriting" it; and (3) the identities of other TikTok users that each TikTok user "follows." Defendants also disclosed each TikTok user's device ID and advertising ID to Facebook and Google, which personally identifies each TikTok user to an ordinary person and matches each TikTok user to their video viewing history when transmitted to Facebook and Google.

398.    Defendants' pairing of the TikTok user's device ID and advertising ID with that user's video viewing history violates the VPPA because it discloses to Facebook and Google the videos that a specific TikTok user has requested or obtained. While the VPPA permits the disclosure of such "personally identifiable information" to third parties by "informed written consent," the requisite consent must be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B)(i). No such consent was obtained by Defendants. Nor can this defect be cured after-the-fact. The VPPA provides that the requisite

written consent must (at the election of the consumer) be "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(ii).

399.    Defendants' disclosures to Facebook and Google are not subject to a statutory exception for disclosures that are incident to "the ordinary course of business of the video tape provider," *see* 18 U.S.C. § 2710(b)(2)(E), which exception is limited to debt collection activities, order fulfillment, request processing, and the transfer of ownership. 18 U.S.C. § 2710(a)(2). Facebook and Google are not involved in any such activities here.

400.    The VPPA also requires that "[a] person subject to the section shall destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purposes for which it was collected . . . ." 18 U.S.C. § 2710(e). In violation of the VPPA, Defendants have not destroyed this "personally identifiable information" and instead continue to maintain it.

401.    Plaintiffs and the Class seek to recover actual damages, not less than liquidated damages in the amount of $2,500 per Plaintiff/Class member, punitive damages, attorneys' fees and costs, and such other preliminary and equitable relief as the Court determines to be appropriate. 18 U.S.C. § 2710(c)(2)(A)-(D).

## NINTH CAUSE OF ACTION
### Violation of Illinois's Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.*
### (On Behalf of the Illinois Plaintiffs and the Illinois Subclass)

402.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

403.    BIPA makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject . . . in writing that a

biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative." 740 ILCS 14/15(b).

404.    At all relevant times, the Illinois Plaintiffs were residents of Illinois and each is a "person" and/or a "customer" within the meaning of BIPA. 740 ILCS 14/15(b). The minor Illinois Plaintiffs' legal guardians are their "legally authorized representative[s]" within the meaning of BIPA, and served in such capacity at all times relevant to this action. *Id.*

405.    Each Defendant is, and at all relevant times was, a "corporation, limited liability company, association, or other group, however organized," and thus is, and at all relevant times was, a "private entity" under the BIPA. 740 ILCS 14/10.

406.    The Illinois Plaintiffs and the Illinois Subclass had their "biometric identifiers," including their face geometry scans, as well as their "biometric information" collected, captured, received, or otherwise obtained by Defendants as a result of the Illinois Plaintiffs' and the Illinois Subclass's use of the TikTok app. 740 ILCS 14/10.

407.    At all relevant times, Defendants systematically and surreptitiously collected, captured, received or otherwise obtained the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" without first obtaining signed written releases, as required by 740 ILCS 14/15(b)(3), from any of them or their "legally authorized representatives."

408.    In fact, Defendants failed to properly inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in

writing (or in any other way) that the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" were being "collected or stored" by Defendants. Nor did Defendants inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in writing of the specific purpose and length of term for which the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" were being "collected, stored and used" as required by 740 ILCS 14/15(b)(1)-(2).

409.    BIPA also makes it unlawful for a private entity "in possession of a biometric identifier or biometric information" to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

410.    Defendants are, and at all relevant times were, "in possession of" the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers," including but not limited to their face geometry scans, and "biometric information." Defendants profited from such "biometric identifiers" and "biometric information" by using them for targeted advertising, improvements to Defendants' artificial intelligence technologies, Defendants' patent applications, and the generation of increased demand for and use of Defendants' other products. 740 ILCS 14/15(c).

411.    Finally, BIPA prohibits private entities "in possession of a biometric identifier or biometric information" from "disclos[ing], redisclos[ing], or otherwise disseminat[ing] a person's or a customer's biometric identifier or biometric information unless" any one of four enumerated conditions are met. 740 ILCS 14/15(d)(1)-(4). None of such conditions are met here.

412.    Defendants disclose, redisclose and disseminate, and at all relevant times disclosed, redisclosed and disseminated, the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers," including but not limited to their face geometry scans, and "biometric information"

without the consent of any of them or their "legally authorized representatives." 740 ILCS 14/15(d)(1). Moreover, the disclosures and redisclosures did not "complete[] a financial transaction requested or authorized by" the Illinois Plaintiffs, the Illinois Subclass or any of their legally authorized representatives. 740 ILCS 14/15(d)(2). Nor are, or at any relevant times were, the disclosures and redisclosures "required by State or federal law or municipal ordinance." 740 ILCS 14/15(d)(3). Finally, at no point in time were the disclosures ever "required pursuant to a valid warrant or subpoena issued by a court of competent jurisdiction." 740 ILCS 14/15(d)(4).

413.    BIPA mandates that a private entity "in possession of biometric identifiers or biometric information" "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

414.    But Defendants do not publicly provide any written policy establishing any retention schedule or guidelines for permanently destroying the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information." 740 ILCS 14/15(a).

415.    BIPA also commands private entities "in possession of a biometric identifier or biometric information" to: (1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information. 740 ILCS 14/15(e). Based on the facts alleged herein, including Defendants' lack of a public written policy,

their failure to inform TikTok users that Defendants obtain such users' "biometric identifiers" and "biometric information," their failure to obtain written consent to collect or otherwise obtain TikTok users' "biometric identifiers" and "biometric information," and their unauthorized dissemination of TikTok users' "biometric identifiers" and "biometric information," Defendants have violated this provision too.

416. Defendants recklessly or intentionally violated each of BIPA's requirements and infringed the Illinois Plaintiffs' and the Illinois Subclass's rights to keep their immutable and uniquely identifying biometric identifiers and biometric information private. As individuals subjected to each of Defendants' BIPA violations above, the Illinois Plaintiffs and the Illinois Subclass are and have been aggrieved. 740 ILCS 14/20.

417. On behalf of themselves and the Illinois Subclass, the Illinois Plaintiffs seek: (1) injunctive and equitable relief as is necessary to protect the interests of the Illinois Plaintiffs and the Illinois Subclass by requiring Defendants to comply with BIPA's requirements; (2) $1,000.00 or actual damages, whichever is greater, for each negligent violation of BIPA by Defendants; (3) $5,000.00 or actual damages, whichever is greater, for each intentional or reckless violation of BIPA by Defendants; and (4) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses. 740 ILCS 14/20(1)-(4).

### TENTH CAUSE OF ACTION
### Violation of the State Consumer Protection Statutes
### (On Behalf of Plaintiffs and the Multi-State Consumer Protection Class)

418. Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-333 as if fully set forth herein.

419. In the alternative to a nationwide class, Plaintiffs bring this action individually and on behalf of the Multi-State Consumer Protection Class.

420. Plaintiffs and Class members have been injured as a result of Defendants' violations

of the state consumer protection statutes listed above in paragraph 322 and footnote 167, which also provide a basis for redress to Plaintiffs and Class members based on Defendants' fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

421.    Defendants' conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

422.    Defendants committed unfair and deceptive acts by surreptitiously accessing, collecting, storing, and/or disclosing Plaintiffs' and the Class's private information and data.

423.    Defendants violated the Multi-State Consumer Protection Class states' unfair and deceptive acts and practices laws by engaging in these unfair or deceptive acts or practices.

424.    Plaintiffs and the Class were injured and have suffered damages as a direct and proximate result of Defendants' unfair acts and practices.

425.    Plaintiffs and the other Multi-State Consumer Protection Class Members' injuries were proximately caused by Defendant's unfair and deceptive business practices.

426.    As a result of Defendants' violations, Defendants have been unjustly enriched.

427.    Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiffs and Class members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief against Defendants as set forth below:

a)  entry of an order certifying the proposed class and subclass pursuant to Federal Rule of

Civil Procedure 23;

b) entry of an order appointing Plaintiffs as representatives of the class and subclass;

c) entry of an order appointing Plaintiffs' counsel as co-lead counsel for the class and subclass;

d) entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

    i. enjoining Defendants, their affiliates, associates, officers, employees and agents from transmitting TikTok user data and content to China, to other locations or facilities where such TikTok user data and content is accessible from within China, and/or to anyone outside the defendant companies;

    ii. enjoining Defendants, their affiliates, associates, officers, employees and agents from taking TikTok users' private draft videos (including any frames, digital images or other content from such videos) and biometric identifiers and information without advanced notice to, and the prior written consent of, such TikTok users or their legally authorized representatives (and, for the Illinois Subclass, without being in compliance with BIPA);

    iii. enjoining Defendants, their affiliates, associates, officers, employees and agents from taking physical/digital location tracking data, device ID data, personally identifiable data and any other TikTok user data and content except that for which appropriate notice and consent is provided and which Defendants can show to be reasonably necessary for the lawful operation of the TikTok app within the United States;

    iv. enjoining Defendants, their affiliates, associates, officers, employees and

agents from sharing TikTok users' video viewing histories unless in compliance with the Video Privacy Protection Act;

v. mandating that Defendants, their affiliates, associates, officers, employees and agents recall and destroy the TikTok user data and content already taken in violation of law;

vi. mandating that Defendants, their affiliates, associates, officers, employees and agents remove from the TikTok app all SDKs based in China or whose data is otherwise accessible from within China;

vii. mandating that Defendants, their affiliates, associates, officers, employees and agents implement protocols to ensure that no TikTok user data and content is transmitted to, or otherwise accessible from within, China;

viii. mandating that Defendants, their affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all of the above steps have been taken; and

ix. mandating that Defendants, their affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for the Plaintiffs in the form of a declaration under oath that the above steps have been satisfied.

e) entry of judgment in favor of each class and subclass member for damages suffered as a result of the conduct alleged herein, including compensatory, statutory, and punitive damages, restitution, and disgorgement, to include interest and prejudgment interest;

f) award Plaintiffs reasonable attorneys' fees and costs; and

g) grant such other and further legal and equitable relief as the court deems just and

equitable.

## XV.   **DEMAND FOR JURY TRIAL.**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 18, 2020         Respectfully submitted,

                            /s/ Elizabeth A. Fegan

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 South Wacker Drive
24th Floor
Chicago, IL 60606
Tel: (312) 741-1019
beth@feganscott.com

Katrina Carroll
**CARLSON LYNCH, LLP**
111 W. Washington Street
Suite 1240
Chicago, IL 60602
Tel: (312) 750-1265
kcarroll@carlsonlynch.com

Ekwan E. Rhow
**BIRD, MARELLA, BOXER,
WOLPERT, NESSIM, DROOKS,
LINCENBERG & RHOW, P.C.**
1875 Century Park East, 23rd Floor
Tel: (310) 201-2100
erhow@birdmarella.com

***Co-Lead Counsel for Plaintiffs and the
Class***

        -and-

Jonathan M. Jagher
**FREED KANNER LONDON &
MILLEN LLC**
923 Fayette St.
Conshohocken, PA 19428

Tel.: (610) 234-6487
Fax: (224) 632-4521
jjagher@fklmlaw.com

Megan E. Jones
**HAUSFELD LLP**
1700 K Street NW, Suite 650
Washington, D.C. 20006
(202) 540-7200

Michael Gervais
**SUSMAN GODFREY LLP**
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
mgervais@susmangodfrey.com

Amanda Klevorn
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70115
Tel: (504) 779-2845
aklevorn@burnscharest.com

Albert Y. Chang
**BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037
Tel: (858) 914-2001
achang@bottinilaw.com

*Plaintiffs' Steering Committee*

-and-

Shannon Marie McNulty
**CLIFFORD LAW OFFICES, P.C.**
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| | Magistrate Judge Sunil R. Harjani |
| This Document Relates to All Cases | |

## PLAINTIFFS' MOTION FOR
## PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

# Table of Contents

INTRODUCTION ................................................................................................................. ii

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 2

    A.    Plaintiffs' Allegations ................................................................................. 2

    B.    The Risks of TikTok's Defenses to Plaintiffs and the Class ...................... 4

    C.    Litigation and Procedural History ............................................................. 8

    D.    The Settlement Agreement ...................................................................... 12

        1.    Proposed Class Definition ............................................................ 12

        2.    Monetary Relief ........................................................................... 12

        3.    Plan of Allocation ........................................................................ 13

        4.    Injunctive Relief .......................................................................... 14

        5.    Notice and Settlement Administration Costs .............................. 15

        6.    Release ......................................................................................... 16

        7.    Attorneys' Fees and Costs for Class Counsel, and Service Awards for Class Representatives ............................................... 16

        8.    Class Size Representations and Confirmatory Discovery ........... 17

ARGUMENT ..................................................................................................................... 18

    A.    This Settlement well surpasses the Seventh Circuit's standards for the approval of class action settlements ................................................... 18

    B.    The Settlement should be preliminarily approved. ................................. 19

        1.    The Settlement provides substantial relief to the Class, particularly given the risks posed by continued litigation. ............... 20

        2.    The Settlement value is well within the range of reasonableness. ............. 23

        3.    Continued litigation would be complex, costly, and lengthy. ..................... 32

        4.    Proposed Class Counsel are competent, well-informed, and experienced and they strongly endorse the Settlement. ................... 34

        5.    The Settlement was reached after significant analysis and arm's-length negotiation. 34

    C.    The Class and Subclass should be provisionally certified for settlement purposes. ...... 37

        1.    The requirements of Rule 23(a) are satisfied. ............................. 38

        2.    The requirements of Rule 23(b)(3) are satisfied. ........................ 43

    D.    Court-Appointed Co-Lead Counsel are experienced and knowledgeable and have dedicated themselves to this case; they should be appointed Class Counsel. ............... 44

    E.    The proposed class notice plan provides the best practicable notice and does so in an easily understood format. ...................................................... 45

    F.    The Court should schedule a fairness hearing to finally approve the settlement. .......... 47

CONCLUSION ................................................................................................................. 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.,*
No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) ................................... 34

*Amchem Prods. Inc. v. Windsor,*
521 U.S. 591 (1997) ......................................................................................... 37, 43

*Armstrong v. Bd. of Sch. Dirs. Of the City of Milwaukee,*
616 F.2d 305 (7th Cir. 1980) .................................................................... 18, 20, 34

*Borcea v. Carnival Corp.,*
238 F.R.D. 664 (S.D. Fla. 2006) ................................................................................ 33

*Carrier iQ, Inc., Consumer Privacy Litig.,*
No. 12-md-02330-EMC, 2016 U.S. Dist. LEXIS 114235 (N.D. Cal. Aug. 25, 2016) ............ 30

*Cotton v. Hinton,*
559 F.2d 1326 (5th Cir. 1977) ..................................................................................... 32

*CV Reit, Inc. v. Levy,*
144 F.R.D. 690 (S.D. Fla. 1992) ................................................................................. 41

*Dohrmann v. Intuit, Inc.,*
823 F. App'x 482 (9th Cir. 2020) .................................................................................. 5

*Eichenberger v. ESPN, Inc.,*
876 F.3d 979 (9th Cir. 2017) ....................................................................................... 23

*Facebook Biometric Info. Privacy Litig.,*
No. 15-cv-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018) ...................................... 22

*Facebook BIPA,*
No. 3:15-cv-03747, 2020 WL 4818608 (N.D. Cal. Aug. 19, 2020) ........................... 25, 26, 26

*Fogarazzao v. Lehman Bros., Inc.,*
232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................................... 41

*Fox v. Asset Acceptance, LLC,*
No. CV 14-734-GW(FFMx), 2015 U.S. Dist. LEXIS 193865, at *23 (C.D. Cal. Aug. 17, 2015) ...................................................................................................................... 36

*Fraley v. Facebook, Inc.,*
966 F. Supp. 2d 939 (N.D. Cal. 2013) ........................................................................ 30

## TABLE OF AUTHORITIES (cont.)

Page(s)

**Cases (cont.)**

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982) ........................................................................................... 44

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................................ 20

*Harris v. Circuit City Stores, Inc.*,
   No. 07-cv-2512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008) ................................... 44

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010) .................................................................... passim

*In re Capital One Telephone Consumer Protection Act Litig.*,
   80 F. Supp. 3d 781 (N.D. Ill. 2015) ................................................................... 30

*In re Equifax Customer Data Sec. Breach Litig.*,
   MDL Docket No. 2800, 2020 U.S. Dist. LEXIS 118209 (N.D. Ga. Mar. 17, 2020) ............. 31

*In re Google Buzz Privacy Litig.*,
   No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) .......................... 30

*In re Google LLC Street View Electronic Communications Litigation*,
   No. 3:10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) ............ 30

*In re Mexico Money Transfer Litig.*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) ............................................................... 34

*In re Netflix Privacy Litig.*,
   No. 5:11-cv-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .................. 29, 33

*In re Nickelodeon Consumer Privacy Litig.*,
   827 F.3d 262 (3d Cir. 2016) ............................................................................. 23

*In re Nissan Radiator*,
   No. 10 CV 7493 (VB), 2013 U.S. Dist. LEXIS 116720 (S.D.N.Y. May 30, 2013) ............... 37

*In re Northfield Labs., Inc. Sec. Litig.*,
   No. 06 C 1493, 2012 WL 366852 (N.D. Ill. Jan. 31, 2012) ................................... 46

*In re Southwest Airlines Voucher Litig.*,
   No. 11-cv-8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ............................. 20

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases (cont.)**

*In re Target Corp. Customer Data Sec. Breach Litig.*,
   892 F.3d 968 (8th Cir. 2018) ................................................................. 32

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) .......................................................... 35

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ................................................... 18, 19, 20, 34

*Johnson v. Uber Techs., Inc.*,
   No. 16-cv-5468, 2018 U.S. Dist. LEXIS 161155 (N.D. Ill. Sep. 20, 2018) ............................. 5

*Kaye v. Amicus Mediation & Arbitration Group, Inc.*,
   300 F.R.D. 67 (D. Conn. 2014) ............................................................... 43

*Kessler v. Am. Resorts International's Holiday Network, Ltd.*,
   No. 05 C, 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007) ................................ 19

*Kline v. Dymatize Enters., LLC*,
   No. 15-CV-2348-AJB-RBB, 2016 U.S. Dist. LEXIS 142774 (S.D. Cal. Oct. 13, 2016) ........ 36

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ................................................... 20, 29, 33

*Lo v. Oxnard European Motors, LLC*,
   No. 11CV1009 JLS (MDD), 2011 U.S. Dist. LEXIS 144490 (S.D. Cal. Dec. 15, 2011) ........ 36

*McCabe v. Crawford & Co.*,
   210 F.R.D. 631 (N.D. Ill. 2002) ............................................................. 38

*McKinnie v. JP Morgan Chase Bank, N.A.*,
   678 F. Supp. 2d 806 (E.D. Wis. 2009) ...................................................... 34

*Medeiros v. HSBC Card Servs.*,
   No. CV 15-09093 JVS (AFMx), 2017 U.S. Dist. LEXIS 178484 (C.D. Cal. Oct. 23, 2017) .. 30

*Miracle-Pond v. Shutterfly, Inc.*,
   No. 19-cv-04722, 2020 U.S. Dist. LEXIS 86083 (N.D. Ill. May 15, 2020) ............................ 5

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) .......................................................................... 45

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

**Cases (cont.)**

*Parker v. Risk Mgmt. Alternatives, Inc.*,
206 F.R.D. 211 (N.D. Ill. 2002) ....................................................................... 41

*Parker v. Time Warner Entm't Co., L.P.*,
631 F. Supp. 2d 242 (E.D.N.Y. 2009) ............................................................. 30

*Peter v. DoorDash, Inc.*,
No. 19-CV-06098-JST, --- F. Supp. 3d ---, 2020 WL 1967568 (N.D. Cal. Apr. 23, 2020) ....... 5

*Pollard v. Remington Arms Co., LLC*,
320 F.R.D. 198 (W.D. Mo. 2017) ................................................................... 24

*Reliable Money Order, Inc. v. McKnight Sales Co.*,
704 F.3d 489 ................................................................................................... 44

*Roach v. T.L. Cannon Corp.*,
773 F.3d 401 (2d Cir. 2015) ........................................................................... 43

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................................................ 32, 33

*Simerlein v. Toyota Motor Corp.*,
No. 3:17-cv-1091 (VAB), 2019 U.S. Dist. LEXIS 96742 (D. Conn. June 10, 2019) ............. 36

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ........................................................................... 24

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ............................................................. 19, 20, 34

*Wal-Mart Stores, Inc. v. Dukes*,
565 U.S. 338 (2011) ....................................................................................... 38

*Yershov v. Gannett Satellite Information Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ........................................................................... 22

*Young v. Rolling in the Dough, Inc.*,
No. 1:17-CV-07825, 2020 WL 969616 (N.D. Ill. Feb. 27, 2020) ........................... 19

*Zyburo v. NCSPlus, Inc.*,
44 F. Supp. 3d 500 (S.D.N.Y. 2014) ............................................................... 42

# TABLE OF AUTHORITIES (cont.)

Page(s)

**Statutes**

18 U.S.C § 2710(c)(2) ......................................................................... 29

18 U.S.C. § 2710 ............................................................................... 31

28 U.S.C. § 1715 ............................................................................. 2, 47

50 U.S.C. § 1601 ................................................................................ 9

50 U.S.C. § 1701 ................................................................................ 9

740 ILCS §14/1 ................................................................................. 3

California Civil Code § 3344 ................................................................. 30

Section 301 of Title 3, United States Code ............................................... 9

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................... 6

Fed. R. Civ. P. 23 ............................................................................. 44

Fed. R. Civ. P. 23(a) .................................................................. 38, 41, 42

Fed. R. Civ. P. 23(a)(1) ...................................................................... 38

Fed. R. Civ. P. 23(a)(1)-(4) .................................................................. 38

Fed. R. Civ. P. 23(a)(2) ...................................................................... 38

Fed. R. Civ. P. 23(a)(3) ...................................................................... 41

Fed. R. Civ. P. 23(a)(4) .................................................................. 41, 42

Fed. R. Civ. P. 23(b)(1), (b)(2), or (b)(3) .................................................. 45

Fed. R. Civ. P. 23(b)(3) ...................................................................... 43

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii) .......................................................... 46

Fed. R. Civ. P. 23(e)(1) ...................................................................... 46

Fed. R. Civ. P. 23(e)(1)(B) .................................................................. 45

## <u>TABLE OF AUTHORITIES (cont.)</u>

**Page(s)**

**Rules (cont.)**

Fed. R. Civ. P. 23(e)(2) ................................................................. 19

Fed. R. Civ. P. 23(g) ..................................................................... 45

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) ................................................ 44

Fed. R. Civ. P. 23(g)(1)(B), (2), (4) ............................................. 44

**Other Authorities**

4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) .................... 18

H. Newberg, A. Conte, Newberg on Class Actions § 11.41 (4th ed. 2002) ................................ 36

Manual for Complex Litigation § 21.632 (4th ed. 2004) .............. 37

## INTRODUCTION

After more than a year of litigation, an expert-led inside look at TikTok's source code, two hard-fought mediations strategized by top firms from the plaintiffs' bar and guided by renowned mediator Honorable Layn Phillips (ret.), and subsequent negotiations for additional relief after Co-Lead Counsel was appointed, Plaintiffs have achieved a $92 million non-reversionary cash settlement fund and meaningful injunctive relief for the Settlement Class.[1] In reaching this substantial result, Plaintiffs overcame concrete litigation risks and capitalized on unique defense-side political and settlement pressures.

Indeed, Plaintiffs faced material risks stemming from arbitration clauses and class action waivers. And they asserted highly technical legal claims, rooted in developing areas of data privacy law, arising from Defendants' novel technology. But Plaintiffs were unrelenting in their pursuit of class-wide relief and took advantage of unique political factors (including the potential for a presidentially mandated rush sale) resulting in an outstanding recovery for Plaintiffs and the Class.

This multidistrict litigation (MDL) consists of 21 putative class actions against U.S. defendants TikTok Inc. ("TikTok") and ByteDance Technology Inc. ("ByteDance"), and foreign defendants TikTok, Ltd. and Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance") (collectively, "Defendants" or, in the Settlement, "Defendant's Released Parties"). The cases allege that Defendants invaded Plaintiffs' and putative class members' privacy through the popular TikTok application and its predecessor application Musical.ly (the "App"), a video-sharing social networking service used to create short videos.

---

[1] Capitalized terms have the same meanings as set forth in the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement"), as clarified by the February 16, 2021 Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, the "Settlement") attached as Exhibit A.

Though the litigation has been contentious, both as among Plaintiffs pre-MDL, and vis-à-vis Defendants, the settling Parties have reached consensus, and jointly endorse the proposed Settlement now before the Court. The Settlement provides substantial relief to the Class, including a non-reversionary $92 million cash fund to pay Class members, and prospective injunctive relief that addresses the complained-of conduct by requiring TikTok to make disclosures in keeping with the laws Plaintiffs claim were violated and to initiate a newly designed data privacy compliance training program for all TikTok employees and contractors.

A recovery of this magnitude ranks among the nation's highest privacy-related settlements, even in those matters involving significant statutory damages claims. The proposed Settlement will also eliminate the risk and uncertainty of continued proceedings in this Court, in which the foreign Defendants would contest personal jurisdiction and the domestic Defendants would immediately pursue motions to compel arbitration and to dismiss Plaintiffs' claims.

Balancing the risks against the substantial attendant benefits, the Court should find that the Settlement is fair, adequate, and reasonable and enter an Order (i) granting preliminary approval of the Settlement Agreement; (ii) provisionally certifying the Class for settlement purposes; (iii) appointing Class Representatives and Class Counsel; (iv) approving the form and manner of the Notice Plan and appointing a Settlement Administrator; (v) establishing deadlines for requests for exclusion and the filing of objections to the proposed settlement contemplated by the Settlement Agreement; (vi) finding that the parties have complied with 28 U.S.C. § 1715; and (vii) scheduling a fairness hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiffs' Allegations

This case involves Defendants' collection, use, and transmission of highly sensitive personal data via Defendants' ubiquitous TikTok app. *See* Consolidated Amended Class Action

Complaint ("Complaint"), ECF No. 114. The App allows users to create and share 60-second videos—typically of people doing activities such as dancing, lip-syncing, and stunts—and boasts a substantial worldwide fanbase. *Id.* at ¶¶ 2, 128, 131, 134. TikTok's popularity has exploded over the past year as the COVID-19 pandemic has left users bored and spending more time at home.

Specifically, Plaintiffs allege that the TikTok app infiltrates its users' devices and extracts a broad array of private data including biometric data and content that Defendants use to track and profile TikTok users for the purpose of, among other things, ad targeting and profit. *Id.* at ¶¶ 9-18, 137-192, 240-298, 402-417.

With regard to Plaintiffs' core claims under the Illinois Biometric Information Privacy Act (BIPA), 740 ILCS §14/1, *et seq.*, the Complaint alleges that the App uses a complex system of artificial intelligence to recognize facial features in users' videos, which allows the user to use various filters and stickers. *Id.* at ¶¶ 240-281, 402-417. Plaintiffs allege that the App also analyzes faces to determine the user's age, race/ethnicity, and gender, using proprietary algorithms to attempt to prevent minor children from using the App and to recommend content and profiles for the user to follow. *Id.* at ¶¶ 242-243, 245, 250, 258-259. By utilizing this private and biometric information, Plaintiffs contend, TikTok maintains a competitive advantage over other social media apps and profits from its use of improperly obtained data, all while failing to comply with the minimum requirements for handling users' biometric data established by BIPA.

The Complaint also alleges violations of a number of other statutory, common law, and constitutional claims arising from Defendants' alleged taking and transmission of other private, legally protected data. Plaintiffs assert claims for violations of the Computer Fraud and Abuse Act (CFAA), California Comprehensive Data Access and Fraud Act (CDAFA), California Constitutional Right to Privacy, California Unfair Competition and False Advertising laws, Video

Privacy Protection Act (VPPA), Intrusion Upon Seclusion, and Restitution/Unjust Enrichment. *Id.* at ¶¶ 338-401. Underlying Plaintiffs' VPPA claim, for example, are allegations that TikTok unlawfully transmitted class members' personal and private viewing histories to third parties like Facebook and Google. *Id.* at ¶ 159. In support of their CFAA claim, as another example, Plaintiffs allege that Defendants exceeded the scope of their authorized access to Plaintiffs' and class members' devices and the private information contained on those devices. *Id.* at ¶ 340.

While these data privacy violations alone support Plaintiffs' legal claims, TikTok's apparent ties to China compound Plaintiffs' concerns. *Id.* at ¶¶ 3. The Complaint alleges that Defendants do not adequately disclose that user data collected from Plaintiffs is stored and shared with affiliates in countries outside the United States, such as China (conduct which TikTok denies). Beijing ByteDance has spent the last decade using technologies such as artificial intelligence and facial recognition. *Id.* at ¶ 271. Defendants' reported connections to the Chinese government have very recently come under close public scrutiny and several U.S. Senators formally requested a risk assessment of Defendants' data collection activities, and the U.S. Department of Defense issued an internal memorandum encouraging its employees to avoid installing the App. *Id.* at ¶¶ 4, 6, 200, 203, 205, 219, 342.

### B. The Risks of TikTok's Defenses to Plaintiffs and the Class

TikTok has taken the position that the foreign Defendants are not subject to personal jurisdiction, and that Plaintiffs' claims are based on speculation about how the App works and an incorrect interpretation of governing law.

First, TikTok has repeatedly asserted that Plaintiffs' claims are subject to an arbitration and class action waiver agreement. According to TikTok, at all relevant times, every TikTok user agreed to an arbitration and class-waiver provision in the App's Terms of Service ("Terms"). When users create their accounts in the App, they encounter a sign-in screen with hyperlinks to the Terms

that read: "By continuing, you agree to TikTok's Terms of Use and confirm that you have read TikTok's Privacy Policy."

While Plaintiffs believe TikTok's policies were not adequately presented or otherwise disclosed to its users, and that class members should not be bound by their provisions, Plaintiffs acknowledge that courts have consistently held that users were on notice of—and thus had agreed to—virtually identical disclosures. *See, e.g., Miracle-Pond v. Shutterfly, Inc.*, No. 19-cv-04722, 2020 U.S. Dist. LEXIS 86083, at *2 (N.D. Ill. May 15, 2020) (granting motion to compel arbitration and staying class action where contract was formed with hyperlinked policies near a sign-in button); *Peter v. DoorDash, Inc.*, No. 19-CV-06098-JST, --- F. Supp. 3d ---, 2020 WL 1967568, at *4 (N.D. Cal. Apr. 23, 2020) (same); *Johnson v. Uber Techs., Inc*., No. 16-cv-5468, 2018 U.S. Dist. LEXIS 161155, at *3-4 (N.D. Ill. Sep. 20, 2018) (same); *Dohrmann v. Intuit, Inc.,* 823 F. App'x 482 (9th Cir. 2020) (reversing denial of motion to compel arbitration where website required acknowledgment of agreement before proceeding).

According to TikTok, even minors who may be able to disaffirm the arbitration agreement may not be able to establish disaffirmance collectively on behalf of a class because disaffirmance purportedly presents individualized issues. Thus, TikTok's position is that arbitration would create a dispositive threshold procedural problem for Plaintiffs before any factual or legal merits are even considered. And even if minors could overcome the arbitration agreement through disaffirmance, some of the claims asserted in this litigation would, according to TikTok, be released in connection with another action, *T.K., et al. v. Bytedance Technology Co., Ltd. Et al.*, No. 1:19-cv-07915 (N.D. Ill.), if not for the settlement benefits achieved here. As part of the Settlement, TikTok has agreed not to dispute claims filed by members of the class in *T.K.*

In addition, with respect to the foreign Defendants, TikTok has repeatedly asserted that they do not have sufficient contacts with any of the forums in which the underlying putative class actions were filed for this Court to exercise personal jurisdiction because the foreign entities have no direct relationship with Plaintiffs and do not operate in the United States. Though Plaintiffs believe they could overcome the jurisdictional hurdle with discovery, Defendants' arguments carry a significant risk if this case were to proceed in litigation.

If Plaintiffs were able to overcome these procedural issues, TikTok has asserted multiple defenses to the merits of Plaintiffs' claims. With regard to BIPA, for example, TikTok has represented that TikTok does not and never has collected from its users any biometric identifiers or derivative information protected by law, nor has it ever shared U.S. user data with the Chinese government. Defendants have expressed their confidence that, if this case were to proceed on a litigation track, they will secure a Federal Rule of Civil Procedure ("Rule") 12(b)(6) dismissal for failure to state a claim based on, *inter alia*, technical arguments that: (1) Defendants' App compiles only anonymized, generalized "demographic data" through "facial landmarking," and does not collect any biometric information of TikTok users; and (2) even if the information the App utilizes does constitute biometric information within the meaning of BIPA, that information resides on the users' devices, and is not collected or stored by Defendants within the meaning of applicable law.

In support of its position that it has not violated BIPA, TikTok has asserted that its user video data is not used to identify anyone. TikTok has explained that App users cannot tag or label faces in videos with a user's real name or identity. This contrasts with Facebook, for example, which requires its users to use and display "the same name that you use in everyday life" when using Facebook. Facebook also allows users to tag the faces of their friends and themselves in photos and videos. Because Facebook users must use their real names, their faces are tagged with

their real names whenever they are tagged in a photo or video. By contrast, TikTok does not have a face-tagging feature, nor a real name requirement, and thus does not associate a particular face with an individual's identity.

The TikTok App also has special effects features that enable users to alter, enhance, and modify their facial features in their video images. TikTok has explained that the technique employed to enable these special effects features is called "landmarking" and uses artificial intelligence to locate the position of a face or specific facial features within a video frame, e.g., the location of a nose relative to the location of the eyes. That general "landmarking," according to TikTok, does not involve generating any face template or personally identifiable data, and thus does not give rise to biometric privacy violations under BIPA.

Although TikTok has admitted that the App uses technology for "demographic classification," which includes recognizing visual patterns that indicate age, gender or other characteristics, TikTok has contended that this is fundamentally different than facial recognition because it does not create facial templates and is not capable of identifying a user. While Plaintiffs disagree with TikTok's contentions, Plaintiffs recognize that the question of what constitutes biometric information under BIPA is novel and evolving, and is a risk if the litigation proceeds.

As another example, TikTok asserts Plaintiffs will be unable to state a claim under the VPPA, which protects consumers against the disclosure of their video viewing histories. TikTok has contended that it is not a video service provider within the meaning of the statute, it does not transmit the requisite personally identifiable information (PII) with video viewing histories, any such transmission is subject to the statute's ordinary course of business exception, and that its privacy policy fully discloses its data sharing practices. While Plaintiffs have rebuttals to each of these arguments, they acknowledge the real risk of continued litigation, that circuit court decisions

on this claim have reached varying conclusions on comparable sets of facts, and the dearth of successful settlements of VPPA claims.

With respect to Plaintiffs' CFAA claim, aimed at protecting against hacking, Defendants have argued that Plaintiffs cannot establish proof of economic damages. TikTok has further contended the claim will be substantively defeated because Plaintiffs voluntarily granted TikTok access to their devices and TikTok complied with the disclosures in its privacy policy about the data it would access and collect, i.e., it never exceeded the scope of its authorized access. Again, while Plaintiffs are well prepared to refute these arguments, each step of litigation brings risk that Co-Lead Counsel balanced against the benefits achieved through the Settlement.

## C. Litigation and Procedural History

The history leading up to the settlement began long before the Judicial Panel on Multidistrict Litigation's (JPML) August 4, 2020 transfer order creating the MDL in this District.[2] The first filed case of all related cases in this MDL is *Hong v. ByteDance, Inc. et al.*, 5:19-cv-07792-LHK, filed in the Northern District of California in November 2019. Led by court-appointed Co-Lead Counsel Mr. Rhow, counsel from *Hong* first mediated with Judge Layn Phillips (Ret.) in April 2020 (before the additional cases comprising the MDL were filed). Although the parties engaged in an in-depth analysis of the issues involved, the first mediation was unsuccessful.

Beginning in late April 2020, additional class action cases against TikTok were filed in four federal districts: the Northern District of Illinois, the Southern District of Illinois, the Northern District of California, and the Central District of California. On May 15, 2020, counsel from the Southern District of Illinois filed a motion with the JPML seeking transfer and coordination in the

---

[2] The relevant procedural history of the related litigation in California is detailed in the accompanying Declaration of Ekwan Rhow. The relevant procedural history of the related litigation in the Northern District of Illinois is detailed in the Declaration of Katrina Carroll.

Southern District of Illinois, or in the alternative, in this Court. MDL No. 2948. Highly contentious litigation among groups of Plaintiffs' counsel and Defendants ensued thereafter. On August 4, 2020, the JPML consolidated the related actions and transferred them to this District.

The second mediation with Judge Phillips, which occurred on August 13, 2020, was spearheaded by a group of Plaintiffs' counsel led by now-Co-Lead Counsel Katrina Carroll. As described in her Declaration, 16 firms, representing 11 of the 19 consolidated actions, collaborated in the months leading up to the mediation, well before the JPML's consolidation order, to pursue the second settlement opportunity. Ms. Carroll and PSC member Jonathan Jagher traveled to California to appear in person and five additional delegates selected by participating plaintiffs' counsel actively participated by phone.[3]

By the time the parties met with Judge Phillips on August 13, 2020, tremendous political pressure had mounted against TikTok, creating a unique settlement opportunity for the Class. Just one week before the mediation, on August 6, 2020, then-President Trump issued an executive order pursuant to the International Emergency Economic Powers Act, 50 U.S.C. 1701, *et seq.*, the National Emergencies Act, 50 U.S.C. 1601, *et seq.*, and section 301 of title 3, United States Code, titled Executive Order on Addressing the Threat Posed by TikTok (the "First Executive Order").[4]

In the First Executive Order, President Trump stated that TikTok presented a "national emergency" that "threaten[s] the national security, foreign policy, and economy of the United States." The First Executive Order stated that the TikTok App would be banned in the U.S. unless

---

[3] Seven delegates participated in the second mediation: Co-Lead Counsel Katrina Carroll; PSC members Jonathan Jagher (Freed Kanner London & Millen LLC) and Michael Gervais (Susman Godfrey LLP); and Robert Foote (Foote, Mielke, Chavez & O'Neil, LLC); Joseph Guglielmo (Scott+Scott Attorneys at Law LLP); Tina Wolfson (Ahdoot & Wolfson, PC); and Tiffany Yiatras (Consumer Protection Legal, LLC).

[4] https://www.federalregister.gov/documents/2020/08/11/2020-17699/addressing-the-threat-posed-by-tiktok-and-taking-additional-steps-to-address-the-national-emergency

ByteDance Ltd. sold or spun-off its domestic TikTok operations to a U.S. company within 45 days. President Trump later extended the 45-day deadline to 90 days through a second executive order titled Regarding the Acquisition of Musical.ly by ByteDance Ltd. (the "Second Executive Order").[5] The Second Executive Order also prohibited ByteDance from any ownership interest in Musical.ly and required that ByteDance divest: (i) any interests in assets or property in the operation of TikTok in the United States; (ii) any data obtained or derived from TikTok or musical.ly; and (iii) immediately upon divestment, destroy any data obtained or derived from TikTok or Musical.ly.

TikTok was thus motivated at the second mediation session to resolve this litigation in order to shed existing liabilities and maximize its value in preparation for its imminent sale. The second mediation session was hard-fought on all fronts and lasted almost 13 hours, culminating in an agreement in principle and a signed term sheet for a class-wide resolution, later memorialized in a signed agreement on September 4, 2020.

At the time of the second mediation, the MDL was in a state of procedural limbo: the administrative transfer of the related actions had not been fully effectuated and the Court had not created a leadership structure subsequent to its pre-consolidation appointment of current Co-Lead Counsel Katrina Carroll as interim lead Plaintiffs' counsel. ECF No. 18. After the Court appointed the Leadership Group on September 28, 2020,[6] that group immediately began collaborating to vet

---

[5] https://www.federalregister.gov/documents/2020/08/19/2020-18360/regarding-the-acquisition-of-musically-by-bytedance-ltd

[6] The Court appointed: Katrina Carroll (Carlson Lynch, LLP), Elizabeth A. Fegan (Fegan Scott LLC), and Ekwan Eric Rhow (Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.) as Plaintiffs' Co-Lead Counsel; Shannon Marie McNulty (Clifford Law Offices, P.C.) as Plaintiffs' Liaison Counsel; and Jonathan Jagher (Freed Kanner London & Millen LLC), Megan E. Jones (Hausfeld LLP), Michael Gervais (Susman Godfrey LLP), Amanda K. Klevorn (Burns Charest LLP), and Albert Y. Chang (Bottini & Bottini, Inc.) as Plaintiffs' Steering Committee ("PSC") (collectively, the "Leadership Group"). ECF No. 94.

and analyze the Settlement Agreement, conduct and evaluate confirmatory discovery, continue negotiations with defense counsel, negotiate the Addendum to the Settlement Agreement, and ultimately reach consensus on the Settlement terms Plaintiffs now present to the Court for approval.

As detailed in the Declaration of Co-Lead Counsel Elizabeth Fegan, various members of the Leadership Group were charged with analyzing a broad array of legal, factual, and strategic issues. The Leadership Group engaged in a candid, collaborative—and at times oppositional— process to assess the case and the proposed settlement benefits. Through that process, and six months of continued negotiations with defense counsel, Co-Lead Counsel was able to improve the already substantial Class recovery obtained in the Settlement Agreement through the clarification of some of its core terms. For example, as detailed in the Addendum and Ms. Fegan's declaration, the Addendum makes clear that the scope of the injunctive relief applies to defendants other than TikTok, and assures that the injunction's prohibitions of wrongful conduct (and the warranty relating to that conduct) extend beyond the function of the App, and apply to Defendants' treatment of App-derived data on the server. The Addendum also specifies that a third party will oversee TikTok's privacy compliance training program.

Through that process, and six months of continued negotiations with defense counsel, the Leadership Group was able to improve upon the already substantial Class recovery through the Addendum. For example, as detailed in the Addendum and Ms. Fegan's declaration, the Addendum expanded the scope of the injunctive relief to apply to defendants other than TikTok, ensured that prohibitions of wrongful conduct and the warranty relating to that conduct extended beyond the function of the App and applied to Defendants' treatment of App-derived data on the server, and now requires third-party oversight of TikTok's privacy compliance training program.

The substantial Settlement has also garnered the support of firms outside of the Leadership Group, who have been involved in this litigation since before consolidation, and their class member clients, who are proposed class representatives. *See* Exhibit B (listing class representatives).

### D. The Settlement Agreement

The Settlement Agreement and the Addendum, contain the following key terms:

### 1. Proposed Class Definition

Plaintiffs ask that the Court provisionally certify the following Classes for settlement purposes only:

**Nationwide Class**: All persons who reside in the United States who used the App— the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S.— prior to issuance of the Preliminary Approval Order. Settlement Agreement §§ 2.2, 2.19; and

**Illinois Subclass**: All persons who reside in the State of Illinois and used the App in the State of Illinois to create videos prior to issuance of the Preliminary Approval Order. Settlement Agreement § 2.17.

### 2. Monetary Relief

Defendants have agreed to pay cash in the amount of $92,000,000 to create a Settlement Fund for the benefit of Class Members, who receive a pro rata payment (per the Plan of Allocation described below), after the deduction of settlement-related costs, including the expenses of the settlement administrator and the costs of notice to the Class, any service awards, any fee award, and any other administrative fees and expenses which may be approved by the Court. *Id.* at § 4.1-5. Defendants will fund the settlement within 90 days after entry of the Preliminary Approval Order. *Id.* at § 4.1. No portion of the Settlement Fund will be returned to Defendants. *Id.* at § 4.5.

Class Members may submit one claim per Class Member to receive a payment from the Settlement Fund according to the proposed Plan of Allocation (attached as Exhibit C). *Id.* at § 5.3.1.

### 3. Plan of Allocation

To determine the allocation as between the Nationwide Class and Illinois Subclass, Co-Lead Counsel discussed and recognized that Subclass Counsel without conflicting interests should be appointed for the Nationwide Class and separately for the Illinois Subclass. *See* Addendum, ¶ 3.1; *See also* Fegan Decl., ¶22. Co-Lead Counsel further recognized that Subclass Counsel should not be restricted to any particular methodology or multiplier for determining how to allocate the Settlement Fund as between the Subclasses. Rather, Co-Lead Counsel agreed that Subclass Counsel should conduct their own assessment of the relative strengths and weakness of the various claims alleged in the Complaint, as well as the consideration itself, and conduct independent negotiations to reach a consensus as to the Plan of Allocation.

To that end, Co-Lead Counsel asked James Zouras for the Illinois Subclass and Jonathan Rotter for the Nationwide Class to research and analyze the merits of the claims asserted, advocate the interests of their respective subgroups, and negotiate an allocation of Settlement funds between the two groups. *See* Declaration of Jim Zouras, ¶¶ 6-9; Declaration of Jonathan Rotter, ¶¶ 6-7.

After at least 10 negotiation sessions, Subclass Counsel agreed that the Plan of Allocation should provide that the net settlement fund will be divided into *pro rata* shares that are equal to the sum of (1) the total number of valid claims submitted by Nationwide Class members and (2) the total number of valid claims submitted by Illinois Subclass members multiplied by five. *See* Rotter Decl., ¶¶ 7-9; Zouras Decl., ¶ 12. Each Illinois Subclass member who submits a valid, authorized claim will be paid six pro rata shares (one as member of the Nationwide Class and five

as a member of the Illinois Subclass). *See id.* Each Nationwide Class member who is not a member of the Illinois Subclass will be paid one pro rata share *See id.*

### 4. Injunctive Relief

TikTok, together with the other Defendants' Released Parties, has agreed ***not*** to do the following unless disclosed expressly in the TikTok Privacy Policy and in compliance with all applicable laws:

- Use the App to collect or store a user's biometric information or identifiers (as defined by applicable law);

- Use the App to collect geolocation or GPS data;

- Use the App to collect information in user's clipboards;

- Use the App to transmit U.S. user data outside of the U.S.;

- Store U.S. user data in databases outside of the U.S.; or

- Pre-upload U.S. user-generated content.

*Id.* § 6.1; Addendum § 2.1 ("'App' means the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S., including its device-side and server-side operations."); Addendum § 2.5 ("[w]ith respect to the Injunctive Relief in Section 6 of the Agreement, "TikTok" means any of Defendants' Released Parties to the extent they are engaged in the operation of the App or involved in receiving or accessing user data obtained through the App").

Consistent with the intent of the injunctive relief in Section 6 of the Settlement Agreement, the Parties jointly reviewed multiple categories of user data potentially in TikTok's possession that should be deleted from TikTok's servers. Following confirmation from TikTok as to what categories existed and should be deleted, TikTok has agreed to delete any Pre-Uploaded User-Generated Content identified in Section 6.2 of the Settlement Agreement. Addendum § 4.2.

14

In addition, TikTok will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter. Settlement Agreement § 6.3. TikTok will provide a written verification under oath of compliance with the foregoing within 90 days of the Effective Date. *Id.* § 6.4. TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification required by Section 6.4 of the Settlement Agreement to Class Counsel. Addendum § 4.3. TikTok will not disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the VPPA, except to the extent such disclosure is not prohibited by the Video Privacy Protection Act; nor will TikTok share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared. Addendum § 4.1.

**5. Notice and Settlement Administration Costs**

All Notice and Administrative Costs will be paid from the Settlement Fund. Settlement Agreement § 4.5. Class members will be notified through a program led by a highly experienced, well-regarded, third-party administrator (Angeion Group, LLC) by the methods ordered by the Court after certification of the Class for settlement purposes. The proposed Notice Plan is described in the Declaration of Steven Weisbrot, Esq. of Angeion Group LLC Re: The Proposed Notice Plan ("Weisbrot Declaration"). The content of the proposed notice ("Proposed Notice"), which seeks to communicate Class Members' rights and options under the Settlement in plain, easily understood language is attached as Exhibit D and submitted for this Court's approval.

15

**6.  Release**

In exchange for the relief afforded by the Settlement Agreement, Defendants' Released Parties[7] will receive a release of all Released Claims.[8] The release is narrowly tailored to the claims related to "the Civil Actions or the collection and use of any user data, including biometric data" and thus covers the claims actually at issue (or that could have been asserted based on the alleged facts) in this MDL through the date of preliminary approval.

**7.  Attorneys' Fees and Costs for Class Counsel, and Service Awards for Class Representatives**

The Settlement Agreement permits Plaintiffs' counsel to apply to the Court seeking a reasonable portion of the Settlement Fund as payment of any reasonable attorneys' fees and costs (the "Fee Award"). *Id.* § 13.1. Class Counsel intends to make an application to the Court for a reasonable Attorneys' Fee Award in an amount not to exceed 33.33% of the Settlement Fund, plus reasonable expenses incurred, in keeping with Seventh Circuit precedent. There is no "clear sailing" provision, and TikTok may object to any fee and expense request if it so desires. Nor is there any "kicker" provision, and any reduction in Plaintiffs' counsel's requested fee returns to the Class, not Defendants.

---

[7] "The current defendants in the Civil Actions, as well as any and all of their current or former directors, officers, members, administrators, agents, representatives, servants, employees, attorneys, parents, subsidiaries, affiliates, divisions, branches, units, shareholders, successors, predecessors, assigns, and all other individuals and entities acting on their behalf." Settlement Agreement § 2.10.

[8] "[A]ny and all claims, complaints, actions, proceedings, or remedies of any kind, whether known or unknown (including, without limitation, claims for attorneys' fees and expenses and costs), arising from or related to the Civil Actions or the collection and use of any user data, including biometric data, whether in law or in equity, under contract, tort or any other subject area, or under any statute, rule, regulation, order, or law, whether federal, state, or local, on any grounds whatsoever, arising from the beginning of time through the Effective Date, that were, could have been, or could be asserted by the Releasing Parties." Settlement Agreement § 2.30

Co-Lead Counsel will also seek service awards for Class Representatives[9] to be paid from the Settlement Fund, in an amount up to $2,500.00 each. *Id.* § 13.2. Each proposed Class Representative has contributed to the prosecution of this litigation, including researching and filing their complaints, participating in the thorough vetting process undertaken by the Leadership Group, and responding to counsel's requests for information for the benefit of the entire Class. Should the Court award less than any amount requested as an Incentive Award, the difference in the amount sought and the amount ultimately awarded shall remain in the Settlement Fund for the benefit of the Class. *Id.*

The Settlement Agreement is neither dependent nor conditioned upon the Court approving the aforementioned payments, nor upon the Court awarding the particular amounts sought. *Id*. § 13.4.

**8. Class Size Representations and Confirmatory Discovery**

TikTok provided representations to Plaintiffs as to the approximate class size (together with a confidential sworn declaration from the company describing how the numbers were ascertained). The class size is estimated to be 1.4 million for the Illinois Subclass and 89 million for the Nationwide Class (which includes the Illinois Subclass, leaving approximately 87.6 million Non-Illinois Nationwide Class Members).

In the Settlement Agreement, TikTok "warrants that it has not used the App to collect biometric identifiers or biometric information as defined by" BIPA and agreed to confirmatory discovery including the ongoing source code inspection, interrogatories, document requests, and

---

[9] The proposed class representatives and subclass representatives are listed in Exhibit B.

depositions concerning these issues. *Id.* § 7.[10] Co-Lead Counsel conducted confirmatory discovery as specified in the Settlement Agreement, with the participation of a world-renowned computer science expert.[11]

## **ARGUMENT**

### **A. This Settlement well surpasses the Seventh Circuit's standards for the approval of class action settlements.**

As the Seventh Circuit recognizes, federal courts strongly favor and encourage settlements—particularly in class actions and other complex matters where the inherent costs, delays, and risks of protracted litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. Of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (collecting cases).

---

[10] This warranty is not intended to cover features and operations of the App that are not used to identify an individual, such as image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations. The warranty is only meant to cover the use of the App to collect biometric data to identify individual App users—whether that biometric data is collected directly upon being uploaded to TikTok's servers through the App or whether that biometric data is later collected after being extracted from other user content that has been uploaded through the App to TikTok's servers. Addendum § 5.1.

[11] Plaintiffs' confirmatory discovery efforts are detailed in the Declaration of Katrina Carroll.

18

The proposed Settlement, negotiated at arm's length by competent, experienced counsel, with the assistance of a highly regarded mediator, provides Class Members substantial monetary and injunctive relief in a prompt and efficient manner while at the same time mitigating the risk of protracted litigation and/or a negative outcome that would preclude any recovery whatsoever for the Class.

## B. The Settlement should be preliminarily approved.

Rule 23(e) provides that a court may approve a proposed class settlement "on a finding that it is fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2); *see also Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006); *Young v. Rolling in the Dough, Inc.*, No. 1:17-CV-07825, 2020 WL 969616, at *3 (N.D. Ill. Feb. 27, 2020). At the preliminary approval stage, the district court should assess whether the proposed settlement falls "within the range of possible approval," in order to "ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Id.*

While "[f]ederal courts naturally favor the settlement of class action litigation," *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010) (*quoting Isby*, 75 F.3d at 1196), district courts must nonetheless consider the following four factors to determine whether a proposed settlement is fair, reasonable, and adequate: (a) the strength of the plaintiff's case compared to the amount of the settlement offer; (b) the length, complexity, and expense of further litigation; (c) the opinion of competent counsel; and (d) the stage of the proceedings and amount of discovery completed. *See Synfuel*, 463 F.3d at 653 (citing *Isby*, 75 F.3d at 1199). "Although this standard and the factors used to measure it are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase," *Kessler v. Am. Resorts International's Holiday Network, Ltd.*, No. 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov.

14, 2007) (citing *Armstrong*, 616 F.2d at 314), under which the facts are viewed "in the light most favorable to the settlement," *Isby*, 75 F.3d at 1199.

Each of these factors weighs in favor of finding the proposed settlement fair, reasonable, and adequate, warranting its preliminary approval.

### 1. The Settlement provides substantial relief to the Class, particularly given the risks posed by continued litigation.

"The most important factor relevant to the fairness of a class action settlement is . . . the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653 (internal quotes and citations omitted). "Because the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (citations omitted).

Given the significant litigation risks, the $92 million common fund provides a significant recovery to class members, together with the injunctive relief, which offers increased protection over consumers' data and requires company-wide privacy compliance training. Plaintiffs continue to believe that their claims against Defendants have merit; it is, however, clear to Plaintiffs that the legal uncertainties associated with continued litigation may pose substantial risk of non-recovery to the Class. *See In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval."). [12]

---

[12] "While a district court must of course assess the plaintiffs' claims in determining the strength of their case relative to the risks of continued litigation," it may properly "evaluat[e] the strength of the plaintiffs' *case* in its entirety rather than on a claim-by-claim basis," especially where, as here, the "claims arise under similar [laws and] plaintiffs' likelihood of success with regard to each of those claims depends on the same basic legal theories and factual issues." *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)) (emphasis in original).

For example, Defendants contend that Plaintiffs' claims are subject to an arbitration and class action waiver agreement incorporated in TikTok's terms of service (which all users are required to accept before using the App), which would preclude maintenance of this class action from the outset. Though Plaintiffs believe they have reasonable arguments against compelling arbitration and/or enforcing the purported class action waiver (especially as to minor class members), Defendants' success on this argument would render it highly unlikely Plaintiffs and the Class would recover anything given the prohibitive time and expense of pursuing millions of individual arbitrations.

Furthermore, Defendants have repeatedly asserted confidence that they would win dismissal for failure to state a claim under the biometric privacy laws—which form the core of Plaintiffs' case and the statutory damages sought— based on technical arguments that: (1) Defendants' App compiles "demographic data" through "facial landmarking," not biometric information of TikTok users, and (2) even if Defendants do gather biometric information, that information resides on the users' phone and is not collected or stored by Defendants within the meaning of applicable law. Defendants thus insist that the TikTok App does not and has never collected from its users any biometric identifiers or derivative information protected by law, nor has TikTok ever shared U.S. user data with the Chinese government. These positions underscore the risks of continued litigation.

While Plaintiffs believe that TikTok's landmarking and other activities do give rise to statutory and common law privacy violations sufficient to survive a motion to dismiss, the case would be complex, rife with technical experts, and likely to be hard fought through trial, much as the Northern District of California ruled in the Facebook biometric privacy litigation. *See*

*Facebook Biometric Info. Privacy Litig.*, No. 15-cv-03747-JD (hereinafter, "*Facebook BIPA*"), 2018 WL 2197546 (N.D. Cal. May 14, 2018).

Indeed, Facebook similarly argued that its technology worked just like a human brain, recognizing a face without capturing biometric information in violation of BIPA. There, the court denied Facebook's motion for summary judgment, holding these issues present a "quintessential dispute of fact." *Id.* at *3. Thus, even assuming Plaintiffs' BIPA claim could clear all of the pre-trial litigation hurdles Plaintiffs face in litigating inevitable motions to compel arbitration, to dismiss Plaintiffs' claims, to certify Plaintiffs' class, and for summary judgment, there would be no quick exit for Plaintiffs short of trial. And if the case proceeds to the factfinder and Defendants' litigation position is accepted, Plaintiffs' claims will fail on the merits and they (and the Class) will recover nothing.

Similar risks arise in connection with Plaintiffs' other claims. For example, TikTok's novel technology and service make establishing a claim under the VPPA—a 1988 statute originally aimed at video service providers like Blockbuster—an ambitious undertaking. If Plaintiffs successfully establish that TikTok is a "video service provider" under the statute, and that Plaintiffs are "subscribers," they will then be faced with divided case law from other circuits regarding whether the type of information TikTok discloses is "personally identifiable" within the meaning of the statute. Plaintiffs will vigorously and zealously argue that TikTok discloses its users' device and advertising identifiers along with users' video viewing histories, and that those identifiers can be de-anonymized to personally identify an individual class member. The First Circuit has held that such device identifiers, when combined with GPS information, amount to personally identifiable information ("PII") under the VPPA. *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482 (1st Cir. 2016). The Third and Ninth Circuits, however, have

suggested that numeric identifiers may not be enough. *Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 985 (9th Cir. 2017); *In re Nickelodeon Consumer Privacy Litig.,* 827 F.3d 262, 286 (3d Cir. 2016). While Plaintiffs strongly believe that the identifiers *here* plainly amount to PII – particularly given that they are associated with social services (Facebook and Google) that can readily identify their users' actual identities - Plaintiffs acknowledge that continued litigation carries risks.

Each claim presents its own hurdles associated with contradicting Defendants' contentions regarding the operations of their proprietary technology, factually and legally refuting the adequacy of Defendants' disclosures in their privacy policies and terms of service, and fitting Defendants' use and misuse of novel technology into the confines of laws that pre-date the existence of apps.

Even if Plaintiffs survived a motion to compel arbitration, motion to dismiss, and motion for summary judgment, Defendants will oppose class certification, arguing, *inter alia*, that individual issues regarding each user's experience with the App predominate and that a unique inquiry is necessary to evaluate each user's review of and assent to the relevant arbitration agreement and class action waiver. Denial of class certification on these or any other grounds would also result in no recovery at all for the Class.

Plaintiffs maintain that Defendants have more to lose at trial and face more risks, warranting the material recovery Plaintiffs have achieved in this proposed settlement, but nonetheless acknowledge that settling now reduces risks to themselves and the Class Members.

## 2. The Settlement value is well within the range of reasonableness.

The Settlement provides a $92 million cash fund for the approximately 89 million members of the Nationwide Class, to be allocated 6:1 between the Illinois Subclass and the Nationwide Class members who are not also members of the Illinois Subclass ("Non-Illinois Class Members"),

23

*supra.* If every class member were to submit a valid claim, the fund would provide a gross recovery of approximately $5.75 per Illinois Subclass member and $0.96 per Non-Illinois Class Member.[13]

The actual value of each claim depends on the number of valid claims submitted. While claims rates are difficult, if not impossible, to predict, a typical claims rate for a class of this size is around 1.5%.[14] As discussed below, in *Facebook BIPA,* an unusually high 22% of Illinois class members made claims. The below table provides some potential scenarios with those numbers in mind:

| Hypothetical Illinois Claims Rate | Hypothetical Non-Illinois Claims Rate | Approximate Illinois Claim Value | Approximate Non-Illinois Claim Value |
|---|---|---|---|
| 1.5% | 1.5% | $383.33 | $63.89 |
| 2% | 2% | $287.50 | $47.92 |
| 15% | 1.5% | $214.45 | $35.74 |
| 22% | 1.5% | $174.57 | $29.10 |
| 20% | 20% | $28.75 | $4.79 |

As explained below, these estimates demonstrate that the proposed Settlement is squarely within the range of reasonableness of other comparable class action privacy settlements.

### a. The settlement achieved here compares favorably with consumer BIPA settlements.

A recent consumer BIPA comparator is *Facebook BIPA, supra*. While that case has material distinctions from this matter, both cases involve allegations that a social media service collected biometric information from its users. The settlement in *Facebook BIPA* provided for a

---

[13] These estimates reflect the gross recovery before the deduction of notice and claims administration expenses, attorneys' fees and costs, or service awards.

[14] *See infra,* § B.2.A (average claims rate for classes above 2.7 million class members is 1.4%). *See also* Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns, Federal Trade Commission, September 2019, at 11, available at: www.ftc.gov/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns (median claims rate is 9% and weighted mean (cases weighted by the number of notice recipients) is 4%); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (claims rates in consumer class action settlements "rarely" exceed 7%, "even with the most extensive notice campaigns"); *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 214 (W.D. Mo. 2017) (citing numerous finally approved settlements with claims rates less than 1%).

non-reversionary $650 million fund to be distributed to the approximately 6.9 million Illinois class members. *Facebook BIPA*, No. 3:15-cv-03747, 2020 WL 4818608 (N.D. Cal. Aug. 19, 2020); *see also* 3:15-cv-03757, ECF No. 517 and 517-2 (amended motion for final approval of settlement and accompanying expert declaration).

In *Facebook BIPA*, the claims rate was approximately 22% (over 1.5 million claimants) and each class member received approximately $342 after the payment of fees and expenses (averaging approximately $428 before those deductions). 15-cv-03747, ECF No. 517. A claims rate of that magnitude is highly unusual. In *Facebook BIPA*, plaintiffs' counsel introduced expert declarations from Professor William B. Rubenstein, the Bruce Bromley Professor of Law at Harvard Law School and a leading national expert on class action law and practice. ECF No. 499-3 and 517-2. Professor Rubenstein maintains what "is likely the largest collection of data on claims rates." ECF No. 517-2, p. 1.

As Professor Rubenstein noted, claims rates with classes above 286,493 members average less than 6% and classes above 2,682,347 average a claims rate of 1.4%. ECF No. 517-2, p. 4. He reported that the claims rate in *Facebook BIPA* was substantially higher than he would have predicted based on both class size and claim amount. *Id.* at, *e.g.,* ¶¶ 5-6. However, for the sake of comparison, if the same 22% claims rate were applied to the Illinois Subclass here, and a more typical claims rate of 1.5% percent were applied to the Non-Illinois Class Members, each Illinois Subclass member would receive a gross recovery of approximately $174.57, and each non-Illinois member of the Nationwide Class would receive approximately, $29.10. If the claims rate is a more realistic, but still above average, 2% for both groups, each Illinois Subclass member would receive a gross recovery of approximately $287.50, and each non-Illinois member of the Nationwide Class would receive approximately $47.92.

Even assuming the Illinois Subclass makes claims at the atypically high rate present in *Facebook BIPA*, their recovery would be over 40% of that achieved in *Facebook BIPA* (gross recovery of $174.57 compared to $428). That result is imminently equitable in light of the distinctions between the two matters. The plaintiffs in *Facebook BIPA* did not face the threat of arbitration that Plaintiffs here face – which could end Plaintiffs' opportunity to reap settlement benefits at all.

And the factual contentions underlying *Facebook BIPA* differ from those here. In *Facebook BIPA*, plaintiffs alleged that Facebook implemented facial recognition technology by creating and storing personally identifiable facial templates from its users' photos. Facebook, unlike TikTok, admitted that it implemented personally identifying facial recognition technology, but denied that its conduct violated BIPA. *See generally* 3:15-cv-03747, 2018 U.S. Dist. LEXIS 81044, at *10-*11 (N.D. Cal. May 14, 2018). Facebook claimed that, rather than "explicitly detect[ing] human-notable facial features," its technology analyzed the pixels in the image of a face, and that the technology was not the type of technology that BIPA sought to address, in part because the technology would calculate a "face signature" even for something other than a face. *Id.* at *10-*11 (citing report of Facebook's expert Dr. Matthew Turk, ECF No. 291-1 at 3). In contrast, TikTok has warranted that its App does not use such facial recognition technology—whether via human features of the face or pixels from the images of a face. Plaintiffs acknowledge that TikTok users are not offered facial recognition features that "tag" and identify individuals appearing in photos, as Facebook offers its users. TikTok has also warranted (and provided confirmatory discovery regarding its warranty) that it neither creates nor stores personally identifiable templates or personally identifiable facial landmarking data.

26

Also, the court in *Facebook BIPA* noted at its June 4, 2020 hearing on the motion for preliminary approval of the settlement in that action: "It looks to me that what Facebook did to violate the BIPA may also have been a violation of that prior FTC consent decree, in which case you have a pretty good argument that this is an intentional or reckless violation of BIPA that would warrant $5,000," instead of the $1,000 statutory damages provided for negligent violations. While Plaintiffs here would certainly contend that TikTok's actions were intentional and reckless, Plaintiffs lack *Facebook BIPA's* persuasive foundation for that argument.

In addition, *Facebook BIPA* settled on the eve of trial – in a much different procedural posture than this case is in. The settlement in *Facebook BIPA* was reached after five years of litigation, including multiple contested motions to dismiss, a motion for class certification, multiple motions for summary judgment, years of intense discovery, key court rulings, an appeal to the Ninth Circuit, petition for writ of certiorari to the Supreme Court, trial preparation including the exchange of motions *in limine* and trial subpoenas, and several rounds of mediation. *See, e.g.,* 3:15-cv-03747, ECF No. 499-1 (Declaration of Class Counsel). While those meritorious efforts resulted in a noteworthy result, following that path toward trial would repeatedly expose Plaintiffs to risks that they may be unable to surmount, and would delay their recovery for years, if one is achieved at all.

Thus, the relief afforded by the settlement here, given the early litigation stage, differences in the underlying conduct alleged, and risks of forced arbitration, is substantial and compares favorably with the settlement in *Facebook BIPA*.

Few other consumer BIPA settlements exist. In *Sekura v. L.A. Tan Enters., Inc.*, plaintiffs alleged that L.A. Tan violated BIPA when collecting fingerprints for customers' check-in verification. No. 2015 CH 16694 (Ill. Cir. Ct. Cook Cty. First Amended Class Complaint filed

27

Apr. 8, 2016). The parties agreed to a $1.5 million settlement for approximately 37,000 class members (roughly $40.54 per class member). In *Prelipceanu v. Jumio Corp.*, plaintiffs alleged that defendant's service, which scanned pictures of consumers' faces to verify their identity and/or age for websites, violated BIPA. 2018 CH 15883 (Ill. Cir. Ct.). The class received a $7 million settlement fund; the settlement approval documents did not provide the size of the class. *Id.*

There have been some non-consumer settlements of BIPA claims that have provided for larger potential per-class member recoveries, but they are generally limited to cases brought by employees. They involve much smaller classes, allege the collection of biometric identifiers expressly enumerated within the text of BIPA (fingerprints), and involve biometric collection as a condition of class members' employment. For example, in *Jones v. CBC Restaurant Corp d/b/a Corner Bakery Café*, the court granted approval of a $3,210,400 settlement providing $800 per class member to the 4,000-person class of employees required by their employer to use a fingerprint time clock. No. 1:19-cv-06736 (N.D. Ill.), ECF No. 45 (preliminary approval order) and ECF No. 53 (final approval order). In *Fluker v. Glanbia Performance Nutrition, Inc.*, a settlement was obtained providing $800 per class member to the 921-person class of employees who were required to use a fingerprint time clock. 2017-CH-12993 (Cook Cty. Cir. Ct. May 12, 2020 preliminary approval; August 20, 2020 final approval). And alongside those recoveries are settlements that achieved no monetary relief, and only credit monitoring. *E.g., Carroll v. Crème de la Crème, Inc.,* 2017-CH-01624 (Ill. Cir. Ct.).

There are few parallels between employment BIPA cases and the case here—in which Defendants deny that the disputed data ever left class members' personal devices, the parties dispute whether the relevant data falls within the protections of BIPA at all, and the Illinois Subclass comprises approximately 1.4 million individuals who voluntarily used the App.

28

As discussed above, this case more closely resembles the facts underlying *Facebook BIPA*, and a settlement of the magnitude achieved here is a meaningful, substantial recovery, even when compared to that historical result.

### b. Non-BIPA privacy settlements typically feature lower recoveries.

Settlements of privacy-based class actions that lack BIPA claims tend to feature lower per-person recoveries. These types of cases, many of which feature statutory damages typically settle for much less than BIPA matters, and in many cases achieve only *cy pres* relief and no direct monetary benefit to each class member. For example, the VPPA allows for actual damages of not less than $2,500, punitive damages, attorneys' fees and costs, and equitable remedies (18 U.S.C §2710(c)(2)), but most VPPA settlements have provided minimal monetary relief. *See In re Vizio, Inc., Consumer Privacy Litig.*, No. 8:16-ml-02693 (C.D. Cal.) ($1.06 per class member); *Lane v. Facebook, Inc.* No. 5:08–cv–03845–RS, 696 F.3d 811, 820-22 (9th Cir. 2012), *cert. denied* 134 S. Ct. 8 (2013) ($2.59 per class member). Indeed, a prior class action against TikTok based on allegations that the company illegally collected the personal information of children included a VPPA claim and provided for a very modest recovery. *See T.K. v. TikTok*, No. 1:19-cv-07915 (N.D. Ill.) ($0.19 per class member).

Many VPPA settlements achieve *cy pres* only relief. For example, in *Lane v. Facebook, Inc.,* 696 F.3d 811, 818 (9th Cir. 2012), the Ninth Circuit upheld approval of a *cy pres*-only settlement of $9.5 million where the settlement class included VPPA claims of 3,663,651 class members, resulting in *cy pres* relief of approximately $2.59 class member. In *In re Netflix Privacy Litig.*, No. 5:11-cv-00379, 2013 WL 1120801 at *1 (N.D. Cal. Mar. 18, 2013), the court approved a *cy pres* settlement of $9 million where the settlement class included VPPA claims of approximately 62 million class members, resulting *in cy pres* relief of approximately 14 cents per

class member. *See also In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3-5 (N.D. Cal. June 2, 2011) (approving $8.5 million *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available to a class of millions).

The monetary benefits achieved here are well within the range of comparable consumer privacy settlements.[15]

### c. Non-monetary components of the proposed settlement serve to ensure users' privacy rights.

In addition to the $92 million in cash, the Settlement also provides meaningful injunctive relief to remedy the complained-of conduct and prevent future violations – including a company-wide data privacy training initiative. That injunctive relief includes, e.g., agreements that:

---

[15] The Settlement also compares favorably with other privacy and consumer class actions pursuing statutory damages. *See, e.g., In re Google LLC Street View Electronic Communications Litigation*, No. 3:10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) (approving *cy pres* distribution of $13 million fund in case with 60 million person class (equating to $0.22 per person before fees, expenses, or administration costs) in Electronic Communications Privacy Act (ECPA) matter with $10,000 available statutory damages); *In re Carrier iQ, Inc., Consumer Privacy Litig.*, No. 12-md-02330-EMC, 2016 U.S. Dist. LEXIS 114235 (N.D. Cal. Aug. 25, 2016) (approving $5.9 million settlement of ECPA claims with $10,000 available statutory damages for class with approximately 30 million members ($0.20 per class member), with funding to be distributed to *cy pres* recipients if a high volume of eligible claims made distribution economically unfeasible (the 0.14% claims rate did not trigger that provision)); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 943-44 (N.D. Cal. 2013) ($15 per claimant was reasonable for violations of several states' laws, even in light of the $750 statutory damages available under California Civil Code § 3344, given hurdles of litigation through final judgment, large class size, and due process concerns over size of maximum damages: "adequacy . . . should not be evaluated against some theoretically available judgment, but against what plaintiffs could reasonably expect to recover."); *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 261-62 (E.D.N.Y. 2009) ("When the benefit is . . . placed in the context of the risks and delay of continued litigation[,]" a settlement providing $6.75 per class member was "clearly within the range of reasonableness" for claims brought under the Cable Communications Policy Act of 1984 which provides for minimum statutory damages of $1,000); *Medeiros v. HSBC Card Servs.*, No. CV 15-09093 JVS (AFMx), 2017 U.S. Dist. LEXIS 178484, at *12 (C.D. Cal. Oct. 23, 2017) (Collecting cases approving settlements with average gross per-class-member recoveries as low as $0.75 under the California Invasion of Privacy Act, which provides a $5,000 statutory penalty); *In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) (providing $34.60 to each claiming class member under the Telephone Consumer Protection Act, which provides $500 in statutory damages).

- Defendants will not collect or store biometric information, biometric identifiers, geolocation or GPS data, or information in users' device clipboards, unless expressly disclosed and in compliance with all applicable laws;

- Defendants will not transmit U.S. data outside of the United States or store U.S. user data in databases outside of the United States, unless expressly disclosed and in compliance with all applicable laws;

- Defendants will delete pre-uploaded, user-generated content collected from users who created videos but did not "save" or "post" the content;

- Defendants will not disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the Video Privacy Protection Act (18 U.S.C. § 2710), except to the extent such disclosure is not prohibited by the Video Privacy Protection Act;

- Defendants will not share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared; and

- Defendants will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter, and TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification required by Section 6.4 of the Settlement Agreement to Class Counsel.

Thus, the Settlement affords a framework of compliance and future protection of the privacy rights of Plaintiffs and the Class—a valuable benefit. *E.g., In re Equifax Customer Data*

*Sec. Breach Litig.*, MDL Docket No. 2800, 2020 U.S. Dist. LEXIS 118209, at *256 (N.D. Ga. Mar. 17, 2020) ("The Court specifically finds that the injunctive relief class counsel obtained here is a valuable benefit to the class because it reduces the risk that their personal data will be compromised in a future breach."); *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 974 n.6 (8th Cir. 2018) (security measures implemented after a data breach have "value to all class members.").

### 3. Continued litigation would be complex, costly, and lengthy.

Preliminary approval is also favored because "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). As explained above, there is tremendous risk that this case will either be dismissed outright or else compelled to arbitration. If Plaintiffs survive these early procedural hurdles and this litigation were to continue on the merits, it would be lengthy, very expensive, and involve extensive motion practice, including a motion for class certification (and possibly a motion for decertification), motions for summary judgment, and various pretrial motions, as well as extensive fact and expert discovery including the preparation of expert reports, expert depositions, and Daubert *motions*. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well-deserved reputation as being most complex.").

The case would probably not go to trial for years. And even if the Class recovered a judgment at trial in excess of the $92 million provided by the Settlement, post-trial motions and the appellate process would deprive them of any recovery for years, and possibly forever in the event of a reversal.

Importantly, unlike a more typical case in which plaintiffs may need to progress through numerous risky litigation hurdles to gain adequate leverage to obtain a fair and reasonable result,

Plaintiffs here achieved substantial, material relief in the early stages of the case. This victory owed in large part to Plaintiffs' insistence on engaging in a second mediation during a uniquely opportune time, when TikTok was under tremendous pressure as a result of presidential executive orders requiring its swift sale. With those pressures now abated, Plaintiffs would be unlikely to obtain a settlement opportunity like this one until trial—if ever. Indeed, courts have repeatedly ruled against President Trump's ban, and on February 10, 2021, the Biden administration asked that the proceedings against TikTok be put on hold while the administration could review the prohibitions and determine whether the ban was appropriate. TikTok's pending sale has been shelved indefinitely.[16]

Rather than embarking on years of protracted and uncertain litigation, Plaintiffs and their counsel took advantage of a unique opportunity to negotiate a Settlement that provides immediate, certain, and meaningful relief to all Class Members. *See Schulte*, 805 F. Supp. 2d at 586. This certainty and immediacy are particularly valuable in the midst of a global pandemic. *See Lane*, 696 F.3d at 820 ("the immediate benefits represented by the Settlement outweighed the possibility—perhaps remote—of obtaining a better result at trial"); *In re Netflix Privacy Litig.*, No. 5:11-cv-00379 EJD, 2013 WL 1120801, at *5 (N.D. Cal. Mar. 18, 2013) (determining that the settlement was fair, adequate and reasonable when the calculation of the value of the case took into account the time value of money). Moreover, the proposed Settlement is also endorsed as adequate and fair by Judge Phillips, as explained in his Declaration. Accordingly, the second factor weighs in favor of finding the Settlement fair, reasonable and adequate. *See Borcea v. Carnival*

---

[16] *See, e.g.,* https://www.npr.org/2021/02/10/966584204/biden-administration-pauses-trumps-tiktok-ban-backs-off-pressure-for-tiktok-to-s; https://www.wsj.com/articles/tiktok-sale-to-oracle-walmart-is-shelved-as-biden-reviews-security-11612958401.

*Corp.*, 238 F.R.D. 664, 674 (S.D. Fla. 2006) (noting that "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush").

**4.    Proposed Class Counsel are competent, well-informed, and experienced and they strongly endorse the Settlement.**

The third factor examines the opinion of competent counsel as to whether a proposed settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1200. In assessing the qualifications of counsel under this factor, a court may rely upon affidavits submitted by class counsel as well as its own observations of class counsel during the litigation. *Id.* This Court appointed Ms. Carroll, Ms. Fegan, and Mr. Rhow as Co-Lead Counsel, in recognition of their significant experience in class action and complex litigation and good judgment. Co-Lead Counsel endorse this settlement and strongly recommend its approval.

Accordingly, the third factor weighs in favor of finding the Settlement fair, reasonable, and adequate. *See, e.g., McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval."); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the . . . strong endorsement of [this] settlement" by a "well-respected" attorney).

**5.    The Settlement was reached after significant analysis and arm's-length negotiation.**

The last factor concerns the stage of the proceedings and amount of discovery completed at the time the settlement is reached. *Synfuel*, 463 F.3d at 653. This factor "indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) (quoting *Armstrong*, 616 F.2d at 325) (internal quotations omitted).

The proposed Settlement was reached after more than a year of litigation on two litigation tracks that were ultimately consolidated before this court, and it is informed by counsel's thorough investigation and Plaintiffs' experts' analysis of the issues at the heart of this case. Armed with this information, Plaintiffs and their counsel had "a clear view of the strengths and weaknesses" of the case and were in a strong position to negotiate a fair, reasonable, and adequate settlement. *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), aff'd 798 F.2d 35 (2d Cir. 1986).

Mediation was also hard-fought, as Judge Phillips attests. The parties engaged in two rounds of mediation, four months apart, spearheaded by two different plaintiff legal teams who ultimately came together under the Court's Leadership Group to reach the Settlement Agreement now before the Court. Plaintiffs researched and drafted three mediation statements, and analyzed the arguments made in three statements drafted by Defendants. The parties were able to reach an agreement in principle after extensive negotiations across two mediations assisted by Judge Phillips; that Settlement Agreement was only possible because it was based on a robust and fully informed factual background. In addition, the Leadership Group continued its in-depth analysis of this case as negotiations continued even after the initial agreement in principle.

Indeed, significant confirmatory discovery, claims analysis, and negotiations continued for several months after the Court appointed the Leadership Group and after the agreement in principle was reached. The Leadership Group served interrogatories; conducted a deposition by written question; retained a renowned expert to conduct on-site source code review over the course of several weeks and subsequent analysis; and coordinated a follow-up Q&A session with Co-Lead Counsel, defense counsel, and Plaintiffs' source code expert to allow the candid, open exchange of technical information. Co-Lead Counsel and members of the PSC undertook several, detailed

research projects to analyze the core legal issues in this case—assessing risks and determining how to maximize benefits to the class. With this analysis by a well-credentialed, experienced team of attorneys, the Leadership Group was well positioned to analyze the strength of Plaintiffs' claims and confirm that the settlement achieved well surpassed all tests for fairness, reasonableness, and adequacy.

In addition, James Zouras and Jonathan Rotter acted as independent counsel representing the discrete interests of the Illinois Subclass and the non-Illinois Subclass members of the Nationwide Class to negotiate the allocation of settlement funds between the two groups. As explained in their declarations, Messrs. Zouras and Rotter engaged in a collegial, but frank and adversarial process over nearly an eight-week period. They each conducted extensive research and analysis of the claims, both in connection with the allocation negotiations, and for months prior in connection with their pursuit of claims in the MDL.

Because the Settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced," the Court may presume the settlement to be fair, adequate, and reasonable. H. Newberg, A. Conte, Newberg on Class Actions § 11.41 (4th ed. 2002).[17]

---

[17] *See also, e.g., Fox v. Asset Acceptance, LLC*, No. CV 14-734-GW(FFMx), 2015 U.S. Dist. LEXIS 193865, at *23 (C.D. Cal. Aug. 17, 2015) ("At this point, the parties have participated in multiple mediations and Plaintiff has conducted additional confirmatory discovery — before reaching this Settlement. . . . Such discovery supports a finding of fairness."); *Lo v. Oxnard European Motors, LLC*, No. 11CV1009 JLS (MDD), 2011 U.S. Dist. LEXIS 144490, at *17-18 (S.D. Cal. Dec. 15, 2011) (Finding settlement fair, reasonable, and adequate when reached upon "only . . . limited confirmatory discovery" because the parties determined they had exchanged sufficient information to make an informed decision; the parties' counsel were well versed in class action litigation and the subject matter underlying the case; and the disputed issues were legal, not factual, such that extensive discovery may not have been required.); *Kline v. Dymatize Enters., LLC*, No. 15-CV-2348-AJB-RBB, 2016 U.S. Dist. LEXIS 142774, at *14-15 (S.D. Cal. Oct. 13, 2016) (The "time and effort" associated with post-settlement and post-mediation negotiations, confirmatory discovery, and informal discovery "militate in favor or preliminary approval."); *Simerlein v. Toyota Motor Corp.*, No. 3:17-cv-1091 (VAB), 2019 U.S. Dist. LEXIS 96742, at *59-61 (D. Conn. June 10, 2019) (Finding plaintiffs "gained a sufficient understanding of their case such that they have

Accordingly, the final factor weighs in favor of finding the Settlement fair, reasonable and adequate.

**C. The Class and Subclass should be provisionally certified for settlement purposes.**

The Court should find that the proposed Class is appropriate for provisional certification pursuant to Rule 23(a) and that it fits into one of the three subsections of Rule 23(b). *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 621 (1997); *In re AT&T Mobility*, 270 F.R.D. at 340-45 (citations omitted); *see also* Manual for Complex Litigation § 21.632 (4th ed. 2004). Provisional certification will allow the Class to receive notice of the Settlement and its terms, including the rights of Class Members to submit a Claim Form and recover a Cash Award if the Settlement is finally approved, to object to and/or be heard on the Settlement's fairness at the Fairness Hearing, and to opt out of the Settlement.

For the reasons below, the Court should provisionally certify the following Classes[18] under Rule 23(a) and Rule 23(b)(3) for settlement purposes only:

**Nationwide Class**: All persons who reside in the United States who used the App prior to issuance of the Preliminary Approval Order.

---

had an opportunity to evaluate the strengths and weaknesses of their claims as well as the adequacy of settlement" even though "Class Counsel only completed informal and confirmatory discovery and had not yet adjudicated pending motions to dismiss. . . ."); *In re Nissan Radiator*, No. 10 CV 7493 (VB), 2013 U.S. Dist. LEXIS 116720, at *13-14 (S.D.N.Y. May 30, 2013) ("[T]he settlement agreement is the product of extensive, arm's-length negotiations by parties represented by experienced and talented counsel with expertise in these types of cases. Additionally, although settlement was reached before extensive merits discovery, plaintiffs conducted an investigation prior to commencing the action, retained experts, and engaged in confirmatory discovery in support of the proposed settlement. . . . Therefore, the Court believes the settlement is the result of serious, informed, and non-collusive negotiations.").

[18] Excluded from the Classes are (i) TikTok, its parent, subsidiaries, successors, affiliates, officers, and directors; (ii) the judge(s) to whom the Civil Actions are assigned and any member of the judges' or judges' immediate family; (iii) Persons who have settled with and released TikTok from individual claims substantially similar to those alleged in the Civil Actions; (iv) Persons who submit a valid and timely Request for Exclusion; and (v) all Class Counsel and counsel of record in the Civil Actions. Settlement Agreement §2.6.

**Illinois Subclass**: All persons who reside in the State of Illinois and used the App in the State of Illinois to create videos prior to issuance of the Preliminary Approval Order.

      **1.   The requirements of Rule 23(a) are satisfied.**

Rule 23(a) requires that (1) the proposed settlement class is so numerous that joinder of all individual class members is impracticable (numerosity); (2) there are questions of law or fact common to the proposed settlement class (commonality); (3) plaintiff's claims are typical of those of the class (typicality), and (4) the plaintiff and class counsel will adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a)(1)-(4); *In re AT&T*, 270 F.R.D. at 340-44. The settlement classes satisfy each of these requirements.

      **a.  Numerosity: The Class includes tens of millions of individuals and the numerosity requirement is readily met.**

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Nationwide Class consists of an estimated 89 million individuals dispersed throughout the United States and the Illinois Subclass consists of 1.4 million individuals. Joinder of all Class Members is obviously impractical. *See McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) (40 or more class members is generally sufficient to establish numerosity). Numerosity plainly exists here.

      **b.  Commonality: Common questions regarding Defendants' privacy violations predominate the case.**

The second requirement is that "there are questions of law or fact common to the class." Rule 23(a)(2). The commonality requirement is satisfied where a plaintiff asserts claims that "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 565

U.S. 338, 389-90 (2011). Many questions of law and fact are common to the Classes, including, for example:

a. Whether Defendants collected, captured, and otherwise obtained the biometric identifiers and information of Plaintiffs and Class Members;

b. Whether Defendants possessed the biometric identifiers and information of Plaintiffs and Class Members;

c. Whether Defendants disclosed, redisclosed and otherwise disseminated the biometric identifiers and information of Plaintiffs and Class Members;

d. Whether Defendants profited from the biometric identifiers and information of Plaintiffs and Class Members;

e. Whether Defendants obtained enforceable written releases from Plaintiffs and Class Members or their authorized representatives before collecting, capturing, obtaining, disclosing, redisclosing and otherwise disseminating the biometric identifiers and information or Plaintiffs and Class Members;

f. For the Illinois Subclass, whether Defendants provided the notice required by BIPA[19] before collecting, capturing, obtaining, disclosing, redisclosing and otherwise disseminating the biometric identifiers and information of Plaintiffs and Class Members;

g. For the Illinois Subclass, whether Defendants had in place – and disclosed to the public – the written retention and destruction policies required by

---

[19] While the BIPA claim is asserted only on behalf of the Illinois Subclass, and legal questions concerning BIPA are common to that Subclass alone, Plaintiffs contend that the undisclosed collection of biometric identifiers and biometric data factually support the data privacy claims asserted by the Nationwide Class as well, e.g., Intrusion Upon Seclusion and the California Constitution's Right to Privacy.

BIPA while in possession of Plaintiffs' and Class Members' biometric identifiers and information;

h.    Whether Defendants protected Plaintiffs' and Class Members' biometric identifiers and information from disclosure using the reasonable standard of care within Defendants' industry and in a manner that was the same as or more protective than the manner in which Defendants protects other confidential and sensitive information;

i.    Whether Defendants wrongfully disclosed class members' video viewing histories to third parties in violation of the VPPA;

j.    Whether Defendants exceeded the scope of their authorized access to Plaintiffs' devices in violation of the CFAA;

k.    Whether Defendants wrongfully accessed Plaintiffs' and class members' devices and data to wrongfully control or obtain that data in violation of the CDAFA;

l.    Whether Defendants' collection, use, storage, and/or transmission of private data violated Plaintiffs Right to Privacy under the California Constitution or California Unfair Competition and False Advertising laws;

m.    Whether Defendants alleged conduct constitutes Intrusion Upon Seclusion;

n.    Whether Defendants were unjustly enriched through their alleged wrongful conduct;

o.    Whether Plaintiffs and Class Members suffered damages as a proximate result of Defendants; and

p.  Whether Plaintiffs and Class Members are entitled to damages, equitable

relief, and other relief.

Accordingly, the commonality requirement of Rule 23(a) is satisfied. *See Parker v. Risk Mgmt.*

*Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002) ("[A] common nucleus of operative fact is

usually enough to satisfy the [commonality] requirement.").

### c.  Typicality: The proposed class representatives' and class members' claims all arise out of the use of the App and their claims are typical.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is not

demanding." *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).

Plaintiffs (i.e., the proposed Class Representatives) submit that their claims are typical of

the claims of Class Members because Plaintiffs' claims arise out of the same "event, practice or

course of conduct that gives rise to the claim[s] of the other class members" and "are based on the

same legal theory." *Parker*, 206 F.R.D. at 213. Plaintiffs and each Class Member are all users of

the App who experienced the same privacy violations in the same manner. Moreover, Plaintiffs

and the putative Class members all seek the same statutory and actual damages. Accordingly, the

typicality requirement of Rule 23(a) is satisfied for purposes of preliminary approval.

### d.  The proposed class representatives and their counsel exceed the requirements to adequately represent the class.

The fourth and final Rule 23(a) requirement is "adequacy of representation," Fed. R. Civ.

P. 23(a)(4), which has two components: (1) "the representatives must not possess interests which

are antagonistic to the interests of the class" and (2) "the representatives' counsel must be qualified,

experienced and generally able to conduct the proposed litigation." *CV Reit, Inc. v. Levy*, 144

F.R.D. 690, 698 (S.D. Fla. 1992) (citation omitted).

41

The first component is satisfied because the proposed class representatives' interests in this litigation are aligned with, and not antagonistic to, those of the classes they seek to represent. *See G.M. Sign*, 2009 U.S. Dist. LEXIS 73869, at *15-16; *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014) (holding that "the adequacy requirement is satisfied with respect to the lead plaintiff in this kind of consumer case unless plaintiff's interests are antagonistic to the interest of other members of the class") (quotation omitted). The proposed representatives and class members are all TikTok users (or were, during the relevant time period) and *all* want to protect their privacy. To pursue that end, the proposed representatives retained counsel, filed actions that were consolidated as part of this MDL, participated in a vetting process conducted by the Leadership Group to assess each plaintiff's suitability to serve as a class representative, assisted with the litigation, vigorously prosecuted the case on behalf of the Class, and considered and approved the Settlement terms.

Moreover, the proposed representatives for the Illinois Subclass are Illinois residents who used TikTok to create videos in Illinois, are entitled to the protections of BIPA, and their interests are aligned with the subclass they seek to represent.

The second component of Rule 23(a)(4) is satisfied because Plaintiffs hired qualified and competent counsel who are highly experienced in class actions generally and consumer privacy litigation in particular. Proposed Class Counsel has successfully investigated, commenced, and prosecuted many complex cases and class actions, including the instant action. Proposed Class Counsel are the same Co-Lead Counsel the Court selected and appointed to drive the litigation to this point. Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied for purposes of preliminary approval.

42

### 2. The requirements of Rule 23(b)(3) are satisfied.

Finally, because Plaintiffs seek certification for settlement purposes, under Rule 23(b)(3), they must additionally show (1) that common questions of law or fact predominate over questions affecting only individual class members (predominance); and (2) that a class action is superior to other available methods of resolving the controversy (superiority). Fed. R. Civ. P. 23(b)(3); *In re AT&T Mobility*, 270 F.R.D. at 344-45. Both requirements are easily satisfied by the proposed Classes.

### a. Common questions predominate.

The predominance requirement of Rule 23(b)(3) is satisfied because common questions comprise a substantial aspect of the case and can be resolved for all Class and Subclass members in a single adjudication. *See Roach v. T.L. Cannon Corp.*, 773 F.3d 401, 405 (2d Cir. 2015) (predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof"). Here, the central questions in this case are all capable of resolution on a class-wide basis by looking to the Defendants' uniform data collection and privacy practices. Predominance is satisfied.

### b. Class treatment of Plaintiffs' claims is superior.

Rule 23(b)(3) also requires that a class action be superior to other available methods for adjudicating the controversy. "The superiority requirement is often met where class members' claims would be too small to justify individual suits, and a class action would save litigation costs by permitting the parties to assert their claims and defenses in a single proceeding." *Kaye v. Amicus Mediation & Arbitration Group, Inc.*, 300 F.R.D. 67, 81 (D. Conn. 2014); *see also Amchem*, 521 U.S. 617 (noting that "the Advisory Committee had dominantly in mind vindication of the rights

of groups of people who individually would be without effective strength to bring their opponents into court at all").

A class action is the superior method for the fair and efficient adjudication of these claims. Plaintiffs' claims are shared by millions of other TikTok users nationwide. The resolution of all claims of all Class Members in a single proceeding promotes judicial efficiency and avoids inconsistent decisions. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (noting "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23"). Further, it is unlikely that any Class Member would be willing or able to pursue relief on an individual basis.

Accordingly, superiority is satisfied and the Court should provisionally certify the Class for purposes of settlement.

### D. Court-Appointed Co-Lead Counsel are experienced and knowledgeable and have dedicated themselves to this case; they should be appointed Class Counsel.

Upon certifying a class, Rule 23 requires that a court appoint class counsel who will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (2), (4); *Harris v. Circuit City Stores, Inc.*, No. 07-cv-2512, 2008 WL 400862, at *11 (N.D. Ill. Feb. 7, 2008) (citation omitted). In appointing class counsel, the court must consider (1) the work counsel has done in identifying or investigating potential claims; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the case; (3) counsel's knowledge of the applicable law; and (4) the resources class counsel has committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv); *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n. 7 (7th Cir. 2013).

In this case, proposed Class Counsel (identical to the Co-Lead Counsel the Court previously appointed, ECF No. 94) readily satisfies the criteria of Rule 23(g). First, proposed Class counsel has devoted substantial time, effort, and resources to this litigation, beginning with their initial investigation of Plaintiffs' allegations, continuing through litigation and confirmatory discovery, and ending with arm's length settlement negotiations and mediation. Indeed, as the Court is aware, Plaintiffs' counsel have not always agreed on the best manner of litigating this case. However, the competing views that were once contentious have ultimately resulted in proposed Class Counsel being able to take a well-rounded, diverse, and objective look at the case and soberly evaluate its strengths, weaknesses, and potential outcomes.

Second, as discussed above, proposed Class Counsel have extensive experience in complex and class action litigation, in district courts of the Seventh Circuit and elsewhere, and have served as class counsel in other complex class actions and cases involving data privacy generally and BIPA specifically.

### E. The proposed class notice plan provides the best practicable notice and does so in an easily understood format.

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for Compl. Lit.*, *supra*, at § 21.312. The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The notice must contain specific information in plain, easily understood

language, including the nature of the action and the rights of class members. Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii); *see also In re AT&T Mobility*, 270 F.R.D. at 352.[20]

As explained in the Weisbrot Declaration, Angeion Group LLC, the Settlement Administrator, has designed a proposed Notice Program that provides individual direct email notice to all reasonably identifiable Class Members combined with a state-of-the-art media campaign comprised of internet advertising, social media advertising and a paid search campaign. Settlement Agreement § 9.2, Weisbrot Decl., ¶¶ 12, 19, 24; *see* Fed. R. Civ. P. 23(e)(1) (calling for notice to be provided in a "reasonable manner to all class members who would be bound by the proposal"); *In re Northfield*, 2012 WL 366852, at *7. The Notice Program includes a dedicated settlement website and toll-free telephone line where Class Members can learn more about their rights and options pursuant to the terms of the Settlement. Weisbrot Decl., ¶ 14. The Notice Program also includes a social media campaign utilizing Facebook, Instagram, and Twitter as well as a paid search campaign to help drive Settlement Class Members who are actively searching for information about the Settlement to the dedicated Settlement Website. Weisbrot Decl., ¶¶ 36, 40.

The notice will direct Class Members to the Settlement Website, which will contain the Class Notice and an electronic version of the Claim Form that can be submitted online, the toll-free Settlement telephone number, and copies of the full Settlement Agreement and other important documents (including the Complaint, this Motion, all Orders of this Court concerning the Settlement, and Plaintiffs' forthcoming motions for attorneys' fees and service award and final approval of the Settlement).

---

[20] Proposed drafts of the Class Notices are attached hereto as Exhibit D and the draft Claim Form is attached hereto as Exhibit E.

The Notice Program outlined above includes direct notice to all reasonably identifiable Class Members, combined with a robust media campaign consisting of state-of-the-art internet advertising, robust social media campaign, and a paid search campaign. Weisbrot Decl., ¶ 48. Accordingly, Plaintiffs respectfully request that the proposed Notice Program be approved, together with the Class Notices and Claim Form.

**F. The Court should schedule a fairness hearing to finally approve the settlement.**

The last step in the settlement approval process, after completion of the Class notice program, will be a Final Approval Hearing to consider the fairness, reasonableness, and adequacy of the proposed Settlement, and to determine the reasonableness of the requested Attorneys' Fee, Expense, and Service Awards. *See* Settlement Agreement § 2.15. Plaintiffs will submit a proposed Order containing a proposed schedule of events for the Court's consideration before the hearing on the instant motion.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion in its entirety and enter an order (i) granting preliminary approval of the Settlement Agreement; (ii) certifying the Class for settlement purposes; (iii) appointing Class Representatives, Subclass Representatives, and Class Counsel; (iv) approving the form and manner of the Notice Plan and appointing a Settlement Administrator; (v) establishing deadlines for requests for exclusion and the filing of objections to the proposed settlement contemplated by the Settlement Agreement; (vi) finding that the Parties have complied with 28 U.S.C. § 1715; and (vii) scheduling the fairness hearing.

Dated: February 25, 2021                    Respectfully Submitted,

                                            By: */s/ Katrina Carroll*
                                            Katrina Carroll
                                            CARLSON LYNCH, LLP

47

111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
kcarroll@carlsonlynch.com

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

By: */s/ Ekwan Rhow*
Ekwan Rhow
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG & RHOW,
P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
(310) 201-2100
erhow@birdmarella.com

*Plaintiffs' Co-Lead Counsel*

Jonathan Jagher
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

Michael Gervais
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mgervais@susmangodfrey.com

Albert Y. Chang
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037

48

(858) 914-2001
achang@bottinilaw.com

Megan E. Jones
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
(202) 540-7200
mjones@hausfledllp.com

Amanda K. Klevorn
Burns Charest LLP
365 Canal Street
Suite 1170
New Orleans, LA 70130
(504) 799-2845
aklevorn@burnscharest.com

*Plaintiffs' Steering Committee*

Shannon Marie McNulty
Clifford Law Offices, P.C.
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*

# EXHIBIT 3

# EXHIBIT A

<u>SETTLEMENT AGREEMENT AND RELEASE</u>

1. PREAMBLE

    1.1. This class action Settlement Agreement and Release ("Agreement") is entered into by and among the individuals and entities defined below as "Class Representatives" and the individuals and entities defined below as "TikTok" where Class Representatives and TikTok are collectively referred to herein as the "Parties."

    1.2. This Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims (as the term is defined below), upon and subject to the terms and conditions of this Agreement, and subject to preliminary and final approval of the Court.

2. DEFINITIONS

    2.1. "<u>Agreement</u>" or "<u>Settlement</u>" means this Settlement Agreement and Release, including any exhibits.

    2.2. "<u>App</u>" means the TikTok - Make Your Day video-sharing application (or its Musical.ly predecessor) distributed in the U.S.

    2.3. "<u>Civil Actions</u>" mean all of the civil actions that have been, will be, or could be initiated relating to the allegations or subject matter at issue in any pleading filed in any action that is included in or related to In Re: TikTok, Inc., Consumer Privacy Litigation, MDL No. 2948.

    2.4. "<u>Class</u>" means all persons who are members of the Nationwide Class and/or Illinois Subclass. The parties understand and agree that issues involving collection of data from minors is the subject of a class action settlement that has been preliminarily approved in T.K. v. TikTok, Inc., No. 1:19-cv-07915 (N.D. Ill.). TikTok agrees to waive any res judicata defense for purposes of this settlement only such that no person who is a member of the settlement class in the T.K. action will be precluded from participating in this Settlement.

    2.5. "<u>Class Counsel</u>" means the attorneys who sign this Agreement as Class Counsel up until such time as the Court appoints counsel to represent the Class in its preliminary approval order; and following such appointment, "Class Counsel" shall mean the counsel so appointed by the Court in its preliminary approval order.

    2.6. "<u>Class Member</u>" means any person who qualifies under the definition of the Class, excluding: (i) TikTok, its parent, subsidiaries, successors, affiliates, officers, and directors; (ii) the judge(s) to whom the Civil Actions are assigned and any member of the judges' or judges' immediate family; (iii) Persons who have settled with and released TikTok from individual claims substantially similar to those alleged in the Civil Actions; (iv) Persons who submit a valid and timely Request for Exclusion; and (v) all Class Counsel and counsel of record in the Civil Actions.

    2.7. "<u>Class Representatives</u>" mean: E.R., a minor, and E.R.'s Guardian, L.H.; D.M., a minor, and D.M.'s Guardian, D.H.; A.S., a minor, and A.S.'s Guardian, A.S.; S.A., a minor, and S.A.'s Guardian, Maritza A.; C.H., a minor, and C.H.'s Guardian, Marc Halpin; G.R., a minor, and G.R.'s Guardian, Mayra De La Cruz; and Morgan

Kukovec along with any other Class Representatives who may be appointed by the Court, acting either individually or through Class Counsel.

2.8.    "<u>Court</u>" means the United States District Court that has been assigned to preside over In Re: TikTok, Inc., Consumer Privacy Litigation, MDL No. 2948 and any appellate court that may review any orders entered by the District Court related to this Agreement.

2.9.    "<u>Day</u>" or "<u>days</u>" refer to calendar days.

2.10.   "<u>Defendants' Released Parties</u>" means the current defendants in the Civil Actions,  as well as any and all of their current or former directors, officers, members, administrators, agents, representatives, servants, employees, attorneys, parents, subsidiaries, affiliates, divisions, branches, units, shareholders, successors, predecessors, assigns, and all other individuals and entities acting on their behalf.

2.11.   "<u>Defendants' Releasing Parties</u>" means the current defendants in the Civil Actions, as well as any and all of their current or former directors, officers, members, administrators, agents, representatives, servants, employees, attorneys, parents, subsidiaries, affiliates, divisions, branches, units, shareholders, successors, predecessors, assigns, and all other individuals and entities acting on their behalf.

2.12.   "<u>Effective Date</u>" means the first date after either (i) the time to appeal the Final Order and Judgment has expired with no appeal having been filed or (ii) the Final Order and Judgment is affirmed on appeal by a reviewing court and no longer reviewable by any court.

2.13.   "<u>Execution</u>" means the signing of this Agreement by all signatories hereto.

2.14.   "<u>Fee Award</u>" means any attorneys' fees, reimbursement of expenses, and other costs awarded by the Court to Class Counsel.

2.15.   "<u>Final Approval Hearing</u>" means the hearing before the Court where the Parties request that the Court enter its Final Order and Judgment in accordance with this Agreement.

2.16.   "<u>Final Order and Judgment</u>" means the order entered by the Court, in a form that is mutually agreeable to the Parties, approving this Agreement under Fed. R. Civ. P. 23(e) and making such other findings and determinations as the Court deems necessary and appropriate to effectuate the terms of this Agreement, without modifying any terms of this Agreement that either Party deems material.

2.17.   "<u>Illinois Subclass</u>" means all persons who reside in the State of Illinois and used the App in the State of Illinois to create videos prior to issuance of the Preliminary Approval Order.

2.18.   "<u>Incentive Award</u>" means any amount awarded by the Court to the Class Representatives for serving as Class Representatives.

2.19.   "<u>Nationwide Class</u>" means all persons who reside in the United States who used the App prior to issuance of the Preliminary Approval Order.

2.20.   "<u>Notice of Proposed Class Action Settlement</u>" means the notice described in the Notice Plan as approved by the Court.

2.21.  "<u>Notice Plan</u>" means the planned method by which notice of this Agreement will be given to the Class.

2.22. "<u>Opt-Out and Objection Deadline</u>" means the deadline for a Class Member to submit a Request for Exclusion or objection as set forth in the Preliminary Approval Order and which will be no more than sixty (60) days from the date upon which Notice of the Proposed Class Action Settlement is commenced.

2.23. "<u>Parties</u>" means, collectively, the Class Representatives and TikTok, and "<u>Party</u>" means any one of them.

2.24. "<u>Person</u>" means an individual or legal entity, including an association, or his, her, or its respective estate, successors, or assigns.

2.25. "<u>Plaintiffs' Released Parties</u>" means the Class Representatives, Class Counsel, and counsel of record in the Civil Actions.

2.26. "<u>Plaintiffs' Releasing Parties</u>" means Class Representatives and all Class Members, as well as their present, former, and future heirs, executors, administrators, estates, representatives, predecessors-in-interest, and assigns, and all other individuals and entities acting on their behalf or otherwise asserting the interests of Class Members.

2.27. "<u>Plan of Allocation</u>" means the plan for allocating the Settlement Fund described in this Agreement, or other such plan for allocating the Settlement Fund as may be approved by the Court.

2.28. "<u>Preliminary Approval Order</u>" means the order issued by the Court provisionally (i) granting preliminary approval of this Agreement; (ii) certifying the Class for settlement purposes; (iii) appointing Class Representatives and Class Counsel; (iv) approving the form and manner of the Notice Plan and appointing a Settlement Administrator; (v) establishing deadlines for Requests for Exclusion and the filing of objections to the proposed settlement contemplated by this Agreement; (vi) finding that the Parties have complied with 28 U.S.C. § 1715; and (vii) scheduling the Final Approval Hearing.

2.29. "<u>QSF</u>" means a court-approved Qualified Settlement Fund for federal tax purposes pursuant to Treas. Reg. § 1.468B-1 in which will be deposited the Settlement Fund.

2.30. "<u>Released Claims</u>" means any and all claims, complaints, actions, proceedings, or remedies of any kind, whether known or unknown (including, without limitation, claims for attorneys' fees and expenses and costs), arising from or related to the Civil Actions or the collection and use of any user data, including biometric data, whether in law or in equity, under contract, tort or any other subject area, or under any statute, rule, regulation, order, or law, whether federal, state, or local, on any grounds whatsoever, arising from the beginning of time through the Effective Date, that were, could have been, or could be asserted by the Releasing Parties. Notwithstanding the foregoing, the released claims shall not be deemed to release, remise, waive, acquit, affect, or discharge any claims that are not releasable under the law or any claims or defenses arising from enforcement of this agreement.

2.31. "<u>Request for Exclusion</u>" means the form that must be completed and returned in the manner and within the time period specified in this Agreement for a Class Member to request exclusion from the Class.

3

2.32. "<u>Settlement Administrator</u>" means a third-party class action settlement administrator who will implement the designated aspects of this Agreement.

2.33. "<u>Settlement Fund</u>" means the non-reversionary cash fund that shall be funded by TikTok in the total amount of $92,000,000.00. The Settlement Fund is the total sum that TikTok will pay in connection with this Agreement, deposited into a common fund for payment of (i) distributions to Class Members, (ii) the Fee Award, (iii) the Incentive Awards, and (iv) all settlement administration and notice costs.

2.34. "<u>TikTok</u>" means TikTok Inc., acting on behalf of Defendant's Released Parties, and its successors or assigns of the rights and obligations of TikTok under this Agreement, including any entity that acquires TikTok's obligations under this agreement through merger or acquisition.

## 3. RESTRICTIONS ON USE OF THIS AGREEMENT

3.1. This Agreement is for settlement purposes only and is entered into as a compromise to avoid the inherent risks and expenses posed by continued litigation of the claims in the Civil Actions. Neither the fact nor content of this Agreement, nor any action based on it, will constitute, be construed as, or be admissible in evidence as an admission of the validity of any claim, of any fact alleged in the Civil Actions or in any other pending or subsequently filed action, or of any wrongdoing, fault, violation of law, or liability or non-liability, wrongdoing, fault, or violation of law or fact alleged in the Civil Actions.

3.2. The Parties agree that, in consideration for the undertakings, promises, and payments set forth in this Agreement and upon the entry by the Court of a Final Order and Judgment approving and directing the implementation of the terms and conditions of this Agreement, the Civil Actions will be settled and compromised upon the terms and conditions set forth in this Agreement.

3.3. The Parties have agreed to enter into this Agreement as an appropriate compromise of the claims in the Civil Actions to put to rest all controversy and to avoid the uncertainty, risk, expense, and burdensome, protracted, and costly litigation that would be involved in prosecuting and defending the Civil Actions.

3.4. TikTok has denied and continues to deny each allegation and all charges of wrongdoing or liability of any kind whatsoever asserted or that could have been asserted in the Civil Actions.

3.5. Plaintiffs' Released Parties deny any wrongdoing, liabilities, claims, and causes of action of any kind whatsoever that TikTok has asserted or could have been asserted against them.

3.6. Subject to approval by the Court, TikTok conditionally agrees and consents to jurisdiction, venue, and certification of the Class for settlement purposes only and within the context of this Agreement only.

3.7. If this Agreement, for any reason, is not approved or is otherwise terminated, the Parties expressly reserve all rights, claims, objections and defenses. TikTok reserves the right to assert any and all objections and defenses to jurisdiction, venue, certification of a litigation class, or other defenses; and neither this Agreement nor any order or other action relating to this Agreement may be offered as evidence in support of jurisdiction, venue, or class certification for a purpose other than

DocuSign Envelope ID: 8ED7697E-4477-42E5-B150-5304505157C2

settlement pursuant to this Agreement. Class Representatives, individually and on behalf of the Class, reserve their rights to pursue their claims in the Civil Actions on any available factual, procedural, equitable or legal grounds.

## 4. SETTLEMENT FUND

4.1. Within 90 days after entry of the Preliminary Approval Order, TikTok shall cause to be deposited the sum of Ninety-Two Million Dollars ($92,000,000) into an escrow account established by the Settlement Administrator to create the Settlement Fund.

4.2. The Settlement Fund shall be a court-approved Qualified Settlement Fund (QSF) for federal tax purposes pursuant to Treas. Reg. § 1.468B-1. TikTok shall be the "transferor" to the QSF within the meaning of Section 1.468B-1(d)(1) of the Treasury Regulations with respect to the Settlement Fund or any other amount Transferred to the QSF pursuant to this Settlement Agreement. The Settlement Administrator shall be the "administrator" of the QSF within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations, responsible for causing the filing of all tax returns required to be filed by or with respect to the QSF, paying from the QSF any taxes owed by or with respect to the QSF, and complying with any applicable information reporting or tax withholding requirements imposed by Section 1.468B-2(l)(2) of the Treasury Regulations or any other applicable law on or with respect to the QSF. TikTok shall provide to the Settlement Administrator any documentation required for the Settlement Administrator to facilitate obtaining QFS status for the Settlement Fund pursuant to Treas. Reg. §1.468B-l. All taxes on income or interest generated by the Settlement Fund, if any, shall be paid out of the Settlement Fund.

4.3. Class Counsel shall select the Settlement Fund escrow account and the Settlement Fund escrow bank. The Settlement Fund escrow bank shall invest the Settlement Fund exclusively in an interest-bearing account or accounts where the principal will not decrease and is fully insured by the United States Government or an agency thereof, including certificates of deposit, a U.S. Treasury Fund or a bank account that is either (a) fully insured by the Federal Deposit Insurance Corporation ("FDIC") or (b) secured by instruments backed by the full faith and credit of the United States Government. The Settlement Fund escrow bank shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates. All interest earned on the investment of the Settlement Fund shall be added to the Settlement Fund, for distribution as set forth herein.

4.4. Other than the Settlement Fund, TikTok will have no financial obligations to Class Representatives, Class Members, Class Counsel, any other attorney representing any Class Member, or the Settlement Administrator with respect to the Defendants' Released Claims. The Settlement Fund represents the total extent of TikTok's monetary obligations under this Agreement. In no event shall TikTok's total monetary obligations with respect to this Agreement exceed the amount stated above.

4.5. The Settlement Administrator will draw from the Settlement Fund to cover all obligations with respect to costs related to this Agreement, including the expenses of the Settlement Administrator, the Notice Plan, payments to Class Members, any Incentive Awards, any Fee Award, and any other administrative fees and expenses in connection with this Agreement; provided, however, that the Parties must approve any payments to the Settlement Administrator prior to the Settlement Administrator incurring such payments. The Parties intend that, after the foregoing payments and disbursements are made, there will be no funds remaining. Nonetheless, to the extent any funds remain, no portion of the Settlement Fund will be returned to TikTok.

4.6. If this Agreement is terminated, the Settlement Administrator will return all funds to TikTok within ten (10) days of the termination date; provided, however, that the Settlement Administrator need not return any funds already spent on notice and on reasonable Settlement Administrator expenses before the termination date. Notwithstanding any provision herein, in the event this Agreement is not approved by any court, or terminated for any reason, or the Settlement set forth in this Agreement is declared null and void, or in the event that the Effective Date does not occur, Settlement Class Members, Class Representatives, and Class Counsel shall not in any way be responsible or liable for any administration expenses, taxes with respect to the Settlement Fund, or any expenses, including costs of notice and administration associated with this Settlement or this Agreement, except that each Party shall bear its own attorneys' fees and costs and Defendants' future payment obligations shall cease.

4.7. Defendants' Released Parties, TikTok's Counsel, Plaintiffs' Released Parties and Class Members shall have no liability, obligation or responsibility with respect to the investment, disbursement, or other administration or oversight of the Settlement Fund or QSF and shall have no liability, obligation or responsibility with respect to any liability, obligation or responsibility of the Settlement Administrator, including but not limited to, liabilities, obligations or responsibilities arising in connection with the investment, disbursement or other administration of the Settlement Fund and QSF.

4.8. Once deposited by TikTok, the Settlement Fund shall be deemed and considered to be in custodia legis of the Court, and shall remain subject to the jurisdiction of the Court until such time as such funds shall be distributed pursuant to the Agreement and/or further order(s) of the Court.

4.9. Notwithstanding any effort, or failure, of the Settlement Administrator or the Parties to treat the Settlement Fund as a QSF, any tax liability, together with any interest or penalties imposed thereon, incurred by TikTok or any Releasees resulting from income earned on the Settlement Fund or the payments made from the Settlement Fund (or the receipt of any payment under this paragraph) shall be reimbursed from the Settlement Fund in the amount of such tax liability, interest or penalties promptly upon and in no event later than five (5) days after TikTok's or any Defendants' Released Party's written request to the Settlement Administrator.

4.10. For avoidance of doubt, neither TikTok nor any of Defendants' Released Parties shall have any liability, obligation, or responsibility whatsoever for tax obligations arising from payments to any Class Member or based on the activities and income of the QSF. In addition, neither TikTok nor any of Defendants' Released Parties shall have any liability, obligation, or responsibility whatsoever for tax obligations arising from payments to Class Counsel. The QSF will be solely responsible for its tax obligations. Each Class Member will be solely responsible for his or her tax obligations. Each Class Counsel or other attorney or firm receiving a distribution from the Settlement Fund will be solely responsible for his, her, or its tax obligations.

4.11. Class Counsel are not providing legal advice regarding the taxability of any amount paid hereunder and nothing contained herein shall be interpreted as constituting legal advice regarding the taxability of any amount paid hereunder, nor shall it be relied upon as such. Any tax issues raised by this Agreement may be unique as to each Party and Class Member, and each Party and Class Member is advised to obtain tax advice from his or her own tax advisor with respect to any payments resulting from this Agreement. Each Party and Class Member will be responsible for paying their own respective share of all applicable state, local, and federal taxes on all amounts the received or paid pursuant to this Agreement.

6

4.12. TikTok shall have no liability whatsoever with respect to (i) any act, omission, or determination by Class Counsel or the Settlement Administrator, or any of their respective designees or agents, in connection with the administration of the settlement or otherwise; (ii) the management, investment, or distribution of the Settlement Fund; (iii) the Plan of Allocation; (iv) the determination, administration, or calculation of claims to be paid to Class Members from the Settlement Fund; or (v) the payment or withholding of taxes or related expenses, or any expenses or losses incurred in connection therewith. The Plaintiffs' Releasing Parties and Class Counsel release TikTok from any and all liability and claims arising from or with respect to the administration, investment or distribution of the Settlement Fund.

4.13. No person shall have any claim against Class Representatives, Class Counsel, counsel of record for any party in the Civil Actions, the Settlement Administrator, or any other person designated by Class Counsel, based on determinations or distributions made substantially in accordance with this Agreement and the settlement contained herein, the Plan of Allocation, administration of the Settlement Fund and the QSF, or further order(s) of the Court.

## 5. PLAN OF ALLOCATION

5.1. Class Counsel shall prepare and submit a Plan of Allocation to the Court for approval in connection with a motion for preliminary approval of the Settlement, which Plan of Allocation shall propose the allocation of distributions from the Settlement Fund among Class Members, Class Representatives, Class Counsel, and any other person to receive a distribution from the Settlement Fund.

5.2. The Plan of Allocation shall include a provision for distribution of the Settlement Fund according to the following preferential order:

5.2.1. Payment of all expenses incurred by the Settlement Administrator for the Notice Plan and settlement administration;

5.2.2. Payment of any taxes associated with the Settlement Fund;

5.2.3. Payment of any Fee Award plus any interest or income earned on the Fee Award portion of the Settlement Fund and Incentive Awards within 14 days of the Effective Date;

5.2.4. Payment of the remaining unallocated portion of the Settlement Fund to Class Members in accordance with the Final Approval Order or any subsequent order of the Court within 14 days of the Effective Date; and

5.2.5. Payment of any residue of the Settlement Fund as set forth in this Agreement, subject to a reduction for any associated administrative costs.

5.3. Settlement Payments to Class Members

5.3.1. Class Members may submit one claim per Class Member to receive a distribution from the Settlement Fund according to the Plan of Allocation.

5.3.2. The Plan of Allocation will divide the portion of the Settlement Fund to be distributed to Class Members into a total number of pro rata shares equal to the sum of the number of Nationwide Class Members who submit a valid claim and a multiple between three (3) and ten (10) of the number of Illinois

DocuSign Envelope ID: 8ED7697E-A477-433E-B169-5304505157C2

Subclass Members who submit a valid claim. Individual counsel representing the Illinois Subclass Members and individual counsel for the Nationwide Class Members will mediate the allocation multiplier before the Hon. Layn Phillips (Ret.) after confirmatory discovery is completed and before the Plan of Allocation is submitted to the Court. It is not a condition of the Agreement that any particular multiplier be approved by the Court. Class Representatives and Class Counsel may not terminate this Agreement based on the Court's modification of the allocation multiplier.

5.3.3.  For feasibility and fraud-prevention reasons, distributions to Class Members will be made by electronic payment. If any Class Member cannot receive an electronic payment, the Settlement Administrator will provide an alternative form of payment.

5.3.4.  The method for submitting a claim and for receiving a distribution will be described and provided in the Notice Plan after consultation with the Settlement Administrator. Class Members will be required to prove eligibility by means reasonably resistant to fraud to be mutually agreed upon by the parties after consultation with the Settlement Administrator.

5.3.5.  To submit a claim, Class Members must provide to the Settlement Administrator at least (i) the Class Member's full name, address, email address, mobile telephone number(s) for the Class Member's device(s) used to access the App, and any and all TikTok user names used by the Class Member; (ii) an attestation confirming they meet the eligibility requirements to be a Class Member; (iii) information sufficient for the Settlement Administrator to make a distribution to the Class Member by the electronic means described in the Notice Plan (unless the Class Member opts for an alternative for of payment); and (iv) a statement under penalty of perjury that the Class Member has not submitted more than one claim and that the information they submit is correct.

5.3.6.  Class Members with valid claims who fail to provide sufficient or correct information or fail to submit a valid claim within the time period identified in the Notice Plan waive any right to any payment from the Settlement Fund.

5.3.7.  The Settlement Administrator shall review all claims to determine their validity. The Settlement Administrator may reject any claim that does not comply in any material respect with the instructions in the Notice Plan; is not submitted by a Class Member; is a duplicate of another claim; is reasonably suspected to be fraudulent; or is submitted after the deadline for claims. The decision of the Settlement Administrator shall be final as to the determination of a claim's validity.

5.3.8.  Late claims may be considered if deemed appropriate by the Settlement Administrator in consultation with Class Counsel, or if ordered by the Court.

5.3.9.  Claims of Class Members that are deemed valid will be paid out to Class Members by the Settlement Administrator beginning 14 days after the Effective Date, or as soon thereafter as is reasonably practical.

5.4.  Residue

5.4.1. Within one year plus 30 days after the date the Settlement Administrator distributes the first Settlement Fund Payments, any funds remaining in the Settlement Fund shall be redistributed on a pro rata basis to Settlement Class Members who previously received payment, to the extent feasible and practical in light of the costs of administering such subsequent payments, unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.

5.4.2. If the Settlement Administrator determines that any residue of the Settlement Fund cannot be distributed on a pro rata basis to Class Members who submitted a claim, the Court may determine an appropriate alternative plan for distribution of the residue.

5.4.3. All costs associated with the disposition of residual funds – whether through additional distributions to Settlement Class Members and/or through an alternative plan approved by the Court – shall be borne solely by the Settlement Fund.

6. **INJUNCTIVE RELIEF**

6.1. TikTok will not do the following unless disclosed expressly in its Privacy Policy and in compliance with all applicable laws (such as where applicable law requires express written consent):

6.1.1. Use the App to collect or store a user's biometric information or identifiers (as defined by applicable law);

6.1.2. Use the App to collect geolocation or GPS data;

6.1.3. Use the App to collect information in user's clipboards;

6.1.4. Use the App to transmit U.S. user data outside of the U.S.;

6.1.5. Store U.S. user data in databases outside of the U.S.; or

6.1.6. Pre-upload U.S. user-generated content.

6.2. TikTok will delete all pre-uploaded user-generated content collected from users who did not "save" or "post" the content.

6.3. TikTok will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter.

6.4. TikTok will provide a written verification under oath of compliance with the foregoing within 90 days of the Effective Date.

7. **CONFIRMATORY DISCOVERY**

7.1. Warranty. TikTok warrants that it has not used the App to collect biometric identifiers or biometric information as defined by the Illinois Biometric Information Privacy Act and TikTok will provide the following confirmatory discovery to confirm this warranty, subject to the terms of a mutually-agreeable confidentiality agreement.

9

7.2. Source Code Inspection. As soon as possible and within 30 days after execution of the Settlement Agreement, TikTok will make the source code of the App available for inspection for a period of 30 days to a third-party expert retained by Class Counsel who has signed the required confidentiality agreement. Class Counsel and TikTok will meet and confer should the expert reasonably require additional time to review the source code.

7.3. Interrogatories. TikTok will respond under oath to a supplemental interrogatory designed to elicit an explanation of the function and purpose of up to 20 specific terms in the source code that the third-party expert believes in good faith to be potentially related to the collection of biometric data from users. The supplemental interrogatory must be in the following form: "Explain the function and purpose of the following terms in the source code of the App: [list of terms]." The parties will meet and confer as necessary to increase the number of terms that may be the subject of this interrogatory if the third-party expert discovers more than 20 terms that the expert reasonably believes in good faith are potentially related to the collection of biometric data from users.

7.4. Class Size. TikTok will provide verification of its internal data by sworn declaration regarding the number of persons in the Nationwide Class and Illinois Subclass.

7.5. Document Requests. TikTok will respond to document requests previously served by Plaintiff E.R. within 14 days after execution of the Settlement Agreement.

7.6. Depositions. TikTok will make available Fed. R. Civ. P. 30(b)(6) witness(es) for depositions by written question to verify the warranty that TikTok has not collected biometric identifiers or biometric information from users of the App.

7.7. Confidentiality. The responses to all confirmatory discovery may be designated for confidentiality protection under the Protective Order where applicable.

8. SUBMISSION FOR PRELIMINARY APPROVAL

8.1. As soon as the required confirmatory discovery has been completed, Class Counsel will submit to the Court a motion for an order conditionally certifying the Class, granting preliminary approval of this Agreement, approving Class Notice and the Notice Plan, setting a briefing schedule for a final approval hearing and a briefing schedule for a motion for an award of Attorneys' Fees and Costs and a Class Representative Incentive Award, and otherwise staying the Civil Actions, in a form mutually agreed to by the Parties and in compliance with all applicable laws, rules, and orders and local guidelines of the Court.

8.2. Class Counsel and TikTok will take any acts reasonably necessary to carry out this Agreement's expressed intent.

9. NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

9.1. The Parties shall agree to the Notice Plan before submission of this Agreement for preliminary approval. The specific text and content of the Notice Plan and Notice of Proposed Class Action Settlement will be mutually agreed upon by the Parties, subject to Court approval.

DocuSign Envelope ID: 8FD7997E-4473-4325-B152-530450515792

9.2.    The notice plan shall include the best notice practicable as recommended by a notice expert. TikTok shall provide information in its possession or control concerning contact information for the Class, to be used by the Settlement Administrator only.

9.3.    The Notice Plan shall include procedures for the handling, protection, security and use of Class Representatives and Class Members' personal data and information.

9.4.    Class Representatives will select the Settlement Administrator. Class Representatives will solicit multiple bids and will provide them to TikTok. TikTok will provide feedback and recommendations concerning the bids.

9.5.    All costs of settlement administration and the Notice Plan will come from the Settlement Fund.

9.6.    The Settlement Administrator shall use means to be agreed upon by the parties to detect and mitigate against fraudulent claims.

9.7.    Within 10 days after the filing of this Agreement with the Court, the Settlement Administrator shall notify the appropriate state and federal officials of this Agreement pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715. Within fifteen (15) days after the Notice Date, the Settlement Administrator shall provide declarations to the Court, with a copy to Class Counsel and Defense Counsel, attesting to the measures undertaken to provide notice as directed by CAFA.

## 10. CLASS MEMBERS' RIGHT OF EXCLUSION/INCLUSION

10.1.    A Class Member may request exclusion from the Class up until the Opt-Out and Objection Deadline. To request exclusion, the Class Member must complete, sign, and mail to the Settlement Administrator a Request for Exclusion, using a form to be agreed on by the Parties. The Request for Exclusion must be signed by the Class Member seeking exclusion under penalty of perjury. So-called "mass" or "class" opt-outs shall not be allowed. To be valid, a Request for Exclusion must be postmarked on or before the Opt-Out and Objection Deadline. Any Person who submits a valid and timely Request for Exclusion shall not be entitled to relief under, and shall not be affected by, this Agreement or any relief provided by this Agreement. For a Request for Exclusion to be considered by the Court, it must set forth: (i) the name of the Action; (ii) the person's or entity's full name, address, email address and telephone number; (iii) a specific statement of the person's or entity's intention to be excluded from the Settlement; (iv) the identity of the person's or entity's counsel, if represented; and (v) the person's or entity's authorized representative's signature and the date on which the request was signed.

10.2.    The Parties shall have the right to challenge the timeliness and validity of any Request for Exclusion. The Court shall determine whether any contested exclusion request is valid.

10.3.    Within 10 days after the Opt-Out and Objection Deadline, the Settlement Administrator will provide the Parties a list of all Persons who opted out by validly requesting exclusion.

## 11. OBJECTIONS

11.1.    Only Class Members shall be eligible to make an objection to this Agreement.

11.2.  Any Class Member who does not submit a valid and timely Request for Exclusion may object to the fairness, reasonableness, or adequacy of this Agreement up until the Opt-Out and Objection Deadline. Class Members may not seek to exclude themselves from the Class and submit an objection to this Agreement.  Any Class Member who both objects to this Agreement and opts-out will be deemed to have opted-out and the objection shall be deemed null and void.

11.3.  Any Class Member who wishes to object to any aspect of this Agreement must send to the Settlement Administrator, Class Counsel, and TikTok's counsel, and file with the Court, a written statement of the objection(s) which must include: (i) the name of the Action and a description of the objection(s), including any evidence and applicable legal authority and any supporting evidence the objector wishes to introduce; (ii) the objector's full name, address, email address, telephone number, mobile telephone number(s) for the Class Member's device(s) used to access the App, and any and all TikTok user names used; (iii) whether the objection applies only to the objector, a specific subset of the Settlement Class, or the entire Settlement Class; (iv) the identity of all counsel who represent the objector, including former or current counsel who may be entitled to compensation for any reason related to the objection, along with a statement of the number of times in which that counsel has objected to a class action settlement within five years preceding the submission of the objection, the caption of the case for each prior objection, and a copy of any relevant orders addressing the objection; (v) all agreements that relate to the objection or the process of objecting, between the objector or objector's counsel and any other person or entity; (vi) the objector (and the objector's attorney's) signature on the written objection; and (vii) a declaration under penalty of perjury that the information provided by the objector and objector's counsel is true and correct.

11.4.  Objectors who fail to timely file and serve written objections shall be deemed to have waived any objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to this Settlement.

11.5.  Class Members may raise an objection either on their own or through an attorney hired at their own expense. If a Class Member hires an attorney other than Class Counsel to represent him or her, the attorney must (i) file a notice of appearance with the Court no later than the Opt-Out and Objection Deadline, and (ii) deliver a copy of the notice of appearance on Class Counsel and TikTok's counsel, no later than the Opt-Out and Objection Deadline. Class Members, or their attorneys, intending to make an appearance at any hearing relating to this Agreement, including the Final Approval Hearing, must deliver to Class Counsel and TikTok's counsel, and file with the Court, no later than 21 days before the date of the hearing at which they plan to appear, or as the Court otherwise may direct, a notice of their intention to appear at that hearing.

11.6.  Any Class Member who fails to comply with the provisions of the preceding subsections shall waive and forfeit any and all rights he or she may have to appear separately and/or object, and shall be bound by all the terms of this Agreement.

11.7.  Any issue not raised with sufficient particularity to give fair notice of the basis for the objection by the Opt-Out and Objection Deadline is waived. Class Members who file an objection may not file any other briefing or similar documents relating to their objection or settlement approval without first obtaining leave of court through a noticed motion.

11.8.   Any Class Member who files an appeal of the Final Order and Judgment shall post a bond in an amount to be determined by the Court.

## 12. RELEASES; EXCLUSIVE REMEDY; DISMISSAL OF ACTIONS

12.1.   Upon entry of the Final Order and Judgment, and regardless of whether any Class Member executes and delivers a written release, each Class Representative and each Class Member shall be deemed to waive, release and forever discharge Defendants' Released Parties from all Released Claims. No Defendants' Released Party will be subject to any liability or expense of any kind to any Plaintiffs' Releasing Party with respect to any Released Claim.

12.2.   Upon entry of the Final Order and Judgment, the Plaintiffs' Releasing Parties and Defendants' Releasing Parties will be deemed to have, and will have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

12.3.   Upon entry of the Final Order and Judgment, the Plaintiffs' Releasing Parties and Defendants' Releasing Parties will be deemed to have, and will have, waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, or the law of any jurisdiction outside of the United States, which is similar, comparable or equivalent to Section 1542 of the California Civil Code, except those Claims that are not releasable under the law or any claims or defenses arising from enforcement of this Agreement.  Plaintiffs' Releasing Parties acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention to finally and forever settle and release the Released Claims, notwithstanding any unknown claims they may have.

12.4.   This Agreement shall be the sole and exclusive remedy for any and all Released Claims. Upon entry of the Final Order and Judgment, each Plaintiffs' Releasing Party shall be barred from initiating, asserting, or prosecuting any Released Claims against the Defendants' Released Parties. Defendants' Releasing Parties shall be barred from initiating, asserting, or prosecuting any liabilities, claims or causes as set forth in ¶12.5.

12.5.   Upon entry of the Final Order and Judgment, Defendants' Releasing Parties shall be deemed to waive, release and forever discharge Plaintiffs' Released Parties from and for any and all liabilities, claims, cross-claims, causes of action, rights, actions, suits, debts, liens, contracts, agreements, damages, costs, attorneys' fees, losses, expenses, obligations, or demands of any kind whatsoever, whether known or unknown, existing or potential, or suspected or unsuspected, whether raised by claim, counterclaim, setoff, or otherwise, including any known or unknown claims, which they have or may claim now or in the future to have, relating to the institution, prosecution, or settlement of the Civil Action, except for claims relating to the enforcement of the Settlement or this Agreement, and for the submission of false or fraudulent claims for Settlement benefits.

12.6.  Upon entry of Final Order and Judgment, the Civil Actions shall be dismissed with prejudice.

## 13. CLASS COUNSEL FEES AND COSTS AND INCENTIVE AWARDS

13.1.  Class Counsel may apply to the Court seeking a reasonable portion of the Settlement Fund as payment of any reasonable attorneys' fees and costs (the Fee Award) and any Incentive Awards in recognition of the Class Representatives' efforts on behalf of the Class for their time and effort expended in serving the Class.

13.2.  Class Counsel intend to file a motion for Court approval of Incentive Awards to Class Representatives to be paid from the Settlement Fund, up to $2,500.00 each. Should the Court award less than this amount, the difference in the amount sought and the amount ultimately awarded shall remain in the Settlement Fund.

13.3.  This Agreement contains no rights and restrictions regarding Class Counsel's application for a Fee Award beyond the right to apply to the Court for a reasonable Fee Award.

13.4.  It is not a condition of this Agreement that any particular amount of attorneys' fees, costs or expenses or incentive awards be approved by the Court, or that such fees, costs, expenses or awards be approved at all. Any order or proceeding relating to the amount of any award of attorneys' fees, costs, or expenses or inventive awards, or any appeal from any order relating thereto, or reversal or modification thereof, shall not operate to modify, terminate or cancel this Agreement, or affect or delay the finality of the Final Order and Judgment, except that any modification, order or judgment cannot result in TikTok's overall obligation exceeding the agreed-upon amount of the Settlement Fund.

13.5.  Except as otherwise provided in this section, each Party will bear its own costs, including attorneys' fees, incurred in connection with the Civil Actions.

## 14. TERMINATION OF THE AGREEMENT

14.1.  The performance of this Agreement is expressly contingent upon achieving the Effective Date. This includes both (i) the entry of the Preliminary Approval Order approving this Agreement, including the Notice Plan, and (ii) the Final Order and Judgment approving this Agreement and the expiration of all appeal periods and appeal rights without modification to the Final Order and Judgment that any Party deems material. If the Court fails to issue either (1) the Preliminary Approval Order or (2) the Final Order and Judgment approving this Agreement without modification that any Party deems material following conclusion of the Final Approval Hearing, this Agreement will be deemed terminated unless otherwise mutually agreed by the Parties.

14.2.  If the Final Order and Judgment is vacated or reversed by a reviewing court in whole or in part in any manner that prohibits subsequent approval of the Agreement without material modification, this Agreement will be deemed terminated (except with respect to rulings on any Fee Award), unless all Parties who are adversely affected thereby, in their sole discretion within thirty (30) days of receipt of such ruling, provide written notice to all other Parties of their intent to proceed with this Agreement as modified.

14.3.  If this Agreement is deemed terminated by refusal of the Court to approve or affirm approval of the Agreement, it will have no force or effect whatsoever, shall be null

and void, and will not be admissible as evidence for any purpose in any pending or future litigation in any jurisdiction.

14.4.   The performance of this Agreement is expressly contingent upon the terms and execution thereof being compliant with applicable law and government orders. Should any party's performance be in conflict with applicable law or government orders, the Parties will negotiate in good faith to modify the Agreement to avoid the conflict prior to termination of the Settlement.

## 15. CONFIDENTIALITY

15.1.   Other than as necessary to comply with legal processes and federal and state tax and securities laws or with the terms of this Agreement or unless otherwise agreed and/or pursuant to Court Order, the Parties will maintain the confidentiality of all terms of the Settlement until the Settlement is presented to the Court for preliminary approval.

15.2.   Unless required by Court Order, the Parties and their counsel will not disclose the terms of the Agreement to any other parties or counsel in the Civil Actions without written agreement from all Parties hereto until the Settlement is presented to the Court for preliminary approval.

15.3.   Unless and until all Parties execute this Agreement and present it to the Court in a motion seeking the Preliminary Approval Order, unless required by Court Order, or unless otherwise agreed, the Parties agree that all terms of this Agreement will remain confidential and subject to Federal Rule of Evidence 408.

## 16. ENFORCEMENT OF THE AGREEMENT

16.1.   The Court will retain jurisdiction to enforce the terms of this Agreement, and all Parties hereto submit to the jurisdiction of the Court for and only for purposes of implementing and enforcing the settlement embodied in this Agreement. As part of its continuing jurisdiction, the Court may amend, modify or clarify orders issued in connection with this settlement upon good cause shown by a party.  No other court or tribunal will have any jurisdiction over claims or causes of action arising under this Agreement.

16.2.   This Agreement will be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of law principles that would direct the application of the laws of another jurisdiction.

16.3.   The prevailing party in any action or proceeding in which is asserted a claim or cause of action for breach of this Agreement will be entitled to recover all reasonable costs and attorneys' fees incurred in connection with the action or proceeding.

16.4.   The release in this Agreement may be enforced by any of the Defendants' Released Parties.

## 17. MISCELLANEOUS

17.1.   This Agreement, including all attached exhibits, shall constitute the entire agreement among the Parties (and covering the Parties and the Class) with regard to the subject matter of this Agreement and shall supersede any previous agreements and understandings between the Parties.

17.2.   This Agreement may not be changed, modified or amended except in writing signed by Class Counsel and TikTok's counsel, subject to Court approval if required.

17.3.   Each Party represents and warrants that it enters into this Agreement of that Party's own free will. Each Party is relying solely on its own judgment and knowledge and is not relying on any representation made by any other Party or any other Party's agents or attorneys concerning the subject matter, basis, or effect of this Agreement.

17.4.   This Agreement has been negotiated at arm's length by Class Counsel and TikTok's counsel with the assistance of Hon. Layn Phillips (Ret.). In the event of any dispute arising out of this Agreement, or in any proceeding to enforce any of the terms of this Agreement, no Party shall be deemed to be the drafter of this Agreement or of any particular provision or provisions, and no part of this Agreement shall be construed against any Party on the basis of that Party's identity as the drafter of any part of this Agreement.

17.5.   The Parties agree to cooperate in good faith fully and to take all additional action that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

17.6.   This Agreement shall be binding upon and inure to the benefit of all the Parties and Class Members, and their respective representatives, heirs, successors, and assigns.

17.7.   The headings of the sections of this Agreement are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect its construction.

17.8.   The Parties have cooperated in the drafting and preparation of this Agreement. This Agreement will not be construed against any party on the basis that the party was the drafter or participated in the drafting.

17.9.   Prior to pursuing relief or submitting any dispute relating to this Agreement or the Civil Actions to the Court, the Parties and Class Counsel agree to mediate the dispute before Hon. Layn Phillips (Ret.) in Palo Alto, California.

17.10.  Any notice, instruction, court filing, or other document to be given by any Party to any other Party shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, or overnight delivery service to the respective representatives identified below or to other recipients as the Court may specify. As of the date of this Agreement, these respective representatives are as follows:

DocuSign Envelope ID: 8ED7997E-4473-425F-B159-530450515702

For the Class:

Katrina Carroll
CARLSON LYNCH LLP
111 West Washington Street,
Suite 1240
Chicago, Illinois 60602
kcarroll@carlsonlynch.com

Jonathan M. Jagher
FREED KANNER LONDON &
MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
jjagher@fklmlaw.com

For TikTok:

Anthony J Weibell
WILSON SONSINI GOODRICH &
ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
aweibell@wsgr.com

17.11. The Parties each represent and warrant that they have not sold, assigned, transferred, conveyed, subrogated, or otherwise disposed of any claim or demand covered by this Agreement. If a Class Member has sold, assigned, transferred, conveyed, subrogated or otherwise disposed of any claim or demand, the Person that acquired such claim or demand is bound by the terms of this Agreement to the same extent as the Class Member would have been but for the sale, assignment, transfer, conveyance, or other disposition.

17.12. The respective signatories to this Agreement each represent that they are fully authorized to enter into this Agreement on behalf of the respective Parties.

17.13. The waiver by one Party of any breach of this Agreement by any other Party will not be deemed as a waiver of any other prior or subsequent breaches of this Agreement.

17.14. Any Exhibits to this Agreement are material and integral parts thereof and are fully incorporated herein by this reference.

17.15. This Agreement may be executed in one or more counterparts, and may be executed by facsimile or electronic signature. All executed counterparts and each of them will be deemed to be one and the same instrument.

17.16. This Agreement will be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto and the Defendants' Released Parties and Plaintiffs' Released Parties.

[SIGNATURES ON FOLLOWING PAGE]

THIS SETTLEMENT AGREEMENT AND RELEASE IS AGREED TO AND APPROVED BY:

__Class Counsel on behalf of below referenced Class Representatives__

_Katrina Carroll_                                    Date: 9/4/2020
Katrina Carroll
CARLSON LYNCH, LLP
On Behalf of E.R., a minor, and E.R.'s Guardian, L.H.

_Jonathan Jagher_                                    Date: 9/4/2020
Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
On Behalf of D.M., a minor, and D.M.'s Guardian, D.H.

_Robert Foote_                                       Date: 9/4/2020
Robert M. Foote
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
On Behalf of Morgan Kukovec

_Tiffany Yiatras_                                    Date: 9/4/2020
Tiffany M. Yiatras
CONSUMER PROTECTION LEGAL, LLC
On Behalf of A.S., a minor, and A.S.'s Guardian, A.S.

_T. Wolfson_                                         Date: 9/4/2020
Tina Wolfson
AHDOOT & WOLFSON, PC.
On Behalf of S.A., a minor, and S.A.'s Guardian, Maritza A.

_Michael Gervais_                                    Date: 9/4/2020
Michael Gervais
SUSMAN GODFREY L.L.P.
On Behalf of C.H., a minor, and C.H.'s Guardian, Marc Halpin

_Joseph Guglielmo_                                   Date: 9/4/2020
Joseph P. Guglielmo
SCOTT+SCOTT ATTORNEYS AT LAW LLP
On Behalf of G.R., a minor, and G.R.'s Guardian, Mayra De La Cruz

**TikTok**

DocuSigned by:

*Vanessa Pappas*

DA74A6BABC754A1...

9/3/2020

_____          _____

Vanessa Pappas                                             Date
TIKTOK, INC.
Interim Head of TikTok Global

DocuSign Envelope ID: 5FCD3B52-21BC-40A9-91B7-0E92AE1ABE86

## ADDENDUM NO. 1 TO SETTLEMENT AGREEMENT AND RELEASE

1. PURPOSE

    1.1. This Addendum No. 1 to Settlement Agreement and Release is intended only to clarify and not to modify the class action Settlement Agreement and Release ("Agreement") executed September 4, 2020 by certain parties in the civil action captioned *In Re: TikTok, Inc., Consumer Privacy Litigation*, MDL No. 2948. The clarifications herein represent the intent of the signatories to the Agreement at the time of execution of the Agreement.

2. CLARIFICATION OF DEFINITIONS

    2.1. "App" means the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S., including its device-side and server-side operations.

    2.2. "Class Counsel" means the plaintiffs' attorneys who have signed the Agreement and/or this Addendum as Class Counsel up until such time as the Court appoints counsel to represent the Class in its preliminary approval of the Settlement; and following such appointment, "Class Counsel" shall mean the counsel so appointed by the Court.

    2.3. "Class Representatives" means those individuals who are proposed as Class Representatives by Class Counsel in their motion for preliminary approval of the Settlement.

    2.4. "Pre-Upload(ed) User-Generated Content" means videos created with the App that are uploaded to TikTok's servers prior to the user selecting whether to "save" or "post" the content and where no such selection was subsequently made by the user.

    2.5. "TikTok" means TikTok Inc., acting on behalf of Defendants' Released Parties, and its successors or assigns of the rights and obligations of TikTok under this Agreement, including any entity that acquires TikTok's obligations under this Agreement through merger or acquisition. With respect to the Injunctive Relief in Section 6 of the Agreement, "TikTok" means any of Defendants' Released Parties to the extent they are engaged in the operation of the App or involved in receiving or accessing user data obtained through the App.

3. CLARIFICATION OF PLAN OF ALLOCATION

    3.1. The method for determining the allocation of benefits to Illinois Subclass Members described in section 5.3.2 of the Agreement is entirely within the discretion of Class Counsel and may, at Class Counsel's discretion, be determined with or without mediation between counsel for Class Members so long as the interests of the Nationwide Class and the Illinois Subclass are both adequately represented in the determination.

4. CLARIFICATION OF INJUNCTIVE RELIEF

    4.1. As part of the conduct listed in Section 6.1 of the Agreement, TikTok will not do the following unless disclosed in its Privacy Policy and in compliance with all applicable laws (such as where applicable law requires express written consent):

4.1.1. Disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the Video Privacy Protection Act (18 U.S.C. § 2710), except to the extent such disclosure is not prohibited by the Video Privacy Protection Act.

4.1.2. Share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared.

4.2. The Parties jointly reviewed multiple categories of user data potentially in TikTok's possession that should be deleted from TikTok's servers consistent with the intent of the injunctive relief in Section 6 of the Agreement. Following confirmation from TikTok as to what categories existed and should be deleted, TikTok has agreed to delete any Pre-Uploaded User-Generated Content, as identified in Section 6.2 of the Agreement.

4.3. Pursuant to Section 6.3 of the Agreement, TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification required by Section 6.4 of the Agreement to Class Counsel.

5. CLARIFICATION OF TIKTOK'S WARRANTY REGARDING BIOMETRIC DATA

5.1. The warranty in Section 7.1 of the Agreement is not intended to cover features and operations of the App that are not used to identify an individual, such as image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations. The warranty is only meant to cover the use of the App to collect biometric data to identify individual App users—whether that biometric data is collected directly upon being uploaded to TikTok's servers through the App or whether that biometric data is later collected after being extracted from other user content that has been uploaded through the App to TikTok's servers.

APPROVED BY:

*For Class Counsel and the Class Representatives:*

Katrina Carroll
CARLSON LYNCH, LLP

Date: 2/16/2021

Elizabeth A. Fegan
FEGAN SCOTT LLC

Date: 2/16/2021

Ekwan Rhow
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

Date: 2/17/2021

2

*For TikTok:*

_____

Anthony Weibell

WILSON SONSINI GOODRICH & ROSATI, P.C.

Date: 2/16/2021

_____

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, <br><br><br><br><br> This Document Relates to All Cases | MDL No. 2948 <br><br> Master Docket No. 20-cv-4699 <br><br> Judge John Z. Lee <br><br> Magistrate Judge Sunil R. Harjani |

## DECLARATION OF KATRINA CARROLL IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

KATRINA CARROLL, declares as follows:

### *My Experience and Qualifications*

1.      I am the managing partner of the Chicago, Illinois office of Carlson Lynch LLP, a nationally recognized litigation boutique specializing in the prosecution of plaintiff-side class actions. I have been appointed by the Court as Co-Lead Counsel for Plaintiffs in this matter, I have personal knowledge of the facts stated herein, and I submit this Declaration in support of Plaintiffs' Unopposed Motion for Preliminary Approval of the Settlement.

2.      By way of my background, I have litigated complex matters and class actions for twenty years and have devoted my career to representing plaintiffs in class cases like this one.  In total, I have litigated over one hundred class actions and have obtained recoveries in excess of $1 billion in all types of cases, including consumer, securities and antitrust cases.  I have been recognized as one of the top 25 class action lawyers in the State of Illinois by the National Trial Lawyers Association and have been named multiple times as a Super Lawyer.

3.      Outside of the courtroom, I am an active participant and panelist at symposiums and conferences related to class action topics and the promotion of women attorneys in the field. In April 2018, I was honored to appear as a panelist at "May it Please the Court: Symposium on Women Lawyers in the Courtroom," sponsored by the United States District Court for the Northern District of Illinois and the Chicago Bar Association.  I currently serve on the Law360 Products Lability Litigation Editorial Advisory Board and am also an active Board member of the Advisory Board of Loyola University School of Law's Institute for Consumer and Antitrust Studies.

4.      I have significant experience litigating biometric privacy matters arising from the collection and use of data by technology companies, including some of the earliest cases on record in this District, including cases against Google and Shutterfly that have shaped BIPA jurisprudence across the country. *See e.g., Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103 (N.D. Ill. 2015) (finding jurisdiction against defendant and that plaintiff stated a claim under the Illinois Biometric Information Privacy Act); *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1095-96 (N.D. Ill. 2017) (interpreting meaning of "biometric identifier" within the meaning of BIPA).

5.      I am currently litigating other BIPA matters in various courts against some of the largest companies in the world, including IBM, Amazon, Google, Microsoft and Facebook. *See e.g., Vance v. International Business Machines Corp.*, No. 20cv577 (N.D. Ill.) (Carlson Lynch appointed as Co-Lead Counsel); *Wise v. Ring LLC*, No. 20-cv-1298 (W.D. Wash.); *Vance, et al. v. Amazon.com, Inc*., No.: 2:20-cv-01084 (W.D. Wash.); *Vance, et al. v. Google, LLC*, No.: 5:20-cv-04696 (N.D. Cal.); *Vance, et al. v. Microsoft Corporation*, No.: 2:20-cv-01082 (W.D. Wash.); *Whalen v. Facebook, Inc.*, No. 5:20-cv-06361-NC (N.D. Cal.).

6.      I have been personally appointed to leadership positions in numerous complex class

cases, including privacy-related actions like this one.  Some of my personal appointments as Co-

Lead Counsel include:

- *Bishop et al. v. Behr Process Corp. et al.*, No. 1:17-cv-4464 (N.D. Ill.): (national products liability class action matter relating to defective deck paint resulting in substantial settlement).

- *Albrecht v Oasis Power, LLC*, No. 1:18-cv-01061 (N.D. Ill.) (TCPA class action; class settlement approved).

- *Mednick v. Precor, Inc.*, No. 14-cv-03624 (N.D. Ill.) (in products liability class action, plaintiffs obtained class certification for a multi-state consumer class and the case ultimately settled on a class-wide basis).

- *Lewert v. PF Chang's China Bistro, Inc.*, No. 1:14-cv-04787 (N.D. Ill.): (one of the first data breach cases on record with landmark ruling in the Seventh Circuit on Article III standing, hailed by Law360 as one of the "top privacy cases" of 2016).

- *Salam v. Lifewatch, Inc.*, No. 1:13-cv-09305 (N.D. Ill.): (plaintiffs prevailed on contested class certification motion and matter is currently being actively litigated).

- *Bakov v. Consolidated World Travel Inc.*, No. 1:15-cv-02980 (N.D. Ill.) (TCPA litigation proceeding on behalf of a certified class of consumers).

7.      I also have extensive MDL experience and have been personally appointed to serve

in leadership in several national matters. For instance, I successfully served as co-lead counsel in

*In Re: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation*, 1:15-cv-

1364 (N.D. Ill.), a sprawling products liability MDL class action which ended in a favorable class

settlement. My other personal MDL appointments include *In re Community Health Systems, Inc.,*

*Customer Data Security Breach Litigation*, 2:15-cv-00222, MDL 2595 (N.D. Ala.) (member of

the plaintiffs' steering committee in consolidated multidistrict litigation stemming from data

breach involving one of the nation's largest hospital chains) and *In re Ashley Madison Customer*

*Data Security Breach Litig.*, MDL No. 2669 (E.D. Mo.) (member of executive committee in well-

publicized data breach relating to social media company; significant class settlement for $11.2 million was approved in November 2017).

8.      Apart from my own appointments, my firm has additional and far-ranging MDL experience in some of the country's largest privacy and data breach matters including: *In re Equifax, Inc. Customer Data Security Breach Litig.*, MDL 2800 (N.D. Ga.); *In re Marriott International Customer Data Security Breach Litigation,* MDL No. 2879 (D. MD.); *In re Home Depot Customer Data Breach Litig.*, 1:14-md-02583, MDL 2583 (N.D. Ga.); *In re Target Corporation Customer Data Breach Litig.*, 0:14-md-02522, MDL 2522 (D. Minn.) and *In re Vizio, Inc. Consumer Privacy Litig.*, MDL No. 2693 (C.D. Cal.).

9.      I have personally devoted my full attention to litigating this matter since its inception and I have a full understanding of the case merits and litigation risks.  Based on my experience and analysis, I believe that the Settlement is the product of collaboration among some of the most experienced class action attorneys in the field, extensive negotiations with defense counsel, and an excellent result for the Class.

### *Pre-MDL Proceedings in the Northern District of Illinois Consolidated Action*

10.      The actions comprising this MDL are nearly all putative class actions against Defendants, TikTok Inc. and ByteDance Technology Inc. arising from alleged privacy violations.

11.      Related cases pending in various districts across the country became the subject of a May 15, 2020 petition filed before the Judicial Panel on Multi-District Litigation ("MDL") by counsel from the Southern District of Illinois seeking transfer and coordination in the Southern District of Illinois, or in the alternative, in this Court.

12.      With respect to the pre-MDL proceedings in this District, I am counsel of record in the first-filed of the Northern District of Illinois related actions (*E.R. v. TikTok, Inc. et al.,* 1:20-

cv-02810 (N.D. Ill.)). Having filed the first matter in this Court, both before and during the pendency of the MDL petition, I worked to organize and coordinate the various other related actions for the benefit of all parties and the putative class.

13. Prior to the creation of an MDL in this Court in August 2020, six related cases were proceeding as a Consolidated Action in this District. [ECF Nos. 10, 18]. Recognizing the fact that the cases would potentially be related in the MDL and that a leadership process in the Consolidated Action would not bind cases outside of our District, I suggested (with the agreement of all counsel then involved) that the Court appoint me as interim lead counsel during the pendency of the MDL without prejudicing the rights of anyone to seek leadership post-MDL. [*E.R.* Docket, at ECF No. 12]. The Court agreed. [*Id., at* ECF No. 18].

14. In my designated role as interim lead counsel during the MDL proceedings, and in an effort at substantive coordination of the various related cases, I communicated extensively with counsel for Defendants and other plaintiffs' counsel to explore a global settlement opportunity beginning in late May and early June of 2020.

15. Because of my efforts, all Plaintiffs' counsel in this District coordinated seamlessly and worked toward the common goal of litigating efficiently. Together, we filed a Consolidated Complaint for the Northern District of Illinois cases, served discovery, and prepared for the August 13, 2020 mediation, which became the foundation for the settlement now being presented to the Court.

### *Pre-MDL Coordination and Preparation for Settlement*

16. At the time defense counsel and I discussed the possibility of a global settlement and scheduled an August 13, 2020 mediation, seventeen related cases were pending in four federal Districts and the MDL panel had not yet ruled on centralization. [ECF No. 11]. The MDL transfer

order would not be issued until August 4, 2020, nine days before the mediation was scheduled to occur. [MDL Docket, ECF No. 2].

17.     Recognizing the state of procedural uncertainty while preserving this opportunity for the class, I galvanized an inclusive process among plaintiffs' counsel involved in the MDL and organized a team representing multiple districts to pursue mediation. Our team collaborated extensively in preparing for mediation. We retained a top expert in code analysis, communicated extensively with defense counsel, researched settlement value and the merits of our legal claims and prepared a detailed mediation statement.

18.     As part of this organizational process, sixteen firms[1] came together and collaborated in the months leading up to the August 13, 2020 mediation. These sixteen firms agreed on a delegation of seven representatives to attend the mediation session.

19.     Jonathan Jagher, now a Court-appointed PSC member, and I traveled to California during the pandemic to appear in person for the extensive, hard-fought, arms-length negotiations conducted for over twelve hours with Judge Phillips, one of the country's most prominent mediators.   Since we were asked to limit in-person attendees due to COVID-19 restrictions, five additional delegates actively participated by teleconference throughout the duration of our negotiations: Robert Foote (Foote, Mielke, Chavez & O'Neil, LLC); Michael Gervais (Susman Godfrey LLP); Joseph Guglielmo (Scott+Scott Attorneys at Law LLP); Tina Wolfson (Ahdoot & Wolfson, PC) and Tiffany Yiatras (Consumer Protection Legal, LLC).

---

[1] The sixteen firms are: Carlson Lynch LLP; Freed Kanner London & Millen LLC; Cafferty Clobes Meriwether & Sprengel LLP; Sauder Schelkopf LLP; Gordon Law Offices, Ltd.; Stephan Zouras, LLP; Erik H. Langeland P.C.; Tostrud Law Group, P.C.; Consumer Protection Legal, LLC; Scott+Scott Attorneys at Law LLP; Baird Law Firm; Wood Law Firm, LLC; Ahdoot & Wolfson, PC; Susman Godfrey LLP; Fegan Scott, LLC and Foote, Mielke, Chavez & O'Neil, LLC.

20.     At the conclusion of the mediation session on August 13, 2020, all of the delegates executed a binding term sheet concerning the material terms of the settlement.   Post-mediation, we continued our collaborative process. All of the delegates were involved in negotiating the September 4, 2020 Settlement Agreement and are signatories to that document.

### *The Unique Timing of the Settlement Opportunity*

21.     As it considers the value of Settlement, the Court should be aware of the political and business climate TikTok was facing.

22.     The August 13, 2020 mediation occurred at a particularly challenging time for TikTok, as the company began facing unprecedented business challenges and political pressure from former President Donald Trump just days before settlement talks were to begin.  By the time the parties met with Judge Phillips on August 13, the pressure had mounted significantly, creating a unique settlement opportunity.

23.     Just one week before the mediation, on August 6, 2020, President Trump issued an "Executive Order on Addressing the Threat Posed by TikTok" (the "First Executive Order"). In the First Executive Order, President Trump stated that TikTok presented a "national emergency" that "threaten[s] the national security, foreign policy, and economy of the United States." The First Executive Order stated that the TikTok App would be banned in the U.S. unless ByteDance Ltd. sold or spun-off its domestic TikTok operations to a U.S. Company within 45 days.

24.     The 45 day sell-off window was later extended to 90 days, by subsequent executive order titled, "Regarding the Acquisition of Musical.ly by ByteDance Ltd." (the "Second Executive Order"), issued on August 14, 2020, the day after the mediation. The Second Executive Order also prohibited ByteDance from any ownership interest in Musical.ly and required that ByteDance divest: (i) any interests in assets or property in the operation of TikTok in the United States; (ii)

any data obtained or derived from TikTok or musical.ly; and (iii) immediately upon divestment, destroy any data obtained or derived from TikTok or Musical.ly.

25.     Thus, the August 13, 2020 mediation session occurred with TikTok motivated to resolve this litigation while it was urgently marketing itself for sale to U.S. technology mega-companies like Microsoft and Oracle. I am confident that we capitalized on this pressure effectively during the negotiations to achieve the greatest possible value for the Class.

### *Post-MDL Coordination and Additional Settlement Negotiations*

26.     As noted above, at the time of the August 13, 2020 mediation, the MDL was in a state of procedural limbo: the administrative transfer of the related actions had not been fully effectuated and the Court had not yet created any leadership structure for the MDL. ECF No. 18.

27.     Prior to the appointment of the Leadership Group on September 28, 2020, confirmatory discovery on the settlement was underway and was in varying stages of completion.

28.     Once the Leadership Group was appointed, Co-Lead Counsel began collaborating immediately to vet the September 4, 2020 Settlement Agreement and in the ongoing confirmatory discovery efforts.  Co-Lead Counsel also continued negotiations with defense counsel, entered into the February 2021 Addendum, and ultimately reached consensus on the settlement terms Plaintiffs now present to the Court for approval. This process is detailed in the Declaration of Co-Lead Counsel Elizabeth Fegan.

### *Pre-Mediation Investigation and Post-Settlement Confirmatory Discovery*

29.     Prior to mediation and in preparing for the session, PSC Member Jonathan Jagher and I retained Bob Zeidman of Zeidman Consulting as Plaintiffs' source code expert.  Mr. Zeidman's *curriculum vitae* is attached hereto as **Exhibit A**.  The practice is well regarded and its professionals are generally recognized as belonging among the world's leading experts for source

code analysis. Atif Hashmi, also associated with Zeidman Consulting, served as one of the plaintiffs' experts in the Facebook biometric case pending in the Northern District of California. Mr. Jagher and I worked directly with Bob Zeidman in preparing for mediation and in connection with settlement related confirmatory discovery efforts. Mr. Zeidman was personally involved in the code review and in the analysis of the relevant issues.

30. After the September 4, 2020 Settlement Agreement was executed by the delegates to the mediation (prior to the Court's appointment of the Leadership Group), Mr. Zeidman, Mr. Jagher and I traveled to California to conduct an in-person source code inspection. Mr. Jagher and I spent several days at the initial stage of the project with Mr. Zeidman, along with settlement signatory Tina Wolfson. Mr. Zeidman assumed responsibility thereafter.

31. Mr. Zeidman was assisted from time to time by Nik Baer of Zeidman Consulting. In total, the in-person code review lasted from September 8th until September 25th. As part of the review, these experts inspected relevant code for the TikTok app (both iOS and Android platforms) and also relevant server code. Throughout the weeks of review, Mr. Jagher had lead responsibility for liaising with the experts to ensure that code was made available and technical issues were appropriately resolved.

32. Mr. Zeidman's code review subsequently formed the basis for supplemental interrogatory questions concerning the function and purpose of terms Mr. Zeidman observed in the source code. Mr. Zeidman's work was also used to elicit testimony from a representative of TikTok, as specified in the settlement agreement.

33. While Mr. Zeidman's source code inspection was ongoing in September of 2020, I assigned various settlement-related tasks to various counsel among the 16 firms involved in the mediation effort.

34.     With the assistance of counsel participating in the mediation, we conducted a competitive bidding process for claims administration and class notice.  Three separate proposals were fully vetted by the group.  Ultimately, we selected Angeion taking various factors into consideration including price, media plan recommendations and prior experience.  Further, Angeion is currently administering a settlement for TikTok in a related case and has institutional knowledge and familiarity with TikTok (including TikTok's available records to notify class members).  Though this was not the only factor considered, we determined that Angeion's institutional knowledge will result in quicker ramp-up times and administrative cost-savings, yielding significant benefits for the Class.

35.     In September 2020, prior to the Court's leadership appointment, I also assigned tasks to various counsel in connection with drafting supplemental written discovery.

36.     Though this work was under way by the time the Court's leadership order was issued, immediately after the Court appointed the Leadership Group, I instructed non-appointed counsel to stop all work in progress and to deliver work product to me, which I ultimately shared with Co-Lead Counsel.

37.     Post-appointment, Co-Lead Counsel (assisted by Mr. Jagher on the PSC) worked extensively with Mr. Zeidman to analyze his findings, which were used to generate additional written discovery and deposition questions for purposes of settlement.  Through collaboration and analysis with the input of experts, Co-Lead Counsel was ultimately able to negotiate key provisions in the Addendum to benefit the class.

38.     The expert analysis and collaboration allowed Co-Lead Counsel to explore and ultimately achieve a more expansive definition of the TikTok "App" to include activities on both the app and server levels.  Addendum § 2.1.

39.     Mr. Zeidman's code review also enabled us to gain an understanding of TikTok's technology to assess TikTok's warranty in Section 7 of Settlement Agreement that TikTok "has not used the App to collect biometric identifiers or biometric information as defined by [BIPA]..." Mr. Zeidman's code review assisted counsel in clarifying that warranty in the addendum to focus the warranty on the technology itself:

> The warranty in Section 7.1 of the Agreement is not intended to cover features and operations of the App that are not used to identify an individual, such as image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations. The warranty is only meant to cover the use of the App to collect biometric data to identify individual App users—whether that biometric data is collected directly upon being uploaded to TikTok's servers through the App or whether that biometric data is later collected after being extracted from other user content that has been uploaded through the App to TikTok's servers.

Addendum§ 5.1

40.     Co-Lead Counsel, working together, also achieved additional important settlement clarifications concerning injunctive relief.  Specifically, the Addendum clarifies that the injunctive relief applies broadly to "any of Defendants' Released Parties to the extent they are engaged in the operation of the App or involved in receiving or accessing user data obtained through the App." Addendum § 5.1.  The Addendum also clarifies that TikTok will continue to comply with the Video Privacy Protection Act (18 U.S.C. § 2710).  *Id*., at § 4.1.1.  Co-Lead Counsel also analyzed categories of data maintained by TikTok which should be deleted, ultimately securing TikTok's agreement to delete "Pre-Uploaded User Generated Content." *Id*.,at § 4.2.   The Addendum also clarifies specific compliance provisions concerning TikTok's hiring a third-party to conduct data privacy law compliance training for three years and provide verification of this training to Co-Lead Counsel. *Id*.,at § 4.3.

41.     All of these important clarifications are the result of significant collaboration among counsel for the benefit of the Class.  As a result, Co-Lead Counsel now present to the Court a fair, reasonable, and adequate Settlement which offers the class $92 million and valuable injunctive relief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 23, 2021

_____
Katrina Carroll

# EXHIBIT A

# *Bob Zeidman*



8050 Palm Cove Court
Las Vegas, NV 89129
Tel (650) 741-5809
Email Bob@ZeidmanConsulting.com
Website www.ZeidmanConsulting.com

## PROFESSIONAL SUMMARY

Bob Zeidman has management experience in the founding and daily operation of various high-tech companies as well as hands-on experience designing, analyzing, and reverse-engineering hardware and software. Mr. Zeidman is considered a pioneer in the fields of analyzing and synthesizing software source code and the creator of the field of Software Forensics. Mr. Zeidman is also considered one of the leading experts in the Verilog hardware description language as well as ASIC and FPGA design. He has written several engineering texts and regularly teaches courses in these areas at conferences throughout the world. Mr. Zeidman is also an experienced and well-regarded expert in intellectual property disputes. Bob is certified in the use of CodeSuite®. He holds a B.A. in Physics and a B.S. in Electrical Engineering from Cornell University and a master's degree in Electrical Engineering from Stanford University.

## EXPERIENCE

10/1987 - present: Zeidman Consulting - founder and president
- Provides engineering hardware and software design services to companies.
- Provides engineering support and expert witnesses for high-tech litigation.

8/2007 - present: Software Analysis and Forensic Engineering Corporation - company founder and president
- Software tools for intellectual property litigation.
- Created patented CodeSuite® software including BitMatch®, CodeCLOC®, CodeCross®, CodeDiff®, CodeMatch®, and SourceDetective® for efficiently finding correlation between source code files of different programs.
- Developed CodeSuite-MP for running CodeSuite® on multiple cores of a multicore processor.
- Architected CodeGrid for running CodeSuite® on a supercomputer grid.

1/2002 - present: Zeidman Technologies - founder and president
- Software tools for embedded software development.
- Created patented SynthOS® software that automatically synthesizes source code for a real time operating system.
- Created patented Molasses® virtualization software that enables a slow speed hardware emulator or prototype to be attached to a high-speed network to emulate network hardware in a live system.

1/2003 - 4/2008: Semizone.com - advisor
- Web-based training for engineers.
- Advisor on issues relating to e-learning content, development, presentation, and delivery.
- Instructor for various electrical engineering courses.

1/1999 - 12/2002: The Chalkboard Network - founder and president
- Web-based training for engineers and business professionals.
- Developed Depth Control®, a unique instructional design methodology for Web-based training.

1/1997 - 12/1997: Apple Computer - consultant

7/1995 - 9/1995
- Firmware development for a multimedia projection system.
- Firmware development for the Apple Studio Display, an advanced flat panel monitor.

7/1996 - 12/1996: Hitachi Computer Products (America) - consultant
- Helped define an architecture and functional specification for an ATM switch.

10/1995 - 6/1996: Cisco Systems - consultant

3/1995 - 10/1995

10/1994 - 1/1995
- Wrote Verilog behavioral models and developed a Verilog simulation environment for a 10baseT switch.
- Performed schematic capture, Verilog design, and simulation of an FDDI hub.
- Performed schematic capture, Verilog design, and simulation of an ATM router.

5/1997 - 6/1997: Quickturn Design Systems - consultant

3/1995 - 7/1995

1/1994 - 2/1994

5/1993 - 6/1993
- Designed custom memory boards for emulation of a supercomputer.

7/1993 - 3/1994: Adaptive Video - consultant
- Managed a team designing DSP-based medical imaging boards.

1/1993 - 3/1993: Wireless Access - consultant
- Supervised the design of an FPGA-based prototype for a telecommunications encoding and decoding scheme.

1/1992 - 4/1999: eVAULT Remote Backup Service - founder and president
- Invented the concept of remote backup.
- Set up a remote backup system with a central file server and communication lines including ISDN.
- Wrote remote backup software for DOS, Windows, and OS/2 including a GUI, a backup scheduler and file compression, encryption, and communication routines.

6/1991 - 9/1991: STEP Engineering - consultant
- Reviewed and optimized RISC hardware and software.

12/1990 - 8/1991: Ricoh Corporation - consultant
- Led a team that designed four RISC-based controllers for laser printers, scanners, faxes, and copiers.

9/1989 - 11/1990: DAVID Systems - consultant
- Designed network interface boards for 10BaseT, 10Base2, and FOIRL.
- Led an international team that tested an AMI encoding scheme and designed an ASIC for a digital phone set.

5/1993 - 8/1993: Ikos Systems - consultant

8/1992 - 2/1993

3/1988 - 8/1989

- Designed a high speed SBUS to MXIbus interface and a high-speed controller for a parallel processor.
- Architected, designed, and wrote diagnostic software for a RISC-based controller for a simulation accelerator.

10/1987 - 10/1988: Stanford University - consultant

- Led a team of graduate students under Professor Mike Flynn in the design and testing of a neural network memory.

1/1986 - 3/1988: Telestream Corporation - staff engineer

- Developed an architecture model for a telecom parallel processor system.
- Modeled, simulated, and tested a proprietary bus.
- Designed a telecom processing element ASIC.
- Designed a telecom system backplane.

9/1985 - 12/1985: American Supercomputers - staff engineer

- Designed a data cache and the register section logic for a CRAY compatible supercomputer.
- Assisted with the implementation of a behavioral simulator.

1/1985 - 8/1985: ROLM Corporation - staff engineer

- Simulated, debugged, and tested cache and memory control ASICs for a minicomputer.
- Microcoded the character string instructions.

4/1983 - 12/1984: Signetics Corporation - staff engineer

- Project leader for a CMOS DMA Interface chip (68431).
- Simulated a TTL VME bus controller chip (68172).
- Redesigned and simulated an oxide isolated ISL Enhanced Video Attribute Controller chip (2675T).
- Simulated a TTL Disk Phase Locked Loop chip (68459).
- Created a standard procedure for developing ASICs.

**LEGAL CONSULTING**

7/2019 - present: Neodron v. Samsung, Microsoft, Amazon, Lenovo, Motorola, Dell, and HP

Law Firm: Russ August & Kabat
Client: Neodron
Court: U.S. International Trade Commission
Case: Inv. No. 337-TA-1162

- Alleged patent infringement of capacitive touch screens
- Wrote expert reports
- Testified in two depositions

6/2019 - 11/2019: iReviewNow & SecurTest v. Datamaxx Applied Technologies

Law Firm: Ausley & McMullen,
Client: iReviewNow & SecurTest
Venue: American Arbitration Association
Case: 01-18-0004-6193

- Alleged breach of contract and trade secret theft of a system for verifying and authenticating background reports and consumer records
- Wrote a declaration and an expert report

- Testified at arbitration hearing

<u>5/2019 - present: ECI Software Solutions. v. John Plyler Plumbing and Hardware, Olshan Lumber Company, Prosperity Computer Solutions, Greg Matatall, Wade Frazier, and Ed Baldridge</u>
Law Firm: Lewis Brisbois Bisgaard & Smith LLP
Client: Prosperity Computer Solutions
Court: U.S. District Court, Northern District of Texas
Case: 3:18-cv-02758-S
- Alleged copyright infringement and trade secret theft of enterprise resource planning software
- Wrote expert report
- Testified in deposition

<u>10/2018 – 2/2020: Automotive Data Solutions v. Directed Electronics Canada</u>
Law Firm: Trojan Law Offices
Client: Automotive Data Solutions
Court: U.S. District Court, Central District of California
Case: 2:18-cv-01560-GW-E
- Alleged copyright infringement of aftermarket automobile remote starter devices
- Alleged trade secret misappropriation of aftermarket automobile remote starter devices
- Wrote expert reports
- Testified in deposition

<u>6/2018 - 3/2019: Sarine Technologies v. Diyora & Bhanderi, et al</u>
Client: I was a neutral expert appointed by the court
Court: Commercial Court at Vadodara, Gujarat, India
Case: Commercial Trademark Suit No. 8 of 2017
- Alleged copyright infringement of diamond imaging software
- Compared code using CodeSuite
- Wrote an expert report
- Affirmed as an expert by the Supreme Court of India

<u>4/2018 - 5/2018: The State of Missouri v. Eric Greitens</u>
Law Firm: St. Louis Circuit Attorney's Office
Client: The State of Missouri
Court: 22nd Circuit Court, Missouri
Case: Cause No. 1822-CR00642
- Alleged criminal privacy violation
- Researched, analyzed, and compared smartphone camera shutter sounds
- Researched smartphone mechanism for transmission of pictures
- Wrote expert reports
- Testified in deposition

<u>1/2018 - 9/2019: Video Gaming Technologies v. Castle Hill Studio, et al</u>
Law Firm: Saul Ewing Arnstein & Lehr LLP
Client: Castle Hill Studios
Court: U.S. District Court, Northern District of Oklahoma
Case: 17-cv-454-GKF-JF
- Alleged trade secret misappropriation of Class II gaming software
- Compared code using CodeSuite
- Wrote an expert report
- Testified in deposition

<u>12/2017 - 9/2018: U.S. Ex Rel Maria Uchytil v. Avanade, et al.</u>
Law Firm: Lowe Graham Jones PLLC

Client: Maria Uchytil
Court: U.S. District Court, Western District of Washington
Case: C12-2091-JCC
- Alleged fraudulent procurement of government contracts for computer software
- Compared software source code using CodeSuite
- Wrote expert report
- Testified in deposition

1/2017 - present: CamSoft Data Systems v. Southern Electronics Supply Company, et al.

Law Firm: Melancon Rimes
Client: CamSoft Data Systems
Court: 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana
Case: Docket No. 582,741
- Alleged trade secret misappropriation of wireless network configuration technology
- Wrote an expert report
- Testified in deposition

12/2016 - 11/2018: Papst Licensing v. Apple, LG Electronics, ZTE Corporation, Samsung Electronics, Lenovo, Motorola Mobility, and Huawei Technologies

Law Firm: DiNovo Price Ellwanger
Client: Papst Licensing
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: Civil Action No. 6:15-cv-1095
- Alleged patent infringement of mobile phones
- Read patents
- Examined mobile phones
- Analyzed software source code
- Wrote expert reports
- Testified in 6 depositions
- Testified at trial

9/2016 - 9/2017: CSS v. Christopher Herrington, Gene Yoho and Compiled Technologies

Law Firm: Robinson & McElwee
Client: Christopher Herrington, Gene Yoho and Compiled Technologies
Court: U.S. District Court, Southern District of West Virginia, Charleston Division
Case: Civil Action 2:16-cv-01762
- Alleged copyright infringement of government document management software
- Alleged trade secret misappropriation of government document management software
- Compared software source code using CodeSuite
- Wrote an expert report
- Testified in two depositions

7/2016 - 1/2017: Commonwealth of MA v. Figuereo, et al.

Law Firm: Committee for Public Counsel Services
Client: Figuereo, et al.
Court: Massachusetts District Court and Boston Municipal Court
Case: 1248CR1075
- Supervised a team of engineers analyzing and testing Draeger Alcotest breathalyzer hardware and firmware for accuracy, consistency, and reliability.

5/2016 - present: In re Papst Licensing GmbH & Co. KG Patent Litigation

Law Firm: Desmarais
Client: Papst Licensing GmbH & Co. KG
Court: U.S. District Court, District of Columbia

Case: Miscellaneous Action No. 07-493-RMC
- Alleged patent infringement of camera interface software
- Read patents and proposed a claim construction
- Wrote a declaration
- Testified in deposition
- Testified at Markman hearing

<u>1/2016 - 6/2016: Verasonics v. Alpinion Medical Systems</u>

Law Firm: Davis Wright Tremaine
Client: Verasonics
Venue: American Arbitration Association, International Centre for Dispute Resolution
Case: 01-15-0002-9484
- Alleged trade secret theft of software for an ultrasound research platform
- Compared software source code using CodeSuite
- Wrote a declaration and an expert report
- Testified at arbitration hearing

<u>12/2015 - 2/2017: ACI Worldwide v. MasterCard Technologies</u>

Law Firms: Faegre Baker Daniels / Robins Kaplan
Client: ACI Worldwide
Venue: U.S. District Court, District of Nebraska
Case: 8:14cv-00031
- Alleged trade secret theft of financial transaction middleware
- Compared software source code using CodeSuite
- Wrote declarations and expert reports
- Testified at depositions

<u>10/2015 - 6/2017: Phoenix Technologies v. VMware</u>

Law Firm: Cooley
Client: Phoenix Technologies
Venue: U.S. District Court, Northern District of California, Oakland Division
Case: 5:15-cv-01414
- Alleged copyright infringement of BIOS code
- Compared software source code using CodeSuite
- Wrote two expert reports
- Testified at deposition
- Testified at trial

<u>7/2015 - 5/2016: Oracle America v. Google</u>

Law Firm: Orrick, Herrington & Sutcliffe
Client: Oracle America
Court: U.S. District Court, Northern District of California
Case: C 10-03561 WHA
- Software copyright infringement of Java API packages
- Wrote expert report
- Testified in deposition

<u>2/2015 - present: Intellisoft v. Acer America</u>

Law Firm: Balaban & Spielberger
Client: Intellisoft
Court: Superior Court of California, County of Santa Clara
Case: 1-14-CV-272381
- Alleged trade secret misappropriation of power management hardware and software
- Examined personal computer hardware and software

- Read patents
- Read industry specifications
- Wrote expert reports
- Testified twice at deposition

<u>2/2015 - 1/2016: NNG v. Ava Enterprises</u>
Law Firm: Lewis Roca Rothgerber Christie LLP
Client: NNG, Kft
Court: U.S. District Court, Central District of California
Case: 2:2014-CV-00220
- Alleged copyright infringement of GPS navigation software
- Wrote expert report

<u>10/2014 - 4/2018: ObjectiVision v. Visionsearch Pty Ltd and University of Sydney</u>
Law Firms: K&L Gates / Marque Lawyers / Allens
Client: ObjectiVision
Court: Federal Court of Australia
Case: NSD 385 of 2014
- Alleged copyright infringement of software for a visual electrophysiology device
- Compared software source code using CodeSuite
- Researched algorithms
- Wrote expert reports
- Collaborated in an expert conclave
- Testified in trial

<u>10/2014 - 6/2016: AAMP of America v. Automotive Data Solutions</u>
Law Firm: Trojan Law Offices
Client: Automotive Data Solutions
Court: U.S. District Court, Middle District of Florida, Tampa Division
Case: 8:13-cv-2019-T-35TGW
- Alleged patent infringement of aftermarket stereo interface devices
- Wrote expert reports
- Participated in inter partes review
- Testified in two depositions

<u>11/2013 - 9/2014: United Services Automobile Association v. Mitek Systems</u>
Law Firm: Wilson Sonsini Goodrich & Rosati / Scheper Kim & Harris
Client: Mitek Systems
Court: U.S. District Court, Western District of Texas, San Antonio Division
Case: SA-12-CA-0282-FB
- Alleged trade secret misappropriation of mobile banking and check imaging software
- Alleged patent infringement of mobile banking and check imaging software
- Analyzed software and examined specifications
- Wrote expert reports

<u>6/2013 - 1/2014: Cellebrite Mobile Synchronization v. Micro Systemation</u>
Law Firm: Pearl Cohen Zedek Latzer Baratz LLP
Client: Cellebrite Mobile Synchronization
Court: U.S. District Court, Virginia Eastern District Court, Alexandria Division
Case: 1:13-cv-01014-TSE-TRJ
- Alleged copyright infringement and trade secret misappropriation of mobile device forensic software
- Compared software binary code using CodeSuite
- Wrote an expert report

<u>4/2013 - 12/2015: Audionics System v. AAMP of Florida</u>

Law Firm: Trojan Law Offices
Client: Audionics System
Court: U.S. District Court, Central District of California, Western Division
Case: 2:12-cv-10763-MMM-JEM

- Alleged patent infringement of aftermarket stereo interface devices
- Wrote expert reports
- Testified in two depositions

<u>2/2013 - 5/2017: Metropolitan Health Corporate v. Neil Harvey Associates</u>

Law Firm: Kritzinger & Co / Attorneys Zumpt
Client: Metropolitan Health Corporate
Venue: Western Cape High Court, Cape Town, South Africa
Case: 10264/2010

- Alleged copyright infringement of healthcare administration software
- Compared software source code using CodeSuite
- Wrote expert reports

<u>10/2012 - 12/2012: E-Tech USA v. 2lemetry</u>

Law Firm: Reed Smith
Client: 2lemetry
Court: U.S. District Court, District of Colorado
Case: cv-03371-REB-KMT

- Alleged trade secret misappropriation of cloud platform software
- Compared software source code using CodeSuite
- Wrote an expert report

<u>8/2012 - 4/2015: Round Rock Research v. SanDisk</u>

Law Firm: Desmarais
Client: Round Rock Research
Court: U.S. District Court, District of Delaware
Case: 12-569 (SLR)

- Alleged patent infringement of flash memory devices
- Analyzed hardware and firmware and examined specifications
- Wrote expert reports
- Testified twice in deposition
- Testified twice in court

<u>8/2012 - 4/2015: SanDisk v. Round Rock Research</u>

Law Firm: Desmarais
Client: Round Rock Research
Court: U.S. District Court, Northern District of California
Case: 1-cv-05243-RS

- Alleged patent infringement of flash memory devices
- Analyzed hardware and firmware and examined specifications
- Wrote expert reports
- Testified in deposition

<u>7/2012 - 5/2013: Kenneth C. Henry v. Petrolink v. Digital Well File</u>

Law Firms: Wright & Close; Martin, Disiere, Jefferson & Wisdom
Client: neutral expert
Court: District Court of Harris County, Texas, 133rd Judicial District
Case: 2010-08178

- Alleged copyright infringement of real-time decision-making software for oilfield data

- Alleged trade secret theft
- Compared software source code using CodeSuite
- Wrote two expert reports

7/2012 - 6/2013: Elan Microelectronics v. Pixcir Microelectronics

Law Firm: Alston & Bird LLP
Client: Elan Microelectronics
Court: U.S. District Court, District of Nevada
Case: 2:10-cv-00014-GMN-(PAL)
- Alleged patent infringement of capacitive touch controller hardware and software

1/2012 - 5/2014: Intellectual Ventures v. Altera, Microsemi, Lattice Semiconductor, and Xilinx

Law Firm: Desmarais LLP
Client: Intellectual Ventures
Court: U.S. District Court, District of Delaware
Case: C.A. No. 10-1065-LPS
- Alleged patent infringement of FPGA and ASIC integrated circuits
- Examined schematics and Verilog code
- Wrote expert reports
- Testified at two depositions

1/2012 - 6/2014: ThinkOptics v. Nintendo of America, et al.

Law Firm: Nix Patterson & Roach LLP
Client: ThinkOptics
Court: U.S. District Court, Eastern District Of Texas, Tyler Division
Case: 6:2011cv00454
- Alleged patent infringement of video game controller hardware
- Wrote expert reports
- Testified at two depositions

1/2012 - 9/2012: E-Micro Corporation v. Google, et al.

Law Firm: Nix Patterson & Roach LLP
Client: E-Micro
Court: U.S. District Court, Eastern District Of Texas, Tyler Division
Case: 6:11-CV-465 (JDL)
- Alleged patent infringement of mobile commerce software

7/2011 - 12/2011: Facebook v. Power Ventures

Law Firm: Orrick, Herrington & Sutcliffe
Client: Facebook
Court: U.S. District Court, Northern District of California
Case: 5:08-cv-05780 JW (HRL)
- Alleged copyright infringement of social network software
- Alleged trademark infringement of social network software
- Alleged DMCA violation
- Alleged violation of the CAN-SPAM Act
- Alleged violation of the Computer Fraud and Abuse Act ("CFAA")
- Alleged violation of the California Comprehensive Computer Data Access and Fraud Act
- Alleged unfair competition
- Wrote expert report

4/2011 - 4/2014: Motorola Mobility, Google v. Microsoft

Law Firm: Sidley Austin
Client: Microsoft

Court: U.S. District Court, Southern District of Florida
Case: 1:10-cv-2406J-MORENO
- Alleged patent infringement of voicemail software
- Alleged patent infringement of graphics software
- Analyzed patents
- Examined source code
- Wrote expert reports
- Testified in deposition

8/2010 - 3/2011: Cross Match Technologies v. Suprema and Mentalix

Law Firm: Latham & Watkins
Client: Cross Match Technologies
Court: U.S. International Trade Commission
Investigation: 337-TA-720
- Alleged patent infringement of fingerprint scanning and imaging software
- Analyzed patents
- Examined source code
- Compared software source code using CodeSuite
- Wrote an expert report
- Testified in deposition

7/2010 - 4/2011: Xpoint Technologies v. Symantec

Law Firm: Quinn Emanuel Urquhart & Sullivan
Client: Symantec
Court: U.S. District Court, District of Delaware
Investigation: 09-CV-0026 (SLR)
- Alleged patent infringement of backup software
- Analyzed patents
- Examined software
- Wrote an expert report

4/2010 - 7/2012: Brocade v. A10 Networks

Law Firms: Orrick, Herrington & Sutcliffe; McDermott, Will & Emery
Client: Brocade
Court: U.S. District Court, Northern District of California, San Jose Division
Case: C 10-03428 LHK (PSG)
- Alleged copying of software for network controllers
- Compared software source code using CodeSuite
- Measured software development using CodeCLOC
- Wrote an expert report and several declarations
- Testified in deposition
- Testified at trial

3/2010 - 9/2010: Datamaxx v. Computer Products of Illinois

Law Firm: Ausley & McMullen
Client: Computer Products of Illinois
Court: U.S. District Court, Northern District Of Florida, Tallahassee Division
Case: 4:09cv435-RH/WCS
- Alleged copying of software to enable law enforcement
- Compared software source code using CodeSuite
- Wrote a declaration and a rebuttal expert report
- Testified in deposition

2/2010 - 7/2010: SplitFish v. Bannco

Law Firm: Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Client: SplitFish
Court: U.S. District Court, Northern Easter District of Virginia, Alexandria Division
Case: l:10cv297
- Preliminary injunction against defendant granted
- Alleged copying of firmware for video game controllers
- Compared software binary code using CodeSuite
- Wrote two declarations

12/2009 - 7/2013: Robin Antonick v. Electronic Arts

Law Firm: Keker & Van Nest LLP
Client: Electronic Arts
Court: U.S. District Court, Northern District of California
Case: 3:11-cv-01543-CRB (EDL)
- Contract dispute
- Examined source code and binary code
- Compared software binary code and source code using CodeSuite
- Wrote expert reports
- Testified in deposition
- Testified in court

10/2009-11/2009: Sigma Six Technologies and Sigma Six Consulting. v. Nagarro and T-Systems Enterprise Services.

Law firm: Ropers, Majeski, Kohn & Bentley PC
Client: Nagarro
Court: U.S. District Court, Northern District of California
Case: C 08-05633 JW
- Alleged trade secret infringement case involving enterprise client user interface software

8/2009 - 11/2010: Zynga v. Green Patch

Law firm: Quinn Emanuel Urquhart & Sullivan
Client: Zynga
Court: U.S. District Court, Northern District of California
Case: CV-09-3636 SC (EMC)
- Alleged copyright infringement case involving web-based social networking game software
- Compared software source code using CodeMatch
- Wrote two declarations and an expert report

8/2009 - 5/2012: De Lage Landen Operational Services v. Third Pillar Systems

Law Firm: Wilson Sonsini Goodrich & Rosati
Client: Third Pillar Systems
Court: U.S. District Court, Eastern District of Pennsylvania
Case: 09-cv-02439-HB
- Alleged trade secret misappropriation and contract dispute involving lending and leasing software
- Compared software source code using CodeSuite
- Wrote an expert report and a rebuttal expert report
- Testified in deposition
- Testified at trial

2/2009 - 10/2009: Minden Schipper & Associates v. Cancercare Manitoba (Varian Medical Systems)

Client: Varian Medical Systems
Court: Queen's Bench, Winnipeg Centre, Canada
Case: CI 05-01-45377

- Alleged trade secret misappropriation and copying of oncology diagnosis expert system software.
- Compared software source code using CodeSuite
- Wrote an expert report

11/2008 - 1/2010: Applied Materials v. Advanced Micro-Fabrication Equipment Co.

Law firm: Goodwin Procter
Client: Applied Materials
Court: U.S. District Court, Northern District Of California
Case: C07 05248 JW (PVT)
- Alleged copying of software for semiconductor manufacturing machines
- Compared software source code using CodeSuite
- Wrote expert reports
- Testified in deposition

9/2008 - 9/2009: Abanco Investments v. GuestLogix

Law firm: Patterson, Thuente, Skaar & Christensen
Client: GuestLogix
Court: U.S. District Court, Northern District of Illinois
Case: 07 C 1071
- Alleged trade secret theft involving point-of-sale software
- Compared software source code using CodeSuite
- Wrote an expert report

9/2008 - 3/2010: Personnel Department v. CareerBuilder

Law firm: Jones, Day, Reavis & Pogue
Client: CareerBuilder
Court: U.S. District Court, District of Vermont
Case: 2:08-cv-59-wks
- Alleged trade secret theft involving resume building software
- Compared software source code using CodeSuite
- Wrote an expert report

9/2008 - 12/2008: Honeywell, Metrologic, OmniPlanar v. Datalogic

Law firm: Robins, Kaplan, Miller & Ciresi
Client: OmniPlanar
Court: U.S. District Court, District of New Jersey
Case: 1:2008cv05234
- Alleged copyright infringement and trade secret theft involving bar code scanner firmware
- Compared software source code to software binary code using CodeSuite

7/2008-10/2008: Facebook v. StudiVZ

Law firm: Orrick, Herrington & Sutcliffe
Client: Facebook
Court: U.S. District Court, Northern District of California
Case: 5:08-CV-03468 JF
- Alleged copyright infringement case involving web-based social networking software
- Compared software source code using CodeSuite

4/2008 - 12/2010: Esbin & Alter v. Zappier, et al.

Law firm: Alter & Alter
Client: Esbin & Alter
Court: U.S. District Court, Southern District of New York
Case: 08 Civ. 313
- Contract dispute case involving billing and document management software

- Compared software source code using CodeSuite
- Wrote two declaration and two expert reports

4/2008 - 12/2008: Piper Jaffray v. Vermilion Capital Management

Law firm: Patterson, Thuente, Skaar & Christensen
Client: Vermilion Capital Management
Court: Minnesota District Court, Fourth Judicial District, County of Hennepin
Case: 07-20203
- Alleged trade secret case involving stock market technical analysis software
- Compared software source code using CodeSuite
- Wrote an expert report

4/2008 - 11/2008: Intelligraphics v. Marvell Semiconductor

Law firm: Sommers and Schwartz
Client: Intelligraphics
Court: U.S. District Court, Northern District Of California, San Francisco Division
Case: C-07-2499 JCS
- Contract dispute case involving WLAN firmware and drivers
- Compared software source code using CodeSuite
- Wrote an expert report
- Testified at deposition

3/2008 - 8/2008: Optovue v. Carl Zeiss Meditec

Law firm: Nixon Peabody
Client: Carl Zeiss Meditec
Court: U.S. District Court, Northern District of California, Oakland Division
Case: C 07-03010 CW
- Alleged copyright/trade secret theft case involving optical coherence tomography software
- Compared software source code using CodeSuite
- Wrote an expert report

2/2008 - 4/2008: Gemstar v. Digeo

Law firm: Ropes & Gray
Client: Gemstar
Court: U.S. District Court, Central District of California, Western Division
Case: CV-06-6519
- Alleged patent infringement case involving program guide displays
- Wrote an expert report

1/2008 - 4/2014: MSC Software v. Altair Engineering, et al.

Law firm: Dykema Gossett
Client: MSC Software
Court: U.S. District Court, Eastern District of Michigan, Southern Division
Case: 2:07-cv-12807
- Alleged trade secret theft case involving motion simulation software
- Compared software source code using CodeSuite
- Wrote a declaration and an expert report
- Testified at a hearing
- Testified in deposition

5/2007 - 12/2008: The MathWorks v. COMSOL

Law firm: Jones, Day, Reavis & Pogue
Client: The MathWorks, Inc.
Court: U.S. District Court, Eastern District of Texas, Tyler Division

– 13 –

Case: 6:06-CV-335
- Alleged copyright infringement case involving mathematical modeling software
- Compared software source code using CodeSuite

5/2007 - 12/2008: The MathWorks v. COMSOL

Law firm: Jones, Day, Reavis & Pogue
Client: The MathWorks, Inc.
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:06-CV-334
- Alleged patent infringement case involving mathematical modeling software

5/2007 - 6/2007: Third Party Verification v. SignatureLink

Law firm: Law Offices of Brian S. Steinberger
Client: Third Party Verification
Court: U.S. District Court, Middle District of Florida
Case: 6:06-cv-00415
- Alleged copyright infringement case involving web-based signature capture software
- Compared software source code using CodeSuite
- Wrote an expert report

4/2007 - 7/2008: Symantec v. Commissioner of Internal Revenue

Law firm: Baker & McKenzie
Client: Symantec
Court: U.S. Tax Court
Case: 12075-06
- Software transfer pricing tax dispute
- Software comparison using CodeDiff and CLOC methodology
- Wrote an expert report
- Testified at trial

4/2007 - 5/2007: Kernius & Frise v. International Electronics

Law firm: Zito tlp
Client: Kernius & Frise
Case: 05-CV-1927
Court: U.S. District Court, District of Maryland
- Alleged patent infringement case involving modems and call waiting
- Wrote an expert report
- Testified in deposition

2/2007 - 8/2008: Quantum Research Group (Atmel) v. Apple, Cypress, Fingerworks

Law firm: Zito tlp, Sidley Austin
Client: Quantum Research Group (Atmel)
Court: U.S. District Court, District of Maryland
Case: 05-cv-03408-WMN
- Alleged patent infringement case involving capacitive sensing devices
- Assisted with claim construction
- Wrote an expert report
- Testified in deposition

8/2006 - 8/2007: AdTech RFID v. Adept Identification Technologies, et al.

Law firm: Wilson Sonsini Goodrich & Rosati
Client: Adept Identification Technologies
Court: Superior Court of Santa Clara County California
Case: 1:06-CV-057464
- Alleged trade secret theft case involving RFID software

- Compared software source code using CodeSuite
- Wrote an expert report

6/2006 - 2/2007: Medinformatix v. AcerMed
Law firm: Timothy McGonigle
Client: MedInformatix
Arbitration: JAMS
Ref: 1220035252
- Alleged trade secret case involving electronic medical records software.
- Assisted with determination of trade secrets
- Compared software source code using CodeSuite
- Wrote declarations
- Testified in deposition

5/2006 - 11/2006: Iconix v. NetPickle, et al.
Law firm: Orrick, Herrington & Sutcliffe
Client: NetPickle
Court: U.S. District Court, Northern District of California, Oakland Division
Case: 4:06-cv-02201
- Alleged copyright infringement case involving web-based presentation software
- Compared software source code using CodeSuite
- Wrote a declaration
- Wrote an expert report
- Testified in deposition

4/2006 - 10/2006: Forgent v. Microsoft et al.
Law firm: Susman Godfrey
Client: Forgent
Court: U.S. District Court, Northern District of California, San Jose Division
Case: M:05-CV-01654
- Alleged patent infringement case involving JPEG encoding of pictures in files
- Reverse engineered video equipment

2/2006 - 5/2008: Rasterex Holdings v. Research in Motion
Law firm: Kilpatrick Stockton
Client: Rasterex Holdings
Court: Superior Court of Fulton County, State of Georgia
Case: 2003-cv-76785
- Alleged copyright infringement case involving mobile document translation and storage software
- Compared software source code using CodeSuite
- Wrote an expert report
- Testified in deposition

2/2006 - 9/2006: Medinformatix v. Camtronics Medical Systems
Law firm: Timothy McGonigle
Client: MedInformatix
Court: U.S. District Court, Central District of California
Case: 2:05-cv-04829 SJO
- Alleged trade secret theft case involving electronic medical records software
- Assisted with determination of trade secrets
- Wrote declarations

8/2005 - 12/2007: Moneygram Payment Systems v. Enterprise Payment Solutions
Law firm: Michael Best & Friedrich LLP

Client: Moneygram
Court: U.S. District Court, Eastern District of Tennessee
Case: 1:05-cv-00172
- Alleged copyright infringement case involving ACH financial software
- Compared software source code using CodeSuite
- Wrote an expert report

8/2005 - 8/2006: Silvaco v. Specular
Law firm: Wilson Sonsini Goodrich & Rosati
Client: Specular
Court: Superior Court of Santa Clara County California
Case: 1:04-cv-031951
- Alleged trade secret case involving electronic design automation (EDA) software
- Compared software source code using CodeSuite
- Wrote an expert report

7/2005-2/2008: ConnectU v. Facebook, et al.
Law firm: Orrick, Herrington & Sutcliffe
Client: Facebook
Court: U.S. District Court, District of Massachusetts
Case: 1:04-cv-11923
- Alleged copyright infringement case involving social network software
- Compared software source code using CodeSuite

4/2005 - 3/2007: Merchant Transaction Systems, et al. v. Nelcela, et al.
Law firm: Lewis & Roca
Client: Merchant Transaction Systems/POST Integration/Ebocom
Court: U.S. District Court, District of Arizona
Case: 2:02-cv-01954
- Alleged copyright infringement involving credit card processing software
- Compared software source code using CodeSuite
- Wrote an expert report
- Testified in deposition

4/2005: Brod v. Lev, et al.
Law firm: Wilson Sonsini Goodrich & Rosati
Client: Lev
Court: Superior Court of Santa Clara County California
Case: 1:03-cv-005813
- Alleged copyright infringement case involving Internet acceleration software
- Compared software source code using CodeSuite

3/2005 - 12/2005: American Video Graphics v. Electronic Arts, et al.
Law firm: McKool Smith
Client: AVG
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:04-CV-398
- Alleged patent infringement case involving 3D graphics software algorithms
- Examined source code for over 50 video games
- Wrote claim charts for each video game

3/2005 - 12/2005: American Video Graphics v. Sony Corporation of America, et al.
Law firm: McKool Smith
Client: AVG
Court: U.S. District Court, Eastern District of Texas, Tyler Division

Case: 6:04cv399
- Alleged patent infringement case involving 3D graphics hardware algorithms
- Examined graphic chips

8/2004 - 12/2007: Creative Science Systems v. Forex Capital Markets

Law firm: Baker & McKenzie/Sommers and Schwartz
Client: Creative Science Systems
Court: U.S. District Court, Northern District of California
Case: 5:04-cv-03746
- Alleged copyright infringement involving web-based financial software
- Compared software source code using CodeSuite
- Compared software object code
- Wrote a declaration and an expert report
- Testified in deposition

8/2004 - 3/2005: XIOtech v. Compellent Technologies, et al.

Law firm: Faegre & Benson
Client: Compellent
Court: Minnesota District Court, Fourth Judicial District, County of Hennepin
Case: 04-5065
- Alleged trade secret theft involving storage area network (SAN) software
- Compared software source code using CodeSuite
- Compared features and researched prior art for storage area network (SAN) software
- Wrote an expert report

8/2004 - 9/2004: OpenTable v. Smart Restaurant Solutions

Law firm: Wilson Sonsini Goodrich & Rosati
Client: Smart Restaurant Solutions
Court: Superior Court of the State of California for the County of San Francisco
Case: CGC-03-424516
- Alleged copyright infringement involving restaurant management software
- Compared software source code using CodeSuite
- Wrote an expert report

7/2004 - 2/2005: Zoran and Oak Technology v. MediaTek, et al.

Law firm: Wilson Sonsini Goodrich & Rosati /Hogan & Hartson
Client: MediaTek
Court: U.S. International Trade Commission
Investigation: 337-TA-506
- Alleged patent infringement involving CD-ROM/DVD controller hardware
- Examined VHDL for two CD-ROM/DVD controller chips to determine their architectures and implementations
- Wrote an expert report and created exhibits for trial
- Testified in deposition
- Testified at trial

4/2004 - 11/2004: Agere Systems v. Intersil

Law firm: Kirkland & Ellis
Client: Agere
Court: U.S. District Court, Eastern District of Pennsylvania
Case: 02-CV-08219, 02-CV-1544
- Alleged copyright infringement and contract dispute involving WLAN chips
- Compared firmware source code using CodeSuite
- Examined Verilog and VHDL source code

- Wrote an expert report and rebuttal to opposition expert report

4/2003 - 5/2003: Alvis v. Hewlett-Packard

Law firm: Drinker Biddle & Reath
Client: Hewlett Packard
Court: U.S. District Court, District Court of Jefferson County, Texas
Case: A-164,880
- Class action suit involving reliability of floppy disk drives and software patches
- Wrote an expert report
- Testified in deposition

4/2003 - 5/2003: MediaTek Software Clean Room Development Project

Law firm: MacPherson Kwok
Client: MediaTek
- Clean room code development
- Reviewed source code and compared different source code routines for similarities

3/2003 - 5/2003: Research In Motion v. Good Technology

Law firm: Jones, Day, Reavis & Pogue
Client: Research In Motion
Court: U.S. District Court, District of Delaware
Case: 02-556-JJF, 02-1286-JJF, 02-1338-JJF
- Alleged patent infringement case involving handheld wireless devices and supporting software
- Analyzed software source code
- Assisted with deposition of opposing expert
- Wrote claim charts

8/2001 - 9/2001: Intel v. VIA Technologies

Law firm: Howrey Simon Arnold & White
Client: Intel
Court: U.S. District Court, Northern District of California
Case: C99-03062
- Alleged patent infringement case involving computer motherboards
- Examined computer motherboards for patent infringement

7/2001 - 4/2003: Intel v. VIA Technologies

Law firm: Dewey Ballantine/Brobeck, Phleger & Harrison
Client: Intel
Court: U.S. District Court, Western District of Texas
Case: A-01-CA-602-SS
- Alleged patent infringement cases involving CPUs and computer chipsets
- Assisted with claim construction
- Wrote test case software in assembly language
- Examined computer motherboards
- Analyzed Verilog code of CPUs
- Wrote several expert reports
- Wrote several claim charts

3/2001 - 3/2001: KRS Distributing v. Gatten Insurance

Law firm: Stone & Hiles
Client: Gatten Insurance
- Insurance claim
- Examined a fax machine to retrieve stored documents

<u>7/1997 - 3/1999: Texas Instruments v. Hyundai Electronics Industries Co.</u>

Law firm: Jones, Day, Reavis & Pogue
Client: Texas Instruments
Court: U.S. District Court, Eastern District of Texas
Case: 2:98CV74

- Alleged patent infringement involving semiconductor wafer handling hardware, software, and communication protocols
- Reverse engineered hardware and software in order to determine infringement.
- Constructed exhibits
- Assisted with the writing of expert reports
- Assisted with the writing of claim charts

<u>8/1996 - 12/1996: Texas Instruments v. Samsung Electronics, et al.</u>

Law firm: Jones, Day, Reavis & Pogue
Client: Texas Instruments
Court: U.S. District Court, Eastern District of Texas
Case: 2:96-CV-1, 2:96-CV-2

- Alleged patent infringement involving semiconductor wafer handling hardware, software, and communication protocols
- Reverse engineered hardware and software in order to determine infringement
- Constructed exhibits
- Assisted with the writing of expert reports
- Assisted with the writing of claim charts

<u>2/1996 - 7/1996: Cirrus Logic v. Agarwal, et al.</u>

Law firm: Morrison & Foerster
Client: Cirrus Logic
Court: Superior Court of Santa Clara County California
Case: CV 745373

- Alleged trade secret case involving semiconductors and LCD display technology
- Examined validity of trade secrets
- Reconstructed the history of an internal engineering project
- Researched prior art

**HONORS, AWARDS, AND DISTINCTIONS**

**Engineering and Science**

1. 2018 CREST (Cupertino Recognizes Extra Steps Taken) Award, Innovator of the Year

2. Outstanding Engineer in a Specialized Field: For Pioneering Contributions to the Field of Forensic Software Analysis, IEEE Region 6 Central Area, 2015.

3. Outstanding Engineer in a Specialized Field: For Pioneering Contributions to the Field of Forensic Software Analysis, IEEE Santa Clara Valley Section, 2015.

4. Final Round, 2011 Jolt Awards, for the book The Software IP Detective's Handbook: Measurement, Comparison, and Infringement Detection.

5. Outstanding Engineer in a Specialized Field: For Innovative Contributions in the Area of Forensic Software Analysis, IEEE Santa Clara Valley Section, 2010.

6. Session's Best Paper Award, The11th World Multi-Conference on Systemics, Cybernetics and Informatics, 2007.

7. The Number 5 Programmable Logic "How To" article of 2006, Programmable Logic DesignLine newsletter.

8. Finalist, Design News magazine 2006 Golden MouseTrap Award: Design and Development Software Tools, for SynthOS.

9. Winner, Software Development magazine 2003 Jolt Reader's Choice Award for the book *Designing with FPGAs and CPLDs*.

10. Senior Member, ACM

11. Senior Member, IEEE

12. Top PLD/FPGA News and Feature Article for 2003, CMP Media

13. Winner, Wyle/EE Times American By Design Contest, 1994

14. Stanford Graduate Engineering Fellowship

15. Eta Kappa Nu (Electrical Engineering honor society)

16. Association for Educational Data Systems Honorable Mention

17. Bausch & Lomb Honorary Science Award

**Writing and Filmmaking**

1. Indie Excellence 2013 Winner, Humor category, for the novel *Good Intentions*.

2. Indie Excellence 2013 Finalist, Political Thriller category, for the novel *Good Intentions*.

3. Honorable Mention, 2013 San Francisco Book Festival, for the novel *Horror Flick*.

4. Pinnacle Book Achievement Award 2012 for the novel *Good Intentions*.

5. Semifinalist, November 2011 Amazon Studios Best Kids and Family Script Award, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

6. Semifinalist, October 2011 Amazon Studios Best Script Award, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

7. Semifinalist, September 2011 Amazon Studios Best Script Award, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

8. Semifinalist, August 2011 Amazon Studios Best Script Award, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

9. Semifinalist, July 2011 Amazon Studios Best Script Award, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

10. Semifinalist, June 2011 Amazon Studios Best Sci-Fi/Action Script Award, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

11. Semifinalist, June 2011 Amazon Studios Best Script Award, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

12. Semifinalist, 2004 Cinequest Screenwriting Competition, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

13. Second Place, 2002 Autumn Moon Productions Screenplay Awards, for the screenplay "Horror Flick."

14. Third Place, 2002 Autumn Moon Productions Screenplay Awards, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

15. Honorary Mention, 2002 Autumn Moon Productions Screenplay Awards, for the screenplay "Sex and Violence."

16. Certificate of Merit, 2002 International Screenplay Competition, for the screenplay "Horror Flick."

17. Certificate of Merit, 2002 International Screenplay Competition, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

18. Certificate of Merit, 2002 International Screenplay Competition, for the screenplay "Sex and Violence."

19. First Place, 2001 Focus on Writers Contest, for the screenplay "Horror Flick."

20. Special Mention Winner, 2001 Screenwriting Showcase Awards, for the screenplay "Horror Flick."

21. Finalist, 2001 Empyrion Screenplay Competition, for the screenplay "Sex and Violence."

22. Finalist, 2001 New Century Writer Awards, for the screenplay "Horror Flick."

23. Top Ten Finalist, 2001 Tennessee Screenwriting Association Competition, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

24. Semifinalist, 2001 WordsFromHere Contest, for the screenplay "Horror Flick."

25. Semifinalist, 2001 Venice Arts Screenwriting Competition, for the screenplay "Horror Flick."

26. Semifinalist, 2001 National Screenwriting Competition, for the screenplay "Horror Flick."

27. Semifinalist, 2001 National Screenwriting Competition, for the screenplay "Sex and Violence."

28. Quarterfinalist, 2001 Fade In: Screenwriting Awards, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

29. Quarterfinalist, Texas Film Institute 2001 Screenplay Competition, for the screenplay "Horror Flick."

30. Top Finalist, BDR 2000 Productions New Millennium Screenplay 2001 Contest, for the screenplay "Horror Flick."

31. Certificate of Merit, Writer's Digest 2000 National Self-Published Book Awards, for the novel "Horror Flick."

32. Semifinalist, 2000 poetry.com North American Open Poetry Contest, for the poem "I Remember."

33. Quarterfinalist, 1999 New Century Writer Awards, for the novel "Horror Flick."

34. Quarterfinalist, 1999 New Century Writer Awards, for the screenplay "The Amazing Adventure of Edward and Dr. Sprechtmachen."

35. Third Place, 1998 Magnum Opus Discovery Awards of the C.C.S. Entertainment Group and the Hollywood Film Festival, for the novel "Horror Flick."

36. Quarterfinalist, 1998 Empire Screenplay Contest, for the screenplay "Sex and Violence."

37. A reading of my screenplay "Sex and Violence" was performed by the Independent Media Artists Group (IMAGE), on August 15th, 1998.

38. Vermont Studio Center scholarship to attend a one-month writing retreat, April 1998.

39. Semifinalist, 1997 Monterey County Film Contest, for the screenplay "Sex and Violence."

40. First Place, 1993 Foster City Annual Writer's Contest, for unpublished short story "The Contest."

41. Semifinalist, 1993 national Syndicated Fiction Project, for unpublished short story "The Contest."

42. First Place, 1990 Foster City Annual Writer's Contest, for unpublished short story "The Lost and Found Virginity."

43. 1989 Philadelphia International Film Festival showing of the short film "Writer's Block."

44.   First Place, 1988 Fremont Film Festival, for the short film "February 20, 1988."

**Miscellaneous**

1.   Albert Nelson Marquis Lifetime Achievement 2018.

2.   United Synagogue Award for Excellence

3.   Biography in Who's Who in America

4.   University Unions Distinguished Service Award

5.   Phi Beta Kappa

6.   Ivy League Honor Society

7.   Alpha Lambda Delta honor society

8.   Dual Degree Program, Cornell University

9.   National Merit Scholarship

10.   Literary Society Foundation Award Gold Medal, Excellence in German

11.   Literary Society Foundation Award Bronze Medal, Excellence in German

12.   Rumsey Scholarship, Cornell Club of Philadelphia

13.   City of Philadelphia Scholarship

14.   School District of Philadelphia Scholarship

15.   Fourth Prize, Colonial Philadelphia Historical Society Essay Contest

16.   Founder, Delaware Valley Teen Mensa

**SPECIAL KNOWLEDGE AND SKILLS**

- CodeSuite certified.
- Software source code analysis and synthesis
- Computer architectures: AMD 29000, CRAY XMP, Data General MV8000, IBM PC, IDT R4650, Intel 8051, Intel x86 family, Motorola 68000, 68HC11, 68HC08, 68HC05, TI TMS320Cxx, TMS340xx
- Networking protocols: ATM, Ethernet
- Buses: ADB, EISA $I^2C$, ISA, MXI, PCI, SBUS, VME
- Hardware programming languages: ABEL, AHDL, CUPL, PALASM, Verilog, VHDL
- Software programming languages: APL, BASIC, C, C++, Delphi, FOCAL, FORTRAN, Java, LISP, Pascal, Perl, PHP, PL/1, PowerBuilder, SQL, Visual BASIC, various assembly, machine languages
- Operating systems: AOS/VS, MSDOS, UNIX, VMS, Windows 3.1/NT/9x/2000/XP/Vista
- Workstations: Apple Macintosh, Daisy, IBM PC, Hewlett Packard, SUN, VALID
- Electronic Design Automation (EDA)
- CAD tools: Concept, Futurenet, MAX+Plus II (Altera), MDE (LSI Logic), Mentor, Orcad, PROCapture, P-CAD, Schema, Viewlogic, XACT (Xilinx)
- Simulation accelerators: Mentor Graphics, Cadence Design Systems
- Hardware emulators: Mentor Graphics, Cadence Design Systems
- ASIC design
- FPGA and CPLD design: Actel, Altera, Lattice, Xilinx
- Miscellaneous design experience: Cache memory, telecommunications, data communications, digital signal processing (DSP), digital logic (CMOS, ECL, TTL), analog
- Patent infringement
- Trade secret theft
- Copyright infringement

- Plagiarism detection
- Solid state theory
- Information theory

**EDUCATION**

Master of Science in Electrical Engineering, 1982, Stanford University

Bachelor of Science with distinction in Electrical Engineering, 1981, Cornell University

Bachelor of Arts cum laude in Physics and with distinction in all subjects, 1981, Cornell University

De Anza College Film Department, 1987 - 1990

**BOOKS**

1. Bob Zeidman, *Just Enough Electronics to Impress Your Friends and Colleagues*, Swiss Creek Publications, Cupertino, CA, 2013, 214pp.

2. Bob Zeidman, The Software IP Detective's Handbook: Measurement, Comparison, and Infringement Detection, Prentice-Hall, Upper Saddle River, NJ, 2011, 450pp.

3. Clive Maxfield, *FPGAs: World Class Designs*, Elsevier Inc., Burlington, MA, 2009, Chapter 1 (reprint).

4. Ashby, Baker, Ball, Crowe, Hayes-Gill, Hickman, Kester, Mancini, Grout, Pease, Tooley, Williams, Wilson, Zeidman, *Circuit Design: Know It All*, Elsevier Inc., Burlington, MA, 2008, Chapters 27-29 (reprint).

5. R. C. Cofer, Clive Maxfield, Bob Zeidman, Richard Munden, Rick Gentile, *Newnes FPGAs: ebook Collection*, Elsevier Science & Technology Books, Burlington, MA, 2008 (reprint).

6. Bob Zeidman, *Designing with FPGAs and CPLDs*, CMP Books, Lawrence, KS, 2002, 220pp.

7. Bob Zeidman, *Introduction to Verilog*, IEEE Press, Piscataway, NJ, 2000, 99pp.

8. Bob Zeidman, *Verilog Designer's Library*, Prentice-Hall, Upper Saddle River, NJ, 1999, 411pp.

9. Bob Zeidman, *Good Intentions*, Swiss Creek Publications, Cupertino, CA, 2012, 259pp.

10. Bob Zeidman, *Horror Flick*, Swiss Creek Publications, Cupertino, CA, 1999, 341pp.

11. Bob Zeidman, *The Amazing Adventure of Edward and Dr. Sprechtmachen*, Swiss Creek Publications, Cupertino, CA, 1998, 73pp.

**PAPERS AND PRESENTATIONS**

1. Zeidman, Bob, "When Science Becomes Biased," The Epoch Times, https://www.theepochtimes.com/when-science-becomes-biased_3343739.html, May 9, 2020.

2. Zeidman, Bob, "A Progressive's Guide To Socialism," CD Media, https://creativedestructionmedia.com/opinion/2020/03/05/a-progressives-guide-to-socialism, March 5, 2020.

3. Zeidman, Bob, "The Other US Women's Champion Soccer Team," CD Media, https://creativedestructionmedia.com/analysis/2019/10/17/the-other-us-womens-champion-soccer-team, October 17, 2019.

4. Zeidman, Bob, "Clarifying the U.S. Approach to Copyright and Plagiarism," *IPWatchdog*, https://www.ipwatchdog.com/2019/08/06/clarifying-u-s-approach-copyright-plagiarism, August 6, 2019.

5. Zeidman, Bob, "The History of Digital Game Intellectual Property from Atari to Zynga," Vintage Computer Festival West, August 5, 2018.

6. Zeidman, Bob, "Oracle v. Google: Protecting Software Development, Not Destroying It," *IPWatchdog*, http://www.ipwatchdog.com/2018/07/15/oracle-v-google-protecting-software-development/id=99359, July 16, 2018.

7. Zeidman, Bob, "RPost Does Not Meet Any Definition of 'Patent Troll'," *IPWatchdog*, (http://www.ipwatchdog.com/2017/12/05/rpost-not-patent-troll/id=90783), December 5, 2017.

8. Zeidman, Robert, et al., In The Supreme Court of the United States, Brief of a Group of Inventors, Entrepreneurs, and Small Business Owners as Amici Curiae in Support of Petitioner, RPost Communications Limited, RMail Limited, RPost International Limited And RPost Holdings Incorporated, Petitioners, V. GoDaddy.com LLC Respondent, No. 17-695, December 1, 2017.

9. Zeidman, Bob, "Was MS-DOS code copied from CP/M?" Vintage Computer Festival West, August 6, 2016.

10. Zeidman, Bob, "Facebook, Oculus, ZeniMax, and Nonliteral Copying of Code" *IPWatchdog* (http://www.ipwatchdog.com/2017/02/07/facebook-oculus-zenimax-nonliteral-copying-code), February 7, 2016.

11. Zeidman, Bob, "What If Someone Steals Your Code?" Better Software, Fall 2016.

12. Zeidman, Bob, "Source Code Comparison of DOS and CP/M," Journal of Computer and Communications (http://www.scirp.org/journal/PaperInformation.aspx?PaperID=71259), Vol.4 No.12, October 2016.

13. Zeidman, Bob, "Was DOS copied from CP/M?" *Embedded.com* (http://www.embedded.com/electronics-blogs/say-what-/4442498/Was-DOS-copied-from-CPM-), August 6, 2016.

14. Zeidman, Bob, "Software, Hard Case," *Legaltech News* (http://www.lawtechnews-digital.com/lawtechnews/august_2016?sub_id=4m2w4egdq99X&folio=30&pg=30#pg30), August 2016.

15. Zeidman, Bob and Gupta, Eashan, "Why Libertarians Should Support a Strong Patent System" *IP Frontline* (http://ipfrontline.com/2016/03/why-libertarians-should-support-a-strong-patent-system), March 15, 2016.

16. Zeidman, Bob, "Not Getting the Truth about the FBI, Apple, the San Bernardino Terrorists, and Hacking an iPhone" *IPWatchdog* (http://www.ipwatchdog.com/2016/02/22/youre-not-hearing-the-truth-about-the-fbi-apple-the-san-bernardino-terrorists-and-hacking-an-iphone), February 22, 2016.

17. Zeidman, Bob, "Drawing Accurate Forensic Conclusions," *Digital Forensics*, Issue 26, February 2016.

18. Zeidman, Bob and Gupta, Eashan, "Why Libertarians Should Support a Strong Patent System" *IPWatchdog* (http://www.ipwatchdog.com/2016/01/05/why-libertarians-should-support-a-strong-patent-system), January 5, 2016.

19. Zeidman, Bob, "The Anti-Marcus Lemonis Principle for Succeeding In Business," RealClearMarkets, http://www.realclearmarkets.com/articles/2015/12/02/the_anti-marcus_lemonis_principle_for_succeeding_in_business_101899.html, December 2, 2015.

20. Zeidman, Bob, "An Overview of Software Forensics," *IP Frontline*, http://ipfrontline.com/2015/10/an-overview-of-software-forensics, October 27, 2015.

21. Zeidman, Bob, "RISC needs to make a comeback," *Embedded Computing Design*, (http://embedded-computing.com/guest-blogs/risc-needs-to-make-a-comeback), September 15, 2015.

22. Zeidman, Bob, "Are wearables wearing thin?" *IT World*, (http://www.itworld.com/article/2979834/internet-of-things/are-wearables-wearing-thin.html), September 3, 2015.

23. Zeidman, Bob, "An inventor's perspective on patent reform" *The Hill* (http://thehill.com/blogs/congress-blog/technology/250593-an-inventors-perspective-on-patent-reform), August 10, 2015.

24. Zeidman, Bob, "How much does your thermostat know about you?" *IT World*, (http://www.itworld.com/article/2952744/internet-of-things/how-much-does-your-thermostat-know-about-you.html), July 30, 2015.

25. Zeidman, Bob, "Living in a multi-processor world," *Embedded Computing Design*, (http://embedded-computing.com/guest-blogs/living-in-a-multi-processor-world), June 19, 2015.

26. Zeidman, Bob, "Software Forensics: Qualifying Tools and Experts Who Use Them" *IPWatchdog* (http://www.ipwatchdog.com/2014/10/31/software-forensics-qualifying-tools-and-experts), October 31, 2014.

27. Zeidman, Bob, "Software Forensics: Objectively Proving Infringement or Misappropriation" *IPWatchdog* (http://www.ipwatchdog.com/2014/10/27/software-forensics-objectively-proving-infringement-or-misappropriation), October 27, 2014.

28. Zeidman, Bob, "Misunderstanding Plagues the Patent System" *Electronic Design* (http://electronicdesign.com/embedded/misunderstanding-plagues-patent-system), July 23, 2014.

29. Zeidman, Bob, "Sloppy, Misleading Yale Paper Challenges University Patenting" *IPWatchdog* (http://www.ipwatchdog.com/2014/07/15/sloppy-misleading-yale-paper-challenges-university-patenting), July 15, 2014.

30. Zeidman, Bob, "ASOS: A new software development paradigm for the Internet of Things" Embedded.com, http://www.embedded.com/design/operating-systems/4431826/NEW--ASOS--A-new-software-development-paradigm-for-the-Internet-of-Things---Part-1--Basic-building-blocks and http://www.embedded.com/design/operating-systems/4431775/2/ASOS--A-new-RTOS-paradigm-for-the-Internet-of-Things---Part-2--Building-a-project-file, June 30, 2014.

31. Zeidman, Bob, "A Code Correlation Comparison of the DOS and CP/M Operating Systems" *Journal of Software Engineering and Applications* (http://www.scirp.org/journal/PaperInformation.aspx?PaperID=46362#.U4WDefldWCU), May 27, 2014.

32. Zeidman, Bob, "The bogeymen destroying the patent system" *San Jose Mercury News* (http://www.mercurynews.com/opinion/ci_25579281/bob-zeidman-bogeymen-destroying-patent-system), April 17, 2014.

33. Zeidman, Bob, "Fortune Magazine's Unusual Position on Non-Practicing Entities" *IPWatchdog* (http://www.ipwatchdog.com/2014/04/10/fortune-magazines-unusual-position-on-non-practicing-entities), April 10, 2014.

34. Zeidman, Bob, "Did Bill Gates Steal the Heart of DOS?" *IEEE Spectrum* (http://spectrum.ieee.org/computing/software/did-bill-gates-steal-the-heart-of-dos), July 2012.

35. Zeidman, Bob, "This one really takes the cake—and the schematics," (http://www.edn.com/electronics-blogs/tales-from-the-cube/4390916/This-one-really-takes-the-cake-and-the-schematics) EDN magazine, July 2012.

36. Zeidman, Bob and Kovanis, Evan, "Round 2: Did Oracle Overlook the Smoking Gun in its Case against Google?" *IPWatchdog* (http://www.ipwatchdog.com/2012/07/11/round-2-did-oracle-overlook-the-smoking-gun-in-its-case-against-google), July 11, 2012.

37. Kovanis, Evan and Zeidman, Bob, "Did Oracle Overlook the Smoking Gun in its Case against Google?" *IPWatchdog* (http://www.ipwatchdog.com/2012/06/26/did-oracle-overlook-the-smoking-gun-in-its-case-against-google), June 26, 2012.

38. Melling, L. and Zeidman, B., "Comparing Android Applications to Find Copying," *Journal of Digital Forensics, Security and Law*, Vol. 7, No. 1, 2012.

39.    Zeidman, Bob, "Program Identifiability: How easily can you spot your code?" *Embedded.com* (http://www.embedded.com/design/embedded/4374526/Program-Identifiability--How-easily-can-you-spot-your-code-), June 7, 2012.

40.    Zeidman, Bob, "Setting the Record Straight: Patent Trolls vs. Progress" *IPWatchdog* (http://www.ipwatchdog.com/2012/05/01/setting-the-record-straight-patent-trolls-vs-progress), May 1, 2012.

41.    Baer, N. and Zeidman, B., "Measuring Whitespace Pattern Sequences as an Indication of Plagiarism," *Journal of Software Engineering and Applications*, 2012, April 2012.

42.    Zeidman, Bob, "Will Congress Break the Internet?" *IPWatchdog* (http://www.ipwatchdog.com/2012/02/08/will-congress-break-the-internet), February 2, 2012.

43.    Zeidman, Bob, "The Case of the Arrogant Expert," *Intellectual Property Today*, February 2012.

44.    Zeidman, Bob, "The Software IP Detective: Infringement Detection in a Nutshell," *IPWatchdog* (http://www.ipwatchdog.com/2011/11/20/the-software-ip-detective-infringement-detection-in-a-nutshell), November 20, 2011.

45.    Zeidman, Bob, "How Do I Infringe Thee? Let Me Count the Ways," *InformIT* (http://www.informit.com/articles/article.aspx?p=1750207&seqNum=3), Sep 21, 2011.

46.    Zeidman, Bob, "The history of digital game intellectual property from Atari to Zynga," The Museum of Art and Digital Entertainment, August 4, 2011.

47.    Shay, I., Baer, N., and Zeidman, R., "Measuring Whitespace Patterns in Computer Source Code as an Indication of Plagiarism," *Intellectual Property Today*, October 2010.

48.    Zeidman, B., "Software v. Software," *IEEE Spectrum* (http://spectrum.ieee.org/computing/software/software-forensics-tools-enter-the-courtroom) October 2010.

49.    Shay, I., Baer, N., and Zeidman, R., "Measuring Whitespace Patterns as an Indication of Plagiarism," ADFSL Conference on Digital Forensics, Security and Law, May 20, 2010.

50.    Hoehn, T. and Zeidman, R., "Measuring the Speedup of a Commercial Application on a Computer Grid," ISCA 22nd International Conference On Parallel And Distributed Computing And Communication Systems, September 24, 2009.

51.    Zeidman, R., "DUPE: The Depository of Universal Plagiarism Examples," 5th International Conference on IT Security Incident Management & IT Forensics, September 2009.

52.    Baer, N. and Zeidman, B., " Measuring Changes in Software with CLOC," *Embedded.com* (http://www.embedded.com/design/prototyping-and-development/4008330/Measuring-Changes-in-Software-with-CLOC), July 28, 2009.

53.    Baer, N. and Zeidman, B., "Measuring Changes in Software IP," *Intellectual Property Today* (http://www.iptoday.com/articles/2009-5-baer.asp) June 2009.

54.    Baer, N. and Zeidman, B., "Measuring Software Evolution with Changing Lines of Code," 24th International Conference on Computers and Their Applications (CATA-2009), April 10, 2009.

55.    Zeidman, B., "Detecting and Proving Software Theft and Infringement," SDForum: Emerging Tech SIG, December 10, 2008.

56.    Zeidman, B., "Find Your Copy-Cats With SCC," *Software Test & Performance*, October 2008, pp 18-23.

57.    Zeidman, B., "Software Intellectual Property," invited guest lecture, NALSAR University of Law, Hyderabad, India, October 27, 2008.

58.    Zeidman, B., "Detecting Stolen Code," EDAC Anti-Piracy Committee, June 12, 2008.

59. Zeidman, R., "Multidimensional Correlation of Software Source Code," The Third International Workshop on Systematic Approaches to Digital Forensic Engineering, May 22, 2008.

60. Zeidman, B., "Getting Better Search Results," *Dr. Dobb's Journal* (http://www.drdobbs.com/architecture-and-design/getting-better-search-results/207401584) May 2008, pp 44-48.

61. Zeidman, B. and Baer, N., "What, Exactly, Is Software Trade Secret Theft?" (http://www.iptoday.com/articles/2008-3-zeidman.asp) *Intellectual Property Today*, March 2008.

62. Berger, A., Hill, M., and Zeidman, B., "Software and RTOS synthesis: The next step in software development?" *Programmable Logic Design Line* (http://www.eetimes.com/design/programmable-logic/4015158/Software-and-RTOS-synthesis-The-next-step-in-software-development-), February 27, 2008.

63. Zeidman, R., "Iterative Filtering of Retrieved Information to Increase Relevance," *Journal of Systemics, Cybernetics and Informatics*, Vol. 5 No. 6, 2007, pp 91-96 (reprint).

64. Hoehn, T. and Zeidman, B., "Grid-Enabling Resource Intensive Applications," (http://www.drdobbs.com/parallel/grid-enabling-resource-intensive-applica/202401080) *Dr. Dobb's Journal*, November 2007, pp 22-28.

65. Zeidman, R., "Iterative Filtering of Retrieved Information to Increase Relevance," The 11th World Multi-Conference on Systemics, Cybernetics and Informatics, July 11, 2007.

66. Zeidman, B., "Who Stole My Software?" High Technology Crime Investigation Association, May 10, 2007.

67. Zeidman, B., "How to choose an RTOS for your FPGA and ASIC designs," *Programmable Logic Design Line* (http://www.eetimes.com/design/programmable-logic/4015109/How-to-choose-an-RTOS-for-your-FPGA-and-ASIC-designs), May 10, 2007.

68. Zeidman, B., "Sharing Videos With Invisible Commercials," The Thirty Third Asilomar Microcomputer Workshop, April 18, 2007.

69. Zeidman, B., "Real Time Operating Systems for Systems on a Chip," IEEE Consultants Network of Silicon Valley, April 17, 2007.

70. Zeidman, B., "What, Exactly, Is Software Plagiarism?" *Intellectual Property Today* (http://www.iptoday.com/pdf/2007/2/Zeidman-Feb2007.pdf) February 2007.

71. Zeidman, B., "Software Synthesis for Embedded Systems," Silicon Valley Code Camp, October 8, 2006.

72. Zeidman, B., "Who Stole My Code," Silicon Valley Code Camp, October 8, 2006.

73. Zeidman, B., "Software Source Code Correlation," 5th IEEE/ACIS International Conference on Computer and Information Science, July 12, 2006.

74. Zeidman, B., "The Death of the Structured ASIC," *Programmable Logic Design Line* (http://chipdesignmag.com/display.php?articleId=386), April 18, 2006.

75. Zeidman, B., "All about FPGAs," *Programmable Logic Design Line* (http://www.design-reuse.com/articles/12884/all-about-fpgas.html), March 22, 2006.

76. Zeidman, B., "The pluses and minuses of being a consultant," IEEE Gold, Santa Clara Valley Chapter, February 9, 2006.

77. Zeidman, B., "Using software synthesis for multiprocessor OS and software development," *Embedded.com* (http://www.embedded.com/design/prototyping-and-development/4006506/Using-software-synthesis-for-multiprocessor-OS-and-software-development), January 6, 2006.

78. Zeidman, B., "Implementing Integrated Hardware/Software Projects With High Level Languages and Tools," Boston Section of the IEEE, December 1, 2005.

79. Zeidman, B., "Back to the basics: Programmable Systems on a Chip," *Embedded.com* (http://www.eetimes.com/design/programmable-logic/4014776/Introduction-to-Programmable-Systems-on-a-Chip), July 27, 2005.

80. Zeidman, B., "Who Stole My Code?" The Thirty First Asilomar Microcomputer Workshop, April 21, 2005.

81. Zeidman, B., "Software Synthesis for OS-Independent Coding," *Dr. Dobb's Journal* (http://www.drdobbs.com/architecture-and-design/software-synthesis-for-os-independent-co/184406036) April 2005, pp 58-63.

82. Zeidman, B., "RTOS Synthesis for Embedded Systems," Server Blade Summit, March 24, 2005.

83. Zeidman, B., "RTOS Synthesis to Reduce Power Consumption," DesignCon 2005, February 1, 2005.

84. Zeidman, B., "Software synthesis for embedded systems," *Embedded Systems Programming* (http://www.embedded.com/design/prototyping-and-development/4006439/Software-synthesis-for-embedded-systems) February 2005, pp 36-43.

85. Zeidman, B., "Testing a Network Device Prototype in a Live Network," *Annual Review of Communications* Volume 4, 2004, p.803 (reprint).

86. Zeidman, B., "Roll Your Own Real-Time OS," *BladeLetter*, Q3 2004, p. 8.

87. Zeidman, B., "Detecting Source-Code Plagiarism," *Dr. Dobb's Journal* (http://www.drdobbs.com/architecture-and-design/detecting-source-code-plagiarism/184405734) July 2004, pp 55-60.

88. Zeidman, B., "Software Synthesis for Embedded Systems," The Thirtieth Asilomar Microcomputer Workshop, April 27, 2004.

89. Zeidman, B., "Smart Pills: The Royal Treatment," *IP Law & Business*, March 2004.

90. Zeidman, B., "Emulating/Prototyping a Network Device in a Live Network," DesignCon 2004, February 3, 2004.

91. Zeidman, B., "Software synthesis is productive for system design," *EE Times* (http://www.eetimes.com/document.asp?doc_id=1148219), January 12, 2004.

92. Zeidman, B., "Guidelines for Effective E-Learning," *Chief Learning Officer* (http://www.clomedia.com/articles/guidelines_for_effective_e_learning) December, 2003, pp. 24-31.

93. Zeidman, B., "Universal Design Methodology," *Embedded Systems Programming* (http://www.embedded.com/electronics-blogs/beginner-s-corner/4024888/The-universal-design-methodology) December, 2003, pp 55-56.

94. Zeidman, B., "Test Your Next Hardware Design—in a Live Network," *Communication Systems Design* (https://www.academia.edu/1576191/Test_Your_Next_Hardware_Design-in_a_Live_Network) October 2003, p.18.

95. Zeidman, B., "Platform FPGAs to Prevail," *Embedded Systems Programming* (http://business.highbeam.com/136935/article-1G1-109898412/platform-fpgas-prevail-before-long-platform-fpgas-containing) November, 2003, pp.28-31.

96. Zeidman, B., "The Universal Design Methodology -- taking hardware from conception through production," *EDN* (http://www.edn.com/design/integrated-circuit-design/4345988/The-Universal-Design-Methodology-taking-hardware-from-conception-through-production) December 26, 2002, p53.

97. Zeidman, B., "FPGAs vs. ASICs for Networking," Network Processor Conference West, October 2002, 11pp.

98. Zeidman, B., "How to Start A Consulting Business," *Embedded Systems Programming* (http://www.embedded.com/design/real-world-applications/4402268/How-to-Start-a-Consulting-Business-) December 2000, pp161-163.

99. Zeidman, B., "An Introduction to Remote Backup," *Disaster Recovery Journal*, Vol. 9 No. 2 (http://www.drj.com/drj-world-archives/data-processing-recovery/an-introduction-to-remote-backup.html) April/May/June 1996, p48.

100. Zeidman, B., "Testing System Memory Quickly and Efficiently," Design SuperCon 96 conference, February 1, 1996, 14pp.

101. Zeidman, B., "Remote Backup - Transmitting Critical Data Over Phone Lines for Offsite Storage," JAMCON '95 Communications Conference, August 20, 1995, pp97-99.

102. Zeidman, B., "Testing Memory Quickly," *Embedded Systems Programming*, Aug 1995, pp68-75

103. Zeidman, B., "Read-Ahead Logic: An Alternative to Cache," Design SuperCon 95 conference, March 1, 1995, 6pp.

104. Zeidman, B., "How to Make Money as a Consultant," *Income Opportunities*, Dec 1993, pp48-62

105. Zeidman, B., "Interleaving DRAMs for Faster Access," *ASIC & EDA*, November 1993, pp24-34.

106. Zeidman, B., "Starting Up Your Engineering Consulting Business," *High Technology Careers*, April/May 1993, p24.

107. Zeidman, B., "New Film Software for Independent Producers," *CUE*, September 1992, pp6-7.

108. Hafeman, D. and Zeidman, B., "Memory Architectures Compound RISC's Gains," *Electronic Design*, July 11, 1991, pp71-82.

109. Flynn, M. J., Zeidman, R. and Lochner, E., "Sparse Distributed Memory Prototype: Address Module Hardware Guide," Stanford University Computer Systems Laboratory CSL-TR-88-373, December 1988 72pp.

110. Flynn, M. J., Kanerva, P., Ahanin, B., Bhadkamkar, N., Flaherty, P., Hickey, P., Lochner, E., Webber, K., and Zeidman, R., "Sparse Distributed Memory Prototype: Principles of Operation," Stanford University Computer Systems Laboratory CSL-TR-88-338, December 1988 96pp.

**PATENTS**

Named inventor on following patents and patent applications:

1. Zeidman, Robert M., "Visual tool for developing real time task management code," U.S. Patent 6,934,947.

2. Zeidman, Robert M., "Method for connecting a hardware emulator to a network," U.S. Patent 7,050,962.

3. Zeidman, Robert M., Hafeman, Daniel R., Barr, Michael, "Method and apparatus for synthesizing a hardware system from a software description," U.S. Patent 7,210,116.

4. Zeidman, Robert M., "Apparatus and method for connecting hardware to a circuit simulation," U.S. Patent 7,266,490, RE 42,227.

5. Zeidman, Robert M., "Software tool for detecting plagiarism in computer source code," U.S. Patent 7,503,035.

6. Zeidman, Robert M., Hafeman, Daniel R., Barr, Michael, "Method and apparatus for synthesizing a hardware system from a software description," U.S. Patent 7,620,928.

7. Zeidman, Robert M., Hafeman, Daniel R., "Method and apparatus for emulating a hardware/software system using a computer," U.S. Patent 7,647,583.

8. Zeidman, Robert M., "Detecting plagiarism in computer source code," U.S. Patent 7,823,127.

9.  Zeidman, Robert M., "Apparatus and method for connecting hardware to a circuit simulation," U.S. Patent 7,835,897.

10. Zeidman, Robert M., "Software tool for synthesizing a real-time operating system," U.S. Patent 7,882,488.

11. Zeidman, Robert M. and Snider, Gregory, "Using readily available driver and application source code with a synthesized operating system," U.S. Patent 7,900,187.

12. Zeidman, Robert M., Hafeman, Daniel R., Barr, Michael, "Method and apparatus for synthesizing a hardware system from a software description," U.S. Patent 7,945,879.

13. Zeidman, Robert M., "System and method for connecting a logic circuit simulation to a network," U.S. Patent 8,160,863.

14. Zeidman, Robert M. "Use of hardware peripheral devices with software simulations," U.S. Patent 8,195,442

15. Zeidman, Robert M., "Detecting copied computer source code by examining computer object code," U.S. Patent US 8,255,885.

16. Zeidman, Robert M., "Software tool for detecting plagiarism in computer source code," U.S. Patent 8,261,237.

17. Zeidman, Robert M., "Method for advertisers to sponsor broadcasts without commercials," U.S. Patent 8,316,390.

18. Zeidman, Robert M., "Conveying Data From A Hardware Device To A Circuit Simulation," U.S. Patent 8,380,481.

19. Zeidman, Robert, "Software for filtering the results of a software source code comparison," U.S. Patent 8,495,586.

20. Zeidman, Robert M., "Detecting plagiarism in computer source code," U.S. Patent 9,003,366.

21. Zeidman, Robert, and Hoehn, Timothy, "Searching the Internet for common elements in a document in order to detect plagiarism," U.S. Patent 9,043,375.

22. Mylroie, Steve and Zeidman, Robert M., "Detecting plagiarism in computer markup language files," US Patent 9,053,296.

23. Zeidman, Robert M., "Method for advertisers to sponsor broadcasts without commercials," US Patent 10,116,999.

24. Zeidman, Robert M., "Method for advertisers to sponsor broadcasts without commercials," USPTO application number 16/125,730 (pending).

**TRAINING/TEACHING EXPERIENCE**

Presented seminars and courses on the following topics:

- Analysis of Software Copyright Infringement Cases
- A Crash Course in Verilog
- All About Patents
- ASIC Design
- All About Electronics
- Choosing an OS for your IoT device
- CPLD Design
- Creating a Multitasking System at the Push of a Button Using SynthOS
- Detecting Software IP Theft
- Electrical Engineering for non-EEs
- Finding and Utilizing Technical Consultants for IP Litigation
- FPGA Design

- FPGAs vs. ASICs for Networking
- The History of Digital Hardware Design
- How to Start a Consulting Business
- Introduction to Programmable Systems on a Chip
- Investigating Technology Theft
- Measuring Software Changes with the CLOC Method
- Memory Architectures
- Patent Litigation Tips
- Patents
- Programmable Systems on a Chip (SOCs)
- Protecting Your Intellectual Property
- Push-Button Creation of an Optimized Application Specific OS
- Real-Time Operating Systems for SOCs
- Software Copyright Infringement Allegations - Inside the Forensic Analysis
- Software Intellectual Property
- Software Synthesis
- Software Synthesis for Embedded Systems
- Starting a Consulting Business
- Technical Consultants for IP Litigation
- Testing Memory
- Understanding Innovation
- Universal Design Methodology
- Verilog and HDLs
- What I Did Right And What I Screwed Up - Lessons From A Parallel Entrepreneur
- You Invented It, Now Protect It!

At the following places:

- Association of Computing Machinery, Bay Area
- Cogswell College
- College of San Mateo
- Cornell Entrepreneur Network
- Design Automation Conference
- DesignCon
- Eastcon
- Easy Paths to Silicon Design
- Embedded Systems Conference

  - Boston
  - Chicago
  - Europe
  - India
  - London
  - Minneapolis
  - Silicon Valley
- Embedded TechCon
- Forensic Expert Witness Association National Conference
- Gigabit Ethernet Conference
- High-Level Electronic System Design Conference
- High Technology Crime Investigation Association
- Institute of Electrical and Electronics Engineers
- IoT Evolution Expo
- LancerHacks
- Maker Faire

- Microsoft Store, Stanford Shopping Center
- Midwest IP Institute
- NALSAR University of Law
- Network Processors Conference West
- Northcon
- Opportunity X
- Palo Alto Area Bar Association
- PCB Design East
- PCB Design West
- San Jose State University
- San Francisco State University
- Semizone.com
- Server Blade Summit
- Silicon Valley Code Camp
- Southcon
- Stanford University
- Vintage Computer Festival
- Westcon
- World Intellectual Property Technical Forum

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: TIKTOK, INC.,<br>CONSUMER PRIVACY<br>LITIGATION, | **MDL No. 2948**<br><br>**Master Docket No. 20-cv-4699**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Sunil R. Harjani** |
| This Document Relates to All Cases | |

**DECLARATION OF ELIZABETH A. FEGAN**
**IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, Elizabeth A. Fegan, under oath, declare and state as follows:

1.      I am Managing Partner of the law firm Fegan Scott LLC and one of the court-appointed Co-Lead Counsel.

2.      I submit this declaration in support of the motion for preliminary approval of the proposed class action settlement, including the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement") as clarified by Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, "the Settlement").

3.      I, along with members of the court-appointed leadership group, have undertaken extensive analyses of the claims and defenses in this case, as well as the underlying facts (as probed by confirmatory discovery and the involvement of highly regarded technical experts and consultants), the benefits conferred by the Settlement, and the risks associated with continued litigation. Based on that comprehensive assessment, and my experience litigating complex class actions, I believe the Settlement is fair, reasonable, and adequate for the Nationwide Class and Illinois Subclass.

### A. My Background

4.        I have over 20 years of experience representing plaintiffs in complex class action litigation. After 15 years as Managing Partner of Hagens Berman's Chicago office, I founded Fegan Scott LLC in May 2019 to help victims of consumer fraud, negligence, abuse, and discrimination.

5.        I have successfully led numerous nationwide class actions as court-appointed counsel.

6.        For example, I was part of the Co-Lead Counsel team in *In re NCAA Student-Athlete Concussion Injury Litigation,* No. 1:13-cv-9116 (N.D. Ill.), which was litigated before this Court. That case resulted in a historic nationwide class settlement on behalf of four million current and former NCAA student-athletes, including the creation of a $70 million, 50-year medical monitoring program to diagnose the short- and long-term effects of concussions and the accumulation of subconcussive hits.

7.        Additional examples of successful class action cases in which I have led the prosecution include:

- *Senior annuities consumer protection class actions*: In a series of class actions against insurance companies that sold equity-indexed deferred annuities that targeted, but were inappropriate for, senior citizens, I was appointed to lead counsel and executive committee positions. These cases led to numerous settlements, *e.g.* American Equity Senior Annuities Fraud (C.D. Cal.) ($129 million settlement) and Midland Senior Annuities Fraud (C.D. Cal.) ($79.5 million settlement).

- *Baby Products Antitrust* (E.D. Pa.): As co-lead counsel for a class of consumers overcharged for high-end baby products (e.g. strollers, high chairs) as the result of a price-fixing conspiracy between Babies 'R Us and baby product manufacturers, I achieved a $35 million settlement after class certification was granted, summary judgment denied, and on the eve of trial.

- *Pre-Filled Propane Tank Marketing and Sales Practices* (W.D. Mo.): As MDL co-lead counsel for a class of consumers who purchased propane tanks for barbecues, I prosecuted this antitrust class action against the two dominant manufacturers who engaged in price fixing. The case settled for a $35 million common fund.

- *RC2 Corp. Toy Lead Paint Products Liab. Litig.*, No. 07 CV 7184, MDL No. 1893 (N.D. Ill.): As MDL co-lead counsel in this nationwide consumer fraud class action on behalf of purchasers of toys covered with lead paint, we successfully settled the MDL, in conjunction with related a state court case, for product refunds and blood lead testing valued at $30 million.

- *Nexium Pharmaceutical Antitrust Fraud* (Mass.): After class certification, I joined the trial team to try antitrust claims on behalf of Massachusetts payors for Nexium. This single-state case settled the night before trial for $20 million.

8. I have also served on special master teams in the Northern District of Illinois and Circuit Court of Cook County, appointed by the courts to manage discovery and oversee class counsel fee petitions in federal and state court class actions. *See In re Waste Mgmt. Sec. Litig.* (N.D. Ill.); *Wolens et al. v. American Airlines* (Cir. Ct. Cook County).

### B. Co-Lead Counsel reached consensus after an exhaustive and in-depth analysis of the Settlement, followed by additional hard-fought negotiations.

9. On September 28, 2020, the Court appointed a leadership team of three Co-Lead Counsel, a five-attorney Plaintiffs' Steering Committee (PSC), and Liaison Counsel (the "Leadership Group"). ECF No. 94.

10. The Leadership Group includes a cross section of lawyers from various teams who filed privacy cases related to the TikTok application, including lawyers from two groups that had been litigating on parallel tracks in two different district courts (the Northern District of California and the Northern District of Illinois), as well as several others whose cases were also consolidated and transferred to this Court by the Judicial Panel on Multidistrict Litigation (JPML).

11. As the Court is aware, the pre-appointment litigation was, at times, contentious – especially among Plaintiffs' counsel. Plaintiffs' counsel disputed, *inter alia*, in which court the cases should proceed, whether the cases should be consolidated, the appropriate claims to pursue, whether certain cases should proceed at all, who leadership counsel should be, whether

3

intervention was appropriate – and even whether settlement discussions should be had and with whom on the Plaintiffs' side.

12.    During the hearing regarding the numerous leadership applications, the Court acknowledged that some applicants suggested that a combination of the various groups would result in a "forced marriage" or "a team of rivals." 09/25/2020 Hearing Transcript ("Transcript"), ECF No. 91, at 11:19-21.

13.    However, the Court viewed the Leadership Group differently:

> I . . . would like to think of it as an all-star team of sorts or an Olympic team, made up of individuals form perhaps different individual teams, but who are asked to come together to pursue the interests of all plaintiffs as a whole in this litigation.

Transcript, 11:21-12:2.

14.    The Court's willingness to bring once-adverse plaintiffs' counsel together proved to be the right approach.

15.    After the Court's appointment, the Leadership Group came together and leveraged their diverse perspectives, experience, and prior dealings with defendants and their counsel to the Class's benefit.

16.    The Leadership Group zealously questioned one another's viewpoints and advocated their own, analyzed the claims asserted in the now-consolidated actions and the inevitable defenses, and engaged in a candid, collaborative—and at times oppositional—process that allowed the Leadership Group to truly vet the case and the adequacy of the proposed Settlement benefits.

17.    For example, members of the Leadership Group were assigned to assess discrete issues and present their views to Co-Lead Counsel. Those assignments included, e.g., the analysis of particular causes of action, the analysis of legal issues related to arbitration clauses –

including whether they bind minor class members, consultation with technology experts and consultants, the analysis of jurisdictional and liability issues related to the foreign defendants, drafting of and participation in confirmatory discovery, research regarding prior recoveries in analogous cases, the vetting of named plaintiffs and proposed class representatives, the drafting of the Consolidated Amended Complaint, negotiations with Defendants, and the drafting of the Addendum.

18.    Co-Lead Counsel also gave careful, critical attention to the confirmatory discovery Plaintiffs obtained as part of the Settlement Agreement. For example, experts and consultants that various teams had retained prior to the Court's leadership appointment were brought together to exchange ideas and assess one another's analyses. The consultants contributed to and cross-checked one another's requests for information made via interrogatories, and jointly assessed TikTok's responses.

19.    That feedback led to a candid question-and-answer session between Co-Lead Counsel, TikTok's counsel, and Plaintiffs' source code expert – in which Plaintiffs' expert was given further free rein to probe TikTok's relevant technology, source code (both in terms of scope and with questions stemming from the expert's findings), and answers to the deposition on written questions.

20.    Co-Lead Counsel was able to advocate for the issues identified by the Leadership Group and leverage those issues into additional settlement relief provided in the Addendum. And the parties' discussions and negotiations regarding confirmatory discovery continued after that meeting, also contributing to the settlement.[1]

21.    Co-Lead Counsel also took an inclusive approach regarding the identification of

---

[1] Additional details about confirmatory discovery are provided in the contemporaneously filed declaration of Co-Lead Counsel Katrina Carroll.

named plaintiffs and class representatives. As part of the Leadership Group's plaintiff vetting process, we took the unusual step of inviting all counsel who filed now-consolidated cases (including those outside of the Leadership Group) to recommend their plaintiffs for inclusion in the consolidated amended complaint. Co-Lead Counsel also gave each named plaintiff's counsel the opportunity to review the terms of the Settlement before seeking the Court's preliminary approval and allowed them to recommend their respective plaintiffs as proposed class representatives.

22.      Co-Lead Counsel also engaged James Zouras and Jonathan Rotter, two attorneys outside of the Leadership Group who filed cases that were consolidated with this MDL, to represent the respective interests of the Illinois Subclass and the non-Illinois members of the Nationwide Subclass; further vet the strengths, weaknesses, and value of each claim; and independently negotiate the allocation of settlement funds without regard to the prior allocation provisions of the Settlement Agreement.[2]

23.      Numerous well-qualified attorneys spent considerable time in the six months following the Court's leadership appointment to thoroughly consider the case and Settlement benefits (in addition to their extensive case analysis during the months of litigation that predated the cases' consolidation) and, in doing so, achieved a resolution that is in the best interests of the Class.

### C. Co-Lead Counsel engaged in months of continued negotiations with defense counsel and improved upon an already substantial recovery.

24.      Prior to reaching an agreement on the Addendum, Co-Lead Counsel engaged with defense counsel countless times – via phone calls, video conferences, emails, and the exchange

---

[2] Additional detail about the analysis and process underlying the allocation of settlement benefits is addressed in the contemporaneously filed declarations of Messrs. Zouras and Rotter.

of revisions and draft documents – in hard-fought, post-mediation negotiations. In many ways, that process benefited from the Leadership Group's varying perspectives and the reality that TikTok had to present settlement terms, provide insight into the companies' operations, and engage in confirmatory discovery that met the expectations of a diverse amalgamation of highly experienced class action and privacy counsel.

25.     Through that process, which took place over six months, Co-Lead Counsel was able to improve upon the terms of the original Settlement Agreement with the new Addendum, including with respect to the following:

a.     **Definition of "TikTok."** For example, the Settlement Agreement includes an array of injunctive relief regarding TikTok's treatment of its users' data, as well as a provision requiring TikTok to initiate privacy compliance training. Settlement Agreement, § 6. The Leadership Group had questions about the application of the injunctive relief provisions to the other defendants, TikTok's affiliates. Though the Settlement Agreement refers to "TikTok" alone, the Addendum redefined "TikTok" to make clear that the injunctive relief applies to *all* of the defendants who were engaged in the operation of the App or who are involved in receiving or accessing user data obtained through the App. Addendum, § 2.5 (clarifying that references to "TikTok" in the injunctive relief section apply to Defendants' Released Parties).

b.     **Definition of "the App."** As another example, the Settlement Agreement includes injunctive relief prohibiting TikTok from "us[ing] the App" to collect, store, and/or transmit various categories of private user data – absent disclosure and compliance with all applicable laws. Settlement Agreement, § 6.1. It also includes other provisions regarding "the App," including a warranty that TikTok does not use the App to collect biometric information or identifiers. Settlement Agreement, § 7.1. The Leadership Group expressed concern regarding

whether the use of the word "App" was an appropriate limitation would exclude TikTok's conduct after user data left the App and was transmitted to TikTok's servers. The Addendum now makes clear that settlement provisions regarding the "App" go beyond the application's operation on class members' devices, i.e., "device-side" operations, and extend to "server-side operations" as well. Addendum, § 2.1.

        c.     **The Warranty.** The Settlement Agreement includes a "Warranty" representing that "TikTok . . . has not used the App to collect biometric identifiers or biometric information as defined by the Illinois Biometric Information Privacy Act [BIPA]" and providing for confirmatory discovery on that issue. Settlement Agreement, § 7.1. However, the Leadership Group questioned, for example, whether TikTok used something other than "the App" (e.g., TikTok's servers) to collect biometric data and whether the parties had a mutual understanding as what data qualified as "biometric identifiers or biometric information" under BIPA. The Addendum addresses those questions and eliminates ambiguity as to the scope of the warranty and TikTok's conduct. The Warranty now represents that many of the features underlying Plaintiffs' claims are non-identifying. In other words, TikTok acknowledges that it engages in functions like "image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations" (which Plaintiffs contend is biometric data)—but, per the warranty, those are not used by TikTok to identify an individual. *Id.*

d. **Privacy Compliance Training.** As another example, the Settlement Agreement provides that TikTok will "require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter." Settlement Agreement, § 6.3. The Addendum does not leave that training program in TikTok's hands alone. Through the Addendum, the Settlement now requires that TikTok hire a third party to review the training program for a period of three years, and to provide a written verification of that review to Plaintiffs' counsel. Addendum, § 4.3.

e. **The VPPA.** In addition, the Addendum includes provisions prohibiting violations of the Video Privacy Protection Act (VPPA), § 4.1.1.

f. **Allocation.** The Addendum also makes clear that the determination regarding how settlement benefits are allocated among classes with divergent interests (i.e., among the Nationwide Class and Illinois Subclass) was not bound by the provisions in the Settlement Agreement. Addendum, § 3.1. As a result, Co-Lead Counsel appointed independent Subclass Counsel to negotiate the plan of allocation. Moreover, this independence eliminated any risk that Defendants' viewpoints as to the strength of Plaintiffs' claims, or their concerns about setting precedent for settlement valuation in other matters, could impact class members' recovery or upend the settlement.

26. In sum, Co-Lead Counsel conducted six months of thorough, research-intensive deliberations to assess the case and Settlement terms, and as a result of that process, now present to the Court a fair, reasonable, and adequate Settlement which offers the class $92 million and valuable injunctive relief.

I declare that the foregoing is true and correct.

Dated: February 25, 2021      _____
                                 Elizabeth A. Fegan

9

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION,** | **MDL No. 2948** |
| | **Master Docket No. 20-cv-4699** |
| | **Judge John Z. Lee** |
| | **Magistrate Judge Sunil R. Harjani** |
| **This Document Relates to All Cases** | |

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

# Table of Contents

I.      INTRODUCTION .................................................................................................... 1

II.     DISCUSSION ........................................................................................................ 1

     A.      Minor Class Members were adequately represented by both proposed Class Representatives and counsel. ...................................................... 1

          1.   Minor Class Members are represented by proposed Class Representatives, those representatives' guardians, the Leadership Group, and the individual counsel retained by the minor Class Representatives. ................................................................................ 1

          2.   The objection regarding the need for separate representation of minor versus adult Class Members is without merit................................ 3

     B.      Plaintiffs' counsel made an exhaustive inquiry as to the strength of Plaintiffs' case—including the value of the claims—and the consequent fairness of the proposed Settlement. ................................................................... 7

          1.   The Leadership Group conducted an extensive analysis of the merits of each claim and of the case as a whole. .................................... 8

          2.   Co-Lead Counsel's assessment made clear that the $92 million settlement (plus injunctive relief) is fair, reasonable, and adequate. .................... 11

          3.   The objectors offer nothing that warrants risking the Class's recovery in continued litigation. .......................................................... 21

     C.      In addition to direct email notice to more than 60 million email addresses and a Notice Plan designed to reach 95% of users several times—the parties will provide notice through TikTok's "Inbox" feature, subject to a Court order................................................................................... 24

III.    CONCLUSION.................................................................................................... 25

# Table of Authorities

Page(s)

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................... 3, 5, 6

*Bower v. AT&T Mobility, LLC*,
  127 Cal. Rptr. 3d 569 (Ct. App. 2011)................................................................ 17

*Brodsky v. Apple Inc.*,
  No. 19-CV-00712-LHK, 2019 WL 4141936 (N.D. Cal. Aug. 30, 2019)............................... 18

*C.M.D.*,
  621 Fed. Appx. 488, 2015 WL 6575724 ............................................................... 4, 12

*Cleary v. Philip Morris Inc.*,
  656 F.3d 511 (7th Cir. 2011) ......................................................................... 19

*Eichenberger v. ESPN, Inc.*,
  No. 14-463, 2015 U.S. Dist. LEXIS 157106 (W.D. Wash May 7, 2015) ............................... 22

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ......................................................................... 23

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) ....................................................................... 14, 15

*Entm't Am., LLC*,
  801 F.3d 1045 (9th Cir. 2015) ........................................................................ 16

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) ........................................................................ 18

*Fraley v. Batman*,
  638 F. App'x 594 (9th Cir. 2016) ..................................................................... 3, 4

*Gregory v. Albertson's, Inc.*,
  104 Cal. App. 4th 845, 128 Cal. Rptr. 2d 389 (2002)................................................. 19

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................ 4, 5

*Hernandez v. Hillsides, Inc.*,
  47 Cal. 4th 272 (2009) ............................................................................... 19

# Table of Authorities (cont.)

Page(s)

**Cases (cont.)**

*In re Facebook Biometric Info. Priv. Litig.*,
  No. 15-CV-03747-JD, 2020 WL 4818608 (N.D. Cal. Aug. 19, 2020) .................................. 22

*In re Google Android Consumer Privacy Litig.*,
  No. 11-MD-02264 JSW, 2013 U.S. Dist. LEXIS 42724 (N.D. Cal. Mar. 26, 2013) .............. 18

*In re Google Assistant Privacy Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................................................... 23

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
  988 F. Supp. 2d 434 (D. Del. 2013) ........................................................................................ 18

*In re Google, Inc. Privacy Policy Litig.*,
  58 F. Supp. 3d 968 (N.D. Cal. 2014) ...................................................................................... 19

*In re iPhone Application Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. 2012) .................................................................................. 18

*In re LinkedIn User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) ............................................................................................ 20

*In re Netflix Privacy Litig.*,
  2013 U.S. Dist. LEXIS 37286 (N.D. Cal. March 18, 2013) .................................................... 22

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3d Cir. 2016) ............................................................................................. 15, 16

*In re Online DVD—Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) .................................................................................................... 5

*In re Pork Antitrust Litig.*,
  Nos. 18-1776, 19-1578, 19-2723, 2020 U.S. Dist. LEXIS 191675 (D. Minn. Oct. 16, 2020) . 19

*In re Sony PS3 "Other OS" Litig.*,
  2017 U.S. Dist. LEXIS 203402 ............................................................................................... 20

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ............................................................................................................ 17

*McDonald v. Kiloo A/S*,
  No. 17-cv-04344-JD, 2020 U.S. Dist. LEXIS 175865 (N.D. Cal. Sep. 24, 2020) .................. 20

# Table of Authorities (cont.)

**Page(s)**

**Cases (cont.)**

*Moreno v. S.F. Bay Area Rapid Transit Dist.*,
   No. 17-cv-02911-JSC, 2019 U.S. Dist. LEXIS 13309 (N.D. Cal. Jan. 28, 2019) ................... 20

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ...................................................................................................... 5, 6

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ........................................................................................ 5

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ........................................................................................ 21

*Sterk v. Redbox Automated Retail, LLC*,
   770 F.3d 618 (7th Cir. 2014) ........................................................................................ 16

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) ........................................................................................ 18

*Williams v. Apple, Inc.*,
   No. 19-CV-04700-LHK, 2020 WL 1492718 (N.D. Cal. Mar. 27, 2020) ............................... 18

*Williams v. Facebook, Inc.*,
   384 F. Supp. 3d 1043 (N.D. Cal. 2018) .......................................................................... 17

**Statutes**

18 U.S.C. § 1030 ........................................................................................................... 11

18 U.S.C. § 1030(c)(4)(A)(i)(I) and (g) ............................................................................ 17

18 U.S.C. § 2710 ........................................................................................................... 11

18 U.S.C. § 2710(a)(4) ................................................................................................... 15

18 U.S.C. § 2710(b)(1) ................................................................................................... 15

18 U.S.C. § 2710(b)(2)(B) ............................................................................................... 16

740 ILCS 14/1 ............................................................................................................... 11

740 ILCS 14/15(b) ......................................................................................................... 13

740 ILCS 14/5, 14/10 ..................................................................................................... 13

## Table of Authorities (cont.)

**Page(s)**

**Statutes (cont.)**

Bus. & Prof. C. § 17200 ............................................................................ 11

Bus. & Prof. C. § 17500 ............................................................................ 11

Cal. Bus. & Prof. Code § 17204 ................................................................. 17

Cal. Pen. C. § 502 ..................................................................................... 11

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................ 25

# I.    INTRODUCTION

At the March 2, 2021 hearing ("Hearing") regarding Plaintiffs' Motion for Preliminary Approval of the Settlement ("Motion," ECF No.122), the Court asked Co-Lead Counsel to provide supplemental briefing regarding three issues: (1) the representation of minor class members; (2) the process through which Co-Lead Counsel valued the claims; and (3) consideration of class notice by email and/or in-App[1] notifications.[2] *See* Hearing Transcript ("Transcript"), pp. 45-47.[3] Each of those topics is addressed below.

# II.    DISCUSSION

## A.  Minor Class Members were adequately represented by both proposed Class Representatives and counsel.

At the Hearing, the Court asked Co-Lead Counsel to address "the representation of the minor [class members], . . . the involvement of the guardians of the minors as part of the settlement, and the consideration that class counsel gave to those minors and the differences between them and the adult class members." Transcript, 45:21-46:1.

### 1.  Minor Class Members are represented by proposed Class Representatives, those representatives' guardians, the Leadership Group, and the individual counsel retained by the minor Class Representatives.

The interests of the minor Class members are adequately represented—both by counsel and by the proposed Class Representatives. As the Court recognized at the Hearing (Transcript,

---

[1] Unless otherwise noted, capitalized terms shall have the same meaning as set forth in the Settlement Agreement and Release ("Settlement Agreement") and Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, "Settlement"). ECF No. 122-1.

[2] The Court did not request supplemental briefing regarding historical claims rates, which were addressed in the Motion and at the Hearing. However, Plaintiffs are concerned with Jay Edelson's (counsel for an objector) misleading communications with the public and potential class members concerning the Settlement, including issues pertaining to notice and claims rates. These concerns are set forth in the accompanying Declaration of Katrina Carroll.

[3] For the Court's convenience, a copy of the Transcript is attached as Exhibit E to the Carroll Declaration.

1

27:23-28:3), the majority of the proposed Class Representatives are minors who are represented by their guardians and parents. Indeed, 28 of the 35 proposed Class Representatives are minors. ECF No. 122-2.

As the Court also presumed at the Hearing (Transcript, 28:4-11), counsel advocated the minors' interests throughout the litigation and settlement process. Not only did the Leadership Group represent minors' interests in their role as Court-appointed counsel for the Class, but many of the lawyers who litigated, negotiated, settled, and/or approved the Settlement in this consolidated matter were directly retained by minors. Co-Lead Counsel Elizabeth Fegan and Katrina Carroll filed initial complaints exclusively on behalf of minor named plaintiffs. ECF No. 122-2. Co-Lead Counsel Ekwan Row represents both adult and minor plaintiffs. *Id.* And counsel retained by the proposed Class Representatives—each of whom reviewed and approved the terms of the Settlement before it was submitted to the Court—likewise reflect adequate representation of the minor and non-minor Class Members.[4]

In addition, throughout this litigation, each minor plaintiff was represented by a parental guardian who supervised the minor's role in the litigation, liaised with counsel, advocated their child's or children's interests, and gave approval at each step. The parental guardians were involved in pursuing these consolidated actions, participating in the vetting of named plaintiffs and Class Representatives, and considering and approving the terms of the Settlement.

Finally, the Leadership Group gave meaningful consideration to actual and potential differences among minors and adult class members. While the details of the Leadership Group's

---

[4] For example, the law firm of Foote, Mielke, Chavez & O'Neil, LLC represents only an adult proposed Class Representative. *Id.* Mr. Foote, though not a member of the Leadership Group, was a participant in the second mediation and a signatory to the initial settlement agreement, ECF No. 122-1, p. 18, in addition to his review and approval of the Addendum and final agreement.

strategy, internal deliberations, and work product are not laid bare in the motion for preliminary approval, that brief nonetheless reflects some of those considerations. *E.g.,* ECF No. 122, pp. 5, 21. The Leadership Group engaged in significant analysis and discussion regarding, for example: whether minors were bound by and/or could disaffirm class action waivers and arbitration clauses (and the hurdles minors would face in overcoming those clauses); whether and to what extent some minors' claims would be waived in connection with the settlement pending in *T.K., et al. v. ByteDance Tech. Co., Ltd., et al.*, 1:19-cv-07915 ("*T.K.*"); ensuring that minors' interests were well represented by counsel, Class Representatives, and plaintiffs' legal guardians; ensuring that the proposed Settlement is in the Class's, including the minor members', best interests; and ensuring that the Notice of Proposed Class Action Settlement would alert guardians as to their children's rights and reach those guardians through the Notice Plan. Through that process, the Leadership Group determined that the Settlement is fair, reasonable, and adequate to minors.

**2. The objection regarding the need for separate representation of minor versus adult Class Members is without merit.**

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). One objector complains that a conflict of interest exists between minor and adult Class Members. ECF No. 126, pp. 6-8. This objection should be rejected because all Class Members are entitled to compensation based on the relative strength of the laws applicable to them, and because each and every class member has the opportunity to opt out and pursue greater relief if they so choose.

A similar objection was raised in *Fraley v. Batman*, 638 F. App'x 594, 597-98 (9th Cir.

2016). There, a settlement was reached on behalf of 150 million Facebook users who appeared in advertisements displayed to the users' friends on the Facebook website. The settlement created a common fund of $20 million and included injunctive relief.

Certain objections to the settlement argued that a structural conflict between minors and adult class members required the appointment of separate counsel for the minor subclass. Rejecting the argument, the Ninth Circuit explained:

> There was no structural conflict of interest requiring the appointment of separate counsel for the minor subclass. The evidence that a structural conflict of interest existed is sparse, especially given that (1) two of the three named representatives were minors, (2) most of the injunctive relief in the settlement benefitted only the minors, and (3) the minors were free to opt out of the settlement (as, in fact, many did). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *see also C.M.D.*, 621 Fed. Appx. 488, 2015 WL 6575724.

*Id.* at 597. Like in *Fraley*, no structural conflict exists here. The Class Representatives include 28 minors through their parents. The injunctive relief benefits all Class Members, including by requiring TikTok to: refrain from collecting user data like biometrics, GPS data, or information in users' clipboards unless expressly disclosed and in compliance with all applicable laws (including those laws that apply only to minors); delete pre-uploaded user-generated content; and initiate a privacy compliance training program which must be reviewed for three years by a third party. ECF No. 122-1, Settlement Agreement, § 6, and Addendum, § 4. And the minors are free to opt out of the settlement. *E.g.,* Settlement Agreement, § 10.

The Ninth Circuit in *Fraley* also rejected the argument that a conflict existed because the minors had more valuable claims. *Fraley*, 638 F. App'x at 598. The court explained:

> The objectors claim that a conflict existed because the minors had significantly more valuable claims than the adults. We have held that part of the minors' case was not meritorious, *see C.M.D.*, 621 Fed. Appx. 488, 2015 WL 6575724, indicating that the objectors may have exaggerated the relative strength of minor subclasses'

4

> claims as compared to the adults' claims. Furthermore, a difference
> in value of claims does not necessarily mean there is a
> structural conflict of interest requiring separate counsel. *See In re Online
> DVD—Rental Antitrust Litig.*, 779 F.3d 934, 942-43 (9th Cir.
> 2015); *Hanlon*, 150 F.3d at 1021.

*Id.* The same analysis applies here. First, neither BIPA nor the VPPA nor any of the other claims

raised provide the potential for greater recovery for minors. Second, the fact that some class

member recovery could vary does not create a conflict. The Eighth Circuit's decision in *Petrovic*

*v. Amoco Oil Co*. addressing the propriety of subclasses provides guidance:

> If the objectors mean to maintain that a conflict of interest
> requiring subdivision is created when some class members receive
> more than other class members in a settlement, we think that
> argument is untenable. It seems to us that almost every settlement
> will involve different awards for various class members. Indeed,
> even if every class member were to receive an identical monetary
> award in settlement, the true compensation would still vary from
> member to member since risk tolerance varies from person to
> person.

*Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1146 (8th Cir. 1999).

Thus, this case is not, as the objector suggests, similar to the settlement classes in

*Amchem* and *Ortiz*, which failed in part because they suffered from disabling intraclass conflicts.

*See Amchem*, 521 U.S. 591; *Ortiz v. Fibreboard Corp*., 527 U.S. 815 (1999). In *Amchem*, the

Supreme Court detected an intraclass conflict between those class members with immediate

injuries and those class members who were merely exposed to asbestos where the terms of the

settlement reflected "essential allocation decisions designed to confine compensation and to limit

[the] defendants' liability." *Amchem*, 521 U.S. at 627. Specifically, the Supreme Court pointed

out that the settlement included no adjustment for inflation and only a few claimants per year

could opt out at the back end. Thus, under those circumstances, the Court held that the settling

parties "achieved a global compromise with no structural assurance of fair and adequate

representation for the diverse groups and individuals affected." *Id.*

Here, however, the Settlement is fundamentally different because all Class Members have already suffered injury; there is no set-aside for future injuries by TikTok. *See generally* ECF No. 122-1 (Settlement Agreement and Addendum). Moreover, all Class Members have the right to opt out. *Id.*, Settlement Agreement, § 10.

This settlement is also fundamentally different than that in *Ortiz.* There, part of the settlement fund comprised an insurance policy that covered the defendant for pre-1959 asbestos claims but was being used to fund post-1959 claims. *See Ortiz*, 527 U.S. at 850, 857. The Supreme Court found that this type of allocation decision represented an intraclass conflict that revealed the lack of structural protection for the class as required by Rule 23(a)(4). Unlike *Ortiz*, Class Counsel here has not been forced to allocate an insurance policy dedicated to minors among adult class members; rather, TikTok itself has offered to fund a settlement to resolve all claims.

The fact that TikTok's venue-based defenses, such as those regarding the arbitration agreement, may be stronger as to adult class members than as to minors (*see* ECF No. 126, p. 8) does not suggest the minors are entitled to a larger recovery or require subclass representation. And whether a minor could prove his case in court versus an adult at arbitration does not affect the amount each could potentially recover and, therefore, the ultimate potential risk to TikTok. Rather, the affirmative defenses raised were part of the calculus of TikTok's risk of liability and overall willingness to pay to resolve all claims.

The objector also suggests that, if adequately represented, minors under the age of 13 would have received preferential settlement treatment. *See* ECF No. 126, at p. 7 (regarding injunctive relief); Transcript 29:19-30:17 (regarding the Child Online Privacy Protection Act (COPPA)). That, too, fails. It ignores that: (1) COPPA is a statute with no private right of action;

6

(2) the injunctive relief provides for deletion of minors' data and requires ongoing compliance with data privacy and data collection laws that would apply to minors;[5] and (3) those under-13 minors would not likely have claims at all in this action if not for the benefits achieved in this Settlement.[6] The fact that *T.K.* class members, i.e., TikTok users under age 13, may recover in this case reflects the Leadership Group's advocacy for the minor Class members' interests.

Accordingly, this Court should reject the objection that minors were required to be subclassed with separate representation, and find that minors, like all Class Members, are adequately represented.

### B. Plaintiffs' counsel made an exhaustive inquiry as to the strength of Plaintiffs' case—including the value of the claims—and the consequent fairness of the proposed Settlement.

At the Hearing, the Court requested "some more information with regard to the valuation process and the process that plaintiffs' counsel went through . . . in arriving at the settlement amount," i.e., "some more information as to what you thought the strengths and weaknesses of your cases were and your claims were." Transcript, 46:2-20 (recognizing, however, that Rule 23

---

[5] *E.g.*, ECF No. 122-1, Settlement Agreement, § 6 (addressing categories of data that Defendants cannot collect or transmit absent disclosure and compliance with "all applicable laws"; Addendum, § 4.2 (addressing deletion of previously collected data to be "consistent with the intent of the injunctive relief in Section 6").

[6] In *T.K.*, plaintiffs alleged that TikTok tracked, collected, and disclosed the personally identifiable information and/or viewing data of children under the age of 13, without parental consent. 1:19-cv-07915, ECF No. 1 (complaint), ¶ 1. That case was settled on behalf of minors under the age of 13. *Id.* at ECF No. 5-1 (settlement agreement). If the court finally approves that settlement (it has already been preliminarily approved), those minor users' VPPA, Intrusion Upon Seclusion, California Constitutional Right to Privacy, California Consumers Legal Remedies Act, and Illinois Consumer Fraud and Deceptive Business Practices Act claims will be released, along with any other actual or potential claim arising out of the facts underlying the complaint. *Id.*; *see also id.* at ECF No. 1 (complaint). However, Co-Lead Counsel here negotiated a provision allowing *T.K.* class members to file claims in this Settlement anyway. ECF No. 122-1, Settlement Agreement, § 2.4.

does not require a detailed valuation or percentage-based success estimate breakdown, as one
objector suggested).

### 1. The Leadership Group conducted an extensive analysis of the merits of each claim and of the case as a whole.

In evaluating the case's value, Co-Lead Counsel, *inter alia*: (1) assessed a broad range of
potentially applicable claims (some of which they did not ultimately pursue); (2) determined the
damages available under each claim; (3) analyzed the strength of each claim and of the case as a
whole; (4) worked with consultants and experts to assess the factual underpinnings of the case;
(5) researched and considered results in other comparable cases (including both settlements and
dismissals); (6) evaluated settlement pressures and factors beyond the claims themselves; and
(7) considered the advice and perspective of the parties' highly experienced mediator, who is
also a former federal judge.

As discussed in the Motion and Co-Lead Counsel Elizabeth Fegan's declaration in
support, the Leadership Group engaged in months of research, analysis, advocacy, internal
debate, and negotiation to assess the value of the claims and defenses in this ligation. Motion,
*e.g.,* pp. 11-14; Fegan Decl., ECF No. 122-7, *e.g.,* ¶¶ 15-23. Well aware of the maximum
damages underlying each claim, members of the Leadership Group undertook discrete research
projects to assess the strength of those claims and the case as a whole. *See id.* at ¶ 17.

As just one example of the post-leadership-appointment analysis, and without waiving
the protections for attorney work product, one member of the Leadership Group, at Co-Lead
Counsel's direction, drafted a 16-page single-spaced memorandum regarding the strengths of the
VPPA claim alone, which was then independently vetted by members of the Co-Lead Counsel
team several times during the parties' settlement negotiations and when crafting the consolidated

amended complaint ("Complaint," ECF No. 114).[7] A member of the Co-Lead Counsel team prepared a comprehensive memorandum regarding the potential valuation of BIPA and non-statutory privacy claims with nearly 30 different potential recovery scenarios. That, too, was discussed and vetted by Co-Lead Counsel multiple times before the Settlement was submitted for approval. These are just examples of the extensive work product undertaken to evaluate and value the claims here.

Co-Lead Counsel and other members of the Leadership Group also analyzed the claims and defenses at numerous other stages of the litigation, including, e.g.:

- researching and drafting the initial complaints;

- vetting the claims asserted in various now-consolidated actions in connection with motions for consolidation and transfer before the Judicial Panel for Multidistrict Litigation and subsequent motions requesting appointment as lead counsel;

- preparing mediation statements for two mediations and analyzing TikTok's own mediation briefing;

- researching and drafting the consolidated amended complaint;

---

[7] One objector claims "Co-Lead Counsel evaluated the VPPA claim in less than a week without the benefit of any discovery." ECF No. 132, at p. 7. He bases this conclusion on a self-concocted theory that counsel here first learned of the VPPA claim's value at an August 7, 2020 status hearing in *T.K.* and later mediated this case on August 13, 2020. *Id.* There is no question that, at the time of the mediation, VPPA claims had long been pending against TikTok in both the *T.K.* case and in a complaint consolidated in this MDL. And the VPPA claims were addressed with the mediator in this case well before the August 7 status hearing the objector chose simply because it was closest in time to the mediation.

The absence of the VPPA claim in the vast majority of the now-consolidated complaints was not an oversight by dozens of the country's best privacy and class action lawyers. Rather, it speaks volumes about the claim's historical weaknesses. And this Court recognized the pitfalls of kitchen sink pleading in denying an earlier motion to intervene in this action: an "attempt to represent an expansive class may delay or even defeat class certification. At a minimum, bringing more claims against more defendants promises to widen the scope of discovery and prolong this litigation." 1:20-cv-02810, ECF No. 46, p. 8. Though Co-Lead Counsel, after much consideration, ultimately decided to pursue the VPPA claim, it is not without risk.

- engaging in ongoing settlement negotiations;

- working with technology experts and consultants, and conducting confirmatory discovery; and

- assessing and negotiating the allocation of settlement funds between subclasses with different claims (more information about that process is available in the declarations of allocation counsel, ECF Nos. 122-10 and 122-11).

Simply put: the Leadership Group revisited the claims, defenses, litigation risks, and valuation *numerous* times. This rigorous analysis was, in part, the result of the way the Leadership Group was brought together from a mix of teams who asserted different claims and had different perspectives about how the case should proceed.

Co-Lead Counsel also worked with experienced technology experts who reviewed TikTok's application code, data transfers, and source code and provided valuable information regarding whether and how plaintiffs would be able to prove their claims. And Co-Lead Counsel considered practical and external factors—like hurdles associated with obtaining discovery from and/or enforcing a judgment against foreign defendants, and settlement pressures related to, for example, former President Trump's executive orders requiring the sale of TikTok, judicial and legislative initiatives to undermine BIPA or overturn it altogether, and challenges to class member standing in actions asserting statutory violations (like that currently pending before the Supreme Court in *TransUnion LLC v. Ramirez,* Case No. 20-296).

No stone was left unturned. By assessing the strengths and weakness of the claims, and in light of their decades of experience with class actions like this one, Co-Lead Counsel were able to assess the case's value now, and at trial—and balance that with the risks of continued litigation.

### 2. Co-Lead Counsel's assessment made clear that the $92 million settlement (plus injunctive relief) is fair, reasonable, and adequate.

The Complaint asserts nine claims.[8] Co-Lead Counsel assessed each of these claims (and others), as well as other case-wide risks (e.g., arbitration clauses, jurisdictional issues, class certification, and legislative changes), in valuing the case and assessing the Settlement.[9] Some of these considerations are addressed in the Motion and below.

### a. All of Plaintiffs' claims are subject to overarching risk and they will be compelled to individual arbitration.

The valuation of Plaintiffs' claims is impacted by terms of service that could effectively dispose of the claims in their entirety. TikTok's terms of service include an arbitration clause, as well as a class action and class arbitration waiver. The enforcement of these provisions would moot Plaintiffs' class case as a threshold matter even before a motion to dismiss is considered, effectively valuing all asserted claims at $0 (absent individual pursuit of those claims in arbitration). *See also*, Motion, pp. 4-5.

---

[8] The Complaint alleges violations of the: Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030; California Comprehensive Data Access and Fraud Act (CDAFA), Cal. Pen. C. § 502; Right to Privacy – California Constitution; Intrusion Upon Seclusion; California Unfair Competition Law (UCL), Bus. & Prof. C. §§ 17200 *et seq*.; California False Advertising Law (FAL), Bus. & Prof. C. §§ 17500 *et seq*.; Restitution / Unjust Enrichment; Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710, *et seq*.; and Illinois' Biometric Information Privacy Act (BIPA), 740 ILCS 14/1, *et seq*. The Complaint also asserts a tenth alternative cause of action for violations of state consumer protection statutes in the event California law is not applied nationwide. Complaint, ¶¶ 322, 418-427.

[9] In providing this supplemental memorandum, Co-Lead Counsel have attempted to balance the Court's need to assess the settlement, with Co-Lead Counsel's need to protect their work product, particularly to the extent it identifies case weaknesses that might cut against the interests of the Class, who would have to resume litigation and zealous advocacy of their claims if the Settlement is not approved.

In this brief, Plaintiffs focus on some of the risks of and defenses to their case because those factors shed light on the reasons why a settlement that recovers less than maximum damages is nevertheless in the best interests of the Class and exceeds Rule 23's requirements for approval. However, Co-Lead Counsel have faith in Plaintiffs' claims, and the $92 million fund (with injunctive relief) is reflective of the positive merits of this case.

Plaintiffs would argue that, even if the terms are valid, minors could disaffirm their agreement to those provisions. Some cases have held, however, that disaffirmance would require minors to cease using the TikTok application permanently (and to have done so before filing their complaint)—a big ask given the App's widespread popularity with teenagers. *See, e.g., C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015). Even if minors can legally disaffirm TikTok's terms and are willing to cease use of the App to do so, the ability to disaffirm these provisions on a class-wide basis is relatively novel and untested. Plaintiffs have not located a single ruling from any jurisdiction to date supporting the concept of class-based disaffirmance.

The substantial risk of forced arbitration factored meaningfully into counsel's valuation of Plaintiffs' claims.

### b. The statutory damages claims provide high maximum damages, with equally high barriers to success and weak track records.

The claims that provide the overwhelming majority of the maximum potential damages in this case are the Video Privacy Protection Act (VPPA) and Illinois Biometric Information Privacy Act (BIPA) claims—which provide statutory damages ($2,500 for VPPA violations; $1,000 for negligent BIPA violations; and $5,000 for intentional or reckless BIPA violations—though neither objector asserts that class members would be entitled to $5,000 here). No consumer class has ever recovered full statutory damages for either claim. To be sure, the statutes set compelling minimum damages amounts. But to recover anything at all, Plaintiffs must, of course, prove their underlying claims (and overcome Defendants' arguments as to arbitration and class certification).

12

### i. BIPA

BIPA was enacted in 2008 to regulate the collection, use, storage, and handling of biometric identifiers. The law is not yet well developed beyond motion to dismiss rulings. This provides an opportunity for Plaintiffs to create new, favorable law—but it also creates substantial risk that courts will construe the law in an undesirable way.

In valuing Plaintiffs' BIPA claims (and the likelihood of obtaining statutory damages), Co-Lead Counsel considered, *inter alia*:

- Whether the Court and jury will conclude that TikTok's facial landmarking constitutes a "biometric identifier" as defined in the statute, given the nature of the landmarking (TikTok contends its landmarking does not use facial recognition and is not used—nor can it be used—to identify a person, and that TikTok does not otherwise collect biometric data). 740 ILCS 14/5, 14/10.

- Whether the Court and jury will conclude that TikTok's facial landmarking constitutes a "biometric information" as defined in the statute, e.g., information that can be "used to identify an individual," given that TikTok's facial landmarking data is not associated with a name or other personally identifying information. 740 ILCS 14/5, 14/10.

- Whether the Court and jury will conclude TikTok was "in possession" and/or "collect[ed], capture[d], purchase[d], receive[d] through trade, or otherwise obtain[ed]" Plaintiffs' biometrics in light of TikTok's contentions that facial landmarking data remained on users' devices and in light of the confidential confirmatory discovery regarding any transfer of such data. 740 ILCS 14/15(b).

13

Plaintiffs also considered potential changes to the legal and legislative treatment of BIPA over the potential years of ongoing litigation should the Settlement be rejected. BIPA defendants often contend the statute is unconstitutional, violates the Dormant Commerce Clauses, and/or cannot be applied extraterritorially. Courts have often rejected or deferred determinations on these arguments. But anti-BIPA legislation is currently pending in Illinois that threatens to eliminate BIPA's private right of action, eliminate BIPA's statutory damages, and/or otherwise materially limit its reach. *See* Laura Ann Wood, *Illinois Bill Seeks To File Down Biometric Law's Sharp Teeth*, LAW360 (March 22, 2021) (attached hereto at **Exhibit A**).[10] Plaintiffs could overcome arbitration clauses, certify a class, get favorable interim legal interpretations of BIPA, gather proof of the alleged facts through months or years of discovery and high-tech expert work—only to find that BIPA's key provisions are stripped by the time of trial.

And, of course, Plaintiffs considered other settlements in comparable consumer BIPA cases (none has gone to trial). The Motion details those recoveries and, in particular, addresses similarities and differences between the facts here and those underlying the recent recovery in *Facebook BIPA*. Motion, pp. 24-29. *See also* **Exhibit B** (chart of relevant settlements). These factors demonstrate that the recovery here is fair, adequate, and reasonable.

### ii. VPPA

The VPPA was enacted in 1988 as a reaction to the disclosure of a Supreme Court nominee's video store rental records in a newspaper. *Ellis v. Cartoon Network, Inc*., 803 F.3d 1251, 1252 (11th Cir. 2015). Though the VPPA has been around two decades longer than BIPA,

---

[10] *E.g*., Illinois SB 3593: https://tinyurl.com/myfknh2p; SB2134: https://tinyurl.com/znm5vchc; SB0056: https://tinyurl.com/24xk8ksm; HB0559: https://tinyurl.com/yffnyznr; HB0560: https://tinyurl.com/hsmvfp2e.

and a greater number of relevant decisions exist—that law is not entirely favorable. And TikTok's cutting edge technology is not a square fit with the statute's outdated phrasing.

In valuing plaintiffs' VPPA claim (and the likelihood of obtaining statutory damages), Co-Lead Counsel considered a number of the statute's elements, e.g.:

- Whether the Court and jury will conclude TikTok is a "video tape service provider" engaged in a business involving "cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4);

- Whether the Court and jury will conclude each TikTok user is a "renter, purchaser, or subscriber of goods or services from a video tape service provider." *See id.* at (a)(1); *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1258 (11th Cir. 2015) ("free downloading of a mobile app . . . to watch free content, without more, does not a 'subscriber' make"; though registering and establishing a profile, for example, likely does);

- Whether the Court and jury will conclude TikTok's alleged disclosure of anonymized third-party advertising identifiers constitutes disclosure of "personally identifiable information" (PII)—particularly as courts have held that the VPPA protects "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *See* 18 U.S.C. § 2710(b)(1); *e.g., In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 290 (3d Cir. 2016);

- Whether the Court and jury will conclude TikTok obtained "informed, written consent" to such disclosures in light of its privacy policies, which include certain

15

disclosures about TikTok's sharing of information with third parties. *See* 18
U.S.C. § 2710(b)(2)(B); and

- Whether the Court and jury will conclude the transfer of the alleged information
  to TikTok's business partners is "incident to the ordinary course of business" of
  TikTok and thus falls within an exception to the statute. *See id.* at (b)(2)(E); *See,
  e.g., Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 621, 623 (7th Cir.
  2014) (dismissing VPPA claim because video tape service providers "may use
  third parties in their business operations"); *Rodriguez v. Sony Comput. Entm't
  Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015) (affirming dismissal of VPPA
  claims alleging disclosure of personal information to affiliate entities).

*See also* Motion at 7-8, 22-23 (further discussing relevant case law, including Third and Ninth
Circuit decisions suggesting numeric identifiers are not PII under the VPPA, and a First Circuit
decision suggesting they may be, if combined with GPS information, for example).

The hurdles associated with a VPPA claim are reflected in the results of numerous prior
VPPA class cases, which Plaintiffs also considered in valuing the claim. Many were dismissed at
the motion to dismiss stage. And those that resulted in a settlement conferred minimal or *cy pres*-
only relief without any money actually paid to class members. These are discussed in the
Motion. *See* Motion, pp. 29-30 ($1.06 per class member in *Vizio*, $0.18 per class member in *T.K.*
(pending final approval); *cy pres* settlement amounting to $0.14 per class member in *Netflix*; *cy
pres* settlement averaging $2.59 per class member in *Lane v. Facebook* (which also asserted an
ECPA claim with $10,000 in statutory damages and other claims). *See also* **Exhibit B**
(identifying these and other cases in more detail).

16

In valuing Plaintiffs' VPPA claim, Co-Lead Counsel considered all the attendant strengths and weaknesses of the claim and balanced the sought-after $2,500 statutory damages with the risks of litigation and the reality that class members have historically recovered closer to $1, if anything at all.

### c. Plaintiffs' additional claims also carry their own risks, without the potential upside of statutory damages.

Plaintiffs' seven other claims (four consumer statutes, one California Constitutional violation, and two common law claims) each have factual and legal hurdles as well, and none offers statutory damages.

With respect to the factual underpinnings of those claims, for example, *The Wall Street Journal* reported just yesterday that national security fears concerning TikTok's connections to China may have been unfounded and that the TikTok app is no more intrusive in terms of data collection than its competitors. *See* Eva Xiao, *TikTok Doesn't Pose Overt Threat to U.S. National Security, Researchers Say*, THE WALL STREET JOURNAL (March 22, 2021) (attached hereto at **Exhibit A**).

Regarding the legal requirements of these claims, many cases have held that the consumer statutes each require allegations of pecuniary damages to state a claim.[11] Courts have often rejected the contention that "that the unauthorized collection, use, or disclosure of personal

---

[11] Defendants would argue, for example, that: The CFAA provides a civil remedy when a plaintiff "suffers damage or loss" stemming from a violation of the Act of at least $5,000 in value during a one-year period. 18 U.S.C. § 1030(c)(4)(A)(i)(I) and (g). CDAFA claims requires economic harm or loss. *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1050 (N.D. Cal. 2018). The UCL requires "injury in fact and . . . lost money or property as a result of the unfair competition," i.e., "some form of economic injury." Cal. Bus. & Prof. Code § 17204; *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011); FAL requires "injury in fact" and "lost money or property . . . ." *Bower v. AT&T Mobility, LLC*, 127 Cal. Rptr. 3d 569, 578 (Ct. App. 2011).

information constitutes economic damages for the purposes of" these claims.[12] Without the requisite showing of damages, Plaintiffs would lack standing and their claims would be entirely dismissed. (Plaintiffs have alleged that deficiencies associated with their devices—e.g., battery and bandwidth drain—are damages; TikTok would dispute that suffices).

There are additional risks with establishing other elements of these claims. The Computer Fraud and Abuse Act (CFAA), for example, is aimed at hacking, and Plaintiffs must overcome defenses that they voluntarily downloaded and authorized the App's access to user data as disclosed in TikTok's privacy policy. *See, e.g., Brodsky v. Apple Inc.*, No. 19-CV-00712-LHK, 2019 WL 4141936, at *8 (N.D. Cal. Aug. 30, 2019) (rejecting CFAA claim where plaintiffs did not allege that they had revoked consent for defendant's servers to receive plaintiffs' login activities); *United States v. Nosal*, 676 F.3d 854, 858, 863 (9th Cir. 2012) (CFAA is aimed at conduct wrongfully "circumventing technological access barriers").

The California Comprehensive Data Access and Fraud Act (CDAFA) is California's state-law parallel to the CFAA, though it lacks a $5,000 loss minimum (it does, however, require loss or damages). The analysis under the CFAA and the CDAFA are similar, and authorized access is not actionable. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016). Plaintiffs would thus be required to show that TikTok exceeded the scope of its authorized access to their devices.

The California False Advertising Law (FAL) and California Unfair Competition Law (UCL) claims depend on false advertisements and unfair conduct, respectively. *E.g., Williams v.*

---

[12] *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 988 F. Supp. 2d 434, 448 (D. Del. 2013) (regarding CFAA), *aff'd in part, vacated in part, remanded*, 806 F.3d 125 (3d Cir. 2015); *see id.* at 450 (regarding UCL); *see also In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1068 (N.D. Cal. 2012) (regarding CFAA); *In re Google Android Consumer Privacy Litig.*, No. 11-MD-02264 JSW, 2013 U.S. Dist. LEXIS 42724, at *34-25 (N.D. Cal. Mar. 26, 2013) (regarding CDAFA).

*Apple, Inc.*, No. 19-CV-04700-LHK, 2020 WL 1492718, at *14 (N.D. Cal. Mar. 27, 2020);

*Gregory v. Albertson's, Inc*., 104 Cal. App. 4th 845, 854, 128 Cal. Rptr. 2d 389, 394 (2002).

Plaintiffs would have to identify specific advertisements and conduct that both (1) meet the

requirements of these claims and (2) are not rebutted or disclosed by TikTok's expansive terms

of service and privacy policies. They would also have to overcome arguments as to reliance.

The California Constitutional claim requires proof of a "highly offensive," intentional

intrusion into a place where Plaintiffs had a reasonable expectation of privacy that is

"'sufficiently serious' . . . to constitute an 'egregious breach' of the social norms." *Hernandez v.*

*Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009). This is a high bar. It is made higher by TikTok's

various privacy policies and terms of service which make numerous disclosures about data

access and disclosures.

Similarly, the intrusion on seclusion claim requires a showing of a "highly offensive"

disclosure. *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 987-88 (N.D. Cal. 2014)

(finding that disclosure of a person's name and identity, contact list, and contents of

communications to third-party developers was not highly offensive).

Unjust enrichment claims often survive a motion to dismiss, with complicated state-by-

state and class-related analyses to come later. *E.g., In re Pork Antitrust Litig*., Nos. 18-1776, 19-

1578, 19-2723, 2020 U.S. Dist. LEXIS 191675, at *61 (D. Minn. Oct. 16, 2020). However, such

claims may require that a plaintiff at least show a "detriment—and, significantly, a connection

between the detriment and the defendant's retention of the benefit." *Cleary v. Philip Morris Inc*.,

656 F.3d 511, 519 (7th Cir. 2011); *id.* at 520 (plaintiffs' "claim that the defendants had a

concerted plan to intentionally mislead consumers and conceal the truth about their cigarettes, is

insufficient to support a cause of action for unjust enrichment. Unjust enrichment is not a mode

of imposing punitive damages; it is a means of recovering something that the defendant is not entitled to but is unfairly possessing to the plaintiff's detriment"). Plaintiffs will have to overcome arguments that they have experienced no detriment because they paid nothing for the App, they enjoyed its benefits, consumer data is not valuable to consumers themselves, and/or the alleged wrongdoing is inadequately linked to TikTok's profit. TikTok may be profitable, but that alone does not establish Plaintiffs' right to recover those profits.

### d. Plaintiffs' non-statutory damages claims generally resolve for nominal damages (if anything).

The high-level overview in this brief identifies just a few of the factors Co-Lead Counsel considered in evaluating the likelihood of success in pursuing, *inter alia,* restitution, actual damages, and/or injunctive relief through these claims. Another important factor was the historical recoveries in cases alleging these claims. They are low.

Setting aside the countless cases that have been dismissed, settlements of these claims in the privacy context include, e.g., $0.25 per class member in a claims-made settlement of CFAA claims in *In re Sony PS3 "Other OS" Litig.*, 2017 U.S. Dist. LEXIS 203402; a *cy pres*-only settlement of CFAA, VPPA, and ECPA claims in *Lane v. Facebook, Inc.*, No. 5:08–cv–03845–RS (N.D. Cal.); preliminary approval of an injunctive-only relief settlement of intrusion upon seclusion, California Constitutional right to privacy, UCL, and other New York and Massachusetts state-law claims in *McDonald v. Kiloo* A/S, No. 17-cv-04344-JD, 2020 U.S. Dist. LEXIS 175865, at *22 (N.D. Cal. Sep. 24, 2020) ("further litigation would have been time-consuming and risky, and any damage award was uncertain and likely to have been nominal for most class members."); $1.56 per class member in case alleging violations of UCL and breach of contract in *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 584 (N.D. Cal. 2015) and 12-cv-03088, ECF No. 136 (preliminary approval order). *See also Moreno v. S.F. Bay Area Rapid*

*Transit Dist.*, No. 17-cv-02911-JSC, 2019 U.S. Dist. LEXIS 13309, at *29 (N.D. Cal. Jan. 28,

2019) (injunctive-only relief settlement of a California Cellular Communications Interception

Act claim after other claims alleged here – including intrusion upon seclusion and California

Constitutional right to privacy—were dismissed). *See also* **Exhibit B**.

In sum, Plaintiffs face risks in establishing these claims and the recoveries are typically

quite low.

### 3. The objectors offer nothing that warrants risking the Class's recovery in continued litigation.

One objector (providing no substantive analysis),[13] represented by Scott Drury, values

the VPPA claim at $1.15 billion and the BIPA claim at $50 million. ECF No. 126, at p. 9. The

Settlement's monetary fund far exceeds the objector's BIPA valuation—yet, he apparently takes

issue with the recovery for the VPPA claim. Similarly, the other objector, represented by Jay

Edelson, says nothing about the Settlement's recovery as it pertains to the BIPA claim, but notes

that the VPPA is "potentially 2.5x as valuable as the . . . BIPA claim" (referring to bare statutory

damages). ECF No. 132, p. 8. While Co-Lead Counsel appreciate that the objectors find the

Complaint so persuasive and compelling that it warrants a result that exceeds by many multiples

any other VPPA (or privacy) settlement in history—the reality of the applicable laws and

---

[13] Drury made no real attempt to value this case, despite referencing the Seventh Circuit's "easy" "formula" in *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002), ECF No. 126, pp. 1, 9—which this Court recognized is of limited import here, Transcript, pp. 35-36. Drury simply applied the numbers that the Seventh Circuit itself repeatedly described as "arbitrary." *Id.*; 288 F.3d at 285. He disregarded the "discount[]" the court contemplated "depending on an estimate of the likely duration of the litigation." *Id.* And he ignores that his "medium" value of $200 million would be the largest recovery in VPPA history and the largest BIPA recovery when class size is considered. Even his basic math doesn't add up: he claims the "net expected value" of the VPPA and BIPA claims is $1.15 billion and $50 million, respectively—but totals that to $1.45 billion. ECF No. 126, p. 9. Regardless, rather than apply "arbitrary" numbers to a theoretical formula, Co-Lead Counsel analyzed this case, and, *inter alia*, considered comparable cases that have actually recovered monetary funds for classes, to assess the value here.

relevant facts do not support shunning a $92 million fund and injunctive relief in favor of continued litigation.

Edelson claims that a split in authority on VPPA "places the claim on equal or stronger footing than the BIPA claim" because the court in *Facebook BIPA* noted the "dearth" of authority regarding issues present here. ECF No. 132, p. 8 (citing 2020 WL 4818608, at *3). He fails to tell the whole story. That "division in authority" concerns only one of several relevant, risky elements of VPPA—and it falls in defendants' favor. Even the supportive circuit court case is based on facts that go beyond what Plaintiffs here have alleged. And that "dearth" of BIPA authority is now complemented by the $650 million settlement in *Facebook BIPA*. No VPPA settlement approaches that amount, let alone does one eclipse it by 2.5 times.

Edelson is no stranger to VPPA actions or their hurdles. When he settled *In re Netflix Privacy Litig.*, No. 11-cv-00379 (N.D. Cal.) in 2012, that class received nothing. 2013 U.S. Dist. LEXIS 37286. But Edelson told the Ninth Circuit Court of Appeals that the $9 million *cy pres* distribution (averaging a "value" of $0.14 per class member) provided "relief in excess of what could reasonably be expected from trial." *In re Netflix Privacy Litig.*, No. 13-15723 (9th Cir.), ECF No. 51-1, p. 17 (attached as **Exhibit C**). He justified a request for $6.4 million in fees by stating that, even if plaintiffs fully prevailed on the merits: "given that Netflix's theoretical liability exceeded $150 *billion*, both constitutional and pragmatic concerns suggested that no court would award such an amount, and, in class counsel's opinion, a best-case recovery for those claims would be $3 million." *Id.* at p. 58 (emphasis in original).

Court-approved settlements are not the only barometer of Plaintiffs' likelihood of success or the value of their claims—many cases never make it past a motion to dismiss. Edelson represented plaintiffs in *Eichenberger v. ESPN, Inc.*, No. 14-463, 2015 U.S. Dist. LEXIS 157106

22

(W.D. Wash May 7, 2015)—the VPPA claim there was dismissed with prejudice after the second amended complaint. That decision was affirmed, 876 F.3d 979 (9th Cir. 2017), contributing to the unfavorable Circuit split weighing against Plaintiffs here. Edelson also represented plaintiffs in *Perry v. CNN, Inc.*, 854 F.3d (11th Cir. 2017), another Circuit Court-affirmed dismissal of a VPPA claim.

Edelson, citing a 2016 case from the Eastern District of Wisconsin, also contends that California's "unique" laws permit restitution of profits. ECF No. 132, pp. 8-9. A 2020 case from the Northern District of California, however, rejected plaintiffs' attempt to seek restitution in connection with a UCL claim that alleged defendants wrongfully monetized and profited from their personal content and information, dismissing plaintiffs' claims outright. *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 840-41 (N.D. Cal. 2020).

Edelson and his co-counsel achieved a historical settlement in *Facebook BIPA*. But the facts here are different, as are the claims. Edelson's objections are entirely divorced from the realities of *this* case. Instead, they are rooted in his feigned surprise that this result, which compares favorably to *Facebook BIPA*, was well-informed and accomplished without the five years of litigation and threat of trial. *See, e.g.,* ECF No. 132, pp. 7, 8. The resolution here was efficient, yes—but it was effective, too. And it was neither achieved overnight nor ill-considered. The first MDL complaint was filed a year before the settlement was submitted for approval; and the Leadership Group vetted the settlement for six months—with confirmatory discovery and candid discussions taking the place of motion briefing and formal discovery processes. Co-Lead Counsel undertook an informed vetting and valuation of this case.

C. **In addition to direct email notice to more than 60 million email
   addresses and a Notice Plan designed to reach 95% of users
   several times—the parties will provide notice through TikTok's
   "Inbox" feature, subject to a Court order.**

At the Hearing, the Court asked Co-Lead Counsel to address why the Notice Plan does

not include "some sort of notice that's provided through the app. . . ." Transcript, 46:21-24. The

Court also asked "the parties . . . to go back and talk about whether or not there is a way to email,

or otherwise, to provide some sort of notice through the app itself." Transcript, 46:26-47:5.

Direct individual notice by email is the foundation of the proposed notice program here.

The Parties conservatively estimate that the email notice (to be sent to 60 million plus email

addresses in TikTok's possession) will provide at least one-third—and potentially more than

two-thirds (70%)—of class members with direct, individual notice.[14] In addition to the direct

email notice, the Parties, in conjunction with proposed claims administrator Angeion, have

proposed a comprehensive publication notice designed to reach 95% of the target audience more

than five times. The Federal Judicial Center (FJC) has concluded that a notice plan that reaches

at least 70% of the class is reasonable. Federal Judicial Center, Judges' Class Action Notice and

Claims Process Checklist and Plain Language Guide, p. 3 (2010). The proposed notice program

far surpasses the 70% threshold.[15]

Per the Court's instruction at the Hearing, the Parties again conferred further about

providing notice through the App. TikTok was previously resistant to providing inbox notice

---

[14] The Parties provide this conservative number as an estimate as it is unknown how many TikTok
accounts with email addresses are duplicate accounts created by the same user using different email
addresses.

[15] Prior to submitting the Settlement for preliminary approval, Angeion also developed a notice plan that
would reach 80.63% of class members an estimated 4.47 times—which also surpasses the FJC's target
threshold. Co-Lead Counsel nevertheless selected the more comprehensive, "enhanced" notice option.

through the App because of, *inter alia*, concerns that: (i) users had not consented to receive "Inbox" and "push" notifications that are not part of the integral features of the App; (ii) the default setting for Android users, and an elective setting for Apple (iOS) users, is to receive "push" notifications for each Inbox notification; and (iii) TikTok is prohibited by its agreements with the app stores (like Apple and Google) from sending push notifications for unsolicited content beyond the "integral features" of the App.

Following numerous conferences related to providing supplemental notice, TikTok has agreed, pursuant to Section 17.5 of the Settlement Agreement ("to take all additional action that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement"), to provide Inbox notice, at its own cost, if the Court determines that (1) Fed. R. Civ. P. 23(c)(2)(B) requires use of the Inbox feature to provide the best notice practicable; and (2) the benefit to class members in receiving this notice outweighs any detriment they may experience in receiving in-app and system notifications for non-integral features of the App.

## III. CONCLUSION

For the foregoing reasons, and those explained in Plaintiffs' Motion, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Approval, and grant such and other further relief as the Court deems appropriate.

Dated: March 23, 2021        Respectfully Submitted,

By: */s/ Katrina Carroll*

Katrina Carroll
CARLSON LYNCH, LLP
111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
kcarroll@carlsonlynch.com

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

By: */s/ Ekwan Rhow*
Ekwan Rhow
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
(310) 201-2100
erhow@birdmarella.com

*Plaintiffs' Co-Lead Counsel*

Jonathan Jagher
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

Megan E. Jones
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
 (202) 540-7200
mjones@hausfledllp.com

Michael Gervais
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mgervais@susmangodfrey.com

Amanda K. Klevorn
Burns Charest LLP
365 Canal Street
Suite 1170
New Orleans, LA 70130

(504) 799-2845
aklevorn@burnscharest.com

Albert Y. Chang
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037
(858) 914-2001
achang@bottinilaw.com

*Plaintiffs' Steering Committee*

Shannon Marie McNulty
Clifford Law Offices, P.C.
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILILNOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: TIKTOK, INC., | ) | |
| CONSUMER PRIVACY | ) | MDL No. 2948 |
| LITIGATION | ) | |
| | ) | Master Docket No. 20 C 4699 |
| | ) | |
| | ) | Judge John Z. Lee |
| | ) | |
| | ) | Magistrate Judge Sunil R. Harjani |
| This Document Relates | ) | |
| to All Cases | ) | |

## MEMORANDUM OPINION AND ORDER

In August 2018, the Beijing-based technology company ByteDance, Ltd. ("ByteDance") launched a social media platform and entertainment application known today as TikTok ("TikTok" or "the App," formerly known as Musical.ly) in the United States and elsewhere abroad. The App, which allows users to share relatively short homemade videos, quickly became one of the most ubiquitous in the world, and boasts more than 800 million active users across the globe today.

Soon after the App exploded in popularity across the United States, however, so too did concerns, and litigation, about its handling of user data. The lead plaintiffs ("Plaintiffs") in this multidistrict litigation ("MDL") are United States residents who allege that the subsidiaries of ByteDance—TikTok, Inc. (formerly Musical.ly, Inc.), TikTok, Ltd., ByteDance Inc., and Beijing ByteDance Technology Co., Ltd. (collectively, "Defendants")—have been flouting U.S. privacy law by surreptitiously harvesting and profiting from Plaintiffs' private information, including their biometric data, geolocation information, personally identifiable information, and

unpublished digital recordings, through the App.  Following months of negotiations, Plaintiffs have reached a settlement agreement with Defendants that would provide $92 million in monetary relief and an array of injunctive relief for the putative settlement class.

Before the Court is Plaintiffs' motion for preliminary approval of the settlement agreement, as well as various objections from putative class members. For his part, Objector Dennis Litteken contends that the settlement agreement is not fair, reasonable, and adequate, because it does not reflect the net expected value of continued litigation to the class, and that the proposed notice plan is deficient. Objector Mark S., as parent and legal guardian of his minor son, A.S., echoes these contentions and adds that the settlement does not account for conflicts between minor and non-minor class members and that the proposed release is overly broad vis-à-vis the proposed settlement in a somewhat related case pending in this judicial district. Finally, Objectors Brian Behnken and Joshua Dugas insist that the proposed opt-out procedure is so onerous as to violate due process and the Federal Arbitration Act.  For the reasons set forth below, the objections are overruled, and Plaintiffs' motion for preliminary approval is granted.

## I.    Background

### A.    Procedural History

The first of the twenty-one putative class actions comprising this MDL was filed in the Northern District of California in November 2019.  *See Hong v. ByteDance, Inc.*, No. 19 C 7792 (N.D. Cal.) (Koh, J.).   Led by one of the future members of

Plaintiffs' Interim Co-Lead Counsel team, the parties in *Hong* first engaged in mediation in April 2020. The mediation was facilitated by Layn R. Phillips, a former United States District Judge for the Western District of Oklahoma and founder of Phillips ADR Enterprise, an experienced and well-respected alternative dispute resolution firm.

Beginning in late April 2020, the other twenty putative class actions were filed in four separate federal districts: the Northern District of California, the Central District of California, the Southern District of Illinois, and the Northern District of Illinois. On May 15, 2020, counsel from one of these cases filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the then-nineteen related actions and to transfer them to one district court for pretrial proceedings pursuant to 28 U.S.C. § 1407. After some contentious litigation, the JPML selected this district, and specifically this Court, on August 12, 2020. *See* 8/12/20 JPML Transfer Order, MDL No. 2948, ECF No. 2.

The next day, on August 13, 2020, Defendant's counsel and Plaintiffs' counsel from eleven of the MDL member cases participated in a second round of mediation with Judge Phillips. Spearheaded by another future member of Plaintiffs' Interim Co-Lead Counsel team, this mediation had been months in the making. By that time, extraordinary political pressure had mounted against TikTok's U.S. operations, culminating in an August 6, 2020, executive order by then-President Trump declaring that TikTok presented "a national emergency" that "threaten[s] the national security,

foreign policy, and economy of the United States." Exec. Order No. 13,942, 85 Fed. Reg. 48,637 (Aug. 6, 2020).

The executive order gave ByteDance forty-five days to sell TikTok's U.S. operations to a U.S. company before the App would be banned in this country, although the White House later extended the deadline. *See* Proclamation No. 10,061, 85 Fed. Reg. 51,297 (Aug. 14, 2020). In light of this ultimatum, Defendants were motivated at the second mediation session to resolve this litigation in order to shed TikTok's existing liabilities and maximize its value in preparation for sale.[1] After more than twelve hours of negotiation, this mediation session ended in an agreement in principle for class-wide resolution. The terms were later memorialized in a signed agreement on September 4, 2020, although it remained confidential, even from the Court, for some time thereafter.

On September 28, 2020, the Court appointed three attorneys to serve as Plaintiffs' Co-Lead Counsel, one to serve as Plaintiffs' Liaison Counsel, and five to serve as members of the Plaintiffs' Steering Committee (collectively, the "Plaintiffs' Leadership Group"). *See* Case Management Order No. 3, ECF No. 94. In making these selections, the Court drew upon the attorneys' efforts "in identifying or investigating potential claims in the action"; their "experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; their

---

[1]     Although ByteDance initially agreed to sell its U.S. operations of TikTok to Oracle and Walmart later in September 2020, a final agreement never materialized, and negotiations have since stalled as the Biden administration has shelved Trump's threat to blacklist the App. *See, e.g.*, Bobby Allyn, *Biden Administration Pauses Trump's TikTok Ban, Backs Off Pressure to Sell App*, National Public Radio, Feb. 10, 2021, https://www.npr.org/2021/02/10/966584204/ (last accessed Sept. 29, 2021).

4

"knowledge of the applicable law"; and the resources that they would "commit to representing the class"; as well as among other factors pertaining to their "ability to fairly and adequately represent the interests of the class." *See* Fed. R. Civ. P. 23(g)(1)(A)–(B). The Court also was driven by a desire to diversify the members of the Plaintiffs' Leadership Group in terms not only of their individual experiences, locations, attributes, and qualifications, but also of their relationship to and involvement in the settlement efforts thus far, in hopes that such diversity would promote more robust efforts to represent the interests of the putative class as a whole.

Once the Court designated the members of the Plaintiffs' Leadership Group, they engaged in an extensive effort to evaluate the September 4, 2020, settlement agreement. Members were tasked with analyzing an array of legal, factual, and strategic issues; evaluating confirmatory discovery, including interrogatories, document requests, depositions by written question; reviewing the results of a weeks'-long, on-site inspection of TikTok's source code conducted by a world-renowned expert; and engaging in further negotiations with Defendants. *See* Pls.' Mot. Prelim. Approval Class Action Settlement ("Pls.' Mot."), Ex. F, Carroll Decl. ¶¶ 29–37, ECF No. 122-6. Through these efforts, the Plaintiffs' Leadership Group achieved an addendum to the settlement agreement that strengthens many of its terms, especially with regard to injunctive relief, as well as a consensus amongst Plaintiffs on the terms now presented before the Court.

Amid these settlement efforts, Plaintiffs filed a consolidated amended class action complaint on December 18, 2020. *See* Consolidated Am. Class Action Compl.

("Compl."), ECF No. 114.  The complaint identifies a Nationwide Class, defined as all United States residents who have used the App prior to preliminary approval, and an Illinois Subclass, defined as all Illinois residents who have used the App to create one or more videos prior to preliminary approval, which is premised on alleged violations of Illinois's Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 *et seq.*  Compl. ¶ 322.

In addition to the BIPA claim (brought on behalf of the putative Illinois Subclass), the complaint asserts nine counts on behalf of the putative Nationwide Class: violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; violation of the Video Privacy Protection Act ("VPPA"), *id.* § 2710; violation of California's Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), Cal. Penal Code § 502; violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; violation of California's False Advertising Law ("FAL"), *id.* § 17500 *et seq.*; violation of the right to privacy under the California Constitution, *see* Cal. Const. art. I, § 1; intrusion upon seclusion under California common law; unjust enrichment under California common law; and violation of consumer protection statutes in various other states.  Compl. ¶¶ 338–427.[2]

After five months of vetting and working to improve upon the original settlement agreement, Plaintiffs moved for preliminary approval on February 25,

---

[2]     According to the complaint, California substantive law (unlike Illinois substantive law under BIPA) should apply to every member of the putative Nationwide Class, regardless of the member's state of residence, because California's substantial contacts with the asserted claims—Defendants' U.S. headquarters and principal place of business are located there, and the alleged misconduct emanated from there—give it a substantial interest in regulating Defendants' U.S. operations.  Compl. ¶¶ 334–37.

6

2021, at which time its terms were first unveiled. *See* Pls.' Mot., Ex. A, Settlement Agreement and Release ("Settlement Agreement"), ECF No. 122-1. In brief, the Settlement Agreement provides as follows.

## B.     Terms of the Settlement Agreement

First, the Settlement Agreement provides for monetary relief in the form of a $92 million escrow account that Defendants would fund within 90 days for the benefit of Settlement Class members. Settlement Agreement § 4.1. After deducting all Court-approved settlement-related costs and fees, including reasonable attorneys' fees, the fund would be divided into a total number of *pro rata* shares equal to the sum of (1) the number of Nationwide Class members (an estimated 89 million persons) who submit a valid claim and (2) five times the number of Illinois Subclass members (an estimated 1.4 million persons, all members of the Nationwide Class as well) who submit a valid claim. *Id.* §§ 4.5, 5.2–5.3, 13.1; *id.*, Ex. C, Plan of Allocation and Distribution of Settlement Funds at 2, ECF No. 122-3. In this way, members of the Nationwide Class would each receive one share, while members of the Illinois Subclass would each receive one share (for being members of the National Class) plus five additional shares, for six shares overall.[3]

Members selected as class representatives also may be eligible for a service award of up to $2,500 each. Settlement Agreement § 13.2. And any residual funds

---

[3]     In order to arrive at the multiplier for the Illinois Subclass, Plaintiffs' Leadership Group designated separate independent counsel to represent the interests of the Nationwide Class and the interests of the Subclass. After evaluating the strength and weaknesses of the respective claims, the attorneys then engaged in arms-length negotiations to arrive at the multiple. Pls.' Mot., Ex. J, Rotter Decl. ¶¶ 7–9, ECF No. 122-10; *id.*, Ex. K, Zouras Decl. ¶¶ 6–12, ECF No. 122-11.

would be redistributed to class members to the extent feasible or otherwise distributed on terms approved by the Court. *Id.* §§ 5.4.1–5.4.2. Nothing would revert to Defendants. *Id.* § 4.5.

In addition to monetary relief, the Settlement Agreement provides for broad injunctive relief. Specifically, Defendants agree to refrain from using the App to collect or store a domestic user's biometric data, geolocation information, or 'clipboard' content; from storing or transmitting a domestic user's data outside of the United States; and from pre-uploading domestic user-generated content; unless expressly disclosed in TikTok's privacy policy and in compliance with all applicable laws. *Id.* § 6.1. Defendants also would delete all pre-uploaded user-generated content collected from domestic users who did not 'save' or 'post' the content, and would require a newly designed annual training program for their employees and contractors on compliance with data privacy laws. *Id.* §§ 6.2–6.3.

What is more, Defendants agree to hire a third-party firm at their own expense to review their data privacy training for a period of three years and to provide a written verification of that review. *Id.*, Attach., Addendum No. 1 to Settlement Agreement § 4.3, ECF No. 122-1. Defendants would not share users' personally identifiable information with any third party to the extent prohibited by the Video Privacy Protection Act and would disclose the extent to which they share any user data with third parties in TikTok's privacy policy. *Id.* § 4.1.

In exchange for such monetary and injunctive relief, members of the Settlement Class agree to release Defendants from any and all claims that were or

could have been asserted in this MDL relating to the collection and use of user data. *Id.* §§ 2.30, 12.1–12.5.[4] To opt out of this bargain, a member of the Settlement Class must timely complete, sign, and mail a request for exclusion using a designated form to a designated settlement administrator, setting forth: (i) the name of this matter; (ii) the person's or entity's full name, address, email address and telephone number; (iii) a specific statement of the person's or entity's intention to be excluded from the settlement; (iv) the identity of the person's or entity's counsel, if represented; and (v) the date on which the request was signed. *Id.* § 10.1.

The parties propose to provide notice of the Settlement Agreement to members of the Settlement Class through a program led by an experienced third-party administrator. *See id.* § 9.1; *id.*, Ex. L, Weisbrot Decl., ECF No. 122-12. The program will include direct notice to all class members whose email addresses the administrator is able to identify and validate from an analysis of class data records as well as a national media campaign consisting of targeted advertisements via the internet, Facebook, Instagram, Twitter, and various search engines, with specific emphasis on reaching Illinois Subclass members. Weisbrot Decl. ¶¶ 12, 19, 24, 36, 40. The digital media campaign alone is anticipated to reach over 95% of class members more than five times each, while at least one-third of class members are

---

[4]     At the same time, Defendants agree to waive their right to enforce the release to the extent that the release would prevent class members from participating in the pending settlement in *T.K. v. ByteDance Tech. Co.*, No. 19 C 7915 (N.D. Ill.) (Blakey, J.). Settlement Agreement § 2.4; *see also* 4/28/21 Min. Entry, *T.K.*, ECF No. 68 (noting that Defendants "do not object to an ostensible 'double recovery' by members of the settlement class" in both that case and this case). For this reason, the Court overrules Mark S.'s objection that the release in this case is overbroad by making class members choose between the proposed settlement in this case and in *T.K.*

expected to receive direct email notice. *Id.* ¶¶ 15, 18, 47. The proposed notice plan also calls for a dedicated settlement website and a toll-free telephone line. *Id.* ¶ 14.

Furthermore, while Defendants were initially reluctant to provide notice via the TikTok App's 'inbox' feature for a variety of reasons, they have since agreed to do so at their own cost. Pls.' Suppl. Mem. Supp. Mot. Prelim. Approval Class Action Settlement at 25, ECF No. 137.

## II.    <u>Legal Standard</u>

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (cleaned up). When parties seek preliminary approval of a class-action settlement agreement under Rule 23(e), the district court must undertake three essential inquiries.

First, the court must determine whether it "will likely be able" to certify the putative class for purposes of judgment on the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B)(ii); *see Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, at *3 (N.D. Ill. July 26, 2011). The criteria for class certification "demand undiluted, even heightened attention" in the Rule 23(e) context given that "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002).

Second, the district court must determine whether the proposed settlement is

"within the range of possible approval" with regard to the criteria set forth in Rule 23(e)(2). *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (cleaned up); *see* Fed. R. Civ. P. 23(e)(1)(B)(i). Under Rule 23(e)(2), the court may finally approve a proposal settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). At the preliminary approval stage, however, the purpose of the inquiry is only "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing," *Gautreaux*, 690 F.2d at 621 n.3, "not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards," *Am. Int'l Grp.*, 2011 WL 3290302, at *6. "Thus, although neither the Federal Rules of Civil Procedure nor binding case law requires it," courts in this district have tended to perform "a more summary version of the final fairness inquiry" at the preliminary approval stage. *Id.* (collecting cases); *see In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979) (stating that preliminary approval hearings are preferable but not mandatory).

The Seventh Circuit's "longstanding guidance" on Rule 23(e)(2) instructs district courts to consider the following factors in conducting a fairness inquiry: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859,

11

863 (7th Cir. 2014) (quoting *Gautreaux*, 690 F.2d at 631); *see also* Fed. R. Civ. P. 23(e)(2) (listing factors for final approval). "The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re Gen. Motors*, 594 F.2d at 1132 n.44. At the same time, courts "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (cleaned up).

Third, if the district court finds that it will likely be able to certify the putative class and that the proposed settlement is within the range of possible approval, the court must then direct the plaintiffs to provide notice "in a reasonable manner to all class members who would be bound" by the proposed settlement agreement. Fed. R. Civ. P. 23(e)(1). For any Rule 23(b)(3) class proposed to be certified for purposes of a settlement under Rule 23(e), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). This notice requirement "is designed to guaranty that those bound by the ruling in a class action were accorded their due process rights to notice and an opportunity to be heard." *Chaffee v. A&P Tea Co.*, Nos. 79 C 2735 and 79 C 3625, 1991 WL 5859, at *2 (N.D. Ill. Jan. 16, 1991).

Before proceeding to this three-part inquiry, it bears emphasizing the Seventh Circuit's recognition that, due to "the built-in conflict of interest in class action suits," the law "quite rightly requires more than a judicial rubber stamp when the lawsuit

that the parties agreed to settle is a class action." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). On the contrary, the ever-present problem in class action litigation of lawyers who "may . . . place their pecuniary self-interest ahead of that of the class . . . . requires district court judges to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Reynolds*, 288 F.3d at 280. The appellate court has even "gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Id.* At the same time, it has recognized that "[f]ederal courts naturally favor the settlement of class action litigation." *Isby*, 75 F.3d at 1196.

## III. <u>Analysis</u>

### A. Whether the Putative Class Is Likely To Be Certified

The first issue is whether the Court "will likely be able" to certify the putative Settlement Class for purposes of a judgment on the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B)(ii). This inquiry focuses on two rules: Rule 23(a) and Rule 23(b)(3).

### 1. Rule 23(a)

First, under Rule 23(a), the Court must determine whether it is likely to find that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

13

The first three of these prerequisites are readily satisfied in this case. Given its estimated 89 million members nationwide, the Class is plainly too numerous for joinder to be practicable. *Cf. McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) ("Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)(1)."). And there are abundant questions of law and fact arising from the "nucleus of operative fact" common to those 89 million class members, including, to name some of the key examples:

- Whether Defendants improperly collected, stored, disseminated, or otherwise used class members' biometric data and personally identifiable information;

- Whether Defendants exceeded the scope of their authorized access to class members' electronic devices;

- Whether Defendants were unjustly enriched through their alleged misconduct;

- Whether class members consented to Defendants' alleged misconduct by agreeing to TikTok's terms of service;

- Whether class members suffered actual damages; and

- Whether class members are entitled to monetary and injunctive relief.

*Cf. Parker v. Risk Mgmt. Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002) ("[A] common nucleus of operative fact is usually enough to satisfy the [commonality] requirement."). Similarly, because each class member is a user of the App who confronted the same alleged misconduct in much the same manner, the claims of the proposed class representatives typify those of the absent class members. *Cf. id.* ("Typicality is satisfied if a plaintiff's claims arise from the same event, practice or

14

course of conduct that gives rise to the claim of the other class members, and if the claims are based on the same legal theory.").

The Court also finds that the proposed representative parties will fairly and adequately protect the interests of the Nationwide Class and Illinois Subclass as a whole, and have done so thus far. This prerequisite of Rule 23(a) has two components: (1) "the representatives must not possess interests which are antagonistic to the interests of the class," and (2) "the representatives' counsel must be qualified, experienced and generally able to conduct the proposed litigation." *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D. Fla. 1992); *see also Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993).

Here, the proposed Nationwide Class representatives' interests are aligned with, not antagonistic to, those of the absent Nationwide Class members, because they all want to use the App without having their privacy rights violated and to receive compensation for their allegations that Defendants have previously violated those rights under law that applies nationwide. The same goes for the proposed Illinois Subclass representatives' interests in vindicating the privacy rights of Illinois users of the App under BIPA. And especially given that the proposed class counsel are the same attorneys whom the Court vetted and selected to serve as Plaintiffs' Interim Co-Lead Counsel, the Court is confident that they possess the qualifications, experience, and capabilities needed to champion these interests.

Disagreeing with this conclusion, Mark S. objects that the proposed settlement does not satisfy Rule 23(a)(4) because, in his view, it omits additional subclasses

15

needed to account for two conflicts that exist between minor and non-minor putative class members. First, Mark S. contends that minor class members should receive greater compensation because, unlike non-minor class members, they are able to disaffirm the purported arbitration agreements and class action waivers found in TikTok's terms of service, which are among the primary litigation risks Plaintiffs face. But Mark S. overlooks that disaffirmance would seem to require individual minor class members, at the very least, to stop using the App, which may not be worthwhile. *Cf., e.g., C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (8th Cir. 2015) ("By continuing to use facebook.com after bringing their action, Plaintiffs manifested an intention not to disaffirm the contract."). And Mark S. does not contend that any minor class members have disaffirmed these agreements to date. In any event, twenty-eight of the thirty-five proposed class representatives are themselves minors and have an interest in ensuring that their rights (and those of other minor class members) are aggressively pursued. And, indeed, the proposed class counsel, all of whom represent minor Plaintiffs, represent that they studied this issue while negotiating the settlement.

Second, Mark S. posits that minors under the age of thirteen require unique injunctive relief in order to ensure that Defendants delete all of their personal information and disclose the identities of the entities with whom Defendants previously shared this information. But Mark S. fails to explain why this is so, and the Court discerns no reason why minor class members under thirteen would suffer

16

harms that are different than those of older minor class members, after the settlement is implemented.

## 2. Rule 23(b)(3)

Because Plaintiffs seek to certify the Class under Rule 23(b)(3), the Court also must consider whether it is likely to conclude that: "the questions of law or fact common to the class members predominate over any questions affecting only individual members"; and "a class action is superior over other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors particularly pertinent to these issues here "include: (A) the class members' interests in individually controlling the prosecution . . . of separate actions" and "(B) the extent and nature of any litigation concerning the controversy already begun." *See id.*

These prerequisites are satisfied as well. Predominance is met because many of the issues of law and fact common to members of the Nationwide Class and Illinois Subclass, respectively, may be resolved "through generalized proof"—namely, by examining Defendants' uniform data collection and privacy practices against their legal obligations. And these issue "are more substantial" than any issues that may be "subject only to individualized proof." *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

The requirement of superiority also is met because, given the relatively modest amounts that class members would stand to recover in individual actions, it is improbable that many "would possess the initiative to litigate individually." *See Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir. 1974); *cf.*

17

*Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (cleaned up)). Indeed, as the procedural history of this MDL illustrates, this is precisely the kind of matter in which "a class suit is the best, and perhaps the only, way to proceed." *See Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 880 (7th Cir. 2000).

In sum, the Court will likely be able to certify the proposed Nationwide Class and Illinois Subclass.

## B. Whether the Proposed Settlement is Within the Range of Possible Approval

The next issue is whether the proposed settlement is "within the range of possible approval" with regard to its fairness, reasonableness, and adequacy to class members. *Gautreaux*, 690 F.2d at 621 n.3 (cleaned up); *see* Fed. Rs. Civ. P. 23(e)(1)(B)(i), 23(e)(2). The Court must consider a variety of factors in making this determination, including: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed," as noted. *Wong*, 773 F.3d at 863 (quoting *Gautreaux*, 690 F.2d at 631).

"The most important factor relevant to the fairness of a class action settlement," *In re General Motors*, 594 F.2d at 1132 n.44, the first of these is also the most challenging to assess. After all, litigating the merits is precisely what

18

settlements are designed to avoid.  And the Seventh Circuit has "instructed district courts 'to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights'" when considering this factor. *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 285 (7th Cir. 2017) (quoting *Isby*, 75 F.3d at 1196–97).

To complicate matters further, two Objectors—Mark S. and Dennis Litteken— insist that the Settlement Agreement's monetary component does not reflect the strength of Plaintiffs' case on the merits.  Mark S. does so based on *Reynolds*, while Dennis Litteken contrasts the value of the proposed settlement in this case with that of the settlement his attorneys helped to achieve in *In re Facebook Biometric Information Privacy Litigation*, 522 F. Supp. 3d 617 (N.D. Cal. 2021), *appeal dismissed*, No. 21-15555, 2021 WL 2660668 (9th Cir. June 22, 2021).

In *Reynolds*, the Seventh Circuit held that, "in the suspicious circumstances" through which the settlement in that case was reached, the district court should have made some effort "to quantify the net expected value of continued litigation to the class." 288 F.3d at 284–85.  "Determining that value," the court explained, "require[s] estimating the range of possible outcomes and ascribing a probability to each point on the range." *Id.* at 285.  While the court recognized that "[a] high degree of precision cannot be expected in valuing a litigation," it noted that the district court "could have insisted that the parties present evidence that would enable four possible outcomes to be estimated: call them high, medium, low, and zero," in terms of the "approximate . . . probability of obtaining each of these outcomes in a trial," thereby deriving "a

19

ballpark valuation." *Id.*; *cf. Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (stating that district courts "should" undertake this analysis). Here, Mark S. contends that Plaintiffs have not provided the Court with enough details to perform such a valuation.

In more recent years, however, the Seventh Circuit has clarified that "the *Synfuel/Reynolds* evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indicators that the settlement reasonably reflects the merits of the case." *Kaufman*, 877 F.3d at 285 (citing *Wong*, 773 F.3d at 864); *see also Martin v. Reid*, 818 F.3d 302, 307 (7th Cir. 2016) (characterizing the "estimate of trial recovery" under *Reynolds* as "important where [the] settlement is problematic"); *cf. Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) ("A district court must take special care in performing this assessment when the proposed settlement evinces certain warning signs."). In *Wong*, for instance, the court affirmed the district court's decision to approve a class action settlement without attempting to quantify the net expected value of continued litigation in the absence of any "suspicious circumstances." 773 F.3d at 864 (quoting *Reynolds*, 288 F.3d at 284). To the contrary, the court observed that the settlement "was reached through extensive arms'-length negotiations with an experienced third-party mediator," during which "the parties' positions on liability and damages were extensively briefed and debated; that the defendant "was prepared to vigorously contest the lawsuit, having raised potentially valid defenses"; its motion to dismiss had been "fully briefed and argued"; and that the lead plaintiff "had received access

20

to extensive public documents," although "formal discovery had not yet commenced." *Id.*[5] The court noted too that further litigation "almost certainly would have involved complex and lengthy discovery and expert testimony" and that the attorneys who negotiated the settlement were "highly experienced." *Id.*

Many of the same reliable indicators of a reasonable, negotiated settlement are present here. The Settlement Agreement was initially reached through hard-fought, arms'-length negotiations, which were mediated, on two separate occasions, by a reputable former federal judge. It was refined through further negotiation by a Court-appointed leadership group comprising a diverse cast of experienced plaintiffs' attorneys. Defendants have forcefully disputed their liability at every stage, raising a host of factual and legal defenses. The parties have exhaustively analyzed and debated their respective positions as part of their negotiations. And Plaintiffs have reviewed substantial confirmatory discovery, including an expert-led analysis of TikTok's source code. What is more, although the initial agreement was inked while this MDL was in its early stages, it capitalized on urgent and extraordinary political pressure upon Defendants to shed TikTok's existing liabilities, and the Settlement Agreement has since been vetted again by the entire Plaintiffs' Leadership Group.

---

[5]      Several circuits even apply a presumption that a class action settlement reached through "arm's-length negotiations between experienced, capable counsel after meaningful discovery" is fair, reasonable, and adequate. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) (same); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (similar); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2012 WL 651727, at *10 (N.D. Ill. Feb. 28, 2012) (following *Wal-Mart*); *see generally* 4 Newberg on Class Actions § 13:45 (5th ed. 2013) ("[C]ourts have long held that the process of an arms-length negotiation supports a presumption that the settlement is fair.").

Consequently, the Court need not undertake the type of mechanical mathematic valuation exercise upon which Mark S. insists.  Instead, it need only recognize that the proposed settlement ensures meaningful, immediate monetary and injunctive relief for 89 million individuals, and weigh those benefits against the substantial risks that Plaintiffs would face in seeking a better outcome at trial.  And, as will be explained, after such an analysis, the Court finds that the settlement agreement is well within the range of fairness, reasonableness, and adequacy

One set of risks that Plaintiffs could have to overcome arise from the many colorable defenses, whether affirmative or failure-of-proof, that Defendants have raised.  For starters, Defendants contend that class members are subject to the class action waiver and arbitration agreements incorporated in TikTok's terms of service.  Given the prohibitive time and expense of undertaking millions of individual arbitrations, Plaintiffs "would likely receive nothing" if Defendants succeeded on this front.  *See Kaufman*, 877 F.3d at 285.  In addition, Defendants have gone so far as to warranty and confirm through discovery that they have "not used the App to collect biometric information or [] identifiers as defined by [BIPA]."  Settlement Agreement § 7.1; *see also id.* §§ 7.2–7.3.  And Defendants have disputed Plaintiffs' VPPA claim on numerous colorable grounds, including that TikTok is not "engaged in the business . . . of rental, sale, or delivery or prerecorded video cassette tapes or similar audio visual materials," *see* 18 U.S.C. § 2710(a)(4); that class members do not count as "subscriber[s]" of TikTok's services, *see id.* § 2710(a)(1); *cf. Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255 (11th Cir. 2015) (reviewing disagreement among district

22

courts as to whether users of an app are subscribers under the VPPA); that the user data at issue does not constitute "personally identifiable information," *see* 18 U.S.C. § 2710(a)(3); that their alleged disclosures of user data to third parties fall under the "incident to the ordinary course of business" exemption, *see id.* § 2710(b)(2)(E); and that Plaintiffs provided "informed, written consent" for these alleged disclosures by agreeing to TikTok's terms of service, *see id.* § 2710(b)(2)(B).

Defendants' position that class members consented to the alleged misconduct by accepting TikTok's terms of service poses an obstacle for Plaintiffs' remaining claims as well. For example, their CFAA and CCDAFA claims hinge on unauthorized access to their mobile devices. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068–69 (9th Cir. 2016). Their FAL and UCL claims require actual reliance on misrepresentations or nondisclosures. *See Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 912 (N.D. Cal. 2020). Their California constitutional claim calls for an intrusion of a reasonable expectation of privacy so serious "as to constitute an egregious breach of the social norms." *See Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073 (Cal. 2009) (cleaned up). Their intrusion upon seclusion claim similarly demands a "highly offensive" intrusion, a "high bar" that courts have found even unauthorized disclosure of user data to fail. *See In re Google, Inc. Privacy Pol'y Litig.*, 58 F. Supp. 3d 968, 987–88 (N.D. Cal. 2014) (cleaned up). And their unjust enrichment claim asks whether Defendants are "unfairly possessing" data to which they are "not entitled." *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 520 (7th Cir. 2011).

23

Another set of litigation risks derive from the difficulty of proving damages for Plaintiffs' claims. Although BIPA and the VPPA offer statutory damages ranging from $1,000 to $5,000 per violation, consumer class actions under these statutes settle for far less. Settlements under the VPPA typically achieve *cy pres*-only relief worth a few dollars or less per class member. *See, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 817, 819 (9th Cir. 2012), *cert. denied* 134 S. Ct. 8 (2013) (about $2.59 per class member); *In re Netflix Privacy Litig.*, No. 11 C 379, 2013 WL 1120801, at *1–2 (N.D. Cal. Mar. 18, 2013) (about $0.14 per class member). The few consumer settlements under BIPA also have featured relatively modest recoveries. *See, e.g.*, *Sekura v. L.A. Tan Enters., Inc.*, No. 2015-CH-16694, 2016 WL 10672183, at *2 (Ill. Cir. Ct. Dec. 01, 2016) (approving settlement providing gross recovery of about $40.54 per class member). In addition, Defendants will no doubt argue that violations of BIPA, without more, do not qualify as injuries for purposes of Article III standing under *Spokeo, Inc. v. Robins*. *See* 136 S. Ct. 1540, 1550 (2016) (holding that "a bare procedural violation" of a statute is not an injury-in-fact); *cf. Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 952–56 (N.D. Cal. 2018) (discussing this issue).

Plaintiffs' other claims will require proof of actual damages, a hurdle given that courts "[g]enerally . . . have rejected the contention that the unauthorized collection, use, or disclosure of personal information constitutes economic damages," *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 988 F. Supp. 2d 434, 448–50 (D. Del. 2013), *aff'd in relevant part, vacated in other part*, 806 F.3d 125 (3d Cir. 2015) (dismissing claims under the CFAA, UCL, and CCDAFA for lack of Article

24

III standing), while non-economic damages can be just as hard to prove. Indeed, it is not uncommon for consumer class action settlements based on such claims to yield no monetary relief at all. *See, e.g.*, *McDonald v. Kiloo A/S*, No. 17 C 4344, 2020 WL 5702113, at *5 (N.D. Cal. Sept. 24, 2020) (granting preliminary approval to settlement providing only injunctive relief and noting that "any damage award" for claims of intrusion upon seclusion and violations of the California constitutional right to privacy, the UCL, and various consumer protection statutes "was uncertain and likely to have been nominal for most class members").

These litigation risks reveal why *In re Facebook* is a poor comparator to this case. Class counsel in that case achieved a stellar settlement, providing a gross recovery of about $428 per class member, even at an impressive 22% claims rate.[6] Unlike Defendants, however, Facebook conceded that it had implemented personally identifying facial recognition technology that could automatically "tag" individuals appearing in photos, while denying that this technology performed facial scans within the meaning of BIPA. *See In re Facebook Biometric Info. Privacy Litig.*, No. 15 C 3747, 2018 WL 2197546, at *2 (N.D. Cal. May 14, 2018). The court found Facebook's

---

[6] According to the plaintiffs' expert witness in *In re Facebook*, the average claims rate for classes above 2.7 million class members is less than 1.5%. *See* 2d Expert Decl. Prof. William B. Rubenstein ¶ 5, *In re Facebook*, ECF No. 517-2; *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (noting that claims rate in consumer class action settlements "rarely exceed seven percent"); *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 214–15 (W.D. Mo. 2017) (collecting cases that have approved settlements "where the claims rate was less than one percent"). In this case, a 1.5% claims rate would result in a gross recovery of $383.33 for each member of the Illinois Subclass and $63.89 for each non-Illinois member of the Nationwide Class, whereas a claims rate of 20% would yield gross recoveries of $28.75 for each member of the Illinois Subclass and $4.79 for each non-Illinois member of the Nationwide Class.

position to raise "a quintessential dispute of fact for the jury to decide." *Id.* at \*3. And the case ultimately settled just days before trial. *In re Facebook*, 2021 WL 757025, at \*2. Here, by contrast, Defendants warrant that TikTok does not use any such facial recognition technology. And, when this defense is combined with the others noted above (such as the risk of being compelled to arbitrate, which was not raised in *In re Facebook*), such defenses raise appreciable doubt as to whether Plaintiffs' BIPA claim would survive summary judgment and prevail at trial.

The remaining factors likewise reveal that the proposed settlement is within the range of fairness, reasonableness, and adequacy. In addition to being risky, further litigation in this case—assuming that Plaintiffs' claims survived motions to compel arbitration and dismiss—would almost certainly be complex, lengthy, and expensive. *Cf. Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well deserved reputation as being most complex."). Proceeding to trial likely would take years and entail extensive fact and expert discovery and motion practice, including, in all probability, a contested motion to certify, motions for summary judgment, and *Daubert* motions. Furthermore, after the completion of pretrial proceedings, many of the individual cases that comprise this MDL would be sent back to their transferor courts for trial, absent a stipulation by the parties to try the cases in this Court, potentially resulting in even further motion practice and delay. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 32–40 (1998); *Armstrong v. LaSalle Bank Nat. Ass'n*, 552 F.3d 613, 615–16 (7th Cir. 2009).

26

The Court also finds it noteworthy that, out of an estimated 89 million members of the Settlement Class, only two (Mark S. and Dennis Litteken) have objected to the fairness, reasonableness, and adequacy of this widely published settlement so far.  Moreover, all three of Plaintiffs' Interim Co-Lead Counsel, whom the Court found well qualified to serve in that role, have attested to their belief that the proposed settlement is fair, reasonable, and adequate.  Carroll Decl. ¶ 41; Pls.' Mot, Ex. G, Fegan Decl. ¶ 3, ECF No. 122-7; *id.*, Ex. H, Rhow Decl. ¶ 3, ECF No. 122-8.  Add to this the opinion of Judge Phillips (whom Chambers and Partners, a respected legal company, has named one of the top mediators in the United States) that the settlement is fair, adequate, and reasonable, "especially when measured against the significant obstacles standing in the way of . . . Plaintiffs' claims." *Id.*, Ex. I, Phillips Decl. ¶ 12, ECF No. 122-9.  And combine all this with the many months Plaintiffs' counsel spent engaging in arms'-length negotiations and performing exhaustive analysis of relevant law and evidence, giving them "a clear view of the strengths and weaknesses" of their case in reaching the proposed settlement. *See In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986).  These factors bolster the Court's confidence that the proposed settlement was the result of careful consideration and robust negotiations.

For all of these reasons, the Court find that the proposed settlement is "within the range of possible approval" and likely to satisfy the requirements of Rule 23(e)(2). *See Gautreaux*, 690 F.2d at 621 n.3 (cleaned up).

## C. Whether the Proposed Notice Plan Provides the Best Notice Practicable

The final issue is whether the proposed notice plan provides "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best notice practicable is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126, 140 (7th Cir. 1974).

### 1. Notice Plan

The notice plan proposes to provide direct email notice to every member of the Settlement Class whose email address the settlement administrator is able to identify from its analysis of class data records; Plaintiffs' counsel estimates that this group would consist of one-third or more of class members. The settlement administrator also will implement a comprehensive digital media campaign calculated to reach over 95% of class members more than five times each. The Federal Judicial Center has found that a notice plan calculated to reach between 70% and 95% of the class in total is reasonable and that, according to a study of recent published decisions, the median reach calculation on approved notice plans is 87%. Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide at 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last accessed Sept. 12, 2021).

28

Believing that this plan does not do enough to provide direct notice to putative class members, Objectors Mark S. and Dennis Litteken argue that notice should be provided through the TikTok App as well. Initially, Defendants were reluctant to provide in-app notice due to concerns that users have not consented to receive 'inbox' notifications unrelated to integral features of the App. In response to this objection, however, Defendants subsequently offered to provide 'inbox' notice at their own cost if the Court so orders. And, in that regard, the Court agrees with Mark S. and Dennis Litteken that notice through the App itself would significantly enhance the notice program and that the benefit to class members of providing in-app notice outweighs any detriment. Thus, the Court accepts Defendants' offer and orders them to provide 'inbox' notice through the App, at their own cost, to every identifiable U.S. user.

The Objectors' remaining challenges to the proposed notice plan fail to persuade. Mark S. argues that the proposed notices should indicate the estimated amount that each claimant will recover, as opposed to the total amount of the settlement fund, but Rule 23(c)(2) does not require such information. *See* Fed. R. Civ. P. 23(c)(2)(B). And given that the total amount is substantial, disclosing that figure alone is reasonably calculated to induce claims. Moreover, while Mark S. complains that the proposed claim form asks claimants to provide information not required to use the App, like their mobile telephone number, these modest demands are unlikely to suppress claims. For his part, Dennis Litteken questions why the settlement administrator cannot guarantee direct email notice to every member of the Class.

Because Defendants must now provide in-app notice as well, the Court declines to require a more expansive email-notice campaign.

### 2. Opt-Out Procedure

Contesting the notice plan's proposed opt-out procedure, Objectors Brian Behnken and Joshua Dugan, along with 957 unidentified others who, their lawyers represent, wish to opt out of the Settlement Class and arbitrate their claims (collectively, the "Arbitration Claimants"), argue that the opt-out procedure is so onerous that it violates their due process rights. Instead of having to complete, sign, and mail in individual paper opt-out forms, the Arbitration Claimants insist that they should be able to opt out *en masse* by means of a single unsigned, electronic filing from their lawyers.

Just as the requirements of notice and opportunity to opt out are designed to protect the due process rights of individual class members, courts have recognized that "opting out is an individual right" that "must be exercised individually." *In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 241 (3d Cir. 2002) (cleaned up); *accord, e.g., In re Nat'l Football League Players' Concussion Inj. Litig.*, No. 14-1995, 2019 WL 95917, at *5 (E.D. Pa. Jan. 3, 2019); *Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 265 F. Supp. 3d 260, 275 (E.D.N.Y. 2017); 3 Newberg on Class Actions § 9:49 (5th ed. 2013). For this reason, courts have routinely enforced the requirement that class members individually sign and return a paper opt-out form as "vital" to ensuring "that the class member is individually consenting to opt out." *In re Centurylink Sales Pracs. & Sec. Litig.*, No. C 17-2832, 2020 WL 3512807, at *3–4 (D. Minn. June 29,

2020) (collecting cases); *see also In re Deepwater Horizon*, 819 F.3d 190, 197 (5th Cir. 2016) (noting that "this common and practical requirement" is "consistently enforced" in MDLs (cleaned up)). Courts also have noted that such a requirement is not unduly burdensome, especially given that e-filing "makes it easier for third parties and their counsel to file unauthorized mass opt-outs." *In re Centurylink*, 2020 WL 3512807, at *3 (cleaned up); *see also In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 118 (D.N.J. 2012) (finding it not overly burdensome for opt-outs to have to "provide some proof of class membership"). In fact, courts have frequently rejected the very sort of "attempts by lawyers to opt out class members *en masse*" that counsel for the Arbitration Claimants ask the Court to approve here. *See In re Diet Drugs*, 282 F.3d at 241 (italics added). As one court has put it, "mass unsigned opt outs are highly indicative of a conclusion that . . . counsel did not spend very much time evaluating the merits of whether or not to opt out in light of the individual circumstances of each of their clients and in consultation with them." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, 910 F. Supp. 2d 891, 939 (E.D. La. 2012), *aff'd sub nom. In re Deepwater*, 739 F.3d 790.

Although the Arbitration Claimants cite a handful of cases from the Northern District of California that did not require individual signatures to opt out, the Court respectfully declines to follow them. Most of these cases failed to grapple with the reasons why courts have required individual signatures in the first place. *See Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067 (N.D. Cal. 2020); *Hadley v. Kellogg Sales Co.*, No. 16 C 4955, 2020 WL 836673, at *8 (N.D. Cal. Feb. 20, 2020);

*Knight v. Concentrix Corp.*, No. 18 C 7101, 2019 WL 3503052, at *6 (N.D. Cal. Aug. 1, 2019); *In re MyFord Touch Consumer Litig.*, No. 13 C 3072, 2018 WL 10539267, at *2 (N.D. Cal. June 7, 2018). Another cited case held only that individual signatures were not necessary "given the unique circumstances" at hand and without suggesting they would have violated due process. *See Arena v. Intuit Inc.*, No. 19 C 2546, 2021 WL 834253, at *10 (N.D. Cal. Mar. 5, 2021). Nor is the Arbitration Claimants' reliance upon *In re Piper Funds, Inc., Institutional Government Income Portfolio Litigation*, helpful. 71 F.3d 298 (8th Cir. 1995). In *Piper*, the court held that it was a violation of the Federal Arbitration Act to *enjoin* a class member, who had sought to opt out, from arbitrating its claim before the settlement was finally approved. *Id.* at 302–03. No such injunction is requested here.

The Arbitration Claimants' suggestion that the entire Settlement Agreement violates the FAA by abrogating Defendants' arbitration agreements with opt-in class members is equally meritless. It is well established that parties may waive their own rights to arbitrate, as the settling parties intend to do here. *See St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 590 (7th Cir. 1992) (noting that courts "treat a waiver of the right to arbitrate the same as [they] would treat the waiver of any other contract right"). Neither *Piper* nor *Bigger v. Facebook, Inc.*, 947 F.3d 1043 (7th Cir. 2020), which the Arbitration Claimants also cite, suggest otherwise. In *Bigger*, the Seventh Circuit placed limitations on a district court's ability to issue notice (there, of a collective action) when the defendant seeks to

*enforce*—not waive—its arbitration agreements with the parties to be noticed. *Id.* at 1048–50.

Yet another problem with this objection is that, given their intent to opt out, the Arbitration Claimants lack standing to object to the substantive terms of the proposed settlement because, once they opt out, they will have "no stake" in the settlement itself. *See Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007); *cf. Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992) ("The general rule, of course, is that a non-settling party does not have standing to object to a settlement between other parties.").

To sum up, the Court approves the proposed notice plan, notices, claim form, and opt-out procedure, with the caveat that Defendants must also provide in-app notice at their own cost to every putative class member, as they have agreed to do.

## IV.    Conclusion

For the reasons set forth above, Plaintiffs' motion for preliminary approval is granted, and the objections of Mark S., Dennis Litteken, Brian Behnken, and Joshua Dugas are overruled. The Court will enter a separate order granting preliminary approval of the class action settlement.

**IT IS SO ORDERED.**            **ENTERED: 9/30/21**

_____
**John Z. Lee**
**United States District Judge**

# EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| | Magistrate Judge Sunil R. Harjani |
| This Document Relates to All Cases | |

## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## Table of Contents

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 2

    A.    Plaintiffs' Allegations ............................................................................. 2

    B.    The Risks of TikTok's Defenses to Plaintiffs and the Class ................. 4

    C.    Litigation and Procedural History.......................................................... 8

III.  SETTLEMENT TERMS .................................................................................. 13

    A.    The Settlement Classes ........................................................................ 13

    B.    Monetary Relief for Settlement Class Members.................................. 13

    C.    Plan of Allocation ................................................................................ 14

    D.    Injunctive Relief.................................................................................. 15

    E.    Release ................................................................................................. 16

    F.    Class Representative Service Awards................................................... 17

    G.    Attorneys' Fees and Costs ................................................................... 17

    H.    Settlement Administration ................................................................... 17

IV.  CLASS NOTICE & RESPONSE ..................................................................... 18

    A.    Notice was disseminated via a robust multi-faceted campaign including widespread publication and advertising, direct emails, and in-App notice. ....... 18

    B.    The claims rates of 1.4% for the Nationwide Class and 13% for the Illinois Subclass falls well within the range of comparable class action settlements. .... 22

    C.    Only a fraction of 1% of the class opted out of the Settlement. ......................... 23

    D.    Only four individuals objected, and none of their objections is colorable. ........ 24

    E.    CAFA notice was provided and no objections followed. .................................... 24

V.    STANDARDS FOR SETTLEMENT APPROVAL ........................................ 24

VI.  FINAL APPROVAL IS WARRANTED........................................................... 28

    A.    The strength of Plaintiffs' case compared to the amount of the Settlement favors final approval. ...................................................................................... 28

    B.    An assessment of the likely complexity, length, and expense of continued litigation favors approval of the Settlement......................................................... 30

    C.    The lack of opposition to the Settlement favors final approval. ......................... 32

        1.    The Helfand Objection was filed by a serial objector and lacks merit. .. 32

        2.    The Cochran Objection was filed by a serial objector, did not comply with the requirements of the Preliminary Approval Order, and lacks merit. ................................................................................................... 37

        3.     The Mark S. Objection did not comply with the requirements of the Preliminary Approval Order, restates objections previously considered and rejected by the Court, and fails to disclose that Mark S. has asked another court to award him legal fees for this "remarkable" Settlement. 39

        4.     The Litteken Objection failed to comply with the requirements of the Preliminary Approval Order, restates objections this Court has already considered and rejected, and continues a string of baseless and irrelevant *ad hominem* attacks. ................................................................................. 45

   D.    The stage of the proceedings and the amount of discovery completed at the time of Settlement, as well as the opinion of competent counsel, favor final approval. .......................................................................................................................... 57

VII.   CONCLUSION ............................................................................................................. 59

## Table of Authorities

**Cases**                                                     **Page(s)**

*Adkins v. Facebook, Inc.*,
No. 18-CV-05982, 2021 U.S. Dist. LEXIS 87097 (N.D. Cal. May 6, 2021) .................. 29-30

*Armstrong v. Bd. of Sch. Dirs.*,
616 F.2d 305 (7th Cir. 1980) ............................................................... 24

*Bayat v. Bank of the W.*,
No. C-13-2376, 2015 U.S. Dist. LEXIS 50416 (N.D. Cal. Apr. 15, 2015) ........................... 22

*Bower v. MetLife, Inc.*,
No. 1:09-CV-351, 2012 U.S. Dist. LEXIS 149117 (S.D. Ohio Oct. 17, 2012) .................... 50

*Brown v. Hain Celestial Grp., Inc.*,
No. 3:11-CV-03082, 2016 U.S. Dist. LEXIS 19275 (N.D. Cal. Feb. 17, 2016) ................... 34

*Burns v. Elrod*,
757 F.2d 151 (7th Cir. 1985) ............................................................... 20

*Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*,
275 F. Supp. 3d 1350 (N.D. Ga. 2017) ...................................................... 38, 40, 41

*Collins v. Quincy Bioscience, LLC*,
No. 19-22864, 2020 U.S. Dist. LEXIS 218673 (S.D. Fla. Nov. 16, 2020) ............... 33, 34, 35

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1977) ............................................................... 31

*Ferron v. Kraft Heinz Foods Co.*,
No. 20-CV-62136, 2021 U.S. Dist. LEXIS 129955 (S.D. Fla. July 13, 2021) ..................... 38

*Fraley v. Facebook, Inc.*,
966 F. Supp. 2d 939 (N.D. Cal. 2013) ........................................................ 29

*Gascho v. Glob. Fitness Holdings, LLC*,
No. 2:11-CV-436, 2014 U.S. Dist. LEXIS 46846 (S.D. Ohio Apr. 4, 2014) ........................ 51

*Gehrich v. Chase Bank U.S.*,
316 F.R.D. 215 (N.D. Ill. 2016) ............................................................ 30

*Grady v. De Ville Motor Hotel, Inc.*,
415 F.2d 449 (10th Cir. 1969) ............................................................. 30

*Halley v. Honeywell Int'l, Inc.*,
  861 F.3d 481 (3d Cir. 2017) ...................................................... 51

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ...................................................... 30

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010) ............................................. 25, 28

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp. 2d 935 (N.D. Ill. June 2, 2011) ............................. 20, 32

*In re Briscoe*,
  448 F.3d 201 (3d Cir. 2006) ..................................................... 21, 22

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  No. 1:17-MD-2800, 2020 U.S. Dist. LEXIS 118209 (N.D. Ga. Mar. 17, 2020) ................. 38

*In re Google Buzz Privacy Litig.*,
  No. 10-00672, 2010 U.S. Dist. LEXIS 146767 at *4-10 (N.D. Cal. June 2, 2011) ............ 29

*In re Google LLC St. View Elec. Commc'ns Litig.*,
  No. 10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) ..................... 29

*In re Google Plus Profile Litig.*,
  No. 5:18-CV-06164, 2021 U.S. Dist. LEXIS 13571 (N.D. Cal. Jan. 25, 2021) ................... 29

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
  No. 08-1999, 2010 U.S. Dist. LEXIS 121684 (E.D. Wis. Oct. 28, 2010) ........................... 50

*In re LinkedIn User Priv. Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) ...................................................... 29

*In re Mercury Interactive Corp. Sec. Litig.*,
  618 F.3d 988 (9th Cir. 2010) ...................................................... 51

*In re Mexico Money Transfer Litig.*,
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) ...................................................... 58

*In re NFL Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ...................................................... 50-51

*In re Northfield Lab'ys, Inc. Sec. Litig.*,
  No. 06-C-1493, 2012 U.S. Dist. LEXIS 12741 (N.D. Ill. Jan. 31, 2012) ........................ 25, 26

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    527 F. Supp. 3d 269 (E.D.N.Y. 2021) ................................................................... 54

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
    No. 08-C-1832, 2016 U.S. Dist. LEXIS 25290 (N.D. Ill. Feb. 29, 2016) ........................ 21, 28

*In re Suboxone Antitrust Litig.*,
    No. 16-5073, 2021 U.S. Dist. LEXIS 166675 (E.D. Pa. Sept. 2, 2021) ................................. 53

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    No. 2445, 2021 U.S. Dist. LEXIS 231508 (E.D. Pa. Dec. 3, 2021) ....................................... 54

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    895 F.3d 597 (9th Cir. 2018) ........................................................................ 49-50, 53

*In re Syngenta AG MIR 162 Corn Litig.*,
    357 F. Supp. 3d 1094 (D. Kan. 2018) .................................................................... 38

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ............................................................... 24, 27, 28, 58

*Johnson v. Uber Techs.*,
    No. 16-C-5468, 2018 U.S. Dist. LEXIS 161155 (N.D. Ill. Sept. 20, 2018) ........................... 5

*Kaufman v. Am. Express Travel Related Servs.*,
    877 F.3d 276 (7th Cir. 2017) ....................................................................... 51, 52

*Kaufman v. Am. Express Travel Related Servs.*,
    No. 07-CV-1707, 2016 U.S. Dist. LEXIS 26167 (N.D. Ill. Mar. 2, 2016) ........................... 20

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) ........................................................................... 50

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015) .................................................................... 22, 25

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ........................................................................... 29

*Legg v. Lab. Corp. of Am. Holdings*,
    No. 14-61543-CV, 2016 U.S. Dist. LEXIS 122695 (S.D. Fla. Feb. 18, 2016) ............... 34-35

*Manigault-Johnson v. Google, LLC*,
    No. 2:18-cv-1032, 2019 U.S. Dist. LEXIS 59892 (D.S.C. Mar. 31, 2019) ..................... 43, 44

*McKinnie v. JP Morgan Chase Bank, N.A.*,
    678 F. Supp. 2d 806 (E.D. Wis. 2009) ................................................................. 58

*Miracle-Pond v. Shutterfly, Inc.*,
    No. 19-CV-04722, 2020 U.S. Dist. LEXIS 86083 (N.D. Ill. May 15, 2020) ...................... 4-5

*Norcia v. Samsung Telcomms. Am., LLC*,
    No. 14-CV-00582, 2021 U.S. Dist. LEXIS 135256 (N.D. Cal. July 20, 2021) .............. 34, 35

*Parker v. Time Warner Ent. Co., L.P.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................................................................. 29

*Perez v. Asurion Corp.*,
    501 F. Supp. 2d 1360 (S.D. Fla. 2007) ................................................................. 22

*Peter v. Doordash, Inc.*,
    445 F. Supp. 3d 580 ................................................................................................ 5

*Poertner v. Gillette Co.*,
    618 F. App'x 624 (11th Cir. 2015) ...................................................................... 22

*Pollard v. Remington Arms Co., LLC*,
    320 F.R.D. 198 (W.D. Mo. 2017) ........................................................................ 23

*Redman v. Radioshack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ........................................................................ 51, 52

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................................. 31

*Spann v. J.C. Penney Corp.*,
    No. CV 12-0215, 2016 U.S. Dist. LEXIS 137184 (C.D. Cal. Sept. 30, 2016) ...................... 33

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) (en banc) ................................................................. 23

*Synfuel Techs., Inc. v. DHL Express, Inc.*,
    463 F.3d 646 (7th Cir. 2006) .............................................................................. 28

*T.K. v. ByteDance Tech. Co*,
    No. 19-CV-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022) ............................................. 41

*Wilkins v. HSBC Bank Nev., N.A.*,
    No. 14-C-190, 2015 U.S. Dist. LEXIS 23869 (N.D. Ill. Feb. 27, 2015) ...................... 20-21

*Wong v. Accretive Health, Inc.*,
    773 F.3d 859 (7th Cir. 2014) ................................................................. 27

*Wright v. Nationstar Mortg. LLC*,
    No. 14-C-10457, 2016 U.S. Dist. LEXIS 115729 (N.D. Ill. 2016) ........................................ 30

**Statutes**

28 U.S.C. § 1715 ................................................................................................. 24

50 U.S.C. § 1601 ................................................................................................. 9

50 U.S.C. § 1701 ................................................................................................. 9

740 Ill. Comp. Stat. §14/1, et seq. ......................................................................... 3, 4

**Rules**

Fed. R. Civ. P. 23 ............................................................................... *passim*

## I.  INTRODUCTION

The Settlement presented for approval here is one of the largest data privacy settlements in history – a $92 million non-reversionary cash settlement fund with additional injunctive relief that directly addresses the privacy concerns raised by Plaintiffs' claims.[1] The Court preliminarily approved the Settlement on September 30, 2021, after a hearing and thorough consideration of objections to Plaintiffs' motion for approval. ECF Nos. 161 (Memorandum Opinion) and 162 (Preliminary Approval Order) (collectively, the "Preliminary Approval Orders").

After the Court preliminarily approved the Settlement, Notice was issued to the Class via a nationwide media campaign, a social media campaign across multiple platforms, a paid search campaign, direct emails to class members, and direct messages within the TikTok application ("App"). The Notice Plan has been successful. Over 1.2 million individuals submitted Valid Claims. Each Nationwide Class Member who submitted a Valid Claim will receive approximately $27.19, and each Illinois Subclass Member who submitted a Valid Claim will receive approximately $163.13 after the deduction of Settlement-related costs, including the expenses of the Settlement Administrator and the costs of Notice to the Class, any service awards, any fee awards, and any other administrative fees and expenses which may be approved by the Court. This result compares favorably with other court-approved privacy class action settlements.

In contrast to the 1.2 million individuals who found the Settlement terms favorable and submitted a Valid Claim, only four have objected to the Settlement and just 28 filed valid requests to opt out of the Settlement. Of those four objections, two were filed by individuals who objected at the preliminary approval stage and raise substantially similar arguments to those the Court

---

[1] Capitalized terms have the same meanings as set forth in the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement"), as clarified by the February 16, 2021 Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, the "Settlement"), ECF No. 122-1.

already considered and rejected. The other two objections were filed by serial objectors and lack both credibility and merit.

These facts indicate a successful Notice Plan and widespread support for the Settlement by Class Members. Accordingly, Plaintiffs now seek final approval of the Settlement and final certification of the Nationwide Class and the Illinois Subclass. The Settlement achieved an excellent result for the Class and satisfies all criteria for final settlement approval.

## II.     BACKGROUND

This multidistrict litigation (MDL) consists of 21 putative class actions against U.S. defendants TikTok Inc. ("TikTok") and ByteDance Technology Inc. ("ByteDance"), and foreign defendants TikTok, Ltd. and Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance") (collectively, "Defendants" or, in the Settlement, "Defendant's Released Parties"). The cases allege that Defendants invaded Plaintiffs' and putative class members' privacy through the popular TikTok application and its predecessor application Musical.ly, a video-sharing social networking service used to create short videos.

### A.  Plaintiffs' Allegations

This case involves Defendants' collection, use, and transmission of highly sensitive personal data via Defendants' ubiquitous TikTok App. *See* Consolidated Amended Class Action Complaint ("Complaint"), ECF No. 114. The App allows users to create and share 60-second videos—typically of people doing activities such as dancing, lip-syncing, and stunts—and boasts a substantial worldwide fanbase. *Id.* at ¶¶ 2, 128, 131, 134. TikTok's popularity has exploded over the past year as the COVID-19 pandemic has left users bored and spending more time at home.

Specifically, Plaintiffs allege that the TikTok App infiltrates its users' devices and extracts a broad array of private data including biometric data and content that Defendants use to track and

profile TikTok users for the purpose of, among other things, ad targeting and profit. *Id.* at ¶¶ 9-18, 137-192, 240-298, 402-417.

With regard to Plaintiffs' core claims under the Illinois Biometric Information Privacy Act (BIPA), 740 Ill. Comp. Stat. §14/1, *et seq.*, the Complaint alleges that the App uses a complex system of artificial intelligence to recognize facial features in users' videos, which allows the user to use various filters and stickers. *Id.* at ¶¶ 240-281, 402-417. Plaintiffs allege that the App also analyzes faces to determine the user's age, race/ethnicity, and gender, using proprietary algorithms to attempt to prevent minor children from using the App and to recommend content and profiles for the user to follow. *Id.* at ¶¶ 242-243, 245, 250, 258-259. By utilizing this private and biometric information, Plaintiffs contend, TikTok maintains a competitive advantage over other social media apps and profits from its use of improperly obtained data, all while failing to comply with the minimum requirements for handling users' biometric data established by BIPA.

The Complaint also alleges violations of a number of other statutory, common law, and constitutional claims arising from Defendants' alleged taking and transmission of other private, legally protected data. Plaintiffs assert claims for violations of the Computer Fraud and Abuse Act (CFAA), California Comprehensive Data Access and Fraud Act (CDAFA), California Constitutional Right to Privacy, California Unfair Competition and False Advertising laws, Video Privacy Protection Act (VPPA), Intrusion Upon Seclusion, and Restitution/Unjust Enrichment. *Id.* at ¶¶ 338-401. Underlying Plaintiffs' VPPA claim, for example, are allegations that TikTok unlawfully transmitted class members' personal and private viewing histories to third parties like Facebook and Google. *Id.* at ¶ 159. In support of their CFAA claim, as another example, Plaintiffs allege that Defendants exceeded the scope of their authorized access to Plaintiffs' and class members' devices and the private information contained on those devices. *Id.* at ¶ 340.

While these data privacy violations alone support Plaintiffs' legal claims, TikTok's apparent ties to China compound Plaintiffs' concerns. *Id.* at ¶¶ 3. The Complaint alleges that Defendants do not adequately disclose that user data collected from Plaintiffs is stored and shared with affiliates in countries outside the United States, such as China (conduct which TikTok denies). Beijing ByteDance has spent the last decade using technologies such as artificial intelligence and facial recognition. *Id.* at ¶ 271. Defendants' reported connections to the Chinese government have very recently come under close public scrutiny and several U.S. Senators formally requested a risk assessment of Defendants' data collection activities, and the U.S. Department of Defense issued an internal memorandum encouraging its employees to avoid installing the App. *Id.* at ¶¶ 4, 6, 200, 203, 205, 219, 342.

### B. The Risks of TikTok's Defenses to Plaintiffs and the Class

TikTok has taken the position that the foreign Defendants are not subject to personal jurisdiction, and that Plaintiffs' claims are based on speculation about how the App works and an incorrect interpretation of governing law.

First, TikTok has repeatedly asserted that Plaintiffs' claims are subject to an arbitration and class action waiver agreement. According to TikTok, at all relevant times, every TikTok user agreed to an arbitration and class-waiver provision in the App's Terms of Service ("Terms"). When users create their accounts in the App, they encounter a sign-in screen with hyperlinks to the Terms that read: "By continuing, you agree to TikTok's Terms of Use and confirm that you have read TikTok's Privacy Policy."

While Plaintiffs believe TikTok's policies were not adequately presented or otherwise disclosed to its users, and that class members should not be bound by their provisions, Plaintiffs acknowledge that courts have consistently held that users were on notice of—and thus had agreed to—virtually identical disclosures. *See, e.g., Miracle-Pond v. Shutterfly, Inc.*, No. 19-CV-04722,

2020 U.S. Dist. LEXIS 86083, at \*7-8 (N.D. Ill. May 15, 2020) (granting motion to compel arbitration and staying class action where contract was formed with hyperlinked policies near a sign-in button); *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, No. 19-CV-06098 (N.D. Cal. 2020) (same); *Johnson v. Uber Techs.*, No. 16-C-5468, 2018 U.S. Dist. LEXIS 161155, at \*3-4 (N.D. Ill. Sept. 20, 2018) (same); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020) (reversing denial of motion to compel arbitration where website required acknowledgment of agreement before proceeding).

According to TikTok, even minors who may be able to disaffirm the arbitration agreement may not be able to establish disaffirmance collectively on behalf of a class because disaffirmance purportedly presents individualized issues. Thus, TikTok's position is that arbitration would create a dispositive threshold procedural problem for Plaintiffs before any factual or legal merits are even considered. And even if minors could overcome the arbitration agreement through disaffirmance, some of the claims asserted in this litigation would, according to TikTok, be released in connection with another action, *T.K., et al. v. Bytedance Tech. Co., Ltd. et al.*, No. 1:19-CV-07915 (N.D. Ill.) (Blakey, J.) (*"T.K."*), if not for the settlement benefits achieved here. As part of the Settlement, TikTok has agreed not to dispute claims filed by members of the class in *T.K.*

In addition, with respect to the foreign Defendants, TikTok has repeatedly asserted that they do not have sufficient contacts with any of the forums in which the underlying putative class actions were filed for this Court to exercise personal jurisdiction because the foreign entities have no direct relationship with Plaintiffs and do not operate in the United States. Though Plaintiffs believe they could overcome the jurisdictional hurdle with discovery, Defendants' arguments carry a significant risk if this case were to proceed in litigation.

If Plaintiffs were able to overcome these procedural issues, TikTok has asserted multiple defenses to the merits of Plaintiffs' claims. With regard to BIPA, for example, TikTok has represented that TikTok does not and never has collected from its users any biometric identifiers or derivative information protected by law, nor has it ever shared U.S. user data with the Chinese government. Defendants have expressed their confidence that, if this case were to proceed on a litigation track, they will secure a Federal Rule of Civil Procedure ("Rule") 12(b)(6) dismissal for failure to state a claim based on, *inter alia*, technical arguments that: (1) Defendants' App compiles only anonymized, generalized "demographic data" through "facial landmarking," and does not collect any biometric information of TikTok users; and (2) even if the information the App utilizes does constitute biometric information within the meaning of BIPA, that information resides on the users' devices, and is not collected or stored by Defendants within the meaning of applicable law.

In support of its position that it has not violated BIPA, TikTok has asserted that its user video data is not used to identify anyone. TikTok has explained that App users cannot tag or label faces in videos with a user's real name or identity. This contrasts with Facebook, for example, which requires its users to use and display "the same name that you use in everyday life" when using Facebook. Facebook also allows users to tag the faces of their friends and themselves in photos and videos. Because Facebook users must use their real names, their faces are tagged with their real names whenever they are tagged in a photo or video. By contrast, TikTok does not have a face-tagging feature, nor a real name requirement, and thus does not associate a particular face with an individual's identity.

The TikTok App also has special effects features that enable users to alter, enhance, and modify their facial features in their video images. TikTok has explained that the technique employed to enable these special effects features is called "landmarking" and uses artificial

intelligence to locate the position of a face or specific facial features within a video frame, e.g., the location of a nose relative to the location of the eyes. That general "landmarking," according to TikTok, does not involve generating any face template or personally identifiable data, and thus does not give rise to biometric privacy violations under BIPA.

Although TikTok has admitted that the App uses technology for "demographic classification," which includes recognizing visual patterns that indicate age, gender or other characteristics, TikTok has contended that this is fundamentally different than facial recognition because it does not create facial templates and is not capable of identifying a user. While Plaintiffs disagree with TikTok's contentions, Plaintiffs recognize that the question of what constitutes biometric information under BIPA is novel and evolving, and is a risk if the litigation proceeds.

As another example, TikTok asserts Plaintiffs will be unable to state a claim under the VPPA, which protects consumers against the disclosure of their video viewing histories. TikTok has contended that it is not a video service provider within the meaning of the statute, it does not transmit the requisite personally identifiable information (PII) with video viewing histories, any such transmission is subject to the statute's ordinary course of business exception, and that its privacy policy fully discloses its data sharing practices. While Plaintiffs have rebuttals to each of these arguments, they acknowledge the real risk of continued litigation, that circuit court decisions on this claim have reached varying conclusions on comparable sets of facts, and the dearth of successful settlements of VPPA claims.

With respect to Plaintiffs' CFAA claim, aimed at protecting against hacking, Defendants have argued that Plaintiffs cannot establish proof of economic damages. TikTok has further contended the claim will be substantively defeated because Plaintiffs voluntarily granted TikTok access to their devices and TikTok complied with the disclosures in its privacy policy about the

data it would access and collect, i.e., it never exceeded the scope of its authorized access. Again, while Plaintiffs are well prepared to refute these arguments, each step of litigation brings risk that Co-Lead Counsel balanced against the benefits achieved through the Settlement.

### C. Litigation and Procedural History

The history leading up to the Settlement began long before the Judicial Panel on Multidistrict Litigation's (JPML) August 4, 2020 transfer order creating the MDL in this District. *See also* ECF Nos. 122-6 and 122-8 (Declarations of Katrina Carroll and Ekwan Rhow, discussing pre-MDL procedural history). The first filed case of all related cases in this MDL is *Hong v. ByteDance, Inc. et al.*, 5:19-cv-07792-LHK, filed in the Northern District of California in November 2019. Led by court-appointed Co-Lead Counsel Mr. Rhow, counsel from *Hong* first mediated with Judge Layn Phillips (Ret.) in April 2020 (before the additional cases comprising the MDL were filed). Although the parties engaged in an in-depth analysis of the issues involved, the first mediation was unsuccessful.

Beginning in late April 2020, additional class action cases against TikTok were filed in four federal districts: the Northern District of Illinois, the Southern District of Illinois, the Northern District of California, and the Central District of California. On May 15, 2020, counsel from the Southern District of Illinois filed a motion with the JPML seeking transfer and coordination in the Southern District of Illinois, or in the alternative, in this Court. MDL No. 2948. Highly contentious litigation among groups of Plaintiffs' counsel and Defendants ensued thereafter. On August 4, 2020, the JPML consolidated the related actions and transferred them to this District.

The second mediation with Judge Phillips, which occurred on August 13, 2020, was spearheaded by a group of Plaintiffs' counsel led by now-Co-Lead Counsel Katrina Carroll. As described in her declaration (ECF No. 122-6), 16 firms, representing 11 of the 19 consolidated actions, collaborated in the months leading up to the mediation, well before the JPML's

consolidation order, to pursue the second settlement opportunity. Ms. Carroll and PSC member Jonathan Jagher traveled to California to appear in person and five additional delegates selected by participating plaintiffs' counsel actively participated by phone.[2]

By the time the parties met with Judge Phillips on August 13, 2020, tremendous political pressure had mounted against TikTok, creating a unique settlement opportunity for the Class. Just one week before the mediation, on August 6, 2020, then-President Trump issued an executive order pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601, *et seq.*, and section 301 of title 3, United States Code, titled Executive Order on Addressing the Threat Posed by TikTok (the "First Executive Order").[3]

In the First Executive Order, President Trump stated that TikTok presented a "national emergency" that "threaten[s] the national security, foreign policy, and economy of the United States." The First Executive Order stated that the TikTok App would be banned in the U.S. unless ByteDance Ltd. sold or spun-off its domestic TikTok operations to a U.S. company within 45 days. President Trump later extended the 45-day deadline to 90 days through a second executive order titled Regarding the Acquisition of Musical.ly by ByteDance Ltd. (the "Second Executive Order").[4] The Second Executive Order also prohibited ByteDance from any ownership interest in Musical.ly and required that ByteDance divest: (i) any interests in assets or property in the

---

[2] Seven delegates participated in the second mediation: Co-Lead Counsel Katrina Carroll; PSC members Jonathan Jagher (Freed Kanner London & Millen LLC) and Michael Gervais (Susman Godfrey LLP); and Robert Foote (Foote, Mielke, Chavez & O'Neil, LLC); Joseph Guglielmo (Scott+Scott Attorneys at Law LLP); Tina Wolfson (Ahdoot & Wolfson, PC); and Tiffany Yiatras (Consumer Protection Legal, LLC).

[3] https://www.federalregister.gov/documents/2020/08/11/2020-17699/addressing-the-threat-posed-by-tiktok-and-taking-additional-steps-to-address-the-national-emergency.

[4] https://www.federalregister.gov/documents/2020/08/19/2020-18360/regarding-the-acquisition-of-musically-by-bytedance-ltd.

operation of TikTok in the United States; (ii) any data obtained or derived from TikTok or musical.ly; and (iii) immediately upon divestment, destroy any data obtained or derived from TikTok or Musical.ly.

TikTok was thus motivated at the second mediation session to resolve this litigation in order to shed existing liabilities and maximize its value in preparation for its imminent sale. The second mediation session was hard-fought on all fronts and lasted almost 13 hours, culminating in an agreement in principle and a signed term sheet for a class-wide resolution, later memorialized in a signed agreement on September 4, 2020.

At the time of the second mediation, the MDL was in a state of procedural limbo: the administrative transfer of the related actions had not been fully effectuated and the Court had not created a leadership structure subsequent to its pre-consolidation appointment of current Co-Lead Counsel Katrina Carroll as interim lead Plaintiffs' counsel. ECF No. 18.

On August 17, 2020, the Court entered Case Management Order No. 1, in which it set a process for the appointment of lead and liaison counsel for Plaintiffs. ECF No. 4. Numerous attorneys and attorney groups applied – including competing factions who attended the first and second mediations. At the September 25, 2020 hearing on those applications, the Court noted that some applications suggested that a combination of the various groups would result in a "forced marriage" or "a team of rivals." ECF No. 91, 11:19-21. The Court viewed the leadership group differently, however:

> I . . . would like to think of it as an all-star team of sorts or an Olympic team, made up of individuals form perhaps different individual teams, but who are asked to come together to pursue the interests of all plaintiffs as a whole in this litigation.

*Id.* at 11:21:12-2. The Court ultimately appointed three attorneys to serve as Co-Lead Counsel: Ekwan Rhow (from the lead Northern District of California action) and Katrina Carroll (from the

lead Northern District of Illinois action) along with Elizabeth Fegan (in recognition that, "perhaps most important of all in this circumstance, [she is] fair and level-headed."). *Id.* at 12:17-25.

After the Court appointed the Leadership Group,[5] that group immediately began collaborating to vet and analyze the Settlement Agreement, conduct and evaluate confirmatory discovery, continue negotiations with defense counsel, negotiate the Addendum to the Settlement Agreement, and ultimately reach consensus on the Settlement terms Plaintiffs now present to the Court for approval.

Various members of the Leadership Group were charged with analyzing a broad array of legal, factual, and strategic issues. The Leadership Group engaged in a candid, collaborative—and at times oppositional—process to assess the case and the proposed settlement benefits. *See also* ECF No. 122-7 (Declaration of Elizabeth Fegan further discussing process). Through that process, and six months of continued negotiations with defense counsel, Co-Lead Counsel was able to improve the already substantial Class recovery obtained in the Settlement Agreement through the clarification of some of its core terms. For example, as detailed in the Addendum and Ms. Fegan's declaration, the Addendum makes clear that the scope of the injunctive relief applies to defendants other than TikTok, and assures that the injunction's prohibitions of wrongful conduct (and the warranty relating to that conduct) extend beyond the function of the App, and apply to Defendants'

---

[5] The Court appointed: Katrina Carroll (now Lynch Carpenter LLP, formerly Carlson Lynch, LLP), Elizabeth A. Fegan (Fegan Scott LLC), and Ekwan Eric Rhow (Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.) as Plaintiffs' Co-Lead Counsel; Shannon Marie McNulty (Clifford Law Offices, P.C.) as Plaintiffs' Liaison Counsel; and Jonathan Jagher (Freed Kanner London & Millen LLC), Megan E. Jones (Hausfeld LLP), Michael Gervais (Susman Godfrey LLP), Amanda K. Klevorn (Burns Charest LLP), and Albert Y. Chang (Bottini & Bottini, Inc.) as Plaintiffs' Steering Committee ("PSC") (collectively, the "Leadership Group"). ECF No. 94.

treatment of App-derived data on the server. The Addendum also specifies that a third party will oversee TikTok's privacy compliance training program.

Through that process, and six months of continued negotiations with defense counsel, the Leadership Group was able to improve upon the already substantial Class recovery through the Addendum. For example, the Addendum expanded the scope of the injunctive relief to apply to defendants other than TikTok, ensured that prohibitions of wrongful conduct and the warranty relating to that conduct extended beyond the function of the App and applied to Defendants' treatment of App-derived data on the server, and now requires third-party oversight of TikTok's privacy compliance training program.

The substantial Settlement has also garnered the support of firms outside of the Leadership Group, who have been involved in this litigation since before consolidation, and their class member clients, who are proposed Class Representatives. *See* ECF No. 122-2 (Exhibit listing class representatives and their counsel).

On February 25, 2021, Plaintiffs filed a motion seeking preliminary approval of this Settlement. ECF No. 122. Three objections to that motion were filed – one by Mark S. (through his counsel Scott Drury), another by Dennis Litteken (through his counsel Edelson PC), and a third by Brian Behnken and Joshua Dugan (through their counsel Labaton Sucharow LLP). The Court held a hearing on Plaintiffs' motion on March 2, 2021. ECF No. 134. On March 23, 2021, at the Court's request, Plaintiffs filed supplemental briefing regarding the representation of minor Class Members, the process through which Co-Lead Counsel valued the claims in this action, and consideration of class notice by email and/or in-App notification. ECF No. 137 ("Supplemental Memo"). Following that Supplemental Memo, on September 30, 2021, the Court overruled the

pending objections and granted Plaintiffs' motion for preliminary approval of the Settlement. *See generally* Preliminary Approval Orders.

Plaintiffs, with the Court-approved Settlement Administrator, then implemented the Notice Plan. Now, after widespread support for the Settlement by the Class, Plaintiffs seek final approval of the Settlement, final approval of the Plan of Allocation, and final certification of the Nationwide Class and Illinois Subclass.

## III.    SETTLEMENT TERMS

The Settlement Agreement and Addendum contain the following key terms, which are described in further detail in Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Motion"), ECF No. 122, and its accompanying documents, including the Settlement itself:

### A.  The Settlement Classes

The Settlement Classes, certified for settlement purposes only, are defined as follows:

> **Nationwide Class**: All persons who reside in the United States who used the App—the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S.—prior to September 30, 2021.

> **Illinois Subclass:** All persons who reside in the State of Illinois and used the App—the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S.—in the State of Illinois to create videos prior to September 30, 2021.

Preliminary Approval Order, ¶ 2 (also noting exclusions from the Settlement Class).

### B.  Monetary Relief for Settlement Class Members

TikTok has agreed to pay $92,000,000 to create a Settlement Fund for the benefit of Class Members, who receive a pro rata payment (per the Plan of Allocation described below), after the deduction of settlement-related costs, including the expenses of the settlement administrator and the costs of notice to the Class, any service awards, any fee award, and any other administrative

fees and expenses which may be approved by the Court. *Id.* at § 4.1-5. *See also* Preliminary Approval Order, ¶ 13. No portion of the Settlement Fund will be returned to Defendants. *Id.* at § 4.5.

Class Members may submit one claim per Class Member to receive a payment from the Settlement Fund according to the Plan of Allocation (discussed *infra*). *Id.* at § 5.3.1.

While it is not possible to predict the precise amount each Class member will receive until the Settlement Administrator has completed vetting the claims and the Court has determined the amount to be awarded for fees, costs, and incentive awards, Class Counsel estimate that each Nationwide Class member will receive $27.19 and each Illinois Subclass member will receive $163.13 after deductions for Court-approved attorneys' fees and costs, Court-approved incentive awards to the Plaintiffs, and costs of Notice and claims administration.

### C. Plan of Allocation

The Plan of Allocation provides that the Net Settlement Funds will be divided into *pro rata* shares that are equal to the sum of (1) the total number of valid claims submitted by Nationwide Class members and (2) the total number of valid claims submitted by Illinois Subclass members multiplied by five. Plan of Allocation, ECF No. 122-3, p. 2. Each Illinois Subclass member who submits a valid, authorized claim will be paid six *pro rata* shares (one as a member of the Nationwide Class and five as a member of the Illinois Subclass). *Id.* Each Nationwide Class member who is not a member of the Illinois Subclass will be paid one *pro rata* share. *Id.*

This Plan of Allocation was determined through the independent analysis and negotiation of two attorneys selected by Co-Lead Counsel to analyze the merits of the claims asserted, advocate the interests of their respective subgroups, and negotiate an allocation of Settlement funds between the two groups. *See* Preliminary Approval Motion, pp. 13-14; Declaration of Jim Zouras, ECF No. 122-11; Declaration of Jonathan Rotter, ECF No. 122-10; Declaration of Elizabeth A.

Fegan, ECF No. 122-7. After this assessment, the Illinois Subclass was awarded additional shares, in part because of the value of the Illinois-only BIPA claim, which provides for statutory damages and has a historically higher settlement value than some other asserted claims.

### D. Injunctive Relief

TikTok, together with the other Defendants' Released Parties, has agreed ***not*** to do the following unless disclosed expressly in the TikTok Privacy Policy and in compliance with all applicable laws:

- Use the App to collect or store a user's biometric information or identifiers (as defined by applicable law);

- Use the App to collect geolocation or GPS data;

- Use the App to collect information in users' clipboards;

- Use the App to transmit U.S. user data outside of the U.S.;

- Store U.S. user data in databases outside of the U.S.; or

- Pre-upload U.S. user-generated content.

*Id.* § 6.1; Addendum § 2.1 ("'App' means the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S., including its device-side and server-side operations."); Addendum § 2.5 ("[w]ith respect to the Injunctive Relief in Section 6 of the Agreement, "TikTok" means any of Defendants' Released Parties to the extent they are engaged in the operation of the App or involved in receiving or accessing user data obtained through the App").

Consistent with the intent of the injunctive relief in Section 6 of the Settlement Agreement, the Parties jointly reviewed multiple categories of user data potentially in TikTok's possession that should be deleted from TikTok's servers. Following confirmation from TikTok as to what categories existed and should be deleted, TikTok has agreed to delete any Pre-Uploaded User-

Generated Content identified in Section 6.2 of the Settlement Agreement. Addendum § 4.2.

In addition, TikTok will require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter. Settlement Agreement § 6.3. TikTok will provide a written verification under oath of compliance with the foregoing within 90 days of the Effective Date. *Id.* § 6.4. TikTok will, at its own expense, hire a third party to review the data privacy law compliance training for a period of three years and to provide a written verification of this review along with the verification required by Section 6.4 of the Settlement Agreement to Class Counsel. Addendum § 4.3. TikTok will not disclose to any third party the "personally identifiable information" of a "consumer" who uses the App, as those terms are defined by the VPPA, except to the extent such disclosure is not prohibited by the Video Privacy Protection Act; nor will TikTok share user data collected through the App with third parties without disclosing in its Privacy Policy the categories of third parties with whom user data is shared. Addendum § 4.1.

### E. Release

In exchange for the relief afforded by the Settlement Agreement, Defendants' Released Parties[6] will receive a release of all Released Claims.[7] The release is narrowly tailored to the claims

---

[6] Defendants' Released Parties are: "The current defendants in the Civil Actions, as well as any and all of their current or former directors, officers, members, administrators, agents, representatives, servants, employees, attorneys, parents, subsidiaries, affiliates, divisions, branches, units, shareholders, successors, predecessors, assigns, and all other individuals and entities acting on their behalf." Settlement Agreement § 2.10.

[7] Released Claims are: "[A]ny and all claims, complaints, actions, proceedings, or remedies of any kind, whether known or unknown (including, without limitation, claims for attorneys' fees and expenses and costs), arising from or related to the Civil Actions or the collection and use of any user data, including biometric data, whether in law or in equity, under contract, tort or any other subject area, or under any statute, rule, regulation, order, or law, whether federal, state, or local, on any grounds whatsoever, arising from the beginning of time through the Effective Date, that were, could have been, or could be asserted by the Releasing Parties." Settlement Agreement § 2.30.

related to "the Civil Actions or the collection and use of any user data, including biometric data" and thus covers the claims actually at issue (or that could have been asserted based on the alleged facts) in this MDL through the date of preliminary approval.

### F. Class Representative Service Awards

The Settlement Agreement permits Plaintiffs' counsel to seek service awards for Class Representatives to be paid from the Settlement Fund in an amount up to $2,500 each. Settlement Agreement, § 13.2. Contemporaneously with this motion, Plaintiffs have filed a motion seeking service awards of that amount. The Settlement is not contingent on Court approval of any service awards. *Id.* at § 13.4.

### G. Attorneys' Fees and Costs

The Settlement Agreement permits Plaintiffs' counsel to apply to the Court seeking a reasonable portion of the Settlement Fund as payment of any reasonable attorneys' fees and costs. *Id*. at § 13.1. The Settlement is not contingent on Court approval of an award of attorneys' fees or costs. *Id*. at § 13.4.

The Notice informed the Class that Class Counsel would seek an award of attorneys' fees of no more than 33.33% of the common fund and costs. Notice, ECF No. 122-4, p. 8. Contemporaneously with this motion, Class Counsel has filed a motion seeking an attorneys' fee award of 33.33% of the common fund and reimbursement of $789,836.62 in costs.

### H. Settlement Administration

All Notice and Administrative Costs will be paid from the Settlement Fund. Settlement Agreement, § 4.5. The Notice Plan and settlement administration was conducted by Angeion Group, LLC ("Angeion") by methods ordered by the Court and described in the Declaration of Steven Weisbrot of Angeion submitted in connection with preliminary approval, ECF No. 122-12, and the declaration of Steven Platt, also with Angeion, filed in connection with this motion ("Platt

Decl."). *See also* Preliminary Approval Motion, p. 15. The Notice and Administrative Costs as of January 31, 2022 are $2,143,540.55, and Angeion estimates that the future administrative cost will be $1,132,727.88, for a total cost of administration of $3,276,268.43. Platt Decl., ¶ 42.

## IV. CLASS NOTICE & RESPONSE

Per the Settlement, Notice Plan, and the Court's Preliminary Approval Orders, the Claims Administrator issued Class Notice. *See generally* Platt Decl. The Claims Administrator set up a Settlement Website, established and staffed a toll-free hotline, disseminated emails to nearly 81 million Class Member email addresses, coordinated with TikTok to commence in-App notification, and initiated media, social media, and paid search campaigns, as well as a custom claims-stimulation program with additional targeted social media advertising placements. *See generally id.*

### A. Notice was disseminated via a robust multi-faceted campaign including widespread publication and advertising, direct emails, and in-App notice.

On November 14, 2021, the Claims Administrator launched the Notice Plan. Platt Decl., *e.g.,* ¶¶ 7, 11, 12, 22, 26, 27, 28, 29. The Notice Plan included a comprehensive media notice program that targeted the known demographics of the Settlement Class and was designed to deliver an approximate 95.23% reach with an average frequency of 5.85 times each. *Id.* at ¶ 35. (This reach is separate from and in addition to the direct notice efforts, the Settlement Website, the toll-free hotline, the claims stimulation package, and the Illinois-specific notice plan). The nationwide media portion of the Notice Plan was successful; it resulted in an approximate 96.78% reach with an average of three times each. *Id.* at ¶ 36.

The number of impressions achieved by the media campaigns also exceeded Plaintiffs' and the Claims Administrator's initial targets. The internet banner notice portion of the Notice Plan was designed to serve approximately 64.3 million impressions nationally and 1.5 million

impressions in Illinois. *Id.* at ¶ 20. This aspect of the program exceeded those targets; it served over 126.1 million impressions nationally and 3.5 million in Illinois. *Id*. at ¶ 20. The national social media campaign also exceeded target impressions: for Facebook and Instagram, the Claims Administrator served over 115.2 million impressions nationwide and 4.5 million for the campaign focused on Illinois; for Twitter, the Claims Administrator served over 39.7 million and over 346 thousand impressions for the Nationwide and Illinois campaigns, respectively. *Id.* at ¶¶ 24-25. In sum, there were hundreds of millions of views on various aspects of the Notice Plan's media campaign.

Beginning on November 14, 2021, the Claims Administrator also commenced direct email notice to over 80.9 million email addresses associated with Class Members, making multiple attempts for certain email addresses as needed. *Id.* at ¶ 7. Approximately 70% of those mails were successfully delivered. *Id.* at ¶ 10.

On November 15, 2021, TikTok also commenced and completed the in-App notification to all standard mode TikTok accounts having certain data corresponding to a United States location in the same manner that TikTok would distribute other TikTok-originated in-App notifications.[8] *Id.* at ¶ 11.

The Claims Administrator also set up a Settlement Website linked to the ads, where potential Settlement Class Members could find important documents and court filings including the long form notice and the Preliminary Approval Order. The website was established at www.TikTokDataPrivacySettlement.com on November 13, 2021. *Id.* at ¶ 30. Settlement Class

---

[8] This excludes users in the under-13 experience (called "TikTok for Younger Users") because there is no Inbox feature in TikTok for Younger Users. *Id.*

Members could submit their claims directly through the website. *Id.* As of March 15, 2022, the settlement website had over 13.7 million page views. *Id.* at ¶ 31.

And finally, beginning November 13, 2021, the Claims Administrator established and maintained a 24/7 toll-free number to field questions about the settlement and to allow potential Class Members to request mail copies of the long form notice. *Id.* at ¶ 32. As of March 15, 2022, the Claims Administrator received a total of 2,579 calls to the toll-free number, totaling over 8,000 minutes of call time. *Id.* at ¶ 33.

Due process does not require that every class member receive notice. *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 968 (N.D. Ill. June 2, 2011) (collecting cases). Rather, parties are required, "within the limits of practicability, to send such notice as [is] reasonably calculated to reach most interested parties." *Burns v. Elrod*, 757 F.2d 151, 157 (7th Cir. 1985); *see also* Memorandum Opinion, p. 28 ("The best notice practicable is that which is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action.'") (*quoting Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)) (other citation omitted).

The Notice Plan was successful. The media campaign alone has reached the vast majority of Class Members and exceeded the threshold for adequate notice. *See* Memorandum Opinion, p. 28 ("The Federal Judicial Center has found that a notice plan calculated to reach between 70% and 95% of the class in total is reasonable and . . . the median reach calculation on approved notice plans is 87%."); *see also, e.g., Kaufman v. Am. Express Travel Related Servs.*, No. 07-CV-1707, 2016 U.S. Dist. LEXIS 26167 (N.D. Ill. Mar. 2, 2016) (granting final approval where notice, including digital ads, was estimated to have reached 70% of the settlement class), *aff'd*, 877 F.3d 276, 288 (7th Cir. 2017); *Wilkins v. HSBC Bank Nev., N.A.*, No. 14-C-190, 2015 U.S. Dist. LEXIS

23869 (N.D. Ill. Feb. 27, 2015) (granting final approval where a combination of direct notice and banner ads were estimated to have reached 79.2% of the class); *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, No. 08-C-1832, 2016 U.S. Dist. LEXIS 25290 (N.D. Ill. Feb. 29, 2016) (approving the use of banner ads as notice where many settlement class members could not be identified in Defendants' records); *In re Briscoe*, 448 F.3d 201, 207 (3d Cir. 2006) (affirming the trial court's decision to use a notice plan that included banner advertisements on the internet directing class members to the official settlement website). Of course, the Notice Plan was further supported by multiple means of direct notice in addition to the Settlement Website and broad media coverage of this high-profile Settlement. In sum, the Notice Plan was well executed and achieved the best practicable notice.

There was also significant media coverage of the Settlement. After the Notice period commenced, the Settlement, and information about filing a claim, was reported by USA Today,[9] NBC News,[10] Business Insider,[11] the New York Post,[12] Today,[13] Newsweek,[14] Mashable,[15] and numerous other national and local news outlets.

---

[9] https://www.usatoday.com/story/tech/2021/11/15/tiktok-settlement-class-action-lawsuit/8633539002/ (last accessed 3/28/2022).

[10] https://www.nbcnews.com/news/us-news/need-know-tiktoks-class-action-lawsuit-rcna5781 (last accessed 3/28/2022).

[11] https://www.businessinsider.com/tiktok-data-privacy-settlement-how-to-submit-claim-2021-11 (last accessed 3/28/2022).

[12] https://nypost.com/2021/11/17/tiktok-agrees-to-92m-settlement-users-in-for-a-payday/ (last accessed 3/28/2022).

[13] https://www.today.com/money/tiktok-notification-about-settlement-payment-isn-t-scam-here-s-t239286 (last accessed 3/28/2022).

[14] https://www.newsweek.com/tiktok-class-action-lawsuit-settlement-eligible-claim-1649615 (last accessed 3/28/2022).

[15] https://mashable.com/article/tiktok-settlement-claim (last accessed 3/28/2022).

**B. The claims rates of 1.4% for the Nationwide Class and 13% for the Illinois Subclass falls well within the range of comparable class action settlements.**

Class Members submitted an almost unprecedented 1,215,541 valid claims by the Claim Deadline, Platt Decl., ¶ 37 – TikTok has repeatedly maintained that it is impossible to estimate the total number of class members because they cannot account for the common practice of users creating multiple TikTok accounts on multiple devices or the creation of artificial accounts by information-gathering entities. At the high end, TikTok has provided a conservative estimate of 89 million class members while recognizing the actual class size could be much smaller. Using this high-end conservative estimate, approximately 1.4% of the Settlement Class submitted a claim. Of those claims, 177,024 are for the Illinois Subclass, amounting to a claims rate of approximately 13% of the roughly 1.4-million-member Illinois Subclass (again, using a very high-end conservative estimate that could in fact be much lower). *Id.* at ¶ 38.

These claims rates fall in line with other consumer class action settlements. *See, e.g.,* Declaration of Professor William B. Rubenstein, *In re Facebook Biometric Info. Privacy Litig.*, 15-CV-03747 (N.D. Cal.) ("*Facebook BIPA*"), ECF No. 517-2, p. 4 (classes above 2.7 million class members average claims rates of 1.4%); *Poertner v. Gillette Co.*, 618 F. App'x 624, 626 (11th Cir. 2015) (approving unfair trade practices settlement with 7.26-million-member settlement class and 1% claims rate); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377 (S.D. Fla. 2007) (1.1% of 10.3-million-member settlement class filed claims); *see also Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) (approving TCPA settlement with 2% claims rate); *Davenport v. Discover Fin. Servs.*, No. 1:15-CV-06052 (N.D. Ill. Dec. 19, 2017) (approving settlement with 3% claims rate); *Bayat v. Bank of the W.*, No. C-13-2376, 2015 U.S. Dist. LEXIS 50416, at *1 (N.D. Cal. Apr. 15, 2015) (approving TCPA settlement with approximately 1% claims rate); *Arthur v. SLM Corp.*, No. C10–0198 (W.D. Wash. Aug. 8, 2012) (claims rate of approximately 2%);

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (claims rates in consumer class settlements "rarely" exceed 7%, "even with the most extensive notice campaigns"); *Pollard v. Remington Arms Co.*, *LLC*, 320 F.R.D. 198, 214 (W.D. Mo. 2017) (citing numerous finally approved settlements with claims rates less than 1%). *See also* Preliminary Approval Motion, pp. 24-25.

It is expected that Nationwide Class Members will receive an award of approximately $27.19 and Illinois Subclass members will receive an award of approximately $163.13, after deductions for Court-approved attorneys' fees and costs, Court-approved incentive awards to the Plaintiffs, and costs of notice and claims administration. *See* Platt Decl., ¶ 43. This is within the range of acceptable settlement amounts. *See infra* § VI. A.

Should the Court grant final approval of the Settlement, payments will be automatically issued to all Class Members who submitted Valid Claims within 14 days of the Effective Date. Settlement Agreement, ¶ 5.2.4.

### C.  Only a fraction of 1% of the class opted out of the Settlement.

The Claims Administrator received only 28 valid requests for exclusion by the January 31, 2022 deadline. Platt Decl., ¶ 39. An additional 4,040 requests for exclusion (some duplicative) were submitted "in mass" by four law firms on behalf of 2,253 individuals, which the Settlement Administrator deemed invalid for violating the prohibition on mass opt outs in the Settlement Agreement. *Id.* at ¶ 40. Two other invalid requests for exclusion were made, as well – one postmarked after the deadline, and another that was filed with a Claim Form seeking payment in the Settlement. *Id.* Even including the invalid requests for exclusion, less than a tiny fraction of 1% of the Class (less than 0.005%) sought to opt out of the Settlement.

**D. Only four individuals objected, and none of their objections is colorable.**

Only four individuals filed objections: Mark S. and Daniel Litteken – whose objections were already denied at preliminary approval, and Steven Helfand and Jennifer Cochran by her counsel George Cochran – serial objectors who lack credibility. None of those objections has merit, and each is addressed in further detail below, in Section VI. C.

**E. CAFA notice was provided and no objections followed.**

On March 5, 2021, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, the Claims Administrator caused Notice of the Settlement and related materials ("CAFA Notice") to be sent to the Attorneys General of all U.S. states and territories, as well as the Attorney General of the United States. Platt Decl., ¶ 5. No objections were received to the Settlement from the Attorneys General of the United States.

**V.     STANDARDS FOR SETTLEMENT APPROVAL**

As the Seventh Circuit recognizes, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation"); *4 Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases).

The traditional means for handling claims like those at issue here—individual litigation on behalf of millions of individuals—would unduly tax the court system, require a massive expenditure of public and private resources and, given the relatively small value of the claims of the individual Settlement Class Members, be impracticable. Indeed, the Supreme Court has repeatedly recognized that class actions save the resources of the courts and parties, and ensure aggrieved plaintiffs can obtain relief:

> [T]he law recognizes class actions as a legitimate part of the U.S. litigation system. The Supreme Court has made this clear on several occasions. *See, e.g.*, *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 . . . (1982) (explaining that, in appropriate cases, "the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23"); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 . . . (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."). In addition, Federal Rule of Civil Procedure 23 provides for the use of such a procedure.

*Kolinek*, 311 F.R.D. at 497 (quoting *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 982 (N.D. Ill. 2011) (citations omitted). For these reasons, the proposed Settlement is the best vehicle for Settlement Class Members to receive relief to which they are entitled in a prompt and efficient manner.

Under Rule 23(e) of the Federal Rules of Civil Procedure, a class-action settlement may be approved if the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010). "Approval of a class action settlement is a two-step process." *In re Northfield Lab'ys, Inc. Sec. Litig.*, No. 06-C-1493, 2012 U.S. Dist. LEXIS 12741, at *15 (N.D. Ill. Jan. 31, 2012) (citing *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010) (quoting *Saranchak v. Beard*, 616 F.3d 292, 314 (3d Cir. 2010))). "First, the court holds a preliminary, pre-notification

hearing to consider whether the proposed settlement falls within a range that could be approved." *Id*. "If the court preliminarily approves the settlement, the class members are notified." *Id*.

The first step in the settlement approval process is a preliminary fairness determination. "The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). This is so the Court may make "a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms[.]" *Manual for Complex Litigation* § 21.632 (4th ed. 2004); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, § 11.25 (4th ed. 2002); *see also* Fed. R. Civ. P. 23(e)(1)(B).

Fed. R. Civ. P. 23, as amended in 2018, calls for front-loaded scrutiny of a proposed settlement so that any issues are identified *before* notice goes out to the class. Fed R. Civ. P. 23(e) states that grounds exist for class notice where the parties show that "the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). To that end, where, as here, the proposed settlement "would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether":

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). If the court preliminarily finds that the settlement is fair, adequate, and reasonable, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal . . . ." Fed. R. Civ. P. 23(e)(1)(B).

The second step in the process is a final fairness hearing. Fed. R. Civ. P. 23(e)(2); *also Manual for Complex Litigation*, § 21.633-34; *In re Northfield Lab'ys, Inc. Sec. Litig.*, No. 06 C 1493, 2012 U.S. Dist. LEXIS, at *15-16 ("Second, the court holds a fairness hearing and considers, among other things, any objections filed by class members.").

The first step in this process—including front-loaded scrutiny of the settlement and the consideration of objection to preliminary approval—has occurred. Plaintiffs now respectfully request that the Court take the second step in the process by granting final approval of the Settlement.

A proposed class action settlement should be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). When making this determination at the final approval stage, courts in this Circuit consider the following factors:

    (1)      the strength of plaintiffs' case compared to the terms of the proposed settlement;

    (2)      the likely complexity, length, and expense of continued litigation;

    (3)      the amount of opposition to settlement among affected parties;

    (4)      the opinion of competent counsel; and

    (5)      the stage of the proceedings and the amount of discovery completed.

*Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (*quoting Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982)); *Isby*, 75 F.3d at 1199; *see also* Fed. R. Civ. P. 23(e)(2) (listing factors for final approval). In reviewing these factors, courts view the facts "in the light most favorable to the settlement." *Isby*, 75 F.3d at 1199. In addition, courts "should not substitute their

own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel." *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS, 25290, at *26-27 (citing *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir. 1980)).

## VI.     FINAL APPROVAL IS WARRANTED

### A.  The strength of Plaintiffs' case compared to the amount of the Settlement favors final approval.

"[T]he 'most important factor relevant to the fairness of a class action settlement' is the first one listed: the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel Techs., Inc. v. DHL Express, Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted). Courts "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness." *Isby*, 75 F.3d at 1199 (cleaned up). Because the "essence of settlement is compromise, courts should not reject a settlement 'solely because it does not provide a complete victory to plaintiffs.'" *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 347 (citations omitted).

While Plaintiffs strongly believe in their claims, Plaintiffs recognize that Defendants have asserted a number of potentially case-dispositive defenses. The Court recognized this, too. Indeed, in its Memorandum Opinion, the Court found numerous risks associated with continued litigation, for example:

- the class action waiver and arbitration agreements in TikTok's terms of service;

- TikTok's warranty and confirmatory discovery regarding whether TikTok used the App in violation of BIPA;

- "numerous colorable" disputes to Plaintiffs' VPPA claim, including whether TikTok is engaged in a covered business or Class Members are "subscribers";

- Class Members' acceptance of TikTok's terms of service;

- the "high bar" prescribed by California Constitutional and intrusion upon seclusion;

- the difficulty establishing damages; and

- the low or cy-pres-only historical settlements in comparable cases.

Memorandum Opinion, pp. 22-24.

Despite these material risks, Plaintiffs achieved an excellent result for the Class. The estimated recovery of $ 27.19 per Nationwide Class Member and $163.13 per Illinois Subclass Member is well within the range of recovery for other comparable, court-approved privacy class action settlements, many of which only obtain injunctive relief. *E.g.*, *T.K.*, 19-cv-07915, ECF No. 94 ($3.06 per claimant in privacy class action); *In re Google Plus Profile Litig.*, No. 5:18-CV-06164, 2021 U.S. Dist. LEXIS 13571, at *14 (N.D. Cal. Jan. 25, 2021) (estimated per-claimant recovery of $0.20 to $29.60 with an average of $2.50 in privacy class action); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 942–44 (N.D. Cal. 2013), *aff'd sub nom.*, *Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016) ($15 per claimant in privacy class action); *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573 (N.D. Cal. 2015) (approximately $14.81 per claimant in privacy class action); *Parker v. Time Warner Ent. Co., L.P.*, 631 F. Supp. 2d 242, 258, 268–69 (E.D.N.Y. 2009), *aff'd sub nom. Lobur v. Parker*, 378 F. App'x 63 (2d Cir. 2010) ($5 per claimant in privacy class action); *Lane v. Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012) (cy-pres-only resolution of Electronic Communications Privacy Act (ECPA) claim brought on behalf of tens of millions of class members); *In re Google Buzz Privacy Litig.*, No. 10-00672, 2010 U.S. Dist. LEXIS 146767 at *4-10 (N.D. Cal. June 2, 2011) (cy-pres-only settlement of ECPA claims); *In re Google LLC St. View Elec. Commc'ns Litig.*, No. 10-md-02184, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) (cy-pres-only settlement of ECPA claims); *Adkins v. Facebook, Inc.*, No. 18-CV-05982,

2021 U.S. Dist. LEXIS 87097 (N.D. Cal. May 6, 2021) (injunctive-only relief in data breach case); *Carroll v. Crème de la Crème, Inc.*, 2017-CH-01624 (Cir. Ct. Cook Cnty. June 25, 2018) (credit monitoring and no monetary relief in BIPA case). *See also* ECF No. 137-2 (chart of comparable privacy settlements).

"In light of the potential difficulties at class certification and on the merits . . ., the time and extent of protracted litigation, and the potential of recovering nothing, the relief provided to class members in the Settlement Agreement represents a reasonable compromise." *Wright v. Nationstar Mortg. LLC*, No. 14-C-10457, 2016 U.S. Dist. LEXIS 115729, at *39 (N.D. Ill. 2016).

### B. An assessment of the likely complexity, length, and expense of continued litigation favors approval of the Settlement.

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." Newberg on Class Actions, § 11:50. This is, in part, because "the law should favor the settlement of controversies, and should not discourage settlement by subjecting a person who has compromised a claim to the hazard of having the settlement proved in a subsequent trial." *Grady v. De Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969). It is also, in part, because "[s]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also Gehrich v. Chase Bank U.S.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016) ("The essential point here is that the court should not 'reject[ ]' a settlement 'solely because it does not provide a complete victory to plaintiffs,' for 'the essence of settlement is compromise'").

Litigation would be lengthy and expensive if this action were to proceed. *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[C]lass action suits have a well deserved reputation as being most complex."). Although the parties engaged in certain confirmatory discovery to evaluate the Settlement, continued discovery would likely include the production and review of millions of pages of documents, numerous depositions, and extensive expert analyses. Continued litigation would involve extensive motion practice (including motions to compel arbitration, to dismiss Plaintiffs' claims, for class certification, and for summary judgment) and ultimately a trial on the merits—each of which has the potential for appeal, further risking and delaying any benefit to the Class. The Court recognized this at preliminary approval:

> Proceeding to trial likely would take years and entail extensive fact and expert discovery and motion practice, including, in all probability, a contested motion to certify, motions for summary judgment, and Daubert motions. Furthermore, after the completion of pretrial proceedings, many of the individual cases that comprise this MDL would be sent back to their transferor courts for trial, absent a stipulation by the parties to try the cases in this Court, potentially resulting in even further motion practice and delay.

Memorandum Opinion, p. 26 (citations omitted).

Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows Plaintiffs and Settlement Class Members to receive immediate and certain relief. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.") (citation omitted). This factor thus favors settlement approval.

### C. The lack of opposition to the Settlement favors final approval.

In contrast to the 1.2 million claims in support of the Settlement, only four objections were filed.[16] "Such a remarkably low level of opposition supports the Settlement." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 965 (the "tiny fraction" of opt-outs and objections supports approval); Memorandum Opinion, p. 27 ("The Court also finds it noteworthy that, out of an estimated 89 million members of the Settlement Class, only two (Mark S. and Dennis Litteken) have objected to the fairness, reasonableness, and adequacy of this widely published settlement so far.").

Moreover, none of the objections raises meritorious concerns. Two of the objections (Helfand and Cochran) were filed by serial objectors with material credibility concerns. Three of the objections (Cochran, Mark S., and Litteken) have procedural deficiencies and should be stricken as invalid. And all four objections fail on their merits, having raised issues already considered and rejected by this Court in connection with preliminary approval, or parroting one another's claims that Class Members do not have an opportunity to respond to Class Counsel's fee request, which is simply untrue. None of the objections provides a basis to deny final approval and relief to more than one million claimants who support the Settlement.

#### 1. The Helfand Objection was filed by a serial objector and lacks merit.

##### a. Mr. Helfand's claim that he is a Class Member who was injured is not credible.

Mr. Helfand is a former attorney who was disbarred because of conduct related to class action settlement objections. The State Bar of California found that, among other egregious

---

[16] The objections were filed by: Steven Franklyn Helfand, pro se, ECF Nos. 182 and 192; Dennis Litteken, through his counsel Edelson PC, ECF No. 184; Jennifer Cochran, through her counsel George W. Cochran, ECF No. 186; Mark. S., as Parent and Legal Guardian of His Minor Son, A.S., through his counsel Scott R. Drury of Loevy & Loevy, ECF No. 187.

conduct, Mr. Helfand: (1) filed objections in the name of class members without being authorized by the class member to do so, (2) misled a court and opposing counsel, (3) settled an objection on appeal without the client's authorization, (4) misappropriated settlement proceeds, and (5) committed other acts of moral turpitude. *In re Equifax Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 U.S. Dist. LEXIS, at *268 (N.D. Ga. Mar. 17, 2020) (citation omitted); *In re Steven Franklyn Helfand*, No. 206667 and *Joseph Darrell Palmer*, No. 125147, Case Nos. 17-O-00411 and 17-O-00412 (State Bar Court of Los Angeles).

Nevertheless, Mr. Helfand continues to act as a serial objector.[17] Here, the timing of Mr. Helfand's download of the TikTok application suggests that he downloaded the application for the sole purpose of objecting. Mr. Helfand downloaded the TikTok application on April 10, 2021, six weeks after Plaintiffs moved for preliminary approval of the Settlement on February 25, 2021. According to the screen shots attached to his objection, Mr. Helfand follows just one other TikTok account, is not followed by any accounts, and he has never shared a video on the application. Mr. Helfand has a history of "falsely claim[ing] to have purchased products, so he could file objections." *Collins v. Quincy Bioscience, LLC*, No. 19-22864, 2020 U.S. Dist. LEXIS 218673, at *14. Mr. Helfand appears to have been similarly motivated here to interfere with the Settlement and extort a payment, rather than to benefit the Class. Accordingly, his objection should be given little, if any, weight.

---

[17] *Collins v. Quincy Bioscience, LLC*, No. 19-22864, 2020 U.S. Dist. LEXIS 218673, at *5 (S.D. Fla. Nov. 16, 2020) (Helfland is "a well-known serial objector who has represented himself and third parties in objecting to multiple class action settlements.") (quoting *Gay v. Tom's of Maine, Inc.*, No. 0:14-cv-60604, ECF No. 43, at 4 n.1 (S.D. Fla. Mar. 11, 2016)). *See also Spann v. J.C. Penney Corp.*, No. CV 12-0215, 2016 U.S. Dist. LEXIS 137184, at *32 n.11 (C.D. Cal. Sept. 30, 2016) (Steven Helfand is a "known serial objector").

Moreover, Mr. Helfand failed to disclose the dozens of objection he has filed as required by the Preliminary Approval Order. In 2020, Mr. Helfand testified that he had objected to 50 or more class action settlements. *Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 U.S. Dist. LEXIS 218673, at *16. *See also Norcia v. Samsung Telcomms. Am., LLC*, No. 14-CV-00582, 2021 U.S. Dist. LEXIS 135256, at *11 (N.D. Cal. July 20, 2021) (noting Mr. Helfand's "50 or 60 cases . . . as an objector or as an attorney for objectors.") (citation omitted). Although the Preliminary Approval Order requires the disclosure of any other class settlement objection made within the previous five years, Mr. Helfand did not disclose any of these dozens of objections. He suggests he was not required to do so because he is proceeding pro se, and the notice requires disclosure regarding "times in which *that counsel* has objected to a class action settlement." Helfand Obj., p. 5 (emphasis in original). Such gamesmanship should not be rewarded.

This is not the first time he has filed objections to settlements in which he is not a class member, including by making false or misleading claims that he purchased the product at issue, nor objections that fail to meet the requirements of courts' preliminary approval orders. *E.g.*, *Hooker v. Sirius XM Radio Inc*., No. 4:13-CV-00003, ECF No. 209, ¶ 20 (E.D. Va. Dec. 22, 2016) (striking objection because Helfland was not a class member and the objection did not meet the requirements of the preliminary approval order) (cited in *Collins v. Quincy Bioscience, LLC*, 2020 U.S. Dist. LEXIS 218673, at *8); *Brown v. Hain Celestial Grp., Inc*., 3:11-CV-03082, 2016 U.S. Dist. LEXIS 19275 (N.D. Cal. Feb. 17, 2016) (Mr. Helfand is a "professional objector" whose efforts courts have "repeatedly turned aside"; he has "provided no proof that he is a class member"; "he neither provides receipts nor identifies the products he claims to have bought"; and "[t]he court could therefore almost certainly strike his objection"); *Legg v. Lab. Corp. of Am. Holdings*, No. 14-61543-CV, 2016 U.S. Dist. LEXIS

122695, at *9 n.2 (S.D. Fla. Feb. 18, 2016) ("objector[] Steven Helfand . . . [is] not [a] member[] of the Settlement Class and therefore lack[s] standing to object to the Settlement"). Other courts have similarly found his testimony "uncooperative, evasive, vague, confrontational, difficult, inconsistent, rude, [and] threatening." *Collins v. Quincy Bioscience, LLC*, 2020 U.S. Dist. LEXIS 218673, at *4. *See also Norcia*, 2021 U.S. Dist. LEXIS 135256, at *11 (making an "adverse credibility finding" after considering the substance of his deposition and in-court testimony, and observing his demeanor at the final approval hearing.").

###### b. Further undermining his credibility, even if he is a Settlement Class Member, Mr. Helfand's objection lacks merit.

In addition to Mr. Helfand's lack of credibility, the two bases for his objection lack merit. First, Mr. Helfand contends that Plaintiffs' fee application (due March 31, 2022) will be filed after the objection deadline (January 31, 2022). Helfand Obj., pp. 2-3. This, according to Mr. Helfand, violates due process, Rule 23(h), and Ninth Circuit case law holding that class members should be allowed an opportunity to examine counsel's fee motion. *Id.* But responses to Plaintiffs' Motion for Final Approval and Motion for Attorneys' Fees are not due until April 14, 2022 (the "Fee Response Date"). Preliminary Approval Order, ¶ 25. Class members will have an adequate opportunity to examine and respond to counsel's fee motion prior to final approval. Mr. Helfand's objection is thus meritless.

After his objection, Mr. Helfand filed a second submission (without leave of Court), complaining that the Fee Response Date was added to the home page of the Settlement Website in January 2022. ECF No. 192. There is nothing improper about the addition of information that may be of assistance to Settlement Class Members. In fact, it is one of the explicit purposes of the Settlement Website; the Preliminary Approval Order requires that the website:

> [M]ake available copies of this [Preliminary Approval] Order, Class
> Notices, the Settlement Agreement and all Exhibits thereto;

> instructions on how to submit Claims online, by email, or by mail; Orders of the Court pertaining to the Settlement; **and such other information as may be of assistance to Settlement Class Members** or required under the Settlement Agreement.

Preliminary Approval Order, ¶ 15 (emphasis added). The Fee Response Date is in the Court's Preliminary Approval Order (which is on the Settlement Website and has been throughout the notice period). The date was later added to the landing page of the Settlement Website for additional clarity and assistance to the Class. It is unclear exactly what Mr. Helfand's criticism of this information is, other than that it is "too little and too late." But the Fee Response Date has long been prescribed by Court order available on the Settlement Website, it was further highlighted on the website more than a month before any fee petition was due and even further before any responses to that petition would be required, and no Class Member has been deprived of their right to respond to counsel's fee request.

As a second basis for his objection, Mr. Helfand complains about the allocation of the settlement fund between the Nationwide Class and Illinois Subclass. He suggests that the Illinois Subclass was given preferential treatment and was able to "extract concessions" as a result of home-court favoritism stemming from the case having been filed in an Illinois court, in part by Illinois-based plaintiffs' attorneys. Helfand Obj., pp. 3-4. He complains that the two classes are being treated differently "based simply on where they live and/or used the application." *Id.* at 3-4.

Of course, there is no support for the idea that this Court or counsel have given improper preferential treatment to the Illinois Subclass. Illinois Subclass members are entitled to more shares of the Settlement because the Illinois BIPA claim provides a unique avenue for statutory damages available only to Illinois users. *Supra*. Co-Lead Counsel appointed independent counsel for each of the classes to consider the strengths and weaknesses of the claims available to the respective classes and to research, negotiate, and make a recommendation regarding the appropriate

settlement allocation between the two classes. *Supra*. Each class is represented by multiple Class Representatives. *Supra*. The provision of additional Settlement shares to Illinois Subclass members is well founded and proper.

Later in his objection, tacitly recognizing the valid, BIPA-related distinction between the two classes, Mr. Helfand contends that the Illinois Subclass should not be entitled to additional shares because that subclass cannot be certified. Helfand Obj., pp. 4-5.[18] But Mr. Helfand further contends that the Nationwide Class cannot be certified either. *Id.* If anything, Mr. Helfand's arguments regarding class certification risks support that the $92 million (plus injunctive relief) Settlement is an excellent result in a case that faces meaningful risks should it proceed in litigation.

For these reasons, Mr. Helfand's objection should be denied.

### 2. The Cochran Objection was filed by a serial objector, did not comply with the requirements of the Preliminary Approval Order, and lacks merit.

#### a. Ms. Cochran failed to provide the information required by the Preliminary Approval Order.

The Cochran Objection also carries no weight. As a procedural matter, the objection should be stricken because Ms. Cochran did not provide the Court-ordered information required for each objection. The Preliminary Approval Order requires that objectors disclose: "the identity of all counsel who represent the objector . . . along with a statement of the number of times in which that

---

[18] Mr. Helfand raises a number of hypothetical questions in arguing that the Illinois Subclass definition is ambiguous such that the Subclass cannot be certified. Each of his hypotheticals is plainly answered by the Subclass definition.

For example, Mr. Helfand queries whether a person who "happens to use TikTok while waiting to board a new plane at O'Hara is a member of the Subclass, even if they only filmed video in Iowa?" Helfand Obj., p. 4. No. The Subclass definition requires that the individual used the App "to create videos" in Illinois. As another example, Mr. Helfand queries: "What about if they filmed video in O'Hare and were using TikTok, but their video was not going to be used on TikTok, but then they decide to use it that way after all?" *Id.* That person would be a Class Member if they are an Illinois resident, because they used the App "to create videos" while in Illinois.

counsel has objected to a class action settlement within five years preceding the submission of the objection, the caption of the case for each prior objection, and a copy of any relevant orders addressing the objection." Preliminary Approval Order, ¶ 9.

Ms. Cochran's counsel is George W. Cochran. Cochran Obj., p. 2. Mr. Cochran "is a serial objector to class action settlements, with a history of attempting to extract payment for the withdrawal of objections." *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1104 (D. Kan. 2018); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 U.S. Dist. LEXIS 118209, at *266 (N.D. Ga. Mar. 17, 2020) (same). Indeed, the Cochran Objection notes that Mr. Cochran has objected to 17 class settlements (that he can recall) in the last five years. Cochran Obj., p. 3. But the Cochran Objection does not include "a copy of any relevant orders addressing" any of those 17 objections, as the Preliminary Approval Order requires. *Supra*.

The objection must also include "the objector (and the objector's attorney's) signature on the written objection" and "all agreements that relate to the objection or the process of objecting, between the objector or objector's counsel and any other person or entity." Preliminary Approval Order, ¶ 9. Mr. Cochran has not signed the objection, nor has Ms. Cochran produced her retainer with Mr. Cochran or any other agreement relating to the objection.

Because the objection fails to provide this Court-ordered information, it should be stricken. *Ferron v. Kraft Heinz Foods Co.*, No. 20-CV-62136, 2021 U.S. Dist. LEXIS 129955, at *43 (S.D. Fla. July 13, 2021) ("[b]ecause [objector] failed to comply with the Court's Order Preliminarily Approving Class Action Settlement and Certifying the Settlement Class, this Court strikes his Objection as invalid."); *Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1353 (N.D. Ga. 2017) (striking objection for "willful refusal to comply with the requirements of the Preliminary Approval Order."); *Hooker*, 4:13-cv-00003, ECF No. 209, ¶ 20

(*supra*). And because Mr. Cochran is a serial objector, the substance of Ms. Cochran's objection, if considered, should be given little weight.

> **b.  Ms. Cochran objects to a fee request of one-third of the Settlement fund; Class Counsel has not made such a request.**

Even if the Court opts to consider the substance of Ms. Cochran's objection, it should be denied on its merits. Ms. Cochran's sole objection is to a hypothetical attorneys' fee award that Class Counsel had not yet requested (nor had the opportunity to support with briefing and lodestar). Plaintiffs will address their fee request and the appropriate bases for award in their separate motion.

Accordingly, Ms. Cochran's objection should be denied.

> **3.  The Mark S. Objection did not comply with the requirements of the Preliminary Approval Order, restates objections previously considered and rejected by the Court, and fails to disclose that Mark S. has asked another court to award him legal fees for this "remarkable" Settlement.**

Mark S.'s objection also lacks merit. Mark S., via his counsel Scott Drury, makes substantially the same objections he made in connection with preliminary approval. *See* ECF No. 126. The Court already considered and rejected those objections. *See generally* Memorandum Opinion.

What is more, despite Mark S.'s opposition to this Settlement at preliminary approval, his attempt to enjoin this Settlement in other proceedings against TikTok before Judge Blakey, and his present objection to final approval – Mark S. has sought attorneys' fees and a plaintiff service award in the TikTok action before Judge Blakey, claiming responsibility for *this* Settlement's benefits.

The Mark S. Objection should be denied.[19]

### c. Mark S. objects to the Settlement but seeks legal fees for its "remarkable" benefits.

The Mark S. Objection focuses on relief to minors under the age of 13. This focus stems from Mark. S.'s objection (via his counsel here, Scott Drury) in another action against TikTok which specifically focuses on that age group, *T.K. v. ByteDance Technology, Ltd.*, et al., 19-cv-07915 (N.D. Ill.) (Blakey, J.). The *T.K.* settlement achieved a $1.1 million fund for under-13 TikTok users who alleged VPPA claims, among other privacy violations. *Id.* at ECF Nos. 5 (motion), 94 (order).

In September 2020, Mark S. asked the *T.K.* Court to enjoin this MDL Settlement, and to deprive all Class Members of relief in this case, in deference to the *T.K.* settlement. *Id.* at ECF Nos. 51-52. He sought that injunction despite contending that the *T.K.* settlement was inadequate, and in disregard of the millions of MDL Class Members above the age of 13 who were not members of the *T.K.* class at all. *Id.* at ECF Nos. 51-52. Judge Blakey denied that request. *Id.* at ECF No. 68 (also denying Mark S.'s motion to intervene). No one – not even defendants – objected to the under-13 minors' "double recovery" under both the *T.K.* and MDL settlements except Mark S. *See id.* Mark S.'s objection did nothing to increase the settlement fund in *T.K.* and likewise, his objection at preliminary approval here in no way benefited this Class.

---

[19] Moreover, despite the requirements of the Preliminary Approval Order, the Mark S. Objection does not include "a copy of any relevant orders addressing" counsel's prior class settlement objection. Instead, the objection simply states that the "objection and related orders are publicly available." Mark S. Obj., p. 7. The objection also does not include the following requirements (Preliminary Approval Order, ¶ 9(v) and (vii)): "all agreements that relate to the objection or the process of objecting, between the objector or objector's counsel and any other person or entity" or "a declaration under penalty of perjury that the information provided by the objector and objector's counsel is true and correct." The objection should be stricken for these willful failures to comply with the Court's order. *Supra.*

Nevertheless, in June 2021, Mark S. requested over <u>$1.5 million in legal fees</u> and a $2,500 service award in *T.K. Id.* at ECF No. 71. In seeking those fees, Mark S. claimed that he and his counsel were responsible for the Settlement benefit <u>here</u>, in the MDL. *Id.* In other words, despite seeking to enjoin this Settlement, twice objecting to it, and having in no way increased its value, Mark S. takes credit for $6.256 million of the MDL Settlement benefits (amounting to 6.8% of the Settlement fund, based on Mark S.'s estimate that 6.8% of the Class is under 13). *Id.* at p. 5.[20] Recognizing that his request exceeded the entire *T.K.* settlement fund, Mark S. offered to take a pro rata value of his fees in *T.K.*, and noted his intention to also seek fees in this MDL. *Id.* at pp. 2, 13. On March 25, 2022, the court denied Mark S.'s requests for a service award and fees (and all of his objections to the *T.K.* settlement), stating: "[e]ven *if* Mark S. could somehow take credit for Defendants' agreement to permit a 'double recovery' for members of the Proposed Settlement Class (which he cannot), his request is utterly misplaced. . . . Mark S. did not obtain a substantial benefit for the Proposed Settlement Class." *T.K. v. ByteDance Tech. Co*, No. 19-CV-7915, 2022 WL 888943, at *27-28 (N.D. Ill. Mar. 25, 2022).

While taking credit for this Settlement in *T.K.* – and boasting that its benefits are "quite remarkable" and "easily justif[y] a fee award of 33.33%" (*Id.* at ECF No. 71 at pp. 2, 12) – Mark S. yet again objects to this Settlement here in the MDL. These objections should again fail.

### d. The Mark S. Objection fails on its merits.

First, Mark S. argues, as he did at preliminary approval, that conflicts exist between minor and non-minor class members and minors were not adequately represented. Mark S. Obj., pp. 8-10. At the preliminary approval hearing, the Court requested that Class Counsel provide

---

[20] The first of 21 putative class actions comprising this MDL was filed six months *before* Mark S.'s objection to the *T.K.* settlement. Nothing about Mark S's objections in either *T.K.* or this MDL have benefited the Class.

supplemental briefing specifically addressing representation of and advocacy for minor class members' interests, and Class Counsel did so. ECF No. 137 ("Supplemental Memo"). That briefing noted that minor class members were well represented by proposed Class Representatives, those representatives' guardians, the Leadership Group, and individual counsel retained by minor Class Representatives. *Id.* at 1-7. The Supplemental Memo further explained that the issues Mark S. raised regarding the representation of and relief to minors were thoroughly vetted by Class Counsel. *Id.* The Court considered Mark S.'s objection and overruled it. Memorandum Opinion, pp. 15-17.

Nevertheless, Mark S. continues to contend that minors are in a better legal position than non-minors because they have a right to disaffirm arbitration agreements. *Id.* at 8-10. He claims that "Class Counsel negotiated the Settlement believing the alternative was worthless class claims. That was not the case for minor class members." *Id.* at 9. That is simply untrue. Class Counsel was well aware of and considered arguments related to disaffirmance in negotiating and evaluating the Settlement. Supplemental Memo, pp. 3, 12. Both Class Counsel and the Court recognized, however, the risks associated with such an argument. *Id.;* Memorandum Opinion, p. 16 (overruling this objection in light of those risks and noting that "proposed class counsel, all of whom represent minor Plaintiffs, represent that they studied this issue while negotiating the settlement").

Mark S. argues that a "second conflict" arises because the Settlement did not require that TikTok destroy the personal information of individuals who represented upon sign up that they were over the age of 13, but who TikTok can "estimate" are actually below the age of 13. Mark S. Obj., p. 10. Mark S. fails to explain the need for this relief, as he failed to do when he raised the same issue at preliminary approval. Memorandum Order, p. 16. His argument appears to stem from the Children's Online Privacy Protection Rule ("COPPA") and its prohibitions against certain

collection of minors' data. *See* Mark S. Obj., p. 2. But COPPA has no private right of action that Plaintiffs here could enforce. *See Manigault-Johnson v. Google, LLC*, No. 2:18-cv-1032, 2019 U.S. Dist. LEXIS 59892, at *18-20 (D.S.C. Mar. 31, 2019).

Moreover, Mark S. recognizes that the FTC has already pursued such claims against TikTok and personal data for those who "self-identified as being under 13" is already being destroyed pursuant to the FTC order. *Id.* at p. 2.[21] In addition, the Settlement Agreement here provides for the deletion of data for *all* Class Members, including those under 13. Settlement Agreement ¶ 6.2, Addendum, ¶ 4.2. With this in mind, the Court considered and overruled this same objection by Mark S. at preliminary approval. Memorandum Opinion, pp. 16-17 ("the Court discerns no reason why minor class members under thirteen would suffer harms that are different than those of older minor class members, after the settlement is implemented"). For the same reasons, Mark S's objection should be overruled again.

Second, the Mark S. Objection argues that Class Counsel had yet another purported conflict when they negotiated and agreed to the Settlement. Mark S. Obj., pp. 10-11. But the objection does not identify what that conflict was. Instead, it argues that Class Counsel were in a "weakened and conflicted position during any settlement discussions" because "they were saddled with their violation of the *T.K.* preliminary injunction which precluded them from bringing new claims or amending existing claims that fell within the broad release in *T.K.*" i.e., BIPA and VPPA claims on behalf of minors under 13. *Id.* at 10-11. That makes no sense. None of the complaints filed in this action omit claims for minors under 13, and there is no indication that Class Counsel ever felt

---

[21] Even if Plaintiffs could pursue COPPA claims, Mark S.'s proposed data deletion relief fails to consider the practicability of using artificial intelligence-driven age estimates to implement class-wide relief and the class certification issues that continued litigation of such claims would raise.

"saddled" with the preliminary injunction in *T.K.* or failed to pursue minors' claims.[22] Indeed, Mark S. was unsuccessful in his attempt to enforce the *T.K.* injunction in this case.

Based on Mark S.'s contention, minors under 13 should get <u>nothing</u> in the Settlement here, having released their claims in the *T.K.* action. But Class Counsel ensured that they do benefit from this Settlement. ECF No. 122-1, Settlement Agreement, § 2.4 (provision expressly allowing *T.K.* class members to participate in this Settlement). In fact, it is Mark S. who has repeatedly sought to prevent under-13 class members from recovering in this case, *supra*, and it is Plaintiffs who have advocated for those minors and obtained relief on their behalf. Mark S.'s objection should be rejected.

Third, the Mark S. Objection again challenges the Settlement's value, claiming that it is "suspicious" that there is no basis for the $92 million amount. Mark S. Obj., p. 12.[23] In truth, Class Counsel's Supplemental Memo explains how Class Counsel evaluated and valued the claims. ECF No. 137, pp. 7-23. And again, the Court overruled this identical objection at preliminary approval. Memorandum Opinion, pp. 20-22 ("[T]he Seventh Circuit has clarified that 'the *Synfuel/Reynolds* evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indicators that the settlement reasonably reflects the merits of the case.' . . . Many of the same reliable indicators of a reasonable, negotiated settlement are present here. . . . And . . . the

---

[22] In fact, Mark S. and his counsel argued before Judge Blakey that the *T.K.* case did not involve BIPA at all. *E.g.*, *T.K.*, ECF No. 52-3, p. 8 ("MR. DRURY: [. . .] Now I don't want to get bogged down in BIPA because this case is not about BIPA and I want to make that clear for the Court."). *See also id.* at ECF No. 50-14 (Mark S.'s proposed consolidated complaint, which contains no BIPA claim).

[23] Mark S. also falsely claims that Plaintiffs "rel[ied] on an artificially low claims rate in an effort to convince the Court that the Settlement is fair, reasonable, and adequate." Mark S. Obj., p. 14. The preliminary approval motion included a range of potential claims rates. Preliminary Approval Motion, pp. 24-25. Moreover, this brief provides the actual claims rate ( conservatively estimated to be at least 1.4%) which us typical in class actions like this one and is in line with Plaintiffs' prior projections.

Court finds that the settlement agreement is well within the range of fairness, reasonableness, and adequacy[.]") (citations omitted). It should be overruled again.

Finally, Mark S. again argues that the notice plan does not provide the best notice practicable. Here, the target audience was determined by the Settlement Administrator's research and expertise, together with input from TikTok, with the goal of reaching TikTok users of all ages, and Notice was also provided to Class Members by email and in-App notification. *E.g.*, ECF No. 122-12 (Weisbrot Declaration regarding Notice Plan). This issue, too, was raised at preliminary approval and overruled by the Court. *See* ECF No. 126 (Mark S.'s initial objections), p. 12; Memorandum Opinion, p. 33.[24] Mark S.'s objection fails again.

Mark S. has provided no basis to upend this Settlement, particularly while seeking fees for the "remarkable" Settlement benefits that Mark S. had nothing to do with. The Mark S. Objection should be denied.

### 4. The Litteken Objection failed to comply with the requirements of the Preliminary Approval Order, restates objections this Court has already considered and rejected, and continues a string of baseless and irrelevant *ad hominem* attacks.

#### a. Mr. Litteken's continued *ad hominem* attacks are false, do nothing to undermine the value of the Settlement, and should be rejected.

As has been commonplace in Mr. Litteken's efforts in this case, the Litteken Objection begins with a histrionic and false narrative claiming that the Settlement was the result of a "reverse auction." Litteken Obj., pp. 1-2. In support, Mr. Litteken complains that the Settlement was reached prior to the appointment of lead counsel and before discovery and motions practice. *Id.* As has been well established, however, settlement analyses and negotiations continued for months

---

[24] The Mark S. Objection also argues final approval is improper because the fee petition is due after objections. Mark S. Obj., pp. 7-8. As addressed herein, all Class Members will have an opportunity to review and respond to the fee petition prior to final approval.

after the initial Settlement Agreement was reached in September 2020. *See, e.g.,* Declaration of Elizabeth A. Fegan, ECF No. 122-7. Indeed, the Court appointed the Leadership Group that same month, and the Leadership Group then diligently vetted the settlement and continued the dialogue with TikTok. *See id.* That Court-appointed counsel conducted confirmatory discovery, including via expert-led onsite review of TikTok's source code. *See id.* In February 2021, a Settlement Addendum was added that further strengthened and clarified the Settlement. *See id.* And only then – after five additional months of analyses, negotiations, and confirmatory discovery – did Plaintiffs seek Court approval of the Settlement. *See* ECF No. 122 (Preliminary Approval Motion). The "motion practice" that Mr. Litteken complains has not yet occurred includes inevitable motions to compel arbitration and to dismiss the case entirely – motions which could have decimated Plaintiffs' claims prior to any discovery at all. *See, e.g.,* Memorandum Opinion, p. 26. The fact that those motions have not yet occurred weighs in favor of the Settlement, not against it. *See id.*

Mr. Litteken tries to undermine the integrity of the pre-leadership settlement negotiations by falsely suggesting the Settlement was initially reached by a single attorney and an "undisclosed client." Litteken Obj., pp. 2, 11. That is irrelevant, given the work performed by the Leadership Group, and it is also untrue. The single attorney on which Mr. Litteken directs his focus – Katrina Carroll – was Court-appointed Interim Lead Counsel at the time the August 2020 mediation was scheduled. (She is now one of the Court-appointed Lead Counsel). She was one of <u>seven</u> attorneys, each from a different law firm, who attended that mediation and entered into the initial Settlement Agreement on behalf of Plaintiffs. ECF No. 122-6, ¶¶ 17-19.[25] And those seven attorneys represented seven proposed class representatives who were named in the initial agreement.

---

[25] Those seven attorneys were a delegation from a broader group of <u>16 law firms</u> that came together to collaborate on behalf of Plaintiffs in the months leading up to the mediation. ECF No. 122-6 (Carroll Decl.), ¶ 18.

Settlement Agreement, ECF No. 122-1, p. 18. Even still, Settlement approval was not sought until further analyses, confirmatory discovery, negotiation, and agreement by the Court-appointed Leadership Group.

And when approval was finally sought, it was done with support extending well beyond the seven attorneys who reached the initial agreement, the initial seven proposed class representatives, and the renowned mediator who facilitated the Settlement. Indeed, Settlement supporters included the three Court-appointed Class Counsel firms, six additional firms in the Leadership Group, more than a dozen additional law firms who were retained by Class Representatives, and 35 proposed Class Representatives. *See* ECF No. 122-2 (Class Representatives and their counsel). In other words, there were dozens of potential "auction bidders" who could have opposed the Settlement had any of them believed the Settlement process was "ineffectual" – as Mr. Litteken now suggests even though the Settlement dwarfs many of his counsel's own privacy settlements (ECF No. 137-2 (settlement comparables chart)).[26] In fact, none of the dozens of law firms who filed cases that were consolidated in the MDL now objects to the Settlement. And what is most important, the Settlement now has the support of over 1.2 million Class Members who have filed Valid Claims.

Mr. Litteken's counsel's preoccupation with Ms. Carroll is misguided and appears to be motivated by his personal legal issues. *See* ECF No. 166 (Edelson PC motion stemming from unrelated Edelson arbitration). The Leadership Group achieved an excellent result for the Class through hard-fought, arms'-length negotiations.

---

[26] Moreover, as Mr. Litteken notes (Litteken Obj., pp. 10-11), some of the counsel who now support the Settlement were skeptical about it before seeing its terms. Those concerns were resolved when that counsel saw the benefits achieved for the Class and participated in the robust, months-long analyses of the Settlement and continued negotiations.

       **b. The Litteken Objection fails to comply with the requirements in the Court's Preliminary Approval Order.**

In his objection, Mr. Litteken acknowledges that he intentionally failed to comply with the Preliminary Approval Order's requirements for objections. Litteken Obj., pp. 4-5. The Preliminary Approval Order requires that objectors provide "a copy of any relevant orders addressing" prior class settlement objections (of which Edelson disclosed four), "all agreements that relate to the objection or the process of objecting, between the objector or objector's counsel and any other person or entity," and "a declaration under penalty of perjury that the information provided by the objector and objector's counsel is true and correct." Preliminary Approval Order, ¶ 9 (iv), (v) and (vii). Instead, Mr. Litteken states that he will not provide "his retainer agreement with his counsel, his declaration, [or] his counsel's declaration" absent further Court instruction, and that "[t]he orders addressing each of [Edelson's prior] objections are matters of public record." Litteken Obj., pp. 4-5. The objection should be stricken for these willful failures to comply with the Court's order. *Supra*.

       **c. The Litteken Objection repeats the same arguments the Court considered and rejected at preliminary approval.**

The substantive sections of the Litteken Objection offer no more support for disrupting the Settlement than its ad hominem attacks. Mr. Litteken's objections are almost entirely repetitive of the objections that he raised at preliminary approval, which the Court considered and overruled.

       **i. Mr. Litteken's request for additional class notice regarding attorneys' fees is not supported by Rule 23 or the precedent he cites.**

First, Mr. Litteken mimics the Helfand Objection's claims about the need for Class Members to have the opportunity to respond to counsel's request for attorneys' fees. Litteken Obj,

pp. 5-8. As discussed above, that objection is without merit; Class Members have an opportunity to oppose Counsel's fee request and no Class Member has been aggrieved.[27]

In fact, Mr. Litteken's proposed remedy for this objection illustrates that Class Members have been provided adequate notice of and opportunity to respond to counsel's fee request. More specifically, Mr. Litteken suggests that Plaintiffs "re-notic[e] … the class so that they have all information about Class Counsel's fee request to which they are entitled at the time they are obligated to object." Litteken Obj., p. 8. But Class Members already have all information "to which they are entitled" – and more, including counsel's detailed fee application – weeks prior to the Fee Response Date.

While Class Members are entitled to respond to counsel's fee request, there is no requirement that the deadline to object to a fee request be the same as the deadline for objections to settlement approval. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 615 (9th Cir. 2018) ("Rule 23(h) does not require that class counsel's fee motion be filed before the deadline for class members to object to, or opt out of, the substantive *settlement*. Rather, the rule demands that class members be able to 'object to *the motion*'—that is,

---

[27] Mr. Litteken's suggestion that the Fee Response Date applies only to the Defendant (Litteken Obj., p. 7) is wrong. Plaintiffs and Defendant both recognize the Court's Order as providing Class Members the right to oppose an attorneys' fees request by the Fee Response Date.

the motion that class counsel must file to make a claim for fees under Rule 23") (citations omitted) (emphasis in original).[28]

Rule 23(h) requires only that fee motions be "served" on the parties and "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). Plaintiffs have complied with this provision via the Notice, the posting of the Preliminary Approval Order, the public filing of their motion for attorneys' fees, and the posting of that motion on the website upon filing.

The Notice discloses that "Class Counsel intends to request up to 33.33% of the Settlement fund for attorneys' fees." ECF No. 122-4, p. 7. The Notice states that "[t]he Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses" and provides information about the hearing. *Id.* at 9. The Notice refers Class Members to the Settlement Website several times, provides the website's URL in the footer of every page, and informs Class Members that they are "urged to review more details in the Settlement Agreement" and to visit the website for those details. *Id.* at 9. Class Counsel's attorneys' fees motion, with the specifics of their fee request, is being publicly filed on the Court's docket and placed on the Settlement Website. The requirements of Rule 23 have therefore been met. *See, e.g., In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 446 (3d Cir. 2016) (Notice that allowed class members to

---

[28] *See also Bower v. MetLife, Inc.*, No. 1:09-CV-351, 2012 U.S. Dist. LEXIS 149117, at *14-16 (S.D. Ohio Oct. 17, 2012) (Rule 23(h) "does not by its plain language require that the fee petition be submitted at any specific time. . . .[C]lass members were informed of the maximum amount of fees, expenses, and contribution awards that would be sought by Class Counsel in the notice(s) months ago. Such notice comports with the requirements of Rule 23(h). . . . [And] objectors had a fair opportunity to prepare objections to the fee petition after it was filed and before the Fairness hearing."); *Keil v. Lopez*, 862 F.3d 685, 706 (8th Cir. 2017) (A schedule that failed to provide class members with *any* opportunity to respond to a fee request prior to final approval – which is not the case here because of the Fee Response Date – was at most harmless error because the objectors had the opportunity to respond via appeal); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, No. 08-1999, 2010 U.S. Dist. LEXIS 121684, at *21 (E.D. Wis. Oct. 28, 2010) (same where class members could have responded (and some did) following class notice or after reviewing the full fee motion).

"ballpark the size of class counsel's eventual fee request. . . [e]ven if the class members were missing certain information—for example, the number of hours class counsel worked and the terms of any contingency fee arrangements class counsel have with particular [plaintiffs]—[still provided] enough information to make an informed decision about whether to object to or opt out from the settlement.").[29]

Neither of the Seventh Circuit cases Mr. Litteken cites – *Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276 (7th Cir. 2017) and *Redman v. Radioshack Corp.*, 768 F.3d 622 (7th Cir. 2014) – supports a different reading of Rule 23. *Kaufman* and *Redman* follow the Ninth Circuit's decision in *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir. 2010). In *Mercury*, the court held that "a schedule that requires objections to be filed before the fee motion itself is filed denies the class the full and fair opportunity to examine and oppose the [fee] motion that Rule 23(h) contemplates." *Id.* at 995.

Following that reasoning, *Redman* reversed the approval of a settlement where the attorneys' fee motion was not filed until after the objection deadline. 768 F.3d at 637-38. The court found that objectors were "handicapped" at the time of the objection deadline because detailed hours, expenses, and rationale in support of the fee request had not been submitted. *Id.* at 638. But

---

[29] *See also, e.g., Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 500 (3d Cir. 2017) (Notice that included a smaller fee percentage than counsel actually requested after the deduction of costs still provided "the critical information" and "did not deprive the class members of the ability 'to make informed decisions' on whether to opt out of the settlement or object to the fee award.") (citation omitted); *Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-CV-436, 2014 U.S. Dist. LEXIS 46846, at *96 (S.D. Ohio Apr. 4, 2014) (Notice of fee request was "directed to class members in a reasonable manner" where maximum fee request was in long-form notice and motion for attorney's fees was filed in advance of fairness hearing); *T.K.*, 19-cv-07914, ECF No. 94, pp. 20-21 (finding that the class "received sufficient notice of fees" and "had ample opportunity to voice their concerns" in light of the settlement notice, which specified the maximum fee request and a fee motion filed two weeks in advance of the objection deadline, even though "the settlement notice does not appear to provide class members with information about the *filing* of the full fee petition") (emphasis in original).

*Redman* makes no mention of *any* opportunity to respond to class counsel's fee motion at all. *See generally id.* Here, in contrast, there is a discrete deadline for Class Members to respond to the attorneys' fees request – the Fee Response Date – and it falls *after* the submission of supporting details and rationale in Plaintiffs' March 31, 2022 brief.

*Kaufman* is distinguishable too. In *Kaufman*, the court addressed whether briefs in support of a settlement (not attorneys' fees) must be filed prior to the objection deadline. 877 F.3d at 284. In dicta, *Kaufman* referenced *Mercury* and *Redman* in comparing Rule 23(h), which requires supporting motions before a fee objection deadline, and Rule 23 more broadly, which "has no provision that would require parties to file briefs in support of the settlement prior to the deadline to file objections." *Id.* The decision's reference to "the deadline to object to the settlement" (on which Mr. Litteken relies) was imprecise, and did not contemplate a scenario with separate settlement and fee objection deadlines (which was irrelevant to the issue under consideration), but it was not a holding that such scenarios are improper or that attorneys' fees motions must be filed before objections to the settlement itself. *See id.* at 284 ("The Intervenors urge us to extend *Redman*'s reach to apply to the filing of briefs in support of settlement before the deadline to object. But, as the Ninth Circuit made clear [in *Mercury*], the plain text of Rule 23(h), which deals exclusively with attorneys' fees and costs, is what requires parties to file motions for attorneys' fees before the deadline to object to the settlement. There is no such requirement for the filing of briefs in support of a settlement agreement").

Indeed, the Ninth Circuit itself has repeatedly made clear that *Mercury* "rejected as insufficient Rule 23(h) notice when the motion for attorneys' fees was due after the deadline for class members to object to *the attorneys' fees motion.*" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954 (9th Cir. 2015) (emphasis added) (finding notice sufficient where it stated the

requested fee percentage and class members had 15 days after the filing of a fee motion to object). "Rule 23(h) does not require that class counsel's fee motion be filed before the deadline . . . to object to . . . the substantive *settlement*." *Volkswagen*, 895 F.3d at 615 (emphasis in original).

Through the Notice and the March 31, 2022 motion for attorneys' fees, Class Members have the information they need to consider counsel's fee request and respond by the April 14, 2022 Fee Response Date. Accordingly, Mr. Litteken's demand for additional notice should be denied and his objection should be overruled.

### ii. The Court has already rejected Mr. Litteken's request to mandate app-store subpoenas because the Notice Plan provides the best notice practicable under the circumstances.

Second, Litteken raises issues about notice that the Court already considered and rejected at Preliminary Approval. Litteken Obj., pp. 8-10; Memorandum Opinion, pp. 29-30. In addition to the publication, email, and in-App notice that has already occurred, Mr. Litteken claims that Class Counsel should subpoena application ("app") platform providers for the email information of those who downloaded TikTok. *Id.* at 9. In support, Mr. Litteken cites *In re Suboxone Antitrust Litig.*, No. 16-5073, 2021 U.S. Dist. LEXIS 166675, at *16-23 (E.D. Pa. Sept. 2, 2021), which rejected publication-only notice in favor of 26 subpoenas to pharmacy benefit managers, third-party payors, and chain store pharmacies (entities that plaintiffs had identified as potential subpoena recipients more than a year prior in plaintiffs' motion for class certification).

But *Suboxone* did not have the expansive notice program that this case has – including direct email to nearly 81 million addresses, a media campaign that had well over 100 million impressions, and in-App notice to Class Members. As noted in a later *Suboxone* opinion: "Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprise interested

parties. . . . Rule 23 does not require the parties to exhaust every conceivable method of identifying the individual class members." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 2445, 2021 U.S. Dist. LEXIS 231508, at *22-23 (E.D. Pa. Dec. 3, 2021) (citations and quotations omitted). Indeed, notice requires only a "reasonable effort," taking into account the cost-benefit of further notice. *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F. Supp. 3d 269 (E.D.N.Y. 2021) (rejecting the approach taken in *Suboxone* in another antitrust case with similar notice considerations).[30]

Mr. Litteken's proposal is not only legally unsupported and duplicative of the robust notice program that already occurred – there is no indication that the costly undertaking would increase the reach of the Notice program or drive additional claims. There is no suggestion that Class Members are more likely to check an email account used for app store purchases than the email account used to register the TikTok App. There is no suggestion that each Class Member has their own app store account such that more email addresses could be obtained from the app store providers than from TikTok itself (for example, family members may share an app store account or the TikTok App itself, even if they have their own TikTok accounts). There is no suggestion that the additional notice would be more effective than the actual Notice that already occurred – which reached more than 97% of the Class, multiple times, through digital media alone, and included other means of direct notice, too. Platt Decl., ¶ 36. But it is clear that Mr. Litteken's proposal would be costly and would delay the provision of Settlement benefits to the Class. As the Court previously concluded, the existing Notice Plan constitutes the best notice practicable under

---

[30] Mr. Litteken also requests that, in connection with "a second round of notice, the Court should also order the parties to produce information about whether this [first round of] notice truly was effective—for instance, did it translate to the types of claim rates one expects with robust direct notice?" *Id.* at 9. The claims rates are included in this brief as is routine in motions seeking the final approval of a class settlement.

the circumstances of this case. Memorandum Opinion, pp. 28-30 ("The Federal Judicial Center has found that a notice plan calculated to reach between 70% and 95% of the class in total is reasonable and that, according to a study of recent published decisions, the median reach calculation on approved notice plans is 87%.") (citation omitted).

### iii. Mr. Litteken's arguments about the Settlement's value and allocation are disingenuous and self-contradicting.

Finally, Mr. Litteken feigns concern over the unremarkable fact that the settling defendant has denied that it engaged in wrongdoing while agreeing to pay to resolve allegations of that wrongdoing. Litteken Obj., pp. 3-4, 10-14. Mr. Litteken complains that the allocation of additional Settlement shares to Illinois Subclass members is unfair because "everyone admits TikTok Didn't violate BIPA." *Id.* at 10. The Settlement, as all settlements are, was a balancing of both parties' independent strength and risk assessments. The fact that the Settlement achieves substantial compensation for wrongdoing that TikTok denies only supports the strength of the Settlement. And to be clear, TikTok denies *all* of the claims against it, as is plainly disclosed on the first page of the Notice. As Mr. Litteken's counsel is well aware, this is common – if not universal – in settlements, just as Facebook denied wrongdoing in *Facebook BIPA*.[31]

Mr. Litteken's complaints about the Settlement's value are self-contradicting. On one hand, Mr. Litteken complains that the additional shares to the Illinois Subclass overvalue the BIPA claim and are thus "not fair . . . and should be readjusted to reflect reality." Litteken Obj., pp. 13-14. On the other hand, Mr. Litteken claims "TikTok got off cheap," and cites *Facebook BIPA* as the top comparator, *id.* at pp. 14-15, even though the Court already deemed *Facebook BIPA* "a poor comparator to this case," Memorandum Opinion, p. 25. The fact that more shares were allocated

---

[31] https://www.facebookbipaclassaction.com/media/2989470/fby_not_200911.pdf ("Facebook denies all allegations of wrongdoing and liability.") (last accessed 3/28/2022).

to Class Members pursuing a BIPA claim – which is one of the few asserted claims with statutory damages, and which has higher historical success rates – reflects the Settlement's fairness and the careful consideration of the value of the case and each of its claims. Mr. Litteken's objection should be overruled.

### iv. Mr. Litteken's patchwork of other complaints is also unavailing.

Mr. Litteken's objection contains a hodgepodge of other irrelevant or untrue complaints. For example, Mr. Litteken claims that the Settlement's gross recovery of $1.03 per class member is "dead last" for "recent privacy settlement[s] with a class size of over a million people." Litteken Obj., pp. 14-15. In support, however, Mr. Litteken cites a table of the 20 "highest" settlements since 2015, not the most recent. *Id.* (citing table from the Declaration of William A. Rubenstein in *Facebook BIPA*, ECF No. 499-3).[32] As discussed above, this Settlement is well within the range of recoveries in comparable cases.

Mr. Litteken claims that the attorneys who determined the allocation did so "with information hand-selected for them." Litteken Obj., p. 13. In truth, allocation counsel was not limited in the information they were entitled to consider.

Mr. Litteken also complains that the mediator was not involved in allocation determinations (beyond overseeing the mediation that resulted in the allocation range in the initial Settlement Agreement). Litteken Obj., p. 13. But this was a benefit to the Class obtained by the Court-appointed Leadership Group. Leaving the allocation determination to independent Plaintiffs' counsel saved the Class costs associated with continued mediation and ensured that

---

[32] Professor Rubenstein also noted in that declaration that "most [privacy class action] settlements are far below $100 million and . . . many are 'full *cy pres*' settlements that return no money to class members directly." *Facebook BIPA*, ECF No. 499-3 at ¶¶ 13. He further recognized the risk in proceeding through class certification, including that "some courts . . . have taken the position that class cannot be certified for statutory damages." *Id.* at ¶ 19.

TikTok and its counsel could not affect Class Member recovery based on their own interests in the valuation of BIPA and non-BIPA claims.

Mr. Litteken claims Ms. Carroll "barred competing counsel" (now Co-Lead Counsel Ekwan Rhow) from participating in the August 2020 mediation. *Id.* at p. 11. In truth, Mr. Litteken's cited document reflects that "Ms. Carroll invited [Mr. Rhow] to participate in the August 13 mediation" and he initially declined. ECF No. 11-1 ¶¶ 4-8 (TikTok, *not* Ms. Carroll, later revoked a subsequent offer to participate in light of concerns related to a potential conflict of interest, but welcomed Mr. Rhow's co-counsel to attend). In any event, Mr. Rhow himself has since fully evaluated the Settlement, engaged in extensive negotiations with TikTok, and supports this Settlement.

As the Court concluded at Preliminary Approval, none of Mr. Litteken's objections warrant depriving the Class of the Settlement's benefits. In sum, the extremely low opposition to the Settlement, including just four objections that provide no credible reason to disrupt Class Members' recovery, support final approval.

**D. The stage of the proceedings and the amount of discovery completed at the time of Settlement, as well as the opinion of competent counsel, favor final approval.**

The Court has recognized the substantial effort Plaintiffs undertook to reach the Settlement here:

> The Settlement Agreement was initially reached through hard-fought, arms'-length negotiations, which were mediated, on two separate occasions, by a reputable former federal judge. It was refined through further negotiation by a Court-appointed leadership group comprising a diverse cast of experienced plaintiffs' attorneys. Defendants have forcefully disputed their liability at every stage, raising a host of factual and legal defenses. The parties have exhaustively analyzed and debated their respective positions as part of their negotiations. And Plaintiffs have reviewed substantial confirmatory discovery, including an expert-led analysis of TikTok's source code. What is more, although the initial agreement

was inked while this MDL was in its early stages, it capitalized on urgent and extraordinary political pressure upon Defendants to shed TikTok's existing liabilities, and the Settlement Agreement has since been vetted again by the entire Plaintiffs' Leadership Group.

Memorandum Opinion, p. 21. This factor thus supports final approval of the Settlement. *See, e.g., Isby*, 75 F.3d at 1200 ("the discovery and investigation conducted by class counsel prior to entering into settlement negotiations was 'extensive and thorough.'").

Moreover, the Court appointed experienced, competent counsel to oversee this case. The Leadership Group comprises nine attorneys with considerable privacy and consumer class action experience. They each endorse this Settlement, and that, too, weighs in favor of final approval, as the Court previously recognized:

> Moreover, all three of Plaintiffs' Interim Co-Lead Counsel, whom the Court found well qualified to serve in that role, have attested to their belief that the proposed settlement is fair, reasonable, and adequate. Carroll Decl. ¶ 41; Pls.' Mot, Ex. G, Fegan Decl. ¶ 3, ECF No. 122-7; *id.*, Ex. H, Rhow Decl. ¶ 3, ECF No. 122-8. Add to this the opinion of Judge Phillips (whom Chambers and Partners, a respected legal company, has named one of the top mediators in the United States) that the settlement is fair, adequate, and reasonable, "especially when measured against the significant obstacles standing in the way of . . . Plaintiffs' claims." *Id.*, Ex. I, Phillips Decl. ¶ 12, ECF No. 122-9.

Memorandum Opinion, p. 27. *See also, e.g., In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval").

## VII.   CONCLUSION

This $92 million plus injunctive relief Settlement provides an excellent result for the Class. The Settlement has garnered substantial support from the Class, with over 1.2 million Valid Claims filed, fewer than 40 exclusions, and just four objections – none of which raises a credible concern. Accordingly, Plaintiffs respectfully request that the Court finally approve the Settlement.

Dated: March 31, 2022

By: */s/ Katrina Carroll*

Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
katrina@lcllp.com

Elizabeth A. Fegan
Melissa Ryan Clark
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Ekwan Rhow
**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
(310) 201-2100
erhow@birdmarella.com

*Plaintiffs' Co-Lead Counsel*

Jonathan Jagher
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

Michael Gervais
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100
mgervais@susmangodfrey.com

Albert Y. Chang
Bottini & Bottini, Inc.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037
(858) 914-2001
achang@bottinilaw.com

Megan E. Jones
Hausfeld LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
(202) 540-7200
mjones@hausfledllp.com

Amanda K. Klevorn
Burns Charest LLP
365 Canal Street
Suite 1170
New Orleans, LA 70130
(504) 799-2845
aklevorn@burnscharest.com

*Plaintiffs' Steering Committee*

Shannon Marie McNulty
Clifford Law Offices, P.C.
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
smm@cliffordlaw.com

*Plaintiffs' Liaison Counsel*

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE TIKTOK, INC., | ) | |
| CONSUMER PRIVACY | ) | MDL No. 2948 |
| LITIGATION | ) | |
| | ) | Master Docket No. 20 C 4699 |
| | ) | |
| This Document Relates to | ) | |
| All Cases | ) | Judge John Z. Lee |
| | ) | Magistrate Judge Sunil R. Harjani |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Tens of millions of Americans use the social media and entertainment application now known as TikTok ("TikTok" or "the App," formerly known as "Musical.ly") to view, create, and share short videos. That is all well and good, but according to the lead plaintiffs ("Plaintiffs") in this multidistrict litigation ("MDL"), the App's widespread popularity comes at the expense of its users' privacy rights. On behalf of a putative class comprising all TikTok users in the United States (an estimated 89 million people) and a subclass of Illinois users, Plaintiffs allege that ByteDance, Inc. (the China-based company that created TikTok) and its subsidiaries—TikTok, Inc., TikTok, Ltd., ByteDance Inc., and Beijing ByteDance Technology Co., Ltd. (collectively, "Defendants")—have used the App to surreptitiously harvest and profit from collecting the private information of users in violation of numerous federal and state consumer privacy laws.

Last year, the Court granted Plaintiffs' motion for preliminary approval of a class action settlement that would provide monetary relief to class members in the form of a $92 million settlement fund, as well as broad injunctive relief prohibiting

Defendants from engaging in the alleged privacy violations going forward. *See In re TikTok, Inc. Consumer Priv. Litig.*, 565 F. Supp. 3d 1076 (N.D. Ill. 2021), ECF No. 161.

Now, after disseminating notice to the class and receiving approximately 1.4 million claims, Plaintiffs have filed a motion for final approval of the settlement, as well as a motion for attorneys' fees, expenses, and service awards. Various objectors have filed objections to both motions, as well as their own fee and service award petitions. For the following reasons, the Court certifies the Nationwide Class and Illinois Subclass for purposes of the settlement, grants Plaintiffs' motion for approval of the settlement, approves the fee and service award petitions to the extent stated below, and makes other rulings as applicable.

## TABLE OF CONTENTS

I.   **Background** ............................................................................................. 4
    A.   Factual and Early Procedural History ...................................... 4
    B.   Plaintiffs' Claims ......................................................................... 9
        1.   Nationwide Class Claims....................................................... 9
        2.   Illinois Subclass Claims ...................................................... 11
    C.   Proposed Settlement Agreement ............................................. 12
        1.   Monetary Relief..................................................................... 13
        2.   Injunctive Relief ................................................................... 14
    D.   Order Granting Preliminary Approval ................................... 15
    E.   The Notice and Claims Submission Period ............................ 17
        1.   Notice..................................................................................... 17
        2.   Claims and Opt-Outs ........................................................... 20
II.   **Analysis** ............................................................................................... 21
    A.   Class Certification .................................................................... 21

| | | | |
|---|---|---|---|
| | 1. | Legal Standard .................................................................................. | 21 |
| | 2. | Rule 23(a) Factors ............................................................................ | 22 |
| | | i. Numerosity, Commonality, and Typicality ............................ | 22 |
| | | ii. Adequacy of Representation ........................................................ | 23 |
| | 3. | Rule 23(b)(3) Factors ....................................................................... | 31 |
| | | i. Predominance ............................................................................. | 31 |
| | | ii. Superiority ................................................................................... | 32 |
| B. | | Rule 23's Notice Requirement ............................................................... | 33 |
| | 1. | Adequacy of Notice ......................................................................... | 33 |
| | 2. | Objections to Notice Plan ............................................................... | 36 |
| | 3. | Motion To Accept Opt-Outs ........................................................... | 41 |
| C. | | Rule 23(e)'s Fairness Inquiry ................................................................ | 44 |
| | 1. | Legal Standard .................................................................................. | 44 |
| | 2. | Strength of Plaintiffs' Case And Value of the Settlement ................... | 45 |
| | 3. | Other Settlement Factors ................................................................. | 53 |
| D. | | Attorneys' Fees and Service Awards ....................................................... | 56 |
| | 1. | Legal Standard .................................................................................. | 56 |
| | 2. | Class Counsel's Motion for Attorneys' Fees ..................................... | 57 |
| | | i. Percentage Method ..................................................................... | 58 |
| | | ii. Lodestar Cross-Check ................................................................. | 65 |
| | | iii. Allocation of Fees Among Plaintiffs' Firms ............................... | 66 |
| | | iv. Expenses ..................................................................................... | 72 |
| | 3. | Objector Mark S.'s Petition for Attorneys' Fees ............................... | 74 |
| | 4. | Incentive and Service Awards ........................................................... | 77 |
| **III. Conclusion** .............................................................................................. | | | **79** |

# I.    <u>Background</u>[1]

## A.    **Factual and Early Procedural History**

The App is a social media and entertainment platform that allows users to view, create, and share short videos.  Using the App, individuals can record videos and overlay them with visual effects, background music, and other enhancements. *See* Consol. Am. Class Action Compl. ¶¶ 127–28 ("Compl."), ECF No. 114.  After recording a video, a user can either save the video to their device or "post" the video to their TikTok account.  *See id.* ¶¶ 146–47.

When a user posts a video to their account, the video is shared with the user's "followers" (that is, other users who subscribe to see the user's content) and also is posted publicly and displayed to users across the world using the App's proprietary content-delivery algorithm.  *Id.* ¶¶ 2, 7–9, 128.  The algorithm uses artificial intelligence technologies and machine learning to gather information about a user and to predict what types of videos the user would want to see.  *Id.* ¶¶ 8–9.  The App then shows the user a curated feed of content (and advertisements) based on those predictions.[2]  *Id.* ¶ 141.

---

[1]    The Court assumes familiarity with the facts of this case as stated in the Preliminary Approval Order.  *See In re TikTok*, 565 F. Supp. 3d at 1079–83.

[2]    For example, if a user "likes" or comments on a video of a dog dancing to a popular song, the App's algorithm will "learn" about the user's preference for such videos and will adjust to show the user more videos involving dogs or other animals dancing to music on the user's video feed.  *See* Compl. ¶ 268.

4

The simultaneous success and secrecy of TikTok's proprietary AI technology has prompted considerable backlash from privacy advocates, politicians, and the United States government. In February 2019, the Federal Trade Commission entered into a consent decree with several Defendants over the App's purported violations of the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*[3] The Department of Defense expressed concerns that its employees' use of the App raised security issues because of the App's "ability to convey location, image and biometric data to its Chinese parent company." Compl. ¶ 6. And several United States Senators called on the intelligence community to investigate TikTok's alleged ties to the Chinese government and its potential as a "target of foreign influence campaigns like those carried out during the 2016 election on United States-based social media platforms." Letter from Senator Charles E. Schumer and Senator Tom Cotton to Joseph Maguire, Acting Director of National Intelligence (Nov. 27, 2019) (on file with the United States Senate), https://www.democrats.senate.gov/imo/media/doc/10232019%20TikTok%20Letter%20-%20FINAL%20PDF.pdf.

These privacy concerns also prompted a wave of putative class action lawsuits against TikTok in federal courts across the country. Beginning in 2018, several plaintiffs' law firms began to investigate whether Defendants' AI and machine

---

[3] Press Release, *Video Social Networking App Musical.ly Agrees to Settle FTC Allegations That It Violated Children's Privacy Law*, FTC (Feb. 27, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/02/video-social-networking-app-musically-agrees-settle-ftc-allegations-it-violated-childrens-privacy (last accessed May 20, 2022).

learning technologies violated United States privacy laws. The investigations focused in particular on whether the App's video camera collected, retained, and distributed App users' facial recognition information or other biometric information without the users' authorization. *See* Pls.' Mot. Prelim. Approval Class Action Settlement ("Mot. Prelim. Approval"), Rhow Decl. ¶¶ 8–10, ECF No. 122-8. The investigations also explored whether the App harvested other types of private information, such as geolocation data, video viewing histories, unpublished TikTok videos (*i.e.*, those not "saved" or "posted"), and personal identifying information such as email addresses, social media account information, or cell phone data, and whether Defendants transferred that data to third parties. *Id.*; *see, e.g.*, Compl. ¶¶ 155–57.

The first case against TikTok based on these allegations was filed in the Northern District of California in November 2019. *See Hong v. ByteDance, Inc.*, No. 19 C 7792 (N.D. Cal.). Other lawsuits followed in the Northern District of California, the Central District of California, the Southern District of Illinois, and the Northern District of Illinois, including one in this Court. *See E.R. v. TikTok, Inc.*, No 20 C 2810 (N.D. Ill.). Eventually, the burgeoning of litigation led the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the then-nineteen related actions and to transfer them to this Court for pretrial proceedings on August 4, 2020. *See In re TikTok, Inc., Consumer Priv. Litig.*, 481 F. Supp. 3d 1331, 1332 (J.P.M.L. 2020); JPML Transfer Order, *In re TikTok* (N.D. Ill. Aug. 12, 2020), ECF No. 2.

By that point, the political tensions surrounding TikTok had reached their zenith. Just two days after the JPML's transfer order, President Donald Trump

issued an executive order declaring that TikTok's continued operation in the United States presented "a national emergency" that "threaten[ed] the national security, foreign policy, and economy of the United States." Exec. Order No. 13,942, 85 FED. REG. 48,637 (Aug. 6, 2020). According to the executive order, immediate action was necessary because TikTok's "data collection threaten[ed] to allow the Chinese Communist Party access to Americans' personal and proprietary information." *Id.* The order gave ByteDance an ultimatum: sell TikTok's United States operations to an American company within forty-five days or face a ban of the App in this country. *See id.*[4]

After the Trump Administration's order, Defendants' motivation to settle the newly-consolidated cases was at an all-time high given its need to shed TikTok's liabilities in preparation for its anticipated sale. *See* Pls.' Mot. Final Approval Class Action Settlement at 9–10 ("Mot. Final Approval"), ECF No. 195. The attorneys in *Hong* had already engaged in months of comprehensive settlement discussions with Defendants, including a round of mediation in April 2020 led by Layn Phillips, a prominent retired federal judge. *Id.* at 8. To that point, however, the parties had not been successful. *Id.*; *see generally* Mot. Prelim. Approval, Carroll Decl., ECF No. 122-6 (discussing pre-MDL settlement negotiations); Rhow Decl. (same).

---

[4]      ByteDance initially agreed to sell its United States operations of TikTok to Oracle and Walmart later in September 2020, but a final agreement never materialized, and the Biden Administration ultimately abandoned the Trump Administration's threat to ban the App. *See, e.g.*, Bobby Allyn, *Biden Administration Pauses Trump's TikTok Ban, Backs Off Pressure to Sell App*, NAT'L PUB. RADIO (Feb. 10, 2021), https://www.npr.org/2021/02/10/966584204/ (last accessed May 20, 2022).

On August 13, 2020, Plaintiffs' counsel in *E.R.*, a case originally filed in this Court, was able to assemble a coalition of attorney representatives from the various consolidated cases to attend a second round of mediation before Judge Phillips in hopes of achieving a global settlement. Mot. Final Approval at 8–9; Carroll Decl. ¶¶ 16–19. That thirteen-hour session proved fruitful and concluded with a settlement agreement in principle and a signed term sheet. Mot. Final Approval at 10. The parties memorialized the settlement in a signed agreement on September 4, 2020. *Id.*

Meanwhile, as part of its management of the MDL, the Court solicited applications from the attorneys who represented the various plaintiff classes in the MDL to serve as Lead Counsel and in other leadership roles. In September 2020, the Court selected three attorneys—Katrina Carroll, Ekwan Rhow, and Elizabeth Fegan—to serve as Co-Lead Counsel; attorney Shannon Marie McNulty to serve as Liaison Counsel; and five attorneys—Jonathan Jagher, Megan E. Jones, Michael Gervais, Amanda K. Klevorn, and Albert Y. Chang—to serve on the Plaintiffs' Executive Committee. *See* Case Management Order No. 3, ECF No. 94 (appointing counsel to these roles).

These attorneys worked with Defendants over the fall and winter of 2020 to assess the initial terms of settlement and negotiate revised terms to address the various concerns raised by different plaintiff groups. As part of this process, Plaintiffs' counsel also conducted a substantial amount of confirmatory discovery, which included interrogatories, document requests, and written depositions, and

arranged for a computer programming expert to inspect the App's source code onsite. *See In re TikTok*, 565 F. Supp. 3d at 1080–81.

## B.     Plaintiffs' Claims

One product of these efforts was a consolidated amended class action complaint filed towards the end of 2020. The complaint proposes two classes. First, the complaint defines a Nationwide Class comprised of all United States residents who had used the App prior to preliminary approval of the settlement. Compl. ¶ 322. Second, the complaint seeks certification of an Illinois Subclass comprised of all Illinois residents who had used the App to create one or more videos prior to the preliminary approval of the settlement. *Id.* A brief summary of the classes' claims follows.

### 1.     Nationwide Class Claims

On behalf of the Nationwide Subclass, the complaint asserts claims under federal statutes, as well as claims under California statutes and common law.

First, the complaint asserts for the Nationwide Class that Defendants have violated the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and its California analogue, the Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), CAL. PENAL CODE § 502, by collecting personal information and data, including user or device identifiers, biometric information, and unpublished TikTok videos, from App users' cell phones without authorization. Compl. ¶¶ 339–41, 345–46.

Next, Plaintiffs bring a claim under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, which creates a private cause of action against a "video tape service provider who knowingly discloses, to any person" the "personally identifiable information" of its consumers. *Id.* § 2710(b). According to Plaintiffs, Defendants have violated VPPA by knowingly disclosing App users' personally identifiable information, including a record of the videos the user has watched, a record of the videos the user has "liked" or commented on, and the identities of the user's followers, to Facebook and Google. *See* Compl. ¶ 397.

Additionally, Plaintiffs assert that, in failing to disclose that they collect and disseminate App users' personal information, Defendants have violated two California consumer protection statutes[5]: the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq.*, which bans "unlawful, unfair, or fraudulent business act[s] or practice[s]," *id.*, and the California False Advertising Law ("FAL"), *id.* § 17500 *et seq.*, which prohibits any "unfair, deceptive, untrue, or misleading advertising." *Id.*; *see* Compl. ¶¶ 372–78, 381–85.

Plaintiffs also assert three claims under California constitutional and common law. First, they argue that Defendants' collection and dissemination of their private information violates the right to privacy enshrined in article I of the California Constitution. *See* CAL. CONST. art. I § 1; Compl. ¶¶ 351–53. Second, Plaintiffs raise

---

[5] Plaintiffs also assert claims pursuant to several other state consumer protection statutes on behalf of a "Multi-State Consumer Protection Class," "in the alternative" to a Nationwide Class. *Id.* ¶ 419; *see id.* ¶ 322 n.167 (listing states with consumer fraud laws that may apply to Defendants' conduct).

a claim based on the common law tort of intrusion upon seclusion, arguing that the collection of App users' personal information constitutes an "intentional interference with [their] interest in solitude or seclusion . . . of a kind that would be highly offensive to a reasonable man." RESTATEMENT (SECOND) OF TORTS § 652B cmt. a (AM. LAW INST. 1977) (updated Oct. 2021); *see* Compl. ¶ 363.

Lastly, Plaintiffs seek recovery under a theory of unjust enrichment, contending that Defendants derived revenues and profits from the dissemination and transfer of App users' private and personal information. Compl. ¶ 387; *see* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 cmt. a (AM. LAW INST. 2011) (recovery under the doctrine of unjust enrichment is appropriate when the defendant "recei[ves] a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant").

### 2. Illinois Subclass Claims

The Illinois Subclass asserts claims under the Illinois Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 *et seq.*, which "embodies a fundamental policy of the state of Illinois. . . . of protecting its citizens' right to privacy in their personal biometric data," and in particular, its "concerns about the use of new technology by '[m]ajor national corporations' to collect personal biometric data." *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1169 (N.D. Cal. 2016) ("*In re Facebook*") (quoting 740 Ill. Comp. Stat. 14/5(b)). In short, BIPA requires a private entity that collects biometric information (defined as "any information . . . based on an individual's . . . retina or iris scan, fingerprint, voiceprint, or scan of hand

11

or face geometry," 740 Ill. Comp. Stat. 14/10) to "inform the subject or 'the subject's legally authorized representative' in writing about several things, such as the purpose of collecting the data and how long they will be kept, and obtain the consent of the subject or authorized representative." *Miller v. Sw. Airlines Co.*, 926 F.3d 898, 900 (7th Cir. 2019) (quoting § 14/15(b)).

BIPA also prohibits sales and limits transfers of biometric information and requires custodians to establish protocols for retaining the information and protecting it from disclosure. *See id.* at 901 (citing § 14/15(a)–(e)). Successful BIPA plaintiffs may recover either actual damages or liquidated damages—$1,000 for negligent violations and $5,000 for intentional or reckless violations—plus attorneys' fees, costs, and injunctive relief. *See* § 14/20.

Here, Plaintiffs claim that Defendants have violated BIPA by harvesting App users' facial scans without obtaining their consent, and by transferring and selling users' biometric information to third parties. Compl. ¶¶ 408–10. Plaintiffs also allege that Defendants routinely violate BIPA's disclosure and retention requirements. *Id.* ¶¶ 411–15.

## C. Proposed Settlement Agreement

In exchange for a release of all of these claims, and any potential claims based on Defendants' collection or handling of App users' data,[6] the Settlement Agreement

---

[6] More specifically, the release covers "any and all claims, complaints, actions, proceedings, or remedies of any kind . . . arising from or related to the Civil Actions or the collection and use of any user data, including biometric data . . . arising from the beginning

provides for monetary relief in the form of a $92 million settlement fund and a range of injunctive remedies to prevent Defendants from engaging in the alleged privacy violations in the future.

### 1.    Monetary Relief

Pursuant to the Settlement Agreement, Defendants have agreed to pay $92 million into an escrow account, to be distributed among class members according to a Court-approved plan of allocation.  *See* Mot. Prelim. Approval Ex. C, Proposed Plan of Allocation, ECF No. 122-3.  The plan provides that the settlement funds are to be paid out in the following descending order: (1) payment of expenses incurred in connection with administering the settlement; (2) taxes associated with the settlement; (3) attorneys' fees, service fees, and other fee awards; and (4) payment to class members who submitted valid claims.  Settlement Agreement § 5.2.

Once administration costs, taxes, and fees are distributed, the remainder of the settlement fund will be divided into prorated shares "that are equal to the sum of (1) the total number of valid claims submitted by Nationwide Class members and (2) the total number of valid claims submitted by Illinois Subclass members multiplied by five."  Mot. Final Approval at 14.  Each Nationwide Class member who submitted a valid claim will receive one prorated share, and each Illinois Subclass member who submitted a valid claim will receive six prorated shares—one as a

---

of time" to the date that the final approval of the settlement is either affirmed on appeal or the date that the time to appeal the final approval order has expired.  *See* Mot. Prelim. Approval Ex. A, Proposed Settlement Agreement and Release § 2.30 ("Settlement Agreement"), ECF No. 122-1.; *id.* § 2.12.

member of the Nationwide Class, and five as a member of the Illinois Subclass.  *See id.*  Based on Plaintiffs' estimates, each Nationwide Class claimant will receive $27.19 and each Illinois Subclass claimant will receive $163.13 in monetary relief from the settlement.  *See id.*; Platt Decl. ¶ 43, ECF No. 196.

### 2.    Injunctive Relief

The Settlement Agreement also contains expansive injunctive remedies.  As part of the settlement, Defendants have agreed to refrain, and upon approval of the settlement will be enjoined, from engaging the following conduct, unless disclosed expressly in TikTok's Privacy Policy: (1) using the App to collect or store a user's[7] biometric information; (2) using the App to collect geolocation or GPS data; (3) using the App to collect information in users' clipboards;[8] (4) using the App to transmit user data outside of the United States; (5) storing user data in databases outside of the United States; and (6) uploading content generated by users to the App's servers before the user saves or publishes it.  Settlement Agreement §§ 6.1–6.2; *see generally id.* at Addendum § 4.

Defendants also pledge to create, at their own expense, a comprehensive data privacy training and compliance program for all newly hired employees and contractors and to institute annual privacy training for all employees.  *Id.* § 6.3.  And

---

[7]    All references to "a user" or "users" in the Settlement Agreement refer to a United States user or users.

[8]    A phone's "clipboard" is the function that allows the user to store text, images, and videos for the purpose of copying and pasting them within an app or between apps.  *See* Compl. ¶¶ 181–85.

Defendants have agreed to pay for a third party to monitor this training for three years and to provide written verification of the review. *Id.* at Addendum § 4.3.

**D.    Order Granting Preliminary Approval**

On February 25, 2021, Plaintiffs presented the Settlement Agreement, the plan of allocation, and a proposed notice plan to this Court for preliminary approval. *See* Mot. Prelim. Approval. Three objections to the preliminary approval motion were filed: one by Mark S., ECF No. 126; one by Dennis Litteken, ECF No. 132; and one by Brian Behnken and Joshua Dugas, ECF No. 142.

After the parties submitted supplemental briefs regarding the adequacy of representation of minor class members, the possibility of in-App notice, and the process by which Plaintiffs valued the claims, the Court granted Plaintiffs' motion for preliminary approval on September 30, 2021. *See generally In re TikTok*, 565 F. Supp. 3d 1076; Order Granting Prelim. Approval Class Action Settlement, *In re TikTok* (N.D. Ill. Oct. 1, 2021) (setting forth procedures for notice, filing claims and objections, and the final approval process) ("10/1/21 Order"), ECF No. 162.

The Court made three principal findings at the preliminary approval stage. First, it found that it "[would] likely be able to certify" the proposed classes for purposes of approving the settlement. *In re TikTok*, 565 F. Supp. 3d at 1087; *see* FED. R. CIV. P. 23(e)(1)(B)(ii). Second, the Court found that the proposed settlement was "within the range of fairness, reasonableness, and adequacy" in light of numerous factors, including the strength of Plaintiffs' case, the complexity of potential ongoing litigation, the amount of opposition to the settlement, and the reaction from class

members. *In re TikTok*, 565 F. Supp. 3d at 1087 (citing *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (listing certain factors to be considered)). Finally, the Court approved the proposed notice plan because it provided the best notice practicable to all class members, with the caveat that Defendants were required to provide in-App notice of the settlement to American users. *Id.* at 1091–92; *see id.* at 1094.

In making these findings, the Court overruled three objections to preliminary approval. The Court first overruled Litteken's objections that the Settlement Agreement undervalued Plaintiffs' claims. In doing so, the Court noted that *In re Facebook*, the case Litteken cited to support his contention that the settlement undervalued the BIPA claims, was "a poor comparator" because Defendants, unlike Facebook, do not concede that they use facial recognition technology to harvest App users' biometric information. *See id.* at 1090 (citing *In re Facebook*, No. 15-cv-3747–JD, 2018 WL 2197546, at *2 (N.D. Cal. May 14, 2018)).

The Court also rejected Mark S.'s argument that the settlement did not account for conflicts between minor and non-minor class members. It found Mark S.'s contention that minor class members should receive more compensation because they could potentially disaffirm the arbitration agreements in the App's terms of service unpersuasive, because disaffirmance would likely "require individual minor class members, at the very least, to stop using the App," which seems improbable. *Id.* at 1085–86.

16

Additionally, the Court rejected Mark S.'s argument that the Court should have denied preliminary approval because Plaintiffs had not undertaken a detailed quantitative analysis of the net expected value of continued litigation to the class. Instead, the Court found that there were "other reliable indicators"—including the hard-fought negotiation process, two rounds of arbitration supervised by a former federal judge, and substantial confirmatory discovery—that supported a finding of reasonableness. *Id.* at 1087 (quoting *Kaufman v. Am. Exp. Travel Related Servs. Co.*, 877 F.3d 276, 285 (7th Cir. 2017)); *see id.* at 1088–89.

Finally, the Court overruled Behnken and Dugas's objection to the opt-out procedure. Behnken and Dugas argued that the notice plan's requirement that class members who desire to opt-out of the settlement complete, sign, and mail individual opt-out request forms to Plaintiffs' counsel violated their due process rights. *Id.* at 1092. But as the Court noted, the requirement that class members individually fill out and mail an opt-out request form is "a common and practical requirement" that is "consistently enforced" in MDL settlements. *Id.* at 1093 (quoting *In re Deepwater Horizon*, 819 F.3d 190, 197 (5th Cir. 2016)); *see id.* (collecting cases). Accordingly, the Court concluded that the opt-out procedure did not violate due process.

### E. The Notice Program and Claims Submission Period

#### 1. Notice Program

After the Court granted preliminary approval, Plaintiffs disseminated notice to the class through a notice program developed by the settlement administrator, Angeion Group ("Angeion"). Mot. Final Approval at 18; *see generally* Platt Decl. Per

the Court's scheduling order, the notice period began on November 14, 2021, and concluded on March 1, 2022. *See* 10/1/21 Order at 7–8; Mot. Final Approval at 18.

Angeion created a settlement website that contained information about the claims and the settlement, a claim-submission portal, a downloadable claim form, and a list of dates and deadlines for submitting claims, filing objections, and opting out of the settlement. Platt Decl. ¶ 30; *see* www.TikTokDataPrivacySettlement.com. Angeion also established a toll-free automated hotline that provided callers with information about the settlement. *Id.* ¶ 32. Angeion then commenced a "multi-faceted campaign" that was intended to reach a majority of class members multiple times. Mot. Final Approval at 18.[9]

First, Angeion sent direct emails to nearly 81 million email addresses associated with users' accounts. Platt Decl. ¶ 7. Seventy percent of these emails (or around 56 million) were successfully delivered. *Id.* ¶ 10.

Second, Plaintiffs purchased digital advertisements and disseminated them using a "programmatic" advertising model that uses an algorithm to place advertisements on the websites that members of a given demographic group are likely to visit. *Id.* ¶ 12. According to Plaintiffs, the digital advertising campaign served over 126 million impressions to the Nationwide Class and over 3.4 million impressions to Illinois Subclass members. *Id.* ¶ 21.

---

[9] As required by the Class Action Fairness Act, 28 U.S.C. § 1715, Angeion also served a notice of the settlement, along with a copy of the Settlement Agreement, on the attorneys general of all fifty states, as well as United States territories and the Attorney General of the United States. *See* Platt Decl. ¶¶ 4–5.

Third, Angeion launched a social media campaign using ads on Facebook, Twitter, and Instagram. *Id.* ¶ 22. The social media campaign ran concurrently with the Internet advertising campaign and provided the Nationwide Class with over 115 million impressions through Facebook and Instagram and over 39 million impressions through Twitter. *Id.* ¶ 24. At the same time, the Illinois Subclass received over 7.1 million impressions through Facebook and Instagram and over 346,000 impressions through Twitter. *Id.* ¶ 25. Additionally, Plaintiffs implemented a "claims stimulation noticing program" that placed additional ads on Facebook, Twitter, and Instagram that were specifically designed to motivate class members to submit claims. *Id.* ¶ 27.

In total, Plaintiffs estimate that the notice program resulted in a 96.78% reach,[10] with an average frequency of three impressions per person. *See id.* ¶ 36.

Finally, on November 15, 2021, Defendants provided an in-App notification of the settlement to all United States-based TikTok accounts for users aged thirteen and older via the App's "Inbox" feature.[11] *Id.* ¶ 11. The notification read: "Class

---

[10] The 96.78% figure references the "target audience" for Angeion's media campaign, not the Nationwide Class itself. Platt Decl. ¶¶ 14, 36. That said, because Angeion constructed the "target audience" based on a demographic profile of the class, and because the "target audience" is more than one-third of the estimated class size, the Court views the reach estimate as probative. *Id.* ¶¶ 13–19; *see, e.g.*, *Schneider v. Chipotle Mexican Grill*, 336 F.R.D. 588, 596 (N.D. Cal. 2020) (finding a publication notice plan that reached approximately 70% of 30 million-member target audience satisfied Rule 23).

[11] App users under the age of thirteen participate in a "limited app experience" that does not have an inbox feature. *TikTok for Younger Users*, TikTok (Dec. 13, 2019), https://newsroom.tiktok.com/en-us/tiktok-for-younger-users (last visited May 22, 2022); Platt Decl. ¶ 11.

Action Settlement Notice: United States residents who used TikTok before 01 OCT 2021 may be eligible for a class settlement payment" and listed the URL of the settlement website. *Id.* Users who clicked on the notification were automatically directed to the settlement website. *Id.*

In addition to these notice efforts, there was considerable media coverage of the settlement. News outlets such as NBC News, Business Insider, and USA Today published online articles about the settlement that included links to the settlement website.[12]

### 2.    Claims and Opt-Outs

The deadline to submit a claim was March 1, 2022. *Id.* ¶ 37. By that date, 1,215,541 valid claims had been submitted—1,038,517 from members of the Nationwide Class, and 177,024 from members of both the Nationwide Class and the Illinois Subclass.[13] *Id.* ¶ 38. Based on the parties' estimate of 89 million total Nationwide Class members and 1.4 million Illinois Subclass members, it appears that

---

[12]    Palmer Haasch, *TikTok May Owe You Money from its $92 Million Data Privacy Settlement*, BUS. INSIDER (Nov. 19, 2021, 1:17 PM), https://www.businessinsider.com/tiktok-data-privacy-settlement-how-to-submit-claim-2021-11 (last visited May 22, 2022); Morgan Sung, *That TikTok Notification About a Settlement Payment Isn't a Scam. Here's What to Know*, NBC NEWS (Nov. 16, 2021, 8:13 PM), https://www.nbcnews.com/news/us-news/need-know-tiktoks-class-action-lawsuit-rcna5781 (last visited May 22, 2022); Kelly Tyko, *TikTok Class Action: You Might Get Money in the $92 Million Proposed Settlement. Here's How to File a Claim*, USA TODAY (Nov. 15, 2021, 10:19 PM) https://www.usatoday.com/story/tech/2021/11/17/you-might-get-money-tiktok-class-action-suit-talking-tech-podcast/8648781002/ (last visited May 22, 2022).

[13]    Angeion received 1,240,080 claim forms. After reviewing the forms, Angeion denied 24,539 for failing to check the box attesting that the claimant had used the App while residing in the United States prior to September 30, 2021, for failing to sign the form, or for being a duplicate of another claim. Platt Decl. ¶ 37.

approximately 1.4% of the Nationwide Class, and 13% of the Illinois Subclass, submitted a claim. *See id.*; Mot. Prelim. Approval at 17.

Requests for exclusion ("opt-outs") were due by January 31, 2022. *Id.* ¶ 39. By that date, Angeion had received 4,068 such requests. *Id.* But Angeion determined that only twenty-eight requests were "valid," because 4,040 requests were submitted in groups by four law firms on behalf of 2,253 individuals. Mot. Final Approval at 23. Angeion declared these requests invalid in light of the Settlement Agreement's prohibition on "mass opt-outs." *Id.* (citing Settlement Agreement § 10.1); *see* discussion *infra* section II.B.3.

After the notice and claims submission period closed, Plaintiffs filed a motion for final approval of the settlement and a motion for attorneys' fees on March 31, 2022. Four class members—Steven Helfand, Litteken, Jennifer Cochran, and Mark S.—filed objections. *See* ECF Nos. 182, 184, 186, 187. For the reasons set forth below, the Court overrules the objections and grants both motions.

## II.    <u>Analysis</u>

A court may approve a class action settlement if: (1) it is able to certify the settlement class; (2) the class was provided adequate notice and a public hearing; and (3) it determines that the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(1)–(2). The Court takes these inquiries in turn, before turning to the question of attorneys' fees and service awards.

### A.    Class Certification

#### 1.    Legal Standard

A plaintiff seeking class certification has the burden to show that their proposed class meets the requirements of Rule 23(a) and the requirements for one of the three types of classes identified in Rule 23(b). *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019). Rule 23(a) requires a plaintiff to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).

Furthermore, Plaintiffs here seek certification as a Rule 23(b)(3) class. This means that they also must show that "the questions of law or fact common to the class members predominate over any questions affecting only individual members," and that "a class action is superior over other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).[14]

## 2.    Rule 23(a) Factors

### i.    Numerosity, Commonality, and Typicality

As the Court observed at the preliminary approval stage, the numerosity, commonality, and typicality requirements of Rule 23(a) "are readily satisfied" here. *In re TikTok*, 565 F. Supp. 3d at 1085. The 89-million-member Nationwide Class (and

---

[14]    The Court does not consider whether the case would be manageable as a class action because that inquiry is unnecessary to certify a settlement-only class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

the 1.4 million-member Illinois Subclass) satisfies the numerosity requirement because it is far too large for joinder to be practicable. *See Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). As to commonality, there are numerous "common contention[s] . . . capable of classwide resolution" here: most notably, whether Defendants harvested class members' personal information and biometric data without their knowledge or consent, and whether Defendants transferred this data to third parties without authorization in contravention of federal and state privacy laws. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And, as typicality requires, the named Plaintiffs' claims "share the same essential characteristics" with those of the absent class members because each named Plaintiff used the same App and was subjected to the same alleged misconduct as the absent class members. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 606 (7th Cir. 2021).

### ii. Adequacy of Representation

The only Rule 23(a) factor in dispute is the requirement that class representatives fairly and adequately represent the class. Rule 23(a)(4); *see Howard*, 989 F.3d at 609. The purpose of this requirement is to protect the rights of absent class members by "uncover[ing] conflicts of interest between named parties and the class they seek to represent" and to "screen[] for conflicts of interest among class members." *Howard*, 989 F.3d at 609 (quoting *Amchem*, 521 U.S. at 625).

The Court found Plaintiffs' representation of the class and subclass to be adequate at preliminary approval and sees no reason why the conclusion should be

any different now.  The named Plaintiffs' interests are the same as those of the absent class members—both groups want to enjoy using the App without their data being collected and disseminated to third parties without authorization.  And based on its prior review of Plaintiffs' counsel's qualifications, the Court is confident that they possess the necessary experience and capabilities to protect class members' interests, and that they have done so here.

Three objectors to the settlement—Helfand, Mark S., and Litteken—disagree. First, Helfand argues that the inclusion of the proposed Illinois Subclass creates a conflict among class members.  According to Helfand, because other states also have privacy statutes like BIPA, members of the Illinois subclass should not receive any more compensation than others.

As a preliminary matter, the Court notes that a number of courts have referred to Helfand as a "serial objector," who has been disbarred for, among other things, filing groundless objections to proposed class action settlements.  *See Collins v. Quincy Bioscience, LLC*, No. 19-22864-CIV, 2020 WL 7135528, at *1–2 (S.D. Fla. Nov. 16, 2020).  This puts his credibility and motivations in doubt from the get-go.[15]

---

[15]    Courts overseeing class action settlements routinely find Helfand's credibility wanting.  *See, e.g.*, *In re Equifax Customer Data Sec. Breach Litig.*, No. 17-md-2800-TWT, 2020 WL 256132, at *42 (N.D. Ga. Mar. 17, 2020) (reciting Helfand's "history of improper conduct in class action litigation"), *rev'd in part on other grounds*, 999 F.3d 1247 (11th Cir. 2021); *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 890 (C.D. Cal. 2016) (identifying Helfand as a 'serial' objector[] who [is] well-known for routinely filing meritless objections to class action settlements for the improper purpose of extracting a fee rather than to benefit the Class"), *aff'd in part, vacated in part, and remanded on other grounds*, 980 F.3d 645 (9th Cir. 2020); *Brown v. Hain Celestial Grp., Inc.*, No. 3:11-cv-03082-LB, 2016 WL 631880, at *9– 10 (N.D. Cal. Feb. 17, 2016) (noting that Helfand is a 'professional' objector[]" and that "courts

Nevertheless, putting his credibility issues to the side, the Court finds Helfand's argument to be meritless. The Illinois Subclass exists because of BIPA's uniquely comprehensive private right of action. Most of the other state statutes Helfand cites do not provide a private cause of action.[16] And the only statute in his list that does—California's Consumer Privacy Act ("CCPA"), CAL. CIV. CODE § 1798.140(a)(1)—provides for such actions only in the context of a defendant's failure to prevent data breaches, not for unauthorized collection of personal information. *See id.* (allowing private suits based on "[a] business's violation of the duty to implement and maintain reasonable security procedures and practices . . . to protect [the plaintiff's] personal information."); *McCoy v. Alphabet, Inc.*, No. 20-cv-05427-SVK, 2021 WL 405816, at *8 (N.D. Cal. Feb. 2, 2021) (dismissing CCPA claim in case involving Google's alleged use of internal program to collect users' data without authorization because plaintiff did not allege a "security breach"). Accordingly, Helfand's objection is overruled.

Next, Mark S. contends that Plaintiffs and their counsel do not adequately represent the interests of minor class members. In his view, the settlement should have contained a subclass for minor class members, because their ability to disaffirm the App's arbitration agreement and terms of service gives them a stronger litigation

---

across the country . . . have repeatedly turned aside [his] efforts to upend settlements").

[16]     *See, e.g.*, ARK. CODE ANN. §§ 4-110-101, 4-110-108; COLO. REV. STAT. §§ 6-1-713, 713.5; MD. COM. LAW § 14-3501 *et seq.*; N.Y. GEN. BUS. LAW § 899-aa(6); N.Y LAB. LAW § 201-a; TEX. BUS. & COM. CODE ANN. § 503.001; WASH. REV. CODE § 19.375.010 *et seq.*

position when compared to non-minor class members.

But the Court already has rejected this argument in its preliminary approval order, *see In re TikTok*, 565 F. Supp. 3d at 1086, and Mark S. offers no new reason for the Court to hold otherwise. First, as the Court has observed, twenty-eight of the thirty-five proposed class representatives are minors and, thus, have an interest in obtaining the best settlement for themselves and of other minor class members. Moreover, their attorneys have participated actively throughout these proceedings, including during the various settlement negotiations. To the extent that Mark S. worries that the interests of minor class members have not been protected there, such worries are baseless.

What is more, Mark S.'s argument is predicated on the idea that there are swaths of absent minor class members who either already have disaffirmed, or are willing to disaffirm, the App's arbitration agreement and terms of service. But this would likely require them to stop using the App—which, as Plaintiffs point out, is "a big ask given the App's widespread popularity" with children and teens. Pls.' Suppl. Mem. Further Supp. Mot. Prelim. Approval at 12, ("Pls.' Suppl. Mem. Supp. Prelim. Approval") ECF No. 137; *see, e.g.*, *C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015) ("By continuing to use facebook.com after bringing their action, Plaintiffs manifested an intention not to disaffirm the contract."); *Doe #1 v. Coll. Bd.*, 440 F. Supp. 3d 349, 355 (S.D.N.Y. 2020) ("[A]fter disaffirmance a minor 'is not entitled to retain an advantage from a transaction which he repudiates.'" (quoting *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y.

2015)); *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1036 (N.D. Cal. 2020) (requiring minor to have stopped playing a video game in order to have disaffirmed its terms of service). Indeed, as Mark S. himself recognizes, it is unlikely that any more than a *de minimis* number of absent minor class members have exercised, or would exercise, their right to disaffirm, rendering any divergence in interests between minor and non-minor class members largely speculative and not the sort of "fundamental" intra-class conflict fatal to class certification. *Cohen v. Brown Univ.*, 16 F.4th 935, 945–46 (1st Cir. 2021) (quoting 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:58 (5th ed. 2011)); *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013) (courts should not decline to certify a class because of "the mere possibility that a trivial level of intra-class conflict may materialize"); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) (collecting cases).[17]

Mark S. also argues that a concurrent proceeding, *T.K. through Leshore v. ByteDance Technology Co., Ltd.*, No. 19 C 7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022), inhibited Class Counsel's ability to aggressively advocate for the interests of the putative class here. In *T.K.*, the plaintiffs brought a putative nationwide class

---

[17]     Mark S. also claims that Plaintiffs have failed to adequately represent minor class members under the age of thirteen because the settlement does not include a provision requiring Defendants to comply with COPPA and their consent decree with the FTC that requires them to destroy all personal information collected from all minors under the age of thirteen (including those who falsely indicated that they were over thirteen when they registered for a TikTok account). But Plaintiffs have not brought a COPPA claim here—nor could they, given that COPPA has no private right of action. *See Hubbard v. Google LLC*, 508 F. Supp. 3d 623, 629 (N.D. Ill. 2020). And, in any event, differences in the relief to which class members are entitled are not, standing alone, the sorts of conflicts of interest that raise adequacy of representation concerns. *See Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2009).

action on behalf of all TikTok users under the age of thirteen and their parents or legal guardians for violations of BIPA, among other things. *Id.* at *1. The case eventually concluded with a $1.1 million settlement, but when the *T.K.* court preliminarily approved the settlement, it entered a preliminary injunction that prohibited *T.K.* class members from bringing any new actions asserting a claim they had already asserted in *T.K. See* Order Granting Prelim. Approval ¶ 16, *T.K.*, No. 19 C 7915 (N.D. Ill. Dec. 19, 2019). According to Mark S., this hindered Class Counsel's ability to effectively represent minors under the age of thirteen in this case.

But this theory lacks merit for several reasons. First, far from abandoning their fiduciary duties to *T.K.* class members, Plaintiffs negotiated heavily with Defendants to ensure that the injunction in *T.K.* would not, as a practical matter, threaten the ability of under-age-13 class members to recover in this case. *See, e.g.*, Prelim. Approval Hr'g Tr. at 8:23, *In re TikTok* (N.D. Ill. Apr. 19, 2021), ECF No. 159. In fact, Defendants notified the *T.K.* court—and Class Counsel here—that they would not seek to enforce here the release entered in *T.K.* Minute Entry, *T.K.*, No. 19 C 7915 (N.D. Ill. Apr. 28, 2021), ECF No. 68. Thus, Class Counsel was free to ignore the *T.K.* release when negotiating the settlement here.

The third objector, Litteken, argues that Class Counsel—and in particular, Co-Lead Counsel Katrina Carroll—have maneuvered behind the scenes to secure a windfall for the Illinois Subclass at the expense of the Nationwide Class. In various filings in this case, Litteken and his counsel have accused Class Counsel of: (1) conspiring to exclude competing counsel from participating in the mediation that

28

led to the initial settlement agreement; (2) failing to disclose alleged personal and business ties between Carroll and a class representative; and (3) pressuring Litteken's counsel to drop his objection to the settlement. *See, e.g.*, Litteken Obj. at 10–14, ECF No. 184. Having reviewed Litteken's submissions, the Court finds that they contain little more than conjecture and do not legitimately call into question the adequacy of Class Counsel's representation of the class.

Like Helfand, Litteken also contends that the allocation of the settlement fund unfairly favors the Illinois Subclass, but this is unfounded for the reasons already discussed. Undeterred, Litteken offers two additional observations in this regard, but neither helps him. First, Litteken contends that Class Counsel eliminated the value of the BIPA claims by allowing Defendants to warrant that they have not violated BIPA. Litteken Obj. at 10–11 (citing Settlement Agreement §§ 7.1–7.3). But the fact that Defendants do not admit that they violated BIPA does not mean that the BIPA claim was meritless *ex ante*. And it is clear that Class Counsel did and will continue to do their own homework to extensively investigate the BIPA claim. *See, e.g.*, Pls.' Suppl. Mem. Supp. Prelim. Approval at 13–14; Carroll Decl. ¶¶ 38–39. Litteken's bald assertion that these efforts were a ruse intended to cover up Plaintiffs' collusion is sheer speculation.

Second, Litteken points to "new evidence" that TikTok "indeed allows ByteDance access to U.S. consumer data." Objector Dennis Litteken Notice of Suppl. Authority at 1, ECF No. 254 ("Notice of Suppl. Authority"). This "new evidence" comes from a recent *BuzzFeed News* investigation that revealed that some China-

based ByteDance employees can use a "backdoor" to access United States App users' data.  *See* Letter from Brendan Carr, Commissioner, FCC, to Tim Cook, CEO, Apple Inc., and Sundar Pichai, CEO, Alphabet, Inc., at 1 (June 24, 2022) (citing Emily Baker-White, *Leaked Audio From 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China*, BUZZFEED NEWS (June 17, 2022, 12:31 PM), https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-tapes-us-user-data-china-bytedance-access?bfsource=relatedmanual ("Baker-White, *Leaked Audio*")).  In Litteken's view, the investigation's findings confirm that Defendants agreed to settle this case not because they believed the BIPA claims were meritorious, but instead to "keep the focus and discovery away from its provision of sensitive U.S. consumer data to the Chinese government."  Notice of Suppl. Authority at 1.

Even assuming that the Court were to take judicial notice of the investigation, Litteken cites nothing in the record to support his belief that Defendants were motivated to enter into the $92 million settlement due to fear that this news would become public.  Nor does Litteken explain how the information revealed in the investigation, if true, increases the value of the non-BIPA claims relative to the BIPA claims, when BIPA itself contains a provision prohibiting unauthorized dissemination of user data.  *See* 740 Ill. Comp. Stat. 14/15(d).[18]  Accordingly, the Court overrules Litteken's objections as well.

_____

[18]    Indeed, according to BuzzFeed, China-based engineers have access to everything TikTok collects, which presumably includes any biometric information that TikTok stores. *See* Baker-White, *Leaked Audio*.

### 3.   Rule 23(b)(3) Factors

###   i.   Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  FED. R. CIV. P. 23(b)(3).  The predominance inquiry requires the Court to "understand what the plaintiffs will need to prove and [to] evaluate the extent to which they can prove their case with common evidence."  *In re Allstate Corp Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020).  That is, "it is the method of determining the answer and not the answer itself that drives the predominance consideration."  *Gorss Motels, Inc.  v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022).

Predominance is readily satisfied here.  In this case, class members allege that they were all subjected to uniform data- and information-harvesting practices as a result of their use of the App.  These allegations are readily amenable to generalized proof.  At trial, Plaintiffs would make their case by presenting evidence of Defendants' data collection practices and measuring those practices against their legal obligations.  They also would introduce evidence that Defendants affirmatively concealed their collection of App users' personal information and dissemination of the same to third parties.  And, to the extent that some of Plaintiffs' state law claims require inquiry into their expectations and beliefs concerning Defendants' handling of their data, these claims are judged by an objective, reasonable-person standard that is resolvable on a class-wide basis.  *See, e.g.*, *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (9th Cir. 2015)  ("[A]n objective 'reasonable person' standard under

California law [is] an inquiry that is the same for every class member."); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("Claims under the UCL and FAL are ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." (alterations and internal quotation marks omitted)).

To this, Helfand argues that the Illinois Subclass cannot be certified because the class definition would require the Court to conduct individualized inquiries into whether the class member used the App within the state of Illinois and whether they used it to "create videos." These concerns are overblown.

By its terms, Rule 23 does not require the complete absence of individualized determinations, only that common questions predominate. *See* FED. R. CIV. P. 23(b)(3) (common questions must "predominate over any questions affecting only individual members"). And the core questions at issue (whether Defendants systematically harvest user information in violation of privacy laws) could be decided through common evidence.

### ii. Superiority

To certify the classes under Rule 23(b)(3), the Court also must find that a class action is "superior over other available methods for fairly and efficiently adjudicating" this case, keeping in mind "the class members' interests in individually controlling the prosecution . . . of separate actions" and "the extent and nature of any litigation concerning the controversy already begun." FED. R. CIV. P. 23(b)(3).

This requirement also is satisfied. Individual class members would likely have

32

little interest in prosecuting a complex data privacy case against a multinational technology company on their own, especially considering the relative sums they could expect to recover in damages. *See, e.g.*, 740 Ill. Comp. Stat. 14/20 (providing that successful plaintiffs may recover the higher of actual damages or liquidated damages of $1,000 for a negligent violation and $5,000 for a willful violation); *see also Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec.*, 137 S. Ct. 2042, 2054 (2017) ("The very premise of class actions is that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (citation omitted)). What is more, by its very nature, class certification and settlement of this sprawling MDL will save years of costly litigation and appeals. *See In re Equifax*, 2020 WL 256132, at *14 (finding the same with respect to data security MDL with 147 million class members).

For all of these reasons, the Court concludes that Plaintiffs have satisfied their burden to show that the proposed classes meet the requirements of Rules 23(a) and 23(b)(3). Accordingly, the Court certifies the Nationwide Class and Illinois Subclass for purposes of the settlement.

## B. Rule 23's Notice Requirement

In order to approve the settlement, the Court must next find that the notice program provided to the class "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2); *see also* FED. R. CIV. P. 23(e)(1).

### 1. Adequacy of Notice

Neither Rule 23 nor due process requires that every class member actually

receives notice. Instead, "notice suffices if it is reasonably calculated to reach the absent parties." 3 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 8:36 (5th ed. 2011) (updated 2021). According to the Federal Judicial Center, notice to at least seventy percent of the class generally meets this standard. *See* FED. JUDICIAL CTR., JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last accessed May 22, 2022).

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances. FED. R. CIV. P. 23(c)(2)(B). And Rule 23(e)(1)(B) requires "notice in a reasonable manner to all class members." FED R. CIV. P. 23(e)(1)(B). The Court finds that Plaintiffs have satisfied these requirements.

Angeion has presented evidence that its media notice campaign alone reached 96.78% of its 34.6 million-member target audience based on a data-driven demographic profile of TikTok users. Platt Decl. ¶¶ 13–14, 36. The direct email campaign also had tremendous impact, resulting in the delivery of the settlement notice to over 56 million email addresses, which were validated and "de-duped" to ensure that each address corresponded to a different individual App user. Platt Decl. ¶ 10. Even assuming a degree of crossover between the recipients of direct email notice and the target audience of the media notice campaign, the combination of these traditional notice methods clears the Federal Judicial Center's seventy-percent threshold.

In addition, TikTok sent the following in-App notice to the "inboxes" of all

34

United States-based TikTok accounts:[19]



Platt Suppl. Decl. Ex. A, ECF No. 241; *see id.* ¶¶ 3–4. This message was sent to every TikTok account "having certain data corresponding to a United States location in the same manner that TikTok would distribute other TikTok-originated in-app notifications using the Inbox feature." *Id.* ¶ 3. Although there is no data as to precisely how many App users actually saw the notification, the number is likely quite high, given that a typical TikTok user would regularly check the App's inbox, which provides notifications for other in-App occurrences such as comments, likes, new followers, and direct messages. *See Notifications*, TIKTOK, https://support.tiktok.com/en/using-tiktok/messaging-and-notifications/notifications (last accessed June 1, 2022). And this method of providing notice within the application environment has been favorably adopted by other courts. *See In re*

---

[19]    This does not include TikTok users under the age of thirteen, who participate in the special program "TikTok for Younger Users," which does not have an inbox feature. *See supra* note 11.

*Facebook*, 522 F. Supp. 3d 617, 624 (N.D. Cal. 2021) (approving notice plan that caused notifications to be sent to Illinois-based Facebook users through the Facebook platform, where class was comprised of people who had used Facebook in Illinois); *see also Lane v. Facebook*, *Inc.*, No. C 08–3845 RS, 2010 WL 9013059, at *1 (N.D. Cal. Mar. 17, 2010), *aff'd*, 696 F.3d 811 (9th Cir. 2012) (approving notice plan that included platform notifications to Facebook users).

### 2. Objections to Notice Program

Mark S. objects to the notice program, contending that the target audience of the media notice campaign, which had a median age of 33.7, was too old. In support, he cites statistics showing that over half of TikTok users are between ten and twenty-nine years old. But as Plaintiffs point out, the notice plan was intended to give notice to the parents of many younger TikTok users, rather than the younger users themselves. This was a reasonable choice, given that parents are more likely than their children to understand their child's rights as a class member and file a claim on their child's behalf. *Cf.* FED. R. CIV. P. 23(c)(2)(B) (stating the detailed information that must be provided in a notice of class certification). And, even assuming for the sake of argument that the media notice campaign was in some way deficient, the combination of direct email notice and in-App notice more than satisfies Rule 23's requirements.

Taking a different tack, Litteken challenges the direct email notice campaign. In his view, Plaintiffs should have asked the Court to subpoena "app platform providers" for lists of the email addresses of every person who has downloaded the

36

App.  Litteken Obj. at 9.  Litteken argues that their failure to do so resulted in a claims rate "far below the double-digit participation rate[]" that he believes should have resulted here.  Litteken Resp. at 1, ECF No. 212.

As an initial matter, Litteken's proposal would have entailed additional costs to the class and created a risk of costly and distracting satellite litigation, if the subpoenas were contested.  Furthermore, Litteken's assumption that his proposal would have increased the claims rate has no support in the record.  Indeed, there may be "any number of reasons" why class members who receive notice do not file claims, and a low claims rate is not "necessarily indicative of a deficient notice plan." *Pollard v. Remington Arms Co., LLC*, 896 F.3d 900, 906 (8th Cir. 2018) (rejecting objectors' argument that a 0.29% claims rate was evidence of insufficient notice).  And the average claims rate for class sizes over 2.7 million is about 1.4%.  *See In re TikTok*, 565 F. Supp. 3d at 1090 n.6 (citing 2d Expert Decl. Prof. William B. Rubenstein ¶ 5, *In re Facebook*, No. 15-cv-3747–JD (N.D. Cal.), ECF No. 517-2).

Next, Mark S., Litteken, and Helfand all argue that the notice program violates Rule 23 because the deadline for a class member to object to the motion for final approval (January 31, 2022) preceded the deadline for Class Counsel to file their petition for attorneys' fees, (March 31, 2022).  Citing *Redman v. RadioShack Corp.*, the objectors contend that scheduling the objection deadline prior to the fee petition deadline contravened Rule 23(h)(2), which provides that class members must have an opportunity to object to the fee petition.  *See* 768 F.3d 622, 637–38 (7th Cir. 2014) (citing FED. R. CIV. P. 23(h)).

37

*Redman* involved a class settlement of claims under the Fair and Accurate Credit Transactions Act, 15 U.S.C. § 1681(g).  768 F.3d at 627.  In response to plaintiffs' motion for final approval of the settlement, multiple objectors argued before the district court that they were prevented from meaningfully objecting to the plaintiffs' attorneys' fee petition because the deadline to file objections to the settlement and the fee petition came before the fee petition was due.  *See Redman v. RadioShack Corp.*, No. 11 C 6741, 2014 WL 497438, at *11 (N.D. Ill. Feb. 7, 2014), *rev'd*, 768 F.3d 622.  The district court overruled the objections because the notice to class members included a disclosure of the amount the attorneys were seeking in fees. *Id.* Because the objectors knew the total amount that plaintiffs' attorneys would seek in fees, the district court concluded that class members were not prejudiced by the schedule. *Id.* at *12.

The Seventh Circuit reversed.  It held that the schedule violated Rule 23(h) because setting the objection deadline before the fee petition deadline "handicapped" class members' ability to object to the petition. *See Redman*, 768 F.3d at 637–38. Although they knew the total amount the attorneys would seek in fees, they did not have the information they needed to object in a meaningful manner, including the breakdown of the attorneys' hours and expenses, and the attorneys' arguments in support of their fee petition. *Id.* at 638.

This case is readily distinguishable.  In *Redman*, the objectors were not provided any opportunity to respond to the petition for attorneys' fees after it was filed.  The deadline to object to the settlement and the deadline to object to the motion

38

for attorneys' fees were one and the same and preceded the deadline for plaintiffs' fee petition. *Redman*, 768 F.3d at 637; *see generally* Prelim. Approval Order, *Redman*, No. 11 C 6741 (N.D. Ill. May 29, 2013), ECF No. 101. Here, the scheduling order provided class members and interested parties the opportunity to object to the fee petition by providing them an opportunity to respond to the fee petition on April 14, 2022—two weeks *after* the fee petition was due. *See* 10/1/21 Order ¶ 25. Accordingly, not only was the class aware in November 2021 that Plaintiffs' counsel intended to seek up to one-third of the settlement fund in fees, Mot. Prelim. Approval Ex. D, Settlement Notice ¶ 15, ECF No. 122-4, but class members had two weeks to analyze the petition after it was filed and submit a response.

The objectors acknowledge this, but still claim it is not enough. As they see it, an individual, who did not submit an objection in January but wanted to file an objection to the fee petition in April, was precluded from doing so by the schedule. But there are two problems with this argument. First, nowhere in the preliminary approval order or the Settlement Agreement does it say that a class member cannot respond to the fee petition if she did not submit an objection by January 31. And, reading the Court's 10/1/21 Order in its entirety, a class member would have reasonably understood the opposite.[20] Second, under the current schedule, a class

---

[20] The objectors also argue that, even if class members were given an opportunity to respond, they were nevertheless "handicapped" in exercising that right because only the objection deadline, and not the deadline for responses to the fee petition, appeared on the settlement notice. But Rule 23 does not require the settlement notice to contain every last bit of information necessary to file an objection. *See* FED. R. CIV. P. 23(c)(2)(b), 23(e)(1)(B);

member concerned about the amount of requested fees could have filed a general objection before January 31 and a more complete response after the actual fee petition was filed. And indeed, consistent with this understanding, a number of class members (including all of the objectors) did exactly that.[21]

Based upon this record, the Court finds that the schedule proposed by Plaintiffs and approved by the Court, while not a model of clarity, provided class members with sufficient notice of the request for fees and sufficient time to respond to the "specifics" of the fee petition as Rule 23(h) and due process require. *See* FED. R. CIV. P. 23 advisory committee's note to 2003 amendment (stating that "the court should provide sufficient time . . . to enable potential objectors to examine the motion"); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (constitutional due process requires "notice, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Cassese v. Williams*, 503 F. App'x

---

*Kaufman v. Am. Exp. Travel Related Servs. Co.*, 283 F.R.D. 404, 406 (N.D. Ill. 2012) (noting that the trial court has "nearly complete discretion to determine the form and content of notice to class members" and collecting cases); 3 RUBENSTEIN § 8:17 (same). And class members had clear notice of the separate response due date both from the 10/1/21 Order and the settlement website. *See* Platt Decl. ¶ 11; *id.* Ex. B, Settlement Notice, *passim*.

[21]    For example, objector Jennifer Cochran filed a "conditional objection" to the fee petition on January 25, 2022, in which she noted that her counsel advised her that the Plaintiffs' anticipated request for one-third of the settlement fund in fees may be grounds for an objection. 1st Cochran Obj. at 1, ECF No. 186. Twelve days after Plaintiffs filed their motion for attorneys' fees, Cochran filed her actual "objection" to the motion, which engaged in some detail with the arguments in Plaintiffs' motion. *See* 2d Cochran Obj., ECF No. 207. Plaintiffs accepted that objection and responded to it in their reply brief in support of the motion.

55, 57–58 (2d Cir. 2012) (holding that notice of attorneys' fee motion was reasonable under the circumstances where, although objection deadline came before deadline for fee motion, class members who had filed objections "had two weeks to crystallize their objections and request further information," *id.* at 58), *cert. denied sub nom. Komar v. Cassese*, 569 U.S. 958 (2013).

### 3.  Motion To Accept Opt-Outs

The last issue bearing on the notice and claims submission process concerns a group of 851 individuals who move the Court to honor their requests for exclusion from the settlement ("Opt-Out Movants").  Rather than individually submitting their opt-out forms, these movants retained counsel who combined the opt-out forms and submitted them *en masse*.  *See* Hart Decl. ¶¶ 6–11, ECF No. 207-1; Swigart Decl. ¶¶ 6–10, ECF No. 207-2; Kind Decl. ¶¶ 39–43, ECF No. 207-3.  As a result, Angeion refused to accept the opt-out requests on the grounds that they were "mass opt-outs," which the preliminary approval order prohibited.  Platt Decl. ¶ 40.

Opting out of a class action settlement is an "individual right" that "must be exercised individually" in order to protect the due process rights of class members. *In re Diet Drugs*, 282 F.3d at 241.  As a result, courts routinely require class members to fill out and sign individually a hardcopy opt-out form in order to be excluded from a settlement and prohibit so-called "mass opt-outs," where an attorney or law firm files a single, unsigned opt-out form on behalf of a large group of class members.  *See id.*; *In re Deepwater Horizon*, 819 F.3d at 197; *see also In re TikTok*, 565 F. Supp. 3d at 1093 (collecting cases).

41

For these reasons, the preliminary approval order required prospective opt-outs to individually fill out an opt-out form that set forth:

> (i)     the name of the Action;
>
> (ii)    the person's or entity's full name, address, email address and telephone number;
>
> (iii)   a specific statement of the person's or entity's intention to be excluded from the Settlement;
>
> (iv)   the identity of the person's or entity's counsel, if represented; and
>
> (v)    the person's or entity's authorized representative's signature and the date on which the request was signed.

10/1/21 Order ¶ 10; *see* Settlement Notice ¶ 10.

The Opt-Out Movants have satisfied these requirements. Each completed a form that listed the name of the case, the individual's personal information, a statement of the individual's desire to be excluded in order to retain a right to file an individual lawsuit against TikTok, an identification of their counsel, and an e-signature and corresponding timestamp. The fact that they were signed electronically is of no moment, because their counsel provided evidence under seal documenting that each e-signature came from a separate, unique IP address.

The "mass-opt outs" prohibited in the preliminary approval order are very different from the opt-outs at issue here. Two objectors to preliminary approval, Behnken and Dugas, sought to "opt out *en masse* by means of a single unsigned, electronic filing from their lawyers." *In re TikTok*, 565 F. Supp. 3d at 1092. The Court found that permitting lawyers to submit mass opt-outs on behalf of their clients

42

without proof of individualized consent from every client would risk violating the due process rights of individual class members, who must be afforded the opportunity to personally decide whether to participate in the settlement. *Id.* at 1093 (citing *In re Centurylink Sales Pracs. and Sec. Litig.*, No. C 17-2832, 2020 WL 3512807, at *3–4 (D. Minn. June 29, 2020)); *see also In re Syngenta AG MIR162 Corn Litig.*, MDL No. 2591, 2016 WL 11782482, at *1 (D. Kan. Nov. 23, 2016) (an individual signature requirement "ensure[s] that those who actually may possess a potential claim are in fact the decision makers").

By contrast, the Opt-Out Movants have individually filled out forms that comply with the preliminary approval order's requirements. These forms bear the Opt-Out Movants' e-signatures, which are the legal equivalents of their handwritten signatures. *See, e.g.*, 15 U.S.C. § 7001(a)(1) (providing that in the commercial context, "a signature, contract, or other record relating to [a] transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form"). And their counsel have authenticated the signatures by providing documentation verifying that the signatures come from different individual IP addresses. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").[22]

---

[22]     TikTok also argues that counsel for the Opt-Out Movants improperly "solicited" opt-outs using deceptive advertising. But neither the Settlement Notice nor the Settlement Agreement makes any reference to prohibiting solicitation of opt-outs. And even if the Court

Accordingly, the Court concludes that Angeion erred in determining that the Opt-Out Movants' submissions violated the Settlement Agreement's prohibition on "mass opt-outs." The Court orders Angeion to accept the 851 opt-out requests, subject to a determination that they meet the remaining opt-out criteria.

## C.  Rule 23(e)'s Fairness Inquiry

### 1.  Legal Standard

The Court now turns to the adequacy of the settlement itself. Before approving the settlement, the Court must find that the terms are fair, reasonable, and adequate in light of numerous factors, including: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of [the] settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) [the] stage of the proceedings and the amount of discovery completed." *Wong*, 773 F.3d at 863; *see* FED. R. CIV. P. 23(e)(2) (listing factors).[23] This analysis does not "focus on individual components of the settlement,

---

were to follow the cases TikTok cites and read a ban on solicitation into the agreement, TikTok has not provided any evidence that these advertisements actually caused confusion among class members. *Cf., e.g.*, Hr'g Tr. at 3:2–6:11, *In re Facebook*, No. 15-cv-3747–JD (N.D. Cal. Sept. 22, 2020), ECF No. 486 (describing evidence of widespread consumer confusion in connection with misleading opt-out communication).

[23]     Congress amended Rule 23 in 2018 to add a list of concerns that courts should consider when deciding whether to approve a class action settlement. FED. R. CIV. P. 23(e)(2), advisory committee note to 2018 amendment; *see* FED. R. CIV. P. 23(e)(2)(A)–(D). But Congress stated that these factors were not intended to "displace" any of the tests devised by the courts of appeals. FED. R. CIV. P. 23(e)(2), advisory committee note to 2018 amendment. Therefore, the Court applies the factors as stated in *Wong*, with a "focus" on the "core concerns"

but rather views it in its entirety in evaluating its fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (cleaned up).

In conducting the fairness inquiry, the Court "consider[s] the facts in the light most favorable to the settlement." *Id.* (internal quotation marks omitted). But at the same time, it is mindful that, when sizeable class action settlements are concerned, the parties may have incentives to "sell out the class" by accepting a "deal that promotes the self-interest of both class counsel and the defendant[s]" at class members' expense. *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). As a result, the Court must act akin to "a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotation marks omitted).

## 2. Strength of Plaintiffs' Case And Value of the Settlement

The first and "most important" factor in the fairness inquiry asks the Court to balance the strength of the merits of Plaintiffs' case against the value that they will receive from the settlement. *Wong*, 773 F.3d at 864. Twenty years ago, in *Reynolds v. Beneficial National Bank*, the Seventh Circuit advised that, in making this inquiry, district courts should "quantify the net expected value of continued litigation" by "estimating the range of possible outcomes and ascribing a probability to each point on the range." 288 F.3d 277, 284–85 (7th Cir. 2002) (Posner, J.). The *Reynolds* court

---

expressed in the amended Rule. *Id.* Indeed, the enumerated factors in Rule 23(e)(2) are discussed throughout this opinion. That said, to the extent necessary, the Court expressly finds that the settlement is fair, reasonable, and adequate under the factors set forth in Rule 23(e)(2).

noted that quantitative analysis was important because of the "suspicious circumstances" surrounding the settlement in that case, where the history of the parties' settlement negotiations suggested that the settlement may have been the product of collusion rather than good-faith negotiation. *Id*. at 284; *see id*. at 280–82.

More recently, the Seventh Circuit has endorsed a less formulaic scrutiny of class action settlements when indicia of trustworthiness—third-party mediation, extensive confirmatory discovery, and hard-fought, arm's-length negotiation—work against any suggestion of impropriety. *See Kaufman*, 877 F.3d at 285; *Wong*, 773 F.3d at 864; *see also In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 218–19 (N.D. Ill. 2019) (approving class action settlement without quantifying net expected value where parties had reached settlement terms after prolonged, arms-length mediation sessions and extensive discovery), *aff'd sub nom. Walker v. Nat'l Collegiate Athletic Ass'n*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019).

The history of this case shows a vigorously negotiated settlement reached in good faith. As recounted above, the settlement was the product of months of arms-length negotiation punctuated by two mediation sessions led by a well-respected former federal judge. It was refined through further negotiation by a Court-appointed leadership group, whose members had different views as to what constituted a favorable settlement. Additionally, the parties have conducted substantial confirmatory discovery, including a detailed expert analysis of TikTok's source code. And Defendants have raised a vigorous factual and legal defense and continue to

46

dispute liability for every claim.

Given these indicia of an arm's length adversarial process, the Court finds it unnecessary to "undertake the type of mechanical mathematic valuation exercise" that *Reynolds* endorsed.[24] *In re TikTok*, 565 F. Supp. 3d at 1088. This, however, does not mean that the Court will simply rubberstamp the settlement. Rather, the Court still must consider carefully the benefits of the monetary and injunctive relief to the classes against the risks and potential benefits of potential future litigation. *See Kaufman*, 877 F.3d at 285.

The Settlement Agreement provides the classes with two substantial benefits. First is the $92 million settlement fund, which will provide immediate monetary relief to class members. Based on Plaintiffs' estimates, each Nationwide Class member who submitted a valid claim will receive $27.19, and each Illinois Subclass member who submitted a valid claim will receive $163.13; both are nontrivial amounts.

Not only are these sums meaningful in their own right, but they also compare favorably to the monetary relief provided in other data privacy class settlements. *See, e.g., Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013) ($15 per claim in case alleging misappropriation of users' likenesses), *aff'd sub nom. Fraley v.*

---

[24] Mark S. again contends that the settlement is the product of a "reverse auction," alleging that Defendants hand-selected certain attorneys to participate in the first round of mediation. But the Court is satisfied that the subsequent months of renegotiation led by the Court-appointed Class Counsel, which resulted in substantial revisions to the final settlement, sufficiently addressed any such concerns.

*Batman*, 638 F. App'x 594 (9th Cir. 2016); *In re Vizio, Inc., Consumer Priv. Litig.*, No. 8:16-ml-02693-JLS, 2019 WL 12966638, at \*4 (C.D. Cal. July 31, 2019) (VPPA settlement providing $16.50 per claim). Indeed, many privacy class actions award only *cy pres* relief. *See In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1113–14 (9th Cir. 2021) (collecting cases).

Along with the monetary relief, class members also receive wide-ranging injunctive relief that prohibits Defendants from collecting and transferring their data without their express consent. The Settlement Agreement also requires TikTok to delete all pre-uploaded content contained in its servers and refrain from collecting such content in the future without prior user consent. Furthermore, TikTok must implement a privacy compliance and training program for all of its employees, and its compliance with the program will be verified a third-party auditor for the first three years after the settlement is finalized. These injunctive remedies confer substantial benefits to the class. *See In re Equifax*, 2020 WL 256132, at \*38 (holding that injunctive relief imposing data privacy compliance and monitoring requirements on defendants was of great value to the class).

With these benefits in mind, the Court must weigh them against "the probabilities and possibilities of victory or defeat" if litigation were to continue. *See Dorvit ex rel. Power Sols. Int'l, Inc. v. Winemaster*, 950 F.3d 984, 988 (7th Cir. 2020) (quoting *United Founders' Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971)). Here, the significant litigation risks Plaintiffs would face if the cases were to proceed weigh heavily in favor of approving the settlement.

48

Foremost of these are the class action waivers and mandatory individual arbitration clauses contained in TikTok's terms of service,[25] to which every class member agreed when they signed up for a TikTok account. All parties concur that, if Defendants were able to enforce these clauses, Plaintiffs' claims would be essentially worthless due to the prohibitive time and expense that individual arbitration would impose upon each individual user. For example, a claimant would need to shoulder the cost of retaining an expert to prove that the App illegally expropriated their personal information. *See Kaufman*, 877 F.3d at 285; *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 245 (2013) (Kagan, J., dissenting) ("No rational actor would bring a claim worth tens of thousands of dollars if doing so meant incurring costs in the hundreds of thousands.").

Indeed, if Defendants were to bring a motion to compel arbitration against each Plaintiff, she would face an uphill battle. *See, e.g., Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ("Courts routinely uphold [such] agreements for the

---

[25] Specifically, the terms of service provide that:

> Any Claim must be brought in the respective party's individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff, or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. . . . The parties understand that any right to litigate in court, to have a judge or jury decide their case, or to be a party to a class or representative action, is waived, and that any claims must be decided individually, through arbitration.

*Terms of Service*, TIKTOK, https://www.tiktok.com/legal/terms-of-service?lang=en, (last visited May 24, 2022).

principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'"); *Wilcosky v. Amazon.com, Inc.*, 517 F. Supp. 3d 751, 765–66 (N.D. Ill. 2021); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 587 (N.D. Cal. 2020); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 469–70 (S.D.N.Y. 2017); *In re Facebook*, 185 F. Supp. 3d at 1166–67; *Miracle-Pond v. Shutterfly, Inc.*, No. 19-CV-04722, 2020 WL 2513099, at *6–7 (N.D. Ill. May 15, 2020).

Plaintiffs' assent to the App's terms of service creates another set of problems for them. Some of Plaintiffs' claims require them to prove that Defendants accessed their information "without authorization." 18 U.S.C. § 1030(a)(2) (CFAA); *see also, e.g.*, CAL. PENAL CODE § 502(c)(2) (CCDAFA) (imposing liability on one who "[k]nowingly accesses and without permission takes, copies, or makes use of any data"). The FAL and UCL claims require actual reliance on misrepresentations or nondisclosures. *See Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 912 (N.D. Cal. 2020). The California right-to-privacy claims require an unwelcome "intrusion" into their private lives so serious "as to constitute an egregious breach of . . . social norms." *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009) (quoting *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.3d 633, 655 (Cal. 1994)). And the unjust enrichment claims ask whether Defendants unfairly possess data to which they are not entitled. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2020). All of these claims could be undermined by the App's terms of service and privacy policy, which disclose the ways in which Defendants collect, use, and share data and

information submitted by App users.[26]

Defendants also could argue that Plaintiffs lack Article III standing to bring some of their claims, given that a "bare procedural violation" of a federal statute, without more, does not confer standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2213 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)); *see, e.g.*, *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1248 (7th Cir. 2021) (holding that plaintiffs' claims that Defendants violated BIPA by selling their data to third parties, without more, did not constitute Article III injury in fact).

Proving damages would present another set of hurdles. For example, courts typically hold that the unauthorized collection and transmission of a plaintiff's personal information, without more, does not constitute "economic damages" under the CFAA. *See, e.g.*, *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262–63 (9th Cir. 2019) (the CFAA's "narrow conception of loss," *id.* at 1262, does not include expropriation of personal information); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1069 (N.D. Cal. 2012) (Koh, J.) (collecting cases). And, although VPPA provides for statutory damages, in practice, many VPPA cases end up settling, often for a smaller recovery than Plaintiffs will receive here. *See, e.g.*, *In re Vizio*, 2019 WL

---

[26]    *See, e.g.*, *Privacy Policy*, TikTok (June 2, 2021), https://www.tiktok.com/legal/privacy-policy-us?lang=en (stating that TikTok and its affiliates "automatically collect certain information from you when you use the [App], including internet or other network activity information such as your IP address, geolocation-related data . . . unique device identifiers, browsing and search history (including content you have viewed in the [App]), and Cookies"); *id.* (explaining how Defendants "share the categories of personal information listed above" with third parties).

12966638, at *4 (VPPA settlement resulting in $16.50 award per claimant after two motions to dismiss); *In re Netflix Priv. Litig.*, No. 11 C 379, 2013 WL 1120801, at *1– 2 (N.D. Cal. Mar. 18, 2013) (*cy pres*-only relief that would have provided $0.14 per class member). Consumer class action settlements under BIPA also typically provide only relatively modest relief. *See, e.g.*, *Prelipceanu v. Jumio Corp.*, No. 2018 CH 15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($41.17 per claimant).

In light of the foregoing, the objectors' contentions that the Settlement Agreement provides inadequate value to class members are unpersuasive. Litteken, in particular, argues that the settlement compares unfavorably to other large data privacy class settlements, contrasting the monetary relief in this case with the $93.14 per-class-member settlement in *In re Facebook*, 522 F. Supp. 3d 617. There, Facebook agreed to pay $650 million to settle BIPA claims of Illinois residents whose facial recognition information Facebook had surreptitiously collected. *Id.* at 620–21. But that case featured none of the aforementioned obstacles that Plaintiffs face here, and had other distinguishing factors.

For example, *In re Facebook* settled on the eve of trial, after plaintiffs had survived multiple motions to dismiss and motions for summary judgment and had won a hotly contested motion for class certification in the district court and on appeal. *See id.* at 621; *see also, e.g.*, 326 F.R.D. 535, 540 (N.D. Cal. 2018), *aff'd sub nom. Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019). Unlike in this case, where Defendants categorically deny that they collected facial recognition data without authorization, *see, e.g.*, Defs.' Suppl. Answers at 7, ECF No. 139, Facebook admitted

that it had used "tagging" software to collect facial recognition information from Facebook users in Illinois, while denying that this conduct violated BIPA. *See In re Facebook*, 2018 WL 2197546, at *2. For these reasons, the Court finds that *In re Facebook* is "a poor comparator" to judge the value of the settlement in this case. *In re TikTok*, 565 F. Supp. 3d at 1090.[27]

For all of these reasons, the Court overrules Mark S.'s and Litteken's objections to the value of the settlement to the class and finds that the relief the Settlement Agreement provides is substantial when considered against the risks and potential pitfalls of Plaintiffs' case.

### 3.    Other Settlement Factors

The remaining settlement factors also support a finding that the settlement is fair, reasonable, and adequate.

Given the nature of the claims and number of putative class members, the complexity, length, and expense of future litigation in this case would be enormous. *See Wong*, 773 F.3d at 863. Proceeding to trial would take years of motion practice and extensive fact and expert discovery, assuming Plaintiffs could survive motions to compel arbitration and to dismiss. Moreover, because this is an MDL, once the Court is finished with pretrial proceedings, the individual cases must return to the transferor courts for trial preparation and trial, which would consume inordinate

---

[27]    On a related note, objector Mark S. argues that the "net expected value" of the litigation to the class is more than ten times the size of the settlement fund. But for much of the reasons already discussed, the Court finds this unpersuasive.

judicial resources. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 23, 34–35 (1998).

The relative dearth of opposition to the settlement and the reaction of class members weighs in favor of approval as well. *See id.* With over 1.2 million claims filed and a class that includes approximately one in four Americans, only four class members have filed objections to the settlement, and only 4,068 have requested to be excluded. This level of opposition is remarkably low, especially for a widely publicized consumer class action concerning a popular social media platform. *Cf., e.g.*, *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 495 (N.D. Ill. 2015) (finding that, in case with a class size of 10 million, the fact that only twenty class members filed objections supported reasonableness of settlement, and collecting cases); *In re Equifax*, 2020 WL 256132, at *10 (referring to 388 objectors as a "miniscule number" in an MDL with a class size of 147 million and 15 million claims). Furthermore, two of the objectors are "serial" objectors who "have unsuccessfully asserted the same or similar objections in other class action settlements." *In re Equifax*, 2020 WL 256132, at *41 (referring to a group of objectors including Helfand); *see also* 1st Cochran Obj. at 3.

Additionally, the opinion of competent class counsel supports approval of the proposed settlement. *See Wong*, 773 F.3d at 863; *see also Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 300 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1000 (2018). Here, the Court hand-picked a diverse group of highly qualified attorneys to represent the class, including attorneys who were not part of the pre-MDL settlement negotiations and who had voiced concerns regarding various aspects of the original

54

terms. The Court's intent was to force Plaintiffs' counsel who disagreed with one another to work together, and after going back to the drawing board, all three members of Plaintiffs' Co-Lead Counsel now attest that the settlement is fair, reasonable, and adequate.[28]  *See* Carroll Decl. ¶ 41; Rhow Decl. ¶ 23; Fegan Decl. ¶ 26, ECF No. 122-7. So too has Judge Phillips, a highly respected mediator. *See* Phillips Decl. ¶ 12, ECF No. 122-9.

The last factor—"the stage of the proceedings and the amount of discovery completed"—asks "how fully the district court and counsel [were] able to evaluate the merits of plaintiffs' claims" before reaching the settlement. *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 350 (N.D. Ill. 2010) (quoting *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980)). Although the settlement was reached at an early stage of litigation, Class Counsel conducted voluminous confirmatory discovery between the initial signing of the Settlement Agreement and Plaintiffs' motion for preliminary approval. Most notably, Plaintiffs retained a programming expert to conduct a two-week-long, in-person inspection of TikTok's source code, which gave Plaintiffs a more comprehensive understanding of the App's technology and served as a launchpad for further discovery. Carroll Decl. ¶¶ 29–39; *see id.* Ex. A, Zeidman Curriculum Vitae. This confirmatory discovery provided the parties with enough information to make an

---

[28]  It is also worth noting that Defendants' counsel appears to view the settlement as a boon for the class. *See, e.g.*, Defs.' Suppl. Answers at 6–7; Final Approval Hr'g Tr. at 43:9–11, *In re TikTok* (N.D. Ill. May 18, 2022), ECF No. 247.

informed decision about settlement. *See Does 1–2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 898–99 (6th Cir. 2019) ("[C]ourts have held that settlements are permissible where, 'notwithstanding the status of discovery, plaintiffs' negotiators had access to a plethora of information regarding the facts of their case.'" (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981)); *Cottle v. Plaid Inc.*, 340 F.R.D. 356, 376 (N.D. Cal. 2021).

For the above reasons, the Court finds that the proposed settlement is fair, reasonable, and adequate pursuant to the standards set forth in Rule 23(e). And, with all three prerequisites—class certification, notice, and fairness—now satisfied, the Court grants Plaintiffs' motion for final approval of the class settlement.

## D.     Attorneys' Fees and Service Awards

### 1.     Legal Standard

One final issue remains—the compensation due to the attorneys, class representatives, and objectors. Rule 23(h) permits a district court to award reasonable attorneys' fees "that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). But in doing so, courts must be aware of the potential conflict of interest between class counsel and the class that arises when class counsel asks for fees to be paid out of a common fund, because every dollar the attorneys receive is a dollar that the class does not. *Redman*, 768 F.3d at 629, 633 (courts must "bear[] in mind that the higher the fees the less compensation will be received by the class members").

When evaluating the reasonableness of a request for attorneys' fees, the

Seventh Circuit has stated that the district court must "compare attorney fees to what is actually recovered by the class," *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791, 793 (7th Cir. 2017), with a goal "to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832–33 (7th Cir. 2018) (quoting *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007)).

Because the market-price estimation is "inherently conjectural," district courts have discretion to use either the percentage method, which awards fees as a percentage of the common fund, or the "lodestar" method, which awards fees based on the attorneys' hours and billing rates, to assess the reasonableness of a fee request. *Douglas v. W. Union Co.*, 328 F.R.D. 204, 220 (N.D. Ill. 2018) (quoting *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 744 (7th Cir. 2011)), *aff'd*, 955 F.3d 662 (7th Cir. 2020); *see* 5 William B. Rubenstein, Newberg on Class Actions § 15:63 (5th ed. 2011) (updated 2021). Courts frequently use the percentage method in the first instance and cross-check the amount using the lodestar method. *See Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011); 5 Rubenstein § 15:88 (stating that the lodestar cross-check is "a means of ensuring that the percentage award is not a windfall" to the attorneys). The Court will do so here, first with respect to Class Counsel's motion for attorney' fees and then with respect to the other fee petitions.

### 2. Class Counsel's Motion for Attorneys' Fees

### i.    Percentage Method

Class Counsel request $30,660,539.91 in attorneys' fees. Assessing the reasonableness of this request under the percentage method is a two-step process. First, the Court determines the value of the fund against which the requested fee percentage will be calculated. This is surprisingly complex because the gross value of the fund is not the proper denominator. Instead, the Seventh Circuit repeatedly has stated that a percentage fee award should be calculated against "the value received from the settlement by the members of the class"—*i.e.*, the net common fund after deduction of administrative expenses, litigation expenses, and service awards. *Pearson*, 772 F.3d at 781 (citing *Redman*, 768 F.3d at 630).

Here, the gross settlement fund is $92 million. After deducting $3,276,268.43 in notice and settlement administration expenses, $789,944.00 in litigation expenses, and $90,000 in service awards, the net common fund is $87,843,787.95. Platt Decl. ¶ 43; Pls.' Mot. Attys.' Fees ("Fee Mot.") at 3, ECF No. 197.

Second, the Court must consider the percentage of the fund that Class Counsel seek and determine whether that percentage—and the dollar amount resulting from it—is "reasonable." FED. R. CIV. P. 23(h); *see* 5 RUBENSTEIN § 15:72. In the Seventh Circuit, a percentage fee is reasonable if it roughly approximates the market rate for legal services, in light of the risk undertaken by the attorneys and the benefit conferred to the class. *See Camp Drug Store*, 897 F.3d at 832–33; *In re Sears*, 867 F.3d at 793. In making this inquiry, courts also can "look to actual fee agreements, data from similar cases, and class-counsel auctions" for guidance. *In re Stericycle Sec.*

58

*Litig.*, 35 F.4th 555, 560 (7th Cir. 2022) (quoting *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005)).

Throughout this litigation, Class Counsel have stated—both to this Court and to the class in the settlement notice—that they intended to seek ""up to 33.33% of the Settlement Fund" in fees. Settlement Notice ¶ 15. And so here, Class Counsel seek one-third (33.33%) of the gross common fund in fees. But when calculated against the net common fund, the $30,660,539.91 requested actually constitutes approximately 34.9% of the common fund. Class Counsel argue that they are entitled to the higher number, citing cases where courts have approved percentage awards of 35 percent or higher. But Class Counsel has repeatedly stated that they will seek no more than one-third of the settlement fund in fees, *see, e.g.*, Settlement Notice ¶ 15, and the Court holds them to their promise. One-third of $87,843.787.95 (the net common fund) amounts to $29,279,203.44.

The objectors believe that this is still too much and ask the Court to adopt a "sliding scale" approach, which decreases the attorneys' fee percentage as the size of the overall settlement fund increases. *See In re Synthroid Mktg. Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) ("*Synthroid II*") (applying a formula under which class counsel received 30% of the first $10 million in the fund, 25% of the next $10 million, and so on). The objectors contend that the size of the settlement and the early stage of litigation at which the settlement was reached support the use of a similar formula here.

Neither of those considerations compels the use of a sliding-scale approach in

this case.  Although many sliding-scale cases involve large fund sizes, many courts confronted with settlement funds in the tens of millions do not use a sliding-scale formula.  *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2021 WL 5709250, at *5 (N.D. Ill. Dec. 1, 2021) (rejecting sliding-scale approach and awarding 33% of a $150 million settlement fund in fees).  And, as demonstrated by the lodestar cross-check below, a flat percentage fee does not create a windfall to Class Counsel in light of the amount of work performed in this case and the risk involved.

Litteken's reliance on the Seventh Circuit's recent decision in *In re Stericycle Securities Litigation* is unavailing.  In *Stericycle*, the Seventh Circuit held that the district court abused its discretion in awarding 25% of a $45 million securities fraud settlement to class counsel, because the district court did not consider the existence of an actual *ex ante* fee agreement or give sufficient weight to other factors, including prior litigation success (which reduced the risk of nonpayment) and the early stage of the litigation.  *See Stericycle*, 35 F.4th at 562–66.  But contrary to Litteken's contention, *Stericycle* did not create a general presumption in favor of a sliding-scale approach for large cases.  Instead, the *Stericycle* court spoke approvingly of using a sliding-scale approach in cases where an actual *ex ante* fee agreement also has adopted a sliding-scale formula.  *Id.* at 563 (district courts should give such agreements "substantial weight" in the reasonableness analysis).[29]

---

[29]    A number of other factors distinguish *Stericycle* from this case.  For example, the risk of nonpayment here was far higher than in *Stericycle*, in which "prior litigation . . . and subsequent, very substantial settlements" suggested that class counsel were reasonably sure

Indeed, as Class Counsel points out, a flat percentage fee award of one-third of the net common fund is typical in other data privacy settlements, including many BIPA settlements that courts have approved within this district. *See, e.g.*, *Crumpton v. Octapharma Plasma, Inc.*, No. 19-cv-08402, slip op. at 5–6 (N.D. Ill. Feb. 16, 2022); *Martinez v. Nando's Rest. Grp., Inc.*, No. 1:19-cv-07012, slip op. at 4 (N.D. Ill. Oct. 27, 2020); *Dixon v. Wash. and Jane Smith Home*, No. 17-cv-8033, slip. op. at 1 (N.D. Ill. Aug. 20, 2019).

A one-third flat fee also is routine for class action settlements in similarly complex fields, such as antitrust litigation, *see, e.g.*, *In re Broiler Chicken*, 2021 WL 5709250, at *4 (awarding a flat 33% of a $150 million common fund and stating "fee awards in antitrust cases in this circuit are almost always one-third"), and consumer protection litigation. *See, e.g.*, *Charvat v. Valente*, No. 12-cv-05746, 2019 WL 5576932, at *11 (N.D. Ill. Oct. 28, 2019) (collecting cases). Furthermore, a one-third fee aligns with the one-third contingency fee routinely charged by class action lawyers across the country. *See* 5 RUBENSTEIN § 15:73 ("The age-old assumption is that tort lawyers receive a third of their clients' recovery."); *id.* at n.9 (collecting cases); *see also Furman v. At Home Stores, Inc.*, No. 1:16–cv–08190, 2017 WL 1730995, at *4 (N.D. Ill. May 1, 2017) (the fact that "plaintiffs routinely agree to a one-third contingency fee arrangement[] reinforces that Plaintiff's Counsel are requesting the proper

---

of payment. *Id.* at 563. Furthermore, prior litigation had laid the groundwork for the *Stericycle* attorneys, who relied on that evidence to negotiate the settlement. *Id.* at 563–65. Here, Class Counsel had to do their own work.

market rate").

The significant litigation risks to Plaintiffs described above also increase the market value of Class Counsel's representation. *Camp Drug Store*, 897 F.3d at 833; *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("*Synthroid I*"). Larger contingency fees are generally needed to persuade lawyers to take riskier cases because there is a lower chance that they will receive anything at the end. *See* John Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 YALE L.J. 473, 481–82 (1981) (endorsing a "probabilistic rationale" for awarding fees under which the size of the fee award correlates with the risk of nonpayment). Admittedly, quantifying risk is a challenging exercise, but in *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995), the Seventh Circuit held that factors supporting the reasonableness of plaintiffs' fee request included (1) the "unsettled and complex" nature of the law of the case; (2) numerous "plausible defenses" available to the defendants; and (3) legitimate doubts about whether the plaintiffs had suffered actual injury. *Id.* at 1247. All three factors support the fee award Class Counsel seek here.

Data privacy law is a relatively undeveloped and technically complex body of law, which creates uncertainty and, therefore, additional risk for Class Counsel. Defendants have a wide array of defenses to Plaintiffs' claims, some of which—the arbitration clause in particular—are more than "plausible." And as in *Florin*, damages may be difficult to recover for many of Plaintiffs' claims, which are untested.

The quality and amount of work that Class Counsel have performed also supports a one-third percentage fee. Class Counsel's timesheets indicate that several

of the lead attorneys have devoted essentially their entire professional lives to this case over the last three years. And judged in light of the considerable litigation risks and in comparison with other data privacy settlements, they have secured a substantial benefit to the class. The need to provide financial incentives for zealous and effective representation of consumers in legally and technologically complex data privacy cases such as this—especially in the age of pervasive social media—weighs in favor of granting the request. *Cf. In re Broiler Chicken*, 2021 WL 5709250, at *3 (noting that a substantial fee is necessary to attract high-quality counsel to litigate complex cases).

Finally, the quality of representation Defendants had for their defense supports the fee request as well. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 357–58 (S.D.N.Y. 2005) (fact that class counsel "faced formidable opposing counsel from some of the best defense firms in the country" supported reasonableness of fee request, *id.* at 358). Defendants are represented by Wilson Sonsini Goodrich and Rosati, which is one of the leading privacy and data security law firms in the United States according to the legal industry researcher Chambers and Partners. *See Privacy and Data Security: The Elite in USA Legal Rankings*, CHAMBERS AND PARTNERS, https://chambers.com/legal-rankings/privacy-data-security-usa-2:3220:225:1 (last accessed May 30, 2022). Indeed, Defendants' counsel has secured victories for major technology companies in several similar consumer privacy cases. *See, e.g.*, *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 266, 295 (3d Cir. 2016) (affirming dismissal of VPPA and state law claims); *Mollett v. Netflix, Inc.*, 795

F.3d 1062, 1063–64 (9th Cir. 2015) (same).  That Class Counsel were able to secure a favorable settlement in the face of this opposition weighs in favor of a one-third fee.

The objectors raise a flurry of additional arguments in opposition to the fee request.  They complain that the settlement is simply too large for a one-third percentage fee to be reasonable.  The Seventh Circuit, however, has "explicitly rejected" the so-called "megafund rule," which caps fees at a given percentage (usually ten to fifteen percent) where the size of the fund exceeds a certain amount, "because it [creates] a perverse incentive."  *In re Broiler Chicken*, 2021 WL 5709250, at *3 (citing *Synthroid I*, 264 F.3d at 718 ("Private parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for more than [the threshold fund size] from the defendants.")); *see also In re Equifax*, 2020 WL 256132, at *36 (collecting cases rejecting the megafund rule)).

Next, the objectors contend that Class Counsel did not perform enough substantive work on the case to justify their requested percentage.  That argument fails to appreciate the nearly three-year history of this case, the considerable resources Class Counsel have expended in confirming the merits of the classes' claims, and the novelty of many of the issues involved.  *See, e.g.*, *In re Equifax*, 2020 WL 256132, at *32–33 (novelty and difficulty of legal issues in data privacy case strongly supported class counsel's fee request).

Litteken also argues that the United States government, and not Class Counsel, should get most of the credit for the settlement because Defendants agreed to settle only after the Trump Administration ordered ByteDance to sell its United

States-based operations. Without more, however, the timing of the settlement alone does not permit an inference that the settlement efforts would have failed if not for the Executive Order. *Cf. Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (timing alone is generally insufficient to establish causation). But even assuming, for the sake of argument, that this external pressure played a role in Defendants' decision to settle this case, the Court declines to discount their fees on that basis. If anything, attorneys should be rewarded, not punished, for leveraging external pressure (of course, within ethical bounds) to zealously promote the interests of their clients.

### ii. Lodestar Cross-Check

A lodestar cross-check also confirms the reasonableness of the one-third amount. Under this approach, the Court first calculates the "lodestar" amount, by multiplying the attorneys' reasonable hourly rates by the number of hours the attorneys reasonably expended on the case. *See* 5 RUBENSTEIN § 15:87. The proposed fee award then is divided by that amount, yielding a "multiplier," which is used to assess the reasonableness of the fee amount. *Id.* Here, the undisputed record indicates a collective lodestar of $14,324,394.90 for Class Counsel. Measuring this figure against the proposed award of $29,279,203.44 results in a multiplier of 2.04.

In practice, most multipliers fall between one and four. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991); *see, e.g., In re Nat'l Collegiate Athletic Ass'n*, 332 F.R.D. at 225 (1.5); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D. Ill. 2011) (2.65); *In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*,

733 F. Supp. 2d 997, 1015 (E.D. Wis. 2010) (2.07).  And, given the considerable benefit that Class Counsel has obtained for the class in the face of significant litigation risk, the Court finds that a multiplier of 2.04 is reasonable for this case.  *See Americana Art China Co. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 245 (7th Cir. 2014) (referring to the multiplier as a "risk multiplier"); *Florin*, 60 F.3d at 1247 (same).  Moreover, the Court observes that 2.04 is well below average for a fund of this size, *see* 5 RUBENSTEIN § 15:89 tbl.2 (for fund sizes over $44 million, the mean multiplier was 2.39), and less than half the multiplier for the fee awarded to class counsel in *In re Facebook*, 522 F. Supp. 3d at 633 (awarding "a higher-end multiplier of 4.71").

For the reasons stated above, the Court finds that Class Counsel's request for one-third of the net common fund is reasonable and appropriate in light of the work they performed on behalf of the Nationwide Class and Illinois Subclass.

### iii.    Allocation of Fees Among Plaintiffs' Firms

Co-Lead Counsel—comprised of Lynch Carpenter LLP; Bird Marella Boxer Wolpert Nessim Drooks Lincenberg & Rhow, P.C. ("Bird Marella"); and Fegan Scott LLC—also request that the Court delegate to them the task of allocating the fee award among the participating plaintiffs' firms.  Such delegation is common when all the attorneys agree about how the fees should be distributed.  *See, e.g.*, *In re Life Time Fitness, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, 847 F.3d 619, 623–24 (8th Cir. 2017) (affirming district court's decision to leave the allocation of the fee award to class counsel "without further judicial oversight or approval"); *In re Warfarin Sodium*

*Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004) ("[D]istribution of an attorney fee award among counsel is and should be a private matter for the attorneys to resolve amongst themselves.").

But a blanket delegation to lead counsel is inappropriate where the attorneys for the class disagree among themselves about fees. For example, in *In re High Sulfur Content Gasoline Products Liability Litigation*, the Fifth Circuit held that a district court abused its discretion by abdicating its duty to supervise the allocation of a fee award when there was a dispute among class counsel over the proper allocation procedures. 517 F.3d 220, 235 (5th Cir. 2008). Instead of resolving the dispute itself, the district court impermissibly "rubber-stamped" the views of the committee it had tasked with allocating the fees. *Id.* at 229; *see also* 5 RUBENSTEIN § 15:23 ("[I]f multiple counsel in a class suit cannot agree, the court can no longer defer but must itself make the allocation decision.").

Unfortunately, this case is of the latter variety. Here, Co-Lead Counsel have proposed a fee distribution schedule that sorts the thirty-one plaintiffs' firms into tiers based upon the level of risk they assumed and their involvement in the litigation. *See generally* Fee Mot. Ex. 16, Lodestar Summary, ECF No. 197-16. Under the proposal, Tier 1 is comprised of Co-Lead Counsel; Tier 2 includes the remaining six firms that make up the Executive Committee and Liaison Counsel; Tier 3 consists of firms that participated in the mediation sessions but were not selected to serve on the Executive Committee; and Tier 4 is comprised of all other firms.

The dissenting view comes from two firms in Tier 3—Glancy Prongay &

Murray, LLP ("Glancy Prongay") and Philips, Erlewine, Given and Carlin LLP ("Philips Erlewine") (collectively the "objecting firms"). They argue that Co-Lead Counsel's proposal undervalues their respective contribution to the litigation and the risk they undertook as part of the first mediation team and the leadership committee appointed by Judge Koh. Consequently, they demand a multiplier equal to at least 75% of the multiplier that Co-Lead Counsel receive.

Given this disagreement, the Court declines to delegate the distribution of fees to Co-Lead Counsel. Rather, the Court will review the tiered fee schedule that Class Counsel proposes, as well as the underlying billing documents, and exercise its independent judgment based upon the amounts requested and particular circumstances of this case.

First, Co-Lead Counsel request a lodestar multiplier of 3.5 for their own fees. The Court agrees that Co-Lead Counsel have expended enormous time, effort, and resources on this litigation, which does justify a high multiplier. However, granting Co-Lead Counsel a 3.5 multiplier would distribute to Co-Lead Counsel more than two-thirds of the total fee award, when they contributed forty percent of Class Counsel's total lodestar. The Court finds that such a distribution unfairly short-shrifts the rest of the firms—in particular, the California firms that participated in the pre-MDL proceedings before Judge Koh. Accordingly, the Court awards Co-Lead Counsel the following fees: $8,117,302.50 to Lynch Carpenter; $7,073,527.50 to Bird Marella; and $2,090,244.00 to Fegan Scott. These awards reflect a multiplier of 3.0, which the Court finds adequately compensates Co-Lead Counsel for the additional

risk they have absorbed over and above the other firms.

As to the Tier 2 firms,[30] whom the Court appointed to the Executive Committee, Co-Lead Counsel propose that Freed Kanner London and Milliken ("Freed Kanner") receive a multiplier of 1.8, and that the five remaining firms in Tier 2 should receive a multiplier of 1.6. Co-Lead Counsel contend that the Tier 2 firms deserve a modest multiplier for their work researching and drafting the consolidated complaint and contributing to pre-MDL litigation strategy. Co-Lead Counsel further argue that Freed Kanner should receive a slightly higher multiplier than the rest of Tier 2, because it was extensively involved in organizing the second mediation and in the drafting of the Settlement Agreement itself.

The Court agrees that the Executive Committee firms materially benefitted the classes by conducting extensive pre-settlement investigation of Plaintiffs' claims (particularly the BIPA claim), securing favorable settlement terms during the second mediation, and negotiating amendments to the settlement agreement in the post-consolidation period. What is more, the Executive Committee invested this time and effort at a relatively early stage, before the Court granted preliminary approval of the settlement, which supports awarding a modest risk multiplier. And Freed Kanner's level of involvement exceeds that of every firm other than Co-Lead Counsel, warranting a slightly higher multiplier than the rest of Tier 2. At the same time,

---

[30] The firms in Tier 2 include: Freed Kanner London & Millen LLC ("Freed Kanner"); Susman Godfrey LLP; Hausfeld LLP; Bottini & Bottini, Inc.; Burns Charest; and Clifford Law Offices.

because the Court reduced Class Counsel's total fee request by nearly $1.4 million, a slight downward adjustment of Co-Lead Counsel's suggested multiplier is appropriate. Accordingly, the Court awards the Tier 2 firms the following fees: $2,046,169.50 to Freed Kanner; $367,694.54 to Susman Godfrey; $875,144.30 to Hausfeld; $644,504.33 to Bottini & Bottini; $837,802.10 to Burns Charest; and $29,429.77 to Clifford Law Offices. These awards reflect a lodestar multiplier of 1.5 for Freed Kanner, and a lodestar multiplier of approximately 1.38 for the remaining firms on the Executive Committee.

The objecting firms in Tier 3 do not take issue with these recommendations. They contend, however, that Co-Lead Counsel's proposal for their own fees, which suggests awarding Glancy Prongay a multiplier of 1.3 and Philips Erlewine a multiplier of 0.9, fails to adequately compensate them for the risk they took on early in the litigation during the proceedings before Judge Koh. The Court agrees.

A fee award must reflect the level of risk the attorneys bore "at the outset of the case." *Harman*, 945 F.2d at 976. Here, that standard commands a higher multiplier for these firms than Co-Lead Counsel suggest. Along with Bird Marella, Glancy Prongay was the first to begin investigating the data privacy allegations against TikTok in January 2018, and the two firms were the first to file a complaint against TikTok in November 2019. *See* Fee Mot. Ex. H, Rotter Decl. ¶ 2, ECF No. 197-24 (citing *Hong*, No. 19 C 7792). Philips Erlewine joined the plaintiffs' team in *Hong* in March 2020 and helped to file an amended complaint in May 2020 that included more detailed factual allegations and a newly-added BIPA claim. *Id.* Ex. I,

70

Given Decl. ¶ 2, ECF No. 197-25. Not only did these two firms join this litigation earlier than any other firm save Bird Marella, but both firms also incurred greater out-of-pocket expenses than any firm save Co-Lead Counsel or Freed Kanner. *See generally* Lodestar Summary.[31]

For these reasons, the Court finds that the objecting firms are entitled to a greater multiplier than Co-Lead Counsel propose. That said, the Court finds that 2.25 (75% of Co-Lead Counsel's multiplier) is too high when compared to the multiplier awarded to other firms given their relative contributions; therefore, the Court awards $3,315,381.00 to Glancy Prongay and $679,018.00 to Philips Erlewine, reflecting a fee multiplier of 2.0.

Co-Lead Counsel also request that the twenty remaining firms in Tiers 3 and 4[32] receive "negative multipliers" (that is, less than their lodestar), ranging from 0.9 for several firms in Tier 3, to as low as 0.15 for Bleichmar Fonti, a firm in Tier 4. In support, Co-Lead Counsel contend that the discounts are appropriate, because these firms did not take on substantial pre-consolidation risk and did not participate in the post-MDL proceedings. They further argue that the Tier 4 firms did not confer direct

---

[31]     Indeed, Glancy Prongay alone incurred more out-of-pocket expenses than all of Co-Lead Counsel put together. Lodestar Summary at 1–2.

[32]     The firms in Tier 3 (other than Glancy Prongay and Philips Erlewine) include: Ahdoot & Wolfson, PC; Consumer Protection Legal, LLC; Scott+Scott LLP; Foote, Mielke, Chavez, & O'Neil, LLC ("Foot Mielke"); Erik H. Langeland P.C. ("Langeland"); Cafferty Clobes Meriwether & Sprengel LLP ("Cafferty Clobes"); Sauder Schelkopf LLP; Baird Law Firm; Stephan Zouras, LLP; Tostrud Law Group, P.C.; Wood Law Firm, LLC; and Gordon Law Offices, LLC. The firms in Tier 4 include: Cotchett, Pitre & McCarthy ("Cotchett Pitre"); DiCello Levitt; Bleichmar Fonti; Chimicles Schwartz Kriner & Donaldson-Smith LLP ("Chimicles Schwartz"); Girard Sharp LLP; Onderlaw LLC; Baer Law; and Lawrence Kamin.

or indirect benefits on the classes, because they merely represented individual class members who filed member cases and did not participate in the mediations or post-MDL litigation.

The Court disagrees that the Tier 3 and Tier 4 firms should receive discounts on their time. These firms all incurred material risks by taking on clients for what would have been protracted, expensive litigation, had the cases not been consolidated into this MDL. While Co-Lead Counsel are correct that they did not confer substantial benefits to the class in the end, that alone does not justify a negative multiplier in light of these early risks. Accordingly, the Court finds that a 1.0 multiplier is appropriate for the Tier 3 and Tier 4 firms, and awards fees to those firms as follows: $169,630.00 to Ahdoot & Wolfson; $286,913.90 to Consumer Protection Legal; $261,526.00 to Scott+Scott; $139,495.00 to Foot Mielke; $228,000.00 to Langeland; $286,825.00 to Cafferty Clobes; $163,840.00 to Sauder Schelkopf; $45,150.00 to Baird Law Firm; $255,242.50 to Stephan Zouras; $208,905.00 to Tostrud Law Group; $39,525.00 to Wood Law Firm; $72,502.00 to Gordon Law Offices; $211,130.00 to Cotchett Pitre; $126,810.00 to DiCello Levitt; $341,962.50 to Bleichmar Fonti; $49,322.50 to Chimicles Schwartz; $235,485.00 to Girard Sharp; $10,822.50 to Onderlaw; $29,549.00 to Baer Law; and $40,350.00 to Lawrence Kamin.

### iv. Expenses

Class Counsel are also entitled to reimbursement of reasonable litigation expenses. A request for reimbursement of litigation expenses is judged under the

72

same market-based standard as a fee petition; the Court must ask whether the expenses are in keeping with what "the private market would permit." *Synthroid I*, 264 F.3d at 722.

Class Counsel report that they have incurred $789,944.00 in litigation expenses throughout this case.[33] Given the scope and duration of the litigation and the Court's consideration of these costs, and in light of Class Counsel's attestations that they have endeavored to comply fully with the protocols listed in the Court's common benefit fee and expense order, Case Management Order No. 4 ¶¶ 5–7, 10, 13, the Court finds that their request for reimbursement of $789,944.00 in litigation expenses is reasonable and in line with private market standards and approves the request.[34]

---

[33] This figure reflects $651,433.09 in expenses independently incurred by the individual firms, and $138,510.53 in payments made from the TikTok Litigation Fund, to which each member of Co-Lead Counsel and the Executive Committee contributed $25,000 and $15,000, respectively. *See* Decl. Katrina Carroll Supp. Pls.' Pet. Award Attorneys' Fees ¶ 9, ECF No. 198; Case Management Order No. 4 ¶¶ 17–23, *In re TikTok* (N.D. Ill. Nov. 18, 2020), ECF No. 105.

[34] Specifically, the Court approves the reimbursement of litigation expenses to the individual firms as follows: $27,374.44 to Lynch Carpenter; $256,057.67 to Bird Marella; $611.10 to Fegan Scott; $309,218.63 to Glancy Prongay; $10,529.00 to Philips Erlewine; $11,555.07 to Freed Kanner; $1,871.63 to Susman Godfrey; $3,315.95 to Hausfeld; $9,867.45 to Bottini & Bottini; $1,511.10 to Burns Charest; $175.30 to Clifford Law Offices; $1,345.60 to Ahdoot & Wolfson; $1,076.00 to Consumer Protection Legal; $624.24 to Scott+Scott; $688.30 to Foot Mielke; $995.05 to Cafferty Clobes; $1,803.11 to Stephan Zouras; $1,928.08 to Tostrud Law Group; $1,767.35 to Wood Law Firm; $400.00 to Gordon Law Offices; $681.89 to Cotchett Pitre; $420.00 to DiCello Levitt; $4,523.92 to Bleichmar Fonti; $968.81 to Chimicles Schwartz; $1,401.44 to Girard Sharp; $705.06 to Onderlaw; and $16.90 to Lawrence Kamin.

### 3. Objector Mark S.'s Petition for Attorneys' Fees

Loevy & Loevy ("Loevy"), counsel for Mark S., also seeks fees. Courts have recognized that objectors "play an essential role in judicial review of proposed settlements of class actions" because their participation helps to ward off the possibility of collusion inherent in class action settlements and to ensure that the settlement terms adequately compensate the class for the value of their claims. *Pearson*, 772 F.3d at 787; *see In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 745 (7th Cir. 2018). Such "participation is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee." *Reynolds*, 288 F.3d at 288.

Because the purpose of permitting objectors to participate in the settlement approval process is to benefit the class, in order to be entitled to a fee award an objector must "produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class." *Id.* In determining whether to award fees to objectors' counsel, then, courts must distinguish objectors who actually add value to the settlement from those who "intervene[] for the purpose of getting paid to go away." *Vollmer v. Selden*, 350 F.3d 656, 661 (7th Cir. 2003).[35]

---

The Court also approves the reimbursement of $138,510.53 to Co-Lead Counsel for expert costs paid from the TikTok Litigation Fund and orders Co-Lead Counsel to distribute that sum amongst themselves and the Executive Committee in accordance with each firm's respective contribution to the fund, and pursuant to the procedures set forth in the common benefit fee and expense order. *See generally* Case Management Order No. 4.

[35] In this vein, Litteken also purported to reserve the right to seek attorneys' fees "should

Loevy claims that, were it not for Mark S.'s efforts to carve out the claims of class members under the age of thirteen ("under-13 class members") in this action from the release in *T.K.*, no under-13 class members would have been able to participate in this settlement. As a result, Loevy contends, Mark S. added at least $6,256,000—the prorated share of the common fund that is attributable to under-13 class members—in value to the settlement and requests twenty-five percent of that number, or $1,564,000, in fees.

The proposition that Mark S. is responsible for the ability of under-13 class members to participate in this settlement is without merit. As the *T.K.* court recognized in denying Loevy's fee petition based on nearly identical arguments there, in as early as the fall of 2020, Plaintiffs and Defendants had "'expressly negotiated the right of class members in the *T.K.* settlement class . . . to participate in the MDL settlement class'" in order to "eliminate any potential impact" of the *T.K.* settlement on this case, all without any input from Mark S. Joint Status Report at 3 (N.D. Ill. Oct. 30, 2020), ECF No. 99; *see T.K.*, 2022 WL 888943, at *27. While those negotiations were underway, Mark S.—far from working to preserve the rights of *T.K.* class members to participate in this settlement—in fact was requesting that the *T.K.* court enforce the *T.K.* preliminary injunction *against* class members in this case in

---

the Court sustain any of [his] objections." Objector Litteken's Provisional Pet. Service Award at 4, ECF No. 193. Because Litteken's objections to final approval of the settlement and to attorneys' fees have been overruled in their entirety, they have not made a material difference to the benefit of class members. Accordingly, the Court will not entertain any such motion.

order to get the MDL reassigned to the *T.K.* docket.  *See* Notice of Filing Ex. A, Objector Mark S.'s Mot. Enforcement Prelim. Inj. and Reassignment and Consolidation Related *TikTok* MDL, *T.K.*, No. 19 C 7915 (N.D. Ill. Sept. 9, 2020), ECF No. 59.  Given the considerable resources Mark S. expended in trying to unravel the settlement, the Court finds Mark S.'s contention that he was acting in the best interests of the classes in this case without merit.

Mark S. also argues that his counsel should receive a fee award because he was the first to propose the in-App notice.  While the Court is confident that the notice program would have satisfied the Rule 23 and due process requirements without the in-App notice, it nonetheless acknowledges that in-App notice conferred a material benefit to the settlement classes.  And the Court finds that Loevy does deserve some compensation for this contribution.

That being said, Loevy's fee request of $1,564,000 far exceeds that contribution.  The Court similarly declines to award Loevy their reported lodestar of $564,938.75, because Loevy's timesheets reveal that much of the work done in connection with this MDL was devoted to undermining the settlement by attempting to enforce the *T.K.* preliminary injunction.  *See In re Sw. Airlines*, 898 F.3d at 745 (citing *Mirfaishi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687–88 (7th Cir. 2008) (awarding objectors a small percentage of their requested fees after balancing the "very slight improvement" to the settlement against the objectors' "lack of constructive activity in the district court," *id.* at 687, and the "detriment caused by their courtroom antics." *Id.* at 688)).

76

Accordingly, the Court awards Loevy $100,000 in fees. Having reviewed Loevy's timesheets, the Court finds that this award approximates the percentage of Loevy's time that was devoted to improving the notice program. The Court will not award Loevy fees for any other work, because that work did not benefit (and indeed, in many cases attempted to harm) the class.

### 4. Incentive and Service Awards

Because a named plaintiff "is an essential ingredient of any class action," *Camp Drug Store*, 897 F.3d at 834 (internal quotation marks omitted), the Court may authorize incentive awards "when necessary to induce individuals to become named representatives." *Douglas*, 328 F.R.D. at 218 (quoting *Synthroid I*, 264 F.3d at 722). "To determine if an incentive award is warranted, a district court evaluates the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Camp Drug Store*, 897 F.3d at 834 (internal quotation marks and citation omitted).

Class Counsel seek an incentive award of $2,500 for each of the thirty-five named Plaintiffs.[36] At the outset of the cases, the thirty-five named Plaintiffs provided Class Counsel with extensive details about their use of the App, including when they downloaded it, how frequently they used it, whether they made any videos,

---

[36] The named Plaintiffs are: Katherine Czajka; Misty Hong; Aparna Iyer; Brandy Johnson; Morgan Kukovec; Karina Quinteiro; and Meghan Smith; and minors A.S. *ex rel.* Laurel Slothower; A.S. *ex rel.* A.S.; A.R.; G.R.; C.W.; I.W.; P.S.; M.T.W.; N.T.; L.T.; S.P.; J.P.; K.P.; G.P.; L.M.; A.J.; E.R.; R.S.; J.S.; S.A.; L.B.; L.P.; M.P.; A.O.; H.S.; K.M.; C.H.; and D.M.

whether their videos contain recordings of their faces, and whether they used any of the App's video editing features or facial filters in their videos. *See generally* Compl. ¶¶ 19–98. These disclosures of Plaintiffs' personal and private information substantially benefited the classes by validating Class Counsel's legal theories and helping them to understand the App's technology.

The named representatives also expended time and effort on the case after the settlement agreement was reached by approving Class Counsel's pleadings and continuing to assist in confirmatory discovery. And these efforts resulted in substantial benefited the class as well.

Lastly, empirical data indicates that the requested incentive awards are modest. A study of approximately 1,200 class actions showed that the median incentive award per plaintiff was $5,250, over twice the amount Class Counsel requests here. 5 RUBENSTEIN § 17:8 tbl.1. Thus, the Court finds the request of $2,500 per named Plaintiff to be reasonable and appropriate.

Mark S. and Litteken also seek service awards of $2,500 and $1,000, respectively. *See In re Nat'l Collegiate Athletic Ass'n*, 332 F.R.D. at 228–29 (awarding service awards to objectors). For the reasons stated above, the Court concludes that Mark S. benefitted the class to some degree by advocating for in-App notice, but not to the degree of the named Plaintiffs. Accordingly, the Court provides him with a service award of $1,500.

As for Litteken, the Court is not convinced that he deserves as much credit for the in-App notice, given that Mark S. was the first to raise the issue. Nevertheless,

because Litteken's insistence on in-App notice impacted the Court's assessment of the costs and benefits of it, the Court finds that Litteken's request for a $1,000 service award is appropriate, and it is granted.

### III.    Conclusion

For the reasons stated above, the Court certifies the Nationwide Class and Illinois Subclass; grants the motion for final approval of the Settlement Agreement [195]; and grants the petitions for fees and service awards [193][197][201] to the extent stated above.  Additionally, the motion to accept opt-outs [207] is granted.  Co-Lead Counsel is instructed to provide a proposed final order within the next five days.


**IT IS SO ORDERED.**                          **ENTERED:  7/28/22**

_____
**John Z. Lee**
**United States District Judge**

79

# EXHIBIT 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: TIKTOK, INC.,**<br>**CONSUMER PRIVACY**<br>**LITIGATION** | **MDL No. 2948**<br><br>**Master Docket No. 20 C 4699**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Sunil R. Harjani** |
| **This Document Relates to All Cases** | |

## ORDER AND FINAL JUDGMENT GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT

WHEREAS, this matter came before the Court on Plaintiffs' Motion for Final Approval of Class Action Settlement, ECF No. 195, and Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards, ECF No. 197.

WHEREAS, unless otherwise defined, all terms used herein have the same meanings as set forth in the Settlement Agreement, ECF No. 122-1.

WHEREAS, after carefully considering the motions, all supporting papers, the arguments of counsel, and all objections, the Court issued a Memorandum Opinion and Order granting final approval of the Settlement Agreement and Plaintiffs' fee petition on July 28, 2022 ("Final Approval Order"), ECF No. 261.

Now, in consideration of the entire record herein, IT IS HEREBY ORDERED THAT:

1. <u>Jurisdiction</u>. This Court has subject matter jurisdiction over this action and personal jurisdiction over the Parties in this action.

2.    <u>Class Certification</u>. The Nationwide Class and Illinois Subclass, as defined in the Court's Preliminary Approval Order, ECF No. 161, and the Final Approval Order, are certified for settlement purposes only pursuant to Federal Rule of Civil Procedure 23, and are defined as follows:

**NATIONWIDE CLASS**

All persons who reside in the United States who used the App—the TikTok video sharing application (or its Musical.ly predecessor) distributed in the United States—prior to September 30, 2021.

**ILLINOIS SUBCLASS**

All persons who reside in the State of Illinois and used the App—the TikTok video-sharing application (or its Musical.ly predecessor) distributed in the U.S.—in the State of Illinois to create videos prior to September 30, 2021.[1]

Certification of the Settlement Class is appropriate pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth in the Preliminary Approval Order and the Final Approval Order.  Specifically, the Court concludes that: the Settlement Class is so numerous that joinder of all members is impracticable; there are questions of fact or law common to the Settlement Class; Plaintiffs' claims are typical of the claims of the Settlement Class Members that Plaintiffs

---

[1]    Excluded from the Settlement Class are: (i) TikTok, its parent, subsidiaries, successors, affiliates, officers, and directors; (ii) the judge(s) to whom the Civil Actions are assigned and any member of the judge's or judges' immediate family; (iii) persons who have settled with and released TikTok from individual claims substantially similar to those alleged in the Civil Actions; (iv) persons who submit a valid and timely Request for Exclusion; and (v) all Class Counsel and counsel of record in the Civil Actions.

seek to represent; Plaintiffs are capable of fairly and adequately protecting the interests of all members of the Settlement Class; and common questions of law and fact predominate over questions affecting only individual persons in the Settlement Class. Accordingly, the Settlement Class appears to be sufficiently cohesive to warrant settlement by representation, and certification of the Settlement Class appears to be superior to other available means for the fair and efficient settlement of the claims of the Settlement Class.

3. <u>Class Representatives</u>. The Court confirms the appointment of the following individuals as Class Representatives: Katherine Czajka; Misty Hong; Aparna Iyer; Brandy Johnson; Morgan Kukovec; Karina Quinteiro; and Meghan Smith; and minors A.S. *ex rel.* Laurel Slothower; A.S. *ex rel.* A.S.; A.R.; G.R.; C.W.; I.W.; P.S.; M.T.W.; N.T.; L.T.; S.P.; J.P.; K.P.; G.P.; L.M.; A.J.; E.R.; R.S.; J.S.; S.A.; L.B.; L.P.; M.P.; A.O.; H.S.; K.M.; C.H.; and D.M.

4. <u>Plaintiffs' Counsel.</u> The Court confirms the appointment of the following attorneys to represent the Settlement Class in the following roles: Katrina Carroll, Ekwan Rhow, and Elizabeth Fegan as Co-Lead Counsel; Shannon Marie McNulty as Liaison Counsel; and Jonathan Jagher, Megan E. Jones, Michael Gervais, Amanda K. Klevorn, and Albert Y. Chang as the remaining members of the Plaintiffs' Executive Committee.

5. <u>Notice</u>. The Class Notice was disseminated in accordance with the procedures required by the Court's Order Granting Preliminary Approval, ECF No. 162, as set forth in the Declaration and Supplemental Declaration of Steven Platt of Angeion Group LLC Re: Settlement Administration, ECF Nos. 196, 241,

in accordance with applicable law, satisfied the requirements of Rule 23(e) and due process, and constituted the best notice practicable for the reasons discussed in the Preliminary Approval Order and Final Approval Order.

6. <u>Fairness Hearing</u>. The Court held a Fairness Hearing on May 18, 2022 to consider the fairness, reasonableness, and adequacy of the proposed Settlement, and adequate notice of the proceedings was given to Settlement Class Members, with a full opportunity to participate in the Fairness Hearing.

7. <u>Objections</u>. The Court has carefully considered and overruled any objections to the Settlement as reflected in its Final Approval Order.

8. <u>Fairness of the Settlement</u>. The Court concludes that the Settlement is a fair, reasonable, and adequate compromise of the claims asserted in this action for the reasons set forth in the Final Approval Order. Specifically, the Court has considered each of the factors in Rule 23(e)(2) and each of the factors set forth in *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014). The factors the Court has considered include: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of [the] settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) [the] stage of the proceedings and the amount of discovery completed." *Id*. The Court has found that these factors supported final approval. The Court has also carefully considered Plaintiffs' request for 33.33% of the gross Settlement Fund in attorneys' fees to Class Counsel plus actual costs; and $2,500 for each Class Representative as service

awards in connection with this Action.

9.　<u>Plaintiffs' Attorneys' Fees</u>. The Court concludes that attorneys' fees and costs should be awarded from the net settlement fund of $87,843,787.95 as calculated in the Final Approval Order. The Court concludes that one-third of the net settlement fund, which amounts to $29,279,203.44, is reasonable under Rule 23 for the award of attorneys' fees based on, *inter alia,* the amount of work performed in this case and the risk involved. Further, the lodestar cross-check, as set forth in the Final Approval Order, confirms the reasonableness of the award. The Court orders the allocation of the fee award as set forth in the Final Approval Order.

10.　<u>Litigation Expenses</u>. The Court finds that Class Counsel's request for reimbursement of $789,944.00 in litigation expenses is reasonable under Rule 23 and in line with private market standards, and orders reimbursement of the same as set forth in the Final Approval Order.

11.　<u>Objectors' Fees</u>. The Court further awards objector Mark S's counsel, Loevy & Loevy ("Loevy"), $100,000 in attorney's fees, which is reasonable based on Loevy's timesheets, because it approximates the percentage of Loevy's time that was devoted to improving the notice program for the benefit of the Class.

12.　<u>Service Awards</u>. Finally, the Court approves the request for service awards of $2,500 for the Class Representatives, $1,500 to objector Mark S., and $1,000 to objector Litteken, as reasonable under Rule 23, and awards payment as set forth in the Final Approval Order.

13.     <u>Effect of Vacatur on Class Certification</u>. If the Final Approval Order is set aside, materially modified, or overturned by this Court or on appeal, and is not fully reinstated on further appeal, this Order certifying a Settlement Class shall be vacated *nunc pro tunc*.

14.     <u>Binding of Parties</u>. All Parties are bound by the Final Approval Order, this Order and Final Judgment, and the Settlement Agreement.

15.     <u>Monetary Relief</u>. The Court orders the Parties to distribute the proceeds of the Settlement Fund to Class Members who filed valid claims according to the process set forth in the Plan of Allocation, ECF No. 122-3.

16.     <u>Affirmative Obligations</u>. Pursuant to the Settlement Agreement, §§ 6.1–6.4, the parties have agreed that Defendants shall refrain from the following, unless disclosed in the TikTok Privacy Policy:

    a.  Using the TikTok App ("App") to collect or store a user's biometric information or identifiers (as defined by applicable law);

    b.  Using the App to collect geolocation or GPS data;

    c.  Using the App to collect information in user's clipboards;

    d.  Using the App to transmit United States user data outside of the United States;

    e.   Storing United States user data in databases outside of the United States; or

    f.  Pre-uploading United States user-generated content.

Additionally, Defendants are required to:

g.  Delete all pre-uploaded user-generated content collected from users who did not "save" or "post" the content;

h.  Require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter; and

i.  Provide a written verification under oath of compliance with the foregoing within ninety (90) days of the Effective Date of the Settlement Agreement.

17.  <u>Binding of Class Members</u>. All Class Members, except those who timely opted out and as otherwise set forth in the Final Approval Order, are bound by the Final Approval Order and this Order and Final Judgment.

18.  <u>Motion to Accept Opt-Outs</u>. With respect to the 851 requests for exclusion in Exhibit B and Exhibit E to the motion to accept opt-outs, ECF No. 207, that were previously deemed invalid by the Settlement Administrator Angeion as "mass" opt-outs, the Court orders Angeion to accept these 851 opt-out requests, subject to a determination that they meet the remaining opt-out criteria enumerated on page 42 of the Final Approval Order.

19.  <u>Amendments to Settlement Agreement</u>. The Parties are authorized, without further approval from the Court, to agree to and adopt such amendments, modifications, and expansions of the Settlement Agreement as (i) shall be consistent in all material respects with the Final Order and Judgment and (ii) do not limit the rights of the Parties or Class Members.

20.  <u>Dismissal of Actions</u>. The Court dismisses, on the merits and with

prejudice, the above-captioned action, all member cases related to and/or consolidated with this action, and all claims currently pending before it belonging to Class Members who did not request exclusion from the Class in the time and manner provided for in the Class Notice ("Settlement Class Members").

21. <u>Release of Plaintiffs' Claims</u>. As of the Effective Date of the Settlement Agreement, Plaintiffs' Releasing Parties (as defined in the Settlement Agreement) irrevocably release, waive, and forever discharge and hold harmless Defendants' Released Parties of and from any and all Released Claims (as defined in the Settlement Agreement), which they have or may hereafter have.

22. <u>Release of Defendants' Claims</u>. As of the Effective Date of the Settlement Agreement, Defendants' Releasing Parties (as defined in the Settlement Agreement) irrevocably release, waive, and forever discharge and hold harmless Plaintiffs' Released Parties of and from any and all liabilities, claims, cross-claims, causes of action, rights, actions, suits, debts, liens, contracts, agreements, damages, costs, attorneys' fees, losses, expenses, obligations, or demands of any kind whatsoever, whether known or unknown, existing or potential, or suspected or unsuspected, whether raised by claim, counterclaim, setoff, or otherwise, including any known or unknown claims, which they have or may claim now or in the future to have, relating to the institution, prosecution, or settlement of the Civil Action, except for claims relating to the enforcement of the Settlement or this Agreement, and for the submission of false or fraudulent claims for Settlement benefits.

23. <u>Exclusive Remedy</u>. Upon issuance of the Final Approval Order and

this Order and Final Judgment: (i) the Settlement shall be the exclusive remedy for Settlement Class Members; (ii) Defendants' Released Parties shall not be subject to liability or expense of any kind to any of Plaintiffs' Releasing Parties for reasons related to the Civil Actions except as set forth herein; and (iii) Plaintiffs' Releasing Parties shall be permanently barred from initiating, asserting, or prosecuting any and all released claims against Defendants' Released Parties.

24.  No Further Litigation. All members of the Class who did not make a valid request for exclusion in the time and manner provided in the Class Notice, or as otherwise set forth in the Final Approval Order, are barred from commencing or prosecuting any action, suit, proceeding, claim or cause of action in any jurisdiction or court against Defendants' Released Parties based upon, relating to, or arising out of, any of the Released Claims.

25.  Use of Settlement Agreement. Neither the Settlement Agreement, nor any acts performed in furtherance of the Settlement Agreement, nor any documents executed in furtherance of the Settlement Agreement may be deemed or used as evidence of an admission or other statement supporting: (a) the validity of any claim made by Plaintiffs, Class Members, or Class Counsel (including the appropriateness of class certification); (b) any wrongdoing or liability of the releasees; or (c) any fault or omission of the releasees in any court, administrative agency, or other proceeding. Further, neither the Settlement Agreement (nor any Addendum thereto) shall be offered or be admissible in evidence against Defendants' Released Parties or cited or referred to in any action or proceeding,

9

except in an action or proceeding that is in furtherance of its terms or brought to enforce its terms.

26.     <u>Effect of Vacatur</u>. If this Order and Final Judgment, other than those portions relating in any way to the award of attorneys' fees, costs, expenses, or incentive awards, is set aside, materially modified, or overturned by this Court or on appeal, and is not fully reinstated on further appeal, this Order and Final Judgment shall be deemed vacated and shall have no force or effect whatsoever.

27.     <u>Continuing Jurisdiction</u>. Without affecting the finality of the Final Approval Order or this Order and Final Judgment in any way, the Court reserves continuing jurisdiction over matters relating to the Settlement, including, without limitation, the administration, interpretation, effectuation and/or enforcement of the Settlement, the Settlement Agreement, and this Final Order and Judgment.

28.     <u>Corrections</u>. Pursuant to Federal Rule of Civil Procedure 60(a), the Court hereby corrects the names and parent companies of the defendants in the Civil Actions as displayed on the Court's docket and in the Final Approval Order to reflect the correct and current legal names of those entities as follows: (i) the correct name of the entity named in the Civil Actions as "TikTok, Inc." is "TikTok Inc."; (ii) the correct name of the entity named in the Civil Actions as "Musical.ly" or "TikTok, Ltd." is "TikTok Ltd."; (iii) the correct name of the entity named in the Civil Actions as "Beijing ByteDance Technology Co., Ltd." or "Beijing ByteDance Technology Co. Ltd." is "Beijing Douyin Information Service Co. Ltd."; (iv) the correct name of the entity named in the Civil Actions as "ByteDance, Inc."

is "ByteDance Inc."; and (v) the correct name of the foreign parent company of TikTok Ltd. that is not a named defendant in the Civil Actions but that is named as "ByteDance, Inc." on page 1, line 8 of the July 28, 2022 Final Approval Order is "ByteDance Ltd.," a Cayman Islands company.

**IT IS SO ORDERED.**           **ENTERED: 8/22/22**

_____
**John Z. Lee**
**United States District Judge**

# EXHIBIT 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

NATE RAHN, individually and on behalf of
all others similarly situated,

     Plaintiff,

Case No. _____

v.

**JURY TRIAL DEMANDED**

TIKTOK, INC., a California corporation, and
BYTEDANCE INC., a Delaware corporation,

    Defendant.

## COMPLAINT - CLASS ACTION

Plaintiff Nate Rahn ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok") and ByteDance, Inc. ("ByteDance") (collectively, "Defendants"), and in support thereof alleges the following:

## INTRODUCTION

1. This is a class action brought against Defendants for surreptitiously intercepting the private electronic communications of users of TikTok's social media application (the "TikTok app") and its integrated website browser (the "in-app browser") without their consent. Defendants intercept these private electronic communications in violation of the Federal Wire Tap Act, 18 U.S.C. § 2510, *et seq.* by embedding JavaScript code into the third-party websites that are accessed using TikTok's in-app browser, which enables Defendants to track users' mouse movements, clicks, keystrokes (*e.g.*, text being entered into an information field or text box), URLs of web pages visited, and other electronic communications in real time (collectively, "Website Communications").

1

2.     Plaintiff brings this action individually and on behalf of a class of all natural persons in the United States whose Website Communications were intercepted by Defendants while using the TikTok in-app browser to visit third-party websites, and seeks all civil remedies provided under the Federal Wire Tap Act, including but not limited to appropriate equitable and/or declaratory relief, damages in an amount to be determined at trial (assessed as the greater of (a) the sum of actual damages suffered by Plaintiff and the proposed Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of $100 per day per violation or $10,000, whichever is greater), and reasonable attorneys' fees and costs.

## PARTIES

3.     **Plaintiff** Nate Rahn is a citizen of the state of Illinois, and at all times relevant to this action, resided and was domiciled in Cook County, Illinois. Plaintiff is a citizen of Illinois.

4.     **Defendant ByteDance, Inc**. is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California. Defendant ByteDance, Inc. is a wholly owned subsidiary of ByteDance, Ltd., a Cayman Islands corporation.

5.     **Defendant TikTok, Inc. f/k/a Musical.ly, Inc.** ("TikTok, Inc.") is, and at all relevant times was, a California corporation with its principal place of business in Culver City, California.[1] Defendant TikTok, Inc. also maintains offices in Palo Alto, California and Mountain View, California.[2] The name change from Musical.ly, Inc. to TikTok, Inc. occurred in May 2019. Defendant TikTok, Inc. is a wholly owned subsidiary of TikTok, LLC, which in turn is a wholly

---

[1] https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[2] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/;
https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

owned subsidiary of TikTok, Ltd. And TikTok, Ltd. – like Defendant ByteDance, Inc. – is a wholly owned subsidiary of ByteDance, Ltd.

<u>**JURISDICTION AND VENUE**</u>

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, namely the Federal Wire Tap Act, 18 U.S.C. §§ 2510 *et seq.*

7.      This Court has personal jurisdiction over Defendants because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Illinois. The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed towards citizens of Illinois while they were located within Illinois. At all relevant times, Defendants knew that their practices would directly result in collection of information from Illinois citizens while those citizens used the TikTok in-app browser. Defendants chose to avail themselves of the business opportunities of making their services specifically available in Illinois and collecting real-time data from TikTok users located in Illinois, and the claims alleged herein arise from those activities.

8.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

<u>**FACTUAL ALLEGATIONS**</u>

A.      **TikTok Becomes A Global Phenomenon With A Strong Presence In The United States.**

9.      Musical.ly, now known as TikTok, is a highly popular social media and social networking app that was first launched in 2014. The Musical.ly app allows users to create short

videos of themselves and share them with friends.[3]

10.   The Musical.ly app provides tools that users can utilize to create and edit their videos. It also provides a large library of music from which users may select background music for their videos.

11.   Beyond creating and sharing of videos, the Musical.ly app provides a platform through which users can interact by, among other things, commenting on other users' videos and "following" their accounts. Users also can send direct messages to communicate with one another on the app.

12.   By November 2017, the Musical.ly app had 60 million monthly active users.[4]

13.   At approximately the same time, another entity, Beijing ByteDance, launched its own app in China called "Douyin," which roughly mirrored the Musical.ly app.[5] By 2017, shortly before its purchase of Musical.ly, Beijing ByteDance introduced an English-language version of the Douyin app under the name "TikTok" for use outside of the China market.

14.   After acquiring Musical.ly, Beijing ByteDance combined the Musical.ly app with its TikTok app in 2018, merging all existing accounts and data into a single app under the retained "TikTok" name.[6] Therefore, Musical.ly and TikTok apps are collectively referred to herein as the "TikTok app," and Musical.ly and TikTok users are collectively referred to as "TikTok users."

15.   The TikTok app has become "one of the world's fastest-growing social media

---

[3] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123.

[4] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123; https://www.nytimes.com/2019/11/01/technology/tiktok-national-security-review.html.

[5] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[6] http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

platforms" and a "global phenomenon."[7]

16.    According to the *Washington Post*, by November 2019 the TikTok app had been downloaded more than 1.3 billion times worldwide, and more than 120 million times in the United States.[8] By April 2020, *TechCrunch* reported that the number of worldwide TikTok app downloads had surpassed 2 billion, and that in "the quarter that ended on March 31, TikTok was downloaded 315 million times — the highest number of downloads for any app in a quarter."[9] By many accounts, the TikTok app is the most downloaded non-game app in the world.[10]

17.    As of the third quarter of 2022, TikTok had 1.5 billion monthly active users.[11] The average user opened the TikTok app more than 8 times per day and spent approximately 45 minutes on the app daily as of March 2019.[12]

18.    TikTok's massive global presence has also reached the United States. As of August 2020, TikTok admitted to having more than 100 million monthly active users in the United States.[13] Some estimates indicate there are 123.8 million active users of TikTok in the United States.[14] In other words, over one-third of the United States' 328.2 million population has used TikTok, and approximately 50 million Americans use TikTok every day.[15]

---

[7] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[8] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[9] https://techcrunch.com/2020/04/29/tiktok-tops-2-billion-downloads/.

[10] https://www.cnbc.com/2019/07/25/china-camera-apps-may-open-up-user-data-to-beijing-government-requests.html.

[11] https://www.demandsage.com/tiktok-user-statistics/.

[12] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[13]    Complaint for Injunctive and Declaratory Relief, ¶ 19, *TikTok Inc. v. Donald J. Trump et al.*, No. 2:20-cv-7672, (C.D. Cal. Aug. 24, 2020), ECF No. 1, available at: https://cdn.vox-cdn.com/uploads/chorus_asset/file/21812645/document__1_.pdf (hereafter "*TikTok v. Trump*").

[14] *See* https://commercialfreechildhood.org/wp-content/uploads/2020/05/tik_tok_complaint.pdf.

[15] *TikTok v. Trump*, ¶ 21.

### B. TikTok Profits From Monetizing Users' Personal Data

19.     The "world's most valuable resource is no longer oil, but data."[16] In today's world, the  ability to obtain and utilize customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that businesses who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[17]

20.     Unsurprisingly, consumers' personal data has inherent, measurable value. The Organization for Economic Cooperation and Development ("OECD") previously estimated the prices for various elements of personal data, including $0.50 USD for an address, $2.00 USD for a date of birth, $8.00 USD for a social security number, $3.00 USD for a driver's license number, and $35.00 USD for a military record. [18]

21.     TikTok's financial success is due in large part to its ability to obtain and utilize consumers' personal financial information to create targeted advertising that it runs through the TikTok app.  Thus, this targeted advertising relies upon TikTok's knowledge of each of its user's personal preferences.[19]

22.     Using highly invasive and secretive practices, Defendants have unlawfully collected private personal information about TikTok's users that Defendants then monetize

---

[16] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.

[17] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[18] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[19] https://www.digitaltrends.com/social-media/tiktok-advertiser-audience-network-targeted-ads/.

through advertising.

23.     As a result of these practices, TikTok was able to generate an estimated $4.6 billion in revenue in 2021, a 142% increase year-over-year.[20]

**C.     Prior Privacy Concerns Regarding Musical.ly/TikTok's Data Use Practices**

**1.     The 2019 FTC Action**

24.     On February 27, 2019, the United States, on behalf of the Federal Trade Commission ("FTC"), filed a lawsuit against Musical.ly alleging it had violated the Children's Online Privacy Protection Act ("COPPA") by collecting and using personal data from children under age 13 without the required notice and consent from parents or guardians.[21] According to the FTC, Musical.ly's violations were knowing and willful, as it received numerous complaints from concerned parents. In fact, in a two-week period in September 2016, Musical.ly received more than 300 complaints from angry parents demanding that Musical.ly close their children's accounts.[22] While Musical.ly closed the accounts, they did not delete the minors' videos or profile information from their servers.[23]

25.     Ultimately, Musical.ly stipulated to an order requiring, among other things, payment of a $5.7 million civil penalty and injunctive relief regarding the collection and destruction of children's personal data.[24] This fine is the largest civil penalty ever imposed for such

---

[20] https://www.businessofapps.com/data/tik-tok-statistics/.

[21] *United States of America v. Musical.ly and Musical.ly, Inc.*, United States District Court, Central District of California, Case No. 2:19-cv-1439 [ECF No. 1]

[22] *Id*. at ¶ 21.

[23] *Id*.

[24] *United States of America v. Musical.ly and Musical.ly, Inc.*, United States District Court, Central District of California, Case No. 2:19-cv-1439 [ECF No. 10].

a violation.[25] According to the FTC, "[i]n our view, these practices reflected the company's willingness to pursue growth even at the expense of endangering children."[26]

26.    Musical.ly's compliance with the FTC stipulation has been called into question. In 2020, the FTC renewed its interest in Musical.ly and TikTok, going as far as to issue an order requiring TikTok to provide information regarding how it collects and uses its users' personal information, as well as information regarding TikTok's advertising practices. [27]

27.    In 2020, the FTC further issued a joint statement explaining that social media companies like TikTok "have been able to exploit their user-surveillance capabilities to achieve such significant financial gains that they are now among the most profitable companies in the world." Moreover, social media companies' "constant access" to users' mobile devices allows them "to monitor where users go, the people with whom they interact, and what they are doing."[28]

### 2.    The United States Senate

28.    In October 2019, United States Senators Charles Schumer and Tom Cotton sent a letter to the Acting Director of National Intelligence describing the "national security" risks posed by the TikTok app. In that letter, the Senators noted there was evidence that Defendants may share private and personally identifiable user data and content with the Chinese government:

> TikTok's terms of service and privacy policies describe how it collects data from its users and their devices, including user content

---

[25] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861; https://www.techinasia.com/tiktok-owner-bytedance-gathers-1-billion-monthly-active-users-apps.

[26] https://www.nbcnews.com/tech/tech-news/tiktok-pay-5-7-million-over-alleged-violation-child-privacy-n977186.

[27] https://www.ftc.gov/news-events/press-releases/2020/12/ftc-issues-orders-nine-social-media-video-streaming-services.

[28] https://www.ftc.gov/system/files/documents/reports/6b-orders-file-special-reports-social-media-video-streaming-service-providers/joint_statement_of_ftc_commissioners_chopra_slaughter_and_wilson_regarding_social_media_and_video.pdf

and communications, IP address, location-related data, device identifiers, cookies, metadata, and other sensitive personal information. While the company has stated that TikTok does not operate in China and stores U.S. user data in the U.S., ByteDance is still required to adhere to the laws of China.

Security experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party. … With over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore. Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok … and brief Congress on these findings.[29]

29.     Similarly, at a hearing held by the Senate Judiciary Subcommittee on Crime and Terrorism, United States Senator Josh Hawley stated in opening remarks: "TikTok should answer … to the millions of Americans who use their product with no idea of its risks."[30] Chairman Hawley also told reporters that: "The idea that TikTok is not sharing data, is not taking direction from Beijing, that just does not appear to be true."[31]

30.     Later, in May 2020, a bipartisan group of prominent United States Senators wrote to the FTC that, "[f]aced with compelling evidence that this wildly popular social media platform is blatantly flouting binding U.S. privacy rules, the FTC should move swiftly to launch an investigation and forcefully hold violators accountable."[32]

### 3.   The 2020 Illinois Biometric Information Privacy Act Litigation

31.     In December 2020, TikTok and related companies were sued for their alleged violation of the Illinois Biometric Information Privacy Act (BIPA), a state statute prohibiting

---

[29] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats; https://www.cotton.senate.gov/?p=press_release&id=1239.
[30] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.
[31] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.
[32] https://www.reuters.com/article/us-tiktok-privacy-usa-children/u-s-senators-urge-probe-of-tiktok-on-childrens-privacy-idUSKBN2352YD.

private companies from collecting, capturing, purchasing, or otherwise obtaining a person's biometric identifiers or information without proper authorization. That case settled for $92 million.

**D.     TikTok Collects Users' Website Communications Without Their Consent**

32.     People generally access websites using their preferred or default internet browsers, such as Google's Chrome or Apple's Safari. But while using the TikTok app, websites are opened by TikTok's in-app browser instead. Thus, when a TikTok user clicks on a link while using the TikTok app, the website opens in the TikTok in-app browser rather than the user's preferred or default internet browser for that particular device.

33.     TikTok's in-app browser was specifically designed to insert JavaScript code into any third-party website that users access while using the in-app browser. The inserted JavaScript code, in turn, intercepts, records, and copies all Website Communications made by the user while interacting with the third-party website accessed using TikTok's in-app browser.[33] This includes, among other things, every click, keystroke, or mouse movement made by the user while interacting with the third-party website.

34.     For example, in the case of a user who visits a third-party website to make a purchase, the JavaScript code could intercept, record, and copy the user's name, address, telephone number, date of birth, and credit card information, as well as the user's username and password for the third-party website. In the case of a user's visit to a healthcare provider, the JavaScript code could intercept private and sensitive health-related information about the user's physical

---

[33] *See* Felix Krause, *iOS Privacy: Instagram and Facebook Can Track Anything You Do on Any Website in Their In-App Browser*, KRAUSEFX.COM (August 10, 2022), https://krausefx.com/blog/ios-privacy-instagram-and-facebook-can-track- anything-you-do-on-any-website-in-their-in-app-browser.

and/or mental health.

35.    Neither the TikTok user nor the third-party website which the user visited consents to the insertion of this JavaScript code.

**E.    Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

36.    Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[34]

37.    Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[35] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[36]

38.    Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

39.    A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be

---

[34] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

[35] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[36] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

required to provide consumers with a complete list of the data that has been collected about them.[37]

40.  Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[38]

41.  Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[39]

## CLASS ACTION ALLEGATIONS

42.  Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> *All natural persons in the United States who used TikTok's in-app browser to visit websites external to the app.*

43.  Excluded from the class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

44.  **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may

---

[37] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[38] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

[39] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

be obtained from the books and records of Defendants.

45.     **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to: (a) whether Defendants used JavaScript code to intercept and record Plaintiff's and the proposed Class's Website Communications with third-party websites while using TikTok's in-app browser; (b) whether Defendants violated the Federal Wire Tap Act; (c) whether the Website Communications at issue constitute "electronic communications" for purposes of the Federal Wire Tap Act; (d) whether Defendants derive a benefit or information from interception of Plaintiff's and the proposed Class's Website Communications; (e) whether TikTok's use of JavaScript code as described herein constitutes a "device" used to intercept or record private electronic communications; (f) whether Defendants acquired the contents of Plaintiff's and the proposed Class's private Website Communications without their consent; (g) whether Plaintiff and the proposed Class had a reasonable expectation of privacy in their Website Communications with third-party websites while using TikTok's in-app browser; and (h) whether Plaintiff and the proposed Class are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

46.     **Typicality:** Plaintiff's claims are typical of the other proposed Class members' claims because, among other things, all proposed Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the proposed Class had their Website Communications intercepted in violation of privacy federal law. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the proposed Class typical of one another.

47.     **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has retained counsel

competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the proposed Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the proposed Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the proposed Class.

48.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

49.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the proposed Class. If Defendants intercepted Plaintiff's and the proposed Class's private Website Communications, then Plaintiff and each proposed Class member suffered damages by that conduct.

50.    **Ascertainability:** Members of the proposed Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified

14

through Defendants' books and records.

### CLAIM FOR RELIEF
### Violation of the Federal Wire Tap Act
### 18 .S.C. §§ 2510, *et seq.*

51.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

52.     Plaintiff brings this claim individually and on behalf of the Class.

53.     The Federal Wire Tap Act provides a private right of action against those who intentionally intercept, attempt to intercept, or otherwise procuring any person to intercept any wire, oral, or electronic communications.

54.     As described above, Defendants intercepted Plaintiff's and the proposed Class's Website Communications whenever they utilized TikTok's in-app browser to communicate with third-party websites using the JavaScript code inserted by TikTok, including every mouse movement, click, keystroke (*e.g.*, text being entered into an information field or text box), URL visited, and other electronic communication. These Website Communications – which comprise the transfer of signs, signals, writing, images, sounds data, and/or intelligence transmitted in whole or in party by wire, radio, electromagnetic, photoelectric or photo-optical system – constitute "electronic communications" under the Federal Wire Tap Act and were copied by Defendants contemporaneously, in real time.

55.     Defendants sought to intercept Plaintiff's and the proposed Class's Website Communications with third-party websites in order to obtain the personal information and data about Plaintiff and the proposed Class contained in the contents of the Website Communications.

56.     Defendants purposely and consciously wanted to intercept these Website Communications as part of their business model designed to monetize the personal information and data obtained from these Website Communications. Defendants derive revenue from their ability to monetize such personal information to target advertising, which was accomplished using

JavaSctipt code intentionally designed and engineered for that very purpose. Interception of these Website Communications was in Defendants' self-interest.

57.     Defendants intercepted these Website Communications using a device or apparatus—*i.e.*, the JavaScript code inserted by TikTok whenever a user of the TikTok app interacted with a third-party website using TikTok's in-app browser—which was used to acquire the contents of users' Website Communications. These interceptions were made contemporaneously by Defendants as the Website Communications were made.

58.     When communicating electronically with these third-party websites, Plaintiff and the proposed Class reasonably believes and expected these Website Communications to be private.

59.     Defendants intercepted Plaintiff's and the proposed Class's Website Communications at the time of transmission without the consent of Plaintiff, the proposed Class, or the third-party websites visited.

60.     As a result of the Federal Wire Tap Act violations described herein, Plaintiff and the proposed Class have been damaged and are entitled to: (1) appropriate equitable and/or declaratory relief; (2) damages in an amount to be determined at trial (assessed as the greater of (a) the sum of actual damages suffered by Plaintiff and the proposed Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of $100 per day per violation or $10,000, whichever is greater); and (3) reasonable attorneys' fees and costs.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A.     Certifying the Class and appointing Plaintiff as the Class representative;

B.     Appointing Plaintiff's counsel as class counsel;

C.     Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.     Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.     Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.     Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.     Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.     Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.     Granting such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

DATE: December 27, 2022               Respectfully submitted,

_/s/ Jonathan Jagher_
Jonathan M. Jagher
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
610.234.6486
jjagher@fklmlaw.com

Katrina Carroll
**LYNCH CARPENTER, LLP**
111 W. Washington St.

17

Suite 1240
Chicago IL 60602
312.750.1265
katrina@lcllp.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
gklinger@milberg.com

# EXHIBIT 12

# BEFORE THE UNITED STATES JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| *In re: TikTok In-App Browser Privacy Litigation* | MD No. 3067 |

# PLAINTIFF NATE RAHN'S
# <u>RESPONSE TO MOTION TO TRANSFER</u>

## I.    INTRODUCTION

Plaintiff Nate Rahn ("Plaintiff"), the Plaintiff in *Rahn v. TikTok, Inc., et al.*, No. 1:22-cv-07256 (N.D. Ill.), pursuant to 28 U.S.C. § 1407 and Panel Rule 6.1(d), through the undersigned counsel, hereby submits this Response to the Motion to Transfer. ECF No. 1. Plaintiff agrees that centralization is appropriate and necessary here but the Northern District of Illinois is the best situs for all of the cases, rather than the Central District of California, as Movant suggests.  The six related cases (the "Member Cases") span the 2,500 mile entirety of the continental United States, with cases in the Southern District of New York, District of New Jersey, Eastern District of Pennsylvania, Northern District of Illinois, and Central District of California.  Most parties will be required to travel to prosecute this case, regardless of the venue chosen, but the Northern District of Illinois represents the most central location and the only location where every party is less than five hours away by air.

## II.    BACKGROUND

Plaintiff's action, like all other actions in the Member Cases, stems from Defendants'—TikTok Inc. and Bytedance Inc. (collectively "TikTok" or "Defendants")—unlawful practice of surreptitiously intercepting Plaintiff's and other consumer's private electronic communications in violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* and analog state causes of action. All Member Cases are based on the same core allegations. As one of the world's fastest-growing social media companies, TikTok has been installed over 100 million times in the United States. *Rahn* Complaint (ECF No. 16-3) ¶¶ 15–16.  The "world's most valuable resource is no longer oil, but data," *id.* ¶ 19, and TikTok has wasted no time leveraging the viewing habits and private data of its millions of users.  *Id.* ¶¶ 19–21.  In particular, the TikTok app serves links clicked by its users through an in-app browser instead of users' preferred or default internet browsers, *id.* ¶ 32,

1

and TikTok in turn designed its in-app browser to intercept, record, and copy all users' web browsing activity, *id.* ¶ 33. This highly invidious design no doubt benefits TikTok's bottom line, but it also violates the Federal Wiretap Act and similar state law statutes. *Id.* ¶¶ 51–60.

All of the Member Cases were filed within weeks of each other. Plaintiff Recht filed his complaint in *Recht v. TikTok Inc., et al.*, Civ. 22 No. 08613 (C.D. Cal.) on November 25, 2022. The other five Member Cases were all filed in December of 2022. Plaintiff Kowalski filed her complaint in *Kowalski v. TikTok Inc., et al.*, Civ. 22 No. 04947 (E.D. Penn.) on December 13 in the Eastern District of Pennsylvania. Plaintiff E.K. (a minor) filed their complaint in *E.K. v. TikTok Inc., et al.*, Civ. 22 No. 10574 (E.D.N.Y.) in the Eastern District of New York on December 14.

Plaintiff Recht filed his Motion for Transfer and Consolidation of Actions Pursuant to 28 U.S.C. § 1407 to the Central District of California on December 15, 2022. ECF No. 1. Thereafter, Plaintiff Fleming filed her complaint in *Fleming v. TikTok Inc., et al.*, Civ. 22 No. 07370 (D.N.J.) in the District of New Jersey on December 19, 2022, Plaintiff Arroyo filed her complaint in *Arroyo v. TikTok Inc., et al.*, Civ. 22 No. 09300 (C.D. Cal.) in the Central District of California on December 22, 2022, and Plaintiff Rahn filed his complaint in *Rahn v. TikTok Inc., et al.*, Civ. 22 No. 07256 (N.D. Ill.) in the Northern District of Illinois on December 27, 2022.

## III. ARGUMENT

### A. The Litigation Satisfies the Requirements for Consolidation and Transfer Under 28 U.S.C. § 1407.

Pretrial transfer and consolidation under § 1407 is appropriate and necessary here. The privacy rights of millions of people are at stake, and the cases filed against TikTok—the most recent of which was filed mere weeks ago—are likely to be numerous. Moreover, they involve the same allegations and legal standards. All of the actions allege similar violations, including, but not limited to, the Federal Wiretap Act, against TikTok based on the same in-app browser and a single

set of policies, practices, and procedures. All of the actions generally seek certification of a similar

class of persons. Unless these cases are consolidated, the parties will incur excessive costs due to

duplicative discovery and will face the risk of inconsistent rulings.

### 1. **The Litigation Involves Common Questions of Fact.**

In assessing the appropriateness of consolidation under § 1407, the Panel looks to the

pleadings to determine the extent to which common questions of fact are present. The Complaints

in these cases clearly present common questions of fact. Each Complaint is based on allegations

that TikTok, through its in-app browser, secretly monitored, recorded, and monetized the

electronic communications and web browsing history of all of its users. *See Rahn* Compl ¶ 1

("Defendants intercept [users'] private electronic communications . . . by embedding JavaScript

code into the third-party websites that are accessed using TikTok's in-app browser, which enables

Defendants to track users' mouse movements, clicks, keystrokes [], URLs of web pages visited,

and other electronic communications in real time."); *E.K.* Compl. (ECF No. 1-5) ¶ 3 ("through a

covert JavaScript code, [TikTok] tracks every single detail of a user's [in-app web browser]

activity."); *Fleming* Compl. (ECF No. 5-3) ¶ 4 ("the in-app browser inserts JavaScript code into

the websites visited by TikTok users . . . to track every detail about TikTok users' website

activity"); *Kowalski* Compl. (ECF No. 1-6) ¶¶ 1 ("Defendants employ JavaScript computer code

to track users' every move as they browse the Internet from within the TikTok app"); *Recht* Compl.

(ECF No. 1-4) ¶¶ 3–4 (TikTok's "in-app browser inserts JavaScript code into the websites visited

by TikTok users. The clear purpose of the JavaScript code inserted into these websites is to track

every detail about TikTok users' website activity.."); *Arroyo* Compl. (ECF No. 11-3) ¶ 4 ("As

users browse a third-party website from within the TikTok app, they do so via TikTok's in-app

web browser (with no option to use the mobile phone's default web browser), and [TikTok]

intercepts and records the user's electronic communications.").

Further, the Complaints seek certification of similar, nationwide classes. The Class is defined in the *Rahn* Complaint as:

> All natural persons in the United States who used TikTok's in-app browser to visit websites external to the app.

*Rahns* Compl. ¶ 42. The Classes are identically or nearly identically defined in the other Member Cases. *Compare id.*; *with Recht* Compl. ¶ 145 (same); *Fleming* Compl. ¶ 106 (same); *Arroyo* Compl. ¶ 50 (same); *Kowalski* Compl. ¶ 46 (defining a class of all citizens of Pennsylvania who used TikTok's in-app browser while in Pennsylvania); *E.K.* Compl. ¶ 48 (defining the class as all minors who used TikTok's in-app browser). Accordingly, this factor is easily satisfied.

## 2. **The Parties Face Duplicative Discovery Absent Transfer and Consolidation**.

Because the factual and legal allegations of each of the cases are essentially the same, the parties face duplicative discovery if the cases are not consolidated and transferred. This is an important consideration for the Panel in that transfer and consolidation "ensure that the actions are supervised by a single judge who, from day-to-day contact with all aspects of the litigation, will be in the best position to design a pretrial program that will prevent duplicative discovery . . . and substantially conserve the time and efforts of the parties, the witnesses and the federal judiciary." *Resource Exploration Inc. Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980). The parties in these actions will necessarily engage in duplicative discovery. All Plaintiffs will be seeking the same discovery from TikTok and will likely request to depose the same witnesses. In response, TikTok will raise the same class certification and discovery objections, seek the same protective orders and assert the same privileges in each case. However, if the Panel consolidates and transfers the cases, the parties will be able to coordinate their efforts and thus save all parties—and the courts— time and money.

3.  **Transfer and Consolidation Will Prevent Inconsistent Pretrial Rulings**.

The Panel considers the possibility of inconsistent rulings on pretrial issues because of the possible *res judicata* or collateral estoppel effects on other cases. *See In re Enron Securities Derivative & ERISA Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (granting a transfer in part to prevent inconsistent pretrial rulings, particularly with respect to questions of class certification). Because of the similarity of the allegations in the Complaints, and the likelihood that future filed actions will contain the same or similar allegations, the possibility of inconsistent rulings on pretrial motions is substantially increased. TikTok is likely to present the same pretrial motions in each action and assert the same discovery objections and privileges. As an example, Plaintiff anticipates that TikTok will file motions to dismiss and/or for summary judgment. Inconsistent rulings on those dispositive motions would pose a serious problem, in that the putative Class is generally the same in each action. Additionally, because of the similarity in the allegations, TikTok will assert the same defenses in opposition to the various Member Case Plaintiffs' claims, creating a real risk of inconsistent pretrial rulings. In light of this, it would be in the best interests of all involved—the parties, the witnesses, and the courts— to transfer and centralize these actions.

4.  **There is Sufficient Numerosity to Support Transfer and Centralization.**

There are already six Member Cases pending, and it can be reasonably anticipated that more will follow. This is a high-profile case that has already received a great deal of pretrial publicity, new plaintiffs continue to file additional cases daily, and numerous actions will likely be filed against TikTok in a multitude of districts, making transfer and consolidation essential. In any event, the Panel has routinely ordered transfer and consolidation of three or fewer cases. *See In re Wireless Telephone Replacement Protection Programs Litig.,* 180 F. Supp. 2d 1381, 1382 (J.P.M.L. 2002) (granting transfer and centralization of three consumer protection

cases and determining that pending motions can be presented to and decided by the transferee judge); *In re Philadelphia Life Ins. Co. Sales Practices Litig*., 149 F. Supp. 2d 937, 938 (J.P.M.L. 2001) (granting transfer of two deceptive insurance sales cases and finding that such transfer would promote the just and efficient conduct of the litigation); *In re Amoxicillin Patent & Antitrust Litig.*, 449 F. Supp. 601, 603 (J.P.M.L. 1978) (granting transfer of three cases involving patent and antitrust issues); *In re Alodex Corp.*, 380 F. Supp. 790, 791 (J.P.M.L. 1974) (granting transfer of three securities actions). There is therefore sufficient authority for the transfer and consolidation of the actions given the number of currently pending Member Cases against TikTok, even without more cases being filed.

**B.    The Northern District of Illinois is the Best Transferee Forum.**

Movant's Motion to Transfer was filed before the *Rahn* Complaint, and so the *Recht* Plaintiff did not have the chance to weigh the benefits of the Northern District of Illinois, but especially with the addition of an Illinois named Plaintiff, the Northern District of Illinois is the most central and accessible court for consolidation of pretrial proceedings.  As the Panel has noted, "there is . . . something to be said for the convenience of a geographically central forum in coast-to-coast litigation."  *See, e.g., In re Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968) (case in which constituent actions spanned the country, with many actions in California and on the East Coast, which was to the Northern District of Illinois).

In addition, Defendants conduct substantial business in the Northern District of Illinois, including placing its app into the stream of commerce directed at millions of consumers within the Northern District of Illinois and within the State of Illinois.  *Rahn* Compl. ¶ 7. Because the named Plaintiffs in the Member Cases live across the United States and used TikTok's in-app browser in New York, New Jersey, Pennsylvania, Illinois, and California, the Northern District of Illinois is the most- logical "center of gravity" for all of the actions.  The district is a natural

6

mid-point between all named Plaintiffs. It is a highly accessible and convenient location for all parties to the Member Cases because it is located in Chicago, a metropolitan area with a major airport in central proximity to Defendant's headquarters on the West coast and Member Case Plaintiffs' places of residence outside of Illinois on the West and East coasts. *See In re Sonic Corp. Customer Data Sec. Breach Litig.,* 276 F. Supp. 3d 1382, 1383 (J.P.M.L. 2017) (centralizing cases in "a centrally-located and easily accessible location"); *In re Nat'l Prescription Opiate Litig.,* 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) (same); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 228 F. Supp. 2d 1379, 1381 (J.P.M.L. 2002) (transferring to the district which was "an accessible and convenient location for [the] parties.").

Furthermore, Defendants are similarly nationally situated with major operations in both Los Angeles and New York,[1] and offices in between including in Nashville, Tennessee[2], Austin, Texas[3] and Chicago, Illinois.[4] Defendants thus will hardly be inconvenienced if the Panel transfers the actions to the Northern District of Illinois. Nor will the named Plaintiffs in California, who will have far less to travel than the Pennsylvania and New York parties who would otherwise have to catch a 6+ hour cross-country flight to Los Angeles.

Finally, while the Panel often weighs when each action was filed, the Member Cases were filed within approximately a month of one another, and so no case is substantially more developed than the others. *See In re: Skechers Toning Shoe Prod. Liab. Litig.*, 831 F. Supp. 2d

---

[1] *See* https://www.tiktok.com/about?lang=en (last visited January 9, 2023).

[2] *See* https://www.bizjournals.com/nashville/news/2022/01/26/report-tiktok-leases-3-floors.html (last visited January 10, 2023).

[3] *See* https://austonia.com/tiktok-downtown-austin-tower (last visited January 10, 2023).

[4] *See* https://www.chicagobusiness.com/commercial-real-estate/tiktok-plans-chicago-hiring-spree-eyes-fulton-market-office (last visited January 10, 2023).

1367, 1370 (U.S. Jud. Pan. Mult. Lit. 2011) (first-filed actions are favored where the action is "filed several months before most other actions.").

## IV.   CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that all actions be consolidated and transferred to the Northern District of Illinois.

Dated: January 10, 2023                                    Respectfully submitted,

                                                           /s/ *Jonathan Jagher*
                                                           Jonathan M. Jagher
                                                           **FREED KANNER LONDON**
                                                           **& MILLEN LLC**
                                                           923 Fayette Street
                                                           Conshohocken, PA 19428
                                                           610.234.6486
                                                           jjagher@fklmlaw.com

                                                           Katrina Carroll
                                                           **LYNCH CARPENTER, LLP**
                                                           111 W. Washington St.
                                                           Suite 1240
                                                           Chicago IL 60602
                                                           312.750.1265
                                                           katrina@lcllp.com

                                                           Gary M. Klinger
                                                           **MILBERG COLEMAN BRYSON**
                                                           **PHILLIPS GROSSMAN, PLLC**
                                                           227 W. Monroe Street, Suite 2100
                                                           Chicago, Illinois 60606
                                                           Telephone: (866) 252-0878
                                                           gklinger@milberg.com

                                                           *Counsel for Plaintiff Nate Rahn*

# EXHIBIT 13

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

October 12, 2022

*By the Court*:

| No. 22-2682 | IN RE:<br><br>    TIKTOK INC., CONSUMER PRIVACY LITIGATION<br><br>APPEAL OF: STEVEN F. HELFAND |
|---|---|
| **Originating Case Information:** | |
| District Court No: 1:20-cv-04699<br>Northern District of Illinois, Eastern Division<br>District Judge John Z. Lee | |

Upon consideration of the **ROUTINE MOTION FOR VOLUNTARY DISMISSAL OF APPEAL**, filed on October 11, 2022, by counsel for Plaintiffs' Co-Lead Counsel, Defendants' Lead Counsel, and Steven F. Helfand.

**IT IS ORDERED** that this case is **DISMISSED**, pursuant to Federal Rule of Appellate Procedure 42(b).

CERTIFIED COPY

A True Copy
Teste:

form name: **c7_FinalOrderWMandate**      (form ID: **137**)

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION, | MDL No. 2948 |
| | Master Docket No. 20-cv-4699 |
| | Judge John Z. Lee |
| | Magistrate Judge Sunil R. Harjani |
| This Document Relates to All Cases | |

## DECLARATION OF EKWAN E. RHOW
## IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

I, Ekwan E. Rhow, under oath, declare and state as follows:

1.      I am a principal with Bird Marella Boxer Wolpert Nessim Drooks Lincenberg & Rhow, P.C. and one of the court-appointed Co-Lead Counsel.

2.      I submit this declaration in support of the motion for preliminary approval of the proposed class action settlement, including the September 4, 2020 Settlement Agreement and Release ("Settlement Agreement") as clarified by Addendum No. 1 to Settlement Agreement and Release ("Addendum") (collectively, "the Settlement").

3.      I, along with members of the court-appointed leadership group, have undertaken extensive analyses of the claims and defenses in this case, as well as the underlying facts (as probed by our extensive pre-filing investigation, formal discovery, confirmatory discovery, and the involvement of highly regarded technical experts and consultants), the benefits conferred by the Settlement, and the risks associated with continued litigation. Based on that comprehensive assessment, and my experience litigating complex class actions, I believe the Settlement is fair, reasonable, and adequate for the Nationwide Class and Illinois Subclass.

1

### A. **I have significant prior legal experience relevant to this case.**

4.     Class actions have been a significant area of my 25-plus years of practice. I personally have litigated and resolved numerous class actions involving the automotive, electronics, telecommunications, financial services and apparel industries with potential liabilities ranging from $100 million to $1 billion. Clients of mine in this area include Samsung, Hyundai and Vizio. My class action experience also includes serving as lead trial counsel for a class of current and former account and sales manager employees of IBM-spinoff Lexmark. We prevailed on behalf of plaintiffs and the class in Lexmark after a lengthy trial and again on appeal.

5.     My firm and I also have substantial experience representing at least a dozen major Chinese corporations, as well as Chinese individuals and others doing business in China and the United States. I personally have represented numerous Chinese and Asian entities in various litigations and international arbitrations, as well as individuals doing business in China. Through these varied experiences, I have developed knowledge of the Chinese government and its unique relationship with Chinese companies.

6.     I also have had a long personal and professional interest in privacy issues attendant to new and emerging technologies. My personal interest in data privacy litigation and my familiarity with source code arose from two prior copyright infringement actions. I represented a start-up Korean company that invented a certain type of keystroke encryption security software designed to protect one's privacy and private data. At trial in one of these cases, I cross-examined several witnesses concerning the keystroke encryption technology and its source code. On the morning of closing arguments, we reached a favorable settlement agreement that resolved the case. The jury was polled and indicated its intent to award damages in the eight figures. As a result of these lawsuits involving data privacy issues, I developed

2

personal relationships with executives and technical teams who focus on this area. Those relationships have led to my litigating other matters touching on data privacy, including other class actions on behalf of U.S. and Asia-based companies.

7. I have substantial experience in litigating cutting-edge complex civil matters and leading the teams of lawyers that handle them. In over 25 years of practice, following my graduation from Stanford University and Harvard Law School, I have tried over 40 cases as lead counsel to a final verdict or award, and have litigated to resolution numerous other complex civil cases. I am a Fellow of the American College of Trial Lawyers, I have been named by Benchmark Litigation as one of the top 20 trial lawyers in California and one of the top 100 trial lawyers in the United States, and I have been recognized by Chambers & Partners as a "trial expert" who is often called upon to "undertake high-profile work" and "bet-the-firm litigation."

**B. My team and I performed substantial work developing this case prior to the September 2020 leadership appointment.**

8. Beginning in 2018, before the Congressional investigations of TikTok became trending news, my colleague and Senior Counsel Marc Masters and I began to suspect the existence of, and initiated research on, privacy issues relating to a number of smartphone applications, including TikTok and its predecessor Musical.ly. This research, including technical expert investigation, led me and Mr. Masters to suspect the app was misappropriating private and personally-identifiable user data and transferring it to servers in China.

9. We continued this internal investigation, but when it became clear the issues and the potential class action might have nationwide and even global implications, we decided a broader coalition of lawyers would be necessary to address the full scope of any violations of law. That coalition would need to cooperate, leverage resources, and develop a comprehensive complaint to remedy the myriad threats to U.S. users our investigation was uncovering.

10. Accordingly, in early 2019, we reached out to Glancy Prongay & Murray LLP, which has a strong national reputation in the class action space. Our collective efforts, which started in early 2019, included:

- working closely with highly trained source code experts in analyzing multiple versions of the Musical.ly and TikTok apps to uncover (1) the various types of private and personally-identifiable data taken by defendants and third-party entities whose software development kits and analytic libraries are secretly embedded within the apps, and (2) the domestic and foreign destinations of such misappropriated data;

- collecting and analyzing numerous iterations of the TikTok terms of use and privacy policies upon which defendants might rely for their arbitration and consent defenses, and developing the arguments and evidence necessary to counter those defenses;

- thoroughly researching the defendant corporations – with the aid of two teams of investigators in California and in China, an ESI expert, and colleagues with Chinese-language skills to translate documents – to better understand defendants' corporate structure, document and data collection and retention systems, internal reporting systems, business and advertising models, artificial intelligence and patent development programs, and other relevant foreign and domestic activities, all of which is relevant to establishing the statutory and common law violations, the class's damages, defendants' unjust enrichment, and the alter ego defense to the foreign defendant companies' anticipated personal jurisdiction challenge;

- consulting with well-credentialed experts who have conducted original research into the intersection of data privacy, artificial intelligence, Chinese corporations and the Chinese government, including Chinese laws requiring corporations to share data with the government; and

- researching numerous legal issues in the data privacy field as they relate to this case – such as (1) jurisdiction and venue; (2) potential causes of action; (3) standing; (4) damages; (5) injunctive relief; (6) notice and consent, and (7) arbitration and class action waivers – to craft our November 27, 2019 complaint and our May 11, 2020 amended complaint.

11.     After the extensive investigation above, my firm, in concert with Glancy Prongay, filed the first class action against TikTok in this MDL, and publicly announced our intention to amend to add Illinois clients and an Illinois Biometric Information Privacy Act ("BIPA") claim on April 15, 2020.

12.     In early 2020, my firm and Glancy Prongay began collaborating with Phillips Erlewine Given & Carlin, LLP to develop the factual and legal foundation for a BIPA claim. Our three firms invested substantial time and resources to this end, including hiring another highly trained source code expert and a biometrics expert with notable experience in BIPA litigation, both of whom helped to develop the unlawful face geometry scanning allegations.

13.     The 89-page amended *Hong* complaint was the first-filed BIPA claim against the China-based defendants, and the only one served on them prior to this Court's appointment of leadership. It contains extremely thorough BIPA allegations incorporated into the final Consolidated Amended Class Action Complaint pending before this Court, focusing not just on the app's conspicuous Augmented Reality ("AR") features, but also on other allegations of BIPA violations (and violations of other statutes and common law), such as:

- the functionality and code of the TikTok app, including (1) content recommendations based on TikTok users' race/ethnicity and age; (2) scans of face geometry to determine TikTok users' age; (3) censoring video content to remove

5

people defendants consider "ugly"; (4) code for deepfake videos; and (5) code for age, race/ethnicity and emotion recognition;

- ongoing work in China, including (1) the application of facial recognition technology to TikTok users' videos by highly-trained engineers skilled in computer vision, convolutional neural network and machine learning; (2) patent applications for face, voice, age, race/ethnicity and emotion recognition technologies; and (3) the publicly-known functionality of the Chinese version of TikTok (Douyin) that allows its users to perform facial recognition on faces selected by such users from other users' videos; and

- the defendants' legal and political obligations to accumulate and share vast troves of data, including biometrics, in order to assist the Chinese government in achieving world dominance in artificial intelligence, and population surveillance and control.

14. My firm, along with Glancy Prongay and Phillips Erlewine, participated in an April 6, 2020 mediation of the eight original claims and the BIPA claim before former United States District Judge Layn Phillips. Preparation for this mediation involved additional technical expert work, further developing responses to defendants' anticipated motions, and formulating specific changes to defendants' business practices that would bring them into compliance with applicable law.

15. My firm and Glancy Prongay also served eight sets of discovery on defendants prior to mediation, and defendants responded to each. Additionally, we negotiated and agreed to a protective order with defendants to facilitate discovery.

16. Although we had informed the Honorable Lucy H. Koh, before any BIPA cases were filed, that we would be amending our complaint to add a BIPA claim, we teamed up with

the first firms to file such a claim against the domestic defendants: Hausfeld LLP and Burns Charest LLP. After follow-on cases were filed, Judge Koh consolidated all of those cases filed in the Northern District of California into *In re: TikTok, Inc. Privacy Litigation*.

17. On July 14, 2020, before *In re: TikTok, Inc. Privacy Litigation* was transferred to this Court, I was appointed interim lead counsel pursuant to Fed.R.Civ.P. 23(g). Judge Koh also appointed an executive committee consisting of me and one lawyer from each of the other four firms in our original group: Glancy Prongay, Phillips Erlewine, Hausfeld, and Burns Charest.

18. I worked closely with this group of experienced lawyers and their colleagues. We added a Video Privacy Protection Act claim to an amended complaint based on original work we performed with our experts concerning TikTok's transmission of users' video viewing histories to Facebook and Google. This work was also incorporated into the final Consolidated Amended Class Action Complaint pending before this Court.

### C. Co-Lead Counsel engaged in months of continued negotiations with defense counsel and improved upon an already substantial recovery.

19. Co-Lead Counsel gave careful, critical attention to the confirmatory discovery Plaintiffs obtained as part of the Settlement Agreement. For example, experts and consultants that various teams had retained prior to the Court's leadership appointment were brought together to exchange ideas and assess one another's analyses. The consultants contributed to and cross-checked one another's requests for information made via interrogatories, and jointly assessed TikTok's responses.

20. That feedback led to a candid question-and-answer session between Co-Lead Counsel, TikTok's counsel, and Plaintiffs' source code expert – in which Plaintiffs' expert was given further free rein to probe TikTok's relevant technology, source code (both in terms of scope and with questions stemming from the expert's findings), and answers to the deposition on

written questions. The parties' discussions and negotiations regarding confirmatory discovery continued after that meeting, also contributing to the settlement.[1]

21.     Prior to reaching an agreement on the Addendum, Co-Lead Counsel engaged with defense counsel countless times – via phone calls, video conferences, emails, and the exchange of revisions and draft documents – in hard-fought, post-mediation negotiations. In many ways, that process benefited from the Leadership Group's varying perspectives and the reality that TikTok had to present settlement terms, provide insight into the companies' operations, and engage in confirmatory discovery that met the expectations of a diverse amalgamation of highly experienced class action and privacy counsel.

22.     Through that process, which took place over six months, Co-Lead Counsel were able to improve upon the terms of the original Settlement Agreement with the new Addendum, including with respect to the following:

          a.          **Definition of "TikTok."** For example, the Settlement Agreement includes an array of injunctive relief regarding TikTok's treatment of its users' data, as well as a provision requiring TikTok to initiate privacy compliance training. Settlement Agreement, § 6. The Leadership Group had questions about the application of the injunctive relief provisions to the other defendants, TikTok's affiliates. Though the Settlement Agreement refers to "TikTok" alone, the Addendum redefined "TikTok" to make clear that the injunctive relief applies to *all* of the defendants who were engaged in the operation of the App or who are involved in receiving or accessing user data obtained through the App. Addendum, § 2.5 (clarifying that references to "TikTok" in the injunctive relief section apply to Defendants' Released Parties).

          b.          **Definition of "the App."** As another example, the Settlement Agreement

---

[1] Additional details about confirmatory discovery are provided in the contemporaneously filed declaration of Co-Lead Counsel Katrina Carroll.

includes injunctive relief prohibiting TikTok from "us[ing] the App" to collect, store, and/or transmit various categories of private user data – absent disclosure and compliance with all applicable laws. Settlement Agreement, § 6.1. It also includes other provisions regarding "the App," including a warranty that TikTok does not use the App to collect biometric information or identifiers. Settlement Agreement, § 7.1. The Leadership Group expressed concern regarding whether the use of the word "App" was an appropriate limitation that would exclude TikTok's conduct after user data left the App and was transmitted to TikTok's servers. The Addendum now makes clear that settlement provisions regarding the "App" go beyond the application's operation on class members' devices, i.e., "device-side" operations, and extend to "server-side" operations" as well. Addendum, § 2.1.

      c.    **The Warranty.** The Settlement Agreement includes a "Warranty" representing that "TikTok . . . has not used the App to collect biometric identifiers or biometric information as defined by the Illinois Biometric Information Privacy Act [BIPA]" and providing for confirmatory discovery on that issue. Settlement Agreement, § 7.1. However, the Leadership Group questioned, for example, whether TikTok used something other than "the App" (e.g., TikTok's servers) to collect biometric data and whether the parties had a mutual understanding as what data qualified as "biometric identifiers or biometric information" under BIPA. The Addendum addresses those questions and eliminates ambiguity as to the scope of the warranty and TikTok's conduct. The Warranty now represents that many of the features underlying Plaintiffs' claims are non-identifying. In other words, TikTok acknowledges that it engages in functions like "image landmarking operations used for special effects and demographic classification, speech-to-text operations used to generate text of words spoken in a video, and similar non-identifying operations" (which Plaintiffs contend is biometric data)—but, per the

9

warranty, those are not used by TikTok to identify an individual. *Id.*

        d.     **Privacy Compliance Training.** As another example, the Settlement Agreement provides that TikTok will "require newly designed training on compliance with data privacy laws and company procedures for all relevant incoming employees and contractors, and annual training thereafter." Settlement Agreement, § 6.3. The Addendum does not leave that training program in TikTok's hands alone. Through the Addendum, the Settlement now requires that TikTok hire a third party to review the training program for a period of three years, and to provide a written verification of that review to Plaintiffs' counsel. Addendum, § 4.3.

        e.     **The VPPA.** In addition, the Addendum includes provisions prohibiting violations of the Video Privacy Protection Act (VPPA), § 4.1.1.

        f.     **Allocation.** The Addendum also makes clear that the determination regarding how settlement benefits are allocated among classes with divergent interests (i.e., among the Nationwide Class and Illinois Subclass) was not bound by the provisions in the Settlement Agreement. Addendum, § 3.1. As a result, Co-Lead Counsel appointed independent Subclass Counsel to negotiate the plan of allocation. Moreover, this independence eliminated any risk that Defendants' viewpoints as to the strength of Plaintiffs' claims, or their concerns about setting precedent for settlement valuation in other matters, could impact class members' recovery or upend the settlement.

     23.     In sum, Co-Lead Counsel conducted six months of thorough, research-intensive deliberations to assess the case and Settlement terms, and as a result of that process, now present to the Court a fair, reasonable, and adequate Settlement which offers the class $92 million and valuable injunctive relief.

10

I declare that the foregoing is true and correct.

Dated: February 24, 2021                                          */s/ Ekwan E. Rhow*

                                                                 Ekwan E. Rhow

# EXHIBIT 15

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Sterling Cluff (SBN 267142)
scluff@baronbudd.com
David Fernandes (SBN 280944)
dfernandes@baronbudd.com
Shannon Royster (SBN 314126)
sroyster@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333

Don Bivens (*pro hac vice* forthcoming)
don@donbivens.com
DON BIVENS PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: 602.708.1450

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Austin Recht, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TikTok Inc. (f/k/a Musical.ly, Inc.); ByteDance Inc.; Beijing Douyin Information Service Co. Ltd. a/k/a ByteDance Technology Co. Ltd.; and Douyin Ltd. a/k/a ByteDance Ltd.,<br><br>Defendants. | Case No. 2:22-cv-8613<br><br>**<u>CLASS ACTION</u>**<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION .................................................................1

II.   THE PARTIES ...................................................................................2

    A.   Plaintiff...............................................................................2

    B.   Defendants ..........................................................................3

    C.   Alter Ego And Single Enterprise Allegations...................4

III.  JURISDICTION AND VENUE........................................................4

    A.   Allegations Supporting Personal Jurisdiction over the Foreign Defendants ..................................................................5

IV.  GENERAL FACTUAL ALLEGATIONS .....................................16

    A.   TikTok's Business Model: Profits from Advertising by Monetizing User Data....................................................................18

    B.   Global Privacy Concerns Regarding TikTok's Data Use Practices ...........................................................................................20

        1.   Concerns in the U.S. ...............................................20

        2.   Concerns Abroad ....................................................26

        3.   Biometric Data Privacy Litigation.........................28

    C.   TikTok's Interception and Theft of Users' Sensitive, Personally Identifying Information Input into Third Party Websites..............29

    D.   The Data Collected in Defendants' In-App Browser Has Inherent Value to Plaintiff and Class Members .............................................46

    E.   Plaintiff and Class Members Have a Reasonable Expectation of Privacy in the Data Collected in Defendants' In-App Browser ....49

    F.   Plaintiff and Class Members Did Not Consent to the Collection of Data via the In-App Browser .......................................................51

V.   TOLLING..........................................................................................52

VI.  CLASS ACTION ALLEGATIONS ................................................................ 53

VII.  CALIFORNIA LAW APPLIES TO ALL CLASS MEMBERS ................... 55

VIII.  CLAIMS FOR RELIEF ............................................................................. 56

FIRST CLAIM FOR RELIEF ............................................................................. 56

SECOND CLAIM FOR RELIEF ......................................................................... 59

THIRD CLAIM FOR RELIEF ............................................................................ 61

FOURTH CLAIM FOR RELIEF ........................................................................ 63

FIFTH CLAIM FOR RELIEF ............................................................................. 65

SIXTH CLAIM FOR RELIEF ............................................................................ 68

SEVENTH CLAIM FOR RELIEF ...................................................................... 70

IX.  PRAYER FOR RELIEF ............................................................................... 71

X.  DEMAND FOR JURY TRIAL ...................................................................... 73

For his complaint against Defendants, Plaintiff, individually and on behalf of all others similarly situated, alleges as follows:

## I.  NATURE OF THE ACTION

1.      Plaintiff brings this proposed class action on behalf of all persons who downloaded TikTok, a social media application (the "TikTok app") [1], and used TikTok's in-app website browser ("in-app browser").

2.      This case exemplifies that the "world's most valuable resource is no longer oil, but data."[2]  Unbeknownst to Plaintiff and Class Members, Defendants TikTok Inc., ByteDance Inc., Beijing Douyin Information Service Co. Ltd. a/k/a ByteDance Technology Co. Ltd.., and ByteDance Ltd. (collectively, the "Defendants") invaded the privacy of Plaintiff and Class Members by secretly intercepting details and contents about Plaintiff and Class Members without their consent.

3.      At no time did Defendants disclose to Plaintiff and Class Members that TikTok users who access external websites via the TikTok app[3] use an in-app browser which is a sophisticated data collection mechanism.

4.      As described more fully below, the in-app browser inserts JavaScript code into the websites visited by TikTok users.  The clear purpose of the JavaScript code inserted into these websites is to track every detail about TikTok users' website activity.

5.      Through the use of its in-app browser, TikTok has secretly amassed massive amounts of highly invasive information and data about its users by tracking their activities on third-party websites.  Defendants have unlawfully intercepted private and personally identifiable data and content from TikTok users so that

---

[1] Also, at times hereinafter, "the app"

[2] *The World's Most Valuable Resource Is No Longer Oil, But Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data (emphasis added).

[3] At times hereinafter, "third-party website"

Defendants may generate revenue from use of this data. Through their clandestine tracking activities, Defendants have violated wiretap laws, unlawfully intruded upon users' privacy, violated their rights of privacy, and unjustly profited from their unlawful activities.

6. Plaintiff's class action complaint seeks to recover all available remedies, including statutory penalties, and redress the wrongs imposed by Defendants on Plaintiff and Class Members.

## II. THE PARTIES

### A. Plaintiff

Plaintiff Austin Recht is a citizen and resident of the State of California, currently residing in Culver City. Plaintiff downloaded the TikTok app and created his TikTok account in 2019 on his mobile device, an Apple iPhone. While using the TikTok app, Plaintiff Recht clicked on links to external, third-party websites. Plaintiff Recht purchased merchandise from a website provided in an advertisement. The link took him to a third-party website via the in-app browser where he completed his purchase and entered his private data, including his credit card information. Defendants surreptitiously collected data associated with Plaintiff's use of third-party websites without his knowledge or consent, including his contact and credit card information provided during Plaintiff's purchase of merchandise.

7. In August of 2022, Plaintiff discovered that TikTok collects data and monitors what users do on third-party websites via the in-app browser after reviewing an article on the internet. Prior to reviewing this article, Plaintiff did not know that his activity on third-party websites was accessed via TikTok's in-app browser and was being monitored by Defendants, nor did he know that his data regarding that activity was being captured and recorded by Defendants.

**B.    Defendants**

8.    **TikTok Inc. f/k/a Musical.ly, Inc.** ("TikTok Inc.") is, and at all relevant times was, a California corporation doing business throughout the United States, with its principal place of business in Culver City, California.  Defendant TikTok Inc. is a wholly owned subsidiary of TikTok, LLC.

9.    **ByteDance Inc**. ("ByteDance Inc.") is, and all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California. Upon information and belief, ByteDance Inc. operates in concert with TikTok Inc. to carry out instructions from the foreign Defendants relating to the TikTok app.  For example, based on LinkedIn profiles of ByteDance Inc., employees, these employees recruit applicants to work with them on research and development of software for the TikTok app.  Additionally, the "ByteDance" website displays job postings that specifically relate to the TikTok app.

10.    TikTok Inc. and ByteDance Inc. are collectively referred to as "the domestic Defendants."

11.    **Beijing Douyin Information Service Co. Ltd. a/k/a ByteDance Technology Co. Ltd**. ("Beijing ByteDance") is, and at all relevant times was, a privately held company headquartered in Beijing, China.  Beijing ByteDance is a wholly owned subsidiary of ByteDance Co., Ltd.

12.    **Douyin Ltd. a/k/a ByteDance Ltd.** ("ByteDance Ltd.") is and at all relevant times was, a privately held company incorporated in the Cayman Islands. ByteDance Ltd. is owned by Yiming Zhang and a number of institutional investors. ByteDance Ltd. owns 100% of Douyin Group (HK) Ltd. a/k/a ByteDance (HK) Co., Ltd., which is headquartered in Hong Kong, TikTok Pte. Ltd., TikTok Ltd., and ByteDance Inc.

13.    Beijing ByteDance and ByteDance Ltd are collectively referred to as "the foreign Defendants."

### C. **Alter Ego And Single Enterprise Allegations**

14.     At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer and/or alter ego of each of the other Defendants, and acted in the course and scope of such agency, partnership, and relationship and/or in furtherance of such joint venture. Each Defendant acted with the knowledge and consent of each of the other Defendants and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted, and/or participated in the acts or transactions of the other Defendants, as described below in Section III(A).

15.     At all relevant times, and in connection with the matters alleged herein, Defendants were controlled and largely owned by the same person, founder Yiming Zhang, and constitute a single enterprise with a unity of interest. Recognition of the privilege of separate existence under such circumstances would promote injustice, as described below in Section III(A).

### III.    <u>JURISDICTION AND VENUE</u>

16.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, i.e., the Wiretap Act, 18 U.S.C. §§ 2510 *et seq.*

17.     This Court also has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Classes are citizens of states in the United States and the foreign Defendants are subjects or citizens of foreign states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

18.     This Court has general jurisdiction over Defendants ByteDance Inc. and TikTok Inc. because they have their principal place of business in California.

19.     This Court has specific jurisdiction over Defendants because they (i) transact business in California; (ii) they have substantial aggregate contacts with

California; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in California; and (iv) purposely availed themselves of the laws California. This Court also has specific jurisdiction over the foreign Defendants for the additional reason that they exert substantial control over the domestic Defendants, as described below in Section III(A).

20. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

21. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims herein occurred in this district and because TikTok Inc. has its headquarters located in this district.

## A. Allegations Supporting Personal Jurisdiction over the Foreign Defendants

### 1. The Foreign Defendants have Pervasive Contacts with the U.S. and California

22. Plaintiff is informed and believes, based on information available in the public domain, including in news articles and reports described below, that China-based employees of the foreign Defendants and U.S. employees of the domestic Defendants perform work on and concerning the TikTok app that is at the center of this lawsuit, including the functionality and operation of the TikTok app that targets consumers in California and across the United States and the Chinese version of the app ("Douyin") that, on information and belief, the foreign Defendants operate in China. Defendants and their engineers have done significant coding for the TikTok app and its many versions and updates. The foreign and domestic Defendants collectively work together to sell, develop, and operate a version of the TikTok app for both Apple and Android mobile devices, available in the Apple and Google stores, respectively.

23.     ByteDance's website touts "we now have over 110,000 employees based out of more than 200 cities globally…our apps operate in 150 markets."  It then goes on to display the number of available jobs in each of its global offices. 13 of those offices are in the U.S., with 5 in California.  Upon information and belief, the "ByteDance" website is owned, controlled, and operated by Beijing ByteDance and ByteDance Ltd.  Upon information and belief, the foreign Defendants actively recruit and employ California personnel to perform work relevant to the TikTok app, including via job postings on U.S.-based job-search websites and via the "ByteDance" website, which is displayed in English.

24.     In October 2021, *GeekWire* reported on "ByteDance's" U.S. presence, noting that that the "TikTok parent" also has offices in several California cities: Mountain View, San Francisco, Los Angeles and—referencing the TikTok parent's "U.S. headquarters"—Culver City.[4]  Upon information and belief, this report describes the activities of Beijing ByteDance and ByteDance Ltd.

25.     TikTok has defended and filed a counter claim in trademark suits regarding the TikTok app in the Central District of California, Case No. 2:21-cv-06636, and in the Southern District of California, Case No. 3:21-cv-00626.  It also defended a contract lawsuit regarding the TikTok app in Delaware District Court, Case No. 1:20-cv-01272.

26.     TikTok specifically targets consumers in California and the United States with advertising that appeared on television in California and across the United States.[5]

---

[4] Todd Bishop, *Tiktok Parent Bytedance Sets Up Bellevue WA Office as First Official Presence in Seattle Area,* GEEKWIRE (October 12, 2021), https://www.geekwire.com/2021/tiktok-parent-bytedance-sets-bellevue-wa-office-first-official-presence-seattle-area/.

[5] *See* Sam Bradley, *TikTok on TV: What Does the Social Media Platform's Ad Spend Tell Us?*, THEDRUM.COM (April 27, 2021), https://www.thedrum.com/news/2021/04/27/tiktok-tv-what-does-the-social-video-

*Footnote continued on next page*

27.     ByteDance Ltd. holds several U.S. trademarks relating to the TikTok app, including its logo. It has also initiated and defended litigation in U.S. courts regarding the app, including in the Central District of California.

28.     Also, upon information and belief, at certain relevant times the foreign Defendants employed a vast number of content reviewers to review TikTok videos uploaded by U.S. and California users, and these reviewers had authority to take down any such videos if the content was deemed to be noncompliant with policies that were disseminated by Beijing ByteDance and ByteDance Ltd.  These substantial and recurring activities were directed toward U.S. and California users.

29.     Upon information and belief, the foreign Defendants regularly evaluate potential acquisitions in the U.S., and occasionally do transact to purchase certain U.S. companies and assets, like Musical.ly, the predecessor to the TikTok app.

## 2.     The Foreign Defendants Exert Substantial Control Over the Operations of the Domestic Defendants

30.     Upon information and belief, Defendant Beijing ByteDance and ByteDance Ltd., direct the operations of the domestic Defendants with respect to the TikTok app, and the domestic Defendants have reported to Defendant Beijing ByteDance and ByteDance Ltd.  The foreign Defendants have collected and analyzed data from the U.S. and California regarding the performance of various features of the TikTok app, and have worked with the domestic Defendants to address performance issues.

31.     Publicly available reports and articles reveal that executives and leaders in Beijing substantially control the operations of the entities whose names include "TikTok", which upon information and belief also includes ByteDance Inc., often referred to colloquially as simply "TikTok."  Upon information and belief, the

---

platform-s-ad-spend-tell-us; Todd Spangler, *TikTok Launches Biggest-Ever Ad Campaign as Its Fate Remains Cloudy*, VARIETY (August 18, 2020) https://variety.com/2020/digital/news/tiktok-advertising-brand-campaign-sale-bytedance-1234738607/.

executives and leaders in Beijing are employees of Beijing ByteDance and ByteDance Ltd., which are referred to colloquially in reports simply as "ByteDance" or described as the "parent" of "TikTok."

32.     Upon information and belief, with respect to Defendants' monitoring and censorship of content on the TikTok app, the foreign Defendants' management at Beijing ByteDance and ByteDance Ltd. have determined content review policies enforced in the domestic Defendants' offices; a content review manager in the same U.S. office was reporting to someone in China; and another content reviewer was required to seek authorization from someone in China in order to access non-published information about user accounts when content concerns arose.

33.     At various relevant times, the TikTok app has been advertised on television in California and throughout the United States.[6]  Based on the publicly available information detailed in this section, the foreign Defendants directed the domestic Defendants to create and implement these advertisements, which had to be approved by leadership in China at Beijing ByteDance and ByteDance Ltd.

34.     Upon information and belief, at certain relevant times, employees have held concurrent leadership positions at the domestic Defendants and Beijing ByteDance or ByteDance Ltd., and personnel freely transition roles between the domestic and foreign Defendants.

35.     The foreign and domestic Defendants share common executives.  For example, in April 2021, "TikTok" announced that Shouzi Chew, the CFO at ByteDance, would also take on the role of CEO of TikTok, thus holding leadership positions at both companies.[7]  The head of HR for "TikTok," Americas & Global Functions, Global Business Solutions also holds herself out in her LinkedIn profile in a concurrent role as Head of HR for "ByteDance," U.S & Europe,

---

[6] *See Id.*

[7] Molly Schuetz, *et al.*, *ByteDance's Shouzi Chew Named New TikTok CEO*, FORTUNE (April 30, 2021), https://fortune.com/2021/04/30/new-tiktok-ceo-bytedance-shouzi-chew/.

Monetization."[8]  LinkedIn profiles of several other non-executive level employees in roles such as global payment, global business development, software engineer, and legal also hold themselves out as working for both "TikTok" and "ByteDance" concurrently.[9]

36.     In a LinkedIn interview of Issac Bess and Gregory Justice, employees of Defendants, Bess identifies himself as responsible for leading "ByteDance" business development from Los Angeles and notes both are part of the "corporate development organization at ByteDance."  Justice notes he works on the content team for "TikTok" in the U.S.  Greg goes on to describe the "free flow of colleagues from China coming to the LA office or vice versa."[10]  Employees often have both a TikTok and a ByteDance email address.[11]

37.     U.S. employees of the domestic Defendants working in California are expected to "restart" their day and work during Chinese business hours to be available to the China-based foreign Defendants' employees.  One former project manager, employed at the domestic Defendants, revealed she was expected to regularly attend late night "Beijing meetings."[12]  This employee was also required to submit a last-minute product proposal regarding the app for approval to the "Beijing team"—after it had already been approved by U.S. leadership.  The "Beijing team" had the final say over whether the proposal would be implemented,

---

[8] https://www.linkedin.com/in/katemcfarlinbarney/ (last visited November 18, 2022).

[9] *See e.g.,* https://ie.linkedin.com/in/kingsleylam; https://www.linkedin.com/in/jordanlowy; https://www.linkedin.com/in/velicue; https://www.linkedin.com/in/carlawebb (last visited November 18, 2022).

[10] ByteDance, *LinkedIn Interviews ByteDance: How ByteDance Builds its Global Employer Brand*, YOUTUBE, (October 29, 2021), https://www.youtube.com/watch?v=Epp_TN52fSU.

[11] *Id.*

[12] Chloe Shih, *Why I Just Quit My Product Manager Job at TikTok*, YOUTUBE (October 11, 2021), https://www.youtube.com/watch?v=pkDXV2g_i7Y.

and without their approval, the project did not move forward. Upon information and belief, the "Beijing team" and "Beijing meetings" refer to employees at Defendant Beijing ByteDance and ByteDance Ltd. and during these meetings, Beijing ByteDance and ByteDance Ltd. employees direct, control, manage, and approve the operations of the domestic Defendants.

38. Employee testimonials demonstrate that the domestic Defendants do not operate as independent corporate entities. Instead, they function as mere satellite offices with little independence and are constantly monitored by Chinese management at, upon information and belief, Beijing ByteDance and ByteDance Ltd. In the words of one former employee, "TikTok product teams sit entirely within Bytedance's scope of influence," "product teams [are] inextricably tied to Beijing HQ," and noting the "heavy China dependency dynamic."[13] She reports that half of her team was located in China and meetings with them would start at 6pm, ending at midnight. She recounts that leadership reviews, which upon information and belief are meetings intended to review an employee's performance, would take place on Sunday or past 10 p.m. – Monday morning in Beijing or during regular Beijing business hours. Teams in the U.S. "directly roll up into China-based managers." Domestic Defendants' employees have also expressed difficulty with the Chinese-English language barrier due to the constant interaction and meetings between U.S. and Chinese employees. These same experiences have been shared and recounted by other former employees of the domestic Defendants.[14] Upon information and belief, these "China-based managers" are employees of Beijing ByteDance and ByteDance Ltd.

---

[13] Melody Chu, *What it's Really Like Working at TikTok: The Challenges,* MEDIUM.COM (April 4, 2022), https://medium.com/@melodychu/what-its-really-like-working-at-tiktok-the-challenges-part-3-9c6f6f04fae2.

[14] *See e.g.,* Georgia Wells, *et al., TikTok's Work Culture: Anxiety, Secrecy and Relentless Pressure,* THE WALL STREET JOURNAL (May 6, 2022), https://www.wsj.com/articles/tiktoks-work-culture-anxiety-secrecy-and-relentless-pressure-11651848638?mod=pls_whats_news_us_business_f.

39.    Upon information and belief, Beijing ByteDance and ByteDance Ltd. made decisions for the domestic Defendants,  and the domestic Defendants and these other offices were tasked with executing such decisions.  Beijing ByteDance and ByteDance Ltd. executives are also heavily involved in day-to-day decisions made for the domestic Defendants, including the TikTok app's development, and have access to U.S. users' data.  Beijing leadership also has the ability to control even minor daily decisions and human resource matters, such as the ability of the domestic Defendants' employees to work from home.  Product development is led by Beijing ByteDance and ByteDance Ltd. employees.  Several publicly available reports and articles describe that employees of the domestic Defendants in California are tethered to the foreign Defendants' Chinese leadership teams on nearly a daily basis, as described above.

40.    Although publicly available information reveals Beijing ByteDance and ByteDance Ltd.'s control over the operations of the U.S. subsidiaries, leaked information shows that the foreign Defendants have attempted to hide this information.  "Multiple TikTok sources, who spoke with The Intercept on the condition of anonymity …, emphasized the primacy of ByteDance's Beijing HQ over the global TikTok operation, explaining that their ever-shifting decisions about what's censored and what's boosted are dictated by Chinese staff, whose policy declarations are then filtered around TikTok's 12 global offices, translated into rough English."[15]  Censorship guidelines emanate from China and have mandated the censorship of U.S. videos ranging from those regarding Tiananmen Square to those in violation of the so-called "ugly-content policy," where domestic Defendants' employees are required to censor because they are "not worthing [*sic*] to be recommended to new users."[16]

---

[15] Sam Biddle, et al., *Invisible Censorship*, THE INTERCEPT (March 15, 2020), https://theintercept.com/2020/03/16/tiktok-app-moderators-users-discrimination/.

[16] *Id.*; *see also* Drew Harwell & Tony Romm,  *Inside Tiktok: a Culture Clash*

*Footnote continued on next page*

41.     In another example, "an American employee working on TikTok needed to get a list of global users, including Americans, who searched for or interacted with a specific type of content — that means users who searched for a specific term or hashtag or liked a particular category of videos.  This employee had to reach out to a data team in China in order to access that information.  The data the employee received included users' specific IDs, and they could pull up whatever information TikTok had about those users.  This type of situation was confirmed as a common occurrence by a second employee."[17]  According to reports, a Beijing-based engineer, known internally as a "master admin," has access to U.S. data, regardless of where it is stored: "everything is seen in China."[18] "Despite the repeated assurances that TikTok's parent company, the China-based ByteDance, isn't checking out data collected about users in the U.S. and Europe, it looks like the company absolutely does and can."[19]  This illustrates the lack of control, authority, and decision making power employees of the domestic Defendants have over daily operations regarding the TikTok app in the U.S. and California, including the data of U.S. and Californian users that provides a major revenue stream.

---

*Where U.S. Views about Censorship Often Were Overridden by the Chinese Bosses*, THE WASHINGTON POST (November 5, 2019), https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[17] Salvador Rodriguez, *TikTok Insiders Say Social Media Company is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021), https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html.

[18] Emily Baker-White, *Leaked Audio From 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China,* BUZZFEED NEWS (June 17, 2022), https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-tapes-us-user-data-china-bytedance-access.

[19] Christianna Silva & Elizabeth de Luna, *It Looks Like China Does Have Access to U.S. TikTok User Data*, MASHABLE (November 3, 2022), https://mashable.com/article/tiktok-china-access-data-in-us.

42. In the summer of 2022, TikTok announced plans to move its silo of U.S. data to the cloud-based Oracle server, intended to quell fears about Chinese government acquisition of U.S. data. According to a leaked audio conversation, an employee of TikTok's U.S. Trust & Safety Team was pressured by TikTok's Chief Internal Auditor—who reports directly to "Beijing-based" Song Ye—to reveal the location and details about the Oracle server. As discussed more below, U.S. data can be accessed by the foreign Defendants regardless of where it is stored, which TikTok Inc. has confirmed.[20]

43. Indeed, the *Washington Post* reported that contrary to the public claims of Defendants, "current and former TikTok employees say managers in Beijing, where many of the company's executives and employees still work, have assumed an increasingly active role in the U.S. team's operations" and TikTok Inc. CEO Chew reports to ByteDance's chief and board.[21]

44. A recent September 2022 *Forbes* article reported that TikTok is "bleeding U.S. execs," because "at least five senior leaders hired to head departments at TikTok in the last two years have left the company after learning that they would not be able to significantly influence decision-making."[22] According to the report, guidance for the U.S. executives came from Beijing and they were expected to follow these directions without question or input. Upon

---

[20] Emily Baker-White, *TikTok Parent ByteDance Planned to Use TikTok to Monitor the Physical Location of Specific American Citizens*, FORBES (October 20, 2022), https://www.forbes.com/sites/emilybaker-white/2022/10/20/tiktok-bytedance-surveillance-american-user-data/?sh=4ba9fcec6c2d.

[21] Drew Harwell & Elizabeth Dwoskin, *As Washington Wavers on TikTok, Beijing Exerts Control,* The Washington Post (October 30, 2022), https://www.washingtonpost.com/technology/interactive/2022/bytedance-tiktok-privacy-china/.

[22] Emily Baker-White, *TikTok is Bleeding U.S. Execs Because China is Still Calling the Shots, Ex-Employees Say*, FORBES (September 21, 2022), https://www.forbes.com/sites/emilybaker-white/2022/09/21/tiktok-bleeding-us-execs-china-control-bytedance/?sh=54b9da549707.

information and belief, these directions came from Beijing ByteDance and ByteDance Ltd.  A former employee also told *Forbes* that a corporate reorganization caused a department head to report to "ByteDance" in Beijing, rather than to the U.S.-based "TikTok"—causing this employee's departure.[23]

45.     Kevin Mayer (former CEO of TikTok) and Chew's power as TikTok's head, has reportedly been "circumscribed by ByteDance," according to a *New York Times* report, corroborated by 5 people with knowledge of the company.[24]

46.     A recently leaked 2021 public relations document, which outlines key messages the company wishes to present to the public, urges employees, including, upon information and belief, U.S. employees at the domestic Defendants, to "***Downplay the parent company ByteDance, downplay the China association***, downplay AI."  The document provides talking points for employees responding to questions, such as "TikTok is a global company; the TikTok app doesn't even operate in China; TikTok is highly localized in its experience and operations, which means <> has a lot of independence in the day-to-day operations of the platform." The document further advises that TikTok employees are to deflect regarding China-based ByteDance's control over TikTok—"TikTok has an American CEO, a head of security with decades of experience in the U.S. military and law enforcement, and a U.S. team that works diligently and responsibly on the consistent development of the security infrastructure."  Unsurprisingly, the issue of whether the "U.S. team" has the ability to meaningfully direct their own operations is sidestepped.  The guidance from the document appears to have made its way into testimony given to the U.K. parliament's Digital, Culture, Media and Sports select committee in September 2020 by Theo Bertram, TikTok's director of government

---

[23] *Id.*

[24] Ryan Mac & Chang Che, *TikTok's C.E.O. Navigates the Limits of His Power*, N.Y. TIMES (September 16, 2022), https://www.nytimes.com/2022/09/16/technology/tiktok-ceo-shou-zi-chew.html.

1   relations and public policy in Europe, the Middle East and Africa; and in TikTok's
2   June 30, 2022, letter to U.S. Senators.[25]

3       47.    At all relevant times, the domestic Defendants have shared office
4   space, most recently in Culver City, California at 5800 Bristol Parkway. They have
5   used the same Applicant Privacy Notice provided to employment applicants,
6   holding themselves out as one joint entity: "ByteDance ("we" or "us") has prepared
7   this Applicant Privacy Notice ("Notice") for applicants to roles with ByteDance…
8   references to "ByteDance" comprises the following U.S. entities: ByteDance Inc.,
9   TikTok Inc., and any US incorporated affiliates."[26]  Upon information and belief,
10  they have also shared employees.

11      *       *       *       *       *

12      48.    The Defendants are all privately held companies and even former
13  employees have noted the secretive nature of details regarding Defendants'
14  corporate structure.  It is clear that the domestic Defendants and the entities that
15  sell, advertise, develop, and operate the Apple and Android version of the TikTok
16  app are controlled by management and employees of Beijing ByteDance and/or
17  ByteDance Ltd. that operate in China.  Given the highly secretive and intertangled
18  nature of the ownership structure of the foreign and domestic Defendants,[27] and the
19  clear instances of control and direction of the entities that sell, advertise, develop,

20  _____

21  [25] Chris Stokel-Walker, *Inside TikTok's Attempts to 'Downplay the China
22  Association,'* GIZMODO (July 27, 2022), https://gizmodo.com/tiktok-master-
    messaging-pr-playbook-china-music-1849334736.

23  [26] *ByteDance US Applicant Privacy Notice*, available at https://sf16-
24  sg.tiktokcdn.com/obj/eden-
    sg/ha_lm_lswvlw/ljhwZthlaukjlkulzlp/portal/static/ByteDance_US_Applicant_Priv
25  acy_Notice.pdf (last visited 11/18/2022).

26  [27] *See* Coco Liu & Yifan Yu, *Inside ByteDance, the $75bn Unicorn Behind TikTok*,
27  NIKKEIASIA (March 25, 2020), https://asia.nikkei.com/Spotlight/The-Big-
    Story/Inside-ByteDance-the-75bn-unicorn-behind-TikTok (providing corporate
28  organization chart and noting "ByteDance's" corporate structure is a "tangled
    web[.]'").

1   and operate the Apple and Android TikTok apps, including the domestic

2   Defendants, Plaintiff seeks leave to issue jurisdictional discovery regarding all

3   foreign and domestic Defendants.

4   ## IV.   GENERAL FACTUAL ALLEGATIONS

5        49.   TikTok has gained immense popularity in the U.S. over the last few

6   years as a social media platform where users create, share, and view short videos.

7   In the U.S., TikTok was originally known as Musical.ly, an app where users

8   uploaded lip synching videos, founded in 2014.  In 2016, Chinese technology

9   company, Bytedance, launched a version of Musical.ly for the Chinese market,

10  entitled Douyin.  Bytedance then purchased Musical.ly and incorporated it into

11  Douyin, launching it for the non-Chinese international market, including the U.S.,

12  becoming the current version of TikTok.[28]

13       50.   One month after its debut, in September 2018, it had surpassed

14  Facebook, Instagram, YouTube, and SnapChat in monthly installations, with more

15  than one billion downloads.[29]  Users enjoy viewing and creating dancing, lip

16  synching videos, comedy skits (sometimes called "memes"), and "challenges"

17  where users upload videos performing the same dance or task as others, often

18  giving their own unique spin on the task.  However, the variety of information and

19  types of content that can be created are virtually limitless—if you can imagine it, it

20  likely exists on TikTok.

21       51.   All of this content is offered in endlessly consumable, dopamine

22  boosting mini "bites," as videos are typically less than one minute long. [30]  Much

23

24  [28] Dan Hughes, *The Rapid Rise of TikTok*, DIGITAL MARKETING INSTITUTE (August

25  26, 2019), https://digitalmarketinginstitute.com/blog/the-rapid-rise-of-tiktok.

26  [29] Starrene Rhett Rocque, *The History of TikTok,* TEEN VOGUE (August 28, 2019),
    https://www.teenvogue.com/story/tiktok-what-is-it.

27  [30] Andrea Silva Santisteban Fort, *TikTok is a Dopamine Factory*, THE GAUNTLET

28  (February 14, 2021), https://thegauntlet.ca/2021/02/14/tiktok-is-a-dopamine-
    factory/.

like a slot machine at a casino, users can find themselves scrolling TikTok for hours without realizing it, awash in the dopamine rush.[31]  Use of TikTok exploded in 2020 during lockdown periods throughout the first year of the COVID-19 pandemic.  It was the second most popular iPhone app downloaded in 2020, and the most popular in the U.S. in 2021.[32]  TikTok's immense success as a social media platform has allowed it to quickly join the ranks of other social media giants like Twitter, SnapChat, Reddit, Facebook, and Instagram.

52.     In 2021, TikTok generated an estimated $4.6 billion in revenue, with 1.2 billion people actively using the app in the last quarter of 2021.[33]



---

[31] Jade Biggs, *TikTok Addiction: Why is TikTok So Addictive?,* COSMOPOLITAN (May 19, 2022), https://www.cosmopolitan.com/uk/body/health/a39964788/tiktok-addiction/

[32] Werner Geyser, *TikTok Statistics – 63 TikTok Stats You Need to Know [2022 Update]*, INFLUENCER MARKETING HUB (updated August 1, 2022) https://influencermarketinghub.com/tiktok-stats/.

[33] Mansoor Iqbal, *TikTok Revenue and Usage Statistics (2022),* BUSINESS OF APPS (November 11, 2022), https://www.businessofapps.com/data/tik-tok-statistics/#:~:text=TikTok%20generated%20an%20estimated%20%244.6%20billion%20revenue%20in,is%20accessed%20by%20over%20600%20million%20users%20daily.

53.     The U.S. is TikTok's largest market outside China.[34]  As of August 2020, TikTok represented that it had over 100 million U.S. users, more than 50 million of whom were daily users. [35]

**A.    TikTok's Business Model: Profits from Advertising by Monetizing User Data**

54.     Despite being a free social media app, TikTok amasses billions in revenue.  It relies on selling digital advertising space as the main source of its income.[36]  TikTok's U.S. ad revenue is slated to grow by 184% this year.[37]  Of the $250 billion companies spend on digital marketing, TikTok will accumulate 2.4% – this is more than what SnapChat and Twitter (combined) will receive.[38]

55.     TikTok touts that 1 in 2 Gen Z TikTok users are likely to buy something while using TikTok and that 81% of users use TikTok to discover new products and brands.[39]  In the second quarter of 2021, consumers spent over $500 million via the app.[40]

---

[34] *Id.*

[35] Alex Sherman, *TikTok Reveals Detailed User Numbers for the First Time*, CNBC (August 24, 2020), https://www.cnbc.com/2020/08/24/tiktok-reveals-us-global-user-growth-numbers-for-first-time.html.

[36] Darina Lynkova, *TikTok Revenue Statistics that Will Amaze You,* SPENDMENOT (updated June 25, 2022), https://spendmenot.com/blog/tiktok-revenue-statistics/.

[37] *Report: TikTok US Ad Revenue to Grow 184% in 2022,* PYMNTS, (April 11, 2022), https://www.pymnts.com/mobile-applications/2022/report-tiktok-us-ad-revenue-to-grow-184-in-2022/.

[38] *Id.*

[39] *Get Your Business Discovered on TikTok,* TIKTOK, https://getstarted.tiktok.com/us-en-v1brand?lang=en&msclkid=9808304b00701c6f2f13532624807b5c (last visited November 11, 2022).

[40] Geyser, *supra,* note 32.

56.     The number of people who conduct purchases while using TikTok and/or learn about new products and brands is significant given what has come to light about TikTok's undisclosed collection of data about its users.

57.     In 2020, TikTok for Business was launched which allowed businesses to purchase ad space on TikTok and create a label specifying who they want to target.[41]  Users can click on the link in these ads to purchase the advertised product.

58.     TikTok's algorithm, the machine learning tool used to determine what videos and advertisements display on a user's home page (the "for you" page) or a user's discover page, utilizes tracking software to understand a users' interests and habits.[42]

59.     Tracking information about a users' interests and habits are critical components to its advertising business model because it is precisely this kind of information that allows TikTok to sell advertising to its customers as effective and targeted to specific audiences.

60.     TikTok offers several different types of ad categories that a business can purchase: Top-View Ads, which display the company's content while a user is engaging with the app; Brand Takeover Ads, which display immediately when the app is opened; Branded Effects, where a company purchases custom filters, stickers and lenses that are used virtually to create content on the app; and Hashtag

---

[41] *Get Your Business Discovered on TikTok*, TIKTOK, https://getstarted.tiktok.com/tt4bnew?attr_source=bing&attr_medium=search-br-ad&attr_adgroup_id=1334808494082548&attr_term=ads%20on%20tiktok&msclkid=af4ae462b9f1157834fb870f9d014a7d (last visited November 11, 2022).

[42] Geyser*, supra*, note 32; Ben Lovejoy, *How TikTok's Algorithm Works: A Fascinating and Disturbing Analysis,* 9 TO 5 MAC (July 28, 2021), https://9to5mac.com/2021/07/28/how-tiktoks-algorithm-works/; Avani Dias, *et al*., *The TikTok Spiral,* ABC  (July 25, 2021), https://www.abc.net.au/news/2021-07-26/tiktok-algorithm-dangerous-eating-disorder-content-censorship/100277134.

Challenges, where a company creates its own challenge and assigned hashtag, and then pays TikTok to make it appear on users' feeds.[43]

**B.    Global Privacy Concerns Regarding TikTok's Data Use Practices**

61.    Despite its popularity, after TikTok's release in 2018, many privacy concerns regarding the app came to light and several countries have launched investigations amidst concerns regarding TikTok's handling of users' personal data.[44]  Notably, TikTok has settled litigation regarding data privacy.[45]

**1.    Concerns in the U.S.**

62.    In February 2019, following its investigation, the U.S. Federal Trade Commission ("FTC") entered into a consent decree with TikTok Inc. and TikTok Ltd., fining them $5.7 million for collecting information from minors under the age of 13 in violation of the Children's Online Privacy Protection Act ("COPPA") despite TikTok's claims that users under 13 were not allowed on the app.[46]

63.    U.S. Senators Charles Schumer and Tom Cotton sent a letter to the Acting Director of National Intelligence in October 2019 explaining the national

---

[43] Julio Cesar, *How Does TikTok Make Money?,* TECH REVIEW ADVISOR (September 13, 2021), https://techreviewadvisor.com/how-does-tiktok-make-money/.

[44] *See* Vincent Manancourt, *Why Europe's Hands are Tied on TikTok,* POLITICO (September 2, 2020), https://www.politico.eu/article/tiktok-europe-privacy-gdpr-complexity-ties-hands/.

[45] Megan Sauer, *Some TikTok Users are Receiving $167 Checks Over Data Privacy Violations—and Google and Snapchat Could be Next*, CNBC (October 28, 2022), https://www.cnbc.com/2022/10/28/tiktok-users-paid-over-privacy-violations-google-snap-could-be-next.html#:~:text=This%20week%2C%20TikTok%20users%20across,with%20the%20social%20media%20platform.

[46] Bree Fowler, *FTC Fines Owners of TikTok App $5.7 Million for Illegal Collection of Children's Data*, CONSUMER REPORTS (February 27, 2019), https://www.consumerreports.org/privacy/ftc-fines-tiktok-for-illegal-collection-of-childrens-data-a1076813068/.

- 20 -

security concerns over the possibility that TikTok may share personally identifiable user information and private content with the Chinese government, stating "[w]ith over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore.  Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok … and brief Congress on these findings."[47]

64.     In July 2020, the FTC and the U.S. Department of Justice ("DOJ") initiated investigations again after a complaint was filed alleging that TikTok violated the terms of the 2019 consent decree.  Again, this garnered Congressional attention regarding TikTok's data practices.[48]

65.     Congress and the DOJ subsequently raised concerns in September 2020 that TikTok's parent company, ByteDance, has a close relationship with Chinese government, putting the data that TikTok accumulates on U.S. users at risk of being transferred to the Chinese government.[49]  Even without a cozy

---

[47] Letter from Charles E. Schumer and Tom Cotton to Acting Director of National Intelligence Joseph Maguire (October 23, 2019), https://www.democrats.senate.gov/imo/media/doc/10232019%20TikTok%20Letter%20-%20FINAL%20PDF.pdf.

[48] Complaint and Request for Investigation of TikTok for Violations of the Children's Online Privacy Protection Act and Implementing Rule (May 14, 2020), https://fairplayforkids.org/wp-content/uploads/2020/05/tik_tok_complaint.pdf; Todd Spangler, *TikTok is Still Violating U.S. Child-Privacy Law, Groups Charge*, VARIETY (May 14, 2020), https://variety.com/2020/digital/news/tiktok-is-still-violating-u-s-child-privacy-law-groups-charge-1234606854/; Maggie Miller, *Democrats Call on FTC to Investigate Allegations of TikTok Child Privacy Violations,* THE HILL (May 28, 2020), https://thehill.com/policy/cybersecurity/499970-democrats-call-on-ftc-to-investigate-potential-tiktok-child-privacy/; Diane Bartz, *Exclusive: U.S. Probing Allegations TikTok Violated Children's Privacy – Sources,* Reuters (July 7, 2020), https://www.reuters.com/article/us-tiktok-privacy-children-exclusive-idUSKBN248373.

[49] Kristen Errick, *Energy & Commerce Reps. Send Letter to TikTok Over Their Concerns,* LAW STREET (May 22, 2020),

*Footnote continued on next page*

1    relationship, ByteDance is subject to laws that would require it to transfer data at

2    the behest of the Chinese government.[50]

3    　　66.　In 2020, then-U.S. President Donald Trump viewed TikTok as a

4    serious national security threat and proposed a ban on the app, ultimately issuing an

5    executive order to that effect, because TikTok's "data collection threatens to allow

6    the Chinese Communist Party access to Americans' personal and proprietary

7    information—potentially allowing China to track the locations of Federal

8    employees and contractors, build dossiers of personal information for blackmail,

9    and conduct corporate espionage."[51]

10   　　67.　*CNBC* reported that ByteDance has access to U.S. user data and

11   former TikTok employees say there is concern regarding the parent company's

12   level of involvement in TikTok's operations—"so blurry as to be non-existent."[52]

13   In fact, ByteDance can readily pull any information collected on a U.S. user.[53]

14   Cybersecurity experts say such ease of access exposes U.S. information to

15   acquisition by the Chinese government.[54]

16   　　68.　A *BuzzFeed News* report in June 2022 confirmed the same—that

17   despite years of TikTok's assertions to the contrary, ByteDance does hold, and has

18   accessed, nonpublic data regarding U.S. TikTok users.  In fact, U.S.-based TikTok

---

20   https://lawstreetmedia.com/news/tech/energy-commerce-reps-send-letter-to-tiktok-over-their-concerns/; Bobby Allyn, *New DOJ Filing: TikTok's Owner Is 'A*

21   *Mouthpiece' Of Chinese Communist Party*, NPR (September 26, 2020),

22   https://www.npr.org/2020/09/26/917134452/new-doj-filing-tiktoks-owner-is-a-mouthpiece-of-chinese-communist-party.

23   [50] *Id.*

24   [51] Bobby Allyn, *Trump Signs Executive Order that Will Effectively Ban Use of*

25   *TikTok in the U.S.,* NPR (August 6, 2020),
     https://www.npr.org/2020/08/06/900019185/trump-signs-executive-order-that-will-

26   effectively-ban-use-of-tiktok-in-the-u-s.

27   [52] Rodriguez, *supra*, note 17.

28   [53] *Id.*

     [54] *Id.*

- 22 -

employees did not have permission or knowledge of how to access the U.S. data.[55]
A 2022 Internet2.0 analysis on TikTok security found that the IOS application of
TikTok connects directly to mainland China.[56]

69.     *Buzzfeed News*'s report prompted several Republican U.S. Senators to
send a letter to TikTok CEO Chew, concerned that "TikTok's representative did not
provide truthful or forthright answers to the Senate Commerce Committee…[and]
is now taking steps to deflect from its knowing misrepresentations by changing the
way in which "protected" data can be accessed by its employees."[57]

70.     Indeed, in September 2022, TikTok confirmed it would not commit to
cutting off China's access to U.S. user data during testimony before the Senate
Homeland Security Committee via COO Vanessa Pappas.[58]  In fact, it appears that
China's control over the app has only expanded as the Chinese government has
recently acquired a 1% stake in Beijing ByteDance and a seat on its board.[59]

71.     Shortly after COO Pappas's testimony, Senator Josh Hawley sent a
letter to Treasury Secretary Janet Yellen, the chair of The Committee on Foreign

---

[55] Emily Baker-White, *supra*, note 18.

[56] Thomas Perkins, TikTok Analysis, (David Robinson, *et al.*, eds.) (2022),
available at https://internet2-0.com/whitepaper/its-their-word-against-their-source-
code-tiktok-report/.

[57] Letter from Marsha Blackburn, *et al.*, to Shou Zi Chew (June 27, 2022),
https://www.blackburn.senate.gov/services/files/8DE2B2CF-27BF-4ADD-8E4C-
D83598D9424D.

[58] Brian Fung, *TikTok Won't Commit to Stopping US Data Flows to China*, CNN
Business (September 14, 2022), https://edition.cnn.com/2022/09/14/tech/tiktok-
china-data/index.html; *see also* Letter from Shou Zi Chew to Senators Blackburn,
*et al.,* (June 30, 2022), https://int.nyt.com/data/documenttools/tik-tok-s-response-to-
republican-senators/e5f56d3ef4886b33/full.pdf.

[59] Jeanne Whalen, *Chinese Government Acquires Stake in Domestic Unit of Tiktok
Owner Bytedance in Another Sign of Tech Crackdown*, The Washington Post
(August 17, 2021),
https://www.washingtonpost.com/technology/2021/08/17/chinese-government-
bytedance-tiktok/.

Investment in the United States ("CFIUS")[60], with a copy to the FTC Chair Lina Khan, urging CFIUS to require TikTok to sever all ties from ByteDance and any other Chinese companies, and urging the FTC to investigate TikTok for "unfair or deceptive acts or practices."[61]   The letter contrasts the testimony from COO Pappas acknowledging Chinese access of U.S. data with TikTok's former steadfast denials of any such capability, calling President Biden's non-enforcement of Trump's order a "mistake."[62]

72.     Concerns over the app's privacy policies have also gathered the attention of several U.S. states' attorney generals.  Texas and Montana have launched investigations this year, and California attorney general Robert Bonta also announced a bipartisan investigation in concert with Florida, Kentucky, Nebraska, Tennessee, Massachusetts, New Jersey, Vermont, and yet-to-be disclosed attorney general offices from other states.[63]

73.     TikTok is banned by the U.S. Army, Navy, Air Force, Coast Guard, Marine Corps., Department of Defense, Department of Homeland Security and

---

[60] CFIUS, which evaluates whether foreign investments in U.S. businesses raise national security concerns, has been investigating and reviewing TikTok since 2019. *See Haley Samsel, U.S. Government Opens Official National Security Investigation Into TikTok*, SECURITY TODAY (November 4, 2019), https://securitytoday.com/articles/2019/11/04/tiktok-national-security-investigation.aspx.

[61] Letter from Josh Hawley to Janet Yellen (September 19, 2022), https://www.hawley.senate.gov/sites/default/files/2022-09/JDH%20Letter%20to%20Yellen%20re%20TikTok_0.pdf.

[62] *Id.*

[63] *Attorney General Bonta Announces Nationwide Investigation into TikTok, OAG.CA.GOV* (March 2, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-nationwide-investigation-tiktok; Brian Contreras, *California attorney general announces investigation into TikTok*, LOS ANGELES TIMES (March 2, 2022), https://www.latimes.com/business/technology/story/2022-03-02/california-ag-investigates-tiktoks-impact-on-children; *Attorney General Knudsen Launches Investigation Into TikTok,* DOJMT.GOV (February 28, 2022), https://dojmt.gov/attorney-general-knudsen-launches-investigation-into-tiktok/.

TSA, and cannot be installed on government-issued phones.[64] President Biden's 2020 campaign also urged its staff to remove the app from their work and personal devices.[65] Wells Fargo has forbidden its employees from installing the app on company mobile devices.[66]

74. The commissioner of the Federal Communications Commission ("FCC"), Brendan Carr, has been increasingly vocal in his call for a ban of TikTok since writing to the CEOs of Apple and Google to remove the app from their app stores in June 2022, citing privacy concerns.[67] In referring to negotiations between TikTok and CFIUS on what data should be protected, he lamented, "I have a very, very difficult time looking at TikTok's conduct thinking we're going to cut a technical construct that they're not going to find a way around."[68] Federal Bureau of Investigation Director Christopher Wray told members of the House Homeland Security Committee that he is "extremely concerned" about TikTok's operations.[69]

75. TikTok's unscrupulous data practices are a bipartisan concern. Senator Mark Warner, Chairman of the Senate Intelligence Committee, issued a warning during a *Fox News Sunday* appearance on November 20, 2022, that "… TikTok is an enormous threat." Senator Warner continued by questioning "the idea

---

[64] Letter from Brendan Carr to Tim Cook and Sundar Pichai (June 24, 2022), https://www.fcc.gov/sites/default/files/carr-letter-apple-and-google.pdf.

[65] Sarah Mucha, *Biden Campaign Tells Staff to Delete TikTok from their Phones,* CNN POLITICS (July 28, 2020), https://www.cnn.com/2020/07/28/politics/biden-campaign-tiktok/index.html.

[66] Danielle Wallace, *Wells Fargo Bans TikTok on All Company Owned Devices,* FOX BUSINESS (July 13, 2020), https://www.foxbusiness.com/technology/wells-fargo-tiktok-ban-china.

[67] Carr, *supra,* note 64.

[68] Brian Fung, *FCC Commissioner Calls for TikTok Ban*, CNN (November 2, 2022), https://www.msn.com/en-us/news/politics/fcc-commissioner-calls-for-tiktok-ban/ar-AA13Foci

[69] Worldwide Threats to the Homeland: Hearing before the Committee on Homeland Security, 117 Cong. (November 15 2022) (Statement of Christopher Wray).

that we can somehow separate out TikTok from the fact that the actual engineers [are] writing the code in Beijing."  He also stated that TikTok is "a massive collector of information … [and] can visualize even down to your keystrokes … all of that data … is being stored somewhere in Beijing."  He ended by reminding viewers that U.S. data would be turned over to the Chinese government, should it so request: "TikTok, at the end of the day, has to be reliant on the Communist Party, the China law states that."[70]

76.    Senator Warner and Senator Marco Rubio sent a bipartisan letter to the FTC earlier this year asking it to investigate TikTok once again.  The letter calls out TikTok's "repeated misrepresentations … concerning its data security, data processing, and corporate governance practices," including those made under oath during a Congressional committee hearing in October 2021.[71]

### 2.    Concerns Abroad

77.    TikTok has been called a "hunting ground" for child predators by digital privacy watchdogs.[72]  In 2019, following the FTC's fine for COPPA violations, the United Kingdom's Information Commissioner's Office launched its own investigation on how the app handles the data of young users, including how private data is collected and concerns that TikTok's messaging system allowed

---

[70] *Fox News Sunday*, (Fox News Broadcast November 20, 2022); *see also* Emily Jacobs, *Top Senate Democrat: 'Trump was Right' about TikTok, Warns Parents to Keep Children off App*, WASHINGTON EXAMINER (November 20, 2022), https://www.washingtonexaminer.com/restoring-america/fairness-justice/mark-warner-trump-tiktok-bytedance-senate-intel.

[71] Letter from Mark Warner and Marco Rubio to Chairwoman Khan (July 5, 2022), https://www.warner.senate.gov/public/_cache/files/3/e/3eeb87b3-e9b5-4aa4-8ea1-361a8472ff46/A42795C63518B32671F9ACCF82B1E26A.khan-ssci-tiktok-letter.pdf.

[72] *See* Shelby Brown, *TikTok, Livestreaming Apps Are 'Hunting Ground' for Abusers, Warn Kids' Advocates*, CNET (February 25, 2019), https://www.cnet.com/tech/mobile/tiktok-live-streaming-apps-are-hunting-ground-for-abusers-warn-childrens-advocates/.

minors to receive direct messages from adult users via the app's messaging system.[73]

78. In June 2020, the European Data Protection Board announced it was assembling a task force to examine TikTok's privacy and security practices.[74]

79. In 2021, the Dutch Authority levied a €750,000 fine against TikTok following its 2020-2021 investigation into TikTok's privacy practices relating to children.[75] After the Dutch investigation, TikTok made changes to its settings to ensure better parental controls over children's use of the app.

80. In September 2021, after TikTok's move to relocate their European regional headquarters to Ireland, the Ireland Data Protection Commission began its investigation into TikTok asking whether TikTok sufficiently protects the personal data for legal minors, the extent of the app's age-verification measures for children under 13 and the app's transfer of personal data to countries outside the EU—namely China, the home to parent company ByteDance.[76]

---

[73] Alex Hern, *TikTok Under Investigation Over Child Data Use,* THE GUARDIAN (July 2, 2019), https://www.theguardian.com/technology/2019/jul/02/tiktok-under-investigation-over-child-data-use.

[74] Foo Yun Chee, *EU Watchdog Sets Up TikTok Task Force, Warns on Clearview AI Software,* Reuters (June 10, 2020), https://www.reuters.com/article/us-eu-privacy-tiktok-clearview-idUSKBN23H2PM.

[75] Letter, *Decision to Impose an Administrative Fine,* AUTORITEIT PERSOONGEGEVENS (April 9, 2021), https://www.autoriteitpersoonsgegevens.nl/sites/default/files/atoms/files/decision_to_impose_a_fine_on_tiktok.pdf; *Tiktok: The Dutch DPA Issues A € 750,000 Fine For A Breach Of Children's Privacy And Transfers Its Investigation Findings To The Irish DPA For Further Ruling*, PRIVACY-VOX, https://privacyvox.com/news/tiktok-the-dutch-dpa-issues-a-750000-fine-for-breach-of-childrens-privacy-and-transfers-its-investigation-findings-to-the-irish-dpa-for-further-ruling/ (last visited November 11, 2022); *Dutch Watchdog To Investigate Tiktok's Use Of Children's Data*, REUTERS (May 8, 2020), https://www.reuters.com/article/us-netherlands-dataprivacy-tiktok-idUSKBN22K1UE.

[76] *Tiktok's Lead EU Regulator Opens Two Data Privacy Probes*, REUTERS

*Footnote continued on next page*

81.    In July 2022, Italian data protection experts issued a warning over a TikTok privacy policy update affecting the European Economic Area, the U.K., and Switzerland, wherein the app would stop asking users permission to be tracked for targeted ads.[77]

82.    The U.K. Information Commissioner's Office recently issued a notice that TikTok Inc., "processed special category data without legal grounds to do so," "processed children's data without parental consent," and failed to provide information regarding its app to users in a "transparent and easily understood way." Special category data includes "ethnic and racial origin, political opinions, religious beliefs, sexual orientation, trade union membership, genetic and biometric data or health data."[78]

### 3.    Biometric Data Privacy Litigation

83.    In December 2020, Defendants were sued for their alleged violation of the Illinois Biometric Information Privacy Act (BIPA), a state statute that prohibits a private company from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's or a customer's biometric identifiers or information without first obtaining the necessary approvals from the biometrics' owner.

84.    TikTok settled this Multi-District Litigation for $92 million.

---

(September 15, 2021), https://www.reuters.com/technology/ireland-regulator-opens-data-privacy-probes-into-tiktok-2021-09-14/.

[77] Natasha Lomas, *Italy Warns Tiktok Over Privacy Policy Switch*, TECHCRUNCH (July 11, 2022), https://techcrunch.com/2022/07/11/tiktok-privacy-switch-warning-italy/.

[78] *ICO Could Impose Multi-Million Pound Fine on Tiktok For Failing To Protect Children's Privacy*, ICO.ORG.UK (September 26, 2022), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2022/09/ico-could-impose-multi-million-pound-fine-on-tiktok-for-failing-to-protect-children-s-privacy/.

**C.     TikTok's Interception and Theft of Users' Sensitive, Personally Identifying Information Input into Third Party Websites**

85.     As alleged above, part of TikTok's business model is to attract businesses to advertise on its platform.  In order to drive business, TikTok touts that 1 in 2 Gen Z TikTok users are likely to buy something while using TikTok, 81% of users use TikTok to discover new products and brands, and TikTok video ads take up 6x more screen space than banners.[79]

86.     In order to drive its business, TikTok presents users with links to third-party websites and does so in multiple ways.

87.     One way in which TikTok presents users with third-party websites is through TikTok video ads.

88.     Video ads typically load onto a user's feed and appear as a normal TikTok video except that they contain icons identifying them as a sponsored post or an ad. As portrayed below, these ad-identifying links open third-party websites.

---

[79] *See*, note 39, *supra*, *Get Your Business Discovered on TikTok,* TIKTOK, https://getstarted.tiktok.com/us-en-v1brand?lang=en&msclkid=9808304b00701c6f2f13532624807b5c (last visited November 11, 2022).



89.     As the video plays, another box appears suggesting that the user click the link to view the product now.  This box also opens a third-party website.




90.     Finally, after the video ad concludes, users are presented with an additional opportunity to click a link that opens a third-party website.



91.     Normally, an individual accesses a website using their default internet browser, such as Safari or Google Chrome.  However, that process can be modified when accessing websites using apps on a computer or mobile device.  In each of the foregoing examples, the third-party website is opened via TikTok's in-app browser. Specifically, when a user attempts to access a website, by clicking a link while using the TikTok app, the website does not open via the default browser.  Instead, unbeknownst to the user, the link is opened inside the TikTok app, in Defendants' in-app browser.  Thus, the user views the third-party website without leaving the TikTok app.

92.     Another way that TikTok presents its users with links to third-party websites is through the profiles of users with a large number of followers.

93.     Specifically, if a TikTok user has more than 1,000 followers, the user has the option to add a link to external websites on their profile.  Popular TikTok personalities, businesses and organizations routinely place such links on their profiles.  User profiles are publicly viewable and especially useful to persons and businesses who use the link to direct a user to their online store or service or website.



94.     These types of links are commonly used to direct users to additional information, merchandise websites, and/or shopping experiences.

95.     When users click on a link located on a user's profile (as shown above), they are directed to that external website.  Undisclosed by Defendants is the fact that users are accessing the website via TikTok's in-app browser (as shown below).

 

96.     Websites opened via links in user profiles do not ever offer users the option to open the website via anything other than TikTok's in-app browser.

97.     TikTok's in-app browser is not benign for two reasons.  First, the in-app browser was designed to insert JavaScript code into the third-party websites that are accessed using the in-app browser.  These websites are unaware of and did not consent to the insertions.  The inserted code intercepts all of the details of the TikTok user's use of the in-app browser while it is open, and TikTok tracks and captures all of these details simultaneous with the user's activities.  These websites did not consent to the interception of the details of visitor's activities on their site.

98.     Second, as described above, consumers spent over $500 million via the TikTok app in just the second quarter of 2021.[80]  The transactions included in the $500 million occurred via TikTok's in-app browser.

---

[80] Geyser, *supra*, note 32.

99.     Felix Krause, a software researcher, recently published a report on the risks of in-app internet browsers.[81]

100.    He found that TikTok injects lines of a programming language called JavaScript—colloquially known as "code" —that creates new commands to copy everything that users are doing on the external websites.  Of the seven popular apps Krause tested, TikTok was the only app that monitors keystrokes.

---

[81] *See* Felix Krause, *iOS Privacy: Instagram and Facebook Can Track Anything You Do on Any Website in Their In-App Browser*, KRAUSEFX.COM (August 10, 2022), https://krausefx.com/blog/ios-privacy-instagram-and-facebook-can-track-anything-you-do-on-any-website-in-their-in-app-browser.

101.    While a user is interacting with the third-party website via the TikTok app, TikTok subscribes to all keyboard inputs—the equivalent of installing a keylogger.  It also records every tap on any button, link, image or other website element and logs details about what that element is.[82]



---

[82] *Id.*

1

2       102.   Krause created and used a tool, called InAppBrowser.com (shown

3   above) to detect JavaScript commands executed.  Krause unequivocally concluded,

4   "TikTok injects code into third party websites through their in-app browsers that

5   behaves like a keylogger."  Anything that a user does via the in-app browser is

6   recorded and copied by Defendants—what links were clicked, what form fields

7   were filled out, how long a user hovered over a particular set of text, what images

8   were viewed, and any text written.  This gives rise to serious data protection

9   concerns.  The preceding graphics show the JavaScript code inserted by

10   Defendants' in-app browser into the Apple iOS and Krause's analysis of that code,

11   along with his tool's description of the function of the code.  Plaintiff is informed

12   and believes that similar JavaScript coding is also inserted by Defendants' in-app

13   browser into the Android operating system.

14       103.   As alleged above, every single detail of a user's website viewing is

15   that occurs through the in-app browser is tracked.  In the case of online purchase

16   transactions, this would include all of the details of the purchase, the name of the

17   purchaser, their address, telephone number, credit card or bank information,

18   usernames, passwords, dates of birth, etc.

19       104.   However, the in-app browser does not just track purchase information.

20   It tracks everything—meaning that Defendants likely obtain detailed private and

21   sensitive information about persons' physical and mental health as well.

22

23

24

25

26

27

28

105.  For example, several health providers and pharmacies have a digital presence on TikTok, with videos that appear on users' feeds.  One such provider, Planned Parenthood, whose account is verified by the app, offers a link to its website.



106.  Once a user clicks on this link, they are immediately directed to the main webpage via TikTok's in-app browser, as shown below.



107.    The user can then click the "learn" link, directing it to a myriad of resources with options to click and read under several topics, including abortion; birth control; cancer; emergency contraception; pregnancy; sex, pleasure, and sexual dysfunction; sexual orientation; and gender identity.  Knowing what page the user reads can reveal deeply personal and private information.  For example, as shown below, a user may be trying to learn about their sexual orientation.  A user may feel assured by Planned Parenthood's promise that others will only know sexual orientation if that user choses to so communicate, not realizing TikTok has already intercepted this valuable information, ready to deploy and monetize it to send targeted content and advertisements to the user.



108.    TikTok will also intercept a user's searches for care, including abortion services, if a user clicks the "Get Care" link.  To use Planned Parenthood "Abortion Clinics Near You" finder feature, a user inputs highly sensitive and private information, such as age, location, and the first day of the user's last period. The user is assured that "your information is private and anonymous," even though—unbeknownst to Planned Parenthood or the user—TikTok is actively intercepting it:



109.   Continuing to book an appointment involves providing increasingly more detailed personal information about the user:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





110.    TikTok's acquisition of this sensitive information is especially concerning given the Supreme Court's recent reversal of *Roe v. Wade* and the subsequent criminalization of abortion in several states.  Almost immediately after the precedent-overturning decision was issued, anxieties arose regarding data privacy in the context of commonly used period and ovulation tracking apps.  The potential of governments to acquire digital data to support prosecution cases for abortions was quickly flagged as a well-founded concern.  Sara Morrison, reporting for *Vox,* answered "yes" to the question at the forefront of women's minds post-*Roe*: should I delete my period app?[83]

111.    Ms. Morrison's article also notes the lucrative nature of a business knowing when someone gets pregnant—so they can be targeted with baby-related ads.

112.    Perhaps a user is looking into pregnancy care.  A simple search of "prenatal care" tells TikTok this user is pregnant.  TikTok might know the user is pregnant even before the users' close family and friends.

113.    Users also have the option to donate to Planned Parenthood on its website.  To do so, a user inputs either PayPal credentials, bank account and routing numbers, or credit card number and expiration date.  Name, address, email, and phone number are also captured during the payment process.  Using its keystroke capturing code, TikTok intercepts and records these inputs.

---

[83] Sara Morrison, *Should I Delete My Period App? And Other Post-Roe Privacy Questions,* VOX (July 6, 2022), https://www.vox.com/recode/2022/7/6/23196809/period-apps-roe-dobbs-data-privacy-abortion.

 

114.   BetterHelp, a mental health service provider, also has a presence on TikTok. Like Planned Parenthood, its link is displayed on its profile page:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22
23        115.   This link takes a user to BetterHelp's survey that matches the user with
24   a therapist.  The questions asked in this survey are highly sensitive and private,
25   revealing a user's sexual orientation, religion, age, relationship status, location,
26   financial status, and more.  Below are just some of the prompts:
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

 

116.   The above are just examples of the thousands of third-party websites where users input private, personally identifying, and sensitive data.  However, all of the examples described in the foregoing paragraphs are instances where users could, and did, transact business via third-party website without knowing that they were using TikTok's in-app browser that simultaneously intercepted, recorded, and used Plaintiff and Class Member's digital information—none of which Plaintiff or the Class Members consented.

**D.   The Data Collected in Defendants' In-App Browser Has Inherent Value to Plaintiff and Class Members**

117.   Defendants built their business around the collection of personal data because the "world's most valuable resource is no longer oil, but data."[84]  As the *Economist* analogized, a user's personal data is the "oil field of the digital era."[85]

---

[84] *The World's Most Valuable Resource Is No Longer Oil, But Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data (emphasis added).
[85] *Id*.

118.   It is common knowledge in the industry that there is an economic market for consumers' personal data—including the data that Defendants collected from Plaintiff and Class Members.

119.   In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location" information are sold for about "$0.50 per 1,000 people."[86]  This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.[87]

120.   In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[88]  That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge"[89] and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[90]

121.   The Organization for Economic Cooperation and Development ("OECD") published a 2013 paper titled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[91]  In this paper, the OECD measured prices demanded by companies concerning user data derived

---

[86] Emily Steel, *et al.*, *How Much Is Your Personal Data Worth?*, FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u.

[87] *Id.*

[88] Pauline Glickman & Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[89] *Id.*

[90] *Id.*

[91] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

from "various online data warehouses."[92]  OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record.  A combination of address, date of birth, social security number, credit record and military record is estimated to cost USD 55."[93]

122.   The OECD published, in this same paper, a chart demonstrating the various "[m]arket prices for personal data by type"[94]:



<hr />

[92] *Id.* at 25.

[93] *Id.*

[94] *Id.* at 26.

123.   Furthermore, individuals can sell or monetize their own data if they so choose.  Indeed, Defendants themselves have valued individuals' personal data in real-world dollars.

124.   As an example, Meta has previously offered to pay individuals for their voice recordings,[95] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Meta to collect data on how individuals use their smartphones.[96]

125.   A myriad of other companies and apps such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.[97]

126.   Given the monetary values that data companies—like Defendants— have already paid for personal information in the past, Defendants have deprived Plaintiff and the Class Members of the economic value of their data without providing proper consideration for their property.

**E.     Plaintiff and Class Members Have a Reasonable Expectation of Privacy in the Data Collected in Defendants' In-App Browser**

127.   Plaintiff and Class Members have a reasonable expectation of privacy in the data Defendants collected through the in-app browser.

_____

[95] Jay Peters, *Facebook Will Now Pay You for Your Voice Recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognitionviewpoints-prounnunciations-app.

[96] Saheli Roy Choudhury & Ryan Browne, *Facebook Pays Teens to Install An App That Could Collect All Kinds of Data*, CNBC (Jan. 29. 2019), https://www.cnbc.com/2019/01/29/facebook-paying-usersto-install-app-to-collect-data-techcrunch.html.

[97] *28 Apps That Pay You for Data Collection: Earn a Passive Income*, DOLLAR BREAK (July. 7, 2022), https://www.dollarbreak.com/apps/that-pay-you-for-data-collection/.

128.   Several studies examining the collection and disclosure of personal data have concluded such collection is a violation of privacy expectations that have been established as general social norms.

129.   Privacy polls and studies are nearly uniform in showing that the overwhelming majority of Americans consider one of the most important privacy right to be the need for an individual's affirmative consent before data is collected and shared.

130.   For example, a recent study by Consumer Reports confirmed Americans' shrinking confidence that their "online information is private and secure."[98]  Consumers across political party lines—92% of Americans—confirmed their belief that internet companies and websites should be required to obtain consent before selling or sharing their data with other companies. [99]  The same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data collected about them.

131.   According to a study by *Pew Research Center*, a majority of Americans—roughly six in ten U.S. adults—say that they do not think it is possible to go through daily life without having data collected about them by companies.[100] However, the holding of this belief has not eroded people's expectation that their data remain private.  Approximately 79% of Americans report being concerned about the way their data is being used by companies.[101]

---

[98] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[99] *Id.*

[100] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information* ("Americans and Privacy") PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confusedand-feeling-lack-of-control-over-their-personal-information/.

[101] *Id.*

132.    When given a choice, users have demonstrated that they will act consistently with their concerns and in favor of their expectation of privacy. Following the roll-out of the new iPhone operating software—which required clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.[102]

133.    Defendants surreptitiously collected and used Plaintiff and Class members' data in violation of Plaintiff's and Class Members' reasonable expectations of privacy.[103]

## F.    Plaintiff and Class Members Did Not Consent to the Collection of Data via the In-App Browser

134.    A core part of the current system of data collection and privacy protection is built on the idea that consumers are given notice about how companies collect and use data, and ask for their consent to having their data used that way.[104] However, 97% of U.S. adults said that they were asked to approve privacy policies, yet only one-in-five adults overall say they always (9%) or often (13%) read these policies.[105]  Approximately 38% of U.S. adults maintain that they sometimes read such policies, and 36% say they never read a company's privacy policy before agreeing to it.[106]

135.    In addition to the concerns cited above about how companies handle personal data, a majority of Americans (57%) say they are not too confident (40%) or not at all confident (17%) that companies follow what their privacy policies say they will do with users' personal data.[107]

---

[102] Margaret Taylor, *How Apple Screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[103] PEW RESEARCH CENTER, *supra,* note 100.

[104] *Id*.

[105] *Id*.

[106] *Id*.

[107] *Id*.

136.   Against that backdrop, Plaintiff and Class Members did not knowingly consent to Defendants' collection of their data through the in-app browser.

137.   Nowhere in Defendants' Terms of Service or the privacy policies is it disclosed that Defendants compel their users to use an in-app browser that installs JavaScipt code into the external websites that users visit from the TikTok app which then provides TikTok with a complete record of every keystroke, every tap on any button, link, image or other component on any website, and details about the elements the users clicked.

138.   Without disclosing the collection of this kind of data, through the JavaScript insertions via the in-app browser, Defendants cannot have secured consent for the sharing and/or use of this kind of data.

## V. **TOLLING**

139.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

140.   The statutes of limitations applicable to Plaintiff's claims were tolled by Defendants' conduct and Plaintiff's and Class Members delayed discovery of their claims.

141.   As alleged above, Plaintiff did not know, and could not have known, when he downloaded and used the TikTok app that the app directed users to third-party websites through the in-app browser and that the in-app browser intercepted all of Plaintiff's activities and communications on third-party websites viewed in the in-app browser using JavaScript insertions that track every key stroke, tap, click, like, etc., and the details of his interaction with any third-party website through the in-app browser.

142.   Plaintiff did not have the means to discover Defendants' alleged unlawful conduct until August of 2022 when he reviewed an article on the internet detailing how the TikTok app collects data and monitors what users do while on third-party websites visited via the in-app browser.

143.   Plaintiff could not have discovered, through the exercise of reasonable diligence, the full scope of Defendants' alleged unlawful conduct.  Defendants seamlessly incorporated their proprietary, in-app browser and the JavaScript insertions that tracked Plaintiff's activities, into the TikTok app.  Simultaneously, Defendants failed to disclose that the in-app browser modifies the source code of websites that users visit using the in-app browser in order to copy every key stroke, and/or interaction with the website, and the contest of those interactions.

144.   All applicable statutes of limitations have been tolled by operation of the delayed discovery rule. Under the circumstances, Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations.

## VI.   CLASS ACTION ALLEGATIONS

145.   Plaintiff brings this action pursuant to Federal Rule of Civil procedure 23 individually and of behalf of the following classes:

      a.   **Nationwide Class**: All natural persons in the United State whose used the TikTok app to visit websites external to the app, via the in-app browser.

      b.   **California Subclass**: All natural persons residing in California whose used the TikTok app to visit websites external to the app, via the in-app browser.

146.   Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

147.   **Numerosity**: The exact number of class members is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is

impracticable.  As of August 2020, TikTok represented that it had over 100 million U.S. users, more than 50 million of whom were daily users.[108]

148.  **Predominant Common Questions**: The Classes' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members.  Common questions for the Classes include, but are not limited to, the following:

        a.     Whether Defendants violated the Federal Wire Tap Act, 18 U.S.C. §§ 2510, *et seq.*;

        b.     Whether Defendants violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

        c.     Whether Defendants violated the California Comprehensive Computer Data Access and Fraud Act Cal. Penal Code § 502, et seq.

        d.     Whether Defendants violated California Business & Professions Code §§ 17200, *et seq.*;

        e.     Whether Plaintiff and the Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

        f.     Whether Plaintiff and the Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

149.  **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class.  The claims of Plaintiff and the Class Members arise from the same conduct by Defendants and are based on the same legal theories.

150.  **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel competent and experienced in complex litigation and class actions.  Plaintiff has no

---

[108] Sherman, *supra,* note 35.

interest that is antagonistic to the interests of the Class, and Defendants have no

defense unique to any Plaintiff.  Plaintiff and his counsel are committed to

vigorously prosecuting this action on behalf of the members of the Class, and they

have the resources to do so.  Neither Plaintiff nor their counsel have any interest

adverse to the interests of the other members of the Class.

151.   **Substantial Benefits**: This class action is appropriate for certification

because class proceedings are superior to other available methods for the fair and

efficient adjudication of this controversy and joinder of all members of the Class is

impracticable.  This proposed class action presents fewer management difficulties

than individual litigation, and provides the benefits of single adjudication,

economies of scale, and comprehensive supervision by a single court.  Class

treatment will create economies of time, effort, and expense and promote uniform

decision-making.

152.   Plaintiff reserves the right to revise the foregoing class allegations and

definitions based on facts learned and legal developments following additional

investigation, discovery, or otherwise.

## VII.   CALIFORNIA LAW APPLIES TO ALL CLASS MEMBERS

153.   California substantive laws apply to all Class Members.  California's

substantive laws may be constitutionally applied to the claims of Plaintiff and the

Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and

Credit Clause, Art. IV, § 1 of the U.S. Constitution.  California has significant

contacts, or significant aggregation of contacts, to the claims asserted by Plaintiff

and Class Members, thereby creating state interests to ensure that the choice of

California state law is not arbitrary or unfair.

154.   TikTok Inc's principal place of business is located in Culver City,

California, and it conducts substantial business in California, such that California

has an interest in regulating TikTok's conduct under its laws.  TikTok's decision to

reside in California and avail itself of California's laws, renders the application of California law to the claims herein constitutionally permissible.

155. ByteDance Inc.'s principal place of business is located in Palo Alto, California, and it conducts substantial business in California such that California has an interest in regulating ByteDance Inc.'s conduct under its laws. ByteDance Inc.'s decision to reside in California and avail itself of California's laws, renders the application for California law to the claims herein constitutionally permissible.

156. Beijing ByteDance and ByteDance Ltd. are both foreign corporations but are part of the ownership structure of TikTok Inc. and ByteDance Inc. As alleged above, they direct the activities of TikTok Inc. and ByteDance Inc. such that they avail themselves of those companies' principal place of business in California and California's laws. As such, application of California law to the claims herein is constitutionally permissible.

157. The application of California law to all Class members is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Classes. California has a greater interest in applying its laws here than any other interested state.

## VIII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Federal Wire Tap Act**

**18 U.S.C. §§ 2510, *et seq.***

**(On behalf of Plaintiff against all Defendants)**

158. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

159. The Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq*., prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authority party to the communication. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communications is

intercepted, disclosed, or intentionally used in violation of this chapter."  18 U.S.C. § 2520(a).

160.  "Intercept" is defined as the aural or other acquisition of the contents of any wire, electronic, or oral communications through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

161.  "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

162.  "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation."  18 U.S.C. § 2510(6).

163.  "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence, of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ."  18 U.S.C. § 2510(12).

164.  Defendants are each a "person" for purposes of the Wiretap Act because they are corporations.

165.  The JavaScript inserted by TikTok that copy every keystroke, every tap on any button, link, image or other component and the details about the elements users clicked on constitute a "device or apparatus" that is used to intercept a wire, oral, or electronic communication because they are electronic means of acquiring the contents of users' wire, electronic or oral communications via Defendants in-app browser.

166.  Plaintiff's and Class Members' sensitive personal information and data that were intercepted by Defendants through their in-app browser are "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

167.  Plaintiff and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications.

168.  Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent and for the unlawful and/or wrongful purpose of monetizing private information and data, including by using their private information and data to develop marketing and advertising strategies.

169.  Interception of Plaintiff's and Class Members' electronic communications without their consent occurred whenever a user clicked on a link to a website external to TikTok.  Defendants were not parties to those communications which occurred between Plaintiff and Class Members and the websites they attempted to access or accessed.  Defendants used Plaintiff's and Class Members' electronic communications as part of their advertising and marketing business model.

170.  Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products.  Moreover, experts who uncovered the JavaScript injections included in Defendants' in-app browser explained that the inclusion of the JavaScript injections were intentional, non-trivial engineering tasks – the kind that do not happen by mistake or randomly.[109]

171.  Neither Plaintiff nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications.  The websites that Plaintiff and Class Members visited did not know of or consent to Defendants' interception of the details about visitor's access to and activities on their websites.  Nor could they—Defendants never sought to, or did, obtain Plaintiff's, Class Members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

---

[109] Richard Nieva, *TikTok's In-App Browser Includes Code that Can Monitor Your Keystrokes, Researcher Says*, FORBES (August 18, 2022), https://www.forbes.com/sites/richardnieva/2022/08/18/tiktok-in-app-browser-research/?sh=5b801c317c55.

172.   Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## SECOND CLAIM FOR RELIEF

### Violation of the California Invasion of Privacy Act

### Cal. Penal Code §§ 630, *et seq.* ("CIPA")

### (On behalf of Plaintiff against all Defendants)

173.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

174.   The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630.  Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

175.   Cal. Penal Code § 632 prohibits eavesdropping upon or recording of any confidential communication, including those occurring among the parties in the presence of one another or by means of a telephone, telegraph, or other device, through the use of an electronic amplifying or recording device without the consent of all parties to the communication.

176.   By contemporaneously intercepting and accessing Plaintiff's and Class Members' data regarding the websites they visited, their keystrokes, every tap on any button, link, image, or other component, and the details about the element users clicked on, Defendants—without consent and authorization of all parties— eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 631(a) of the CIPA.

177.   Defendants utilized Plaintiff's and Class Members' personal data and information for their own purposes, including for advertising.

178.   Neither Plaintiff nor the Class members consented to Defendants' interception, disclosure, and/or use of their electronic communications.  The websites that Plaintiff and Class Members visited did not know of or consent to Defendants' interception of the details about visitor's access to and activities on their websites.  Nor could they—Defendants never sought to, or did, obtain Plaintiff's, Class Members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

179.   Plaintiff and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

180.   Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure; their personal, private, and sensitive data have been collected, viewed, accessed, stored, and used by Defendants, and have not been destroyed.  Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law, Plaintiff and Class Members are entitled to injunctive relief.

### THIRD CLAIM FOR RELIEF

**Violation of the Comprehensive Computer Data Access and Fraud Act**

**Cal. Penal Code § 502, *et seq*. ("CDAFA")**

**(On behalf of Plaintiff against all Defendants)**

181.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

182.   The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA") to "expand the degree of protection afforded . . . from tampering, interference, damage, and unauthorized access to [including the extraction of data from] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

183.   Plaintiff's and Class Members' devices on which they accessed the TikTok app and unknowingly accessed Defendants' in-app browser, including their computers, smart phones, and tablets, constitute "computers, computer systems, and/or computer networks" within the meaning of the CDAFA. *Id.* § 502(b)(5).

184.   The information that Defendants obtains from the JavaScript injections through their in-app browser constitute data because the information is "a representation of information." *Id.* § 502(b)(7). "Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." *Id*.

185.   Defendants violated § 502(c)(2) of the CDAFA by knowingly accessing and without permission taking, copying, or making use of any Plaintiff

1    and Class Members' data from a computer, computer system, or computer network.

2    This includes, but is not limited to, data while it was in transit.

3        186.   Defendants did so in order to wrongfully obtain and use their personal

4    data in violation of Plaintiff and Class members' reasonable expectations of privacy

5    in their devices and data.

6        187.   Under § 502(b)(12) of the CDAFA a "Computer contaminant" is

7    defined as "any set of computer instructions that are designed to . . . record, or

8    transmit information within computer, computer system, or computer network

9    without the intent or permission of the owner of the information." Defendants

10   violated § 502(c)(8) by knowingly and without permission injecting JavaScript

11   instructions into websites viewed using Defendants in-app browser which

12   intercepted Plaintiff's and the Class Members' data.

13       188.   Plaintiff and Class members suffered damage and loss as a result of

14   Defendants' conduct.  Defendants' practices deprived Plaintiff and the Class

15   Members of control over their valuable property (namely, their data), the ability to

16   receive compensation for that data, and the ability to withhold their data for sale.

17       189.   Plaintiff and the Class members seek compensatory damages in

18   accordance with California Penal Code § 502(e)(1), in an amount to be proven at

19   trial, and injunctive or other equitable relief.

20       190.   Plaintiff and Class members have also suffered irreparable and

21   incalculable harm and injuries from Defendant's violations.  The harm will

22   continue unless Defendants are enjoined from further violations of this section.

23   Plaintiff and Class members have no adequate remedy at law.

24       191.   Plaintiff and Class members are entitled to punitive or exemplary

25   damages pursuant to Cal. Penal Code § 502(e)(4) because Defendants' violations

26   were willful and, upon information and belief, Defendants are guilty of oppression,

27   fraud, or malice as defined in Cal. Civil Code § 3294.  Plaintiff and the Class

28

members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## **FOURTH CLAIM FOR RELIEF**

### **Violation of California Business & Professions Code §§ 17200, *et seq.***

### **(On behalf of Plaintiff against all Defendants)**

192. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

193. Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, ("UCL"), because, as alleged, Defendants violated the California common law, California Constitution, and other statutes and causes of action described herein.

194. Defendants' business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interest, including protecting consumers' personal data. Defendants violated this public policy by, among other things, surreptitiously collecting data about its users through its in-app browser without Plaintiff's or Class Members' consent. Defendants' conduct violates the policies described herein.

195. Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm posed and caused by Defendants' secretly collecting data about Plaintiff and the Class Members is significant, and there is no corresponding benefit resulting from such conduct. Because Plaintiff and the Class Members were completely unaware of Defendants' conduct, they could not have avoided the harm.

196. Defendants' business acts and practices are also "fraudulent" within the meaning of the UCL. Defendants amassed a large collection of sensitive information and data about its users without disclosing their practices and therefore acted without consumers knowledge or consent.

197.   Defendants failed to disclose (i.e., omit) the existence of the in-app browser or the insertion of JavaScript code intentionally designed to intercept Plaintiff's and Class Members' private information and data.  Without disclosing the existence of the in-app browser and the JavaScript insertions that track every detail of a user's activity in the in-app browser the disclosures, Defendants' privacy policies are meaningless.

198.   Defendants' business acts and practices were likely to, and did, deceive members of the public, including Plaintiff and the Class Members, into believing that their use of the TikTok app, and their access of websites through the app, was private.

199.   Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

200.   Had Plaintiff and the Class Members known that information about their access to websites through the app would be collected and used by Defendants for their own benefit, they would not have used those services.

201.   Plaintiff and the Class Members have a property interest in their data, including data about the websites they access, their keystrokes, their credit card information, etc.

202.   Defendants have taken property from Plaintiff and the Class Members without providing just, or any, compensation.

203.   Plaintiff and Class Members have lost money and property as a result of Defendants' conduct in violation of the UCL.  Data, about Plaintiff and the Class Members, has value.  Companies are willing to pay for data, like the data unlawfully collected and used by Defendants.

204.   By deceptively collecting and using data about Plaintiff and the Class Members, Defendants have taken money and property from Plaintiff and Class Members.  Moreover, Defendants were able to use the data obtained from Plaintiff and Class Members to support their business model of profiting from advertising.

205.   For these reasons, Plaintiff seeks restitution, disgorgement, injunctive relief, and compensatory damages on behalf of himself and Class Members.

## FIFTH CLAIM FOR RELIEF

### Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion
### (On behalf of Plaintiff against all Defendants)

206.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

207.   Plaintiff asserts claims for intrusion upon seclusion and so must plead (1) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiff and Class Members had a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

208.   Defendants' in-app browser inserts JavaScript instructions into any website that is visited using the in-app browser.  These JavaScript instructions record every keystroke, which could include names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouse's names, children's names, or any other information which is typed into the in-app browser.  The JavaScript instructions also record every tap on any button, link, image, or other component of a website.  This provides Defendants with very detailed information about the kinds of things that each user of the in-app browser is tapping or "clicking" on.  As one example, Planned Parenthood maintains a TikTok presence, and its member profile links to Planned Parenthood's external website.  Clicking on that link from inside Defendants' in-app browser would supply Defendants with an exact record of every link or button that is tapped while viewing that site from within the in-app browser.  Finally, the JavaScript instructions in Defendants' in-app browser provide Defendants with details about

the elements users clicked on – providing them with additional information about the content that is being viewed or clicked on during use of the in-app browser.

209.   Defendants' copying of all these kinds of data using the undisclosed JavaScript tracking insertions constitutes an intentional intrusion upon Plaintiff and Class Members' solitude or seclusion in that Defendants collected these kinds of sensitive pieces of information that were intended to stay private from third parties without users' consent.

210.   Plaintiff and Class Members had a reasonable expectation of privacy in their data.  Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred.  Plaintiff and Class Members never agreed that Defendants could collect or disclose their data from third-party websites.

211.   Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred.  Plaintiff and Class Members never agreed that their data would be collected or used by Defendants.

212.   Defendants' intentional intrusion on Plaintiff's and Class Members' solitude or seclusion without consent would be highly offensive to a reasonable person.  Plaintiff and Class Members reasonably expected that their data would not be collected or used.

213.   The surreptitious taking and disclosure of data from millions of individual TikTok users was highly offensive because it violated expectations of privacy that have been established by social norms.  Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

214.   Given the nature of the data Defendants collected and disclosed including, but not limited to: names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account

or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouses names, children's names, or any other information which is typed into the in-app browser, every tap on any button, link, image or other component of a website, and details about the contents of what users clicked and/or viewed—this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

215. As a result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

216. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

217. Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of its intrusions upon Plaintiff's and Class Members' privacy.

218. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

219. Plaintiff also seeks such other relief as the Court may deem just and proper.

## SIXTH CLAIM FOR RELIEF

### Invasion of Privacy and Violation of the California Constitution, Art. 1, § 1

### (On behalf of Plaintiff against all Defendants)

220.  Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

221.  Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."  California Constitution, Article I, Section 1.

222.  To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

223.  The right to privacy in California's constitution creates a right of action against private and government entities.

224.  Plaintiff and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and data pursuant to Article I, Section I of the California Constitution.

225.  Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected by Defendants; and (ii) Plaintiff and Class Members did not consent or otherwise authorize Defendants to collect and use this private information for their own monetary gain.

226.  The confidential and sensitive data, which Defendants intruded upon, intercepted, collected, and disclosed without Plaintiff's and Class Members' authorization or consent, included, without limitation: names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card

numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouses names, children's names, or any other information which is typed into the in-app browser, every tap on any button, link, image or other component of a website, and details about the contents of what users clicked and/or viewed.

227. Defendants' actions constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the data collected was highly sensitive and personal, as protected by the California Constitution; (ii) Defendants did not have authorization or consent to collect this information; and (iii) the invasion deprived Plaintiff and Class Members the ability to control the circulation of said information, which is considered a fundamental right to privacy.

228. Defendants' invasion violated the privacy rights of millions of Class Members, including Plaintiff, without authorization or consent. Their conduct constitutes a severe and egregious breach of social norms.

229. As a result of Defendants' actions, Plaintiff and Class Members have sustained damages and will continue to suffer damages as a direct and proximate result of Defendants' invasion of privacy.

230. Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant because of its intrusions upon Plaintiff's and Class Members' privacy.

231. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

232.   Plaintiff also seeks such other relief as the Court may deem just and proper.

### SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment

### (On behalf of Plaintiff against all Defendants)

233.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

234.   Defendants received benefits from Plaintiff and Class Members in the form of data which has substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiff and Class Members.

235.   Plaintiff and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected from Plaintiff and Class Members, without authorization and proper compensation. Defendants collected and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

236.   Defendants unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendants' conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

237.   The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

238. Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiff and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## IX. PRAYER FOR RELIEF

239. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

    a.    An order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Code of Civil Procedure § 382;

    b.    An order enjoining Defendants to desist from further deceptive business practices with respect to the in-app browser and such other injunctive relief that the Court deems just and proper;

    c.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

    d.    An award for Plaintiff and Class Members costs, restitution, compensatory damages for economic loss and out of pocket costs, damages under applicable state laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

    e.    All remedies available under the Wire Protection Act, including but not limited to damages whichever is greater of (A) actual damages suffered by Plaintiff and Class Members and any profits made as a result of the violations; or (B) statutory damages of whichever is greater of $100 a day for each day of violation of $10,000;

f.      All remedies available under CIPA, including but not limited to damages whichever is great of (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages sustained by the Plaintiff and Class Members;

g.      All remedies available under the CDAFA, including but not limited to compensatory damages, injunctive relief, and punitive and exemplary damages;

h.      All remedies available under the UCL, including but not limited to, restitution, disgorgement, injunctive relief, and compensatory damages;

i.      Any applicable statutory and civil penalties;

j.      An award of costs and attorneys' fees, as allowed by law;

k.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded.

l.      Leave to amend this Complaint to conform to the evidence produced at trial; and

m.      Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

1

# X. <u>DEMAND FOR JURY TRIAL</u>

2       240.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

3   Plaintiff demands a jury trial as to all issues triable by a jury.

4

    Dated: November 25, 2022

5                                                       Respectfully submitted,

6
                                                        /s/ *Roland Tellis*
7                                                       Roland Tellis

8                                                       BARON & BUDD, P.C.
                                                        Roland Tellis (SBN 186269)
9                                                       rtellis@baronbudd.com
                                                        Sterling Cluff (SBN 267142)
10                                                      scluff@baronbudd.com
                                                        David Fernandes (SBN 280944)
11                                                      dfernandes@baronbudd.com
                                                        Shannon Royster (SBN 314126)
12                                                      sroyster@baronbudd.com
                                                        15910 Ventura Boulevard, Suite 1600
13                                                      Encino, CA 91436
                                                        Telephone: 818-839-2333
14                                                      Facsimile: 818-986-9698
15
16                                                      DON BIVENS PLLC
17                                                      Don Bivens (*pro hac vice* forthcoming)
                                                        don@donbivens.com
18                                                      15169 N. Scottsdale Road, Suite 205
                                                        Scottsdale, AZ 85254
19                                                      Telephone: 609.708.1450
20
21
22
23
24
25
26
27
28

# EXHIBIT 16

BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: TIKTOK, INC. CONSUMER PRIVACY LITIGATION | MDL No. 2948 |

## DEFENDANT TIKTOK'S OPPOSITION TO PLAINTIFF AUSTIN RECHT'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-3)

Defendant TikTok Inc. on behalf of itself and its affiliates (Bytedance Inc., et al.), which comprise all defendants named to date in the underlying civil actions, respectfully opposes the Motion to Vacate the Conditional Transfer Order ("CTO"), ECF No. 108 ("Mot."), filed by the plaintiff in the action styled *Recht v. TikTok Inc.*, No. 2:22-cv-08613 (C.D. Cal.). *See* Pl. and Movant Austin Recht's Mem. Supp. Mot. Vacate Conditional Transfer Order, ECF No. 108-1 ("Mem.").[1]

## INTRODUCTION

Mr. Recht's motion to vacate the order conditionally transferring his action to the *TikTok Inc. Consumer Privacy Litigation* relies on the fiction that the existing MDL (No. 2948) was confined to TikTok's alleged collection of biometric data. In fact, that MDL alleged, litigated, and settled claims relating to *all* data that TikTok was claimed to have improperly collected. Included among the specific categories of data

---

[1] Separately from his Motion to Vacate the CTO, Plaintiff Recht has also filed a motion to create a new MDL, MDL No. 3067. For the same reasons given herein to deny Plaintiff Recht's motion to vacate the Conditional Transfer Order, his motion to create new MDL No. 3067 should likewise be denied.

at issue in the MDL was users' internet browsing histories—i.e., the issue at the center of Mr. Recht's newly filed case. This substantial overlap is reason enough to deny his request for vacatur, as the Panel has consistently disfavored carving duplicative MDLs out of existing MDLs.

But the problems with Mr. Recht's motion run much deeper. Although he claims his action is unbound by the Settlement Agreement approved by the transferee court in this MDL (*In re TikTok Inc. Consumer Privacy Litigation*), that Agreement explicitly released any claims—including Mr. Recht's—arising from or related to "the collection and use of ***any*** user data." Mot. Prelim. Approval Ex. A, Proposed Settlement Agreement and Release § 2.30, *In re TikTok, Inc., Consumer Priv. Litig.* (N.D. Ill. Feb. 25, 2021), ECF No. 122-1 ("Settlement Agreement") (emphasis added). And the release clause extends to unknown, unasserted claims, while waiving the right to bring any future actions based on additional facts that might come to light. Beyond those dispositive features of the Settlement Agreement, the transferee court also enjoined further litigation on the released claims and retained jurisdiction over the interpretation and enforcement of the agreement. That, too, is dispositive of Mr. Recht's request for vacatur.

Facing those realities, Mr. Recht tries to salvage his break-away MDL by misrepresenting the scope of the settlement class and the adequacy of the settlement notice in the existing MDL. The thrust of both misrepresentations is the same: that only people who created videos were class members in the *TikTok Inc. Consumer Privacy Litigation*, or that the notice could be read to suggest as much. But this

argument is refuted by Mr. Recht's own evidence submitted with his motion. Equally unavailing is Mr. Recht's claim that party convenience favors his bid to vacate transfer to the existing MDL. In fact, the Panel already rejected those issues when it centralized this MDL in the Northern District of Illinois back in 2020, and Mr. Recht offers nothing that changes the analysis, let alone warrants vacatur.

The Panel should thus deny Mr. Recht's motion to vacate the conditional transfer order.

## ARGUMENT

## I.  MDL NO. 2948 ENTIRELY ENCOMPASSES THE *RECHT* ACTION

Like his motion to create a new MDL, Mr. Recht's motion to vacate the order conditionally transferring his case to MDL 2948 is riddled with inaccuracies and misrepresentations. The facts confirm that Plaintiff Recht's case (and all newly filed copycat cases) are encompassed within—and enjoined by—this existing MDL.

Perhaps hoping that naming things will make them so, Mr. Recht creates a misnomer for MDL 2948, which he refers to as the "*Biometric Data* MDL" throughout his briefing. *E.g.*, Mot. at 1. But in fact, MDL 2948 was broadly and properly named by the Panel "*In re TikTok Inc. Consumer Privacy Litigation*" because the claims at issue concerned *all* user data that TikTok allegedly collected without sufficient notice and consent. Indeed, as is apparent from the Consolidated Class Action Complaint in MDL No. 2948, the plaintiffs alleged that *biometric data was just one of more than 18 different types of data* that TikTok collected through its app allegedly without sufficient notice and consent. Consolidated Am. Compl. ¶ 156, *In re TikTok, Inc.,*

*Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. Dec. 18, 2020), ECF No. 114. They further alleged that "[t]he TikTok App secretly collects data far beyond what Defendants disclose to users," including "internet browsing history." *Id.* ¶ 167.

The alleged use of the app to collect users' internet activity on third-party websites without sufficient notice and consent is the identical factual predicate as Mr. Recht's theory of the case, the "crux" of which he describes as TikTok collecting "personal activity on third-party websites" through the in-app browser without sufficient notice and consent from class members. Mem. at 3. Mr. Recht strains to differentiate his theory from MDL 2948, which addressed *all* user data collected through the app. *Id.* at 2-3. But he ignores the obvious: the in-*app* browser is part of the *app*. As such, his repeated claim that there are "no overlapping facts" is demonstrably false, *id.* at 14, and the overlap between MDL 2948 and Recht's action requires denial of his motion to vacate, *see, e.g.*, *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804, 2019 U.S. Dist. LEXIS 129695, at *1, *3 (J.P.M.L. Aug. 2, 2019) (denying motions to vacate orders conditionally transferring actions and denying an attempt "to create a new MDL" because, despite "some variances," the newly filed actions "share[d] a factual core" with an existing MDL).

For these reasons, the Panel should reject Mr. Recht's attempt to break away from MDL No. 2948 and re-litigate the same core facts in a separate MDL. The Panel disfavors such attempts to create multiple MDLs if doing so "would result in unnecessary duplication." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1393 n.5 (J.P.M.L. 2018); *accord In re Juul Labs, Inc., Mktg., Sales*

*Pracs., & Prods. Liab. Litig.*, 396 F. Supp. 3d 1366, 1367 (J.P.M.L. 2019) ("The proposal to create two MDLs is not well-taken. Given the substantial overlap in the core factual issues, parties, and claims, a single MDL will best achieve Section 1407's purposes."); *In re Frito-Lay N. Am., Inc. "All Natural" Litig.*, 908 F. Supp. 2d 1379, 1379-80 (J.P.M.L. 2012) (rejecting request "that the Panel should create two MDLs" because "the transferee judge may account, at her discretion, for any differences among the actions through the use of appropriate pretrial devices, such as separate tracks for discovery or motion practice").

Indeed, even in circumstances where the relation between the new and existing actions was much more remote, the Panel has rejected attempts to carve out a new MDL from an existing MDL. *In re Infants Born Opioid-Dependent Prods. Liab. Litig. ("Opioid Litig.")*, 350 F. Supp. 3d 1377, 1379 (J.P.M.L. 2018) (declining to create a new MDL focused on opioid-addicted infants given existing MDL regarding the improper marketing and inappropriate distribution of opioids more generally). The duplication urged by Mr. Recht is "at odds with Section 1407's mandate that centralization 'promote the just and efficient conduct of [the involved] actions.'" *Id.* (quoting 28 U.S.C. § 1407(a)).

As its name suggests, the *TikTok Consumer Privacy Litigation* examined all aspects of consumer privacy with respect to the TikTok app. Although biometric data featured prominently, that was due to the press drawing parallels between MDL 2948 and a landmark case asserting claims under the Illinois Biometric Information Privacy Act ("BIPA") against Facebook. *See In re Facebook Biometric Info. Priv. Litig.*,

522 F. Supp. 3d 617, 621-29 (N.D. Cal. 2021). It was also driven by financial rather than substantive reasons, as BIPA imposes $5,000 statutory damages per class member and threatened total damages of about $7,000,000,000 given the class size. *See* 740 Ill. Comp. Stat. 14/20. That figure understandably commanded much of the parties' attention, especially given that the BIPA case involving Facebook settled for over half a billion dollars. *See In re Facebook*, 522 F. Supp. 3d at 621-29. The record is nonetheless clear that MDL 2948 alleged, litigated, analyzed, and settled claims for TikTok's collection of users' internet browsing data (among many other categories of data). Plaintiff Recht's revisionist attempt to confine *TikTok Consumer Privacy Litigation* to biometrics ignores that reality.

While Mr. Recht's case does not focus on biometrics, the law is clear that "Section 1407 does not require a complete identity or even majority of common factual and legal issues." *Opioid Litig.*, 350 F. Supp. 3d at 1379 n.5; *cf. In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, — F. Supp. 3d —, 2021 U.S. Dist. LEXIS 21511, at *3 (J.P.M.L. Feb. 4, 2021) ("MDLs can naturally expand to encompass other claims involving the products at issue and presenting similar factual questions.").

His motion to vacate the CTO should therefore be denied.

## II.   THE SETTLEMENT AGREEMENT IN MDL NO. 2948 BARS THE *RECHT* ACTION

The breadth of the claims litigated in MDL 2948 is reflected in the parties' Settlement Agreement, which is in no way limited to biometric data. Recognizing that the claims asserted in the complaint covered the collection of any user data without proper disclosure and consent, the Settlement Agreement likewise released claims

"arising from or related to . . . the collection and use of *any* user data." Mem. Op. & Order at 12 n.6, *In re TikTok, Inc., Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. July 28, 2022), ECF No. 261 (emphasis added); *see also* Settlement Agreement § 2.30. And the Settlement Agreement made clear that, in negotiating its terms, "[t]he Parties jointly reviewed *multiple categories of user data* potentially in TikTok's possession that should be deleted from TikTok's servers." Settlement Agreement § 4.2 (emphasis added).

The Settlement Agreement forecloses Mr. Recht's case. Mem. at 5-6 (explaining that his claims "arise from Defendants' use of an in-app browser to secretly intercept personal information and data during users' communications with third-party websites"). Looking for a way out, he argues that his case revives the already-settled MDL 2948 because it asserts different *causes of action* that rely on new research. Mem. at 5-7. And he claims that "[n]othing in the *Biometric Data* MDL [*sic*] indicates those plaintiffs were aware of, or based their claims on," his new research.[2] Mot. at 2.

All of that is irrelevant. The Settlement Agreement includes a release clause that expressly covers: "[C]laims . . . of any kind, whether known *or unknown* . . .

---

[2] Mr. Recht concedes that the Settlement Agreement provided remedies related to the collection of several categories of data beyond biometrics. Mem. at 10 (listing data subject to injunctive relief: GPS data, clipboard data, pre-uploaded data, etc.); *see also* Settlement Agreement § 6.1. The only reason that internet browsing data was not included in the Settlement Agreement's list was that, after discovery, the parties and the court recognized that TikTok's privacy policy expressly disclosed the collection of "browsing and search history (including content you have viewed in the [App])." Mem. Op. & Order at 50-51 & n.26, *In re TikTok, Inc., Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. July 28, 2022), ECF No. 261.

arising from or related to the Civil Actions or the collection and use of any user data . . . whether in law or in equity, under . . . any other subject area, or under any statute, rule, regulation, order, or law, whether federal, state, or local, on any grounds whatsoever . . . that were, *could have been*, *or could be asserted* by the Releasing Parties." Settlement Agreement § 2.30 (emphasis added).

Thus, even if Mr. Recht's asserted causes of action and evidence in support thereof were truly distinct from those litigated in MDL 2948, he cannot crack open the Settlement Agreement's release clause because it covers both unknown and unasserted claims. It is blackletter law that "a release incorporated into an order approving a class action settlement bars subsequent litigation based on the released claims," *Tropp v. W.-Southern Life Ins. Co.*, 381 F.3d 591, 596 (7th Cir. 2004), and that holds true even where "the claim was not presented and might not have been presentable in the class action," *Schulte v. Fifth Third Bank*, No. 09-6655, 2012 U.S. Dist. LEXIS 82790, *4-10 (N.D. Ill. June 15, 2012) (enforcing class settlement agreement's "broad release" where subsequent litigation sought to bring claims that "were previously litigated, settled, and released"); *see also In re VMS L.P. Sec. Litig.*, No. 90-2412, 1995 U.S. Dist. LEXIS 16921, *8 (N.D. Ill. Nov. 9, 1995) (enforcing class settlement agreement's release clause that covered "unknown claims"; "There is no barrier to such releases even if they encompass claims broader than those plead in the complaint so long as the release is clear and part of a just settlement.").

The release clause expressly waives claims based on evidence that might be discovered after the Settlement Agreement: "Plaintiffs' Releasing Parties

acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention to finally and forever settle and release the Released Claims, notwithstanding any unknown claims they may have." Settlement Agreement § 12.3. Courts routinely give effect to such clauses and dismiss claims based on facts discovered after a plaintiff has entered into a settlement agreement. *See, e.g.*, *Skilstaf, Inc. v. CVS Caremark Corp.*, No. 09-02514, 2010 U.S. Dist. LEXIS 2662, *18 (N.D. Cal. Jan. 13, 2010) (enforcing covenant not to sue in class-settlement agreement by dismissing claims brought by plaintiff in later-filed action), *aff'd*, 669 F.3d 1005 (9th Cir. 2012).

Consequently, despite Mr. Recht's argument that "allegations involving TikTok's use of an in-app browser to track user activity on third party websites" were not raised in MDL 2948 (Mem. at 3), that is irrelevant under the plain terms of the Settlement Agreement (§§ 2.30, 12.3). It is also wrong. In fact, plaintiffs in MDL 2948 tasked an expert with examining the TikTok app and code to look for precisely the sort of data-privacy issues asserted in Mr. Recht's complaint. Plaintiffs' expert presumably found *nothing* regarding the tracking of keystroke data, otherwise that issue would have been raised by the plaintiffs in that action.[3] Regardless, any claims seeking to relitigate those issues are plainly barred by the Settlement Agreement.

---

[3] There is good reason to doubt the veracity of Mr. Recht's newly discovered "facts." By his own admission, his case is "founded on information" in a report by Felix Krause dated August 18, 2022 claiming that TikTok had the ability to track keystroke data. Mem. at 2. But Mr. Recht fails to mention that, as *Forbes* reported just months later, "there is no evidence [that] TikTok is actually doing so." *See* Richard Nieva & Thomas

## III.    THE *RECHT* ACTION VIOLATES THE COURT'S INJUNCTION

Mr. Recht next argues for vacatur on the ground that MDL 2948 is "already settled and terminated." Mem. at 10-11. But that cuts *against*, not *for*, vacatur, as the transferee court retained "continuing jurisdiction over matters relating to the Settlement, including, without limitation, the administration, interpretation, effectuation and/or enforcement of the Settlement, the Settlement Agreement, and this Final Order and Judgment." Order & Final J. ¶ 27, *In re TikTok, Inc., Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. Aug. 22, 2022), ECF No. 264. Moreover, Mr. Recht's duplicative action violates the injunction in the transferee court's Order and Final Judgment, which prohibits further litigation of claims covered by the Settlement Agreement:

> No Further Litigation. All members of the Class who did not make a valid request for exclusion in the time and manner provided in the Class Notice, or as otherwise set forth in the Final Approval Order, are barred from commencing or prosecuting any action, suit, proceeding, claim or cause of action in any jurisdiction or court against Defendants' Released Parties based upon, *relating to, or arising out of, any of the Released Claims* [e.g., those related to the collection and use of any user data].

*Id.* ¶ 24 (emphasis added).

There can be no doubt that it is for the transferee court to interpret and enforce its injunction.[4] *See id.* ¶¶ 24, 27. In analogous circumstances, the Panel emphatically

---

Brewster, *Lawmakers Press Apple and Google Over TikTok's Keystroke Tracking Ability*, Forbes, Nov. 4, 2022, https://www.forbes.com/sites/richardnieva/2022/11/04/lawmakers-letter-apple-google-tiktok-keystroke-tracking/?sh=5ec8859d41a6.

[4] Indeed, even if centralization under 28 U.S.C. § 1407 were not at issue, Mr. Recht's case (together with all the other tag-along actions) would be susceptible to dismissal or transfer to the Northern District of Illinois under these provisions of the transferee

rejected a faction of plaintiffs' "extraordinary request" to create a new MDL that consisted of exclusions and opt-outs from settlements that were approved in an existing MDL. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 961 F. Supp. 2d 1355, 1356-57 (J.P.M.L. 2013). There, the Panel found that "[r]ather than serve Section 1407's purposes, the proposed new MDL would subvert them." *Id*. The subversion would be run even deeper here. Whereas the break-away faction in *Deepwater Horizon* comprised those *excluded* from settlements for one reason or another, here Mr. Recht *remains bound* by the settlement approved by a transferee court that (1) expressly released the very claims he brings, (2) expressly prohibited further litigation on those released claims, and (3) expressly retained jurisdiction over the interpretation and enforcement of points 1 and 2 (i.e., the release and prohibition).

Mr. Recht nonetheless complains that he will somehow be "severely prejudice[d]" if the Panel transfers his case to the existing MDL where it belongs. Mem. at 2. There is absolutely no prejudice. As explained above, whether Mr. Recht's case is barred by the Settlement Agreement must be decided by the transferee court. And if that court determines that any portion of his claim is not so barred, then it can proceed to adjudicate them just the same as it could any other claims. Mr. Recht will be none the worse in that unlikely scenario.

---

court's Order and Final Judgment. Mem. Op. & Order at 50-51 & n.26, *In re TikTok, Inc., Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. July 28, 2022), ECF No. 261.

## IV. MR. RECHT'S MOTION MISREPRESENTS THE SETTLEMENT AGREEMENT AND THE SETTLEMENT NOTICE

Mr. Recht tries to salvage his break-away MDL by misrepresenting the scope of the settlement class and the adequacy of the settlement notice in the existing MDL. The thrust of both misrepresentations is the same: (1) that only people who created videos were class members in the *TikTok Inc. Consumer Privacy Litigation*, or (2) that the notice could be read to suggest as much. Both arguments are refuted by Mr. Recht's own evidence submitted with his motion.

First, the nationwide class in the Settlement Agreement comprises "[a]ll persons who reside in the United States who used the App—the TikTok video sharing application (or its Musical.ly predecessor) distributed in the United States—prior to September 30, 2021." Order & Final J. ¶ 2, *In re TikTok, Inc., Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. Aug. 22, 2022), ECF No. 264; *see also* Mem. at 8 n.23 (quoting this same language). It is not limited in any way to only those who created videos. In Mr. Recht's telling, however, the nationwide settlement class was limited to "persons who used the video-sharing functions of the TikTok application." Mem. at 8; *see also id.* at 12 ("[T]he certified settlement classes *only* included users who used TikTok as a video sharing application." (emphasis added)). Mr. Recht suggests that the phrase "video sharing" distinguishes between users of the app (i.e., separating those who "used the video-sharing functions" from those who did not). *See* Mem. at 8. That is wrong, and a simple reading of the transferee court's Order and Final Judgment—and of Mr. Recht's own footnote—disproves this claim. It cannot be

seriously disputed that the nationwide settlement class encompasses *all* U.S. users of the TikTok app, including Mr. Recht.

Second, and just as unavailing, is Mr. Recht's argument that the settlement notice in the *TikTok Consumer Privacy Litigation* somehow failed to inform all U.S. users of the app that they were class members. Mem. at 12-13. Mr. Recht's support for this claim is an excerpt of the notice, which states in large, bold letters: "**If you and/or your minor child used TikTok and/or Musical.ly application, You May Be Entitled to a Payment from a Class Action Settlement**." Mem. at 12. Then, in smaller font, the excerpt broadly defines the allegations being settled as TikTok's alleged collection of "personal data in connection with [class members'] *use* of the [TikTok app]"—regardless of which app features class members may have used. *Id.* (emphasis added). It is thus obvious that the class was, without qualification, all U.S. users of the TikTok app. Recht tries to narrow the notice; seizing on a stray phrase that defines the app—*not* the class—as the "the TikTok – Make Your Day video-sharing application," he claims that a class member "would reasonably interpret" the notice to exclude activities related to the in-app browser. Mem. at 13. That tortured reading fails to persuade.

Mr. Recht again opts for misdirection by including a screenshot of the settlement claim form that pertains to the *Illinois subclass*, rather than the *nationwide* class. *Id.* While the *Illinois subclass* was indeed limited to those who used the TikTok app to create videos, the *nationwide* class was not so limited. Order &

Final J. ¶ 2, *In re TikTok, Inc., Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. Aug. 22, 2022), ECF No. 264.

In sum, Mr. Recht's attempt to use various screenshots to gin up a dispute regarding the scope of the release and the adequacy of the notice only distracts from the single issue before the Panel: Do Recht's claims overlap with the claims at issue in the *In re TikTok Inc. Consumer Privacy Litigation*? They do. In fact, they are completely subsumed within the settlement and release in that MDL. *See supra* Section I. That is dispositive of his request for vacatur.

## V. THE PARTY CONVENIENCE FACTOR WAS ALREADY WEIGHED WHEN THE PANEL CREATED THIS MDL

Finally, Mr. Recht argues that party convenience favors centralizing his dispute in the Central District of California. Mem. at 15-17. But the issue of party convenience was decided back in 2020 when the Panel centralized *In re TikTok, Inc., Consumer Privacy Litigation* in the Northern District of Illinois, despite that several actions had been filed in California. 481 F. Supp. 3d 1331, 1332 (J.P.M.L. 2020). Mr. Recht cites no authority for the proposition that this issue ought to be relitigated on account of his duplicative action, much less that an altered reckoning of party convenience can serve as grounds for vacating an order conditionally transferring his action. *See* Mem. 15-17. If that were the rule, every tag-along plaintiff could well argue that the transferee venue is less convenient than the district in which they opted to sue. No vacatur of a conditional transfer order is warranted on this ground.

That is especially true here, where Mr. Recht's argument focuses on where *TikTok* is located. *Id.* As the Panel reasoned when it selected the Northern District of

Illinois, "although common defendants ByteDance, Inc., and TikTok, Inc., are headquartered in California, they support selection of the Northern District of Illinois, as do multiple plaintiffs." *In re TikTok*, 481 F. Supp. 3d at 1332. Mr. Recht offers nothing that changes the Panel's prior analysis.

## CONCLUSION

Mr. Recht's Motion to Vacate the Conditional Transfer Order should be denied, and his action—together with the other newly filed actions—should be transferred to existing MDL No. 2948.

Respectfully submitted,

DATED: January 24, 2023

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:   */s/Anthony J Weibell*
      Anthony J Weibell

*Lead Counsel for all Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2023, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issues through the Court's Electronic Case Filing System on this date.

*/s/ Anthony J Weibell*
Anthony J Weibell
