## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**IN RE: TIKTOK INC. CONSUMER PRIVACY LITIGATION**

This Document Relates to:

*Bravo v. TikTok Inc.,* 23 C 225
*Murphy v. TikTok Inc.,* 23 C 504
*Buckley v. TikTok Inc.,* 23 C 841
*Tado v. TikTok Inc.,* 23 C 1430
*Recht v. TikTok Inc.,* 23 C 2248
*Fleming v. TikTok Inc.,* 23 C 2260
*E.K. v. TikTok Inc.,* 23 C 2262
*Androshchuk v. TikTok Inc.,* 23 C 2462
*Albaran v. TikTok Inc.,* 23 C 2463
*G.R. v. TikTok Inc.,* 23 C 2464
*Moody v. TikTok Inc.,* 23 C 2465
*Schulte v. TikTok Inc.,* 23 C 2466
*Fugok v. TikTok Inc.,* 23 C 2467

MDL No. 2948-A

Master Docket No. 24 C 2110

Judge Rebecca R. Pallmeyer

Magistrate Judge Sunil R. Harjani

**MASTER CONSOLIDATED COMPLAINT**

TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................... 1

II.   PARTIES ........................................................................................ 2

    A.   Plaintiffs ................................................................................. 2

    B.   Defendants ............................................................................. 7

    C.   Alter Ego Allegations ............................................................ 9

III.  JURISDICTION ............................................................................ 10

    A.   Allegations Supporting Personal Jurisdiction over Defendants Beijing ByteDance and ByteDance Ltd............................................... 11

        1.   Defendants Beijing ByteDance and ByteDance Ltd. have Pervasive Contacts With Each State in the United States ............................. 11

        2.   Defendants Beijing ByteDance and ByteDance Ltd. Exert Substantial Control Over the Operations of the Domestic Defendants ............ 16

IV.  GENERAL FACTUAL ALLEGATIONS ..................................... 41

    A.   TikTok's Business Model: Profits from Advertising by Monetizing User Data ..................................................................................... 45

    B.   Global Privacy Concerns Regarding TikTok's Data Use Practices ....... 49

        1.   Concerns in the U.S........................................................... 49

        2.   Concerns Abroad............................................................... 57

    C.   Defendants' Interception and Theft of Users' Sensitive, Personally Identifying Information Input into Third-Party Websites ................. 59

    D.   The Data Collected in Defendants' In-App Browser Has Inherent Value to Plaintiffs and Class Members ............................................. 78

    E.   Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in the Data Collected in Defendants' In-App Browser......................... 83

    F.   Plaintiffs and Class Members Did Not Consent to the Collection of Data via the In-App Browser .......................................................... 85

V.   TOLLING .................................................................................... 86

VI.      CLASS ACTION ALLEGATIONS .................................................................. 88

VII.     NATIONWIDE CLAIMS FOR RELIEF ...................................................... 91

    A.      Nationwide Claim for Relief No. 1: Violation of the Federal Wiretap Act – 18 U.S.C. § 2510, *et seq.* .................................................................... 91

    B.      California Law Applies To All Class Members .................................... 94

    C.      Nationwide Claim for Relief No. 2: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA") ......................... 96

    D.      Nationwide Claim for Relief No. 3: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA") ......................... 98

    E.      Nationwide Claim for Relief No. 4: Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ................. 104

    F.      Nationwide Claim for Relief No. 5: Unjust Enrichment ...................... 107

VIII.    STATE-SPECIFIC CLAIMS FOR RELIEF ................................................. 109

    A.      California Claims for Relief .............................................................. 109

        1.     California Claim for Relief No. 1: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA") .............. 109

        2.     California Claim for Relief No. 2: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA") .............. 112

        3.     California Claim for Relief No. 3: Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ........ 118

        4.     California Claim for Relief No. 3: Unjust Enrichment ............... 121

    B.      Florida Claims for Relief .................................................................. 123

        1.     Florida Claim for Relief No. 1: Violation of the Florida Security of Communications Act – Fla. Stat. § 934, *et seq.* ........................... 123

        2.     Florida Claim for Relief No. 2: Unjust Enrichment ................... 126

    C.      Illinois Claims for Relief .................................................................. 128

        1.     Illinois Claim for Relief No. 1: Violation of the Illinois Eavesdropping Act – ILCS 720 § 5/14-1, *et seq.* ................................................... 128

        2.     Illinois Claim for Relief No. 2: Unjust Enrichment .................... 130

D.   Pennsylvania Claims for Relief ............................................................ 132

    1.   Pennsylvania Claim for Relief No. 1: Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act – 18 Pa. Cons. Stat. § 5701, *et seq* ................................................................................ 132

    2.   Pennsylvania Claim for Relief No. 2: Unjust Enrichment ........... 135

IX.   PRAYER FOR RELIEF ............................................................... 136

X.   DEMAND FOR JURY TRIAL ................................................... 139

For their complaint against Defendants TikTok Inc., ByteDance Inc., Beijing Douyin Information Service Co. Ltd. a/k/a ByteDance Technology Co. Ltd., and ByteDance Ltd. (collectively, the "Defendants"), Plaintiffs, individually and on behalf of all others similarly situated, allege as follows:

## I.  NATURE OF THE ACTION

1.  This case exemplifies that the "world's most valuable resource is no longer oil, but data."[1] Unbeknownst to Plaintiffs and Class Members, Defendants utilized an "in-app browser" to secretly inject JavaScript code into third-party websites accessed via Defendants' TikTok social media application ("TikTok"), which, in turn, allowed Defendants to intercept, view and record TikTok users' private activities on those websites.  Defendants used this valuable data to command massive advertising revenue.

2.  Plaintiffs bring this class action on behalf of all persons who downloaded TikTok and accessed a third-party website via the TikTok app's in-app browser.

3.  At no time did Defendants disclose to Plaintiffs and Class Members that TikTok users who access third-party websites via the TikTok app are forced to use an in-app browser which serves as Defendants' sophisticated data collection tool.

---

[1] *The World's Most Valuable Resource Is No Longer Oil, But Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data (emphasis added).

4. As described more fully below, through their secret use of an in-app browser, Defendants have unlawfully intercepted private and personally identifiable data from TikTok users and used such data to generate massive revenue. Through their clandestine tracking activities, Defendants have violated federal and state wiretap laws and unjustly profited from their unlawful activities.

## II. PARTIES

### A. Plaintiffs

5. Plaintiff Austin Recht is a citizen and resident of the State of California, currently residing in Beverly Hills. Plaintiff Recht downloaded the TikTok app and created his first TikTok account in 2019 on his mobile device, an Apple iPhone. While using the TikTok app, Plaintiff Recht encountered and clicked on links to external, third-party websites. Unbeknownst to Plaintiff Recht, the link took him to a third-party website via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Recht's website activities and purchases, including his personal information, contact information, and credit card information. Defendants surreptitiously collected Plaintiff Recht's personal data without his knowledge or consent.

6. Plaintiff Sean Guzman is a citizen and resident of the State of California, currently residing in San Gabriel. Plaintiff Guzman downloaded the TikTok app and created his first TikTok account in August 2022 and a second

account in October 2023, both on his mobile device, a Nubia Red Magic Pro. While using the TikTok app, Plaintiff Guzman encountered and clicked on links to external, third-party websites. Unbeknownst to Plaintiff Guzman, the links took him to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Guzman's website activities and purchases, including his personal information, contact information, and credit card information. Defendants surreptitiously collected Plaintiff Guzman's personal data without his knowledge or consent.

7.      Plaintiff Michael Walsh is a citizen and resident of the State of California, currently residing in Whittier. Plaintiff Walsh downloaded the TikTok app and created his first TikTok account before September 30, 2021, on his mobile device, an Android Pixel 8 by Samsung. While using the TikTok app, Plaintiff Walsh encountered and clicked on links to external, third-party websites. Unbeknownst to Plaintiff Walsh, the links took him to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Walsh's website activities and purchases, including his personal information, contact information, and credit card information. Defendants surreptitiously collected Plaintiff Walsh's personal data without his knowledge or consent.

8.      Plaintiff Steve Berrios is a citizen and resident of the State of Florida,

currently residing in Orange County. Plaintiff Berrios downloaded the TikTok app and created a TikTok account in November 2021 on his mobile device, an Apple iPhone. While using the TikTok app, Plaintiff Berrios encountered and clicked on links to external, third-party websites. Unbeknownst to Plaintiff Berrios, the links took him to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Berrios's website activities and purchases, including his personal information, contact information, and social security number. Defendants surreptitiously collected Plaintiff Berrios's personal data without his knowledge or consent.

9.      Plaintiff Christi Stowers is a citizen and resident of the State of Georgia, currently residing in Fulton County. Plaintiff Stowers downloaded the TikTok app and created her first TikTok account in 2020 on her tablet and mobile devices, an Apple iPad and iPhone, respectively. While using the TikTok app, Plaintiff Stowers encountered and clicked on to external, third-party websites. Unbeknownst to Plaintiff Stowers, the links took her to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Stowers website activities and purchases, including her personal information, contact information, and credit card information. Defendants surreptitiously collected Plaintiff Stowers' personal data without her knowledge or consent.

10.      Plaintiff Anibeth Bravo is a citizen and resident of the State of Illinois,

currently residing in the city of Des Plaines.  Plaintiff Bravo downloaded the TikTok app and created her current TikTok account in 2019 on her mobile device, an Apple iPhone.  While using the TikTok app, Plaintiff Bravo encountered and clicked on links to external, third-party websites.  Unbeknownst to Plaintiff Bravo, the links took her to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Bravo's website activities and purchases, including her personal information, contact information, banking information, and credit card information.  Defendants surreptitiously collected Plaintiff Bravo's personal data without her knowledge or consent.

11.     Plaintiff Katie Murphy is a citizen and resident of the State of Illinois, currently residing in the city of Oak Park.  Plaintiff Murphy downloaded the TikTok app and created her first TikTok account in September 2022 on her mobile device, an Apple iPhone.  While using the TikTok app, Plaintiff Murphy encountered and clicked on links to external, third-party websites.  Unbeknownst to Plaintiff Murphy, the links took her to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Murphy's website activities and purchases, including her personal information, contact information, and credit card information.  Defendants surreptitiously collected Plaintiff's Murphy's personal data without her knowledge or consent.

12.     Plaintiff Jessica Gann is a citizen and resident of the State of Indiana,

5

currently residing in Marion County. Plaintiff Gann downloaded the TikTok app and created her first TikTok account in late 2022 on her mobile device, a Samsung Galaxy device running Android. While using the TikTok app, Plaintiff Gann encountered and clicked on links to external, third-party websites. Unbeknownst to Plaintiff Gann, the links took her to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Gann's website activities and purchases, including personal information, contact information, and credit card information. Defendants surreptitiously collected Plaintiff Gann's personal data without her knowledge or consent.

13.     Plaintiff Delaney Arnold is a citizen and resident of the Commonwealth of Kentucky, currently residing in Hopkins County. Plaintiff Arnold downloaded the TikTok app and created her TikTok account in 2020 on her mobile device, an Apple iPhone. While using the TikTok app, Plaintiff Arnold encountered and clicked on links to external, third-party websites. Unbeknownst to Plaintiff Arnold, the links took her to third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Arnold's website activities and purchases, including her personal information, contact information, and credit card information. Defendants surreptitiously collected Plaintiff Arnold's data without her knowledge or consent.

14.     Plaintiff Bradley Fugok is a citizen and resident of the Commonwealth

6

of Pennsylvania, currently residing in Chester County. Plaintiff Fugok downloaded the TikTok app and created his TikTok account in 2019 on his mobile device, a Samsung Android. While using the TikTok app, Plaintiff Fugok encountered and clicked on links to external, third-party websites. Unbeknownst to Plaintiff Fugok, the links took him third-party websites via an in-app browser which Defendants secretly used to monitor and capture the details of Plaintiff Fugok's website activities and purchases, including his personal information, contact information, and credit card information. Defendants surreptitiously collected Plaintiff Fugok's personal data without his knowledge or consent.

**B.    Defendants**

15.    TikTok Inc. f/k/a Musical.ly, Inc. ("TikTok Inc.") is, and at all relevant times was, a California corporation doing business throughout the United States, with its principal place of business in Culver City, California. Defendant TikTok Inc. is a wholly owned subsidiary of TikTok, LLC, which is a wholly subsidiary of TikTok Ltd, which is a wholly owned subsidiary of ByteDance Ltd.

16.    ByteDance Inc. ("ByteDance Inc.") is, and all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California. ByteDance Inc. is also a wholly owned subsidiary of ByteDance Ltd. Upon information and belief, ByteDance Inc. operates in concert with TikTok Inc. to carry out instructions from the foreign Defendants relating to the TikTok app. For

example, based on LinkedIn profiles of ByteDance Inc., employees, these employees recruit applicants to work with them on research and development of software for the TikTok app. Additionally, the "ByteDance" website displays job postings that specifically relate to the TikTok app.

17. TikTok Inc. and ByteDance Inc. are collectively referred to as "the domestic Defendants."

18. Douyin Ltd. a/k/a ByteDance Ltd. ("ByteDance Ltd.") is, and at all relevant times was, a privately held company incorporated in the Cayman Islands. ByteDance Ltd. is owned by Yiming Zhang and a number of institutional investors. ByteDance Ltd. owns 100% of ByteDance Inc. and 100% of TikTok Ltd. ByteDance Ltd. also owns 100% of Douyin Group (HK) Ltd. a/k/a ByteDance (HK) Co., Ltd., which is headquartered in Hong Kong, TikTok Pte. Ltd., and TikTok Ltd. TikTok Ltd. and Douyin Group (HK) Ltd. a/k/a ByteDance (HK) Co., Ltd. are both direct subsidiaries of ByteDance Ltd.

19. Beijing Douyin Information Service Co. Ltd. a/k/a ByteDance Technology Co. Ltd. ("Beijing ByteDance") is, and at all relevant times was, a company headquartered in Beijing, China. Beijing ByteDance is a subsidiary of ByteDance Co., Ltd. ByteDance Co., Ltd. owns 99% of Beijing ByteDance; Chinese state-owned enterprises own the other 1%.

20. Beijing ByteDance and ByteDance Ltd. are collectively referred to as

8

"the foreign Defendants."

### C.    Alter Ego Allegations

21.    At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer and/or alter ego of each of the other Defendants, and acted in the course and scope of such agency, partnership, and relationship and/or in furtherance of such relationship.  Each Defendant acted with the knowledge and consent of each of the other Defendants and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted, and/or participated in the acts or transactions of the other Defendants, as described below.

22.    Throughout the relevant time period, and in connection with the matters alleged herein, Defendants were controlled and largely owned by the same people—ByteDance co-founders Zhang Yiming, Liang Rubo, and a few institutional investors—with a unity of interest.  Zhang Yiming served as the CEO of ByteDance from its founding until he resigned in May 2021, shortly after the Chinese Communist Party ("CCP") gained an ownership stake in Bejing ByteDance.  After his resignation, Zhang appointed long-time ByteDance tech head Liang Rubo as his successor.  In Liang Rubo's tenure at the ByteDance entities, he led technological development of news app Toutiao and Chinese TikTok analogue Douyin.  Liang Rubo has served as the ByteDance CEO and Chairman of its Board since his

appointment in 2021. Recognition of the privilege of separate existence under such circumstances would promote injustice, as described below.

23.     At all relevant times, the domestic Defendants have shared office space, most recently in Culver City, California at 5800 Bristol Parkway. They have held themselves out as one joint entity: "ByteDance ("we" or "us") has prepared this Applicant Privacy Notice ("Notice") for applicants to roles with ByteDance . . . references to "ByteDance" comprises the following U.S. entities: ByteDance Inc., TikTok Inc., and any US incorporated affiliates."[2] Upon information and belief, they have also shared employees.

### III.     **JURISDICTION**

24.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, *i.e.*, the Wiretap Act, 18 U.S.C. § 2510*, et seq.*

25.     This Court also has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Classes are citizens of states in the United States different from Defendants' home states in the United States, or in foreign states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

---

[2] ByteDance US Applicant Privacy Notice, available at https://sf16-sg.tiktokcdn.com/obj/eden-sg/ha_lm_lswvlw/ljhwZthlaukjlkulzlp/portal/static/ByteDance_US_Applicant_Privacy_Notice.pdf (last visited March 21, 2024).

26.     This Court has jurisdiction over all Defendants because they all: (i) transact business in each state in the United States, including all states from which Plaintiffs originate; (ii) have substantial aggregate contacts within each state in the United States, including all states from which Plaintiffs originate; (iii) engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in each state in the United States, including all states from which Plaintiffs originate; and (iv) purposely availed themselves of the laws of each state in the United States, including all states from which Plaintiffs originate. This Court also has specific jurisdiction over the foreign Defendants for the additional reason that they exert substantial control over the domestic Defendants, as described below.

27.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

### A.     Allegations Supporting Personal Jurisdiction over Defendants Beijing ByteDance and ByteDance Ltd.

#### 1.     Defendants Beijing ByteDance and ByteDance Ltd. have Pervasive Contacts With Each State in the United States

28.     Plaintiffs are informed and believe, based on information available in the public domain, including in news articles and reports described below, that China-based employees of Defendants Beijing ByteDance and ByteDance Ltd., and U.S. employees of the domestic Defendants, perform work on and concerning the

TikTok app that is at the center of this lawsuit, including the functionality and operation of the TikTok app, that targets consumers in each state in the United States, including California, Florida, Georgia, Illinois, Indiana, Kentucky, and Pennsylvania, and the Chinese version of the app ("Douyin") that, on information and belief, Beijing ByteDance and ByteDance Ltd. operate in China. Beijing ByteDance and ByteDance Ltd., and their engineers, have done significant coding for the TikTok app and its many versions and updates. Beijing ByteDance and ByteDance Ltd., and the domestic Defendants, collectively work together to sell, develop, and operate a version of the TikTok app for both Apple and Android mobile devices, available in the Apple and Google stores, respectively.

29. Beijing ByteDance and ByteDance Ltd. have both intentionally targeted the markets in each state in the United States since at least 2017. A former ByteDance employee in China has recounted conversations with ByteDance founder and then-CEO Zhang Yiming, who identified the United States, Japan, and Latin America as target markets for its apps and that, when strategizing globalization for TikTok, the United States was considered the single most important market.[3] Defendants employed the same strategies to facilitate TikTok's worldwide adoption as they employed to facilitate Douyin's adoption in China, targeting cities in China

---

[3] Zhang Xiaojun, *TikTok Insider: Zhang Yiming's Journey of Giant Waves*, WEIXIN (April 24, 2022), mp.weixin.qq.com/s/1Dv17rDRto_1i_LdHEVARA.

instead of countries.[4]

30.     ByteDance's website touts, "we now have over 150,000 employees based out of nearly 120 cities globally . . . our apps operate in 150 markets" and touts offices in locations like Los Angeles, New York, and Seattle.  It then goes on to display the number of available jobs in each of its global offices.  Thirteen of those offices are in the U.S., with five in California.[5]  Upon information and belief, the ByteDance website is owned, controlled, and operated by Beijing ByteDance and ByteDance Ltd.  Upon information and belief, Beijing ByteDance, and ByteDance Ltd. actively recruit and employ United States personnel to perform work relevant to the TikTok app, including via job postings on U.S.-based job-search websites and via the "ByteDance" website, which is displayed in English.  Indeed, TikTok Inc. has admitted that ByteDance does "play[] a role in the hiring of key personnel at TikTok."[6]

31.     In October 2021, *GeekWire* reported on ByteDance's U.S. presence, noting that the "TikTok parent" also has plans for an office in Seattle in addition to offices in Mountain View, San Francisco, Los Angeles and—referencing the TikTok

---

[4] *Id.*

[5] *ByteDance – Inspire Creativity, Enrich Life*, BYTEDANCE, https://www.bytedance.com/en/ (last visited April 1, 2024).

[6] Letter from Shou Zi Chew to Senators Blackburn, *et al.,* (June 30, 2022), https://int.nyt.com/data/documenttools/tik-tok-s-response-to-republican-senators/e5f56d3ef4886b33/full.pdf.

parent's "U.S. headquarters"—Culver City, California.[7]  Upon information and belief, this report describes the activities of Beijing ByteDance and ByteDance Ltd.

32.    News coverage further reported that ByteDance, TikTok's parent company, has leased large parcels of land in Culver City and the Mountain View area of California.  The *Commercial Observer* reported that ByteDance increased its leased space in Culver City by more than 143,000 square feet.[8]  *CoStar* reported that ByteDance leased over 650,000 square feet of space in San Jose, California.[9]  In 2020, it was reported that ByteDance signed to a 10-year lease for 232,000 square feet of New York office space in Manhattan's Time Square.[10]

33.    Beijing ByteDance and ByteDance Ltd., and the domestic Defendants, specifically target consumers in each state in the United States, including California, Florida, Georgia, Illinois, Indiana, Kentucky, and Pennsylvania with advertising that appeared on television throughout the United States.[11]

---

[7] Todd Bishop, *Tiktok Parent Bytedance Sets Up Bellevue WA Office as First Official Presence in Seattle Area*, GEEKWIRE (Oct. 12, 2021), https://www.geekwire.com/2021/tiktok-parent-bytedance-sets-bellevue-wa-office-first-official-presence-seattle-area/.
[8] Greg Cornfield, *TikTok Parent ByteDance Signs 143K SF of Office Deals in Los Angeles*, COMM. OBSERVER (Oct. 2, 2023), https://commercialobserver.com/2023/10/tiktok-bytedance-office-los-angeles/.
[9] Katie Burke, *TikTok Parent Signs Sublease Deal for Major Chunk of Silicon Valley Office Space*, COSTAR (Sept. 19, 2022), https://www.costar.com/article/1291195444/tiktok-parent-signs-sublease-deal-for-major-chunk-of-silicon-valley-office-space.
[10] Steve Cuozzo, *TikTok Taking 232K-SF in Durst's One Five One*, Commercial Observer (May 28, 2020), https://commercialobserver.com/2020/05/tiktok-taking-232k-sf-in-dursts-one-five-one/.
[11] *See* Sam Bradley, *TikTok on TV: What Does the Social Media Platform's Ad Spend Tell Us?*, THEDRUM (Apr. 27, 2021), https://www.thedrum.com/news/2021/04/27/tiktok-tv-what-does-the-social-video- platform-s-ad-spend-tell-us; Todd Spangler, *TikTok Launches Biggest-Ever Ad*

34.     Also, upon information and belief, at certain relevant times Beijing ByteDance and ByteDance Ltd. employed a vast number of content reviewers to review TikTok videos uploaded by users from each state in the United States, including California, Florida, Georgia, Illinois, Indiana, Kentucky, and Pennsylvania, and these reviewers had authority to take down any such videos if the content was deemed to be noncompliant with policies that were disseminated by Beijing ByteDance and ByteDance Ltd.  These substantial and recurring activities were directed toward users in every state.

35.     ByteDance Ltd. has defended and filed a counter claim in trademark suits regarding the TikTok app in the Central District of California, Case No. 2:21-cv-06636, and in the Southern District of California, Case No. 3:21-cv-00626. Beijing ByteDance and ByteDance Ltd. have also appeared in litigation in the Northern District of Illinois, Case Nos. 1:23-cv-04953, 1:19-cv-07915.

36.     ByteDance Ltd. holds several U.S. trademarks relating to the TikTok app, including its logo.  It has also initiated and defended litigation in U.S. courts regarding the TikTok app, including in the Central District of California.

37.     Upon information and belief, Beijing ByteDance, and ByteDance Ltd.

---

*Campaign as Its Fate Remains Cloudy*, VARIETY (Aug. 18, 2020), https://variety.com/2020/digital/news/tiktok-advertising-brand-campaign-sale- bytedance-1234738607/; Julia Alexander, *Tiktok Has Its Super Bowl Moment in More Ways Than One*, THE VERGE (Feb. 2, 2020), https://www.theverge.com/2020/2/2/21119668/tiktok-super-bowl-ad-charli-damelio-hyundai-mountain-dew-justin-bieber.

regularly evaluate potential acquisitions in the U.S., and occasionally do transact to purchase certain U.S. companies and assets, like Musical.ly, the predecessor to the TikTok app.

> **2. Defendants Beijing ByteDance and ByteDance Ltd. Exert Substantial Control Over the Operations of the Domestic Defendants**

38.     Upon information and belief, Beijing ByteDance, and ByteDance Ltd., direct the operations of the domestic Defendants with respect to the TikTok app, and the domestic Defendants have reported to Beijing ByteDance and ByteDance Ltd on their business operations.

39.     Beijing ByteDance and ByteDance Ltd. have also collected and analyzed data from every state regarding the performance of various features of the TikTok app and have worked with the domestic Defendants to address performance issues.  TikTok Inc. has admitted "ByteDance engineers around the world may assist in developing [TikTok's] algorithms[.]"[12]

40.     Publicly available reports and articles reveal that executives and leaders in Beijing substantially control the operations of the entities whose names include "TikTok", which upon information and belief also includes ByteDance Inc., often referred to colloquially as simply "TikTok."  Upon information and belief, the executives and leaders in Beijing are employees of Beijing ByteDance and

---

[12] Shou Zi Chew, *supra,* note 6.

ByteDance Ltd., which are referred to colloquially in reports simply as "ByteDance" or described as the "parent" of "TikTok."

41.     With respect to Defendants' monitoring and censorship of content on the TikTok app, both Beijing ByteDance's and ByteDance Ltd.'s management have determined content review policies enforced in the domestic Defendants' offices;[13] a content review manager in the same U.S. office was reporting to someone in China; and another content reviewer was required to seek authorization from someone in China in order to access non-published information about user accounts when content concerns arose.[14]

42.     At various relevant times, the TikTok app has been advertised on television in every state in the United States, including California, Florida, Georgia, Illinois, Indiana, Kentucky, and Pennsylvania.[15]  Based on the management structure detailed in this section and in publicly available information, Beijing ByteDance and ByteDance Ltd. directed the domestic Defendants to create and implement these

---

[13]Alex Hern, *Revealed: How TikTok Censors Videos that Do Not Please Beijing*, THE GUARDIAN, (Sept. 25, 2019), https://www.theguardian.com/technology/2019/sep/25/revealed-how-TikTok-censors-videos-that-do-not-please-beijing ("TikTok, the popular Chinese-owned social network, instructs its moderators to censor videos that mention Tiananmen Square, Tibetan independence, or the banned religious group Falun Gong, according to leaked documents detailing the site's moderation guidelines. The documents, revealed by the Guardian for the first time, lay out how ByteDance, the Beijing-headquartered technology company that owns TikTok, is advancing Chinese foreign policy aims abroad through the app.").

[14] Salvador Rodriguez, *Tiktok Insiders Say Social Media Company Is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021), https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html.

[15] *See supra* note 11.

advertisements, which had to be approved by Beijing ByteDance's and ByteDance Ltd.'s leadership in China.

43.    At certain relevant times, employees have held concurrent leadership positions at the domestic Defendants and Beijing ByteDance or ByteDance Ltd., personnel freely transition roles between the domestic and Beijing ByteDance or ByteDance Ltd., and employees of the domestic Defendants preform work relevant to the products of Beijing ByteDance and ByteDance Ltd. (and vice versa).

44.    Beijing ByteDance and ByteDance Ltd., and the domestic Defendants, share common executives. For example, in April 2021, "TikTok" announced that Shou Zi Chew, the CFO at ByteDance, would also take on the role of CEO of TikTok, thus holding leadership positions at both companies.[16]  Former Global Chief Security Officer Robert Cloutier had concurrent responsibilities regarding cyber risk and data security support at both TikTok Inc. and ByteDance Ltd.[17]  The head of HR for ByteDance, Corporate Services has stated in her LinkedIn profile that she held concurrent roles as Head of HR, "TikTok," Americas & Global Functions, Global Business Solutions and Head of HR for "ByteDance," U.S & Europe, Monetization."[18]  LinkedIn profiles of several other non-executive level employees

---

[16] Molly Schuetz, *et al.*, *ByteDance's Shouzi Chew Named New TikTok CEO*, FORTUNE (Apr. 30, 2021), https://fortune.com/2021/04/30/new-tiktok-ceo- bytedance-shouzi-chew/.

[17] Cloutier Decl. ¶¶1–2, Dkt. 15-2, *TikTok Inc. v. Trump*, No. 20-cv-02658 (D.D.C. Sept. 23, 2020).

[18] *Kate McFarlin Barney*, LINKEDIN, https://www.linkedin.com/in/katemcfarlinbarney/ (last visited March 21, 2024).

in roles such as global payment, global business development, software engineer, and legal also hold themselves out as working for both "TikTok" and "ByteDance" concurrently.[19] Job postings will frequently list "TikTok" or "ByteDance" alone, but actually involve working for multiple Defendant entities—including TikTok Inc., Beijing ByteDance and ByteDance Co., Ltd.[20] In fact, a recent ByteDance job posting for a position in California described the position as being part of "the

---

[19] *See, e.g.*, *Kingsley Lam*, LINKEDIN, https://ie.linkedin.com/in/kingsleylam (last visited March 21, 2024); *Jordan Lowy*, LINKEDIN, https://www.linkedin.com/in/jordanlowy (last visited March 21, 2024); *Ming Chen*, LINKEDIN, https://www.linkedin.com/in/velicue (last visited March 21, 2024); *Carla Webb*, LINKEDIN, https://www.linkedin.com/in/carlawebb (last visited March 21, 2024).

[20] *See, e.g.*, Zhang Xiaojun, *supra* note 3; ByteDance, *Data Scientist - Tiktok Ads, Growth Marketing*, INDEED, https://www.indeed.com/viewjob?jk=f01ed45ae9d69850&tk=1hqd7dfnok7t2800&from=iiqccs& advn=6685526577544883&adid=421975713&ad=-6NYl%E2%80%A6 (last visited April 1, 2024) (listing employer "ByteDance" and work on the TikTok Ad Platform); ByteDance, *UX Researcher- Bytedance*, INDEED, https://www.indeed.com/viewjob?jk=ff2a873d15ae0c9f&tk=1hqd7eirbkecq800&from=iiqccs&a dvn=6685526577544883&adid=421975713&ad=- 6NYlbfkN0Dl17lUic1YjpnXc5NJDGXr233RnfAMjjxrCXEDV2HcRL2tpBekDhe1qukxBCmu Y0tmM5gfiQFm1CP93JM6-fbeW57eWD0- loaPNgQy4onR5sRJfSYf77KbhIT3FNXfYeM0JhIK3o_8GQpwsEtnk2- 84HIikPFQiE2nzfPA2QkxOPofkMfcmTEFIXSIdGj7ctPRwXSGiGbPB26szrqMqFd8OZt__xyR UD6PUjZ4N8pJxB63vTf081Fp- OI7DoDrQ1MRPvMnT0sQkLcGltv7DavBBijDHg4e8Ofb6osA3o0VbWWk9TYomHvRCoVp2 bqlaT0eycdtlrWr- _E2uaa9jwOyLIe4py8VMU8K6smZ_xyvj5PdewfKFjmcfr0xi_lZRoDmQdxDig0kvnols5Sp3tdg Md32Fh7LINoCTEQ-aGWurkZPleN-44Bq0bwRHmp- eSqezWUtR5VSdxPwumTTBgFqF_6Pkc-2Iich8dIznpaBHYhk5Qu1Zzt36glOaYT- n5I%3D&sjdu=Q7Vp1SZLlb1gd3yeRNULpBgOzznC33IKa1SCNGaksmuxB8R3dLGUnDF4d mAgSJmivTjYOt3zuM0Zgb6eANflAQTfvHq9FvIgvAzcNg8r1FM&acatk=1hqd7eiv6ikqb800& pub=2627301949e83508706993589f5674620cace3277f6b99df&camk=4HOcmqOLYrDJS5t4nh 7wJQ%3D%3D&xkcb=SoBe6_M3CNG1hGQ8Hx0JbzkdCdPP&xpse=SoBx6_I3CNG1hGw8H x0LbzkdCdPP&xfps=de19cb95-951f-4dd5-900b-17670339c809 (last visited April 1, 2024) (listing employer "ByteDance," work at "TikTok," and listing support for Douyin Group as a job function).

strategic team of Douyin Group, providing support for Douyin Group's various business lines."[21]

45.     The Douyin and TikTok products—the apps bearing the same names—have been simultaneously managed by the same ByteDance executives.    For example, Ren Lifeng managed both products in 2017, then Zhang Nan managed both in 2018.[22]

46.     ByteDance executives also move freely between the ByteDance and TikTok entities. In June 2019, Zhang Nan managed ByteDance Ltd.'s globalization efforts (*i.e.*, TikTok) while Zhu Jun managed Douyin.  In October 2019, Zhang Nan took over management of Douyin, while Zhu Jun moved to TikTok Inc.  In 2020, Zhang Nan would become the CEO of ByteDance for China and the head of the Douyin Group (ByteDance Co., Ltd.).[23]  Zhu Wengjia, a former ByteDance Ltd. employee who worked on the Douyin app, became CEO of fellow ByteDance app Toutiao, and leads production and research at TikTok Inc. as of April 2022.  Vanessa Pappas, who previously served as interim CEO for TikTok Inc. and COO of TikTok Inc., also served as ByteDance Ltd.'s general manager for North America.[24]  In 2020,

---

[21] *See* ByteDance, *UX Researcher- Bytedance*, *supra* note 20.

[22] Zhang Xiaojun, *supra* note 3.

[23] *Id.* Exemplifying the frequent internal movement among ByteDance entities, Zhang Nan resigned from this role in February 2024 to join the team working on Jianying—ByteDance's new video editing app. Josh Ye, *China Video App Douyin Group CEO Resigns to Take New Role Within Bytedance*, REUTERS (Feb. 7, 2024), https://www.reuters.com/technology/chinas-bytedance-says-zhang-nan-resigns-douyin-groups-ceo-2024-02-07/.

[24] Zhang Xiaojun, *supra* note 3.

she held herself out as "head" of TikTok Inc. and "interim head of the global TikTok business for ByteDance Ltd."[25]

47.     While TikTok claims to be an independent, insulated entity, research by Lee *et al.* indicates that TikTok and its Chinese analogue Douyin "share personnel and technological resources, have parallel management, structures, and permit data sharing with each other."   Lee *et al.* reported that their "research points to a functional fusion of TikTok and Douyin under the control of a single corporate entity - ByteDance, a conglomerate registered in the Cayman Islands but headquartered in Beijing until November 2020."[26]

48.     In a LinkedIn interview of Issac Bess and Gregory Justice, employees of Defendants, Bess identifies himself as responsible for leading "ByteDance" business development from Los Angeles and notes both are part of the "corporate development organization at ByteDance."   Justice notes he works on the content team for "TikTok" in the U.S.   He goes on to describe the "free flow of colleagues from China coming to the LA office or vice versa."[27]   Employees often have both a

---

[25] Pappas Decl. ¶1, Dkt. 15-3, *TikTok Inc. v. Trump*, No. 20- cv-02658 (D.D.C. Sept. 23, 2020)
[26] Rachel Lee *et al.*, *TikTok, ByteDance, and Their Ties to the Chinese Communist Party: Submission to the Senate Select Committee on Foreign Interference through Social Media* (March 14, 2023), available at
https://docs.house.gov/meetings/IF/IF00/20230323/115519/HHRG-118-IF00-20230323-SD030.pdf
[27] ByteDance, *LinkedIn Interviews ByteDance: How ByteDance Builds its Global Employer Brand*, YOUTUBE, (Oct. 29, 2021), https://www.youtube.com/watch?v=Epp_TN52fSU.

TikTok and a ByteDance email address.[28]

49.     Employee testimonials demonstrate that the domestic Defendants do not operate as independent corporate entities.  Instead, they function as mere satellite offices with little independence and are constantly monitored by Chinese management at, upon information and belief, Beijing ByteDance, and ByteDance Ltd.

50.     U.S. employees of the domestic Defendants are expected to "restart" their day and work during Chinese business hours to be available to the China-based employees of Beijing ByteDance and ByteDance Ltd.  One former project manager, employed by the domestic Defendants, revealed she was expected to regularly attend late night "Beijing meetings."[29]  This employee was also required to submit a last-minute product proposal regarding the app for approval to the "Beijing team"—after it had already been approved by U.S. leadership.  The "Beijing team" had the final say over whether the proposal would be implemented, and without their approval, the project did not move forward.  Employees giving interviews to *BuzzFeed News* described that "their managers hand[ed] down key product decisions after they had 'talked to Beijing'" and described instances where sensitive information was put into

---

[28] *Id.*

[29] Chloe Shih, *Why I Just Quit My Product Manager Job at TikTok*, YouTube (Oct. 11, 2021), https://www.youtube.com/watch?v=pkDXV2g_i7Y.

a .cn domain[30] (the country-code top level domain for the People's Republic of China). Upon information and belief, the "Beijing team" and "Beijing meetings" refer to employees at Defendant Beijing ByteDance and ByteDance Ltd. and during these meetings, Beijing ByteDance, and ByteDance Ltd. employees direct, control, manage, and approve the operations of the domestic Defendants.

51. Such experiences are not unique, as TikTok employees "find themselves called into weekly meetings with their Chinese counterparts to discuss intimate details of how the U.S. app runs."[31] A former TikTok recruiter told *CNBC*, "Beijing-based ByteDance executives [are] heavily involved in "all kinds" of TikTok's decision-making," even "minor" decisions, and "employees [are expected] to be available at all hours of the day."[32] This recruiter, and four other former employees, affirmed that the "Chinese parent company" is "actively involved in the Los Angeles company's decision making and product development."[33] In the words of another former employee, "TikTok product teams sit entirely within Bytedance's scope of influence," "product teams [are] inextricably tied to Beijing HQ"; there is

---

[30] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer to US Lawmakers' China Fears,* BUZZFEED NEWS (March 10, 2022), https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data.

[31] Drew Harwell & Elizabeth Dwoskin, *As Washington Wavers on TikTok, Beijing Exerts Control,* THE WASHINGTON POST (October 30, 2022), https://www.washingtonpost.com/technology/interactive/2022/bytedance-tiktok-privacy-china/.

[32] Rodriguez, *supra,* note 14.

[33] *Id.*

a "heavy China dependency dynamic."[34] An employee reported that half of her team was located in China and meetings with them would start at 6pm, ending at midnight. She recounts that leadership reviews, which upon information and belief are meetings intended to review an employee's performance, would take place on Sunday or past 10 p.m.—Monday morning in Beijing or during regular Beijing business hours. Unsurprisingly, teams in the U.S. "directly roll up into China-based managers."[35] Domestic Defendants' employees have also expressed difficulty with the Chinese-English language barrier due to the constant interaction and meetings between U.S. and Chinese employees. These same experiences have been shared and recounted by other former employees of the domestic Defendants.[36] Upon information and belief, these "China-based managers" and "Chinese counterparts" are employees of Beijing ByteDance and ByteDance Ltd.

52. Several publicly available reports and articles describe that employees of the domestic Defendants are tethered to Beijing ByteDance's and ByteDance Ltd.'s Chinese leadership teams on nearly a daily basis. "In a recorded call from September 2021, TikTok's internal auditor—who is also ByteDance's internal

---

[34] Melody Chu, *What it's Really Like Working at TikTok: The Challenges*, MEDIUM (Apr. 4, 2022), https://medium.com/@melodychu/what-its-really-like-working-at-tiktok-the-challenges-part-3-9c6f6f04fae2.
[35] *Id.*
[36] *See, e.g.*, Georgia Wells, *et al.*, *TikTok's Work Culture: Anxiety, Secrecy and Relentless Pressure*, WSJ (May 6, 2022), https://www.wsj.com/articles/tiktoks-work-culture-anxiety-secrecy-and-relentless- pressure-11651848638?mod=pls_whats_news_us_business_f.

24

auditor—advised a member of the U.S. Trust & Safety team to forge closer relationships with the company's China HQ[]" because "the Beijing office controlled access to TikTok's internal tools" and without the Beijing office's assistance, it would be too difficult to "get things done."[37]  Upon information and belief, Beijing ByteDance and ByteDance Ltd. made decisions for the domestic Defendants, and the domestic Defendants and these other offices were tasked with executing such decisions.

53.    Beijing ByteDance's and ByteDance Ltd.'s executives are heavily involved in day-to-day decisions made for the domestic Defendants, including the TikTok app's development, and have access to U.S. users' data.  "Nearly 100% of TikTok's product development is led by Chinese employees."[38]  Upon information and belief "Chinese employees" are Beijing ByteDance and ByteDance Ltd. employees.  Beijing leadership also can control even minor daily decisions and human resource matters, such as the ability of the domestic Defendants' employees to work from home.[39]

54.    As reported by *Forbes*, "[e]mployees who worked on product,

---

[37] Emily Baker-White, *TikTok is Bleeding U.S. Execs Because China is Still Calling the Shots, Ex-Employees Say*, FORBES (September 21, 2022), https://www.forbes.com/sites/emilybaker-white/2022/09/21/tiktok-bleeding-us-execs-china-control-bytedance/?sh=54b9da549707.
[38] Rodriguez, *supra* note 14.
[39] Harwell & Dwoskin, *supra,* note 31 (noting that managers in Beijing are "even the final decision-makers on human resources matters, such as whether an American employee can work remotely)."

engineering and strategy at TikTok into 2022—including those on teams handling sensitive U.S. user data—also told *Forbes* that they reported directly into ByteDance leadership in China, bypassing TikTok's executive suite. In addition, former employees told the *New York Times* that key product decisions about TikTok have been made by ByteDance, rather than TikTok, leadership."[40] One former TikTok employee's paycheck listed ByteDance, rather than TikTok, as the check's drawer.[41] Another employee revealed that their contract listed TikTok as their employer, but their tax returns listed ByteDance.[42]

55. In another example of Beijing ByteDance's and ByteDance Ltd.'s control, "an American employee working on TikTok needed to get a list of global users, including Americans, who searched for or interacted with a specific type of content—that means users who searched for a specific term or hashtag or liked a particular category of videos. This employee had to reach out to a data team in China in order to access that information. The data the employee received included users' specific IDs, and they could pull up whatever information TikTok had about those users. This type of situation was confirmed as a common occurrence by a second employee."[43] According to reports, a Beijing-based engineer, known internally as a

---

[40] Baker-White, *supra* note 37. (*TikTok is Bleeding U.S. Execs*).
[41] *Id.*
[42] *Id.*
[43] Rodriguez, *supra* note 14.

"master admin," has access to U.S. data, regardless of where it is stored: "everything is seen in China."[44]

56.     Although publicly available information reveals Beijing ByteDance's and ByteDance Ltd.'s control over the operations of the U.S. subsidiaries, leaked information shows that Beijing ByteDance and ByteDance Ltd. have attempted to hide this information. "Multiple TikTok sources, who spoke with The Intercept on the condition of anonymity . . . emphasized the primacy of ByteDance's Beijing HQ over the global TikTok operation, explaining that their ever-shifting decisions about what's censored and what's boosted are dictated by Chinese staff, whose policy declarations are then filtered around TikTok's 12 global offices, translated into rough English."[45] Censorship guidelines emanate from China and have mandated the censorship of U.S. videos ranging from those regarding Tiananmen Square to those in violation of the so-called "ugly-content policy," where domestic Defendants' employees are required to censor because they are "not worthing [sic] to be recommended to new users."[46] A U.S. content moderation employee, speaking

---

[44] Emily Baker-White, *Leaked Audio from 80 Internal TikTok Meetings Shows that US User Data Has Been Repeatedly Accessed from China*, BUZZFEED NEWS (June 17, 2022), https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-tapes-us-user-data-china-bytedance-access.

[45] Sam Biddle, *et al.*, *Invisible Censorship*, THE INTERCEPT (Mar. 15, 2020), https://theintercept.com/2020/03/16/tiktok-app-moderators-users-discrimination/.

[46] *Id.*; *see also* Drew Harwell & Tony Romm, *Inside Tiktok: A Culture Clash Where U.S. Views About Censorship Often Were Overridden by the Chinese Bosses*, WASH. POST (Nov. 5, 2019), https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture- clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

on the condition of anonymity, described this dynamic in frank terms: "[a]s I get more senior at the company, I realize China has more control[.]"[47]  In the words of a different TikTok employee, "TikTok is an American company on paper. It's a Chinese company underneath."[48]

57.     "Despite the repeated assurances that TikTok's parent company, the China-based ByteDance, isn't checking out data collected about users in the U.S. and Europe, it looks like the company absolutely does and can."[49]  The examples in the preceding paragraphs illustrate the lack of control, authority, and decision making power employees of the domestic Defendants have over daily operations regarding the TikTok app in the U.S., including the data of users in California, Florida, Georgia, Illinois, Indiana, Kentucky, and Pennsylvania that provides a major revenue stream.

58.     In the summer of 2022, TikTok announced plans to move its silo of U.S. data to the cloud-based Oracle server, intended to quell fears about Chinese government acquisition of U.S. data—dubbed "project Texas."  As part of Project Texas, TikTok began hiring a new, dedicated engineering team called United States Technical Services ("USTS") charged with controlling and managing access to

---

[47] Harwell & Dwoskin, *supra,* note 31.

[48] Geoffery Cain, *How China Got Our Kids Hooked on 'Digital Fentanyl',* THE FREE PRESS (November 16, 2022), https://www.thefp.com/p/how-china-got-our-kids-hooked-on.

[49] Christianna Silva & Elizabeth de Luna, *It Looks Like China Does Have Access to U.S. TikTok User Data*, MASHABLE (Nov. 3, 2022), https://mashable.com/article/tiktok-china-access-data-in-us.

sensitive U.S. data. To give the impression of independence from the foreign ByteDance entities, Chinese nationals were not allowed to join the USTS team. However, USTS reports to ByteDance leadership in China. In leaked audio from a recorded January 2022 meeting, a data scientist stated, "I get my instructions from the main office in Beijing."[50] According to another leaked audio conversation, an employee of TikTok's U.S. Trust & Safety Team was pressured by TikTok's Chief Internal Auditor—who reports directly to "Beijing-based" Song Ye—to reveal the location and details about the Oracle server. As discussed more below, U.S. data can be accessed by Beijing ByteDance and ByteDance Ltd. regardless of where it is stored, which TikTok Inc. has confirmed.[51]

59.     During this time, a Chinese television network reported that during divestment talks with Oracle, ByteDance refused to surrender TikTok's source code to any potential U.S. buyers, instead retaining it in China.[52] Upon information and belief, Beijing ByteDance and ByteDance Ltd. retain the TikTok source code. In a

---

[50] Baker-White, *supra* note 44 (*Leaked Audio from 80 Internal TikTok Meetings*).

[51] Emily Baker-White, *TikTok Parent ByteDance Planned to Use TikTok to Monitor the Physical Location of Specific American Citizens*, FORBES (Oct. 20, 2022), https://www.forbes.com/sites/emilybaker-white/2022/10/20/tiktok-bytedance-surveillance-american-user-data/?sh=4ba9fcec6c2d; Shou Zi Chew, *supra* note 6.

[52] *ByteDance Not to Sell TikTok's U.S. Operations to Microsoft or Oracle: Sources*, CGTN (Sept. 14, 2020), https://news.cgtn.com/news/2020-09-14/ByteDance-rejects-Microsoft-s-bid-for-TikTok-TLLgABWx56/index.html; Jonathan Cheng, @JChengWSJ, TWITTER (Sept. 13, 2020, 10:44 PM), https://twitter.com/jchengwsj/status/1305381978422812673 ("Chinese State Television: 'ByteDance Will Not Sell TikTok's U.S. Operations to Microsoft or Oracle, nor Will the Company Give the Source Code to Any U.S. Buyers, Sources Said'").

2022 speech, FBI Director Christopher Wray also stated that the Chinese government controls ByteDance and has the "ability to control the recommendation algorithm."[53]

60.     Indeed, the Washington Post reported that contrary to Defendants' public claims, "current and former TikTok employees say managers in Beijing, where many of the company's executives and employees still work, have assumed an increasingly active role in the U.S. team's operations" and TikTok Inc. CEO Chew reports to ByteDance's chief and board.[54]  China remains the "central hub" for "pretty much everything" and "Beijing managers sign off on major decisions involving U.S. operations, including from the teams responsible for protecting Americans' data and deciding which videos should be removed. They lead TikTok's design and engineering teams and oversee the software that U.S. employees use to chat with colleagues and manage their work."[55]

61.     U.S. employees are expected to "just follow" decisions "from China." This mandate applies equally to the domestic Defendants' executives and department leaders.[56]  A September 2022 *Forbes* article reported that TikTok is "bleeding U.S. execs," because "at least five senior leaders hired to head

---

[53] Christopher Wray, *2022 Josh Rosenthal Memorial Talk*, FORD SCHOOL AT THE UNIV. OF MICHIGAN (Dec. 2, 2022), https://fordschool.umich .edu/video/2022/christopher-wray-2022-josh-rosenthal-memorial-talk.
[54] Drew Harwell & Elizabeth Dwoskin, *supra,* note 31.
[55] *Id.*
[56] *Id.*

departments at TikTok in the last two years have left the company after learning that they would not be able to significantly influence decision-making."[57]  In the words of one of the interviewees, "[f]olks are hired in leadership positions in the U.S. and then their scope is reduced in favor of folks in Beijing."[58]  According to the report, guidance for the U.S. TikTok executives came from Beijing and they were expected to follow these directions without question or input. Upon information and belief, these directions came from Beijing ByteDance and ByteDance Ltd. A former employee also told *Forbes* that a corporate reorganization caused a department head to report to "ByteDance" in Beijing, rather than to the U.S.-based "TikTok"— causing this employee's departure.[59]

62.    Kevin Mayer (former CEO of TikTok) and Chew's power as TikTok's head is "limited" and has reportedly been "circumscribed by ByteDance," according to a New York Times report, corroborated by 5 people with knowledge of the company.[60]  As told by former employees, "[t]he American execs are there to smile, look pretty, push away criticism. But ByteDance is still calling the shots behind the scenes."[61]

---

[57] Emily Baker-White, *supra,* note 37 (*TikTok is Bleeding U.S. Execs*).

[58] *Id.*

[59] *Id.*

[60] Ryan Mac & Chang Che, *TikTok's C.E.O. Navigates the Limits of His Power*, NY TIMES (Sept. 16, 2022), https://www.nytimes.com/2022/09/16/technology/tiktok-ceo-shou-zi-chew.html.

[61] Cain, *supra,* note 48.

63.     ByteDance's Internal Audit and Risk Control Department reported similar findings in a late 2021 risk assessment, which found that numerous senior TikTok employees felt "that themselves and their teams are just 'figureheads' or 'powerless ombudsmen" who were "functionally subject to the control of CN-based teams."[62] The Fall 2021 risk assessment did not treat TikTok as a separate entity from ByteDance.[63]

64.     This Internal Audit and Risk Control Department, led by "Beijing-based" ByteDance employee Song Ye, was responsible for internal ByteDance and TikTok investigations—including investigations of employees.[64] When the Internal Audit team has requested information about U.S. employees, that data has been pulled from mainland China.[65] The ByteDance Internal Audit department also reportedly investigated TikTok Global Chief Security Officer Roland Cloutier repeatedly prior to his exit from the company.[66]

65.     In October 2022, *Forbes* reported it had reviewed material indicating

---

[62] Emily Baker-White, *A China-Based ByteDance Team Investigated TikTok's Global Security Chief, Who Oversaw U.S. Data Concerns*, FORBES (Oct. 25, 2022), https://www.forbes.com/sites/emilybaker-white/2022/10/25/bytedance-tiktok-investigation-global-chief-security-officer-roland-cloutier/.

[63] Emily Baker-White, *Tiktok Couldn't Ensure Accurate Responses to Government Inquiries, a ByteDance Risk Assessment Said*, FORBES (Nov. 28, 2022), https://www.forbes.com/sites/emilybaker-white/2022/11/28/tiktok-inaccurate-government-inquiries-internal-bytedance-risk-assessment/?sh=72e98e5323fe.

[64] Baker-White, *supra* note 51 (*TikTok Parent ByteDance Planned to Use TikTok to Monitor*).
[65] *Id.*
[66] Baker-White, *supra* note 62 (*A China-Based ByteDance Team Investigated TikTok's Global Security Chief*).

that ByteDance's Internal Audit team was planning to use TikTok location data to surveil individual American citizens.[67] In December 2022, *Forbes* also reported that ByteDance had tracked multiple *Forbes* journalists who had published articles about the company. The surveillance was overseen by the ByteDance Internal Audit team, involved the company's Chief Security and Privacy Office, was known to TikTok's Head of Global Legal Compliance, and was approved by Beijing-based ByteDance employees.[68]

66.    Despite TikTok's public statement that Internal Audit is "our" team, *Forbes* reported that internal materials indicated the Internal Audit team does not report to any TikTok executives, but instead reports directly to ByteDance executives in China.[69]

67.    Sources told *Forbes* that the ByteDance Internal Audit team has previously pushed out other TikTok executives, including TikTok's Global Head of Marketing, and that ByteDance had a list of TikTok employees it hoped to remove from their positions.[70] The investigation into Roland Cloutier was characterized by some former employees as a pretext to push him out of the company; his "efforts to

---

[67] *Id.*; Baker-White, *supra* note 51 (*TikTok Parent ByteDance Planned to Use TikTok to Monitor*).
[68] Emily Baker-White, *EXCLUSIVE: TikTok Spied on Forbes Journalists*, FORBES (Dec. 22, 2022), https://www.forbes.com/sites/emilybaker-white/2022/12/22/tiktok-tracks-forbes-journalists-bytedance/?sh=331d4ba97da5.
[69] Baker-White, *supra* note 62 (*A China-Based ByteDance Team Investigated TikTok's Global Security Chief*).
[70] *Id.*

build out a robust security team were hamstrung by ByteDance's Internal Audit and Risk Control department."[71]

68.    Defendants go to great lengths to deny these accounts, which stand in direct opposition to their public statements regarding the relationship and control of ByteDance Ltd. and Beijing ByteDance.  A recently leaked 2021 public relations document, which outlines key messages the company wishes to present to the public, urges employees, to "Downplay the parent company ByteDance, downplay the China association, downplay AI."  The document provides talking points for employees responding to questions, such as "TikTok is a global company; the TikTok app doesn't even operate in China; TikTok is highly localized in its experience and operations, which means <> has a lot of independence in the day-to-day operations of the platform."  The document further advises that TikTok employees are to deflect regarding China-based ByteDance's control over TikTok—"TikTok has an American CEO, a head of security with decades of experience in the U.S. military and law enforcement, and a U.S. team that works diligently and responsibly on the consistent development of the security infrastructure."  Unsurprisingly, the issue of whether the "U.S. team" can meaningfully direct their own operations is sidestepped.  The guidance from the document appears to have made its way into testimony given to the U.K. parliament's Digital, Culture, Media

---

[71] *Id.*

and Sports select committee in September 2020 by Theo Bertram, TikTok's director of government relations and public policy in Europe, the Middle East and Africa; and in TikTok's June 30, 2022, letter to U.S. Senators.[72]

69.    In fact, while TikTok and ByteDance officials have publicly stated that they have moved U.S. user data and critical code to Oracle-run servers in the U.S. in connection with Project Texas and the Committee on Foreign Investment in the United States ("CFIUS") negotiations, multiple whistleblowers have come forward and explained that Project Texas is merely a façade meant to give the appearance of data separation while preserving Beijing ByteDance's and ByteDance Ltd.'s access and use of U.S. user data.[73]  For example, the TikTok app and its tools contain backdoors built to facilitate access of user data by employees of the Chinese ByteDance entities. When a team of consultants from Booz Allen Hamilton was brought in to help manage the Project Texas data migration, one consultant investigating the flow of data through TikTok and ByteDance tools said to colleagues, "I feel like with these tools, there's some backdoor to access user data in almost all of them, which is exhausting."[74]  Another whistleblower, referenced in a

---

[72] Chris Stokel-Walker, *Inside TikTok's Attempts to 'Downplay the China Association'*, GIZMODO (July 27, 2022), https://gizmodo.com/tiktok-master-messaging-pr-playbook-china-music-1849334736.

[73] Drew Harwell, *A Former TikTok Employee Tells Congress the App is Lying About Chinese Spying*, WASH. POST (Mar. 10, 2023), https://www.washingtonpost.com/technology/2023/03/10/tiktok-data-whistleblower-congress-investigators/.

[74] Baker-White, *supra* note 44 (*Leaked Audio from 80 Internal TikTok Meetings*).

letter Sen. Josh Hawley (R - Mo.) sent to the Treasury Department, reported that TikTok's data access controls were illusory and that ByteDance's China-based engineers could use proprietary tools to access U.S. data near-instantly.[75]

70. While TikTok's external statements provide assurances of data security, its employees have told reporters that almost anyone with basic access to ByteDance tools, including China-based ByteDance employees, can easily look up any user's closest contacts and other sensitive information.[76]

71. Former and current CCP officials are also reportedly embedded in Beijing ByteDance and ByteDance Ltd. and are involved in the companies' functioning. In April 2021, the Chinese government acquired a stake in Beijing ByteDance and with it, one of the company's board seats. Notably, just one month later, ByteDance Ltd. CEO Zhang Yiming resigned. In September 2020, a U.S. Department of Justice filing stated that "ByteDance contains an internal corporate CCP committee through which the CCP exercises influence at the company."[77] Upon information and belief, the ByteDance entity to which the U.S. Department of Justice was referring is ByteDance Ltd.

---

[75] Letter from Sen. Josh Hawley to Secretary of the Treasury Janet Yellen, March 7, 2023, https://s3.documentcloud.org/documents/23698254/2023-03-07-hawley-letter-to-yellen-tiktok.pdf.

[76] Alexandra S. Levine, *India Banned TikTok in 2020. TikTok Still Has Access to Years of Indians' Data*, FORBES (Mar. 21, 2023).

[77] U.S. Department of Justice, *Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction* (Sept. 25, 2020), https://www.documentcloud.org/documents/7218230-DOJ-s-MEMORANDUM-in-OPPOSITION-to-TIKTOK.html.

72.    In August 2022, *Forbes* reported that its journalists found more than 300 LinkedIn profiles of current TikTok and ByteDance employees who had previously worked at Chinese state media publications.  Twenty-three of those employees appeared to be current TikTok or ByteDance directors.  Fifteen of those profiles indicated that the depicted individuals were employed by ByteDance and Chinese state media publications at the same time.[78]

73.    TikTok and ByteDance officials have also been negotiating with federal officials from CFIUS since 2019 regarding actions the companies must take to satisfy U.S. national security concerns.  TikTok and ByteDance presented their proposal to CFIUS in August 2022.

74.    While a TikTok executive testified in an October 2021 Senate hearing that "a world-renowned, U.S.-based security team" decides who gets access to U.S. user data, leaked TikTok meeting recordings mentioned nine situations where U.S. employees had to consult China-based ByteDance employees to determine how U.S. user data was flowing.[79]  U.S.-based TikTok staff "did not have permission or knowledge of how to access the data on their own."[80]  Leaked audio of internal TikTok meetings further indicated that engineers based at ByteDance entities located

---

[78] Emily Baker-White, *LinkedIn Profiles Indicate 300 Current TikTok and ByteDance Employees Used to Work for Chinese State Media—and Some Still Do*, FORBES, (Aug. 11, 2022), https://www.forbes.com/sites/emilybaker-white/2022/08/10/bytedance-tiktok-china-state-media-propaganda/.
[79] Baker-White, *supra* note 44 (*Leaked Audio from 80 Internal TikTok Meetings*).
[80] *Id.*

in China, such as ByteDance Ltd., accessed U.S. user data multiple times in 2021 and 2022.[81]  Those same recordings indicated that China-based ByteDance engineers accessed non-public U.S. user information, including phone numbers and birthdays.[82]  Multiple whistleblower leaks indicate that it was common practice for China-based ByteDance employees to access U.S. user data.[83]

75.  In a blog post, then-TikTok Chief Information Security Officer Roland Cloutier tacitly admitted that ByteDance employees in China access U.S. user data. According to *Forbes*, current and former TikTok employees stated that Cloutier's attempts to build a robust security team were hamstrung by the ByteDance Internal Audit and Risk Control Department, which was managed by an executive at ByteDance Ltd. in Beijing.  On his LinkedIn profile, Cloutier currently describes himself as "[former] Global Chief Security Officer TikTok & ByteDance."

76.  Chinese officials and employees also play a role in determining content distribution.  TikTok and ByteDance employees have access to TikTok's algorithm and unique technical features, including "heating." TikTok's "heating" feature allows employees with access to manually select content for inclusion on users' "for you" recommendation pages, bypassing its recommendation algorithm and

---

[81] *Id.*

[82] *Id.*

[83] *Id.*; *see also* Letter from Sen. Josh Hawley to Secretary of the Treasury Janet Yellen, *supra* note 75.

artificially causing the selected content to go viral. In 2023, *Forbes* reported that ByteDance employees had used the heating feature to artificially promote content on TikTok and that several ByteDance departments had issued guidance on the heating feature's use. On information and belief, employees of the China-based ByteDance entities can—and have—used the heating feature to make content on the TikTok app artificially go viral.[84]

77.     Upon information and belief, Beijing ByteDance and ByteDance Ltd. have a pattern and practice of leveraging the TikTok app at the behest of the Chinese government, which affect the content U.S. users view. In 2020, TikTok admitted that the Chinese government had asked it to quietly set up an account that, according to a TikTok employee, "[features] the best side of China (some sort of propaganda)."[85]

78.     In 2022, former ByteDance employees also revealed that ByteDance served pro-China content and censored content critical of the Chinese government on its old news app, *TopBuzz*, which targeted a U.S. audience.

---

[84] Emily Baker-White, *TikTok's Secret 'Heating' Button Can Make Anyone Go Viral*, FORBES, (Jan. 20, 2023), https://www.forbes.com/sites/emilybaker-white/2023/01/20/TikToks-secret-heating-button-can-make-anyone-go-viral.

[85] Olivia Solon, *Chinese Government Asked TikTok for Stealth Propaganda Account*, BLOOMBERG (July 29, 2022), https://www.bloomberg.com/news/articles/2022-07-29/chinese-government-asked-TikTok-for-stealth-propaganda-account?leadSource=uverify%20wall ; Drew Harwell and Tony Room, *TikTok's Beijing Roots Fuel Censorship Suspicion as it Builds a Huge U.S. Audience*, WASH. POST (Sept. 15, 2019), https://www.washingtonpost.com/technology/2019/09/15/TikToks-beijing-roots-fuel-censorship-suspicion-it-builds-huge-us-audience/.

79.     Documents leaked to *The Guardian* similarly revealed that ByteDance Ltd. is advancing Chinese foreign policy aims through TikTok content moderation guidelines, instructing its moderators to censor videos that mention Tiananmen Square, Tibetan independence, or the banned religious group Falun Gong.[86]

80.     As of October 2022, almost 25% of U.S. adults under 30 report they regularly get their news from TikTok.[87]

81.     Beijing ByteDance and ByteDance Ltd. are both privately held companies and even former employees have noted the secretive nature of details regarding their corporate structure: "the company's internal secrecy and murky chain of command limit the U.S. team's ability to know who in Beijing is really in control."[88]  It is clear that the domestic Defendants and the entities that sell, advertise, develop, and operate the Apple and Android version of the TikTok app are controlled by management and employees of Beijing ByteDance and/or ByteDance Ltd. that operate in China.  Given the highly secretive and intertangled nature of the ownership structure of Beijing ByteDance, ByteDance Ltd. and the domestic Defendants,[89] and the clear instances of control and direction of the entities

---

[86] Hern, *supra* note 13 (*Revealed: How TikTok Censors Videos*).
[87] Katerina Eva Matsa, *More Americans Are Getting News on TikTok, Bucking the Trend on Other Social Media Sites*, PEW RESEARCH CENTER (Oct. 21, 2022), https://www.pewresearch.org/fact-tank/2022/10/21/more-americans-are-getting-news-on-TikTok-bucking-the-trend-on-other-social-media-sites/.
[88] Harwell & Dwoskin, *supra,* note 31.
[89] *See* Coco Liu & Yifan Yu, *Inside ByteDance, the $75bn Unicorn Behind TikTok*, NIKKEIASIA (Mar. 25, 2020), https://asia.nikkei.com/Spotlight/The-Big-Story/Inside-ByteDance-the-75bn-

that sell, advertise, develop, and operate the Apple and Android TikTok apps, including the domestic Defendants, Plaintiffs seek leave to issue jurisdictional discovery regarding all foreign and domestic Defendants.

## IV.     GENERAL FACTUAL ALLEGATIONS

82.    TikTok is a highly popular social media and social networking application that has become "one of the world's fastest growing social media platforms" and a "global phenomenon."[90]

83.    TikTok has gained immense popularity in the U.S. over the last few years as a social media platform where users create, share, and view short videos. In the U.S., TikTok was originally known as Musical.ly, an app where users uploaded lip synching videos, founded in 2014.  In 2016, Chinese technology company, Bytedance, launched a version of Musical.ly for the Chinese market, entitled Douyin.  Bytedance then purchased Musical.ly and incorporated it into Douyin, launching it for the non-Chinese international market, including the U.S., becoming the current version of TikTok.[91]

84.    One month after its debut, in September 2018, TikTok had surpassed

---

unicorn-behind-TikTok (providing corporate organization chart and noting "ByteDance's corporate structure is a "tangled web[.]'").

[90] Drew Harwell & Tony Room, *Inside TikTok: A Culture Clash Where U.S. Views About Censorship Often Were Overridden by Chinese Bosses*, WASH. POST (Nov. 5, 2019), https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[91] Dan Hughes, *The Rapid Rise of TikTok*, DIGITAL MARKETING INSTITUTE (Aug. 26, 2019), https://digitalmarketinginstitute.com/blog/the-rapid-rise-of-tiktok.

Facebook, Instagram, YouTube, and SnapChat in monthly installations, with more than one billion downloads.[92]  Users enjoy viewing and creating dancing, lip synching videos, comedy skits (sometimes called "memes"), and "challenges" where users upload videos performing the same dance or task as others, often giving their own unique spin on the task.  Users can interact on the platform by, among other things, commenting on other users' videos, "following" their accounts, and sending direct message to communicate with one another on the app.  The platform allows users to get creative with their content using filters, stickers, voiceovers, sound effects, and background music.  The variety of information and types of content that can be created are virtually limitless—if you can imagine it, it likely exists on TikTok.

85.    All of this content is offered in endlessly consumable, dopamine boosting mini "bites," as videos are typically less than one minute long.[93]  Indeed, TikTok videos could originally be only up to 15 seconds,[94] though platform has extended this limit to allow up to 3 minutes and then 10 minutes of video.  Such evolutions allow TikTok to compete with long-form video platforms such as YouTube and Facebook.

---

[92] Starrene Rhett Rocque, *The History of TikTok*, TEEN VOGUE (Aug. 28, 2019), https://www.teenvogue.com/story/tiktok-what-is-it.

[93] Andrea Silva Santisteban Fort, *TikTok is a Dopamine Factory*, THE GAUNTLET (Feb. 14, 2021), https://thegauntlet.ca/2021/02/14/tiktok-is-a-dopamine-factory/.

[94] Starrene Rhett Rocque, *supra* note 92.

86.    The TikTok app has simplified the video creation and sharing process and taken it to the next level.  Users can record anything and post it instantly.  Due to the short format, neither the video-creation nor the watching process takes much time or effort.  Additionally, this short-form video content is played as soon as a user opens the app.  The videos continue to play on a rolling basis, allowing users to get lost in a sea of fun, entertaining, and addictive video content.  As of March 2019, the average user opened the TikTok app more than 8 times per day and spent approximately 45 minutes on the app daily.[95]

87.    Much like a slot machine at a casino, users can find themselves scrolling TikTok for hours without realizing it, awash in the dopamine rush.[96]  Use of TikTok exploded in 2020 during lockdown periods throughout the first year of the COVID-19 pandemic.  It was the second most popular iPhone app downloaded in 2020, and the most popular in the U.S. in 2021, and was the most downloaded app globally in 2023.[97]  TikTok's immense success as a social media platform has allowed it to quickly join the ranks of other social media giants like Twitter,

---

[95] Georgia Wells, Yang Jie & Yoko Kubota, *TikTok's Videos Are Goofy. Its Strategy to Dominate Social Media Is Serious*, WALL ST. J. (June 29, 2019), https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[96] Jade Biggs, *TikTok Addiction: Why is TikTok So Addictive?*, COSMOPOLITAN (May 19, 2022), https://www.cosmopolitan.com/uk/body/health/a39964788/tiktok-addiction/.

[97] Werner Geyser, *TikTok Statistics – 63 TikTok Stats You Need to Know [2024 Update]*, INFLUENCER MARKETING HUB (updated Jan. 30, 2024), https://influencermarketinghub.com/tiktok-stats/.

SnapChat, Reddit, Facebook, and Instagram.

88.    In 2021, TikTok generated an estimated $4.6 billion in revenue, with 1.2 billion people actively using the app in the last quarter of 2021.[98]  In 2023, TikTok generated an estimated $14.3 billion revenue in 2023, a 52% increase year-on-year.[99]



89.    The U.S. is TikTok's largest market outside China.[100]  As of August 2020, TikTok represented that it had over 100 million U.S. users, more than 50

[98] Mansoor Iqbal, *TikTok Revenue and Usage Statistics [2024 Update]*, BUSINESS OF APPS (updated Feb. 22, 2024), https://www.businessofapps.com/data/tik-tok-statistics/#:~:text=TikTok%20generated%20an%20estimated%20%244.6%20billion%20revenue%20in,is%20accessed%20by%20over%20600%20million%20users%20daily.
[99] *Id.*
[100] *Id.*

million of whom were daily users.[101]  Of these users, around 57% are under the age of 18.  This is a significant portion of the overall user base, showing the platform's popularity among younger generations.  The majority of TikTok creators are aged 18 to 24.[102]

### A.   TikTok's Business Model: Profits from Advertising by Monetizing User Data

90.    Despite being a free social media app, TikTok amasses billions in revenue.  The reason for this is because TikTok's digital advertising capabilities are second-to-none: TikTok serves ads to users of their applications based on the content they interact with within the application itself.  TikTok relies on selling digital advertising space as the main source of its income.[103]  TikTok accumulates 2.4% of the $250 billion companies spend on digital marketing–this is more than what SnapChat and Twitter (combined).[104]

91.    TikTok touts that 1 in 2 Gen Z TikTok users are likely to buy something while using TikTok and that 81% of users use TikTok to discover new products and

---

[101] Alex Sherman, *TikTok Reveals Detailed User Numbers for the First Time*, CNBC (Aug. 24, 2020), https://www.cnbc.com/2020/08/24/tiktok-reveals-us-global-user-growth-numbers-for-first-time.html.

[102] TikTok by the numbers (2023): Stats, Demographics & Fun Facts, OMNICORE AGENCY (2023), https://www.omnicoreagency.com/tiktok-statistics/ (last visited Jan. 25, 2023).

[103] Darina Lynkova, *TikTok Revenue Statistics that Will Amaze You*, SPENDMENOT (updated Mar. 10, 2023), https://spendmenot.com/blog/tiktok-revenue-statistics/.

[104] *Report: TikTok US Ad Revenue to Grow 184% in 2022*, PYMNTS, (Apr. 11, 2022), https://www.pymnts.com/mobile-applications/2022/report-tiktok-us-ad-revenue-to-grow-184-in-2022/.

brands.[105]  In the September quarter of 2022, consumers spent over $914 million via the app, and by late 2022, lifetime consumer spending on TikTok reached $6.3 billion.[106]

92.    The number of people who conduct purchases while using TikTok and/or learn about new products and brands is significant given what has come to light about TikTok's undisclosed collection of data about its users.

93.    For example, if the respective user is a music fan and enjoys listening to, say, musician Taylor Swift, that user might interact with videos and other content on TikTok (*i.e.*, commenting on a video or "liking" it) to related to Swift.  TikTok then, in combination with the other data and demographics that it has on that respective user, profiles that user's interest in Taylor Swift.  That user's data profile might then be sold to third-party advertisers whose job it is to serve relevant advertisements to that respective user.  Thus, the third-party advertiser makes inferences regarding that specific person and determines that they should be served advertisements for Taylor Swift's related artwork, music, merchandise, and tickets.

94.    Third-party advertisers may also make additional inferences about that same person.  For example, the advertiser might conclude that, because of the user's

---

[105] *Get Your Business Discovered on TikTok*, TIKTOK, https://getstarted.tiktok.com/us-en-v1brand?lang=en&msclkid=9808304b00701c6f2f13532624807b5c (last visited Apr. 1, 2024).
[106] Werner Geyser, *TikTok Statistics – 63 TikTok Stats You Need to Know [2024 Update]*, INFLUENCER MARKETING HUB (updated Jan. 30, 2024) https://influencermarketinghub.com/tiktok-stats/.

fandom of Taylor Swift, they are likely of a certain age, gender, and other demographic subsets. This is called microtargeting and it leads to other advertisements that third-parties might want to target toward those demographics.

95. In 2020, TikTok launched "TikTok for Business," which allowed businesses to purchase ad space on TikTok and create a label specifying who they want to target.[107] Users can click on the link in these ads to purchase the advertised product.

96. TikTok's algorithm, the machine learning tool used to determine what videos and advertisements display on a user's home page (the "for you" page) or a user's discover page, utilizes tracking software to understand a users' interests and habits.[108] This algorithm was developed by ByteDance and shares many of the same "underlying basic technology building blocks" as Douyin.[109]

---

[107] *Get Your Business Discovered on TikTok*, TIKTOK, https://getstarted.tiktok.com/tt4bnew?attr_source=bing&attr_medium=search-br-ad&attr_adgroup_id=1334808494082548&attr_term=ads%20on%20tiktok&msclkid=af4ae462b9f1157834fb870f9d014a7d (last visited Apr. 1, 2024).

[108] Werner Geyser, *TikTok Statistics – 63 TikTok Stats You Need to Know [2024 Update]*, INFLUENCER MARKETING HUB (updated Jan. 30, 2024) https://influencermarketinghub.com/tiktok-stats/; Ben Lovejoy, *How TikTok's Algorithm Works: A Fascinating and Disturbing Analysis,* 9 TO 5 MAC (July 28, 2021), https://9to5mac.com/2021/07/28/how-tiktoks-algorithm-works/; Avani Dias, *et al.*, *The TikTok Spiral,* ABC (July 25, 2021), https://www.abc.net.au/news/2021-07-26/tiktok-algorithm-dangerous-eating-disorder-content-censorship/100277134.

[109] Shou Zi Chew, *supra* note 6.
The foreign Defendants fiercely guard the algorithm, making it known that even if U.S. TikTok assets were divested, it would "not hand out source code" to any such U.S. buyer. Zhou Xin & Tracy Qu, *TikTok's Algorithm Not for Sale, ByteDance Tells US: Source,* SOUTH CHINA MORNING POST (September 13, 2020), https://www.scmp.com/economy/china-economy/article/3101362/tiktoks-algorithm-not-sale-bytedance-tells-us-source.

97.     Tracking information about a users' interests and habits are critical components to its advertising business model because it is precisely this kind of information that allows TikTok to sell advertising to its customers as effective and targeted to specific audiences.

98.     TikTok offers several different types of ad categories that a business can purchase: Top-View Ads, which display the company's content while a user is engaging with the app; Brand Takeover Ads, which display immediately when the app is opened; Branded Effects, where a company purchases custom filters, stickers and lenses that are used virtually to create content on the app; and Hashtag Challenges, where a company creates its own challenge and assigned hashtag, and then pays TikTok to make it appear on users' feeds.[110]  The nature of the ad increases the price: an ad with 7.4 million "impressions" cost $65,000 per day in 2020.[111]  But TikTok can charge "as much as 2.6 million for a one day run of a Top View ad—the first thing that pops up on users' feed when they open the app."[112]  In comparison, Super Bowl ads run about $6.5 million each, but air only one day out of the whole year.  TikTok can charge their rates every day.[113]

---

[110] Julio Cesar, *How Does TikTok Make Money?*, TECH REVIEW ADVISOR (Sept. 13, 2021), https://techreviewadvisor.com/how-does-tiktok-make-money/.
[111] Kristen Wiley, *6 Types of TikTok Ads With Examples (Why and How They're Effective)*, STATUSPHERE (Mar. 2, 2022), https://brands.joinstatus.com/6-types-of-tiktok-ads.
[112] Zheping Huang, *TikTok Turns On the Money Machine*, BLOOMBERG (Jun. 23, 2022), https://www.bloomberg.com/news/features/2022-06-23/tiktok-becomes-cash-machine-with-revenue-tripling-to-12-billion.
[113] *Id.*

B.    **Global Privacy Concerns Regarding TikTok's Data Use Practices**

99.    Despite its popularity, after TikTok's release in 2018, many privacy concerns regarding the app came to light and several countries have launched investigations amidst concerns regarding TikTok's handling of users' personal data.[114]   Notably, TikTok has settled litigation regarding data privacy.[115]

1.    **Concerns in the U.S.**

100.    In February 2019, following its investigation, the U.S. Federal Trade Commission ("FTC") entered into a consent decree with TikTok Inc. and TikTok Ltd., fining them $5.7 million for collecting information from minors under the age of 13 in violation of the Children's Online Privacy Protection Act ("COPPA") despite TikTok's claims that users under 13 were not allowed on the app.[116] According to the FTC, TikTok's violations were knowing and willful, as it received numerous complaints from concerned parents.   In fact, in a two-week period in September 2016, TikTok received more than 300 complaints from angry parents

---

[114] *See* Vincent Manancourt, *Why Europe's Hands are Tied on TikTok,* POLITICO (Sept. 2, 2020), https://www.politico.eu/article/tiktok-europe-privacy-gdpr-complexity-ties-hands/.
[115] Megan Sauer, *Some TikTok Users are Receiving $167 Checks Over Data Privacy Violations—and Google and Snapchat Could be Next*, CNBC (Oct. 28, 2022), https://www.cnbc.com/2022/10/28/tiktok-users-paid-over-privacy-violations-google-snap-could-be-next.html#:~:text=This%20week%2C%20TikTok%20users%20across,with%20the%20social%20media%20platform.
[116] Bree Fowler, *FTC Fines Owners of TikTok App $5.7 Million for Illegal Collection of Children's Data*, CONSUMER REPORTS (Feb. 27, 2019), https://www.consumerreports.org/privacy/ftc-fines-tiktok-for-illegal-collection-of-childrens-data-a1076813068/.

demanding that TikTok close their children's accounts.[117]  While TikTok closed the accounts, they did not delete the minors' videos or profile information from their servers.[118]

101.  U.S. Senators Charles Schumer and Tom Cotton sent a letter to the Acting Director of National Intelligence in October 2019 explaining the national security concerns over the possibility that TikTok may share personally identifiable user information and private content with the Chinese government, stating "[w]ith over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore.  Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok … and brief Congress on these findings."[119]

102.  In July 2020, the FTC and the U.S. Department of Justice ("DOJ") initiated investigations again after a complaint was filed alleging that TikTok violated the terms of the 2019 consent decree.  Again, this garnered Congressional attention regarding TikTok's data practices.[120]

---

[117] *United States of America v. Musical.ly and Musical.ly, Inc.*, United States District Court, Central District of California, Case No. 2:19-cv-1439 [ECF No. 1] ¶ 21.
[118] *Id.*
[119] Letter from Charles E. Schumer and Tom Cotton to Acting Director of National Intelligence Joseph Maguire (Oct. 23, 2019), https://www.democrats.senate.gov/imo/media/doc/10232019%20TikTok%20Letter%20-%20FINAL%20PDF.pdf.
[120] Complaint and Request for Investigation of TikTok for Violations of the Children's Online Privacy Protection Act and Implementing Rule (May 14, 2020), https://fairplayforkids.org/wp-content/uploads/2020/05/tik_tok_complaint.pdf; Todd Spangler, *TikTok is Still Violating U.S.*

103.    Congress and the DOJ subsequently raised concerns in September 2020 that TikTok's parent company, ByteDance, has a close relationship with Chinese government, putting the data that TikTok accumulates on U.S. users at risk of being transferred to the Chinese government.[121]   Even without a cozy relationship, ByteDance is subject to laws that would require it to transfer data at the behest of the Chinese government.[122]

104.    In 2020, then-U.S. President Donald Trump viewed TikTok as a serious national security threat and proposed a ban on the app, ultimately issuing an executive order to that effect, because TikTok's "data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information—potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct

---

*Child-Privacy Law, Groups Charge*, VARIETY (May 14, 2020), https://variety.com/2020/digital/news/tiktok-is-still-violating-u-s-child-privacy-law-groups-charge-1234606854/; Maggie Miller, *Democrats Call on FTC to Investigate Allegations of TikTok Child Privacy Violations,* THE HILL (May 28, 2020), https://thehill.com/policy/cybersecurity/499970-democrats-call-on-ftc-to-investigate-potential-tiktok-child-privacy/; Diane Bartz, *Exclusive: U.S. Probing Allegations TikTok Violated Children's Privacy – Sources*, Reuters (July 7, 2020), https://www.reuters.com/article/us-tiktok-privacy-children-exclusive-idUSKBN248373.
[121] Kristen Errick, *Energy & Commerce Reps. Send Letter to TikTok Over Their Concerns,* LAW STREET (May 22, 2020), https://lawstreetmedia.com/news/tech/energy-commerce-reps-send-letter-to-tiktok-over-their-concerns/; Bobby Allyn, *New DOJ Filing: TikTok's Owner Is 'A Mouthpiece' Of Chinese Communist Party*, NPR (Sept. 26, 2020), https://www.npr.org/2020/09/26/917134452/new-doj-filing-tiktoks-owner-is-a-mouthpiece-of-chinese-communist-party.
[122] *Id.*

corporate espionage."[123]

105. Even TikTok former employees voiced concern that the parent company was too highly involved in TikTok's operations. *CNBC* reported that ByteDance has access to U.S. user data and former TikTok employees say there is concern regarding the parent company's level of involvement in TikTok's operations—"so blurry as to be almost non-existent."[124] In fact, ByteDance can readily pull any information collected on a U.S. user.[125] Cybersecurity experts say such ease of access exposes U.S. information to acquisition by the Chinese government.[126]

106. A *BuzzFeed News* report in June 2022 confirmed the same—that despite years of TikTok's assertions to the contrary, ByteDance does hold, and has accessed, nonpublic data regarding U.S. TikTok users. In fact, U.S.-based TikTok employees did not have permission or knowledge of how to access the U.S. data.[127] A 2022 Internet2.0 analysis on TikTok security found that the IOS application of TikTok connects directly to mainland China.[128]

---

[123] Bobby Allyn, *Trump Signs Executive Order that Will Effectively Ban Use of TikTok in the U.S.*, NPR (Aug. 6, 2020), https://www.npr.org/2020/08/06/900019185/trump-signs-executive-order-that-will-effectively-ban-use-of-tiktok-in-the-u-s.

[124] Salvador Rodriguez, *TikTok Insiders Say Social Media Company is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021), https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html.

[125] *Id.*

[126] *Id.*

[127] Emily Baker-White, *supra* note 44 (*Leaked Audio From 80 Internal TikTok Meetings*).

[128] Thomas Perkins, TikTok Analysis, (David Robinson, *et al.*, eds.) (2022), https://internet2-

107.   *Buzzfeed News*'s report prompted several Republican U.S. Senators to send a letter to TikTok CEO Chew, concerned that "TikTok's representative did not provide truthful or forthright answers to the Senate Commerce Committee . . . [and] is now taking steps to deflect from its knowing misrepresentations by changing the way in which 'protected' data can be accessed by its employees."[129]

108.   Indeed, in September 2022, TikTok confirmed it would not commit to cutting off China's access to U.S. user data during testimony before the Senate Homeland Security Committee via then COO Vanessa Pappas.[130]  In fact, it appears that China's control over the app has only expanded as the Chinese government acquired a 1% stake in Beijing ByteDance and a seat on its board.[131]

109.   Shortly after COO Pappas's testimony, Senator Josh Hawley sent a letter to Treasury Secretary Janet Yellen, the chair of CFIUS[132], with a copy to the

---

0.com/whitepaper/its-their-word-against-their-source-code-tiktok-report/.

[129] Letter from Marsha Blackburn, *et al*., to Shou Zi Chew (June 27, 2022), https://www.blackburn.senate.gov/services/files/8DE2B2CF-27BF-4ADD-8E4C-D83598D9424D.

[130] Brian Fung, *TikTok Won't Commit to Stopping US Data Flows to China*, CNN BUSINESS (Sept. 14, 2022), https://edition.cnn.com/2022/09/14/tech/tiktok-china-data/index.html; *see also* Letter from Shou Zi Chew to Senators Blackburn, *et al.*, (June 30, 2022), https://int.nyt.com/data/documenttools/tik-tok-s-response-to-republican-senators/e5f56d3ef4886b33/full.pdf.

[131] Jeanne Whalen, *Chinese Government Acquires Stake in Domestic Unit of Tiktok Owner Bytedance in Another Sign of Tech Crackdown*, WASH. POST (Aug. 17, 2021), https://www.washingtonpost.com/technology/2021/08/17/chinese-government-bytedance-tiktok/.

[132] CFIUS, which evaluates whether foreign investments in U.S. businesses raise national security concerns, has been investigating and reviewing TikTok since 2019. *See Haley Samsel, U.S. Government Opens Official National Security Investigation Into TikTok*, SECURITY TODAY (Nov. 4, 2019), https://securitytoday.com/articles/2019/11/04/tiktok-national-security-investigation.aspx.

FTC Chair Lina Khan, urging CFIUS to require TikTok to sever all ties from ByteDance and any other Chinese companies, and urging the FTC to investigate TikTok for "unfair or deceptive acts or practices."[133]  The letter contrasts the testimony from COO Pappas acknowledging Chinese access of U.S. data with TikTok's former steadfast denials of any such capability, calling President Biden's non-enforcement of Trump's order a "mistake."[134]

110.  TikTok's unfair and deceptive business practices have also gathered the attention of several U.S. states' attorney generals.  Texas and Montana launched investigations in 2022, and California attorney general Robert Bonta also announced a bipartisan investigation in concert with Florida, Kentucky, Nebraska, Tennessee, Massachusetts, New Jersey, Vermont, and attorney general offices from other states.[135]

111.  TikTok is banned by the U.S. Army, Navy, Air Force, Coast Guard, Marine Corps., Department of Defense, Department of Homeland Security and TSA,

---

[133] Letter from Josh Hawley to Janet Yellen (Sept. 19, 2022), https://www.hawley.senate.gov/sites/default/files/2022-09/JDH%20Letter%20to%20Yellen%20re%20TikTok_0.pdf.
[134] *Id.*
[135] *Attorney General Bonta Announces Nationwide Investigation into TikTok, OAG.CA.GOV* (Mar. 2, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-nationwide-investigation-tiktok; Brian Contreras, *California attorney general announces investigation into TikTok*, LOS ANGELES TIMES (Mar. 2, 2022), https://www.latimes.com/business/technology/story/2022-03-02/california-ag-investigates-tiktoks-impact-on-children; *Attorney General Knudsen Launches Investigation Into TikTok,* DOJMT.GOV (Feb. 28, 2022), https://dojmt.gov/attorney-general-knudsen-launches-investigation-into-tiktok/.

and cannot be installed on government-issued phones.[136]  President Biden's 2020 campaign also urged its staff to remove the app from their work and personal devices.[137]  Wells Fargo has forbidden its employees from installing the app on company mobile devices.[138]

112. The commissioner of the Federal Communications Commission ("FCC"), Brendan Carr, has been increasingly vocal in his call for a ban of TikTok since writing to the CEOs of Apple and Google to remove the app from their app stores in June 2022, citing privacy concerns.[139]  Carr explained in an interview with the Reliable Sources show that the TikTok application is a wolf in "sheep's clothing," and if you look at the data that it collects, "[i]t's looking at search and browsing history, your keystroke patters, biometric data . . ."[140]  In referring to negotiations between TikTok and CFIUS on what data should be protected, he lamented, "I have a very, very difficult time looking at TikTok's conduct thinking we're going to cut a technical construct that they're not going to find a way

---

[136] Letter from Brendan Carr to Tim Cook and Sundar Pichai (June 24, 2022), https://docs.fcc.gov/public/attachments/DOC-389977A1.pdf.
[137] Sarah Mucha, *Biden Campaign Tells Staff to Delete TikTok from their Phones,* CNN POLITICS (July 28, 2020), https://www.cnn.com/2020/07/28/politics/biden-campaign-tiktok/index.html.
[138] Danielle Wallace, *Wells Fargo Bans TikTok on All Company Owned Devices*, FOX BUSINESS (July 13, 2020), https://www.foxbusiness.com/technology/wells-fargo-tiktok-ban-china.
[139] Letter from Brendan Carr to Tim Cook and Sundar Pichai (June 24, 2022), https://docs.fcc.gov/public/attachments/DOC-389977A1.pdf.
[140] Rachel Martin, *Can TikTok Be Trusted with Users' Data?*, NPR'S THE MORNING EDITION, Jun. 30, 2022, https://www.npr.org/2022/06/30/1108843837/can-tiktok-be-trusted-with-users-data.

around."[141]  Federal Bureau of Investigation Director Christopher Wray told members of the House Homeland Security Committee that he is "extremely concerned" about TikTok's operations.[142]

113.  Defendants' unscrupulous data practices are a bipartisan concern. Senator Mark Warner, Chairman of the Senate Intelligence Committee, issued a warning during a *Fox News Sunday* appearance on November 20, 2022, that " . . . TikTok is an enormous threat."  Senator Warner continued by questioning "the idea that we can somehow separate out TikTok from the fact that the actual engineers [are] writing the code in Beijing."  He also stated that TikTok is "a massive collector of information . . . [and] can visualize even down to your keystrokes . . . all of that data … is being stored somewhere in Beijing."  He ended by reminding viewers that U.S. data would be turned over to the Chinese government, should it so request: "TikTok, at the end of the day, has to be reliant on the Communist Party, the China law states that."[143]

114.  Senator Warner and Senator Marco Rubio sent a bipartisan letter to the FTC in 2022 asking it to investigate TikTok once again.  The letter calls out TikTok's "repeated misrepresentations . . . concerning its data security, data

---

[141] Brian Fung, *FCC Commissioner Calls for TikTok Ban*, CNN (Nov. 2, 2022), https://www.cnn.com/2022/11/02/tech/fcc-commissioner-tiktok-ban/index.html.
[142] Worldwide Threats to the Homeland: Hearing before the Committee on Homeland Security, 117 Cong. (Nov. 15, 2022) (Statement of Christopher Wray).
[143] *Fox News Sunday*, (Fox News Broadcast Nov. 20, 2022), transcript available at https://www.foxnews.com/transcript/fox-news-sunday-november-20-2022.

processing, and corporate governance practices," including those made under oath during a Congressional committee hearing in October 2021.[144]

### 2. Concerns Abroad

115. TikTok has been called a "hunting ground" for child predators by digital privacy watchdogs.[145] In 2019, following the FTC's fine for COPPA violations, the United Kingdom's Information Commissioner's Office launched its own investigation on how the app handles the data of young users, including how private data is collected and concerns that TikTok's messaging system allowed minors to receive direct messages from adult users via the app's messaging system.[146]

116. In June 2020, the European Data Protection Board announced it was assembling a task force to examine TikTok's privacy and security practices.[147]

117. In 2021, the Dutch Authority levied a €750,000 fine against TikTok following its 2020-2021 investigation into TikTok's privacy practices relating to

---

[144] Letter from Mark Warner and Marco Rubio to Chairwoman Khan (July 5, 2022), https://www.warner.senate.gov/public/_cache/files/3/e/3eeb87b3-e9b5-4aa4-8ea1-361a8472ff46/A42795C63518B32671F9ACCF82B1E26A.khan-ssci-tiktok-letter.pdf.

[145] *See* Shelby Brown, *TikTok, Livestreaming Apps Are 'Hunting Ground' for Abusers, Warn Kids' Advocates*, CNET (Feb. 25, 2019), https://www.cnet.com/tech/mobile/tiktok-live-streaming-apps-are-hunting-ground-for-abusers-warn-childrens-advocates/.

[146] Alex Hern, *TikTok Under Investigation Over Child Data Use*, THE GUARDIAN (July 2, 2019), https://www.theguardian.com/technology/2019/jul/02/tiktok-under-investigation-over-child-data-use.

[147] Foo Yun Chee, *EU Watchdog Sets Up TikTok Task Force, Warns on Clearview AI Software*, REUTERS (June 10, 2020), https://www.reuters.com/article/us-eu-privacy-tiktok-clearview-idUSKBN23H2PM.

children.[148] After the Dutch investigation, TikTok made changes to its settings to ensure better parental controls over children's use of the app.

118. In September 2021, after TikTok's move to relocate their European regional headquarters to Ireland, the Ireland Data Protection Commission began its investigation into TikTok asking whether TikTok sufficiently protects the personal data for legal minors, the extent of the app's age-verification measures for children under 13 and the app's transfer of personal data to countries outside the EU—namely China, the home to parent company ByteDance.[149]

119. In July 2022, Italian data protection experts issued a warning over a TikTok privacy policy update affecting the European Economic Area, the U.K., and Switzerland, wherein the app would stop asking users permission to be tracked for targeted ads.[150]

120. The U.K. Information Commissioner's Office recently issued a notice

---

[148] Letter, *Decision to Impose an Administrative Fine*, AUTORITEIT PERSOONGEGEVENS (Apr. 9, 2021), https://www.autoriteitpersoonsgegevens.nl/sites/default/files/atoms/files/decision_to_impose_a_fine_on_tiktok.pdf; *Tiktok: The Dutch DPA Issues A € 750,000 Fine For A Breach Of Children's Privacy And Transfers Its Investigation Findings To The Irish DPA For Further Ruling*, PRIVACY-VOX (May 8, 2021), https://privacyvox.com/news/tiktok-the-dutch-dpa-issues-a-750000-fine-for-breach-of-childrens-privacy-and-transfers-its-investigation-findings-to-the-irish-dpa-for-further-ruling/; *Dutch Watchdog To Investigate Tiktok's Use Of Children's Data*, REUTERS (May 8, 2020), https://www.reuters.com/article/us-netherlands-dataprivacy-tiktok-idUSKBN22K1UE.
[149] *Tiktok's Lead EU Regulator Opens Two Data Privacy Probes*, REUTERS (Sept. 15, 2021), https://www.reuters.com/technology/ireland-regulator-opens-data-privacy-probes-into-tiktok-2021-09-14/.
[150] Natasha Lomas, *Italy Warns TikTok Over Privacy Policy Switch*, TECHCRUNCH (July 11, 2022), https://techcrunch.com/2022/07/11/tiktok-privacy-switch-warning-italy/.

that TikTok Inc., "processed special category data without legal grounds to do so," "processed children's data without parental consent," and failed to provide information regarding its app to users in a "transparent and easily understood way." Special category data includes "ethnic and racial origin, political opinions, religious beliefs, sexual orientation, trade union membership, genetic and biometric data or health data."[151]

121.   As of March 2024, TikTok has been reportedly banned in the following countries: Afghanistan, India, Pakistan, Nepal, and Somalia.[152]   The European Union, Australia, and Canada have banned TikTok from all government-issued phones.[153]

### C.   Defendants' Interception and Theft of Users' Sensitive, Personally Identifying Information Input into Third-Party Websites

122.   Internet users have long used browsers, such as Chrome, Safari, and Firefox, to access websites on the internet.  Computers and cellular phones typically have a default browser installed, which can be chosen by the consumer, that accesses the internet.  However, unbeknownst to Plaintiffs and Class Members, the TikTok

---

[151] *ICO Could Impose Multi-Million Pound Fine on Tiktok For Failing To Protect Children's Privacy*, ICO.ORG.UK (Sept. 26, 2022), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2022/09/ico-could-impose-multi-million-pound-fine-on-tiktok-for-failing-to-protect-children-s-privacy/.
[152] Jennifer Hassan et. al, *The U.S. Could Ban TikTok. These Countries Have Blocked or Restricted It*, WASH. POST (Mar. 13, 2024), https://www.washingtonpost.com/world/2024/03/13/tiktok-ban-countries-restrictions/.
[153] *Id.*

app includes its own in-app browser which surpasses a user's default browser whenever a user clicks on an internet hyperlink in the TikTok app. Because hyperlinks can be attached to images or videos, consumers often do not realize that they are following a hyperlink to an external site, thus they do not realize that they are utilizing a browser, much less realize that they are utilizing the Defendants' in-app browser.

123. As alleged above, part of Defendants' business model is to attract businesses to advertise on its platform. In order to drive business, TikTok touts that 1 in 2 Gen Z TikTok users are likely to buy something while using TikTok, 81% of users use TikTok to discover new products and brands, and TikTok video ads take up 6x more screen space than banners.[154]

124. In order to drive business, TikTok presents users with links to third-party websites and does so in multiple ways.

125. One way in which TikTok presents users with third-party websites is through TikTok video ads.

126. Video ads typically load onto a user's feed and appear as a normal TikTok video except that they contain icons identifying them as a sponsored post or an ad. As portrayed below, these ad-identifying links open third-party websites.

---

[154] TɪᴋTᴏᴋ, *supra* note 105.



127. As the video plays, another box appears suggesting that the user click the link to view the product now. This box also opens a third-party website.



128.   Finally, after the video ad concludes, users are presented with an additional opportunity to click a link that opens a third-party website.



129.   Normally, an individual accesses a website using their default internet browser, such as Safari or Google Chrome.  However, that process can be modified when accessing websites using apps on a computer or mobile device.  In each of the foregoing examples, the third-party website is opened via the TikTok app's in-app browser.  Specifically, when a user attempts to access a website, by clicking a link while using the TikTok app, the website does not open via the default browser.  Instead, unbeknownst to the user, the link is opened inside the TikTok app, in

Defendants' in-app browser. Thus, the user views the third-party website without leaving the TikTok app. In fact, when these links are clicked, there is no option to open the website via any browser other than Defendants' in-app browser.

130. Another way that TikTok presents its users with links to third-party websites is through the profiles of users with a large number of followers.

131. Specifically, if a TikTok user has more than 1,000 followers, the user has the option to add a link to external websites on their profile. Popular TikTok personalities, businesses and organizations routinely place such links on their profiles. User profiles are publicly viewable and especially useful to persons and businesses who use the link to direct a user to their online store or service or website.

  

132. These types of links are commonly used to direct users to additional information, merchandise websites, and/or shopping experiences.

133.   When users click on a link located on a user's profile (as shown above) or in an advertisement, they are directed to that external website.  Undisclosed by Defendants is the fact that users are accessing the website via an in-app browser (as shown below).



134.   Websites opened via links in user profiles do not ever offer users the option to open the website via anything other than the TikTok app's in-app browser.

135.   Defendants' in-app browser is not benign for two reasons.  First, the in-app browser was designed to insert JavaScript code into the third-party websites that are accessed using the in-app browser.  These websites are unaware of and did not consent to the insertions.  The inserted code intercepts all of the details of the user's activities on third-party websites while the in-app browser is open, and Defendants

track and capture all of these details simultaneous with the user's activities. These websites did not consent to the interception of the details of visitor's activities on their site.

136. Second, as described above, consumers spent over $914 million via the TikTok app in just the September quarter of 2022.[155] The transactions included in the $914 million occurred via the TikTok app's in-app browser.

137. Felix Krause, a software researcher, recently published a report on the risks of in-app internet browsers.[156]

138. He found that Defendants inject lines of a programming language called JavaScript—colloquially known as "code"—that creates new commands to copy everything that users are doing on the external websites. Of the seven popular apps Krause tested, TikTok was the only app that monitors keystrokes.

---

[155] Werner Geyser, *TikTok Statistics – 63 TikTok Stats You Need to Know [2024 Update]*, INFLUENCER MARKETING HUB (updated Jan. 30, 2024) https://influencermarketinghub.com/tiktok-stats/.
[156] *See* Felix Krause, *iOS Privacy: Instagram and Facebook Can Track Anything You Do on Any Website in Their In-App Browser*, KRAUSEFX.COM (Aug. 10, 2022), https://krausefx.com/blog/ios-privacy-instagram-and-facebook-can-track-anything-you-do-on-any-website-in-their-in-app-browser.

139.   While a user is interacting with a third-party website via the TikTok app, Defendants subscribe to all keyboard inputs—the equivalent of installing a keylogger.  It also records every tap on any button, link, image or other website element and logs details about what that element is.[157]



---

[157] *Id.*

140. Krause created and used a tool, called InAppBrowser.com (shown above) to detect JavaScript commands executed by social media applications like TikTok. Krause unequivocally concluded, "TikTok injects code into third party websites through their in-app browsers that behaves like a keylogger." Anything that a user does via the in-app browser is recorded and copied by Defendants—what links were clicked, what form fields were filled out, how long a user hovered over a particular set of text, what images were viewed, and any text written. This gives rise to serious data protection concerns. The preceding graphics show the JavaScript code inserted by Defendants' in-app browser into the Apple iOS and Krause's analysis of that code, along with his tool's description of the function of the code. Plaintiffs are informed and believes that similar JavaScript coding is also inserted by Defendants' in-app browser into the Android operating system.

141. The insertion of this sort of JavaScript code is a deliberate and conscious decision that Defendants made. "This [addition of JavaScript] was an active choice the company made," Krause states. "This is a non-trivial engineering task. This does not happen by mistake or randomly."[158]

---

[158] Richard Nieva, *TikTok's In-App Browser Includes Code That Can Monitor Your Keystrokes, Researcher Says*, FORBES (Aug. 18, 2022), https://www.forbes.com/sites/richardnieva/2022/08/18/tiktok-in-app-browser-research/?sh=5849e78b7c55.

142.    As alleged above, every single detail of a user's website viewing that occurs through the in-app browser is tracked.   In the case of online purchase transactions, this would include all of the details of the purchase, the name of the purchaser, their address, telephone number, credit card or bank information, usernames, passwords, dates of birth, etc.

143.    However, the in-app browser does not just track purchase information. It tracks everything—meaning that Defendants likely obtain detailed private and sensitive information about persons' physical and mental health as well.

144.    For example, several health providers and pharmacies have a digital presence on TikTok, with videos that appear on users' feeds.  One such provider, Planned Parenthood, whose account is verified by the app, offers a link to its website.



145.    Once a user clicks on this link, they are immediately directed to the main webpage via Defendants' in-app browser, as shown below.



146.   The user can then click the "learn" link, directing it to a myriad of resources with options to click and read under several topics, including: abortion; birth control; cancer; emergency contraception; pregnancy; sex, pleasure, and sexual dysfunction; sexual orientation; and gender identity.   Knowing what page the user reads can reveal deeply personal and private information.   For example, as shown below, a user may be trying to learn about their sexual orientation.   A user may feel

70

assured by Planned Parenthood's promise that others will only know sexual orientation if that user choses to so communicate, not realizing Defendants have already intercepted this valuable information, ready to deploy and monetize it to send targeted content and advertisements to the user.



147. Defendants will also intercept a user's searches for care, including abortion services, if a user clicks the "Get Care" link. To use Planned Parenthood "Abortion Clinics Near You" finder feature, a user inputs highly sensitive and

private information, such as age, location, and the first day of the user's last period. The user is assured that "your information is private and anonymous," even though—unbeknownst to Planned Parenthood or the user—TikTok is actively intercepting it:



148. Continuing to book an appointment involves providing increasingly

more detailed personal information about the user:



149.   Defendants' acquisition of this sensitive information is especially concerning given the Supreme Court's recent reversal of *Roe v. Wade* and the subsequent criminalization of abortion in several states.  Almost immediately after

the precedent-overturning decision was issued, anxieties arose regarding data privacy in the context of commonly used period and ovulation tracking apps. The potential of governments to acquire digital data to support prosecution cases for abortions was quickly flagged as a well-founded concern. Sara Morrison, reporting for *Vox,* answered "yes" to the question at the forefront of women's minds post-*Roe*: should I delete my period app?[159]

150. Ms. Morrison's article also notes the lucrative nature of a business knowing when someone gets pregnant—so they can be targeted with baby-related ads.

151. Perhaps a user is looking into pregnancy care. A simple search of "prenatal care" tells TikTok this user is pregnant. TikTok might know the user is pregnant even before the users' close family and friends.

152. Users also have the option to donate to Planned Parenthood on its website. To do so, a user inputs either PayPal credentials, bank account and routing numbers, or credit card number and expiration date. Name, address, email, and phone number are also captured during the payment process. Using its keystroke capturing code, TikTok intercepts and records these inputs.

---

[159] Sara Morrison, *Should I Delete My Period App? And Other Post-Roe Privacy Questions*, Vox (July 6, 2022), https://www.vox.com/recode/2022/7/6/23196809/period-apps-roe-dobbs-data-privacy-abortion.





153.   BetterHelp, a mental health service provider, also has a presence on TikTok.  Like Planned Parenthood, its link is displayed on its profile page:



154.    This link takes a user to BetterHelp's survey that matches the user with

a therapist.    The questions asked in this survey are highly sensitive and private,

revealing a user's sexual orientation, religion, age, relationship status, location, financial status, and more.  Below are just some of the prompts:





155.   The above are just examples of the thousands of third-party websites where users input private, personally identifying, and sensitive data.  However, all of the examples described in the foregoing paragraphs are instances where users could, and did, transact business via third-party website without knowing that they were using Defendants' in-app browser that simultaneously intercepted, recorded, and used Plaintiffs' and Class Members' digital information—none of which Plaintiffs or Class Members consented to.  At no point did Defendants inform Plaintiffs or Class Members of such practices.

156.   A TikTok user would have no reason whatsoever to know about a secret code injected into Defendants' in-app browser which would monitor nearly everything that individual does within the in-app browser, regardless of how personal or private the website was.  Users are not provided with an opportunity to review any privacy policies or disclosures regarding this surveillance on third-party websites before the in-app browser is launched.  Even the companies behind the third-party websites are unaware of the malicious code embedded in Defendants' application.

**D.    The Data Collected in Defendants' In-App Browser Has Inherent Value to Plaintiffs and Class Members**

157.   Defendants built their business around the collection of personal data

because the "world's most valuable resource is no longer oil, but data."[160]  As the *Economist* analogized, a user's personal data is the "oil field of the digital era."[161]

158.   Personal information is seen as a form of "currency."  As Professor Paul M. Schwartz noted in the Harvard Law Review: "Personal information is an important currency in the new millennium.  The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend.  Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[162]

159.   It is common knowledge in the industry that there is an economic market for consumers' personal data—including the data that Defendants collected from Plaintiffs and Class Members.

160.   In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location" information are sold for about "$0.50 per 1,000 people."[163]  This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.[164]

---

[160] THE ECONOMIST, *supra* note 1.
[161] *Id.*
[162] Paul M. Schwartz, Property, Privacy and Personal Data, 117 HARV. L. REV. 2055, 2056–57 (2004).
[163] Emily Steel, *et al.*, *How Much Is Your Personal Data Worth?*, FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u.
[164] *Id.*

161. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[165] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge,"[166] and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[167]

162. The Organization for Economic Cooperation and Development ("OECD") published a 2013 paper titled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[168] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[169] OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [*i.e.* $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security

---

[165] Pauline Glickman & Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[166] *Id.*

[167] *Id.*

[168] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[169] *Id.* at 25.

number, credit record and military record is estimated to cost USD 55."[170]

163.   The OECD published, in this same paper, a chart demonstrating the various "[m]arket prices for personal data by type:"[171]



164.   Furthermore, individuals can sell or monetize their own data if they so choose.  Indeed, Defendants themselves have valued individuals' personal data in real-world dollars.

165.   As an example, Meta has previously offered to pay individuals for their voice recordings,[172] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Meta to collect data on how individuals use their

---

[170] *Id.*

[171] *Id.* at 26.

[172] Jay Peters, *Facebook Will Now Pay You for Your Voice Recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognitionviewpoints-pronunciations-app.

smartphones.[173]

166.   A myriad of other companies and apps such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.[174]

167.   User data—including personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data and information (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) constitutes highly valuable information about consumers that companies use to improve customer experiences, refine their marketing strategies, capture data to sell it, and even secure more sensitive consumer data.

168.   Given the monetary values that data companies—like Defendants—have already paid for personal information in the past, Defendants have deprived Plaintiffs and Class Members of the economic value of their data without providing proper consideration for their property.

---

[173] Saheli Roy Choudhury & Ryan Browne, *Facebook Pays Teens to Install An App That Could Collect All Kinds of Data*, CNBC (Jan. 29. 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html.
[174] *28 Apps That Pay You for Data Collection: Earn a Passive Income*, DOLLAR BREAK (July. 7, 2022), https://www.dollarbreak.com/apps-that-pay-you-for-data-collection/.

### E. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in the Data Collected in Defendants' In-App Browser

169. Plaintiffs and Class Members have a reasonable expectation of privacy in the data Defendants collected through the in-app browser.

170. Several studies examining the collection and disclosure of personal data have concluded such collection is a violation of privacy expectations that have been established as general social norms.

171. Privacy polls and studies are nearly uniform in showing that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before data is collected and shared.

172. For example, a recent study by *Consumer Reports* confirmed Americans' shrinking confidence that their "online information is private and secure."[175] Consumers across political party lines—92% of Americans—confirmed their belief that internet companies and websites should be required to obtain consent before selling or sharing their data with other companies.[176] The same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data collected about them.

---

[175] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017),
https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.
[176] *Id.*

173.    According to a study by *Pew Research Center*, a majority of Americans—roughly six in ten U.S. adults—say that they do not think it is possible to go through daily life without having data collected about them by companies.[177] However, the holding of this belief has not eroded people's expectation that their data remain private.   Approximately 79% of Americans report being concerned about the way their data is being used by companies.[178]

174.    When given a choice, users have demonstrated that they will act consistently with their concerns and in favor of their expectation of privacy. Following the roll-out of the new iPhone operating software—which required clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.[179]

175.    Defendants surreptitiously collected and used Plaintiffs and Class Members' data in violation of Plaintiffs' and Class Members' reasonable expectations of privacy.[180]

---

[177] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.
[178] *Id.*
[179] Margaret Taylor, *How Apple Screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.
[180] *See* PEW RESEARCH CENTER, *supra* note 177.

**F.      Plaintiffs and Class Members Did Not Consent to the Collection of Data via the In-App Browser**

176.    A core part of the current system of data collection and privacy protection is built on the idea that consumers are given notice about how companies collect and use data, and ask for their consent to having their data used that way.[181] However, 97% of U.S. adults said that they were asked to approve privacy policies, yet only one-in-five adults overall say they always (9%) or often (13%) read these policies.[182]   Approximately 38% of U.S. adults maintain that they sometimes read such policies, and 36% say they never read a company's privacy policy before agreeing to it.[183]

177.    In addition to the concerns cited above about how companies handle personal data, a majority of Americans (57%) say they are not too confident (40%) or not at all confident (17%) that companies follow what their privacy policies say they will do with users' personal data.[184]

178.    According to a study by Princeton, the type of sophisticated tracking code implemented by Defendants "exceeds user expectations." [185]

179.    Against that backdrop, Plaintiffs and Class Members did not knowingly

---

[181] *Id.*
[182] *Id.*
[183] *Id.*
[184] *Id.*
[185] Acar, *et al., No Boundaries: Data Exfiltration by Third Parties Embedded on Web Pages*, 4 PROCEEDINGS ON PRIVACY ENHANCING TECH. 220 (2020).

consent to Defendants' collection of their data through the in-app browser.

180. Defendants acted unilaterally to collect Plaintiffs' and Class Members' online data and concealed the very nature of this collection by touting the privacy and anonymity of the TikTok platform. Nowhere in Defendants' Terms of Service or the privacy policies is it disclosed that Defendants compel their users to use an in-app browser that installs JavaScipt code into the external websites that users visit from the TikTok app which then provides TikTok with a complete record of every keystroke, every tap on any button, link, image or other component on any website, and details about the elements the users clicked.

181. Without disclosing the collection of this kind of data, through the JavaScript insertions via the in-app browser, Defendants cannot have secured consent for the sharing and/or use of this kind of data.

## V.     <u>TOLLING</u>

182. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

183. The statutes of limitations applicable to Plaintiffs' claims were tolled by Defendants' conduct and Plaintiffs' and Class Members delayed discovery of their claims.

184. As alleged above, Plaintiffs did not know, and could not have known, when they downloaded and used the TikTok app that the app directed users to third-

party websites through an in-app browser and that the in-app browser intercepted all of Plaintiffs' activities and communications on third-party websites viewed in the in-app browser using JavaScript insertions that track every key stroke, tap, click, like, etc., and the details of their interactions with any third-party website through the in-app browser.

185.   Defendants' alleged unlawful conduct could not have been discovered until at least August of 2022 when an article was published on the internet detailing how the TikTok app collects data and monitors what users do while on third-party websites visited via the in-app browser.

186.   Plaintiffs could not have discovered, through the exercise of reasonable diligence, the full scope of Defendants' alleged unlawful conduct. Defendants seamlessly incorporated their proprietary, in-app browser and the JavaScript insertions that tracked Plaintiffs' activities, into the TikTok app. Simultaneously, Defendants failed to disclose that the in-app browser modifies the source code of websites that users visit using the in-app browser in order to copy every key stroke, and/or interaction with the website, and the contest of those interactions.

187.   All applicable statutes of limitations have been tolled by operation of the delayed discovery rule. Under the circumstances, Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations.

## VI.      CLASS ACTION ALLEGATIONS

188.   Plaintiffs bring this action pursuant to Federal Rule of Civil procedure 23 individually and of behalf of the following classes:

      a.      Nationwide Class: All natural persons in the United State who used the TikTok app to visit external, third-party websites via the in-app browser.

      b.      California Subclass: All natural persons residing in California who used the TikTok app to visit external, third-party websites via the in-app browser.

      c.      Florida Subclass: All natural persons residing in Florida who used the TikTok app to visit external, third-party websites via the in-app browser.

      d.      Illinois Subclass: All natural persons residing in Illinois who used the TikTok app to visit external, third-party websites via the in-app browser.

      e.      Pennsylvania Subclass: All natural persons residing in Pennsylvania who used the TikTok app to visit external, third-party websites via the in-app browser.

Each class and subclass described above is referred to individually as a "Class" and collectively as the "Classes." The members of each Class are referred to as "Class Members."

189.   Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and

Defendants' counsel.

190. **Numerosity**: The exact number of Class Members is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. As of August 2020, TikTok represented that it had over 100 million U.S. users, more than 50 million of whom were daily users.[186]

191. **Predominant Common Questions**: The class claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Classes include, but are not limited to, the following:

   a. Whether Defendants violated the Federal Wire Tap Act, 18 U.S.C. § 2510*, et seq.*;

   b. Whether Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 630*, et seq.*;

   c. Whether Defendants violated California Business & Professions Code § 17200*, et seq.*;

   d. Whether Defendants violated the Florida Security of Communications Act – Fla. Stat. § 934*, et seq.*;

   e. Whether Defendants violated the Illinois Uniform Deceptive Trade Practices Act – 815 Ill. Comp. Stat. § 510/2*, et seq.*;

   f. Whether Defendants violated the Pennsylvania Wiretapping and Electronic Surveillance Act – 18 Pa. Cons. Stat. § 5701*, et seq.*;

   g. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

---

[186] Sherman, *supra*, note 101.

      h.    Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

192.  **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes.  The claims of Plaintiffs and Class Members arise from the same conduct by Defendants and are based on the same legal theories.

193.  **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel competent and experienced in complex litigation and class actions.  Plaintiffs have no interest that is antagonistic to the interests of the Classes, and Defendants have no defense unique to any Plaintiff.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Classes.

194.  **Substantial Benefits**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform

decision-making.

195. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VII.    NATIONWIDE CLAIMS FOR RELIEF

### A.    Nationwide Claim for Relief No. 1: Violation of the Federal Wiretap Act – 18 U.S.C. § 2510, *et seq.*

(On behalf of all Plaintiffs, the Nationwide Class and All State Subclasses)

196. Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

197. The Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*, prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authority party to the communication. The statute confers a civil claim on "any person whose wire, oral, or electronic communications is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

198. "Intercept" is defined as the aural or other acquisition of the contents of any wire, electronic, or oral communications through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

199. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

200. "Person" is defined as "any employee, or agent of the United States or

any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation."  18 U.S.C. § 2510(6).

201.   "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence, of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ."  18 U.S.C. § 2510(12).

202.   Defendants are each a "person" for purposes of the Wiretap Act because they are corporations.

203.   The JavaScript code inserted by Defendants that copies every keystroke, every tap on any button, link, image or other component and the details about the elements users clicked on constitutes a "device or apparatus" that is used to intercept a wire, oral, or electronic communication because they are electronic means of acquiring the contents of users' wire, electronic or oral communications via Defendants' in-app browser.

204.   Plaintiffs' and Class Members' sensitive personal information and data that were intercepted by Defendants through their in-app browser are "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

205.   Plaintiffs and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications.

206.   Plaintiffs' and Class Members' electronic communications were

intercepted during transmission, without their consent and for the unlawful and/or wrongful purpose of monetizing private information and data, including by using their private information and data to develop marketing and advertising strategies.

207. Interception of Plaintiffs' and Class Members' electronic communications without their consent occurred whenever a user clicked on a link to a website external to TikTok. Defendants were not parties to those communications which occurred between Plaintiffs and Class Members and the websites they attempted to access or accessed. Defendants used Plaintiffs' and Class Members' electronic communications as part of their advertising and marketing business model.

208. Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products. Moreover, experts who uncovered the JavaScript injections included in Defendants' in-app browser explained that the inclusion of the JavaScript injections were intentional, non-trivial engineering tasks—the kind that do not happen by mistake or randomly.[187]

209. Neither Plaintiffs nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. The websites that Plaintiffs and Class Members visited did not know of or consent to

---

[187] Richard Nieva, *supra* note 158.

Defendants' interception of the details about visitors' access to and activities on their websites. Nor could they—Defendants never sought to, nor did, obtain Plaintiffs', Class Members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

210. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Classes and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**B. California Law Applies To All Class Members**

211. California's substantive laws may be constitutionally applied to the claims of all Plaintiffs and Class Members under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV, § 1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

212. TikTok Inc.'s principal place of business is located in Culver City, California, and it conducts substantial business in California, such that California has an interest in regulating TikTok's conduct under its laws. TikTok's decision to reside in California and avail itself of California's laws, renders the application of California law to the claims herein constitutionally permissible.

213. ByteDance Inc.'s principal place of business is located in Palo Alto, California, and it conducts substantial business in California such that California has an interest in regulating ByteDance Inc.'s conduct under its laws. ByteDance Inc.'s decision to reside in California and avail itself of California's laws, renders the application for California law to the claims herein constitutionally permissible.

214. Beijing ByteDance and ByteDance Ltd. are both foreign corporations but are part of the ownership structure of TikTok Inc. and ByteDance Inc. As alleged above, they direct the activities of TikTok Inc. and ByteDance Inc. such that they avail themselves of those companies' principal place of business in California and California's laws. As such, application of California law to the claims herein is constitutionally permissible.

215. The application of California law to all Class Members is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes. California has a greater interest in applying its laws here than any other interested state.

### C. Nationwide Claim for Relief No. 2: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA")

(On behalf of all Plaintiffs, the Nationwide Class and All State Subclasses)

216.   Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.  Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and their respective State Subclasses, against all Defendants.  Alternatively, the California Plaintiffs, bring this claim individually and on behalf of the California Subclass.  The California Plaintiffs and California Subclass members are individuals who reside in California.

217.   The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code § 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630.  Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

218.   Cal. Penal Code § 632(a) provides, in pertinent part:

A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other

device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation[.]

219. Accordingly, a defendant must show it had the consent of all parties to a communication. By contemporaneously intercepting, tracking and accessing Plaintiffs' and Class Members' data regarding the websites they visited, including but not limited to their keystrokes, every tap on any button, link, image, or other component, and the details about the element users clicked on, Defendants—without consent and authorization of all parties—eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 631(a) of the CIPA.

220. Defendants utilized Plaintiffs' and Class Members' personal data and information for their own purposes, including for advertising.

221. Neither Plaintiffs nor Class Members consented to Defendants' interception, recording, tracking, accessing, disclosure, and/or use of their electronic communications. The websites that Plaintiffs and Class Members visited did not know of or consent to Defendants' interception of the details about visitor's access to and activities on their websites. Nor could they—Defendants never sought to, or did, obtain Plaintiffs', Class Members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

222. Plaintiffs and Class Members seek statutory damages arising from Defendants' violation of Penal Code § 672, in accordance with Penal Code §

637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

223. Plaintiffs and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure; their personal, private, and sensitive data have been collected, viewed, accessed, stored, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, Plaintiffs and Class Members have no adequate remedy at law, Plaintiffs and Class Members are entitled to injunctive relief.

### D. Nationwide Claim for Relief No. 3: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA")

(On behalf of all Plaintiffs, the Nationwide Class and All State Subclasses)

224. Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein. Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and their respective State Subclasses, against all Defendants. Alternatively, the California Plaintiffs, bring this claim individually and on behalf of the California Subclass. The California Plaintiffs and California Subclass members are individuals who reside in California.

225. In the California Invasion of Privacy Act ("CIPA"), the California Legislature explained that it was their intent "to protect the right of privacy of the people of this state." Cal. Penal Code § 630. The Legislature also declared that such

protection was necessary given "that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*.

226. It is illegal under CIPA for any person to use "any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [to ] willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, or attempt to read, or to learn the contents or meaning of any message, report or communication while the same is in transit or passing over any wire, line, or cable or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires in any way, in any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned in [section 631.]"

Cal. Penal. Code § 631(a).

227.   Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  CIPA governs "electronic communications."

228.   By contemporaneously tapping, intercepting and accessing Plaintiffs' and Class Members' data regarding the websites they visited, their keystrokes, every tap on any button, link, image, or other component, and the details about the element users clicked on, Defendants—without consent and authorization of all parties—tapped and made unauthorized connection with Plaintiffs' and Class Members' confidential communications in violation of § 631(a) of the CIPA.

229.   Defendants willfully attempted to and did learn the contents or meaning of Plaintiffs' and Class Members' communications with websites accessed via the in-app browser.

230.   Defendants' in-app browser inserts JavaScript instructions into any website that is visited using the in-app browser.  These JavaScript instructions record every keystroke, which could include names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouse's names, children's names, or any other information which is typed into the in-app browser.  The JavaScript

instructions also record every tap on any button, link, image, or other component of a website. This provides Defendants with very detailed information about the kinds of things that each user of the in-app browser is tapping or "clicking" on. As one example, Planned Parenthood maintains a TikTok presence, and its member profile links to Planned Parenthood's external website. Clicking on that link from inside Defendants' in-app browser would supply Defendants with an exact record of every link or button that is tapped while viewing that site from within the in-app browser. Finally, the JavaScript instructions in Defendants' in-app browser provide Defendants with details about the elements users clicked on—providing them with additional information about the content that is being viewed or clicked on during use of the in-app browser.

231. Defendants also attempted to and did use the information it learned from the contents of Plaintiffs' and Class Members' communications with third-party websites. Based on Defendants' marketing and advertising business, and on the facts alleged above, Defendants use the information they obtain and collect from the third-party websites in order to create profiles, categorize individuals, and derive information about them in order to sell its customers the ability to create targeted marketing and advertising.

232. The information obtained by Defendants through the in-app browser is not mere "record information." Rather, the information obtained via the in-app

browser is substantive and personal; revealing, for example, Plaintiffs' financial information and information that can be used to personally identify Plaintiffs and Class Members.

233. Through the foregoing practices, Defendants intended to learn, and did learn, the meaning of the contents of Plaintiffs' and Class Members' communications with the third-party websites including, but not limited to, URLs, search queries, financial information, information that can be used to personally identify Plaintiffs and Class Members, and content and/or messages exchanged between third-party websites and Plaintiffs and Class Members.

234. The in-app browser satisfies CIPA's requirement that a person use means such as a "machine, instrument, or contrivance, or in any other manner." Cal. Penal Code § 631(a). Moreover, the in-app browser satisfies the requirements of section 631 because the in-app browser is programmed and intended to cause other machines, instruments, contrivances and in any other manner cause Defendants to obtain and learn the contents of Plaintiffs' and Class Members' communications with third-party websites. These include:

    a.    Plaintiffs' and Class Members' internet browsers;

    b.    Plaintiffs' and Class Members' computers, tablets, and/or mobile devices;

    c.    Defendants' TikTok app, website, marketing and ad servers;

    d.    The website and ad servers from which Defendants obtained Plaintiffs' and Class Members' communications while they were

using the in-app browser; and

e.   The JavaScript and/or computer code and programs that Defendants used to obtain and learn the contents of Plaintiffs' and Class Members' communications.

235.   Defendants conceived of and carried out their plan—to learn the contents of Plaintiffs' and Class Members' communications while they were using the in-app browser—originated and was executed in California.

236.   Plaintiffs and Class Members suffered loss by reason of Defendants' violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, and the inequity of Defendants' enrichment by means of obtaining and identifying and private information pertaining to Plaintiffs and Class Members and learning the contents of their communications with third-party websites.

237.   Defendants did not obtain authorization or consent to learn the contents of Plaintiffs' and Class Members' communications with the third-party websites or to use that information.  Plaintiffs and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiffs and Class Members never agreed that Defendants could collect or disclose their data from third-party websites.

238.   Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendants' violation of Cal. Penal Code § 631 and each seek

damages for the greater of $5,000 or three times the actual amount of damages they suffered.

239. Furthermore, Plaintiffs and Class Members seek an injunction prohibiting Defendants from continuing to obtain and learn the contents of their communications with third-party websites via the in-app browser, or from using any of that information.

**E.     Nationwide Claim for Relief No. 4: Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.***

(On behalf of all Plaintiffs, the Nationwide Class and All State Subclasses)

240. Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.  Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and their respective State Subclasses, against all Defendants.  Alternatively, the California Plaintiffs bring this claim individually and on behalf of the California Subclass.

241. Defendants are each a "person" as that term is defined by, *inter alia*, Cal. Bus. & Prof. Code § 17201.

242. The California Unfair Competition Law ("UCL") proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

243. Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, because, as

alleged, Defendants violated the Federal Wiretap Act, California common law, California Constitution, and other statutes and claims described herein.

244. Defendants' business acts and practices are "unfair" under the UCL.

245. California has a strong public policy of protecting consumers' privacy interest, including protecting consumers' personal data. Defendants violated this public policy by, among other things, surreptitiously collecting data about its users through its in-app browser without Plaintiffs' or Class Members' consent.

246. Defendants' conduct violates the policies described herein.

247. Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm posed and caused by Defendants' secretly collecting data about Plaintiffs and Class Members is significant, and there is no corresponding benefit resulting from such conduct. Defendants' illegal conduct, as alleged herein, is not outweighed by any countervailing benefits to consumers or competition as contemplated under the UCL. Because Plaintiffs and Class Members were completely unaware of Defendants' conduct, they could not have avoided the harm.

248. Defendants failed to disclose (*i.e.*, omitted) the existence of the in-app browser or the insertion of JavaScript code intentionally designed to intercept Plaintiffs' and Class Members' private information and data. Without disclosing the

existence of the in-app browser and the JavaScript insertions that track every detail of a user's activity in the in-app browser, Defendants' privacy policies are meaningless.

249. Defendants' business acts and practices were likely to, and did, deceive members of the public, including Plaintiffs and Class Members, into believing that their use of the TikTok app, and their access of websites through the app, was private.

250. Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

251. Defendants engaged in unlawful business practices by violating Cal. Penal Code § 632, California's constitution and each of the state statutory prohibitions against wiretapping and electronic surveillance as alleged below herein.

252. Had Plaintiffs and Class Members known that information about their access to websites through the app would be collected and used by Defendants for their own benefit, they would not have used those services.

253. Had Defendants disclosed its unlawful conduct and practices to Plaintiffs and the Class, while disregarding users' privacy and informational security. Defendants acted intentionally, knowingly, and maliciously to violate the UCL in reckless disregard of Plaintiffs' and the Classes' rights.

254. Plaintiffs and Class Members have a property interest in their data,

including data about the websites they access, their keystrokes, their credit card information, etc.

255.   Defendants have taken property from Plaintiffs and Class Members without providing just, or any, compensation.

256.   Plaintiffs and Class Members have lost money and property as a result of Defendants' conduct in violation of the UCL.  Data, about Plaintiffs and Class Members, has value.  Companies are willing to pay for data, like the data unlawfully collected and used by Defendants.

257.   By deceptively collecting and using data about Plaintiffs and Class Members, Defendants have taken money and property from Plaintiffs and Class Members.  Moreover, Defendants were able to use the data obtained from Plaintiffs and Class Members to support their business model of profiting from advertising.

258.   For these reasons, Plaintiffs seek restitution, disgorgement, injunctive relief, and compensatory damages on behalf of themselves and Class Members.

### F.     Nationwide Claim for Relief No. 5: Unjust Enrichment

(On behalf of all Plaintiffs, the Nationwide Class and All State Subclasses)

259.   Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.  Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and their respective State Subclasses against all Defendants.  Alternatively, the California Plaintiffs bring this claim individually

and on behalf of the California Subclass.

260. Defendants received benefits from Plaintiffs and Class Members in the form of data with substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiffs and Class Members.

261. Plaintiffs and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected from Plaintiffs and Class Members, without authorization and proper compensation.

262. Defendants collected and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

263. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

264. The benefits that Defendants derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the

unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

265. Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiffs and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## VIII.     <u>STATE-SPECIFIC CLAIMS FOR RELIEF</u>

### A.   California Claims for Relief

### 1.   California Claim for Relief No. 1: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA")

(On behalf of Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh, and the

California Subclass)

266. Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

267. Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh bring this claim on behalf of themselves, individually, and on behalf of the California Subclass. For purposes of this claim, Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh are referred to as "Plaintiffs," the California Subclass is referred to as the "Class," and the members of the California Subclass are referred to as "Class Members."

268. The California Legislature enacted the California Invasion of Privacy

Act, Cal. Penal Code § 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

269. Cal. Penal Code § 632(a) provides, in pertinent part:

A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation[.]

270. Accordingly, a defendant must show it had the consent of all parties to a communication. By contemporaneously intercepting, tracking and accessing Plaintiffs' and Class Members' data regarding the websites they visited, including but not limited to their keystrokes, every tap on any button, link, image, or other component, and the details about the element users clicked on, Defendants—without consent and authorization of all parties—eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 631(a) of the CIPA.

110

271. Defendants utilized Plaintiffs' and Class Members' personal data and information for their own purposes, including for advertising.

272. Neither Plaintiffs nor Class Members consented to Defendants' interception, recording, tracking, accessing, disclosure, and/or use of their electronic communications. The websites that Plaintiffs and Class Members visited did not know of or consent to Defendants' interception of the details about visitor's access to and activities on their websites. Nor could they—Defendants never sought to, nor did, obtain Plaintiffs', Class Members', or the websites' consent to intercept their electronic communications through Defendants' in-app browser.

273. Plaintiffs and Class Members seek statutory damages arising from Defendants' violation of Penal Code § 672, in accordance with Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

274. Plaintiffs and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure; their personal, private, and sensitive data have been collected, viewed, accessed, stored, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, Plaintiffs and Class Members have no adequate remedy at law, Plaintiffs and Class Members are entitled to injunctive relief.

### 2. California Claim for Relief No. 2: Violation of California Invasion of Privacy Act – Cal. Penal Code § 630, *et seq.* ("CIPA")

(On behalf of Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh, and the

California Subclass)

275. Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

276. Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh bring this claim on behalf of themselves, individually, and on behalf of the California Subclass. For purposes of this claim, Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh are referred to as "Plaintiffs," the California Subclass is referred to as the "Class," and the members of the California Subclass are referred to as "Class Members."

277. In the California Invasion of Privacy Act ("CIPA"), the California Legislature explained that it was their intent "to protect the right of privacy of the people of this state." Cal. Penal Code § 630. The Legislature also declared that such protection was necessary given "that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and

civilized society." *Id*.

278. It is illegal under CIPA for any person to use "any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [to] willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, or attempt to read, or to learn the contents or meaning of any message, report or communication while the same is in transit or passing over any wire, line, or cable or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires in any way, in any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned in [section 631.]" Cal. Penal. Code § 631(a).

279. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. CIPA governs "electronic communications."

280. By contemporaneously tapping, intercepting and accessing Plaintiffs'

113

and Class Members' data regarding the websites they visited, their keystrokes, every tap on any button, link, image, or other component, and the details about the element users clicked on, Defendants—without consent and authorization of all parties— tapped and made unauthorized connection with Plaintiffs' and Class Members' confidential communications in violation of § 631(a) of the CIPA.

281.  Defendants willfully attempted to and did learn the contents or meaning of Plaintiffs' and Class Members' communications with websites accessed via the in-app browser.

282.  Defendants' in-app browser inserts JavaScript instructions into any website that is visited using the in-app browser.  These JavaScript instructions record every keystroke, which could include names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouse's names, children's names, or any other information which is typed into the in-app browser.  The JavaScript instructions also record every tap on any button, link, image, or other component of a website.  This provides Defendants with very detailed information about the kinds of things that each user of the in-app browser is tapping or "clicking" on.  As one example, Planned Parenthood maintains a TikTok presence, and its member profile links to Planned Parenthood's external website.  Clicking on that link from inside

Defendants' in-app browser would supply Defendants with an exact record of every link or button that is tapped while viewing that site from within the in-app browser. Finally, the JavaScript instructions in Defendants' in-app browser provide Defendants with details about the elements users clicked on – providing them with additional information about the content that is being viewed or clicked on during use of the in-app browser.

283.   Defendants also attempted to and did use the information they learned from the contents of Plaintiffs' and Class Members' communications with third-party websites.  Based on Defendants' marketing and advertising business, and on the facts alleged above, Defendants use the information they obtain and collect from the third-party websites in order to create profiles, categorize individuals, and derive information about them in order to sell their customers the ability to create targeted marketing and advertising.

284.   The information obtained by Defendants through the in-app browser is not mere "record information."  Rather, the information obtained via the in-app browser is substantive and personal; revealing, for example, Plaintiffs' financial information and information that can be used to personally identify Plaintiffs and Class Members.

285.   Through the foregoing practices, Defendants intended to learn, and did learn, the meaning of the contents of Plaintiffs' and Class Members'

communications with the third-party websites including, but not limited to, URLs, search queries, financial information, information that can be used to personally identify Plaintiffs and Class Members, and content and/or messages exchanged between third-party websites and Plaintiffs and Class Members.

286. The in-app browser satisfies CIPA's requirement that a person use means such as a "machine, instrument, or contrivance, or in any other manner." Cal. Penal Code § 631(a). Moreover, the in-app browser satisfies the requirements of section 631 because the in-app browser is programmed and intended to cause other machines, instruments, contrivances and in any other manner cause Defendants to obtain and learn the contents of Plaintiffs' and Class Members' communications with third-party websites. These include:

    a.    Plaintiffs' and Class Members' internet browsers;

    b.    Plaintiffs' and Class Members' computers, tablets, and/or mobile devices;

    c.    Defendants' TikTok app, website, marketing and ad servers;

    d.    The website and ad servers from which Defendants obtained Plaintiffs' and Class Members' communications while they were using the in-app browser; and

    e.    The JavaScript and/or computer code and programs that Defendants used to obtain and learn the contents of Plaintiffs' and Class Members' communications.

287. Defendants conceived of and carried out their plan—to learn the contents of Plaintiffs' and Class Members' communications while they were using

the in-app browser—originated and was executed in California.

288. Plaintiffs and Class Members suffered loss by reason of Defendants' violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, and the inequity of Defendants' enrichment by means of obtaining and identifying and private information pertaining to Plaintiffs and Class Members and learning the contents of their communications with third-party websites.

289. Defendants did not obtain authorization or consent to learn the contents of Plaintiffs' and Class Members' communications with the third-party websites or to use that information. Plaintiffs and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiffs and Class Members never agreed that Defendants could collect or disclose their data from third-party websites.

290. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendants' violation of Cal. Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages they suffered.

291. Furthermore, Plaintiffs and Class Members seek an injunction prohibiting Defendants from continuing to obtain and learn the contents of their communications with third-party websites via the in-app browser, or from using any

of that information.

### 3. California Claim for Relief No. 3: Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

(On behalf of Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh, and the

California Subclass)

292.    Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

293.    Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh bring this claim on behalf of themselves, individually, and on behalf of the California Subclass. For purposes of this claim, Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh are referred to as "Plaintiffs," the California Subclass is referred to as the "Class," and the members of the California Subclass are referred to as "Class Members."

294.    Defendants are each a "person" as that term is defined by, *inter alia*, Cal. Bus. & Prof. Code § 17201.

295.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

296.    Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, ("UCL"), because,

118

as alleged, Defendants violated the Federal Wiretap Act, California common law, California Constitution, and other statutes and claims described herein.

297. Defendants' business acts and practices are "unfair" under the UCL.

298. California has a strong public policy of protecting consumers' privacy interest, including protecting consumers' personal data. Defendants violated this public policy by, among other things, surreptitiously collecting data about their users through the in-app browser without Plaintiffs' or Class Members' consent.

299. Defendants' conduct violates the policies described herein.

300. Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm posed and caused by Defendants' secretly collecting data about Plaintiffs and Class Members is significant, and there is no corresponding benefit resulting from such conduct. Defendants' illegal conduct, as alleged herein, is not outweighed by any countervailing benefits to consumers or competition as contemplated under the UCL. Because Plaintiffs and Class Members were completely unaware of Defendants' conduct, they could not have avoided the harm.

301. Defendants amassed a large collection of sensitive information and data about its users without disclosing their practices and therefore acted without consumers knowledge or consent.

302.   Defendants failed to disclose (*i.e.*, omitted) the existence of the in-app browser or the insertion of JavaScript code intentionally designed to intercept Plaintiffs' and Class Members' private information and data.  Without disclosing the existence of the in-app browser and the JavaScript insertions that track every detail of a user's activity in the in-app browser, Defendants' privacy policies are meaningless.

303.   Defendants' business acts and practices were likely to, and did, deceive members of the public, including Plaintiffs and Class Members, into believing that their use of the TikTok app, and their access of websites through the app, was private.

304.   Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

305.   Defendants engaged in unlawful business practices by violating Cal. Penal Code § 632, California's constitution and each of the state statutory prohibitions against wiretapping and electronic surveillance as alleged below herein.

306.   Had Plaintiffs and Class Members known that information about their access to websites through the app would be collected and used by Defendants for their own benefit, they would not have used those services.

307.   Had Defendants disclosed their unlawful conduct and practices to Plaintiffs and the Class, while disregarding users' privacy and informational

security.  Defendants acted intentionally, knowingly, and maliciously to violate the UCL in reckless disregard of Plaintiffs' and the Class's rights.

308.   Plaintiffs and Class Members have a property interest in their data, including data about the websites they access, their keystrokes, their credit card information, etc.

309.   Defendants have taken property from Plaintiffs and Class Members without providing just, or any, compensation.

310.   Plaintiffs and Class Members have lost money and property as a result of Defendants' conduct in violation of the UCL.  Data, about Plaintiffs and Class Members, has value.  Companies are willing to pay for data, like the data unlawfully collected and used by Defendants.

311.   By deceptively collecting and using data about Plaintiffs and Class Members, Defendants have taken money and property from Plaintiffs and Class Members.  Moreover, Defendants were able to use the data obtained from Plaintiffs and Class Members to support their business model of profiting from advertising.

312.   For these reasons, Plaintiffs seek restitution, disgorgement, injunctive relief, and compensatory damages on behalf of themselves and Class Members.

### 4.    California Claim for Relief No. 3: Unjust Enrichment

(On behalf of Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh, and the California Subclass)

121

313.    Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

314.    Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh bring this claim on behalf of themselves, individually, and on behalf of the California Subclass. For purposes of this claim, Plaintiffs Sean Guzman, Austin Recht, and Michael Walsh are referred to as "Plaintiffs," the California Subclass is referred to as the "Class," and the members of the California Subclass are referred to as "Class Members."

315.    Defendants received benefits from Plaintiffs and Class Members in the form of data with substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiffs and Class Members.

316.    Plaintiffs and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected from Plaintiffs and Class Members, without authorization and proper compensation.

317.    Defendants collected and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

318.    Defendants unjustly retained those benefits at the expense of Plaintiffs

and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

319.   The benefits that Defendants derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members.  It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

320.   Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiffs and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**B.   Florida Claims for Relief**

**1.   Florida Claim for Relief No. 1: Violation of the Florida Security of Communications Act – Fla. Stat. § 934, *et seq.***

(On behalf of Plaintiff Steve Berrios and the Florida Subclass)

321.   Plaintiff re-alleges and incorporates Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

322.   This claim is brought by Plaintiff Steve Berrios individually and on behalf of the Florida Subclass against all Defendants.  For purposes of this claim, Plaintiff Steve Berrios shall be referred to as "Plaintiff," the Florida Subclass shall

refer to as the "Class," and members of the Florida Subclass shall be referred to as "Class Members."

323.   The Florida Security of Communications Act (the "FSCA"), Fla. Stat. §934, *et seq.*, makes it illegal for a person to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept any wire, oral or electronic communication." Fla Stat. § 934.03(1)(a). Further, the FSCA prohibits the "use," "disclosure" or any endeavors to use or disclose the contents of such intercepted communications. Fla. Stat. § 934.03(1)(b)-(e).

324.   The FSCA further permits a private civil claim:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of ss. 934.03-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including:
>
> . . .
>
>> (b) Actual damages, but not less than liquidated damages, computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
>>
>> (c) Punitive damages; and
>>
>> (d) A reasonable attorney's fee and other litigation costs reasonably incurred.

Fla. Stat. § 934.10(1).

325.   Defendants are each a "person or entity" for purposes of the FSCA

124

because they are corporations.

326.  The JavaScript code inserted by TikTok in its in-app browser—that copies every keystroke, every tap on any button, link, image, or other component and the details about the elements users clicked on—constitutes a "device" that is "affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication" within the meaning of the Fla. Stat. § 934.03.

327. Plaintiff's and Class Members' intercepted data and website communications constitute a "wire, oral or electronic communication" within the meaning of the Fla. Stat. § 934.03.

328.  Defendants intentionally procure and embed JavaScript code in Defendants' in-app browser to spy on, and automatically and secretly, intercept TikTok users' electronic interactions.

329.  Plaintiff's and Class Members' electronic communications are intercepted contemporaneously with their transmission.  Defendants further endeavor to and do in fact "disclose" and "use" such intercepted communications for their own benefit.

330.  Plaintiff and Class Members did not consent to having their activity and communications within Defendants' in-app browser wiretapped.

331.  Pursuant to Fla. Stat. § 934.10, Plaintiff and Class Members seek (1)

actual damages, not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation, not to exceed one thousand dollars, (2) punitive damages and (3) reasonable attorneys' fees and other costs of litigation incurred.

332. Defendants' conduct is ongoing, and they continue to unlawfully intercept the communications of Plaintiff and Class Members any time they use Defendants' in-app browser, without Plaintiff's and Class Members' consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications and to require TikTok to disclose its conduct and practices and obtain their express consent prior to intercepting users' interactions and communications with third-party websites via Defendants' in-app browser.

## 2. Florida Claim for Relief No. 2: Unjust Enrichment

(On behalf of Plaintiff Steve Berrios and the Florida Subclass)

333. Plaintiff re-alleges and incorporates Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

334. This claim is brought by Plaintiff Steve Berrios individually and on behalf of the Florida Subclass against all Defendants. For purposes of this claim, Plaintiff Steve Berrios shall be referred to as "Plaintiff," the Florida Subclass shall refer to as the "Class," and members of the Florida Subclass shall be referred to as

"Class Members."

335.  Defendants received benefits from Plaintiff and Class Members in the form of data with substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiff and Class Members.

336.  Plaintiff and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected from Plaintiff and Class Members, without authorization and proper compensation.

337.  Defendants collected and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

338.  Defendants unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

339.  The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair

and unconscionable methods, acts, and trade practices alleged in this Complaint.

340.    Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiff and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

### C.    Illinois Claims for Relief

#### 1.    Illinois Claim for Relief No. 1: Violation of the Illinois Eavesdropping Act – ILCS 720 § 5/14-1, *et seq.*

(On behalf of Plaintiffs Anibeth Bravo and Katie Murphy and the Illinois Subclass)

341.    Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

342.    This claim is brought by Plaintiffs Anibeth Bravo and Katie Murphy individually and on behalf of the Illinois Subclass against all Defendants.   For purposes of this claim, Plaintiffs Anibeth Bravo and Katie Murphy shall be referred to as "Plaintiffs," the Illinois Subclass shall refer to as the "Class," and members of the Illinois Subclass shall be referred to as "Class Members."

343.    720 Ill. Comp. Stat. 5/14-2 provides, in relevant part, that:

(a)    A person commits eavesdropping when he or she knowingly and intentionally:

***

(3)    Intercepts, records, or transcribes, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication; [or]

\*\*\*

(5)   Uses or discloses any information which he or she knows or
reasonably should know was obtained from a private conversation or
private electronic communication in violation of this Article, unless he
or she does so with the consent of all of the parties.

344.   Defendants have knowingly and intentionally intercepted, recorded or
transcribed, in a surreptitious manner, Plaintiffs' and Class Members' private
electronic communications, without consent, in violation of 720 Ill. Comp. Stat.
5/14-2(1).

345.   Upon information and belief, Defendants have used or disclosed
information that they knew or reasonably should have known was obtained from a
private electronic communication in violation of 720 Ill. Comp. Stat. Ann. 5/14-1,
*et seq.*

346.   Defendants did not notify Plaintiffs or Class Members of the above-
described intentional interception, disclosure and/or use of their wire or electronic
communications, nor did Plaintiffs or Class Members consent to such interception,
disclosure, and or use.

347.   Upon information and belief, Defendants are currently engaged in and
will continue to engage in the above-described intentional interception, disclosure,
and/or use of Plaintiffs' and Class Members' wire or electronic communications,
and therefore, are entitled to and do seek injunctive relief prohibiting the Defendants
from violating provisions of the Illinois Eavesdropping Act in the future.

348.   As a result of the Defendants' intentional interception, disclosure, and/or use of Plaintiffs' and Class Members' wire or electronic communications in violation of 720 Ill. Comp. Stat. 5/14-1, *et seq.*, Plaintiffs and Class Members are entitled to an injunction by this Court, actual damages as a result of the violations, and punitive damages, pursuant to 720 Ill. Comp. Stat. 5/14-6.

### 2.   Illinois Claim for Relief No. 2: Unjust Enrichment

(On behalf of Plaintiffs Anibeth Bravo and Katie Murphy and the Illinois Subclass)

349.   Plaintiffs re-allege and incorporate Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

350.   This claim is brought by Plaintiffs Anibeth Bravo and Katie Murphy individually and on behalf of the Illinois Subclass against all Defendants.   For purposes of this claim, Plaintiffs Anibeth Bravo and Katie Murphy shall be referred to as "Plaintiffs," the Illinois Subclass shall refer to as the "Class," and members of the Illinois Subclass shall be referred to as "Class Members."

351.   Defendants received benefits from Plaintiffs and Class Members in the form of data with substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiffs and Class Members.

352.   Plaintiffs and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected

from Plaintiffs and Class Members, without authorization and proper compensation.

353.   Defendants collected and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

354.   Defendants unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

355.   The benefits that Defendants derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members.  It would be inequitable under unjust enrichment principles in Illinois and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

356.   Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiffs and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**D.      Pennsylvania Claims for Relief**

**1.      Pennsylvania Claim for Relief No. 1: Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act – 18 Pa. Cons. Stat. § 5701, *et seq***

(On behalf of Plaintiff Bradley Fugok and the Pennsylvania Subclass)

357.    Plaintiff re-alleges and incorporates Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

358.    This claim is brought by Plaintiff Bradley Fugok, individually and on behalf of the Pennsylvania Subclass against all Defendants.  For purposes of this claim, Plaintiff Bradley Fugok shall be referred to as "Plaintiff," the Pennsylvania Subclass shall refer to as the "Class," and members of the Pennsylvania Subclass shall be referred to as "Class Members."

359.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA") prohibits the intentional (1) interception, endeavoring to intercept, or procurement of any other person to intercept or endeavoring to intercept "any wire, electronic or oral communication;" (2) disclosure or endeavoring to disclose to any other person the contents of "any wire, electronic or oral communication, or evidence derived therefrom," knowing or having reason to know that the information was obtained through such interception; and (3) using or endeavoring to use the contents of "any wire, electronic or oral communication, or evidence derived therefrom," knowing or having reason to know the information was obtained through such interception.  18 Pa. Cons. Stat. § 5703.

360.   WESCA defines "intercept" as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  18 Pa. Cons. Stat. § 5702.  "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." *Id*.

361.   "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation."  *Id*.  Defendants, as corporations, are each "persons" under WESCA.

362.   "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system."  *Id*.

363.   Plaintiff's and Class Members' keystrokes, clicks, scrolling and swiping finger movements, text typed, and other interactions with websites via Defendants' in-app browser are "contents" of "electronic communications" within the meaning of WESCA.

364.   The JavaScript inserted by Defendants is an "electronic, mechanical or other device" "used to intercept a wire, electronic, or oral communication" under WESCA.  *See id*.

365. Defendants intentionally employ a JavaScript insertion to automatically and indiscriminately spy on and intercept website visitors' electronic communications as they take place in real time.

366. Plaintiff's and Class Members' electronic communications and data were intercepted contemporaneously with their transmission. They did not give prior consent to having their communications intercepted by Defendants. In fact, Plaintiff and Class Members reasonably expected under the circumstances that their electronic communications would not be intercepted.

367. Defendants also used and endeavored to use the electronic communications and data that they intercepted. Defendants knew and had reason to know that Plaintiff's and Class Members' electronic communications and data were intercepted.

368. At all relevant times, Defendants' conduct was knowing and intentional.

369. Plaintiff and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of WESCA. Pursuant to 18 Pa. Cons. Stat. § 5728(a) Plaintiff and Class Members are entitled to and hereby seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $10,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

370.   Defendants' conduct is continuous and ongoing.  Defendants continue to violate WESCA without the consent of Plaintiff and Class Members each time they interact with or visit websites with Defendants' in-app browser.  Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications without their prior express consent.

### 2.    Pennsylvania Claim for Relief No. 2: Unjust Enrichment

(On behalf of Plaintiff Bradley Fugok and the Pennsylvania Subclass)

371.   Plaintiff re-alleges and incorporates Paragraphs 1-195, above, with the same force and effect as if fully restated herein.

372.   This claim is brought by Plaintiff Bradley Fugok, individually and on behalf of the Pennsylvania Subclass against all Defendants.  For purposes of this claim, Plaintiff Bradley Fugok shall be referred to as "Plaintiff," the Pennsylvania Subclass shall refer to as the "Class," and members of the Pennsylvania Subclass shall be referred to as "Class Members."

373.   Defendants received benefits from Plaintiff and Class Members in the form of data with substantial monetary value that Defendants sold for marketing and advertising purposes and unjustly retained those benefits at the expense of Plaintiff and Class Members.

374.   Plaintiff and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected

from Plaintiffs and Class Members, without authorization and proper compensation.

375.   Defendants collected and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation from third parties who utilize Defendants' marketing and advertising services.

376.   Defendants unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendants' conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

377.   The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable under unjust enrichment principles in Pennsylvania and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

378.   Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiff and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the putative classes, pray for relief and judgment as follows:

a.     An order certifying the proposed Classes, designating Plaintiffs as the named representative of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class Members as the Court deems appropriate, under Federal Rule of Civil Procedure 23;

b.     An order enjoining Defendants to desist from further deceptive business practices with respect to the in-app browser and such other injunctive relief that the Court deems just and proper;

c.     A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

d.     An award for Plaintiffs' and Class Members' costs, restitution, compensatory damages for economic loss and out of pocket costs, damages under applicable state laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

e.     All remedies available under the Wire Protection Act, including but not limited to damages whichever is greater of (A) actual damages suffered by Plaintiffs and Class Members and any profits made as a result of the violations; or (B) statutory damages of whichever is greater of $100 a day for each day of

violation of $10,000;

f.    All remedies available under CIPA, including but not limited to damages whichever is great of (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages sustained by Plaintiffs and Class Members;

g.    All remedies available under the UCL, including but not limited to, restitution, disgorgement, injunctive relief, and compensatory damages;

h.    All remedies available under the Florida Security of Communications Act, including but not limited to, actual or liquidated damages, and punitive damages;

i.    All remedies available under the Illinois Eavesdropping Act;

j.    All remedies available under the Pennsylvania Wiretapping and Electronic Surveillance Control Act, including but not limited to actual or liquidated damages computed at the rate of $100/day for each violation or $10,000, whichever is higher, punitive damages, and reasonable attorneys' fees and other litigation costs;

k.    Any applicable statutory and civil penalties;

l.    An award of costs and attorneys' fees, as allowed by law;

m.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

n.  Leave to amend this Complaint to conform to the evidence produced at trial; and

o.  Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

## X.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  April 9, 2024                 Respectfully submitted,

*/s/  Roland Tellis*

Roland Tellis
rtellis@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333

Stephen R. Basser
sbasser@barrack.com
BARRACK, RODOS & BACINE
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone:  (619) 230-0800

James E. Cecchi
jcecchi@carellabyrne.com

CARELLA, BYRNE, CECCHI, BRODY &
AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone:  (973) 994-1700

Bryan P. Thompson
bryan.thompson@cclc-law.com
CHICAGO CONSUMER LAW CENTER,
P.C.
650 Warrenville Road, Suite 100
Lisle, IL 60532
Telephone:  (312) 584-2614

MaryBeth V. Gibson
marybeth@gibsonconsumerlawgroup.com
GIBSON CONSUMER LAW GROUP, LLC
4729 Roswell Road
Suite 208-108
Atlanta, GA 30342
Telephone: (678) 642-2503

John Herman
jherman@hermanjones.com
HERMAN JONES LLP
3424 Peachtree Road NE
Suite 1650
Atlanta, GA 30326
Telephone: (404) 504-6555

Israel David
Israel.david@davidllc.com
ISRAEL DAVID LLC
17 State Street
Suite 4010
New York, NY 10004
Telephone: (212) 739-0622

Tyler S. Graden
tgraden@ktmc.com

140

KESSLER, TOPAZ, MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610)667-7706

Kate M. Baxter-Kauf
kmbaxter-kauf@locklaw.com
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

Michael R. Reese
mreese@reesellp.com
REESE LLP
100 West 93rd Street
Sixteenth Floor
New York, NY 10025
Telephone: (212) 643-0500

Carey Alexander
calexander@scott-scott.com
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: (212) 223-6444

*Counsel for Plaintiffs and the Putative Classes*