# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: TIKTOK INC. IN APP BROWSER PRIVACY LITIGATION** | **MDL 2948-A** |
| | **Master Docket No. 24-cv-2110** |
| **This Document Relates to:** | **Judge Rebecca R. Pallmeyer** |
| **ALL ACTIONS** | |

**JOINT STIPULATED ORDER REGARDING THE PROTOCOL FOR PRODUCING DOCUMENTS AND ELECTRONICALLY STORED INFORMATION ("ESI")**

To facilitate the production of discovery material and consistency in the format of the documents to be produced by the Parties in this case, Plaintiffs and Defendants (collectively, the "Parties"), by and through their respective counsel hereby stipulate and agree to the terms of this Stipulated Order Regarding the Protocol for Producing Documents and Electronically Stored Information ("ESI") (the "ESI Protocol"):

**IT IS HEREBY STIPULATED**, subject to the approval of the Court, that:

1. This ESI Protocol shall govern the production of documents and ESI by the Parties in the above captioned litigation ("this Action").

2. The Parties shall make reasonable efforts to preserve documents and ESI relevant to the claims and defenses in the matter, and proportional to the needs of this Action. The Parties agree that the Parties need not preserve, search for, or produce: (1) ~~deleted, slack,~~

~~fragmented, or other data only accessible by forensics; (2)~~ random access memory (RAM), temporary files, or other data difficult to preserve without disabling the operating system; (~~3~~2) on-line access data such as temporary internet files, history, cache, cookies, and the like; and (~~3~~4) data in metadata fields that are frequently updated automatically, such as last-opened dates~~.~~; ~~(5) server, system, or network logs; (6) data remaining from systems no longer in use that is unintelligible on the systems currently in use; and (7) back-up data that is entirely duplicative of data that can be collected from reasonably accessible sources located elsewhere.~~ Also, absent a showing of good cause, the following are deemed not reasonably accessible and need not be collected or preserved: (1) data contained on mobile phones and personal devices;[1] and (2) voicemail messages of any kind~~.~~; ~~and (3) instant messages and/or chat data not stored on a server dedicated to this type of messaging.~~ The Parties will take reasonable steps to preserve all Metadata associated with documents and ESI that is automatically created and available at the time of collection and processing, and there is functionality to export such metadata. The Parties agree to meet and confer in good faith in order to resolve any issues that may arise regarding the foregoing preservation obligations. Activities undertaken in compliance

---

[1] For the avoidance of doubt, the reference to data contained on mobile phones and personal devices in this section includes only such data contained on non-corporate/personal mobile phones or devices of Defendants' employees to the extent that no unique and responsive data or information exists on such non-corporate/personal mobile phones or devices. If unique and responsive data or information exists on Defendants' employees' non-corporate/personal mobile phones or devices, then the parties will meet and confer about the ~~preservation and~~ collection of such data. Data or information on any of Plaintiffs' mobile phones or personal devices used to access the TikTok IAB that may be unique and relevant must be preserved. To the extent responsive and not subject to Plaintiffs' objections in connection with Defendants' document requests, such data or information will be produced. The parties will meet and confer about the collection and production of any such data or information for which Plaintiffs maintain objections.

with the duty to preserve information are protected from disclosure and discovery under Fed. R. Civ. P. 26(b).

3. The production of Documents and ESI also shall be subject to the provisions of orders concerning confidentiality and privilege (collectively, the "Protective Orders") as agreed to among the Parties and/or entered by the Court.

4. A Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this Order and a copy of the Protective Orders with such subpoena and state that the Parties in this Action have requested that non-Parties produce documents in accordance with the specifications set forth herein, including, specifically as to such non-Party productions:

   (a) The Issuing Party shall produce a copy to all other parties of any documents and ESI (including any metadata) obtained under subpoena to a non-Party.

   (b) If the non-Party production is not Bates-stamped by the non-Party Producer, prior to any Party reproducing the non-Party Documents, the Parties will meet and confer to agree upon a format for designating the documents with a unique Bates prefix and numbering scheme.

5. Nothing in this ESI Protocol shall be interpreted to require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections to the discoverability, admissibility, or confidentiality of Documents or ESI. The Parties reserve all objections under the Federal Rules of Civil Procedure and applicable decisional authority other than concerning matters that are addressed in this Order.

6. Nothing in this ESI Protocol shall be construed to eliminate, alleviate, or shift any

obligations the Parties have to produce relevant and responsive documents pursuant to the Federal Rules of Civil Procedure, including but not limited to Rules 26 and 34.

7.    The production specifications in this ESI Protocol apply to paper records and ESI that are produced after the date of entry of this ESI Protocol.  To the extent any documents, ESI, or other materials produced in a related action, prior to the entering of this ESI Protocol, are re-produced in this Action, Defendants are not under any obligation to produce those materials in a manner different from how they were originally produced. This paragraph does not, however, bar reasonable requests for data fields identified in this Order that are missing from any ESI materials produced in related actions to the extent they exist and are reasonably accessible, or to the extent that a document is illegible and needs to be reproduced to be readable.

8.    To the extent additional obligations or rights not addressed in this ESI Protocol arise under Federal Rules of Civil Procedure 26, 33, and 34, local rules, or applicable state and federal statutes, those rules and/or statutes shall control.

### A. Definitions

1.    **"Confidentiality Designation"** means the legend affixed to "Confidential Information" as defined by, and subject to, the terms of the Agreed Confidentiality Order entered in this Action.

2.    **"Discovery Material"** is defined as all information produced, given, or exchanged by and among all Parties, or received from non-Parties in this Action, including all deposition testimony, testimony given at hearings or other proceedings, interrogatory answers, documents, and all other discovery materials, whether produced informally or in response to requests for discovery.

3. **"Document"** is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Civil Procedure 26 and 34. The term "document" shall include Hard Copy Documents, electronic documents, and ESI as defined herein.

4. **"Electronically Stored Information"** or **"ESI,"** as used herein has the same meaning as in the Federal Rules of Civil Procedure 26 and 34 and includes Electronic Documents or Data, and computer-generated information or data, stored or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.

5. **"Extracted Full Text"** means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body information.

6. **"Family"** means email and all related attachments.

7. **"Hash Value"** is a unique numerical identifier that can be calculated by applying a standard mathematical algorithm to a file, a group of files, or a portion of a file.

8. **"Metadata"** means information describing characteristics of a file, generated by the application that created or modified it or generated automatically by a computer or network operating system on which the file is located.

9. **"Native Format"** means and refers to an electronic document's associated file structure defined by the export format of the original creating application. For example, the native format of an Excel workbook is a .xls or .xslx file.

10. **"Optical Character Recognition"** or **"OCR"** means the process of recognizing, and creating a file containing searchable, visible text from the contents of a document image.

11. **"Paper Records"** or **"Hard Copy Documents"** means Documents existing in paper form at the time of collection.

12.    **"Party"** means Plaintiffs and Defendants in this Action.

13.    **"Producing Party"** means the Party that may be producing documents in response to the request of the Requesting Party.

14.    **"Requesting Party"** means the Party requesting production of documents.

15.    **"Searchable Text"** means the native text extracted from ESI and any Optical Character Recognition text ("OCR text") generated from a Hard Copy Document or electronic image.

### B.    Production of Documents Originating as Paper

Paper records will be scanned or otherwise converted into electronic form from paper documents in the following format:

(a)    **TIFFs.** All documents shall be scanned to single page Group IV, TIFF format, at least 300 dpi and 8 ½ x 11-inch page size, except for documents requiring higher resolution or different page size.

(b)    In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (*i.e.*, paper documents should be logically unitized). For example, documents stored in a binder, folder, or similar container (each a "container") should be produced in the same order as they appear in the container with consecutive Bates numbers. T h e  front cover of the container should be produced immediately before the first document in the container.  The back cover of the container should be produced immediately after the last document in the container.  The Parties will undertake reasonable efforts to, or have their vendors, logically unitize documents in accordance with the requirements of this paragraph, but nothing in this

paragraph shall require the Parties to undertake efforts to unitize documents that would be unduly burdensome. The Parties agree to meet and confer to address situations in which a Party believes that documents have not been properly unitized. Documents shall be produced in the order in which they are kept in the usual course of business.

(c)     Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT) as detailed below. Each image file should have a unique file name which shall be the Bates number of the page.

(d)     **Unique IDs.** Each TIFF image should have a unique filename, which corresponds to the Bates number of that page. The filename should not contain any blank spaces and should be zero-padded (*e.g.*, ABC_000000001). A single prefix should be used for each Producing Party. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a Party produces in this Action.

(e)     **Objective Coding Fields.** The following objective coding fields should be provided, if applicable: (i) beginning Bates number; (ii) ending Bates number; (iii) beginning attachment Bates number; (iv) ending attachment Bates number; (v) page count; and (vi) source location/custodian.

(f)     **OCR Text Files.** Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first

image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. To the extent that documents have been run through OCR software, the full text shall be provided on a document-level in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. Text files should be provided in a "Text" folder. To the extent that a document is redacted, the text files should not contain the text of the redacted portions. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages. If it is not possible to provide OCR for certain documents, the Producing Party shall inform the Requesting Party of the issue and the Parties will meet and confer about the issue.

(g)     For Hard Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN," "CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER," "REDACTION," fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable. Any bates numbers previously assigned to a document as a result of a legal, regulatory, or governmental production shall be included. For documents collected in paper, the beginning and end bates numbers previously assigned to those documents as a result of the production in another matter shall be added as distinct metadata fields for those documents and be included in the production file.

(h)     **Parent-Child Relationships**. The Parties shall preserve parent-child relationships (the association between an attachment and its parent document)

within a document family to the extent possible. Absent a claim of privilege, responsive as well as non-responsive or irrelevant family members will be produced consecutively with the responsive related parent document. The Parties shall undertake reasonable efforts to produce each document with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family. The Parties agree to meet and confer to address situations in which a Party believes that parent-child relationships have not been adequately preserved. For avoidance of doubt, a document and all other documents in its attachment range, e-mails with attachments, and files with extracted embedded OLE documents all constitute family groups. If any member of a family group is produced, all members of that group must also be produced, or else logged as privileged, and no such member shall be withheld from production as a duplicate.

(i)     Black-and-white ("B&W") Hard Copy Documents shall be produced as single-page, B&W group IV TIFFs imaged at 300 dpi. To the extent that a static image has previously been created of any Hard Copy Document containing color and/or grayscale and is reasonably available for production, such static image containing color and/or grayscale shall be produced, except for documents requiring higher resolution or different page size. If not previously imaged in color or grayscale, the Parties will use reasonable efforts to produce Hard Copy Documents containing color and/or grayscale as static images with color and grayscale, respectively to the extent that production in color is reasonably necessary to

understand the meaning of the document.  A Receiving Party may request that documents be re-produced with the coloration of the original document by providing a list of the Bates numbers of documents it requests to be produced in color format to the extent that production in color is reasonably necessary to understand the meaning of the document.  In the event the Producing Party objects to re-producing the documents, the Parties shall meet and confer within three (3) business days, or longer for good cause shown.

(j)     Nothing herein shall preclude a Party from, at its discretion, producing for inspection Hard Copy Documents for which there are no electronic images or other tangible things in hard copy or tangible form.  However, to the extent that a Party elects to produce for inspection Hard Copy Documents in tangible form, the Producing Party shall also make available to the Requesting Party any existing indices, inventories, lists, catalogs, or other data or documents that exist in the normal course of business that identify or describe the documents produced. Nothing in this paragraph, however, prevents a Party from asserting undue burden in response to a request for such documents, and nothing in this paragraph waives or dilutes such an objection.

(k)     Upon notice from the Requesting Party that a document or portion thereof is illegible, the Producing Party shall, if possible, produce a legible copy in the form of either a new TIFF, static image, or hard copy, or, if not possible, explain why a more legible copy of the document cannot be produced.  The document's original orientation should be maintained (*i.e.*, portrait to portrait, landscape to landscape).  No Producing Party shall be required to alter or re-create any

document for which no grayscale or color version is in the Party's possession or control or for which the original Hard Copy Document is illegible.

(l)     If any original Hard Copy Document has any note or attachment affixed to it, the Producing Party shall scan and produce copies of the original Hard Copy Document along with all notes and attachments to it in the same manner as other documents. If any such note or attachment obscures any information on the original Hard Copy Document, the Producing Party shall also produce a copy of the original Hard Copy Document without the note or attachment affixed in order to make the underlying information visible. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable.

## C.     Production of Electronically Stored Information ("ESI")

1.     The Parties will produce responsive, complete families of electronically stored information ("ESI") in TIFF format according to the following specifications:

(a)     **TIFFs**. Each page of a document should be produced as single-page, black and white, group IV 1-bit TIFFs imaged at 300 dpi with the exception of spreadsheet type files, source code, audio, and video files, which shall be produced in native format, when reasonably practicable. Image file names will be identical to the corresponding Bates numbered images, with a ".tif" file extension. The Requesting Party retains the right to request a TIFF image in a higher resolution or larger page size if necessary to render the image legible or reasonably usable. If a Party encounters a document where production in color is reasonably

11

necessary to understand the meaning of the document, the Producing Party will cooperate to honor reasonable and specific requests to re-produce that document in a color format. All images of redacted documents that contain active comments will be processed such that all data is visible in the image, to the extent it exists in "last saved" or "last modified" format. TIFFs will reasonably show text and images which would be visible to the reader to the extent reasonably possible using the native software that created the document. For example, TIFFs of e-mail messages should include the BCC line. Bates numbers, Confidentiality Designation (in accordance with the Protective Orders governing this Action), and redactions (to the extent they are necessary) should be burned into the image. Whenever it is practical to do so, the document's original orientation should be maintained (i.e., portrait to portrait and landscape to landscape). TIFF image files should be provided in an "Images" folder.

(b)    **Load Files**: All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file) as well as a metadata (.dat) file with the metadata fields identified below on the document level. The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load files in the production.

An image load file, in standard Opticon format, showing the Bates number endorsed onto the lower right corner of each page but not obscuring the content on any page and the appropriate unitization of the documents, will accompany all

12

document images.  All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index.  If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (*e.g.*, unsupported file format, file corruption, inaccessible password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed," and the associated metadata for the file with the technical problem shall be produced if possible.  A Receiving Party thereafter may raise with the Producing Party any questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

(c)     Each imaged version of an electronic document will be created from the version of the document that was collected.  TIFFs shall be produced as black & white, single-page TIFF images in accordance with the technical specifications set out above, unless agreed with the Receiving Party or ordered by a court. Additionally, the Producing Party shall make a reasonable attempt, using automated processes, to identify all documents with color content, including, but not limited to, marketing materials and advertisements, and shall produce those in color to the extent that production in color is reasonably necessary to understand the meaning of the document. The Producing Party shall also produce PowerPoint files in color to the extent that production in color is reasonably necessary to understand the meaning of the document (to the extent they are not produced natively).  Upon written request that identifies a reasonable number of individual documents at issue by Bates number, a Party shall produce color images for those documents

to the extent that production in color is reasonably necessary to understand the meaning of the document. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher. To the extent there is metadata that identifies a document as containing deleted or resolved comments, or to the extent that the Requesting Party identifies by Bates number such a document, and that document is not produced in native format pursuant to this Protocol, such document should be produced in color with all active comments, to the extent that production in color is reasonably necessary to understand the meaning of the document.

(d)     All TIFF files that have an available corresponding searchable text (.TXT) file that can be extracted are to be provided with such file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all active comments, speaker's notes, and text from hidden worksheets, slides, columns and rows. If a Producing Party identifies document types where it cannot provide such information as part of the extracted text file, it shall inform the Requesting Party. In the case of files with redacted text, OCR'd text of the non-redacted portion of the documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

(e)     Each text file shall be named according to the Bates number of the first page of

the corresponding image files (e.g., BATES00000l.TXT).

(f)     In the case of email, the corresponding text file shall include, where reasonably available:

(i)     the individual(s) to whom the communication was directed ("To"); (ii) the author(s) of the email communication ("From"); (iii) who was copied and blind copied on such email ("CC" and "BCC"); (iv) the subject line of the email ("RE" or "Subject"); (v) the names of any attachments; and (vi) the text (body) of the email.

(g)     **Active Comments**. To the extent that the collected version of a document contains active comments, the document should be imaged showing such active comments or produced in the native format preserving such active comments. The Parties agree to meet and confer in good faith about any request from Plaintiffs to review the Edit History of specific documents to determine whether suggestions, tracked changes or comments were left in prior versions of specific documents, and restore, collect and produce prior versions of documents that contain tracked changes or comments.

(h)     **Password Protected Files**. The Producing Party shall produce passwords for any password-protected files to the extent the passwords are reasonably accessible and available. If a password is not reasonably accessible and available, the Parties will use reasonable and proportional efforts and standard industry practices to try to access the content of the file(s).

(i)     **Embedded Documents.** If reasonably possible, embedded ESI documents (e.g., a spreadsheet embedded within a word processing document) will be extracted,

15

produced as independent document records, and related back to the respective top level parent document (e.g., standalone file, email message, etc.) via the BegAttach and EndAttach fields referenced in **Appendix 2**. Related documents will be produced within a continuous Bates number range. Nothing in this paragraph will require a Party to extract or produce information from an embedded or attached internet link.

(j)     **Hyperlinked Documents.**     No party need collect or produce, as a matter of course, documents referenced by document stubs or via links. A Receiving Party may request the production of a specific hyperlinked document or specific version of a hyperlinked document if it has a reasonable basis to believe that the hyperlinked document or specific version of the hyperlinked document is responsive and has not yet been produced. The Producing Party shall consider any such request in good faith, but reserves the right to object to such request as cumulative and overburdensome. If the Producing Party objects to such request, the Parties will meet and confer in good faith.

(k)     **Parent-Child Relationships.**  The Parties will use reasonable efforts to preserve the Parent-Child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business.  The relationship between attachments, enclosures, embedded files, and/or exhibits to any parent document shall be preserved to the extent it exists.[2]  For the avoidance

---

[2] If the preservation and provision of parent-child relationships for certain documents is not possible, the Producing Party shall inform the Requesting Party of the issue and the Parties will meet and confer about the issue.

of doubt, the Parties are not obligated to produce hyperlinked documents as family members. A Receiving Party may request the production of a specific hyperlinked document or specific version of a hyperlinked document if it has a reasonable basis to believe that the hyperlinked document or specific version of that hyperlinked document is responsive and has not yet been produced. The Producing Party shall consider any such request in good faith, but reserves the right to object to such request as cumulative and overburdensome. If the Producing Party objects to such request, the Parties will meet and confer in good faith. Child-documents should be consecutively produced immediately after the Parent-document. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family. Non-Responsive Parents and Attachments: The Parties agree that non-responsive parent documents must be produced if they contain a responsive attachment and are not withheld as privileged. Non-responsive attachments to responsive parent emails must be produced.

(l)     **Production of Text Messages or Chats**.  If there are responsive messages from message-based applications other than e-mail, which include applications such as Gchat, Microsoft Teams, texting on cell phones, WhatsApp, Facebook Messenger, Slack, or other similar messaging or texting applications, then these will be produced in clearly legible format.  The produced chats and/or text messages shall be produced in a way that provides sufficient context for the Receiving Party to understand the subject matter within the conversation, rather

than just producing any single chat or text message by itself, without context. The parties reserve the right to request the needed context if the produced version does not include it.  If the Producing Party objects to such request, the Parties will meet and confer in good faith.  Any attachments should be produced along with the message following the protocol for embedded documents described in Paragraph i and parent-child relationship described in Paragraph k.  For avoidance of doubt, this paragraph does not refer to hyperlinked documents, as explained in Paragraph k.  Text or chat message data retrieved from a cellphone, application, or the cloud should be converted to any format that the Producing Party deems appropriate for producing the data and meeting its discovery obligations. The parties agree to meet and confer in good faith if a production format becomes an issue. Multimedia files, such as images, GIFs, videos, audio files, etc. that are sent via text message or chat shall be produced embedded (to the extent reasonably possible) within the image, and/or separately as an attachment, linked to its parent record through an attachment ID (to the extent reasonably possible), consistent with what the Producing Party deems appropriate for producing the data and meeting its discovery obligations. Parties shall meet and confer if any relevant cellphone or chat data during the relevant time period has been lost due to changes in devices or destruction.

(m)     **Translations**. The Producing Party will produce translations of documents that exist in its files in the ordinary course of business to the extent they are non-privileged and identified as responsive in the course of the Producing Party's searches. The Producing Party will not produce translations created at the

direction of the Producing Party's counsel. The Producing Party's production of any pre-existing translations does not reflect any agreement that the translations are accurate in content or nature and the Producing Party reserves all evidentiary objections as it relates to such translations. Nothing in this provision creates any obligation for the Producing Party to search for translations outside of any agreement between the Parties regarding relevant dates, custodians, search terms, or other agreed criteria.

2.      The metadata fields associated with each electronic document will be produced, to the extent they are automatically created and available at the time of collection and processing, and there is functionality to export such metadata.   The Parties agree to meet and confer in good faith about any request from any Party about the production of metadata fields that are not automatically generated by the processing of ESI or Documents, or that do not exist as part of the original metadata of the collected ESI or Documents, including information contained in the edit history of specific ESI or Documents.

| Field Name | Field Description | Required For E-mails | Required For Chats | Required For Documents |
|---|---|---|---|---|
| Custodians | Name of custodian(s) of email(s) or file(s) produced and any de-duped file(s) not produced | X | X | X |
| Duplicate Custodian (or similar name) | Name of duplicate custodian(s) of email(s) or file(s) produced | X | X | X |
| BegBates | Beginning Bates number (including Prefix) | X | X | X |
| EndBates | Ending Bates number (including Prefix) | X | X | X |

| | | | | |
|---|---|---|---|---|
| BegAttach | Beginning Bates number of the first document in an attachment range (only in emails with attachments) | X | X | X |
| EndAttach | Ending Bates number of the last document in an attachment range (only in emails with attachments) | X | X | X |
| From | From field extracted from an email message | X | | |
| Author or owner (or similar name) of a document | Author or owner field extracted from the metadata of a non-email document | | | X |
| Collaborators | Individuals who have access to the document at the time of export | | | X |
| Sender | Sender field extracted from the metadata of a chat message | | X | |
| Members | Individuals who are members of a chat thread at the time of export | | X | |
| To | To or recipient field extracted from an email message | X | | |
| Cc | Carbon copy ("Cc") field extracted from an email message | X | | |
| Bcc | Blind carbon copy ("Bcc") field extracted from an email message | X | | |
| Subject | Subject line extracted from an email message | X | | |
| Title | Title extracted from a thread with a chat message | | X | |
| Filename, name, title, or similar name | Filename, name, title, or similar name of the collected document | | | X |
| Sent date | Sent date of an email message (mm/dd/yyyy hh:mm:ss format) (a given email will have either a date sent or date received, but not both) or sent date range of a chat message thread | X | X | |

| Received date | Received date of an email message (mm/dd/yyyy hh:mm:ss format) (a given email will have either a date sent or date received, but not both) | X | | |
|---|---|---|---|---|
| Creation date or time | Date or time that a non-email file was created (mm/dd/yyyy hh:mm:ss format) | | | X |
| Modified date or update time | The application recorded time on which the document was last modified or updated (mm/dd/yyyy hh:mm:ss format) | | | X |
| Pgcount | Number of pages of document produced | X | X | X |
| NativeLink | Relative path to any files produced in native format | X | X | X |
| Text Path | Relative path to any OCR/extracted text files in the production set | X | X | X |
| GmailMessageID | Unique message identifier of an email message | X | | |
| Hash value | MD5 or SHA-1 hash value, unique document identifier | X | X | X |
| ConfidentialityDesignation | Confidentiality Designation for produced documents | X | X | X |
| Redaction | Identifies if a document has been redacted | X | X | X |
| Deleted comments | Identifies if a document has deleted comments | | | X |
| Resolved comments | Identifies if a document has resolved comments | | | X |

| | | | | |
|---|---|---|---|---|
| File extension or type*<br><br>*will not be populated for emails | Indication of what type of file it is (*e.g.*, .ppt, .doc, .pdf) | | | X |
| Box Number | The box number associated with archived documents that are scanned for production | | | X |
| Other Legal Matter BegBates[3] | Beginning Bates number (including Prefix) used when produced in the other legal matter | | | X |
| Other Legal Matter EndBates | Ending Bates number (including Prefix) used when produced in the other legal matter | | | X |
| Other Legal Matter BegAttach | Beginning Bates number of the first document in an attachment range (only in emails with attachments) used when produced in the other legal matter | | | X |
| Other Legal Matter EndAttach | Ending Bates number of the last document in an attachment range (only in emails with attachments) used when produced in the other legal matter | | | X |

**D. Native Format Production of Documents**

1.      The Parties will produce the following ESI types in native file format to the extent that

---

[3] All "Other Legal Matter" fields apply exclusively to documents collected as paper to be scanned or otherwise converted to electronic format for review and production.

they were collected in native format:

(a)    Excel spreadsheets

(b)    Audio/video files

(c)    Animations

(d)    PowerPoint presentations

2.    A Receiving Party may request that documents (identified by Bates number) be produced in native format where native format is reasonably required to understand the documents' meaning. The Producing Party shall accommodate a reasonable number of requests. To the extent that the requested documents include any privileged material, the Producing Party will consider requests on a case-by-case basis.

3.    Any document produced in native format will be produced according to the following specifications:

(a)    A unique Bates number and Confidentiality Designation shall be used as the file name and the original file name and file extension shall be preserved in the corresponding load file. An example of this convention would be:

""XX_XXX_MDL_00000l_MDL_00000l_Confidential-Subject_to_Protective_Order.xls" or naming convention agreed upon by the Parties.

(b)    The native format documents shall be accompanied by reference information that sets forth for each document, sufficient information to allow the Parties to track and authenticate the native format documents produced, including: (i) the name of the custodian from whose files the electronic file is produced; (ii) an appropriately calculated "MD-5 Hash Value"; (iii) the original name of the file; and (iv) a Bates number.

(c)      Any file produced in native format need not be imaged.  Instead, a single page placeholder image shall be provided that indicates the file was produced in native format and contains the Bates number and Confidentiality Designation of the corresponding file.

(d)      To the extent that the information in a native file must be redacted, the Producing Party may produce TIFF images with redactions in lieu of a native file and TIFF placeholder image.  The Producing Party shall make reasonable efforts to ensure redacted TIFF images of native files are legible and usable.  If redacting TIFF images, and to the extent that any of the following can be automated, the Producing Party, or its e-discovery vendor, should make reasonable efforts to: (1) reveal hidden rows, columns, or sheets prior to converting the document to TIFF; (2) clear any filters that may conceal information; (3) adjust column widths and row heights to avoid  numbers or other text content being truncated or appearing as "########"; (4) ensure that column and row headings print; (5) ensure that the tab name appears in the header or footer of the document; (6) process comments so that they are produced at the end of the spreadsheet; and (7) process spreadsheets so that they print across then down.  If good cause exists, the Requesting Party may ask the Producing Party to manually undertake the foregoing for certain documents to the extent the document was originally produced with concealed information.  The Producing Party shall not unreasonably deny such a request.

**E.    Redacted Files**

1.    The Parties reserve the right to redact any information covered by the attorney-client

privilege, attorney-work product doctrine, or any other applicable privilege, prior to producing documents in this Action. To the extent a Party redacts such information, the information redacted shall be identified by the endorsement "Redacted for Privilege," "Redacted – Privileged," or similar language.

2. Extracted text that has been redacted on the produced TIFF will not be provided. Documents that do not render in a readable format to TIFF, such as Excel spreadsheets, may be redacted in native form as long as the Producing Party keeps an unredacted copy of the native file and identifies the natively redacted documents to the Receiving Party in the production cover letter or by way of a native redaction field.

## F. Deduping Documents and De-NISTing Documents

1. To the extent reasonably feasible, each Party will dedupe ESI globally for exact duplicate documents (based on MD5 or SHA-1 hash values at the parent document level). This will result in the Producing Party producing only a single copy of responsive Duplicate ESI, provided that all other custodians of the Duplicate ESI are listed in the "Duplicate Custodians" (or similar name) field. The Parties shall de-duplicate stand-alone documents against stand-alone documents and shall de-duplicate top-level email documents against top-level email documents. De-duplication shall not break apart families.

2. Common system and program files as defined by the NIST library need not be processed, reviewed or produced.

3. If documents contain embedded objects, the Producing Party shall extract the embedded objects as separate documents and treat them like attachments to the document to the extent reasonably possible and consistent with how the data is processed. To the extent

reasonably possible, images embedded in emails shall not be extracted and produced separately.

## G. Proprietary or Third-Party Software

To the extent that information produced pursuant to this Protocol cannot be rendered or viewed without the use of proprietary or third-party software, the Parties shall meet and confer to discuss the production formats that are available within the software or directly from the software's database. During the meet and confers, the Producing Party shall have available a person who will be able to answer questions regarding the capabilities and formats that production can be made in. If production is not feasible, the Producing Party shall provide the Receiving Party written notice of the reason why the production is not feasible. The Parties shall meet and confer within seven (7) days of the date of the written notice.

## H. Database Data

When responsive information is in structured data, or other non-standard formats, the Parties will meet and confer to address the production and production format of any responsive data.

## I. Alternative Formats

Notwithstanding the Parties' stipulations herein, upon reasonable request made by the Receiving Party, the Parties shall confer regarding the production in an alternate format of a document previously produced in accordance with this Order.

## J. Production Media

The Parties shall produce documents electronically via a secure File Transfer Protocol ("FTP") rather than through physical media (e.g. CD, DVD, or hard drive), unless such electronic transmission is impracticable, or the Parties agree on a different method of transmission. The

produced documents shall be password protected and encrypted. Each piece of Production Media shall be encrypted and assigned a production number or other unique identifying label ("Production Volume Number") corresponding to the sequence of the material in that production and shall include (a) the name of this Action and the case number; (b) the identity of the Producing Party; (c) the Bates number range of the materials contained on such Production Media item; and (d) the Production Volume Number of the Production Media. However, the Parties expressly recognize that this section may be superseded by the anticipated agreement to create a document production repository.

**K. ESI Disclosures: Parties' Identification and Classification of Documents – Search Terms and Custodial Sources.**

1.      To the extent necessary, the Parties agree to meet and confer to discuss any custodial or non-custodial sources for responsive documents and information and to try to agree on a reasonable scope of discovery. To facilitate that meet-and-confer, the Producing Party shall disclose their custodial and non-custodial sources of potentially relevant documents and information within fourteen (14) days of the entry of this ESI Protocol. The custodial source information disclosure shall include group or department, job or position title to the extent one exists based on the records of the company's HR department, the corporate entity that employed the custodian, and the dates in which the custodian was in the group or department and held the job or title. The non-custodial source information disclosure shall include the system name and, if the name differs from the relevant software, an identification of the relevant software.[4] The Producing Party reserves its right to amend

---

[4] If the non-custodial data source is a shared folder, the name of the folder should be disclosed.

such disclosures. The Parties also agree to meet and confer to discuss their ESI and document production, including (a) additional parameters for scoping the review and production efforts (e.g., application of date ranges, etc.); (b) potential use and identification of search terms and other tools or techniques; and (c) the identification and production of Documents and ESI from custodial and non-custodial sources that do not require the use of search terms, and other tools or techniques.

2.  The Producing Party shall use reasonable efforts to identify custodians or originating sources. A Producing Party shall use reasonable efforts to use a uniform description of a particular custodian across productions.

3.  All Parties reserve the right to request, at any time prior to the close of discovery, inclusion of additional custodians or non-custodial data sources whose relevance was discovered after the initial designations, or for other good cause shown. If the Producing Party objects to the inclusion of such additional non-custodial or custodial sources, the Parties will meet and confer to resolve the matter. If the Parties cannot reach resolution, the Court or its designee will determine the matter.

4.  Before a Producing Party uses search terms to cull specific data sets in advance of a review for responsiveness, the Producing Party shall describe the search protocol they intend to use and shall include: (a) the criteria to be used to identify the universe of documents to which search terms will be applied (e.g., custodians and date ranges), (b) proposed search terms to be applied to that universe of documents, subject to revision based on, for example, meet and confer of the Parties, (c) targeted search term exclusions, (d) date range filters, and (e) file type filters. A Requesting Party may also suggest search terms to be applied. If there is a dispute between the Parties regarding the search term

28

protocol described by the Producing Party, the Parties will meet and confer to resolve the matter. If the Parties cannot reach resolution, the Court or its designee will determine the matter. The Producing Party will provide a search term hit list or hit report after global de-duplication where available, but reserves the right to update the list or report. The list or report should include the number of documents that hit on each term, the number of unique documents that hit on each term (documents that hit on a particular term and no other term on the list), and the total number of documents that would be returned by using the proposed search term list (including families). Where the Producing Party will run searches on custodial and noncustodial data sources using English language terms, the Producing Party will also run searches using the relevant corresponding[5] foreign language terms on such custodial and noncustodial data sources. The Producing Party will disclose those sources and foreign language terms to the Receiving Party.

5.     Documents or ESI that a Producing Party is or becomes aware of that are responsive to discovery requests (subject to the Producing Party's objections and responses) but are otherwise outside the scope of the agreement between the Parties to limit the search for relevant documents by date ranges, custodians, search terms or other agreed criteria should be produced or logged. This issue might arise, for instance, if a Party's counsel specifically discovers new information after agreeing to search limitations or a witness brings responsive documents to a deposition preparation session. For the avoidance of doubt, this provision does not create an independent obligation for the Producing Party to search for documents or information outside of the Parties' agreement on relevant

---

[5] For purposes of this ESI Protocol, "corresponding" means the term that is used by native speakers of the foreign language to describe the same term in English.

dates, custodians, search terms, or other agreed criteria.

6.     Nothing in this ESI Protocol shall be deemed to be a waiver of any Party's right to reasonably seek agreement from the other Parties, or a Court ruling, to modify proposed or previously agreed-to search terms, techniques, or tools (including any proposed as supplements).

7.     To the extent the Producing Party knows of documents and data in its possession, custody or control that are discoverable or responsive to a request for production that is from a source or custodian that has been agreed to for production, then its use of search terms, shall not relieve it of its obligation to produce that information.

### L.     Inability to Produce Metadata.

1.     At this time, the Parties do not represent that any or all metadata described in this Order exists or is otherwise available.  During the course of collection, review, and production of documents and ESI, the Parties shall determine what metadata exists.  If metadata does not exist for any specific document, the required production field will be blank.

2.     If data is encrypted when it is produced, then to the extent the decrypting information necessary to decrypt the information is reasonably available, the Producing Party shall transmit the credentials necessary to decrypt the data subsequent to the production.

3.     If the Producing Party becomes aware of responsive data that is encrypted and is unable unencrypt it, the Producing Party shall let the Receiving Party know and will explain the steps taken to attempt to unencrypt the data.

### M.     Production of deposition transcripts from related actions.

The Parties acknowledge that depositions may have been taken in other matters that could

30

be relevant in this Action. If those transcripts are to be produced by a Party in this Action, they are to be produced with their exhibits to the extent possible. If a Party in this Action believes that a deposition transcript, or exhibits thereto, cannot be produced for any reason, including a confidentiality obligation, that Party must notify the other Party in this Action of the basis for withholding documents and log those documents, where applicable, pursuant to the applicable orders in this Action.

**N.     Privilege Logging**

1.  Unless otherwise provided in this Order, any document falling within the scope of any request for production or subpoena that is withheld or produced in redacted form on the basis of a claim of attorney-client privilege, work product, or any other claim of privilege or immunity from discovery is to be identified by the Producing Party on a privilege log, which the Producing Party shall produce in Excel format.

2.  Within thirty (30) days of each production of documents or ESI, the Producing Party shall provide a privilege log or logs concerning the information that has been redacted or withheld in whole or in part from that production based on an assertion of attorney-client privilege, work product protection or any other applicable privilege or protection. The following documents presumptively need not be included on a privilege log:

    (a)     Attorney-client privileged communications between a named party or an affiliated company within the same corporate structure as the named party, officer, director, agent, or employee of a named party and their counsel relating to this litigation on or after November 25, 2022 and any attachments to such communications. For avoidance of doubt, the Parties cannot exclude from the privilege log any responsive document created before November 25, 2022 that it

31

would otherwise need to independently log solely because that document is attached to an attorney-client privileged communication between a named party or an affiliated company within the same corporate structure as the named party, officer, director, agent, or employee of a named party and their counsel related to this litigation that was sent on or after November 25, 2022; or

(b)     Attorney work product relating to this litigation created on or after November 25, 2022.

3.     The privilege log shall set forth the privilege or protection relied upon and specify separately for each document the following to the extent such information is available, and reasonably ascertainable from the metadata of the document or supplied by counsel as necessary:

(a)     Bates-number range. If no Bates-number range, a unique identifier for each logged document consecutively numbered starting with the number 1 (the "Privilege Log ID");

(b)     Custodian or source (the name of the person(s) or non-custodial source from which the document was collected);

(c)     Family relationship, if applicable[6] (i.e., identification of parent emails and all attachments);

(d)     A description of the document, including the factual basis sufficient to support the claim that the document is privileged and/or protected;

(e)     The name(s) of the author(s) / owner(s) / collaborator(s) / sender(s) / member(s)

---

[6] The Parties acknowledge that hyperlinked documents do not constitute "family members" as that term is understood with respect to emails and attachments to emails.

or other similar name;

(f)    The name(s) of all recipient(s), including carbon copies ("ccs") and blind carbon copies ("bccs") for emails;

(g)    The name(s) of all sender(s) or member(s) for chats/messages;

(h)    The document date (from metadata);

(i)    The create date or time (if different than the document date);

(j)    File or Document type (file extension or similar indication of file type from metadata);

(k)    Document filename, name, or title (for documents), subject line (for emails), or title (for chats/messages) so long as the disclosure would not reveal information itself privileged; if the disclosure would reveal information itself privileged, then the field shall indicate "Privileged," as appropriate;

(l)    Date last modified or time updated;

(m)    An indication of whether the document has been produced in redacted form or withheld in its entirety;

(n)    The privilege designation (attorney-client; attorney work product; joint defense and/or common interest, etc.); and

(o)    If multiple email messages are logged using the most inclusive message in the chain or "thread" pursuant to paragraph 5 below, the number of email messages that are included in the chain or "thread."

4.    Attachments to emails shall be logged as separate documents on the log pursuant to paragraph 6 below, with family relationships identified. A party shall only be required to include one entry on the privilege log to identify each component of non-email files that

are withheld in their entirety for privilege (document that has embedded objects or attachments).

5. An email chain or thread for which a party claims as protected entirely by privilege may be logged in a single entry, which will be the "last-in-time" email in the email chain or thread. The privilege log entry must include the: (1) names of the senders and recipients (including copies and blind copies) for all emails in the chain or thread, (2) description of the chain or thread including the factual bases sufficient to support the claim of privilege for each chain or thread member over which privilege is asserted, and (3) the privilege designations applicable to any chain or thread members. For the avoidance of doubt, an email chain or thread will only be treated as a single chain or thread if it consists of the same participants throughout the messages; if participants are added or removed in the course of a chain or thread, or a new chain or thread is created by forwarding an email that then consists of different participants, then emails resulting from that action will be treated as separate chains or threads and, to the extent that the Producing Party elects to log email chains or threads in a single entry, they would be the subject of a separate log entry. To the extent that an email chain or thread contains privileged and non-privileged communications, such email chains or threads will be produced with the privileged communications redacted.

6. Each privileged attachment to a privileged email must be logged separately from the privileged parent email. The log entry for any attachment should identify who sent and received the email containing the attachment and/or the Bates number and Privilege Log ID of the parent email if it contains such identifying information. If the create date or time of an attachment precedes November 25, 2022, it is not subject to the exceptions to

34

logging privileged documents described above in paragraph 2, even if the parent email is subject to either exception. Mixed privileged families subject to production shall be handled as follows:

(a)     If a parent document is entirely privileged and the attachments are not privileged, only the parent will be logged on the privilege log and withheld. The withheld parent document will be produced as a slip sheet with its non-withheld attachments to keep the family context. The slip sheet will receive a Bates number and be referenced on the log.

(b)     To the extent there is an entirely privileged attachment to a non-privileged parent document, that non-privileged parent document shall be produced, and the privileged attachment produced with a slip-sheet as indicated. Only the attachment will be logged on the privilege log and withheld.

(c)     In instances where a limited portion of any document is privileged, the document will be redacted and produced.

(d)     To the extent the Producing Party cannot tell a hard copy document's contextual or familial relationship, the Producing Party will make privilege determinations for hard copy documents at the document level.

7.     After the receipt of a privilege log, the Receiving Party may dispute a claim of privilege. Prior to seeking Court intervention, the Party disputing, questioning, or otherwise objecting to a claim of privilege shall provide in writing the identification of the documents for which it questions the claim of privilege and the reasons for disputing, questioning, or otherwise objecting to the privilege designation. Within fourteen (14) days, the Producing Party will provide a written response explaining the basis for its

35

claim, or if applicable, de-designating documents as privileged and producing such documents in accordance with this Order. Thereafter, if the Parties continue to disagree, they will then meet and confer in good faith as to the claims of privilege to resolve the dispute. If agreement has not been reached after fourteen (14) days from the Parties' meet-and-confer, the Parties shall submit the dispute to the Court for resolution.

8.   The privilege logs shall be produced in searchable/sortable Excel format. Documents that are redacted shall be identified as such in a "redaction" field in the accompanying data load file. Additionally, if a document's metadata contains privileged information, that metadata field will likewise either be identified as redacted or left blank where the document indicates it is redacted.

9.   All attorney names and the names of their staff, or other legal personnel appearing on the log shall be designated with an asterisk, and any outside counsel and their staff shall be listed with the name of their firm.

**O. General Provisions**

1.   Any practice or procedure set forth herein may be varied by agreement of the Parties or Court order.

2.   **Good Faith Resolution of Disputes**.  Should any Party subsequently determine in good faith that it cannot proceed as required by this ESI Protocol or that the ESI Protocol requires modification, the Parties will meet and confer to resolve any dispute at least fourteen days before seeking Court intervention.  The Parties shall make good faith efforts to comply with and resolve any differences concerning compliance with this ESI Protocol.  If a Producing Party, notwithstanding their good faith efforts, cannot comply with any material aspect of this ESI Protocol or if compliance with such material aspect would be

unreasonable, such Party shall inform the Requesting Party in writing, within a reasonable time before the date of the relevant production, as to why compliance with the ESI Protocol is impossible or unreasonable. No Party may seek relief from the Court concerning compliance with the ESI Protocol unless it has met and conferred in good faith with the affected Parties.

IT IS SO ORDERED

Dated: _____

                                       _____
                                         Hon. Rebecca R. Pallmeyer
                                         Chief Judge
                                         Northern District of Illinois, Eastern Division