UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TIKTOK INC. IN APP BROWSER PRIVACY LITIGATION<br><br>This Document Relates to: ALL ACTIONS | MDL 2948-A<br><br>Master Docket No. 24-cv-2110<br><br>Judge Rebecca R. Pallmeyer |

DECLARATION OF WARREN SOLOW

I, Warren Solow, declare:

1. I am the eDiscovery Lead for TikTok Inc. ("TTI"). In my role, I oversee e-discovery for the company. The facts set forth in this declaration are based on the knowledge and understanding developed in my capacity and experience as eDiscovery Lead and in communications with others at the company. I am over the age of 18, and if called upon to do so, I would testify competently to the facts contained in this declaration.

2. I am aware that the parties disagreed about the inclusion of the four categories of data ("Disputed Data Sources") that are the subject of this declaration while they negotiated Paragraph 2 of the draft Joint Stipulated Order Regarding the Protocol for Producing Documents and Electronically Stored Information ("ESI") ("ESI Protocol"),

1

ECF No. 104-1, 104-2. *See* Plaintiffs' Submission of Proposed ESI Protocol, ECF No. 104.[1] The Disputed Data Sources are (1) deleted, slack, fragmented, or other data only accessible by forensics, (2) server, system, or network logs, (3) data remaining from systems no longer in use that is unintelligible on the systems currently in use, and (4) backup data that is entirely duplicative of data that can be collected from reasonably accessible sources located elsewhere.

3. I understand that the agreed-upon relevant time period for discovery in this matter is January 1, 2019 or July 1, 2019 (depending on the subject matter of the request) through February 1, 2023.

4. I understand that TTI has agreed to produce responsive, non-privileged custodial documents (subject to TTI's objections to the relevant requests) from 13 custodians, as well as certain relevant source code and Lark documents identified other than through custodial collections ("In-Scope Discoverable Data").

**Deleted, Slack, Fragmented, or Other Data Only Accessible by Forensics**

5. This category of Disputed Data typically refers to data located in the unallocated space on a computer's hard drive. Unallocated space consists of bytes (1s and 0s) that may once have been part of an active file accessible by the operating system, such as when a user finds and opens it from a folder, but have since been deleted, including from the recycle bin. *See* Decl. of Jonathan M. Redgrave ("Redgrave Decl.") ¶ 29 (Mar. 25, 2025).

---

[1] I understand that TTI did not stipulate to the ESI Protocol prior to its entry by the Court on February 24, 2025 (ECF No. 107).

2

6. I understand that, because the operating system no longer tracks these bytes, they are (a) not accessible to an ordinary user; and (b) considered by the operating system as computer memory that is available for overwriting with active data, and thus subject to constant overwriting during normal use. *See* Redgrave Decl. ¶ 29.

7. TTI has a vast network of computers, servers, and databases. Deleted, slack, fragmented, and similar data accessible by forensics exists for approximately 190,000 systems and applications, along with an estimated 220,000 devices such as phones, computers, and laptops.

8. Discovery of this data would be a resource-intensive and costly endeavor, and may not be successful (e.g., certain of the data may have been overwritten as reflected above in paragraph 6). For example, I am aware that recovery of data from a single, one terabyte hard drive may cost approximately $35,000 and necessitate as much as one week to image the drive, carve out the data from the deleted, slack and fragmented space of that drive, and process it.

### Server, System, or Network Logs

9. Server, system, or network logs are examples of data that are typically short-lived, and I understand that they are not usually retained for litigation. *See* Redgrave Decl. ¶ 30.

10. Such logs document numerous and varied activities and events on servers, operating systems, and networks, capturing information such as data transfers, error messages, login attempts, configuration changes, and access details. They may be

3

employed by various systems to generate alerts, produce reports, and monitor performance. *See* Redgrave Decl. ¶ 30.

11. TTI maintains more than approximately 160,000 internal application and network systems, each of which could generate various logs that are necessary for its systems to function. Generally, these logs serve different purposes, are generated by different systems, and track high volumes of data.

12. I understand that Plaintiffs have not articulated which type of server, system, or network log they believe may contain potentially responsive information beyond their reference to "preservation logs" at the February 19, 2025, conference. Hr'g Tr. 23:10 (ECF No. 106).

13. I do not know what "preservation logs" Plaintiffs may be referring to. TTI does not currently maintain server, system, or network logs that would be described as "preservation logs," as I interpret the plain language used by Plaintiffs.

**<u>Data Remaining from Systems No Longer in Use That Is Unintelligible on the Systems Currently in Use</u>**

14. Data that cannot be interpreted or accessed using current TTI systems presents significant challenges because I understand that TTI has approximately 30,000 legacy systems (i.e., those that are no longer in use and data from which is unintelligible on systems currently in use, *see* Redgrave Decl. ¶ 28).

15. Such "unintelligible" data would have to be rendered intelligible, which would be a substantial undertaking, involving specialized technical expertise, time, software development and significant costs.

4

16. The estimation of time and cost associated with this undertaking is contingent upon various factors, including the age, size, and structure of the system in question. From a cost standpoint, I understand that legacy restoration projects can vary significantly, from costs of approximately $10,000 per system for a simpler restore, and costs in excess of $50,000 for more complicated ones. Assuming each of TTI's 30,000 legacy systems was simple to restore and even capable of restoration, which is a pure assumption, the costs of restoring them all would likely approach $300,000,000.

**Backup Data That Is Entirely Duplicative of Data That Can Be Collected from Reasonably Accessible Sources Located Elsewhere**

17. TTI's backup systems are primarily for disaster recovery, which I understand is a purpose that is aligned with industry standards, such as NIST SP 800-209, which states that backup systems are designed for short-term recovery, not for long-term legal preservation or compliance use cases. *See generally* Ramaswamy Chandramouli & Doron Pinhas, Nat'l Inst. of Standards & Tech., *Security Guidelines for Storage Infrastructure*, NIST Special Publ'n 800-209 (Oct. 2020), https://doi.org/10.6028/NIST.SP.800-209.

18. Requiring TTI to preserve this data would entail deploying a team of full-time investigators to assess TTI's backup environment, which backs up approximately 100 petabytes daily. Investigating daily backups of 100 petabytes would be time-consuming and burdensome because TTI would need to sift through and restore enormous volumes of data, most of which are likely to be unrelated to this matter.

19. Backup data is particularly burdensome to preserve because it commingles data from various sources. TTI's backup data is not stored in custodial files. Targeted, custodial-based retrieval efforts from backup sources would likely require TTI to retain a team of backup specialists who, in turn, would need to develop custom search methodologies to identify backup data for preservation. Such an effort will almost certainly add disproportionate time and cost to TTI's discovery process.

20. At TTI, this burden would be exacerbated by the fact that backup data is typically stored in compressed, system-oriented formats, making it unsuitable for search, retrieval, or legal discovery.

21. This process, along with the associated cost and time, is unnecessary, since the language pertaining to this Disputed Data Source applies <u>exclusively</u> to duplicate data that can also be collected from reasonably accessible sources outside the backup environment. Those reasonably accessible sources, as made clear by the plain language describing this Disputed Data Source, would be less costly and burdensome to pursue for discovery purposes, and would contain the same data.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, true and correct.

Executed this 31st day of March 2025, in New York, NY.

By: *[signature]*
Warren Solow