UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| IN RE: TIKTOK INC. IN APP BROWSER PRIVACY LITIGATION | MDL 2948-A  Master Docket No. 24-cv-2110  Judge Rebecca R. Pallmeyer |
|---|---|

**DECLARATION OF JONATHAN M. REDGRAVE**

I, Jonathan M. Redgrave, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I have been retained to prepare this expert declaration on behalf of TikTok, Inc. ("TTI"), in connection with the above-referenced case.

2. I am an adult, over the age of 21 years, and competent to testify.

3. The opinions herein are based on my education, experience, and training.

**EXECUTIVE SUMMARY**

4. I have been asked to provide an opinion on: (a) industry customs, practices, and standards for preservation of electronically stored information (ESI), including the expected scope of preservation obligations in the context of litigation; and (b) the industry customs, practices, and standards regarding implementation of preservation steps associated with an ESI Protocol recently entered by the Court.

5. Industry customs, practices, and standards have developed over time to account for what is technologically possible and what is practical to expect of litigants (especially business organizations) regarding preservation duties. Informed by these considerations, these customs, practices, and standards reflect that litigants should take steps that are reasonable and proportional in each given matter to preserve from sources of ESI that have been identified as reasonably likely

to contain discoverable evidence for that matter. The customs, practices, and standards for business organizations who are litigants do not require an organization to preserve or "freeze" all sources of ESI across a company regardless of the remoteness of the prospect that a source or type of data could contain discoverable evidence.

6. It is customary for business organizations in litigation to: (a) identify individual custodians believed to possess ESI that is likely to be relevant and discoverable, based on an evolving investigation of the facts throughout the litigation; (b) identify other sources of ESI likely to be relevant and discoverable that are non-custodial, i.e., are managed at an enterprise rather than an individual level; and (c) take reasonable and proportionate steps to preserve likely relevant and discoverable ESI from those sources.

7. Absent unusual circumstances, reasonable and proportionate steps generally are limited to ESI that is active and reasonably accessible. In this context, extraordinary steps customarily are not undertaken, including but not limited to preserving: (a) deleted, slack, fragmented, or other data only accessible by forensics; (b) server, system, or network logs; (c) data remaining from systems no longer in use that is unintelligible on the systems currently in use[1]; and (d) back-up data that is entirely duplicative of data that can be collected from reasonably accessible sources located elsewhere ("Disputed Data Sources").[2] *See* Document No. 104-1: 2–3 (Plaintiffs' Proposed "Joint Stipulated Order Regarding The Protocol For Producing Documents And Electronically Stored Information ('ESI')"). Many authorities set forth the presumption that such

---

[1] These are frequently referred to as "legacy systems."

[2] *See*, e.g., Seventh Circuit Electronic Discovery Pilot Program ("Seventh Circuit Pilot Program"), Report on Phase One, May 20, 2009 – May 1, 2010 ("Pilot Program Report"), https://www.ca7.uscourts.gov/7thCircuit_ElectronicDiscovery.pdf, Principle 2.04(d) (identifying categories of ESI that are generally not discoverable in most cases).

steps are normally beyond the scope of reasonable and proportionate preservation, such as the Seventh Circuit Pilot Program materials which reflect:

> The following categories of ESI generally are not discoverable in most cases, and if any party intends to request the preservation or production of these categories, then that intention should be discussed at the meet and confer or as soon thereafter as practicable: (1) "deleted," "slack," "fragmented," or "unallocated" data on hard drives; (2) random access memory (RAM) or other ephemeral data; (3) on-line access data such as temporary internet files, history, cache, cookies, etc.; (4) data in metadata fields that are frequently updated automatically, such as last-opened dates; (5) backup data that is substantially duplicative of data that is more accessible elsewhere; and (6) other forms of ESI whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course of business.[3]

8. Extraordinary steps such as those contemplated by paragraph 7 are undertaken only when special circumstances exist and reveal a specific and articulable need to take such additional steps. An example of such a case would be a theft of trade secrets matter where former employees surreptitiously copied and stole documents from the former employer, and forensic analysis of data is necessary to ascertain source and data transfers.

9. In stark contrast, in a case like this where no such special circumstances appear to be present, Plaintiffs nonetheless pursue via the scope of the proposed preservation portion of the recent ESI Protocol the very kinds of ESI that the Seventh Circuit Pilot Program would generally exempt from discovery, including, in particular, backup data that are *entirely duplicative* of more accessible data.

10. Indeed, many authorities (such as the Seventh Circuit Pilot Program) specifically warn against entry of such "laundry list" orders as being counterproductive, and violative of the concepts of reasonableness and proportionality, because they "do not promote the just, speedy, and

---

[3] Pilot Program Report, Principle 2.04(d).

inexpensive resolution of the case and are not reasonably designed to identify relevant categories or sources of information."[4]

## QUALIFICATIONS

11. I graduated *cum laude* from the University of Notre Dame in 1988 with a Bachelor of Arts degree in Economics and Government and International Relations. I received my juris doctor *cum laude* from the University of Minnesota Law School in 1991.

12. I am a partner at the law firm of Redgrave LLP, a firm that focuses on Information Law, which includes information governance, records and information management, data protection and privacy issues, as well as the discovery of ESI or eDiscovery.

13. I am currently an attorney licensed to practice law in the State of Minnesota, the District of Columbia, and the Commonwealth of Virginia.

14. My *curriculum vitae* is attached as Appendix A. As set forth in Appendix A, I have extensive experience and recognition in the field of eDiscovery and information management. This includes prior appointments as a Special Master, Assistant to a Special Master, and expert neutral in various high-profile cases, including serving as a Special Master to the Honorable Shira A. Scheindlin in *Abu Dhabi Commercial Bank v. Morgan Stanley*, No. 08 Civ. 7508 (SAS) (S.D.N.Y.). My contributions include membership on various boards and working groups, such as the Advisory Board of the American College of e-Neutrals (ACESIN) and The Sedona Conference®, where I served as the founding Chair of Working Group 1 on best practices for electronic document retention and production. I have authored or co-authored over fifty publications and participated in more than 150 educational seminars nationally and internationally on eDiscovery and related topics. Throughout my career, I have worked across various industries,

---

[4] *See* Pilot Program Report, Committee's Reasoning for Principle 2.03.

4

including social media, and have received consistent recognition for my expertise, including top-tier rankings in *Chambers USA: America's Leading Lawyers for Business* in the area of Electronic Discovery since 2008. My specialized knowledge spans the evolution of eDiscovery technology, corporate best practices, and the development of business processes to support compliance.

15. My opinions expressed in this declaration rely on my education, training, professional experience, and my knowledge of evolving legal standards, emerging best practices, and the development of typical policies, processes, technologies, and approaches implemented by large organizations in the areas of litigation response and eDiscovery.

16. I previously have provided opinions related to the management of ESI and electronic discovery issues in civil litigation as an expert witness in the matters listed in Appendix A, at 3–4.

## BACKGROUND

17. It is my understanding that the claims and defenses in this matter focus on how TTI's in-app browser handles user data when users access external websites.

18. The Court entered a Joint Stipulated Order Regarding The Protocol For Producing Documents And Electronically Stored Information (ESI"), dated February 24, 2025 ("As-Entered ESI Protocol") following a hearing on a disputed ESI protocol.[5] The As-Entered ESI Protocol provided that "[t]he Parties shall make *reasonable* efforts to preserve documents and ESI *relevant* to the claims and defenses in the matter, and *proportional* to the needs of this Action" (emphasis added). These notions of relevance and proportionality, as affirmed and underscored by Fed. R. Civ. P. 26(b)(1), are the twin touchstones of discovery.

---

[5] The As-Entered ESI Protocol was entered as "Stipulated" although it is my understanding that portions of it were disputed by TTI.

5

19. The As-Entered ESI Protocol also provides opportunities to meet and confer and seek judicial resolution, if necessary, as the Parties continue to discuss the actual scope of discovery in the case.

## OPINIONS

### I.

### Reasonableness And Proportionality Are The Standard For Preservation

20. Reasonableness and proportionality are the standard for preservation of ESI, pursuant to which parties customarily analyze the scope of their duty to preserve in the context of the claims and defenses of which they are aware at the time. It is customary and reasonable that a defendant would undertake reasonable and proportional efforts, in targeted fashion, to preserve information only from sources that the company has identified as likely to contain relevant and discoverable information based on the company's reasonable understanding of the claims articulated in a complaint and the defenses to the complaint.

21. Authorities addressing the extent of a party's duty to preserve reflect the reality of industry customs, standards, and practices. Courts often repeat the maxim that "perfection is not the standard" for a party's evidence preservation and discovery efforts, recognizing that it is neither realistic nor required that a party flawlessly execute its identification, preservation, collection, processing, review, or production of documents.[6] As the Honorable Shira A. Scheindlin, author

---

[6] *See,* e.g., Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment ("Due to the ever-increasing volume of electronically stored information and the multitude of devices that generate such information, perfection in preserving all relevant electronically stored information is often impossible… This rule recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection."); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F.Supp.2d 456, 461 (S.D.N.Y. 2010) ("In an era where vast amounts of electronic information is available for review, discovery in certain cases has become increasingly complex and expensive. Courts cannot and do not expect that any party can meet a standard of perfection"), *abrogated in part by Chin v. Port Authority of New York & New Jersey*,

of the seminal *Zubulake* decisions, the Honorable George C. Hanks, Jr., and I wrote in a book chapter we co-authored:

> The law requires business organizations to take reasonable and good faith steps to preserve ESI when litigation arises or is anticipated, ***yet courts recognize that perfection is not the standard***. Businesses should not be paralyzed by the fear of not being able to implement the perfect preservation program. Instead, businesses should examine their litigation response procedures and assess whether those procedures are reasonable and defensible if challenged….[7]

22. That a party need undertake only "reasonable" and "good faith" efforts to preserve information is one of the core principles of The Sedona Conference's Best Practices, Recommendations & Principles for Addressing Electronic Document Production:[8]

> The obligation to preserve electronically stored information requires reasonable and good faith efforts to retain information that is expected to be relevant to claims or defenses in reasonably anticipated or pending litigation. However, it is

---

685 F.3d 135 (2d Cir. 2012); *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010) ("Whether preservation or discovery conduct is acceptable in a case depends on what is reasonable, and that in turn depends on whether what was done—or not done—was proportional to that case and consistent with clearly established applicable standards. As Judge Scheindlin pointed out in Pension Committee, that analysis depends heavily on the facts and circumstances of each case and cannot be reduced to a generalized checklist of what is acceptable or unacceptable.") (emphasis in original); *Agerbrink v. Model Service LLC*, No. 14 Civ. 7841, 2017 WL 933095, at *5 (S.D.N.Y. Mar. 8, 2017) ("The standard for evaluating discovery is reasonableness, not perfection."); *Marten Transp., Ltd. v. Platform Avert, Inc*., No. 14-cv-02464-JWL-TJJ, 2016 WL 492743 (D. Kan. Feb. 8, 2016) ("The Court will not use a 'perfection' standard or hindsight in determining the Plaintiff's duty to preserve ESI."); Hon. Craig B. Shaffer, "Defensible" by What Standard?, 13 SEDONA CONF. J. 217, 222 (2012) ("While a defensible e-discovery plan is not held to a standard of perfection, [Fed. R. Civ. P. 34] does require a party to undertake reasonable efforts to identify and produce responsive, non-privileged material in its possession, custody or control."); *see also Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*, No. 03 C 9421, 2008 WL 4876845, at *2 (N.D. Ill. June 16, 2008) ("There is no such thing as perfect discovery and this case is no exception."); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape? The answer is clearly, 'no.' Such a rule would cripple large corporations…").

[7] Hon. Shira A. Scheindlin, Hon. George C. Hanks, Jr. & Jonathan M. Redgrave, 33 Business & Commercial Litigation in Federal Courts § 33:8 (5th ed. 2021) (emphasis added).

[8] The Sedona Conference is a nonprofit legal policy research and educational organization which sponsors Working Groups on issues of law, including eDiscovery and the duty to preserve. Working Groups generally consist of judges, attorneys, and experts whose real-world experience informs their recommendations. The work of the Sedona Conference thus reflects industry customs, standards, and practices, and other authorities routinely rely on the Sedona Conference to ensure, among other things, that decisions account for practical considerations.

unreasonable to expect parties to take every conceivable step or disproportionate steps to preserve each instance of relevant electronically stored information.[9]

23. Of note, proportionality was emphasized in the 2015 amendments to Federal Rule of Civil Procedure 26, which was amended to define discoverable information as that which was not only "relevant to any party's claim or defenses" but also "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[10]

## II.
## Extraordinary Measures
## Generally Are Not Required

24. The Sedona Conference[11] published guidelines limiting discovery of ESI (including preservation) to "reasonably accessible" sources. Principle 9 of The Sedona Conference Principles explicitly states "[a]bsent a showing of special need and relevance, a responding party

---

[9] *See* Sedona Principles, Third Edition at 93.

[10] Fed. R. Civ. P. 26(b)(1); *see also* Hon. Elizabeth D. Laporte & Jonathan M. Redgrave, Hon. Elizabeth D. Laporte, Jonathan M. Redgrave, A Practical Guide to Achieving Proportionality Under New Federal Rule of Civil Procedure 26, 9 Fed. Cts. L. Rev. 19, 52 (2015).

[11] Sedona Principles, Third Edition, Principle 9; *see also* The Sedona Conference Commentary on Preservation, Management and Identification of Sources of Information that are Not Reasonably Accessible, 10 Sedona Conf. J. 281, 288 (2009) (although "[t]he Federal Rules do not define 'not reasonably accessible' other than to caution that it turns on the presence or absence of 'undue burden or cost…deleted information whose fragments remain only accessible by forensics" was one type of information deemed not to be reasonably accessible without undue burden or cost.).

should not be required to preserve, review, or produce deleted, shadowed, fragmented, or residual electronically stored information."[12] Many courts have published similar guidelines.[13]

25. Indeed, Sedona Principle 5 further expounds on the kinds of preservation obligations that are not reasonable to impose upon a party, including observing that "[c]onsistent with the generally applicable principles of proportionality . . . a party need not preserve multiple or duplicative copies of the same relevant ESI."[14]

26. This focus on reasonableness and proportionality is featured prominently in the Seventh Circuit Pilot Program materials.[15] Courts and commentators recognize the Seventh

---

[12] Sedona Principles, Third Edition, Principle 9; *see also* 10 Sedona Conf. J. 281, 288 (2009) (although "[t]he Federal Rules do not define 'not reasonably accessible' other than to caution that it turns on the presence or absence of 'undue burden or cost…deleted information whose fragments remain only accessible by forensics" was one type of information deemed not to be reasonably accessible without undue burden or cost); *see also* N.D. Cal. Guidelines for the Discovery of Electronically Stored Information, Guideline 2.01(b) ("[i]n determining what ESI to preserve, parties should apply the proportionality standard referenced in Guideline 1.03); D. Colo. Guidelines Addressing the Discovery of Electronically Stored Information, Commentary 3.6 (in general, the volume of and ability to search ESI means that most parties' discovery needs will be satisfied from reasonably accessible data"); *see also* Eastern District of Michigan Model ESI discovery order (mirroring the Seventh Circuit Pilot Program Rule 2.04(d)).

[13] *See,* e.g. the Northern District of California's Guidelines for the Discovery of Electronically Stored Information, Guideline 2.01(b) ("[i]n determining what ESI to preserve, parties should apply the proportionality standard referenced in Guideline 1.03); the District of Colorado's Guidelines Addressing the Discovery of Electronically Stored Information, Commentary 3.6 (in general, the volume of and ability to search ESI means that most parties' discovery needs will be satisfied from reasonably accessible data"); the Eastern District of Michigan Model ESI discovery order (mirroring the Seventh Circuit Pilot Program Rule 2.04(d)); the District of Delaware's Default Standard for Discovery, Including for Electronically Stored Information, Schedule A (identifying categories of ESI that need not be preserved); the District of Kansas's Guidelines for Cases Involving ESI, Guideline 24(c) ("[e]lectronic searches of information identified as not reasonably accessible should not be conducted until the initial search has been completed, and then only by agreement of the parties or pursuant to a court order. Requests for electronically stored information that is not reasonably accessible must be narrowly focused with good cause supporting the request.").

[14] *See* Sedona Principles, Third Edition at 94.

[15] As the Court is no doubt aware, the Seventh Circuit Pilot Program originated in the Northern District of Illinois. The purpose of the program was specifically to "develop, implement, evaluate, and improve pretrial litigation procedures that would provide fairness and justice to all parties while seeking to reduce the cost and burden of electronic discovery consistent with Rule 1 of the Federal Rules of Civil Procedure." Seventh Circuit Pilot Program Report, p. 1.

9

Circuit Pilot Program materials as a source of truth for eDiscovery customs, practices, and standards informed by real world experience, like the materials from The Sedona Conference.[16] Notably, the Committee's Reasoning for Pilot Program Principle 2.04(a) provides that "the scope of preservation is subject to the limits of reasonableness and proportionality. Furthermore, the scope of preservation is limited to that which is 'discoverable,' a term which incorporates all of the various limitations on discovery in the Federal Rules of Civil Procedure."

27. The Seventh Circuit Pilot Program materials also direct that absent unique and specific circumstances suggesting otherwise in a particular case as to a particular source(s), "reasonable steps" presumptively do not include preserving sources of ESI that require extraordinary affirmative measures that are not utilized in the ordinary course of business. Such sources include but are not limited to, deleted, slack, fragmented and unallocated data; random access memory (RAM) or other ephemeral data; on-line access data such as temporary internet files, history, cache, cookies, etc.; data in metadata fields that are frequently updated automatically, such as last-opened dates; backup data that is substantially duplicative of data that is more

---

[16] *See*, e.g., *LKQ Corp. v. Kia Motors America, Inc*., 345 F.R.D. 152, 162 (N.D. Ill. 2023) ("To address disputes regarding ESI, many courts have also turned to the Sedona Principles and Sedona Commentaries, which are 'the leading authorities on electronic document retrieval and production.' *DeGeer v. Gillis*, 755 F. Supp. 2d 909, 918 (N.D. Ill. 2010) (cleaned up). The Sedona Principles provide the best practices, recommendations, and principles for addressing electronic document production. *See* The Sedona Conference, The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1 (2018). Courts often look to the Sedona Principles in the context of ESI discovery for particularized discovery issues. *See*, e.g., *Gross v. Chapman*, No. 19 C 2743, 2020 WL 4336062, at *2 (considering the principles of the Sedona Conference in the context of discovery on discovery); *AOT Holding AG v. Archer Daniel Midland Co.*, No. 19-2240, 2021 WL 6118175, at *4 [(C.D. Ill. Sept. 3, 2021)] ('the comments to Sedona Conference Principle 6 are instructive')."); *City of Rockford v. Mallinckrodt ARD, Inc.*, 326 F.R.D. 490, 492 n. 2 (N.D. Ill. 2018) ("A good way for attorneys to increase their competency and comfort level with ESI is to review the educational materials available from the Seventh Circuit's Electronic Discovery Pilot Program. See www.discoverypilot.com. Attorneys can also familiarize themselves with ESI terms by referring to the Grossman-Cormack Glossary of Technology-Assisted Review. 7 Fed. Cts. L. Rev. 1 (2013); *see also* The Sedona Conference Glossary: E-Discovery & Digital Information Management, 15 Sedona Conf. J. 305 (2014).").

accessible elsewhere; and other forms of ESI whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course of business.[17]

### III.

### Plaintiffs Make No Showing Of Need For The Extraordinary Measures Associated With The Disputed Data Sources

28. I have seen no showing by Plaintiffs of circumstances that would suggest a need for the extraordinary preservation steps associated with: (a) deleted, slack, fragmented, or other data only accessible by forensics; (b) server, system, or network logs; (c) data remaining from systems no longer in use that is unintelligible on the systems currently in use (also known as "legacy data"); and (d) back-up data that is entirely duplicative of data that can be collected from reasonably accessible sources located elsewhere.

29. ***Deleted, slack and fragmented data, or other data only accessible by forensics.*** This generally refers to data in the unallocated space on a hard drive of a computer. Unallocated space are bytes (1s and 0s) that may once have been part of an active file that the operating system could recall, such as when an ordinary user finds it in a folder and opens it, but that has been deleted, including from the recycle bin. The operating system no longer tracks those 1s and 0s so they are: (a) not discoverable to an ordinary user; and (b) deemed by the operating system as available to be overwritten with active data (and therefore subject to constant overwriting in normal use). A forensic investigator using specialized forensic software tools and techniques, sometimes called "carving" data, can access these types of data and resurrect files, parts of files or other data that still resides in the unallocated space. Such extraordinary forensic discovery is called for only

---

[17] *See,* e.g., Seventh Circuit Pilot Program, Principle 2.04(d) (identifying categories of ESI that are generally not discoverable in most cases).

11

under special circumstances, such as when a particular employee or former employee is reasonably suspected of having tried to destroy files on her hard drive that evidence misconduct.[18]

30. **Server, system or network logs.** These are examples of data that are often ephemeral and temporary and are not normally preserved for litigation purposes. Such logs record activities and events that occur on servers, operating systems and networks. They capture details like data transfers, error messages, login attempts, configuration updates, access, etc. These logs can be utilized by various systems to generate alerts, create reports, and monitor performance. While these logs are essential for maintaining system health and security, they are routinely overwritten because they are of only temporary value and storing them indefinitely would overwhelm storage capacity and degrade performance. It would be an extraordinary step to preserve such logs, which would be triggered only by specific circumstances indicating a unique need for such evidence in a given case. An example would be where system logs are the *only* evidence of activity that is at the heart of the case.[19]

31. ***Data remaining from systems no longer in use that is unintelligible on the systems currently in use.*** Because technology is constantly evolving companies are always retiring older technology that is obsolete, which can lead to the existence of legacy data that is unintelligible on systems currently in use. Accessing legacy data requires extraordinary measures, if it can be

---

[18] *See, e.g.*, *Coburn v. PN II, Inc.*, No. 2:07–cv–00662, 2008 WL 879746, * 3 (D. Nev. March 28, 2008) (ordering court appointed forensic examiner to make a "copy" or "mirror image" of party's hard drive due to credible allegations such forensics would reveal former employee stole trade secrets).

[19] *See* Sedona Principles, Third Edition at 180 (preserving "system logs" is an "extraordinary preservation measure" only appropriate where "it is reasonably foreseeable that system-generated metadata contains unique evidence that likely is material to the claims and defenses involved in the matter" (footnote omitted)).

accessed at all. Such measures might be reasonable and proportional if the legacy data is crucial to the fair resolution of the dispute.[20]

32. ***Back-up data that is entirely duplicative of data that can be collected from reasonably accessible sources located elsewhere.*** This typically refers to data that duplicates active data and can be used to restore active systems in the event of a disaster. Plaintiffs seek preservation and discovery of back-up data that is "entirely duplicative of data that can be collected from reasonably accessible sources located elsewhere." This is inconsistent with Sedona Principle 5's teaching that "[c]onsistent with the generally applicable principles of proportionality a party need not preserve multiple or duplicative copies of the same relevant ESI."[21] In my experience, backup data is subject to discovery only when it is shown to actually or likely contain *unique* ESI that is important to the fair resolution of the dispute, and even then is subject to limitations.[22] If there exists any theoretical situation in which there would be a legitimate need for "entirely duplicative" back-up data, I am not aware of a showing by Plaintiffs to preserve it.

---

[20] *See, e.g.*, *King v. National General Ins. Co.*, No. 15-cv-00313, 2023 WL 3002692, *1, 3 (N.D. Cal. April 18, 2023) (ordering "retrieval" of legacy data because the "legacy systems" contained unique policyholder data "essential to demonstrate that rates and corresponding damages can be calculated for the entire class").

[21] *See* Sedona Principles, Third Edition at 94.

[22] In *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 289 (S.D.N.Y. 2003), discovery was permitted into backup tapes after determining that "[t]here is plainly relevant evidence that is only available on UBS's backup tapes" which might include "indispensable evidence.").

13

## IV.
## Conclusion

33. There is nothing in the As-Entered 2025 ESI Protocol, any communication I have seen from Plaintiffs, or in the nature of the claims and defenses in this matter, that indicates a need for extraordinary preservation steps (such as those identified above) in this matter.

Executed on March 31, 2025

*Jonathan M. Redgrave*
Jonathan M. Redgrave